**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN Re UBS AG SECURITIES LITIGATION | MASTER FILE NO. 1:07-CV-11225-RJS |

## CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

**SCHIFFRIN BARROWAY TOPAZ**
**& KESSLER, LLP**
Gregory M. Castaldo
Andrew L. Zivitz
Sharan Nirmul
Naumon A. Amjed
Jennifer L. Keeney
Richard A. Russo, Jr.
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

**GRANT & EISENHOFER, P.A.**
Jay W. Eisenhofer
Geoffrey C. Jarvis
Charles T. Caliendo
Brenda F. Szydlo
485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8500
Fax: 646-722-8501

**COUGHLIN STOIA GELLER**
**ROBBINS & RUDMAN, LLP**
Robert M. Rothman
58 South Service Road
Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173

**MOTLEY RICE, LLP**
Joseph S. Rice
William H. Narwold
Gregg S. Levin
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450

*CO-LEAD COUNSEL FOR LEAD PLAINTIFFS AND THE CLASS*

**TABLE OF CONTENTS**

I.    SUMMARY OF THE ACTION .................................................................... 2

    A.    UBS's Drive to Become the World's Most Profitable Investment Bank ............... 4

    B.    The Creation of DRCM ............................................................. 7

    C.    The Defendants Conceal Massive Losses at DRCM ............................. 9

    D.    UBS Closes DRCM to Avoid Disclosures about its Losses ................... 12

    E.    UBS's Inexperienced IB Replicated DRCM's Subprime-Backed Positions and Their Resulting Losses Were Also Concealed From Investors ........................... 14

    F.    UBS Places A $100 Billion Wager on Subprime in Flagrant Disregard of Risk Controls ........................................................................ 16

    G.    Defendants Knew That UBS Had Accumulated a $100 Billion Subprime and Alt-A Mortgage-Backed Asset Portfolio And That It Was Materially Over-Valued.. 20

    H.    UBS's $38 Billion Asset Write-Down .................................... 22

    I.    The Fallout at UBS:  Terminations and Governmental Investigations ............... 24

    J.    The UBS Shareholder Report ........................................... 26

    K.    UBS's Fraud Extends Beyond the Subprime Debacle .................... 27

        1.    Defendants Conceal UBS's Multi-Billion Dollar Exposure to Auction Rate Securities ("ARS") ........................................... 27

        2.    UBS Counseled its U.S.-based Clients to Evade U.S. Tax Laws ............. 29

II.    JURISDICTION AND VENUE ............................................................ 30

III.    PARTIES ................................................................................. 31

    A.    Plaintiffs ..................................................................... 31

    B.    The Corporate Defendant ............................................. 32

    C.    The Individual Defendants ........................................... 33

    D.    The Confidential Witnesses Cited Throughout the Complaint ............... 40

**IV.**    UBS's ORGANIZATIONAL STRUCTURE ................................................. 43

**V.**    CONTROL PERSON ALLEGATIONS/GROUP PLEADING ...................................... 44

**VI.**    BACKGROUND .................................................................... 46

    **A.**    The U.S. Mortgage Crisis ................................................... 46

        **1.**    The Explosion of Fixed Income Instruments Collateralized by U.S. Residential Mortgages ................................................. 47

        **2.**    Cash CDOs ................................................................ 51

        **3.**    Synthetic CDOs ........................................................... 55

    **B.**    The Value of Fixed Income Securities Based on RMBS Were Sensitive to the Performance of the Underlying Pools of Mortgages ............................ 57

    **C.**    Indicators That Mortgage Markets Were Deteriorating by Early 2006 .............. 59

**VII.**    THE DEFENDANTS' FRAUDULENT SCHEME ........................................... 66

    **A.**    UBS Publicly Claims to Improve Its Internal Controls Following the Long Term Capital Management Crisis and UBS's Merger with SBC .................. 66

    **B.**    UBS Publicly Purports to Implement New Risk Management Policies and Controls to Prevent the LTCM Debacle From Reoccurring ....................... 68

    **C.**    UBS Privately Casts Aside Its Internal Controls in a Renewed Effort to Become an Investment Banking Powerhouse ..................................... 70

        **1.**    U.S. Mortgage-Backed Securities Secretly Became the Backbone of UBS's Investment Banking Growth Plan ................................... 72

        **2.**    UBS Launches DRCM in June 2005 as an Internal Hedge Fund to Pursue U.S. Fixed Income Investments Backed by U.S. Subprime Residential Mortgages ............................................................... 74

        **3.**    The Appointment of Costas, Hutchins and Karl as DRCM's Leadership 75

        **4.**    DRCM Takes Control of the IB's Real Estate Business ...................... 76

        **5.**    Risk Management Controls for DRCM ....................................... 79

        **6.**    UBS Secretly Doubles-Down on Fixed Income by Simultaneously Ramping-up Its IB With Personnel Inexperienced to Handle the Risks... 81

**7.**      The IB's External Consultant's Report Identified UBS's Fixed Income Business as the Company's Biggest Competitive Gap ............................ 84

**8.**      The IB's Fixed Income Growth Strategy is Privately Endorsed by UBS's Global Executive Management Group Despite the Group's Concerns About Internal Controls ............................................................................. 85

**D.**      DRCM and FIRC Secretly Take on Enormous Risks as They Focus on Subprime and Alt-A Mortgage-Backed Assets as Their Principal Investment and Trading Strategy ........................................................................................ 88

**1.**      DRCM's Trading Strategies Emphasize Immediate Profits at the Expense of Exposing UBS to Enormous Market Risks .......................................... 88

**2.**      The IB Privately Adopts an Equally Risky Strategy of Originating Subprime-Backed Mezzanine CDOs and Retaining the Resulting Super Senior Tranches ........................................................................................ 89

**E.**      UBS Risk Managers and Traders Within IB and DRCM Manipulated Risk Control Indicators to Conceal the True Risks to Which UBS was Exposed ........ 96

**1.**      VaR as an Externally Reported Indicator of UBS's Risk ......................... 97

**2.**      DRCM and IB Employees Manipulated VaR to Conceal the True Market Risks to Which UBS Was Exposed .......................................................... 99

**3.**      Tier 1 Capital Ratio as an External Indicator of Risk ............................ 102

**4.**      A $1.31 Billion Credit Default Swap Transaction Between UBS and a Hedge Fund Restricted to a $40 Million Investment Evidences Defendants' Deceit ................................................................................. 105

**F.**      UBS Concealed the True Value of Its Subprime Exposure by Manipulating Its Asset Valuations Throughout the Class Period ................................................. 107

**1.**      UBS's Valuation Policies During the Class Period ................................ 107

**2.**      External Market Conditions Required UBS to Adjust Its Carrying Values of Its Assets ............................................................................................ 109

**3.**      Internal Events Required UBS to Markdown the Carrying Value of its Assets Beginning in Q1 2007 ................................................................ 111

**a)**      The Eventual DRCM Write-downs ............................................ 112

**b)** Defendants Publicly Acknowledged UBS's Exposure to Losses in the Subprime and Alt-A Mortgage Market ................................. 115

**c)** Defendants Had Actual Knowledge of the Impairment of UBS's Subprime Alt-A Mortgage-Backed Assets as Early as April 2007 Due to UBS's Secret Audit of DRCM and the IB ...................... 118

**d)** UBS's Closing of DRCM and the Termination of UBS Executives Concealed From the Market That the Carrying Values of UBS's Subprime and Alt-A Mortgage-Backed Assets Were Materially Inflated ...................................................................................... 120

**VIII.** DEFENDANTS LEAK OUT THE TRUTH IN STAGES ............................................ 123

**A.** UBS Selectively Disclosed News Relating to Its Potential Subprime And Alt-A Exposure While Downplaying the True Impact on Its Financials ..................... 123

**B.** Additional Write Downs Continue to Reveal the Extent of UBS's Fraud and Necessitate Further Capital-Raising Plans .......................................... 129

**C.** UBS is Compelled by Swiss Authorities to Explain the Reasons for Its Write-downs in a Shareholder Report .......................................................... 131

**IX.** UBS's Fraud Extends Beyond the Acquiring Subprime and Alt-A Mortgage-Backed Securities .................................................................................................... 140

1. Defendants Conceal UBS's Multi-Billion Dollar Exposure to Auction Rate Securities ...................................................................................... 140

2. UBS Counseled U.S.-based Clients to Evade U.S. Tax Laws ............................ 144

**X.** FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS DURING THE CLASS PERIOD ............................................................................................ 147

**A.** Total Mix of Information Entering the Class Period .......................................... 147

**B.** Class Period Statements ................................................................................ 152

1. The 4Q 2005 Form 6-K ........................................................................ 152

2. The 2005 Annual Report ...................................................................... 156

3. 2005 Handbook ................................................................................ 168

4. 1Q 2006 Form 6-K .............................................................................. 171

v

**5.**     2Q 2006 Form 6-K ................................................................ 174

**6.**     2Q 2006 Earnings Conference Call ...................................... 177

**7.**     1H 2006 Form 6-K ............................................................... 178

**8.**     3Q 2006 Form 6-K ............................................................... 179

**9.**     4Q 2006 Form 6-K ............................................................... 184

**10.**    4Q 2006 Earnings Conference Call ...................................... 188

**11.**    The 2006 Annual Report ....................................................... 193

**12.**    2006 Handbook ..................................................................... 203

**13.**    2007 Fixed Income Investor Day .......................................... 206

**14.**    1Q 2007 Earnings Press Release and Form 6-K ................... 208

**15.**    1Q 2007 Earnings Conference Call ...................................... 212

**16.**    June 4, 2007 Risk Management Presentation ........................ 223

**17.**    2Q 2007 Form 6-K ............................................................... 225

**18.**    2Q 2007 Earnings Conference Calls ..................................... 230

**19.**    October 1, 2007 Press Release .............................................. 237

**20.**    1H 2007 Form 6-K ............................................................... 238

**21.**    October 1, 2007 Conference Call ......................................... 239

**22.**    3Q 2007 Form 6-K ............................................................... 242

**23.**    3Q 2007 Earnings Conference Calls ..................................... 244

**24.**    4Q 2007 Form 6-K ............................................................... 252

**25.**    2007 Annual Report .............................................................. 254

**26.**    April 12, 2008 Kurer Interview ............................................ 257

**XI.**    UBS'S AND THE INDIVIDUAL DEFENDANTS' SCIENTER ................................. 257

**A.** Defendants Were Specifically Informed That UBS's Valuation Methodologies Failed to Properly Value UBS's Subprime and Alt-A Mortgage-Backed Assets259

    **1.** A Senior UBS Employee Warned Defendants as Early as 2004 That UBS's Valuation Models for its ABS, CDOs and CDSs Were Improper Causing UBS's Subprime and Alt-A Mortgage-Backed Assets to be Materially Overvalued ................................................................................ 259

    **2.** A UBS Executive Admitted That UBS Applied Subjective Marks to its CDOs Positions During the Class Period ............................................... 261

    **3.** The Preliminary Results of the Secret Internal Audit of DRCM Identified Issues With UBS's Valuation of Subprime Positions............................ 262

**B.** The Write-Downs at DRCM Provide a Strong Inference of Defendants' Knowledge and Deliberate Disregard That UBS's RMBS and CDO Holdings Were Materially Overvalued During the Class Period ...................................... 264

    **1.** The March 2007 Write-Downs ............................................................... 264

    **2.** The April 2007 Write-Downs ................................................................. 267

    **3.** UBS's Secret Audit of DRCM................................................................ 268

**C.** The Circumstances Surrounding the Closure of DRCM and the OIF Provide a Strong Inference of Scienter.................................................................................. 269

**D.** UBS's Failure to Regulate the Extension of Its Low Cost Funding to the IB Throughout the Class Period is Additional Evidence of Scienter...................... 273

    **1.** UBS's Funding Policy ........................................................................... 273

    **2.** Defendants Knew or Recklessly Disregarded the Negative Effects of the Funding Policy......................................................................................... 275

**E.** The Government Investigations Launched by U.S. and Swiss Government Agencies Further Evidences Defendants' Scienter ............................................ 278

    **1.** The SEC Investigation ............................................................................ 278

    **2.** The U.S. DOJ Investigation................................................................... 280

    **3.** The SFBC Investigation.......................................................................... 281

**F.** The Termination and Resignation of Key Members of UBS's Senior Management Team and Other Participants in the Fraud is Further Evidence of Defendants' Scienter ..................................................................................................... 282

**G.** Confidential Witnesses Confirm UBS's Admitted Lack of Risk Management and Internal Controls During the Class Period ......................................................... 286

**H.** Defendants Knew of or Recklessly Disregarded Red Flags Indicating That Subprime and Alt-A Mortgage-Backed Securities Were Risky and That UBS's Valuations of These Securities Were Materially Overstated ............................. 289

    **1.** UBS Analysts Repeatedly Warned the Market of Trouble Ahead In U.S. Residential Mortgage Markets ................................................................ 290

    **2.** UBS's "Investor Optimism" Press Releases Warned That Investors Were Concerned With the Developments in the U.S. Residential Mortgage Market ................................................................................................... 291

    **3.** UBS Attempted To Mitigate Losses Associated With Defaulted Loans Beginning in 2006 ................................................................................. 293

    **4.** Mortgage Market Indices Indicated Severe Downturn in the Subprime Sector Beginning in Q4 2005 ................................................................. 295

**I.** Confidential Witnesses Confirm UBS's Knowledge of Problems in the Subprime Mortgage Market ................................................................................................. 299

    **1.** UBS Analysts Repeatedly Warned the Market of Liquidity and Valuation Concerns in the RMBS and CDO Market .............................................. 302

    **2.** UBS Received Monthly Trustee Reports from the CDO Asset Managers 310

    **3.** Publicly Reported Write-downs and Asset Sales During 1Q 2007 and 2Q 2007 Were Red Flags ........................................................................... 311

    **4.** The Decline of the ABX Index Served as a Red Flag to UBS .............. 314

**J.** Senior UBS Executives Counseled Clients to Evade U.S. Taxes ....................... 317

**K.** UBS Knowingly Accumulated and Failed to Properly Value $5.9 Billion in ARS 319

**XII.** ADDITIONAL SCIENTER ALLEGATIONS AGAINST THE INDIVIDUAL DEFENDANTS AND UBS ............................................................................... 323

    **A.** The Executive Officer Defendants .................................................................... 324

**B.** Defendants Wuffli, Rohner, Jenkins, Stuerzinger, Standish and Suter Were Responsible for Implementing UBS's Risk Management Protocols As Members of the GEB ................................................................................... 324

**C.** Defendant Ospel's and Defendant Suter's Knowledge and/or Extremely Reckless Disregard of UBS's Risk Control Deficiencies Based on Their Positions in the Chairman's Office ("ChO") ............................................. 328

**D.** The DRCM Defendants' and the IB Defendants' Knowledge and/or Extremely Reckless Disregard of the Fraud ...................................................... 330

**XIII.** UBS'S FINANCIAL STATEMENTS FAILED TO COMPLY WITH IFRS, GAAP AND SEC REGULATIONS .......................................................................... 333

**A.** Applicable Accounting Principles And SEC Regulations .................................. 334

**B.** UBS's Failure to Follow Applicable Accounting Principles Misrepresented Its Financial Appearance ..................................................................... 338

**C.** UBS's Valuation of its RMBS and RMBS CDO Related Positions Violated Applicable Accounting Principles ........................................................... 339

**D.** UBS's Disclosures Regarding Its RMBS and RMBS CDO Related Positions, And Concentrations of Risk, Violated Applicable Accounting Principles And SEC Regulations ...................................................................................... 345

**E.** UBS's Failure to Maintain Adequate Controls Over Its Financial Reporting And Disclosures Violated Applicable Accounting Principles And SEC Regulations 355

**F.** UBS Violated IFRS By Failing to Disclose a Contingent Liability In Connection with Its Wealth Management Services ............................................... 358

**XIV.** ADDITIONAL JURISDICTION ALLEGATIONS ..................................................... 359

**A.** The Locus of DRCM's Fraudulent Conduct was the United States ................... 362

**B.** The Locus of the IB's Fraudulent Conduct was the United States .................... 363

**C.** The Locus of the Auction-Rate Securities Fraud is the United States ............... 373

**D.** The Locus of the Tax Evasion Scheme is the United States ............................. 373

**XV.** INAPPLICABILITY OF SAFE HARBOR .................................................................. 374

**XVI.** APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-MARKET DOCTRINE ................................................................................... 376

**XVII.** LOSS CAUSATION / ECONOMIC LOSS .................................................... 377

    **A.** The August 14, 2007 Announcement ................................................ 379

    **B.** The October 30, 2007 Announcement ............................................... 380

    **C.** The November 15, 2007 and November 19, 2007 Analyst Reports ................... 382

    **D.** The December 10, 2007 Announcement .............................................. 383

    **E.** The January 18, 2008 Announcement ............................................... 385

    **F.** The January 30, 2008 Announcement ............................................... 386

    **G.** The February 14, 2008 Announcement .............................................. 387

    **H.** The February 27, 2008 Announcement .............................................. 388

    **I.** UBS Is Sued Over Its Auction-Rate Securities While Bear Stearns Collapses .. 390

    **J.** The 2007 Annual Report ............................................................ 391

    **K.** UBS Announces Writes-Down The Value Of Auction-Rate Securities ............. 392

    **L.** The Shareholder Report ............................................................ 393

    **M.** The May 6, 2008 Announcement ..................................................... 393

    **N.** The May 21, 2008 Announcement .................................................... 395

    **O.** UBS Advises Employees Not To Travel To The United States ..................... 396

    **P.** The June 9, 2008 Article .......................................................... 396

    **Q.** UBS Faces Additional Write-Downs ................................................. 397

    **R.** UBS Banker Pleads Guilty .......................................................... 398

    **S.** UBS Is Sued By Massachusetts Over Its Auction-Rate Securities ................ 399

    **T.** Judge Joan A. Lenard Allows Federal Authorities To Seek Names Of UBS's Clients ............................................................................. 400

**U.**     The July 4, 2008 Announcement ........................................................................ 401

**XVIII.** CLASS ACTION ALLEGATIONS ................................................................. 402

**XIX.**   COUNTS.......................................................................................................... 404

**XX.**    PRAYER FOR RELIEF ................................................................................. 408

**XXI.**   JURY DEMAND ............................................................................................ 409

City of Pontiac Policemen's and Firemen's Retirement System ("Pontiac"), Arbejdsmarkedets Tillægspension ("ATP"), Union Asset Management Holding AG ("Union") and International Fund Management S.A. ("IFM") (collectively, "Lead Plaintiffs") and Teamsters Union Local 500 Severance Fund ("Teamsters") and the Council of the Borough of South Tyneside Acting in Its Capacity as the Administering Authority of the Tyne and Wear Pension Fund (the "Council") (and collectively defined as, "Plaintiffs"), individually and on behalf of all other persons and entities who purchased or otherwise acquired registered securities issued by UBS AG ("UBS" or the "Company") on Worldwide exchanges, including, but not limited to, the New York Stock Exchange ("NYSE"), the Swiss Exchange ("SWX"), and the London Stock Exchange ("LSE") from February 13, 2006 to July 3, 2008, inclusive (the "Class Period"), by their undersigned attorneys, for their Consolidated Securities Class Action Complaint (the "Complaint"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on their investigation (made by and through their attorneys), which investigation included, among other things, a review and analysis of: (1) public documents pertaining to UBS and the Individual Defendants, as defined herein; (2) UBS's filings with the Securities and Exchange Commission ("SEC"); (3) press releases published by UBS; (4) analyst reports concerning the Company; (5) pleadings in other litigations where UBS is a party; (6) interviews with, *inter alia*, former UBS employees; and (7) newspaper and magazine articles (and other media coverage including web logs or "blogs") regarding UBS, its business or any Individual Defendant. Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control. Plaintiffs believe

1

that substantial further evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.    On April 1, 2008, UBS announced that it had written down its asset portfolio backed by nonprime U.S. real estate mortgages by $19 billion, bringing its total write-downs of such assets since October 30, 2007 to a staggering ***$38 billion*** – currently the second largest loss in the history of modern banking.  Notably, last week on July 4, 2008, UBS shocked the market by announcing that it had taken ***additional*** write-downs in the second quarter of 2008.  UBS has not yet quantified the write-downs, but when the dust settles, UBS likely will have recognized the worst loss in the history of modern banking as a result of the fraud detailed herein.

2.    The $38 billion-plus write-down is a direct consequence of fraud in connection with a multi-year venture by UBS and the Individual Defendants (defined below and, collectively with UBS, the "Defendants") to compete in the United States' investment banking business.  Wedded to an aggressive business plan to make UBS – historically defined by its staunchly conservative wealth management business – the world's most profitable investment bank by 2008, Defendants threw caution to the wind during the Class Period by tying the Company's growth plan to high risk trading strategies employed by UBS's New York and Stamford, Connecticut-based investment banking and hedge fund operations.

3.    Over the course of 2006 through 2007, these U.S.-based branches of UBS amassed a $100 billion position in U.S. residential mortgage backed securities ("RMBS") and collateralized debt obligations ("CDOs") backed mainly by U.S. subprime mortgages.  UBS's $100 billion position was taken (i) in contravention of UBS's stated risk management policies and public representations, and (ii) with knowledge that the U.S. real estate market was in a

2

steep decline. Additionally, when UBS's risk managers and senior executives learned that the $100 billion portfolio was declining in value, they resorted to extraordinary acts of deception to conceal and misrepresent the depressed value of the portfolio from investors.

4. Specifically, Defendants issued materially false and misleading statements regarding, *inter alia*: (i) the nature and scope of UBS's risk management policies and controls; (ii) UBS's purportedly limited exposure to high concentrations of assets, including high-risk and illiquid assets; and (iii) the value of the mortgage-backed securities that UBS held on its balance sheet.

5. As detailed herein, Defendants' Class Period fraud occurred in two phases. *First*, UBS acquired tens of billions of dollars in illiquid securities backed by high-risk U.S. residential mortgage loans in contravention of Company policy and Defendants' representations to the market. *Second*, when Defendants discovered that UBS's multi-billion dollar mortgage-backed asset portfolio had been materially overvalued, they concealed this information from UBS's investors through deceptive acts and by issuing additional materially false and misleading statements.

6. Defendants' material misrepresentations and omissions during the Class Period caused the price of UBS's common stock trading on worldwide exchanges, including, but not limited to, the NYSE, the SWX and the LSE, to become artificially inflated. When the truth was disclosed, the price of UBS's common stock trading on the NYSE fell from a Class Period high of $66.15 per share on April 26, 2007 to $18.90 per share on July 7, 2008, the first trading day following the close of the Class Period, thereby causing investors to suffer tens of billions of dollars in damages.

### A. UBS's Drive to Become the World's Most Profitable Investment Bank

7.     Since its inception, UBS has held itself out as a model institution for conservative wealth and risk management.  UBS's reputation for conservatism was the foundation upon which it built the largest wealth management business in the world.

8.     Looking for opportunities to grow beyond its wealth management business, UBS sought to expand its small U.S.-based investment banking business to become more involved in the lucrative U.S.-based market.  To that end, UBS acquired U.S.-based PaineWebber Group for $16.5 billion in 2000, and headquartered its Investment Bank ("IB") in New York City, NY and Stamford, CT.

9.     In 2002, UBS promoted U.S. resident John Costas ("Costas") to CEO of the IB. Costas was responsible for growing the IB's revenues from 22% of UBS's 1999 revenue to 51% in 2003.  By 2004, Costas's stated goal was for UBS "to become the world's most profitable investment bank" by surpassing the top three U.S. investment banking firms – Citigroup ("Citi"), Goldman Sachs and Merrill Lynch ("Merrill").

10.     Costas's drive to push UBS beyond its conservative wealth management focus into the top tier of U.S. investment banks was embraced by UBS's management.  In fact, UBS's CEO at the time, Peter Wuffli ("Wuffli") reiterated Costas's sentiments, predicting that UBS could be in the top two or three in investment banking by 2008.  (Ian Kerr, *Watch Out – Here Comes UBS*, EUROWEEK, Feb. 18, 2005).  What investors were not told, was that the expansion of UBS's U.S.-based investment banking business would come at the expense of UBS's well-publicized traditions of conservative and disciplined risk control.

11.     To effectuate its goal of becoming a top tier U.S.-based investment bank, UBS hired two consultants, one in the summer of 2004 and one in the summer of 2005, to assess the

state of the IB and to identify those areas of the market in which UBS was lacking and from which UBS stood to profit the most. The consultants' reports advised UBS that it needed to (i) harness the growth potential of investments such as hedge funds; and (ii) increase its investment in fixed income products, such as CDOs and RMBS backed by subprime mortgage collateral.

12.     Subprime loans are characterized as high-risk loans because they typically have high loan-to-value ratios ("LTV Ratio"), or are made to individuals with low credits scores (*i.e.,* FICO scores of 625 or lower) and/or to individuals with limited or no documented source of income. As alleged in detail below, a subprime-backed CDO is a bond secured by a pool of RMBS, which itself is collateralized by a pool of subprime loans.

13.     In response to the consultants' reports, and at the behest of Costas and other members of the U.S.-based IB, UBS (i) created an internal hedge fund, Dillon Read Capital Management ("DRCM"), and (ii) commenced an asset buying spree, through DRCM and the IB, of what ultimately would result in a $100 billion position in fixed-income assets backed mainly by high risk subprime mortgages.

14.     While trumpeting its goal of becoming the world's most profitable investment bank, UBS also repeatedly assured investors that it employed and followed the most stringent risk management policies and controls in the industry. Indeed, both preceding and throughout the Class Period, UBS assured investors that its risk management controls would preclude UBS from acquiring high concentrations of any single asset type or assets that were or could become illiquid.

15.     UBS's claimed adherence to strict risk management arose, in part, as a result of UBS's loss of approximately $680 million in 1998 from the Company's investment in a hedge fund named Long Term Capital Management ("LTCM"). Founded in 1994, LTCM experienced

enormous success during its first few years in operation. Seeking to take advantage of the hedge fund's success, UBS invested more than $1 billion in LTCM in 1997 – more than any other investor. One year later, LTCM's collapse nearly caused a worldwide financial crisis and UBS lost $680 million.

16.     Claiming to learn from its mistakes, UBS fired those responsible for the reckless LTCM investment and vowed never again to allow UBS's thirst for profits to undermine UBS's risk management policies. For example, according to an article in the July 2008 edition of *Bloomberg Magazine* titled "The Mess at UBS," "[i]n the aftermath [of LTCM's collapse], Wuffli told Bloomberg News that the LTCM affair 'reinforced our emphasis on controlling risk. That's still an essential part of our DNA.'" Likewise, as noted in UBS's 1998 Annual Report, UBS commissioned an internal audit as a result of the LTCM loss, which revealed that UBS needed to make sure that it was "measuring and limiting risk exposures towards potential loss in extreme conditions as well as more normal conditions."

17.     Following the LTCM debacle and during the Class Period, Defendants repeatedly assured investors that UBS would avoid acquiring "illiquid and concentrated positions" in any assets, including fixed-income, and internally recognized that UBS's acquisition of any such positions would need to be "carefully analyzed and tightly controlled." Moreover, Defendants guaranteed investors that while UBS was growing its mortgage and asset-backed securities business, it was "focus[ed]" on "avoid[ing] illiquid and concentrated positions" and "actively pursu[ing] risk distribution strategies." (4Q 2006 Letter to Shareholders, dated February 13, 2007).

18.     Notwithstanding the foregoing representations, during the Class Period, UBS (through DRCM and the IB) amassed a $100 billion portfolio concentrated exclusively in RMBS

and CDOs backed by U.S. subprime and Alternative-A (or "Alt-A", defined herein) mortgages --- in a rapidly declining U.S. real estate market -- without disclosing to UBS shareholders: (i) the true nature and concentration of the Company's investments; (ii) the true value of these investments; or (iii) the fact that core risk policies designed to prevent UBS from accumulating such a high concentration of one asset type were being overridden and/or deliberately ignored at almost every level of the Company.

**B.      The Creation of DRCM**

19.      UBS originally contemplated that DRCM would serve only as an investment vehicle for third-party investors such that UBS could obtain fees from managing the fund, but not assume the risk associated with the hedge fund's assets.  Indeed, when UBS management learned that UBS was starting an internal hedge fund, management stressed that any risk associated with the fund's assets must be borne by third-party investors -- not UBS.

20.      UBS quickly scrapped the initial plan for DRCM when Costas – the reputed "golden boy" of UBS – presented his fellow UBS managers with an ultimatum; Costas demanded that UBS cede control of DRCM to him, and his colleagues Michael Hutchins ("Hutchins"), the Head of UBS's Global Fixed Income Rates and Currencies ("FIRC"), and Kenneth Karl ("Karl"), the head of UBS's Principal Finance Credit Arbitrage ("PFCA") business.  If UBS refused, Costas threatened that he, along with Hutchins and Karl, would leave UBS for a competitor.  UBS succumbed to Costas's demand, appointing Costas as CEO, Hutchins as President/Co-Chief Investment Officer and Karl as Co-Chief Investment Officer of DRCM.

21.      Moreover, UBS, and specifically Wuffli, approved of Costas changing DRCM's focus from that of a fund for outside investors to a fund generating revenue for UBS off of

proprietary positions. Indeed, UBS gave Costas, Hutchins and Karl: (i) initial seed money of $3.5 billion along with eighty of the IB's top traders; (ii) a guaranteed bonus of $1 billion over three years; a 35% success fee and 3% of assets under management; and (iii) offices down the street from the IB in New York City. Unbeknownst to investors, UBS also gave Costas access to $100 billion of UBS's balance sheet to leverage DRCM's proprietary trades – Costas used $70 billion for the DRCM's trades made on behalf of UBS. In effect, UBS ceded control of DRCM to U.S.-based Costas, Hutchins and Karl.

22. In light of UBS's significant investment in DRCM, Costas and UBS assured investors that DRCM would be managed carefully so as to protect UBS's banking and wealth management business. Indeed, Costas assured investors that he would be "super-protective" of UBS's banking business during his tenure at DRCM, stating during a July 26, 2005 interview with *EuroWeek* that he would rather reject business opportunities than chance violating UBS's risk management policies: "Even with the conservative risk-management philosophy we are careful. ***It would be reckless to squander that for one quarter's earnings, or for a deal***." (Emphasis added). Unbeknownst to investors, Costas (with UBS's knowledge) was about to completely disregard UBS's risk management philosophy and policies to further his and UBS's financial goals.

23. After its launch in June 2006, DRCM embarked on a secret campaign to acquire CDOs and RMBS backed by subprime and Alt-A mortgage collateral. Between June 2006 and May 2007, DRCM accumulated at least $20 billion in such assets.

24. While DRCM managed assets on behalf of UBS (and UBS included the stated value of those assets on its balance sheet), UBS did not specifically attribute those assets to DRCM for investors' information. In so doing, Defendants were able to conceal from investors

8

hundreds of millions of dollars in write-downs of subprime backed assets managed by DRCM in February, March and April 2007.

**C.     The Defendants Conceal Massive Losses at DRCM**

25.     By early 2007, the U.S. real estate market was well in the midst of a freefall from its 2005 apex, as property values plummeted and mortgage defaults soared.  Declining property values coupled with rising interest rates caused delinquency rates for U.S. residential subprime and Alt-A mortgages to rise sharply during the Class Period.  The free fall began in early 2006 and by October 2006, borrowers were 60+ days behind in payments on 3.9% of the subprime loans packaged into mortgage securities during 2006 -- nearly twice the delinquency rate on subprime loans recorded a year earlier.  By early 2007, the 60+ day delinquency rate of some Alt-A and subprime mortgages were running at four times the level of loans issued in 2003-2004.  Additionally, the Housing Price Index (the "HPI"), which measures the level of U.S. real estate values, began a dramatic decline in 2006 which continued throughout 2007.

26.     Furthermore, in February 2007, UBS's competitor HSBC Holdings plc ("HSBC") shocked the market when it issued a profit warning due to losses suffered on its U.S. subprime lending operations.  HSBC further announced a $10.86 billion impairment charge related to its subprime assets.

27.     As a result, in late February through early March 2007, DRCM management, including Hutchins, set up a secret experiment to test whether the stated value of DRCM's subprime backed asset portfolio was accurate.  It was not.  Unbeknownst to investors, Hutchins sold a random selection of assets backed by subprime mortgages that UBS valued on its books at $100 million for only 50 cents on the dollar.  Notwithstanding the 50% drop in stated value on a randomly chosen portfolio, Hutchins chose to mark down only a $4 billion DRCM subprime-

backed portfolio by only 5% or $204 million (a fact which Defendants concealed from investors), and ignored the remainder of DRCM's and the IB's multi-billion dollar subprime and Alt-A mortgage-backed asset portfolios.

28.     By not writing-down its positions, UBS violated applicable accounting rules that required UBS to value its *entire* $100 billion mortgage-backed asset portfolio according to readily observable market inputs, such as the sales prices obtained by Hutchins.  Moreover, at no time did UBS disclose that it had conducted a test of its asset values, or the results of the test to investors.  Instead, Defendants falsely assured investors that the values UBS carried on its books were "genuine mark to markets," that the Company was "extremely careful with the valuation process," and that the Company was "go[ing] out to the market to get quotes on what it would actually cost to move these positions and extrapolat[ing] some of those across the portfolio." Nothing could have been further from the truth.

29.     Despite the demonstrable impairments being suffered by the IB and the DRCM as a result of their subprime backed portfolios, UBS's public face was one of record results and risk controls.  In his letter to shareholders on March 21, 2007, Wuffli wrote,

> Our recent entry into new markets and the launch of new business ventures is, of course, associated with some risk.  However, it is only as a result of our diligent effort to improve our risk profile over the last nine years that we have been able to assume them comfortably.

30.     In fact, the atmosphere within DRCM and the IB was far from comfortable.  In a frenzied effort to conceal mounting losses, the Defendants resorted to fraud.

31.     UBS's concealment of the overvalued DRCM subprime-backed positions continued through April 2007.  As reported in THE WALL STREET JOURNAL (on October 12, 2007), in April 2007, DRCM trader John Niblo ("Niblo") wrote-down a $1 billion portfolio by

$100 million after obtaining discount prices from at least a dozen Wall Street dealers for the DRCM holdings. Niblo re-priced many other mortgage-backed securities he oversaw by 20-50%. Recognizing that Niblo's write-downs, if extended to UBS's similar fixed income positions, would lead to billions of dollars in write-downs at the IB, UBS officers Ramesh Singh ("Singh"), the Global Head of Securitized Products and Head of Debt Capital Markets Americas, and Ramesh Chari ("Chari"), a Manhattan-based executive director in the IB, challenged Niblo on the legitimacy of the write-downs and ultimately fired him.

32.     Other UBS managers, including Walter Stuerzinger ("Stuerzinger"), UBS's Chief Risk Officer ("CRO") and the Chairman's Office, the Board of Director's risk committee whose membership included UBS's Chairman, Marcel Ospel ("Ospel"), Stephan Haeringer ("Haeringer") and Marco Suter ("Suter"), were informed of the write-downs at DRCM as Stuerzinger and the Chairman's Office tasked UBS's General Internal Audit team ("GIA") on March 29, 2007 to conduct a review of the DRCM valuation adjustments. It was not revealed to investors until February 14, 2008 that the review had culminated in an April 2007 report, which had warned, *inter alia*, that there were then "valuation uncertainties in both IB and DRCM portfolios" and "inherent risks not adequately analyzed."

33.     Notwithstanding their knowledge of DRCM's write-downs and the effect of such on the IB's multi-billion dollar subprime and Alt-A mortgage-backed asset portfolio, Defendants omitted this material information from UBS's contemporaneous financial reports, and further concealed that it continued to hold tens of billions of dollars in subprime-backed RMBS and CDOs on UBS's balance sheet at materially inflated values. Moreover, UBS took active steps to ensure that the truth was not disclosed to the market. For example, like Niblo before him, UBS fired Hutchins in May 2007, two months after his valuation test resulted in UBS selling a

sampling of assets for 50 cents on the dollar. Also, Karl suddenly resigned from DRCM on March 15, 2007 without any public disclosures for the reasons behind his resignation.

**D.      UBS Closes DRCM to Avoid Disclosures about its Losses**

34.      Defendants' deception continued with the sudden and unexplained closing of DRCM and incorporation of DRCM's $20 billion in subprime and Alt-A mortgage-backed holdings into the IB that, unbeknownst to investors, were materially overvalued.

35.      On May 3, 2007, UBS announced that DRCM had suffered a first quarter loss of 150 million Swiss francs ("CHF"). UBS told investors and analysts that it was disappointed with DRCM's results and was closing DRCM because of "operational" issues regarding the management structure of the hedge fund and that operating DRCM has become "too complex" and "too expensive". At no time did UBS disclose that DRCM had written-down more than $400 million in RMBS and CDOs backed by subprime collateral that were virtually identical to the tens of billions in subprime-backed assets on UBS's balance sheet. On the Company's May 3, 2007 earnings call, an analyst queried Standish as to what UBS's subprime exposure was across the entire bank and if UBS had taken any provisions with respect to such exposure. In responding, he concealed DRCM's losses, falsely stating:

> We have taken a very, very non material credit loss as a result of exposure to the sub-prime mortgage lender. This is related to the new [centric] [sic, New Century] situation. This was an amount of approximately CHF20 million, that is always taken and we feel confident in our position going forward.

Moreover, when asked point blank by a market analyst during the Q2 2007, August 14, 2007 conference call whether DRCM's positions suffered any decline in value with the decline in the real estate market, UBS's CEO, Marcel Rohner ("Rohner"), refused to answer, deceptively and inexplicably, claiming that it would not be appropriate to break out the asset values of DRCM.

12

36.     Additionally, UBS deceived investors into believing that DRCM was a success by paying a 16.5% return on investment to third-party investors upon the dissolution of the Outside Investor Fund ("OIF") component of DRCM. (Reed, *Behind the Mess at UBS*, BUSINESSWEEK, Feb. 21, 2008).  While the idea that DRCM would serve primarily as a hedge fund for third-party investors died when UBS capitulated to Costas's ultimatum to run DRCM, DRCM eventually launched a small third-party investor fund, the OIF, on November 2, 2006. OIF investors contributed $1.3 billion to the fund, which UBS used to acquire additional positions in subprime and Alt-A mortgage-backed RMBS and CDOs between November 2006 and April 2007.  While UBS closed the OIF on May 3, 2007 – just six months after its creation – and reintegrated the fund's holdings onto the IB's balance sheet, UBS returned the reported $1.3 billion originally invested in the fund to the third-party investors, and provided the investors with a hefty 16.5% return on their investment.  Thus, to investors in OIF and UBS shareholders, it appeared that OIF was a success and that UBS's subprime investments were profitable.

37.     Unbeknownst to UBS shareholders, however, UBS paid the outside investors – at the expense of UBS shareholders – so that the outside investors and the market would not discover the truth about the OIF's over-valued asset portfolio or the losses that the OIF had truly sustained.  UBS recently has admitted that the OIF had losses on its home equity positions in Q1 2007 that were similar to those suffered by DRCM and IB.  As a result, the OIF investors were not entitled to the 16.5% return on their investment.  Additionally, UBS chose to incorporate the fund's over-valued subprime and Alt-A mortgage-backed assets on its balance sheet to the detriment of UBS shareholders rather than selling them at their actual market value, as such a sale would have forced the IB to markdown its own positions to prevailing and highly discounted market prices.

38.     In the end, the trading strategies employed by DRCM during its eleven month existence led to the accumulation of at least $20 billion in subprime and Alt-A mortgage-backed assets and contributed 16% or $3 billion to UBS's $18.7 billion write-downs as at December 31, 2007.   Additionally, the creation of DRCM in June 2005 left the IB lacking for experienced leadership and direction, as approximately eighty of the IB's top fixed income traders were reassigned to work at DRCM.   This lack of leadership in the fixed income business further weakened enforcement of UBS's policies against risk-concentration and further contributed to UBS's materially adverse, and undisclosed, exposure to the U.S. subprime mortgage market.

### E.     UBS's Inexperienced IB Replicated DRCM's Subprime-Backed Positions and Their Resulting Losses Were Also Concealed From Investors

39.     By taking the IB's top traders to DRCM, Costas, Hutchins and Karl left the IB with little direction and inexperienced management.   As a result, Costas's successor Huw Jenkins ("Jenkins") commissioned the July 2005 report, which found that UBS was $4.6 billion behind the top-three U.S. investment banking firms in revenues from fixed income assets.   As such, in 2005 the IB set out to build its fixed income asset portfolio primarily through subprime backed RMBS and CDOs – attempting to replicate, albeit to a greater extent, the same portfolio that DRCM was amassing on UBS's balance sheet.   It was an approach that Marcel Rohner ("Rohner"), the current CEO of UBS, described at the end of 2007 as a "me too strategy."

40.     Upon commencing its fixed income investment strategy, UBS's highest ranking risk management team, the Group Executive Board ("GEB"), warned the IB that the strategy of acquiring potentially risky illiquid subprime-backed assets required close monitoring and tight controls.   Furthermore, Defendants assured the public that trading UBS's capital was not a significant part of UBS's business.   For example, Defendant Wuffli in a February 13, 2007 call

14

with analysts represented:

> And, so, the pure proprietary characteristics of a business where you, essentially, have a team that invests the Bank's capital just to make money, they're relatively rare and they're not very important for our business. They do exist but they're not – they're not of significance in terms of overall contribution.

41. In line with the foregoing, UBS repeatedly assured investors that the IB was following the Company's historically stringent risk management policies and controls, and avoiding concentrated asset exposures. For example, the Defendants issued the following statements, among others, about UBS's risk avoidance practices:

a. "VaR and stress measures control our overall portfolio exposure … The diversification of risks and **avoidance of undue concentrations** remain key pillars of our risk control process" -- 1Q 2005 Form 6-K;

b. "As you know, 1 of our overriding risk management goals is the **avoidance of concentration risks**" -- 1Q 2005 Conference Call;

c. "We protect our reputation by managing and controlling the risks incurred in the course of our business, and for this reason we **avoid concentrations of exposure**" -- 2005 Annual Report;

d. "The primary focus in our risk-taking activities is to ensure the adequate diversification of risk in order to **avoid illiquid and concentrated positions**" -- 4Q 2006 Form 6-K;

e. "We have grown our business without compromising any of the risk disciplines that are the foundation of prudent management. . . . **We have scaled back our ill-equipped (sic) [illiquid] and concentrated positions** . . . we continue to apply our very strong philosophy of originating and distributing as opposed to holding on our balance sheet large chunks of liquid (sic) [illiquid], in effect, or equity positions. And as a consequence of these directions you see that you will not see us essentially growing substantially illiquid positions on the balance sheet." -- 4Q 2006 Earnings Conference Call;

f. "**Controls and restrictions are placed on risk concentrations** in trading books, taking into account variations in price volatility and market liquidity." -- 2006 Annual Report;

g.      "But while we are willing to expand into new and potentially higher risk areas such as emerging markets, *we will continue to exercise caution where this might involve illiquid and concentrated exposures*." -- 2006 Handbook; and

h.      UBS is "clearly" invested in "highly liquid assets" and has "moved out of…certain illiquid assets."   "*We rigorously want to avoid risk concentrations of all kinds.  We are basically obsessed with risk diversification*." Defendant Sluerzinger, June 4, 2007 Risk Management Presentation.

(Emphases added).

42.    Unbeknownst to investors, however, the Company's representation--as UBS acquired at least $100 billion in subprime and Alt-A mortgage-backed assets beginning in Q4 2005--bore no resemblance to the actual risk controls and operations employed within the IB. In truth, the IB failed to place any operational limits on the total amount of subprime and Alt-A mortgage-backed assets it could acquire across the IB and DRCM and, as UBS has since admitted in an April 21, 2008 Shareholder Report on UBS's Writedowns (the "Shareholder Report"), "the IB management did at no stage conduct a robust independent assessment of its overall subprime exposures." Moreover, UBS manipulated the limited risk management controls that the IB had in place in an effort to recognized revenue from the origination, underwriting and retention of high-risk subprime and Alt-A mortgage-backed securities.

**F.     UBS Places A $100 Billion Wager on Subprime in Flagrant Disregard of Risk Controls**

43.    At the same time UBS was assuring investors that it was avoiding high concentrations of specific asset classes, internal UBS sources claimed that UBS management repeatedly applied "pressure to build aggressively in fixed income [investments]." UBS management's drive to build the Company's fixed income investment portfolio led UBS to secretly amass more than $100 billion in U.S. asset backed securities during the Class Period,

comprised almost exclusively of subprime and Alt-A backed CDOs, RMBSs and loan pools. Indeed, between February 2006 and September 2007, the IB acquired at least $50 billion in super senior tranches of subprime backed mezzanine CDOs alone, and at no time relevant hereto did Defendants disclose the nature or extent of the multi-billion dollar investment to UBS shareholders.

44.     The IB's ability to amass the vast majority of the Company's $100 billion mortgage-backed asset portfolio in contravention of UBS's risk management policy and Defendants' representations to investors arose as a result of several factors that UBS also concealed from investors during the Class Period.

45.     *First*, Defendants manipulated UBS's risk management controls so as to increase UBS's fixed income investments in response to management's growth directive.  As noted above, UBS had no operational limits on the total amount of RMBSs or CDOs it could acquire. The principal risk management control over UBS's fixed income asset portfolio was based on the "Value at Risk" or "VaR" associated with UBS's assets.  In the event that the VaR amounts associated with UBS's asset portfolio rose above a specified monetary level, UBS's risk management controls triggered, requiring UBS to cease purchasing additional assets.  This cessation would reduce the Company's VaR and limit UBS's exposure to high concentrations of specific assets.  UBS reported its VaR figures to shareholders in its Annual and Quarterly financial reports.

46.     As discussed in extensive detail below, Defendants subjectively concluded that only 2-4% of the value of UBS's subprime and Alt-A mortgage-backed CDO holdings was "at risk."   Defendants, initially through Hutchins, next determined that they could erase the

VaR amounts associated with the CDO holdings if UBS bought insurance to offset the 2-4% risk of loss in value. As reported by the *Financial Times* on April 21, 2008:

> Former colleagues say Mr. Hutchins understood how UBS could make aggressive bets while operating within the risk controls being enforced by Zurich. One trick was to take AAA-rated bonds and then buy protection against the risk of the securities losing 2 per cent of their value. UBS risk models assumed AAA-rated bonds would never receive less than 98 percent of their face value. With the additional protection, the assets were regarded as being almost risk-free.

47. This manipulation of VaR – the main risk metric employed by UBS – enabled UBS to acquire exponentially more RMBS and CDO positions than UBS would have been able to acquire had Defendants not manipulated UBS's risk management system. Furthermore, the undisclosed use of these tactics contradicted UBS's Class Period mantra that it was not acquiring high concentrations of a given asset type or illiquid assets.

48. To make matters worse, the IB's traders, who partly were responsible for ensuring that UBS complied with its risk policies, were motivated to disregard those policies because their employment agreements tied their compensation to the growth of the IB's asset base.

49. *Second*, UBS acquired tens of billions in synthetic and hybrid CDOs tied to subprime and Alt-A mortgage-backed assets, exponentially increasing UBS's exposure to the plummeting U.S. subprime and Alt-A mortgage market. As the number of available traditional or "cash" RMBS and CDOs dwindled during the Class Period, UBS secretly turned to purchasing synthetic and hybrid CDOs to satisfy its drive for continued revenue growth.

50. A synthetic CDO is one step removed from a traditional or cash CDO, which is backed directly by subprime or Alt-A RMBS. One type of synthetic CDO in which UBS invested billions of dollars during the Class Period was backed by "Credit Default Swaps" or "CDS".

51.     A CDS is akin to insurance on a traditional cash-CDO, with the insurance purchaser acquiring protection to offset the risk of default associated with the cash-CDO.   For example, UBS often bought CDS insurance for its mortgage-backed assets, including CDO tranches, from a third-party to insure the 2-4% risk of loss in the asset's par value over time. The insurance seller would obtain premium payments from the insurance purchaser, who would be said to possess the CDS.

52.     Among the financial engineering that UBS kept concealed from its investors, UBS created CDOs collateralized by pools of CDSs and retained tranches of those CDOs.  The theory behind this type of CDO was that (a) the premium payments paid to the insurance seller would provide a source of revenue to the CDO investor, UBS, but (b) the CDO investor, UBS, would step into the shoes of the protection seller if a triggering event occurred, requiring UBS to pay proceeds to beneficiaries of the underlying CDSs.

53.     UBS was motivated to acquire such synthetic CDOs because, unbeknownst to investors, (i) UBS was not obligated to pay for or "fund" its tranche of the CDS backed CDO unless there was an insurance triggering event that required the payment of the insurance proceeds; and (ii) UBS apparently believed that it did not have to alert the market of the potential liability associated with the CDS backed CDO investment because it did not have to include the potential liability on its balance sheet.  Put simply, UBS was obtaining revenue through the CDS premium payments for nothing, all the while keeping the market unaware that it was exposing itself to billions of dollars in potential liability to the CDS protection buyers if their subprime and Alt-A mortgage-backed assets declined in value – a reality that emerged as subprime and Alt-A related assets plummeted in value throughout 2006 and 2007.

54.     UBS subsequently has admitted that the retention of its unfunded tranches of synthetic CDOs was one of the "key drivers" of the accumulation of UBS's $50 billion CDO position during the Class Period which caused 50% or $9.15 billion of UBS's write-downs as of December 31, 2007.

**G.      Defendants Knew That UBS Had Accumulated a $100 Billion Subprime and Alt-A Mortgage-Backed Asset Portfolio And That It Was Materially Over-Valued**

55.     While assuring investors that UBS avoided concentrations of risk and specific assets, Defendants knew and/or with extreme recklessness disregarded that (i) UBS had accumulated a $100 billion subprime and Alt-A mortgage-backed asset portfolio as the U.S. real estate market was declining rapidly, (ii) the quality of subprime and Alt-A mortgages was deteriorating at an unprecedented pace, (iii) subprime and Alt-A mortgage-backed assets were losing value and becoming illiquid, and (iv) the value of UBS's subprime and Alt-A mortgage-backed holdings were materially overvalued.  For example, Defendants knew and/or recklessly disregarded that:

      a.     UBS's own analysts warned in 2006 and 2007 that CDOs and RMBSs backed by subprime loans were declining in value and should be avoided;

      b.     Group Treasury warned the GEB (i) in late 2006 that the IB had amassed a build-up of "less liquid assets," which included MBS positions, (ii) in March 2007, that the IB should place a hard limit on the accumulation of the illiquid assets and a freeze on the IB's balance sheet—the GEB, in particular Wuffli and Jenkins ignored the warnings;

      c.     UBS's January 17, 2007 *CDO Insights* article stated, in part, "Unless you have been living under a rock for the past few months, you've heard negative news about the subprime mortgage market";

      d.     The ABX Index, which tracks the subprime Asset Backed Securities ("ABS") market, declined precipitously from late 2006 through 2007;

e.　　DRCM traders expressed increased credit concerns regarding subprime ABS in 2006;

f.　　UBS admits that its senior management expressed concern about the decline in the U.S. subprime mortgage market and communicated this to the GEB's Risk Sub-committee ("GRSC") as early as September of 2006;

g.　　In March 2007, Hutchins randomly tested and found that a $100 million portfolio of DRCM's subprime backed assets was worth only $50 million;

h.　　After Hutchins' test, Hutchins wrote-down a $4 billion DRCM subprime backed asset portfolio by $204 million;

i.　　In April 2007, DRCM trader John Niblo wrote-down a $1 billion subprime backed asset portfolio by $100 million, re-pricing these securities downwards by 20%-50%;

j.　　DRCM wrote-down more than $400 million in subprime backed assets in the first and second quarters ("1Q" and "2Q") of 2007;

k.　　UBS paid the OIF investors a 16.5% return on their investments to buy their silence so that UBS would not have to extend the depressed valuations of DRCM's assets to the tens of billions of subprime and Alt-A mortgage-backed assets held by the IB;

l.　　UBS executive Eric S. Rothman ("Rothman"), who was in charge of marking all of the IB's CDO positions, blatantly ignored the observable marketing pricing inputs that he was required to consider by the applicable international accounting standards, deciding instead to "subjectively" determine the values of UBS's portfolio of CDO tranches in order to manage UBS's CDO marks;

m.　　UBS conducted an internal investigation into DRCM and the IB prior to DRCM's closure, generating an April 2007 report finding that (1) improvements were required in analyzing, measuring and reporting risks inherent in subprime-related activities; and (2) valuation uncertainties in both IB and DRCM portfolios were not sufficiently transparent and inherent risks not adequately analyzed;

n.　　According to confidential witnesses ("CWs"), internally at UBS it was clear that by the end of 2006 and start of 2007 the mortgage-backed securities market had begun to decline.  For example, by the end of 2006, at least one witness employed at the IB during the Class Period and whose responsibilities included purchasing pools of subprime loans and

21

securitizing them into bonds, confirmed that his/her responsibilities had shifted from packaging and selling MBS to "loss mitigation";

o.   UBS began originating its own U.S. mortgages through UBS Home Finance to use as the collateral for pools of RMBS in 2006, providing Defendants with additional evidence of how the real estate and mortgage markets were suffering;

p.   DRCM's traders, including Hutchins and Niblo, were marking down subprime positions beginning in February 2007 and continuing throughout Q1 and Q2 2007; and

q.   Beginning in September 2006, DRCM began to short the ABX Index and ultimately acquired a net short position, demonstrating that DRCM knew the subprime and Alt-A mortgage markets, and thus DRCM's subprime and Alt-A backed holdings, were declining in value.

56.   Notwithstanding the foregoing, Defendants continued to amass UBS's subprime and Alt-A mortgage-backed RMBS and CDO portfolio throughout the Class Period in contravention of representations to the market that, *inter alia*, UBS would not take on high concentrations in any given type of asset or in illiquid assets. Additionally, Defendants refused to properly value UBS's RMBS and CDO portfolios when they discovered that the portfolios were materially overvalued in direct contravention of Company policy and international accounting standards.

## H.   UBS's $38 Billion Asset Write-Down

57.   Notwithstanding that Defendants knew (i) that UBS acquired high concentrations of highly illiquid subprime and Alt-A mortgage-backed assets in contravention of UBS's risk management policy and public statements; and (ii) that the stated value of those subprime and Alt-A mortgage-backed holdings were materially overvalued on UBS's financial statements, Defendants misrepresented and concealed the truth from investors until October 30, 2007. Even then, Defendants did not disclose the entire truth to investors but instead gradually revealed the

extent of the Company's losses.

58.     The extent of UBS's losses to date has been revealed through the following disclosures by the Company:

a.      On October 30, 2007, UBS wrote-down **$4.4 billion** in subprime related RMBS and CDOs. However, artificial inflation remained in the stock price because, *inter alia*, UBS assured investors that UBS had provided "the maximum possible transparency to the bare bone" with respect to its exposure to the U.S. real estate market;

b.      On December 10, 2007, UBS wrote-down **$10 billion** in subprime related RMBS and CDOs. However, artificial inflation remained in the stock price because, *inter alia*, UBS assured investors that the write-downs would create "maximum clarity" with respect to the Company's subprime exposure, and that its current valuations "reflect[ed] the extreme loss projections implied by the prices achieved in the very limited number of observable market transactions in US sub-prime related securities and indices up to the end of November";

c.      On January 30, 2008, UBS announced that it had written-down an additional **$4 billion** as at December 31, 2007 – notably, UBS took the write-down just weeks after an analyst from JP Morgan told the market that if UBS obtains an impending capital infusion of CHF 13 billion, UBS would be so well capitalized that it could write-down an additional $4 billion with little problem;

d.      On February 13, 2008, UBS announced that its write-downs for fiscal year 2007 totaled **$18.7 billion**, causing UBS to take its first ever annual loss of CHF 4.384 billion and a fourth quarter loss of CHF 12.451 billion;

e.      After convincing shareholders to approve a CHF 13 billion mandatory convertible bond offering (discussed herein), on April 1, 2008, UBS again shocked the market by announcing a **$19 billion** write-down of subprime and Alt-A mortgage-backed assets; and

f.      On July 4, 2008, the day after the close of the Class Period, UBS announced that it recognized further, albeit not yet quantified, write-downs of its remaining subprime and Alt-A mortgage-backed positions in 2Q 2008. Analysts estimate that UBS's write-down could for 2Q 2008 be upwards of **$7.5 billion**.

## I.     The Fallout at UBS:  Terminations and Governmental Investigations

59.     The fraud, recklessness and other misconduct alleged herein has led to the termination and resignation of UBS's highest ranking officers and directors.

60.     As noted above, on March 15, 2007, Karl, the co-chief investment officer at DRCM, unexpectedly resigned from DRCM.

61.     On May 3, 2007, UBS announced that Hutchins would be leaving UBS and that Costas would be stepping down as CEO of DRCM and would serve only as a consultant for the reincorporation of DRCM's positions into the IB.

62.     In June 2007, UBS placed Niblo, the DRCM trader who as early as April 2007 attempted to write-down the value of his mortgage-backed securities portfolio, on administrative leave, and fired him shortly thereafter.

63.     On July 5, 2007, the Company's board of directors terminated Wuffli, appointing Rohner as CEO.

64.     In mid-August 2007, just one day before UBS announced a profit warning for the second half of 2007, UBS terminated Simon Bunce ("Bunce"), the head of UBS's Fixed Income Division.

65.     On October 1, 2007, as UBS announced its first subprime-related write-downs, the Company announced that Jenkins, the CEO of the IB, and Clive Standish ("Standish"), the CFO of UBS would be leaving UBS.

66.     On October 11, 2007, UBS terminated IB employees, David Martin ("Martin") and James Stehli ("Stehli").  Defendant Martin ran the IB's Rates business, reporting to Bunce, while Stehli ran the IB CDO desk, reporting to Singh.

67.     On April 1, 2008, after announcing the $19 billion write-down for the first quarter of 2008, UBS announced that Ospel would be stepping down as Chairman on April 23, 2008.

68.     Defendants' fraudulent actions, as detailed herein, also have caused U.S. and Swiss governmental agencies to commence investigations into the Company's Class Period activities.

69.     In October 2007, the SEC commenced an initial investigation into whether UBS properly valued its subprime related asset portfolio during the Class Period.  As reported by the *Wall Street Journal*, "the agency is examining, among other things, a situation last year in which a trader at a now-defunct hedge fund of UBS's Dillon Read unit was confronted and then ousted after he valued mortgage securities at prices below the value assigned to the same securities elsewhere at UBS." (Kara Scannell, Anita Raghavan and Amir Efrati, *The Subprime Cleanup Intensifies – Did UBS Improperly Book Mortgage Prices?* Wall Street Journal, Feb. 2, 2008).

70.     The SEC has since issued subpoenas to UBS and in February 2008, upgraded its probe of UBS into a formal investigation.

71.     Likewise, on February 2, 2008, WALL STREET JOURNAL reported that the United States Attorney for the Eastern District of New York ("EDNY") was investigating "whether UBS AG misle[]d investors by booking inflated prices of mortgage bonds it held despite knowledge that the valuations had dropped" bringing, for the first time, the specter of possible criminal prosecutions related to UBS's write-downs.  (Kara Scannell, Anita Raghavan and Amir Efrati, *The Subprime Cleanup Intensifies – Did UBS Improperly Book Mortgage Prices?*, Wall Street Journal, Feb. 2, 2008).

72.     Additionally, in December 2007, Switzerland's federal banking regulator, the Swiss Federal Banking Commission ("SFBC", also known by its German name, Eidgenössische

Bankenkommission or "EBK"), announced that it was investigating UBS's losses in the U.S. residential mortgage market, and which individuals within UBS were responsible for the losses. The SFBC's investigation broadened significantly in early April 2008, to determine whether UBS "breached market disclosure regulations" given UBS's shocking revelation on April 1, 2008 that it was writing-down an additional $19 billion in subprime and Alt-A mortgage-backed assets.

### J.      The UBS Shareholder Report

73.      Following the commencement of the SFBC investigation, UBS agreed to provide the SFBC with a report detailing the reasons behind the $18.7 billion in asset write-downs between October 30, 2007 and December 31, 2007.  In March, 2008, UBS issued a 400-page report, drafted by 20 UBS lawyers with help from UBS's auditor KPMG LLP, to the SFBC. UBS has not made the 400-page report available to the public.

74.      As a result of UBS shareholder outrage stemming from the $18.7 billion write-down, UBS agreed to provide shareholders with a summary of the 400-page report. Accordingly, on April 21, 2008, UBS released the 50-page "Shareholder Report."

75.      While the report was created and, thus, sanitized by UBS's army of attorneys and its external auditor, it made a variety of startling admissions (which are set out in detail *infra*). For example, the Shareholder Report:

a.      attributes 16% and 76% of the $18.7 billion write-down in 2007 to DRCM and the IB, respectively.;

b.      admits that between 2005 and 2007, the Company acquired a staggering $50 billion in super senior CDO bonds backed by high-risk subprime mortgages as a result of its focus on profit maximization and in complete disregard for the Company's stated risk policy and Class Period representations that UBS would not accumulate high concentrations of a specific asset type.;

c.      concedes that the GEB in March 2006 demanded that UBS management apply "tight controls" over and "carefully analyze" the planned increase in

fixed income positions to avoid the accumulation of illiquid commitments, which Defendants disregarded;

d.  admits that UBS management had concerns with the decline in the U.S. real estate market and the resulting effects on the MBS market, yet the IB continued to acquire additional mezzanine RMBS and CDO holdings backed by subprime collateral throughout 2007; and

e.  concedes that by September 2006, DRCM already had taken a net short position on the ABX, demonstrating that Defendants believed that the subprime backed securities market, and DRCM's subprime backed assets, were declining in value.

76.     When juxtaposed against Defendants' public statements, including, *inter alia*, that (i) UBS avoids "illiquid and concentrated positions" and ensures "adequate diversification of risk"; (ii) Defendants were "very highly focused on managing and controlling concentration and liquidity risk[,] ... executing on our growth agenda, without jeopardizing our risk principles," (iii) "we rigorously want to avoid risk concentrations of all kinds [--] we are basically obsessed with risk diversification", (*see* Walter Stuerzinger's June 4, 2008 Risk Management Presentation), the UBS Shareholder Report further demonstrates that Defendants' Class Period statements were materially false and knowingly when issued.

**K.     UBS's Fraud Extends Beyond the Subprime Debacle**

**1.     Defendants Conceal UBS's Multi-Billion Dollar Exposure to Auction Rate Securities ("ARS")**

77.     UBS's improper inflation of its financial results despite known losses is not limited to its exposure to subprime and Alt-A RMBS and CDOs.  During the Class Period UBS: (i) accumulated billions of dollars in ARS on its books in violation of its promise to avoid high concentrations of illiquid assets; (ii) represented to its clients that ARS had essentially the same liquidity as cash knowing that the ARS market was deteriorating; and (iii) failed to properly advise its investors and Plaintiffs that its multi-billion ARS portfolio was materially overvalued

27

starting in August 2007 when the market for ARS became illiquid, but for UBS's and other investment banks' artificially supporting the auctions. When the market learned in early 2008 that the ARS, which UBS previously had touted as "cash-equivalents", were illiquid, and that UBS had to write-down nearly $1 billion in ARS, UBS's stock price fell precipitously.

78.     ARS are long-term bonds with interest rates that are reset and determined regularly through a Dutch auction process. During the Class Period and unbeknownst to investors, the term "auction" was a misnomer as the interest rates for UBS-issued ARS often were not set in a true bidding process. Indeed, while UBS attempted to match-up ARS sellers with willing buyers in a "auction" context, often there was insufficient interest on the buyers' side. In those instances, UBS generated false demand for and liquidity of ARS by purchasing the unwanted ARS.

79.     As a result and unbeknownst to investors, UBS acquired at least ***$5.9 billion*** in ARS during the Class Period in direct contravention of its representations that UBS avoided accumulating high concentrations of any given asset type and illiquid assets.

80.     In February, 2008, the market for ARS crashed and investors were unable to sell securities that UBS had told them were highly liquid. Internal emails between UBS executives have surfaced, indicating that UBS executives knew that the market for these securities was deteriorating as early as August, 2007. Instead of informing clients and UBS investors of the drying market for ARS and their illiquidity, UBS continued to describe ARS as highly liquid cash alternatives. Additionally, the Company's internal emails indicate that UBS secretly began an aggressive campaign to unload UBS's ARS onto unsuspecting Wealth Management clients in an attempt to limit UBS's own risk exposure in the deteriorating market while at the same time purchasing ARS in order to support the auctions.

28

81.     Unable to keep up the charade, on March 28, 2008, UBS announced that it would begin marking down the value of the ARS held by investors, and that starting in April, 2008, UBS would no longer be calling ARS "cash equivalents" on customer statements; instead referring to them as "fixed-income securities." (*UBS Lowers Price of Security seen as 'Cash'*, *Wall Street Journal*, Mar. 29, 2008).   On May 6, 2008, UBS wrote down its ARS by *$974 million*.

82.     On May 7, 2008, following an investigation by the Massachusetts Attorney General into UBS's ARS portfolio, UBS agreed to pay the Massachusetts Turnpike Authority and 17 towns and cities a settlement of $37 million for its alleged ARS fraud.   Most recently, on June 26, 2008, the Massachusetts Securities Commission filed an administrative proceeding against UBS alleging that UBS had knowingly defrauded its ARS investors and released the aforementioned Company emails attached to its complaint.   These emails demonstrate UBS's knowledge of the deteriorating ARS market long before the March and May 2008 disclosures.

### 2.     UBS Counseled its U.S.-based Clients to Evade U.S. Tax Laws

83.     UBS's wealth management unit, long thought to have been a hallmark of UBS's conservative risk management approach, is reeling in the wake of a current U.S. Department of Justice ("DOJ") investigation into whether UBS aided wealthy U.S. clients in evading more than $300 million in U.S. taxes between 2000 and 2007.

84.     On May 7, 2008, UBS filed its quarterly results with the SEC on Form 6-K, announcing, among other things, that UBS was the subject of the DOJ probe into whether senior UBS advisors had helped American clients evade U.S. taxes.   (*UBS Announces $10.9 Billion Loss, Job Cuts and Tax Probe*, NEW YORK TIMES, May 7, 2008).

85.     Since May 7, 2008, details of the fraud prompting the investigation have

emerged. For example, a former senior UBS banker testified on June 19, 2008 in federal court that UBS executives explicitly advised American clients on how to evade U.S. taxes, including urging clients to destroy banking records and lie to customs officials. Likewise, the market has learned that while UBS released a statement stating that it was cooperating with the DOJ investigations in early May, 2008, it cautioned its Swiss-based wealth management team not to travel to the United States for fear of arrest. (*U.S. Detains Executive, Deepening UBS Inquiry*, NEW YORK TIMES, May 8, 2008 and *UBS Tells Unit Staff to Avoid US visits*, *Financial Times*, May 27, 2008).

86. The evidence revealed through the DOJ investigation directly contradicts Defendants' Class Period statements claiming, *inter alia*, that UBS performed "above and beyond what laws and regulations require," "strive[d] to maintain … compliance with relevant regulations," and "monitor[ed] and enforc[ed] compliance … with regulatory requirements."

## II.   JURISDICTION AND VENUE

87. This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

88. This Court has subject-matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

89. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391. Many of the acts and practices complained of herein, including the misrepresentations and schemes alleged herein, occurred in substantial part in this District. Additional facts supporting this Court's jurisdiction are set forth in Section XIV, *supra*.

90. In connection with the acts, transactions and conduct alleged herein, Defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States' mail, interstate telephone communications and the facilities of a national securities exchange and market.

## III.    PARTIES

### A.    Plaintiffs

91.    Lead Plaintiff The City of Pontiac, located in Michigan purchased shares of UBS stock at artificially inflated prices during the Class Period, as set forth in its certification that was previously filed in this litigation and incorporated herein by reference, and suffered losses in an amount to be determined at trial.

92.    Lead Plaintiff ATP is a pension and insurance fund based in Denmark that was established by statute in 1964 (the "ATP Act").  ATP's assets under management are approximately $80 billion.  ATP purchased shares of UBS stock at artificially inflated prices during the Class Period, as set forth in its certification that was previously filed in this litigation and incorporated herein by reference, and suffered losses in an amount to be determined at trial.

93.    Lead Plaintiff Union is based in Frankfurt am Main, Germany and is the holding organization of the Union Investment Group with offices in Germany, Switzerland, Luxembourg, Poland, Italy, and Spain.  The Union Investment Group ranks among the three leading German fund managers by market share, with fifty years of experience and 1,900 employees.  Union's assets under management are over $271 billion.  Union purchased shares of UBS stock at artificially inflated prices during the Class Period, as set forth in its certification that was previously filed in this litigation and incorporated herein by reference, and suffered losses in an amount to be determined at trial.

94.     Lead Plaintiff IFM is based in, Luxembourg, Belgium and is a subsidiary of DekaBank Deutsche Girozentrale AG, one of the largest German financial institutions and financial services providers with assets under management of more than €190 billion (or U.S. $300 billion).  IFM purchased UBS stock at artificially inflated prices during the Class Period, as set forth in its certification that was previously filed in this litigation and incorporated herein by reference, and suffered losses in an amount to be determined at trial.

95.     Representative Plaintiff Teamsters, located in Philadelphia, PA, purchased shares of UBS common stock at artificially inflated prices during the Class Period, as set forth in its certification attached as an appendix to the Complaint, and suffered losses in an amount to be determined at trial.

96.     Representative Plaintiff Council, located in England, purchased shares of UBS stock at artificially inflated prices during the Class Period, as set forth in its certification that was previously filed in this litigation and incorporated herein by reference, and suffered losses in an amount to be determined at trial.

### B.     The Corporate Defendant

97.     Defendant UBS is a global provider of wealth management, individual banking and investment banking services based in Zurich, Switzerland.  The Company provides a wide array of fixed income, equities, foreign exchange and investment banking services to customers in the United States and around the world.  In addition, UBS provides wealth management services ranging from asset management to estate planning to clients around the globe.  UBS maintains U.S. investment banking offices in Stamford, Connecticut, where it houses the world's largest trading floor, and in New York, New York, where the offices of DRCM were also located.  UBS has branch offices and subsidiaries in the United States and around the globe.

98.    Defendant Wuffli was the Group CEO of UBS and the President of the GEB from the beginning of the Class Period until July 6, 2007 when he was replaced by Rohner. According to the Company, the GEB has executive management responsibility for UBS and is accountable to the Board for the Company's results. The GEB is responsible for the implementation and results of the firm's business strategies, for the alignment of the Business Groups to UBS's integrated business model and for the exploitation of synergies across the firm. Together with the Chairman's Office, the GEB assumes overall responsibility for the development of UBS's strategies

99.    Wuffli was also responsible for setting the corporate agenda, ensuring high quality and timely decision-making, controlling the implementation of decisions made and ensuring that the Chairman's Office and Board are informed of issues in a timely and appropriate manner.

100.    Together with the Chairman, Wuffli was responsible for assuming a leading role in setting UBS's strategic direction, shaping an entrepreneurial corporate culture, determining UBS's risk philosophy, defining global compensation principles, planning succession at the GEB level, managing UBS's high quality reputation and representing UBS to investors, clients and other stakeholders, as well as to the general public.  As Group CEO, Wuffli maintained an "all-encompassing right to information and examination" regarding all matters handled by the Business Groups, and possessed veto power over "any decisions taken by any management body."  Wuffli signed the Company's annual report filed with the SEC on Form 20-F for the years ended December 31, 2005 and 2006, and each of the Company's quarterly, mid-year and year-end reports filed with the SEC on Form 6-K from the beginning of the Class Period until

July 6, 2007. Wuffli also provided certifications under sections 302 and 404 of the Sarbanes-Oxley Act of 2002 in connection with the Company's 2005 and 2006 annual reports filed on Form 20-F.

101. Defendant Ospel was Chairman of the UBS Board of Directors from the beginning of the Class Period until April 23, 2008. On April 1, 2008, after UBS reported an additional $19 billion in subprime-related write downs, Ospel announced that he would not seek re-election as Chairman. Kurer, Group Chief General Counsel, was named his successor at the Company's Annual General Meeting ("AGM") on April 23, 2008. As Chairman, Ospel was responsible for leading the Board, ensuring alignment of the Board Committees to the Board's agenda, and presiding over the Board meetings and the General Meeting of Shareholders. On behalf of the Board, Ospel was responsible for exercising ongoing supervision and control over the GEB, and for providing information to the Chairman's Office and the Board that was relevant to their function. As Chairman, Ospel was also required to challenge and support the Group CEO and the GEB in developing strategies, plans and targets, and to assume a leading role in designing the Group's Corporate Governance, Group CEO succession planning and in positioning the Group on issues of public affairs and corporate social and environmental responsibility. Together with Wuffli, Ospel was responsible for setting the Group's strategic direction and for shaping an entrepreneurial corporate culture, determining the Group's risk philosophy, defining global compensation principles, planning succession at the GEB level, managing the Company's high quality reputation and representing UBS to important investors, clients and other stakeholders, and the general public. Group Internal Audit ("GIA") reported directly to Ospel.

102.    Defendant Marcel Rohner ("Rohner") is the current Group CEO of UBS and a member of the GEB.  Rohner became Group CEO after Defendant Wuffli left UBS on July 6, 2007.  Prior to taking over for Wuffli, Rohner was Chairman and CEO of Global Wealth Management & Business Banking, and Deputy Group CEO.  Together with the Chairman, Rohner is responsible for assuming a leading role in setting UBS's strategic direction, shaping an entrepreneurial corporate culture, determining UBS's risk philosophy, defining global compensation principles, planning succession at the GEB level, managing UBS's high quality reputation and representing UBS to important investors, clients and other stakeholders, as well as to the general public.  As Group CEO, Rohner possesses an all-encompassing right to information and examination regarding all matters handled by the Business Groups, and possesses veto power over any decisions taken by any management body.  Rohner is also responsible for setting the corporate agenda, ensuring high quality and timely decision-making, controlling the implementation of decisions made and ensuring that the Chairman's Office and Board are informed of issues in a timely and appropriate manner.  Rohner signed the Company's annual report filed with the SEC on Form 20-F for the year ended December 31, 2007 and the Company's quarterly, mid-year and year-end reports filed with the SEC on Form 6-K from July 6, 2007 through the end of the Class Period.  Rohner also provided certifications under sections 302 and 404 of the Sarbanes-Oxley Act of 2002 in connection with the Company's 2007 annual report filed on Form 20-F.

103.    Defendant Standish was the Group CFO and a member of the GEB from beginning of Class Period until October 1, 2007 when he tendered his resignation.  As Group CFO, Standish reported directly to Defendant Wuffli, and later to Defendant Rohner.  According to UBS's 2005 Handbook, "[t]he CFO is responsible for transparency in the financial

35

performance of the Group and its individual businesses, for its financial reporting, forecasting, planning and controlling processes as well as providing advice on financial aspects of strategic plans and mergers and acquisitions transactions." During the Class Period, Standish was also responsible for UBS's tax and capital management and, in coordination with Defendant Wuffli and Tom Hill ("Hill"), the Company's Chief Communication Officer, defining the standards for accounting, reporting and disclosure. Standish was responsible for coordinating working relationships with internal and external auditors and, along with Defendant Wuffli, managing relations with investors. Standish signed the Company's annual report filed with the SEC on Form 20-F for the years ended December 31, 2005 and 2006, and each of the Company's quarterly, mid-year and year-end reports filed with the SEC on Form 6-K from the beginning of the Class Period until October 1, 2007. Standish also provided certifications under sections 302 and 404 of the Sarbanes-Oxley Act of 2002 in connection with the Company's 2005 and 2006 annual reports filed on Form 20-F.

104. Defendant Marco Suter ("Suter") was the Group CFO and a member of the GEB from October 1, 2007 through the end of the Class Period. Prior to becoming Group CFO, Defendant Suter was Executive Vice Chairman of the Board of Directors. According to UBS's 2007 Handbook, as Group CFO, Suter was responsible for ensuring that presentation of the financial performance of both the Group and its businesses was transparent, including high-quality and timely reporting and disclosure in line with regulatory requirements, corporate governance standards and global best practices. Suter also assumed responsibility for the Group's financial reporting, planning, forecasting and controlling processes, as well as the provision of advice on financial aspects of strategic plans and mergers and acquisitions transactions. Further responsibilities included overseeing UBS's tax and capital management,

and implementing risk principles in the areas of capital management, liquidity, funding and tax. In coordination with the Group General Counsel and Chief Communication Officer, the Group CFO also defines the standards for accounting, reporting and disclosure. These duties are in addition to managing relations with investors and coordination of working relationships with internal and external auditors. Suter signed the Company's annual report filed with the SEC on Form 20-F for the year ended December 31, 2007, and the Company's quarterly, mid-year and year-end reports filed with the SEC on Forms 6-K from October 1, 2007 through the end of the Class Period. Suter also provided certifications under sections 302 and 404 of the Sarbanes-Oxley Act of 2002 in connection with the Company's 2007 annual report filed on Form 20-F.

105. Defendant Stuerzinger was the Group CRO and a member of the GEB from the beginning of the Class Period until October 1, 2007 when he became the Chief Operating Officer of the Corporate Center, the UBS business group responsible for corporate governance and risk control. As CRO, Stuerzinger was responsible for "developing UBS's risk management and control principles and for formulating and implementing its risk policies and controls processes for market risk, credit risk and operational risk." During the Class Period, Stuerzinger was further responsible for ensuring that UBS's risk management approach was "consistent with best market practice and that the firm is operating within its agreed risk bearing capacity." Stuerzinger was also responsible for (i) "develop[ing] risk quantification methods and set[ting] and monitor[ing] associated limits and controls"; (ii) "ensur[ing] complete and consistent recording and aggregation of risk exposures"; and (iii) "continuous monitoring and pro-active control or risks." Stuerzinger exercised "direct approval authority for market risk limits and exposures," and reported directly to Defendant Wuffli, and later to Defendant Rohner.

106. Defendant Jenkins was Chairman and CEO of the IB and a member of the GEB

from the beginning of the Class Period until his October 1, 2007 resignation. Prior to taking over as CEO of the IB, Jenkins was the Head of Global Equities at UBS. Jenkins assumed the position of Investment Bank CEO when Defendant Costas became Chairman and CEO of DRCM. As Chairman and CEO of the Investment Bank, Jenkins developed a strategy to grow the Investment Bank's fixed income business in order to close the gap between the UBS Investment Bank and its U.S. competitors.

107. Defendant Singh was the Global Head of Securitized Products and Head of Debt Capital Markets Americas. Based in Manhattan, Singh criticized and covered up the markdowns certain DRCM traders took on their portfolios beginning in or around late February/early March 2007. After the Company announced it was closing DRCM in May 2007, Singh was appointed as DRCM's interim Chief Investment Officer. In addition, after Defendants Martin and Stehli left UBS in October 2007, Singh also took over UBS's mortgage-backed and asset-backed securities groups.

108. Defendant Martin was the Global Head of UBS's Rates business, a segment of the IB's FIRC unit, from the beginning of the Class Period until October 11, 2007. Within the Rates business, Martin was also the Head of Residential Mortgages and ABS. The Rates business included the CDO Desk run by James Stehli. Beginning in 2005, Martin was, in part, responsible for implementing the Investment Bank's fixed income growth plan developed by Defendant Jenkins. In addition, Martin was responsible for giving presentations to analysts and investors on global asset-backed and mortgage-backed securities throughout the Class Period.

109. Defendant Stehli was the head of UBS's Global CDO Group, a business unit within the IB's FIRC unit from the beginning of the Class Period until his departure on October 11, 2007. The Global CDO group was responsible for originating, retaining and purchasing

38

CDO bonds, and for reviewing all CDO transactions undertaken by UBS. Stehli was based in the Company's New York City office, and reported directly to Defendant Singh, the Head of UBS's Structured Products Group.

110. Defendant Costas was the Chairman and CEO of DRCM from the beginning of the Class Period until June 30, 2007. Prior to heading up DRCM, Costas was Chairman and CEO of UBS's Investment Bank, Deputy Group CEO and a member of the GEB. At DRCM, Costas was responsible, along with Co-Chief Investment Officers Defendants Karl and Hutchins, for implementing DRCM's trading strategies. Costas was also partly responsible for, among other things, determining DRCM's fee structure and for attracting investment capital to DRCM's OIF. Upon DRCM's closure, Costas agreed to help oversee its reintegration into the IB. Effective June 30, 2007, Costas assumed a senior advisory role at UBS, a position he held until October 2007 when he left the Company.

111. Defendant Hutchins was the Head of UBS's Fixed Income Rates and Currencies department until 2005, when he became the President and Co-Chief Investment Officer ("Co-CIO") of DRCM. Hutchins resigned from DRCM upon its closure on May 3, 2007. Among other things, as President and Co-CIO of DRCM, Hutchins, along with Defendants Costas and Karl, was responsible for the day-to-day implementation of DRCM's trading strategies.

112. Defendants Wuffli, Ospel, Rohner, Standish, Suter, Stuerzinger, Jenkins, Singh, Martin, Stehli, Costas and Hutchins herein are collectively known as the "Individual Defendants."

## D. The Confidential Witnesses Cited Throughout the Complaint

113. Confidential Witness #1 ("CW 1")[1] was a trader at UBS in the IB and DRCM from the mid-2004 until late 2007. While at UBS, CW 1 worked in sales, mainly in ABS and residential mortgage-backed CDOs. Generally, CW 1 provided information regarding, *inter alia,* the write-downs at DRCM and the IB's retention of super senior positions during the Class Period.

114. Confidential Witness #2 ("CW 2") was employed at the IB from mid-2006 until early 2007. CW 2 was hired to be a part of the newly created Real Estate Finance Group. Among other things, CW 2 provided information regarding the formation of the Real Estate Finance Group.

115. Confidential Witness #3 ("CW 3") was employed at UBS first as a collateral analyst working to purchase pools of loans and then as a structure analyst working to aggregated the pools of loans into bonds. CW 3 worked for the IB from early 2005 until late 2007. CW 3 provided information regarding UBS's purchase of subprime loans and UBS's process with respect to creating mortgage-backed securities, among other things.

116. Confidential Witness #4 ("CW 4") was a director in the IB from early 2006 until early 2007. While at UBS, CW 4 structured and sold CDO products. CW 4 provided information regarding, *inter alia*, the compensation CDO traders received, the application of risk management controls, the saturation of the CDO market and recognized problems in the CDO marketplace during his tenure at the Company.

---

[1] In an effort to protect the identities of knowledgeable witnesses who have come forward on a confidential basis, Plaintiffs have not pleaded all available information concerning job titles, locations, and starting and ending dates of employment when providing such information would be tantamount to revealing the witness' identity. Plaintiffs will provide such information to the Court *in camera* if the Court so requests.

117.     Confidential Witness #5 ("CW 5") was employed at UBS from late 2005 until late 2007 as a transaction manager.  CW 5 was responsible for managing the purchase of pools of Alt-A loans, which UBS then securitized into bonds.  CW 5 provided information regarding, *inter alia*, the downturn in the Alt-A market, the timing of this downturn as known within UBS and the effect of this downturn on UBS's business.

118.     Confidential Witness #6 ("CW 6") was employed at UBS in the IB from 2003 until 2008 as an associate director.  CW 6's duties included the purchase and securitization of subprime and Alt-A mortgages as well as institutional sales of mortgage-backed securities.  CW 6 provided information regarding, *inter alia*, the downturn in the subprime mortgage market, the timing of this downturn as known within UBS and the effect of the downturn on UBS's business.

119.     Confidential Witness #7 ("CW 7") was a director and a trader in the IB at UBS from late 2006 until early 2008.  Along with structuring CDOs, CW 7 also compiled statistics for UBS's CDO holdings and assisted with the Company's eventual write-downs of UBS's CDO positions.  CW 7 provided information regarding, *inter alia*, the effect of the downturn in the subprime market on UBS and the Company's write-downs, among other things.

120.     Confidential Witness #8 ("CW 8") was a quantitative analyst in the IB from early 2004 until the beginning of 2006.  While at UBS, CW 8 worked to create statistical models for the FIRC unit of the IB.  CW 8 provided information about how UBS developed its risk models.

121.     Confidential Witness #9 ("CW 9") was a director of quantitative analysis at UBS from mid-2002 until late 2007.  While at UBS, CW 9 reviewed valuation methodology for credit derivatives, including CDOs, which were developed by the relevant trading desks.  CW 9 provided information regarding, *inter alia*, Defendants' knowledge that the valuation

41

methodologies employed for valuing CDOs and other similar credit derivatives were incorrect and failed to yield reliable valuations.

122. Confidential Witness #10 ("CW 10") was an IT contractor at DRCM from the early 2006 until early 2007. CW 10 provided information regarding, *inter alia*, the interaction of Costas and Hutchins at DRCM, as witnessed during the course of his employ, and the general management systems, which he monitored, that tracked DRCM's financial positions.

123. Confidential Witness #11 ("CW 11") was employed at UBS in the IB as an Administrative Analyst from early 2007 until late 2007. CW 11's responsibilities included assisting the traders, including MBS/ABS traders, with any of their administrative needs. CW 11 provided information regarding Defendant Singh's interaction with DRCM.

124. Confidential Witness #12 ("CW 12") was employed as an underwriter at DRCM and the IB from the beginning of 2006 until early 2008. CW 12 provided information regarding the Commercial Real Estate ("CRE") business at DRCM.

125. Confidential Witness #13 ("CW 13") was a director in the IB from mid-2006 until late 2007. While at the IB, CW 13 bought pools of subprime loans and securitized them into bonds. CW 13 provided information regarding, *inter alia*, subprime market trends and the affect of the downturn in the subprime market on UBS and UBS's risk management at the IB during the Class Period.

126. Confidential Witness #14 ("CW 14") was employed at UBS Home Finance from early 2006 until late 2007, managing other underwriters. CW 14 provided information regarding UBS's underwriting standards in early 2007.

127. Confidential Witness #15 ("CW 15") was a director at the IB from late 2002 until early 2008. CW 15 managed other employees who bought and securitized pools of loans into

bonds. CW 15 provided information regarding UBS's ability to sell subprime MBS in early 2007.

128. Confidential Witness #16 ("CW 16") was a surveillance analyst in the IB from mid-2007 until early 2008. CW 16 provided financial analysis regarding UBS's mortgage holdings to traders in the MBS department. CW 16 provided information regarding the mortgage originators that UBS worked with as well as information regarding reports that were provided to UBS management.

129. Confidential Witness #17 ("CW 17") was a financial analyst in the IB from early 2005 until early 2008. While at UBS, CW 17 provided analysis to support the trading activities of RMBS and CDO traders. CW 17 provided information regarding, among other things, the quality of the subprime collateral used to originate CDOs and the growth of the Global CDO Group during early 2007.

## IV.    UBS's ORGANIZATIONAL STRUCTURE

130. The chart below depicts the relevant upper-level management structure within UBS as at March 31, 2007:



## V.    CONTROL PERSON ALLEGATIONS/GROUP PLEADING

131.    By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about UBS, its business, operations, operational trends, finances, and present and future business prospects.  The Individual Defendants would ascertain such information through UBS's internal corporate documents, conversations and connections with other corporate officers, bankers, traders, risk officers, marketing experts, and employees, attendance at management and Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as UBS officers and/or directors.

132.    It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and public statements, as alleged herein was the result of the collective actions of the Individual Defendants identified above.  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

133.    The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, knew, or with extreme recklessness, disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of securities laws.

134.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.    The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

135.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, they are responsible for the accuracy of the public reports and statements detailed herein.

136.    Each of the Defendants is liable as a participant in a scheme, plan and course of conduct that operated as a fraud and deceit on Class Period purchasers of the Company's securities.

## VI.    BACKGROUND

### A.    The U.S. Mortgage Crisis

137.    The current crisis in the U.S. residential mortgage market is rooted in the massive volume of mortgage loans given to higher credit risk consumers in recent years, and the subsequent bundling of those loans by investment banks, like UBS, into various security and debt obligations, or fixed income products, which were then marketed and sold by the banks to investors.

138.    Generally, after a homeowner gets a mortgage, the lending institution sells the mortgage to third-parties in the secondary market.  These secondary market participants include quasi-government institutions like Fannie Mae and Freddie Mac (or "agency" institutions), who purchase only certain mortgages that conform to specific underwriting standards, and private institutions, including many Wall Street firms (or "non-agency" institutions).

139.    During the late 1990s, as interest rates for mortgages declined, more and more individuals in the United States were afforded access to residential mortgages.  The increase in origination and lending to new homeowners spurred a rapid increase in the residential mortgage industry.  Demand for homes amid lower interest rates fueled a rise in home prices.  Rising home prices fueled a building boom in new homes.   Inevitably, as lenders attempted to reach ever more potential homebuyers, aggressive, and oftentimes predatory, lending practices by U.S. lenders spurred ever increasing loans to U.S. borrowers whose ability to repay their loans became particularly sensitive to interest rate changes.  Lenders were willing to take on riskier loans because there were always mortgage purchasers in the secondary market willing to relieve the lender of the risk associated with these loans.

140.     When housing prices began to stall and interest rates began to rise in mid-2005, homeowners who over-extended themselves by relying on teaser loans, which gave the mortgagee an artificially low interest rate for an introductory period of time, and those with poor credit and unstable income, began to default on their loans.  These default rates began to rise dramatically in 2005, leading to a cascading effect on the credit markets due to the correlation of the rising rate of default for subprime and Alt-A mortgages with the decline in value of the securities backed by these mortgages.

141.     UBS was an active participant and indeed, a market maker, in these complex financial instruments, which were based on underlying U.S. residential mortgages.    To understand UBS's fraud, it is necessary to briefly understanding how these financial instruments were created and how they were valued.

### 1.     The Explosion of Fixed Income Instruments Collateralized by U.S. Residential Mortgages

142.     Broadly speaking, in the U.S. residential mortgage market, borrowers are classified as being either "prime", "nonprime" or "subprime."  A subprime borrower is one who:

> has a high debt-to-income ratio, an impaired or minimal credit history, or other characteristics that are correlated with a high probability of default relative to borrowers with good credit history. It is generally accepted that a FICO [Fair Isaac Corporation] score less than 620 is considered Subprime. In addition to having lower FICO scores, Subprime borrowers typically have a loan-to-value [of property] ratio ("LTV") in excess of 80%.

(Shareholder Report at 49).

143.     In addition to subprime mortgages, another product that grew to prominence in the U.S. residential mortgage industry during the Class Period was the "no income/no asset verification" loan, otherwise known as a "NINA" or "no-doc" loan.    This product allowed

borrowers with a purportedly satisfactory credit rating to borrow money without providing any income verification. At UBS, this type of mortgage was classified as a nonprime or Alt-A mortgage, a category which included all mortgages that fell below prime status, but above subprime status, because they were deficient in one or more of the following categories: LTV Ratio, loan documentation, debt-to-income ratio ("DTI ratio"), occupancy status or property type. Any one of these factors could prevent the loan from qualifying for prime status under standard underwriting programs.

144. During the Class Period, UBS was the underwriter for and invested in RMBS. To create an RMBS, an originator or underwriter, such as UBS, purchased a large number of individual residential mortgages (often numbering in the thousands) from bank and/or non-bank mortgage lenders (*i.e.*, Washington Mutual or Countrywide). Generally, the purchased mortgages underlying an RMBS possessed similar characteristics with respect to the quality of the borrower (prime, Alt-A or subprime), so that they could be pooled together and rated accordingly.

145. Once the originator or underwriter purchased a sufficient number of mortgage loans, it then pooled the mortgages together and sold them to a "special purpose vehicle" ("SPV"). An SPV is a separate, bankruptcy-remote legal entity created by the originator in order to transfer the risk of the underlying mortgages off the originator's balance sheet. The SPV takes title of the individual mortgages and issues bonds or RMBS collateralized by the transferred mortgage pool. RMBSs are issued in tranches, ranging from "High Grade" (AAA- and AA-rated bonds), "Mezzanine" (BBB- to B-rated bonds), or an unrated equity tranche sometimes called the "residual."

146. The SPV is able to issue AAA-rated paper out of a pool of subprime mortgages

through the prioritization of payments and the apportionment of losses among the different classes of bonds. Typically, the AAA-rated tranche of the RMBS received first priority on cash flows from the borrowers on the underlying mortgages (otherwise known as "remittance payments") but received a lower yield on the investment, reflecting less reward for less presumed risk. Conversely, the equity tranche holders received the highest return on their investment because the equity tranche is the first tranche to experience losses in the event that the underlying pool of mortgages experienced defaults. Under the typical payment structure, the AAA-rated RMBS-holder would only experience losses if both the equity and mezzanine tranches were exhausted as a result of credit events, such as defaults, in the underlying mortgage collateral.

147. In most instances, an RMBS originator or underwriter, such as UBS, worked closely with one of the three rating agencies, Moody's Corp. ("Moody's"), Standard & Poor's ("S&P") or Fitch, to determine the right combination of mortgages to include as collateral for a given RMBS. The goal for an originator or underwriter, such as UBS, was to fill each mortgage pool with high interest paying but riskier collateral that would still allow for an AAA-rated class of RMBS. As set forth above, riskier Alt-A and subprime borrowers typically paid higher interest rates on their loans. By securing an RMBS with riskier loans that carried higher interest rates, an originator theoretically maximized the amount of interest payments that were paid into the SPV. This, in turn, allowed the SPV to issue RMBS bonds that paid higher interest rates, which placed the SPV at a competitive advantage in attracting investors.

148. Once a payment schedule was agreed upon and the rating agency assigned ratings to the various RMBS tranches, the SPV sold the resulting RMBS to investors. The SPV transferred proceeds from the sale of the bonds to the originator (*i.e.*, UBS) in consideration for

49

the underlying collateral. Additionally, the SPV passed on the remittance payments from the individual mortgagees to the RMBS-holders by the priority dictated in the RMBS agreement.

149. The following chart, created by the Commercial Mortgage Securities Association ("CMSA"), a trade organization of which UBS is a member, illustrates the creation and structure of a typical RMBS issuance:



150. While the RMBS structure may seem intuitive, it was by no means the end of the line from a financial engineering perspective. As UBS strived to become the preeminent provider of investment banking services in the world, it devised more complex structured finance products designed to profit from Mezzanine subprime RMBS, most notably cash, hybrid and synthetic CDOs.

## 2. Cash CDOs

151. Structurally, the Cash CDO resembles the RMBS in many ways. Both involve the transfer of assets to an SPV, and both involve the issuance of bonds by an SPV collateralized by the transferred assets. The major difference between an RMBS and CDO is that while an RMBS is collateralized by a pool of residential mortgages, the bonds issued by a CDO are collateralized by a pool of RMBS tranches (*i.e.*, bonds backed by residential mortgages).

152. CDO originators, such as UBS, typically finance the creation of the CDO and contract with a collateral manager to manage the distribution of the CDO assets and operations of the CDO thereafter.

153. At the CDO's inception, much like the creation of an RMBS, CDO originators like UBS amassed a collection of assets for inclusion in the CDO, a process known as "warehousing" or "ramping up" the CDO. Instead of warehousing residential mortgages, however, a CDO originator amassed and warehoused tranches of RMBS. According to UBS, the warehousing process typically took between one and four months to complete. During this interim period, originators like UBS assume 100% of the credit risk (*i.e.* the risk of default of the security) and the market risk (*i.e.* the risk of devaluation of the security) associated with holding the RMBS tranches in their warehouse and, thus, on their balance sheet.

154. Prior to sourcing and warehousing the RMBS collateral for the CDO, however, the originator and the CDO's collateral manager had to make a series of decisions regarding the quality of RMBS tranches used to collateralize a CDO. Specifically, the originator, such as UBS, had to determine whether to create a "Mezzanine CDO" or a "High Grade CDO." High Grade CDOs were typically collateralized by AAA/AA rated RMBS tranches, while Mezzanine CDOs were collateralized by lower, BBB/BB rated RMBS tranches. To create Mezzanine

CDOs during the Class Period, UBS utilized B-rated bonds backed by the riskiest subprime and Alt-A mortgages.

155. During the Class Period, originators, such as UBS, earned higher fees for structuring Mezzanine CDOs, which also paid higher interest rates to the CDO investors (to compensate for the added risk associated with holding bonds backed by BBB/BB rated paper). For this reason, during the Class Period UBS secretly and primarily originated Mezzanine CDOs backed by subprime mortgages.

156. The following chart, prepared by UBS for its Sixth Annual New York CDO Conference held on March 26, 2008, and after UBS admitted to the market in 4Q 2007 that it had been investing in Mezzanine CDOs backed by subprime mortgages, illustrates how UBS was able to purportedly turn high-risk subprime mortgage loans into triple-A rated securities:



157. Once UBS acquired the necessary RMBS collateral, it transferred the collateral to a bankruptcy-remote SPV. As with the creation of RMBS, the SPV housing the CDO then issued CDO bonds backed by the pool of RMBS.

158. Just as the CDO was collateralized by RMBS that had previously been divided into tranches *i.e.*, Mezzanine or High Grade RMBS, the CDO bonds that the SPV issued were also divided into tranches. In general, the bonds issued by a CDO were divided into at least three tranches: senior, mezzanine, and equity. In addition, CDOs originated by UBS during the Class Period also contained an AAA-rated super senior tranche.

159. Similar to an RMBS, the CDO was able to issue AAA-rated paper based on a pool of lower rated securities based on the prioritization of payments and the apportionment of potential losses suffered by the underlying RMBSs, or more specifically, defaults in the mortgages underlying the RMBS. Thus, the super senior tranche of the CDO received the first dollars paid into the CDO but received the lowest yield on its investment, while the equity tranche (which often was not even rated) received the highest return on the investment but absorbed the first mortgage default losses. Once the equity tranche has absorbed its maximum amount of losses, then the mezzanine tranche begins absorbing losses, up to a predetermined level, and so on up the tranches of the CDO.

160. The percentage of total losses at which a particular tranche begins absorbing losses in the event of default in the underlying collateral is called its "attachment point." The percentage of total losses at which a particular tranche stops absorbing losses and the next-highest tranche begins absorbing losses is called its "detachment point." The equity tranche's attachment point is 0%, while the super senior tranche will always have the highest attachment point. According to UBS, its super senior CDO positions had attachment points ranging from

30% to 55%. This means that once the total losses in the collateral pool reached 30% to 55%, UBS's super senior positions began to absorb losses. Moreover, since all other tranches must have been fully exhausted before the super senior tranche experienced any losses, the super senior tranche had a detachment point of 100%, meaning that it absorbed *all* losses exceeding its attachment point.

161. For example, assume that the equity tranche agrees to absorb all losses up to 10% of the notional value of the CDO, the mezzanine tranche agrees to absorb all losses between 10% and 20%, and the super senior tranche agrees to absorb all losses above 20%. If there are defaults in the underlying collateral totaling 15% of the notional value of the CDO, the equity tranche absorbs all losses up to 10% of the CDO's value, and the mezzanine tranche absorbs the remaining losses. If, however, there are losses of up to 70%, the equity absorbs all losses up to 10% of the CDO's value and is wiped out, the mezzanine tranche absorbs all losses between 10% and 20% of the CDO's value and is wiped out, leaving the super senior bondholder to absorb the remaining losses. Thus, in this example, despite being the most senior tranche, the super senior bond ultimately absorbs 71.4% of the CDO's total losses.

162. Again, in most instances, the CDO originator works closely with a rating agency to determine the right mix of RMBS such that AAA-rated bonds can be issued. As with RMBS creation, the goal for the CDO originator is to fill each pool with the lowest quality RMBS because, as set forth above, lower-rated RMBS carry higher interest rates, allowing the CDO investor to earn a higher yield on his or her investment. Notably, each individual RMBS included in the CDO is backed by the lowest quality *mortgages* that would support an AAA/AA rating for High Grade CDOs or a BBB/BB rating for Mezzanine CDOs. Thus, by also striving to include the lowest quality *RMBS* in the CDO, the risk associated with holding a CDO

position over an RMBS position is magnified exponentially.

163.    Finally, the SPV sold the tranched bonds to investors.  The SPV transferred the proceeds received from the sale of the bond to the originator (UBS), while the cash flows received by the underlying RMBS are passed through to the CDO investors in accordance with the CDO's payment structure.  In many instances, the CDO originator retained a tranche of the CDO to facilitate the sale and liquidity of the CDO tranches.  During the Class Period, UBS often retained the super senior bonds of the Mezzanine CDO it created.  UBS viewed the super senior CDO tranche as an "attractive source" of profit that would further management's desire to become the world's largest investment bank.  (Shareholder Report p. 14).

### 3.    Synthetic CDOs

164.    Synthetic CDOs were made up of bundled credit default swaps ("CDS") that in turn were linked to residential mortgages.

165.    A CDS is an insurance-type instrument used to transfer credit risk from the owner of an asset to another party.  A CDS is a contractual agreement between two parties whereby the owner of an asset (such as a residential mortgage), an RMBS tranche or a Cash CDO tranche agrees to make periodic payments to a counterparty in exchange for the counterparty's willingness to assume the risk of default associated with the underlying asset (sometimes known as the "referenced asset").

166.    For example, a protection buyer may own a RMBS bond.  Since the value of the bond could decrease if a substantial number of borrowers default in the underlying pool of mortgages, the bondholder seeking to hedge against this potential loss could do so by entering into a CDS with a counterparty who would agree, in exchange for annual premium payments, to accept the risk of loss associated with the bond.

55

167.     In this regard, a CDS operates like an insurance policy.  The "protection seller" provides the "protection buyer" with insurance against the risk of loss in the referenced asset, while the protection buyer agrees to provide the protection seller with regular premium payments.

168.     In the event of default, the protection seller usually agrees to either take possession of the insured asset at face value or to pay the protection buyer the difference between the bond's par value and the recovery amount on the bond.

169.     The protection seller is, thus, taking a long position with respect to the referenced asset, since the protection seller is betting that the default rate will be low and that the losses suffered by the holder of the mortgage, RMBS or Cash CDO position will be minimal.  The protection buyer is, accordingly, shorting the referenced asset in order to hedge against the risk of loss, since the protection buyer is betting that the asset will experience at least some amount of losses.

170.     Notably, CDSs offer protection sellers the ability to take a long position with respect to residential mortgages, RMBS and/or CDOs tranches without having to take possession of any underlying asset.  Moreover, CDSs also allowed originators, such as UBS, to hedge the credit risk associated with assets held in their mortgage warehouse.

171.     This was significant for CDO originators, like UBS during the Class Period, because they were no longer constrained by the amount of available mortgages and mortgage-backed assets. Indeed, while the number of mortgages UBS needed to create RMBS and Cash CDOs was finite (thus making the number of RMBS and CDO investors finite), there is, conceivably, no limit to the number of "insurance policies" or "CDS" that can be written in connection with existing RMBS and CDOs. Thus, UBS was able to take a finite number of cash

assets and create an unlimited number of synthetic assets which could be used as collateral to create even more CDO structures. It is in this vein that the Synthetic CDO was created.

172. The Synthetic CDO were not collateralized by mortgage loans, RMBS or CDO tranches, but were instead the right to premium payments from a basket of CDS agreements which insured against the risks of mortgage loans, RMBS and cash CDO tranches.[2] The creation of Synthetic CDOs opened the door to a seemingly endless amount of securitizations, because the *same* RMBSs and CDOs could now be referenced by originators like UBS in numerous structured financial transactions.

173. Other than a difference in the underlying assets, UBS originated a Synthetic CDO the same way it originated a Cash CDO, as discussed *supra*. Like the Cash CDO, the Synthetic CDO issued super senior tranche, a mezzanine tranche and an equity tranche.

174. Unlike a Cash CDO, however, the super senior tranche of the Synthetic CDO could remain unfunded in some instances, meaning that super senior investors received a portion of the CDS premium payments without initially contributing any funds into the collateral account. In the event that the assets referenced by the Synthetic CDO suffer losses which exceed the super senior attachment point, the bondholders would be forced to pay the excess amount to the CDO issuer, much like an insurance company.

**B. The Value of Fixed Income Securities Based on RMBS Were Sensitive to the Performance of the Underlying Pools of Mortgages**

175. According to Class Period publications from UBS's own fixed income research analysts, while the value of an RMBS or CDO is primarily derived from the value of the collateral underlying the RMBS or CDO and the prevailing interest rates, any downgrades in the

investment grade rating and market indices can also affect the value of an RMBS or CDO tranche.

176. First and foremost, the value of RMBS and CDOs referencing U.S. residential mortgages is dependent upon the mortgage borrower's ability to repay the mortgage loan. If borrowers are unable to make their mortgage payments or remittances, the RMBS or CDO will suffer losses that will reduce the overall value of the RMBS or CDO bonds.

177. Interest rates also effect the value of a security to the extent that the underlying loans were adjustable-rate mortgages ("ARM"), meaning that the interest rate paid by the borrower changes along with the prevailing market interest rates. For example, if an RMBS or CDO is backed by a pool of subprime ARMs, a rise in interest rates could cause the borrower's monthly payment to balloon, increasing the likelihood that the borrower will default on his or her mortgage, thereby affecting the value of the security.

178. Additionally, if a rating agency downgrades the RMBS or CDO tranche, the value of the tranche is reduced.

179. Finally, indices like the ABX Index are also probative of the market value of subprime RMBSs and CDOs. The ABX Index measures the cost of purchasing protection for a subprime RMBS. Thus, if the cost of "insuring" an RMBS increases, that suggests that the market anticipates that the RMBS will suffer future losses in value. Alternatively, a reduction in the cost of protection suggests that the market views the investment as becoming less risky. Significantly, the American Institute of Certified Public Accountants' Center for Audit Quality has affirmed the relationship between the level of the ABX Index and the value of securities backed by subprime mortgage loans. *See infra* ¶ 196.

---

[2] In addition, Hybrid CDOs also exist. Hybrid CDOs consist partially of synthetic assets (CDS) and partially of cash

**C.      Indicators That Mortgage Markets Were Deteriorating by Early 2006**

180.      There are three main indicators that are used by industry experts to assess the current state of, and future prospects for, the mortgage market:  (1) the Housing Price Index, which measures changes in home prices; (2) interest rates; and (3) delinquency rates, which monitor the percentage of mortgagors who default on their mortgage obligations.

181.      As illustrated in the following chart, U.S. housing prices collapsed in early 2006:



OFHEO HOUSE PRICE INDEX HISTORY FOR USA
Seasonally-Adjusted Price Change Measured in Purchase-Only Index

182.    As U.S. housing prices fell, interest rates increased dramatically between 2006 and 2007:



183.    This combination was devastating for U.S. borrowers who over-extended themselves by purchasing homes that they could not afford without low initial interest rates, called "teaser" rates, and on ARMs that increased substantially in 2006 and 2007.   In the early 2000s, since home values were rising at the time of purchase, and presumably would continue to rise in the future, buyers could refinance their 3, 5, or 7-year ARMs at the time the teaser rate expired, using the additional equity in the homes to support the refinancing.



**Figure 11: Comparison of Prime Versus Subprime Delinquency Rates, Total US 1998–2007**

Sources: Mortgage Bankers Association.

184.    Beginning in 2005 home values began to decline, interest rates began to rise, and ARM teaser rates expired.   As a result, the American homeowners who overextended themselves were faced with new, higher mortgage payments that they could not afford and could not refinance.   The result – beginning in the first quarter of 2005 – was that mortgage default rates rose dramatically, particularly for subprime loans.

185.    The increase in mortgage defaults in the U.S. residential mortgage market between 2005-2008, during which time UBS amassed a $100 billion portfolio of subprime and Alt-A mortgage-backed assets completely compromised the value of U.S. mortgage-backed securities, such as the RMBS and CDOs, by eroding the supposedly secure revenue streams that supported the highly rated tranches of RMBS and CDOs.   This erosion materially reduced the value of these assets and diminished their marketability.

186. The market signals that RMBS and CDO values were being eroded by increasing defaults of U.S. mortgages were rendered even clearer by the trading platforms that monitored pricing of RMBS.

187. For example, in January 2006, several banks, including UBS, collaborated with Markit to create an exchange known as the ABX Index to provide some purported value transparency within the RMBS and CDO market. The ABX Index showed that by no later than October 2006, subprime mortgage derived fixed income instruments were being adversely affected by the subprime mortgage crisis.

188. During the Class Period, the ABX Index tracked the performance of 15 to 20 equally-weighted RMBS tranches backed by subprime collateral and was used as a barometer for assessing how subprime loan related assets were performing in the market place. As noted above, the ABX Index tracked the cost of buying and selling CDS protection on selected RMBS tranches. Each of the 15-20 RMBS tranches had a different rating, from AAA to BBB- and was considered a representative sample of other RMBS tranches backed by subprime collateral with the same rating.

189. The various components of the ABX were classified by vintage (*i.e.*, the year that the underlying subprime collateral was issued). For example, the ABX Index 07-1 references subprime mortgage-backed RMBS tranches that were originated in the second half of 2006. Likewise ABX Index 07-2 references subprime mortgage-backed RMBS tranches that were originated in the first half of 2007. As the trend suggests, new indices are rolled out every six months.

190. For example, below is the complete ABX table as of February 23, 2007:

| Index | Series | Version | | Coupon | RED ID | Price | High | Low |
|---|---|---|---|---|---|---|---|---|
| ABX-HE-AAA 07-1 | | 7 | 1 | 9 | 0A08AHAC6 | 99.15 | 100.09 | 99.15 |
| ABX-HE-AA 07-1 | | 7 | 1 | 15 | 0A08AGAC8 | 99.15 | 100.09 | 99.15 |
| ABX-HE-A 07-1 | | 7 | 1 | 64 | 0A08AFAC0 | 92.50 | 100.01 | 92.50 |
| ABX-HE-BBB 07-1 | | 7 | 1 | 224 | 0A08AIAC4 | 75.21 | 98.35 | 75.21 |
| ABX-HE-BBB- 07-1 | | 7 | 1 | 389 | 0A08AOAC1 | 68.50 | 97.47 | 68.50 |
| ABX-HE-AAA 06-2 | | 6 | 2 | 11 | 0A08AHAB8 | 99.15 | 100.12 | 99.15 |
| ABX-HE-AA 06-2 | | 6 | 2 | 17 | 0A08AGAB0 | 99.15 | 100.12 | 99.15 |
| ABX-HE-A 06-2 | | 6 | 2 | 44 | 0A08AFAB2 | 92.69 | 100.12 | 92.69 |
| ABX-HE-BBB 06-2 | | 6 | 2 | 133 | 0A08AIAB6 | 76.80 | 100.58 | 76.80 |
| ABX-HE-BBB- 06-2 | | 6 | 2 | 242 | 0A08AOAB3 | 69.39 | 100.94 | 69.39 |
| ABX-HE-AAA 06-1 | | 6 | 1 | 18 | 0A08AHAA1 | 99.54 | 100.38 | 99.54 |
| ABX-HE-AA 06-1 | | 6 | 1 | 32 | 0A08AGAA9 | 99.76 | 100.73 | 99.76 |
| ABX-HE-A 06-1 | | 6 | 1 | 54 | 0A08AFAA7 | 96.20 | 100.51 | 96.20 |
| ABX-HE-BBB 06-1 | | 6 | 1 | 154 | 0A08AIAA4 | 88.50 | 101.20 | 88.50 |
| ABX-HE-BBB- 06-1 | | 6 | 1 | 267 | 0A08AOAA2 | 85.17 | 102.19 | 85.17 |

191.    In the table above, "Series" refers to the type of loan ("HE" or Home Equity), the bond's credit rating (*e.g.*, BBB), and the vintage of the referenced mortgage-backed securities (*e.g.*, 06-2).    "Coupon Rate" sets the annual premium payment (measured in basis points) that a protection seller agrees to pay a protection buyer over the life of the CDS.    For example, assuming a CDS notional value of $100 million, a Coupon Rate of 224 on the ABX-HE-BBB 07-1 means that protection on a BBB-rated RMBS tranche issued during the second half of 2006 would cost roughly $2.24 million over the life of the CDS contract.

192.    "Price" is the cost of buying the specific bond protection.    Essentially the "Price" is an expression of the par value of the referenced tranche.  The price is set to 100 on the day the particular Index is launched and equal to 100 cents on the dollar.  At 100, the only payment made by the protection buyer to the protection seller is the Coupon Rate.  If the Index drops below 100, however, it means that protection is becoming more expensive and that protection sellers are demanding an additional premium payment.  The amount of the additional premium is expressed by the amount by which the Index drops below 100.

193. By way of example, as of February 23, 2007, the ABX-HE-BBB 07-1 was trading at 76.80, a 23.20% discount from its 100 par value. This means that, in addition to the coupon payment, protection sellers were also demanding an up-front fee from protection sellers equal to 23.20% of the bond's face value. In the $100 million example above, this would translate into an up-front fee of $23.2 million, in addition to the $2.24 million coupon payment that will be made over the life of the contract.

194. Thus, by tracking the level of additional premiums required by protection sellers, the level of the ABX Index indicates market sentiment as to the likelihood that certain assets backed by subprime mortgages will experience future losses.

195. The ABX Index is important not only because it added some visibility to the subprime market during the Class Period, but also because many banks and CDO investors like UBS used the ABX to hedge against the risks associated with holding subprime assets. In fact, as discussed below, UBS/DRCM acquired short positions based on the ABX to offset any losses suffered from a drop in value of their subprime-backed RMBS holdings.

196. Significantly, the American Institute of Certified Public Accountants' Center for Audit Quality has stated that "the pricing indicated by the ABX credit derivative index for subprime mortgage bonds may be a Level 2 input [*see* ¶ 196 and Section V.F] when used as an input to the valuation of a security backed by subprime mortgage loans." As detailed below, all of UBS's RMBS and CDO holdings were characterized as "Level 2" assets, requiring UBS to consider all market observable inputs, including the ABX Index, upon setting the values of its holdings.

197. As set forth in the chart below, during the fourth quarter of 2006 and the first half of 2007, the value of the ABX indices plummeted, evidencing that the cost of insuring

subprime RMBS and CDO bonds had increased dramatically. Investors thus anticipated that the risks associated with subprime RMBS and CDO tranches would almost certainly cause large losses. Therefore, the collapse of the ABX Index during the Class Period was yet another indicator in the marketplace, which indisputably revealed that the value of RMBSs and CDOs backed by subprime mortgages was deteriorating at a near-historic pace during late 2006 and 2007:

**Figure 5: ABX.BBB 06-2**



Source: Markit

198. It is in this environment – defined by (i) the increase in mortgage defaults, (ii) the decline in home values, (iii) the decrease in remittance payments, (iv) the decline in the ABX Index, (v) severe financial difficulties experienced by mortgage originators and other investment banks (discussed *infra*), including the uptick in repurchase requests for early payment default ("EPD") loans, write-downs of subprime loans and subprime-backed assets and bankruptcies, and (vi) distressed asset sales and write-downs (discussed *infra*) -- that UBS chose to amass a $100 billion portfolio of loan pools, RMBS and CDOs backed by risky U.S.

residential mortgages, including Alt-A and subprime loans  and then concealed the deterioration of these assets when these impairments became obvious.  UBS's amassing of this $100 billion dollar portfolio of risk and illiquid assets contradicted Defendants' numerous statements during the Class Period concerning UBS's avoidance of concentrated positions in these types of assets. Defendants' efforts to conceal the value of UBS's assets in a deteriorating market inflated the Company's financial results and contradicted Defendants' assurances about UBS's minimal exposure to the ailing U.S. residential mortgage market.  These false statements and assurances to the market involved the knowing and/or reckless participation of each of the Individual Defendants as set forth herein.

## VII.    THE DEFENDANTS' FRAUDULENT SCHEME

### A.    UBS Publicly Claims to Improve Its Internal Controls Following the Long Term Capital Management Crisis and UBS's Merger with SBC

199.    UBS AG was created by the June 1998 merger of the Swiss Banking Corporation ("SBC") and the Union Bank of Switzerland ("Union Bank").  The merger between SBC and Union Bank resulted in a Swiss bank worth a combined $19.7 billion and, with CHF 1.3 trillion under management at the time, the world's largest wealth manager.  (Stephanie Baker-Said and Elena Logutenkova, *The Mess at UBS*, BLOOMBERG MARKETS, July 2008).   SBC had previously built a global investment banking business through its acquisitions of Dillon Read in New York and S.G. Warburg in London.

200.    Union Bank's merger with SBC followed a tumultuous period at Union Bank in which serious internal control problems almost led to the Swiss bank's demise, necessitating its merger with SBC, and causing the bank to lose $680 million in a single highly risky investment in the Long Term Capital Management ("LTCM") hedge fund.

201.    LTCM was a hedge fund founded in 1994. LTCM's trading strategies were enormously successful during its first few years in operation.  Because of LTCM's extraordinary early success, UBS desired to purchase a significant stake in the fund.

202.    As a result, UBS made an initial investment of approximately $540 million and then increased its bet by investing an additional $300 million.

203.    In 1998, LTCM began losing money at a spectacular rate, in large part because of the hedge fund's over-reliance on its Value-at-Risk measurement.   As the value of LTCM declined precipitously, the value of Union Bank's more than $800 million investment plummeted.

204.    During the LTCM debacle and prior to the merger, Union Bank was led by CEO Mathis Cabiallavetta ("Cabiallavetta").   Cabiallavetta's vision for Union Bank in 1998, like Defendants Ospel and Costas's during the Class Period, was to make Union Bank a leading investment bank.  In pursuit of this goal, Cabiallavetta, like Defendants during the Class Period, compromised Union Bank's internal controls, exposing it to hundreds of millions of dollars in liability.

205.    The newly-minted UBS executives blamed Cabiallavetta for the internal control problems that led to a $680 million loss.  UBS's new management promised widespread changes in internal control that would avoid the problems of its past.  According to the October 2, 1998 press release announcing Mathis Cabiallavetta's resignation from UBS:

> The internal audit into UBS's investment in Long Term Capital Management (LTCM) has uncovered shortcomings in risk management processes both before, during and after the UBS merger. …the Board of Directors of UBS has decided to implement changes at top management level. On top of this, the Board of Directors has encouraged the Group Executive Board **to learn the necessary lessons from what has happened** in terms of business orientation and risk management.

67

*     *     *

> ***The internal investigation identified shortcomings in those responsible
> for aspects of risk management as well as in the decision-making process
> both before, during and after the merger.*** Particularly, the evaluation and
> the ongoing management of risk positions were not carried out to the
> standards expected.

(Emphases added).

206.    As a result of the LTCM debacle, top executives from SBC, including Defendant Ospel, took over the newly created UBS and vowed never to let the drive for corporate profits compromise the Company's stated risk management policies. (*Id.*) According to an article in the July 2008 edition of *Bloomberg Markets*, "The Mess at UBS", "[i]n the aftermath, Wuffli told Bloomberg News that the LTCM affair 'reinforced our emphasis on controlling risk. That's still an essential part of our DNA.'" Unbeknownst to investors, however, UBS would commence a similar campaign to elevate the stature of the IB in 2005 – this time betting more than 100 times its investment in LTCM.

### B.    UBS Publicly Purports to Implement New Risk Management Policies and Controls to Prevent the LTCM Debacle From Reoccurring

207.    As a result of the LTCM losses, UBS's Board of Directors commissioned a review of the Company's risk management and control processes and procedures in the fall of 1998. UBS announced the results of the review in its 1998 Annual Report. According to UBS's 1998 Annual Report, the review revealed that UBS needed to make sure that it was, *inter alia*: (i) "reinforc[ing] existing efforts to ensure the completeness and accuracy of data which support the risk management decision-making process"; (ii) "assess[ing]…the risk/return potential of particular business activities fully [and] tak[ing] into account all relevant risk considerations"; and (iii) "measuring and limiting risk exposures towards potential loss in extreme conditions as

68

well as more normal conditions."

208.    This commitment to risk management in the wake of the $680 million loss, garnered Defendant Stuerzinger *Risk Magazine's* top honors as "Bank Risk Manager of the Year" for 2004.  In a January 2005 article, *Risk Magazine* cited the fact that UBS had "***made risk management a consistent core business priority since the bail-out of Union Bank of Switzerland by Swiss Banking Corporation in 1998***" due, in part, to the LTCM debacle, as support for its decision to give Stuerzinger the award.  (Emphasis added.)

209.    Moreover, the underlying message of the January 2005 article was crystal clear: UBS's risk management did not allow "large concentrations of highly exotic exposures." Stuerzinger was quoted as saying "[w]e apply our risk management and control principles rigorously to market risk" and "[w]e are a distributor of risk, not a reinsurer." (*Id*).  According to Defendant Costas, at that time, "strict concentration limits are in place at all…trading divisions at the bank, including the bank's interest rate division, the single largest consumer of risk at UBS." (*Id*).    Specifically, the January 2005 article noted that UBS was "***not particularly interested in warehousing large risks associated with some of the more complex interest products.***"  (Emphasis added.)

210.    Notwithstanding UBS's promises to shareholders that risk management would not be forsaken again in the name of corporate profitability, the Defendants ignored and manipulated UBS's risk management controls to effectuate a plan to invest tens of billions of dollars in the high-risk world of U.S. residential mortgage-backed securities, while misrepresenting, to the UBS investors the risks associated with these investments and concealing the losses incurred when the risks materialized.

### C. UBS Privately Casts Aside Its Internal Controls in a Renewed Effort to Become an Investment Banking Powerhouse

211. Following the UBS merger and the resolution of the LTCM scandal, Defendant Ospel was appointed CEO of UBS and after paying lip service to maintaining and abiding by UBS's new stringent risk management controls, "set about making his mark in investment banking and wealth management in the US." (*Id.*) In 2000, UBS spent $16.5 billion to acquire the PaineWebber Group, a U.S. brokerage firm, thereby commencing UBS's plan to become a "top-five" player in global investment banking, equities and debt market. In that same year, Defendant Ospel "decided to once again build a significant presence in the United States." (Jenny Anderson, *From UBS's Suite of Power to the Sweat of a Hedge Fund*, NEW YORK TIMES, Sept. 9, 2005).

212. In order to build UBS's "significant" presence in the U.S., UBS needed to understand and become more involved in the U.S. investment banking market. For that, UBS turned to Defendant Costas and the IB, based in Manhattan, NY and Stamford, CT.

213. Defendant Costas served as the COO of the IB from 2000 to 2001 before being promoted to chairman and CEO of the IB in 2002. As head of the IB, Costas was credited with increasing UBS's corporate and investment banking revenues from 22% of UBS's revenue in 1999 to 51% of UBS's revenue in 2003. Revenues from the IB's FIRC unit, a Manhattan-based arm of the IB run by Defendant Hutchins, grew from $2.8 billion in 2000 to $7.3 billion in 2004. (Stephanie Baker-Said and Elena Logutenkova, *UBS $100 Billion Wager Prompted $24 Billion Loss in Nine Months*, Bloomberg, May 19, 2008).

214. In 2001, Costas spent $600 million to hire 50 more senior bankers to augment the IB ranks and opened a new trading floor in Stamford, CT that was the size of two American football fields. According to a presentation given by Defendant Martin on May 12, 2005 titled

"Global Mortgage and Asset-Backed Securities" (the "May 12, 2005 Presentation"), by the end of 2001, UBS topped the list of underwriters of global mortgage-backed securities. In 2002, UBS embarked on a "5 year plan to broaden [its] product offerings by starting a whole loan conduit and growing [its] asset-backed business." The vast majority of these mortgage-backed securities were tied to U.S. residential mortgages.

215. In November 2003, during an interview with *Reuters News*, Defendant Costas revealed UBS's desire "to push into the top bracket of U.S. investment banking." (Knut Engelmann, *UBS's Costas Wants to Push Into Top Bracket*, REUTERS NEWS, Nov. 12, 2003 at 10:14 pm). Costas reiterated UBS's "bulge-bracket" bank dreams in December 2003, noting that opportunities for growth existed "in interest rate derivatives, credit derivatives, real estate and other commodity businesses that will enable [UBS] to close the gap" in the fixed income business and that UBS "ha[d] overcome that European niche class to become a viable competitor to US bulge bracket firms." (*John Costas Is Enjoying Life*, THE BANKER, Dec. 1, 2003).

216. By the beginning of 2004, the media proclaimed that UBS had succeeded in breaking into the "bulge bracket" of U.S. investment banks. (Ian Kerr, *The Rise and Rise of UBS's John Costas*, EUROWEEK, May 14, 2004). According to the May 12, 2005 Presentation, UBS was the third largest underwriter of U.S. CDOs in 2004. According to the *Financial News Daily*, Costas "turned the group's investment banking, trading and securities operations from an also-ran into a global powerhouse." (*Costas Deserves Place in Pantheon*, Financial News Daily, May 16, 2004).

217. Mere "bulge bracket" status, however, did not satisfy Defendants Ospel, Wuffli and Costas or UBS. In February 2004, Costas announced that "UBS next want[ed] to become

the world's most profitable investment bank" and, "[o]ver the next five years[, UBS] want[ed] to have the largest fee pool globally." (Jane Merriman and Alistair MacDonald, *UBS Sees Investment Bank Revs Growing By a Third*, REUTERS NEWS, Feb. 20, 2004 at 4:46 pm). Costas declared that UBS had "raised the bar" for its U.S.-based investment bank. (*Id.*)

218.     In July 2004, Costas once again announced "plans to expand [UBS's] investment banking business, mainly through organic growth." Costas further stated that, "[a]t the moment [UBS is] number four," citing three American entities as the top three investment banks (Citi, Goldman Sachs and Merrill) and noted that "there isn't any reason why we can't improve this position further." (*UBS Seeks Organic Invest Banking Growth*, Dow Jones Int'l News, July 29, 2004 at 9:52 am).

219.     All the while, however, Costas assured investors that UBS would not ignore the strict risk management principles that had come to define the Company since the LTCM debacle. As Costas stated in a mid-2005 interview with *Bloomberg News*, he would rather reject business opportunities than violate UBS's risk management policies, because ***"[i]t would be reckless to squander [UBS's conservative risk-management philosophy] for one quarter's earnings, or for a deal.***" (Emphasis added.)

### 1.     U.S. Mortgage-Backed Securities Secretly Became the Backbone of UBS's Investment Banking Growth Plan

220.     UBS's growth plan reached its apex and defining moment in 2005, when UBS embarked on a campaign of (i) originating, underwriting and retaining RMBS and Mezzanine CDOs collateralized by U.S. subprime and Alt-A mortgages, and (ii) maintaining a large portion of super senior tranches of the resulting Mezzanine CDOs referencing U.S. subprime mortgages on the Company's balance sheet. As noted above, Defendants implemented UBS's growth plan

at a time when market information, which, as set forth below, was obvious to Defendants, demonstrated deteriorating conditions in the U.S. housing market: (i) U.S. non-prime and subprime borrower defaults were escalating exponentially; and (ii) investor sentiment in and prices of securities backed by U.S. real estate collateral was falling. Defendants amassed tens of billions of dollars in RMBS and CDOs backed by subprime mortgages during this period for the purpose of securing short-term trading and securitization profits, and concealed the decline in value of UBS's holdings in these securities until late-2007 and early 2008 when UBS was forced to take more than $38 billon in asset write-downs.

221. After achieving success in growing its U.S. investment banking footprint from 2000 through 2004, UBS's plan to be one of the top investment banks stalled in early 2005. Despite statements by Defendant Costas in January 2005 that "UBS aim[ed] to become the world's most profitable investment bank by 2008" and "the most profitable investment bank in individual quarters before 2008" (*UBS Investment Bank Aims to Be Global Leader by 08*, Reuters News, Jan. 8, 2005 at 11:32 am) and Defendant Wuffli, a month later, reiterating Costas's January statements (Ian Kerr, *Watch out – Here Comes UBS*, EUROWEEK, Feb. 18, 2005), UBS had yet to cash in on two growing areas of business: hedge funds and fixed income (specifically, MBS and CDOs).

222. Despite Defendant Martin's statements during his May 12, 2005 Presentation titled "MBS and ABS" that UBS's "mission" in 2005 was "[t]o be the **dominant global intermediary** in the residential mortgage and asset-backed market" (emphasis in original), and UBS's "strengths," included its "[g]lobal origination and distribution capabilities," a "[w]ell capitalized and highly rated balance sheet," and a "[d]eep experienced RMBS/ABS sales, trading and research team," UBS fell steadily in the Global CDO League Tables, from 4th place

for the first half of 2005 to 10th place for 3Q 2005, before losing its "seat" at the league tables by 4Q 2005. (Thomson, *Debt Capital Market Review*).

> **2.** **UBS Launches DRCM in June 2005 as an Internal Hedge Fund to Pursue U.S. Fixed Income Investments Backed by U.S. Subprime Residential Mortgages**

223. UBS's quest to become the most profitable investment bank by 2008 spurred the launch of DRCM in June 2005. DRCM, as a business strategy, originated from a consulting project led by McKinsey & Co. ("McKinsey") during the summer of 2004. (Chris Hughes, Peter Thal Larsen, Haig Simonian, *Corroded to the Core: How a Staid Swiss Bank Let Ambitions Lead it Into Folly*, THE FINANCIAL TIMES, Apr. 20, 2008)

224. McKinsey worked with Defendants Wuffli and Costas, among other UBS executives, "to identify and plug gaps in UBS's business model." The project concluded, in part, "that UBS needed to harness the growth opportunity in alternative, but risky, investments such as hedge funds."

225. In implementing this strategy, however, UBS executives, including Defendants Wuffli and Costas, initially posited that UBS should not risk its own capital for investment in the hedge fund but, instead, should invest only those assets of its private wealth clients in return for a management fee. Thus, by creating an outside investor hedge fund, according to UBS's initial plan, UBS could allow its clients to utilize its proprietary trading strategies in exchange for the fees associated with alternative asset management vehicles. Like typical hedge funds, these fees included, at a minimum, a 20% success fee. Critically, UBS determined that it would not be risking its own capital to allow its clients to take advantage of UBS's proprietary trading strategies. Thus, DRCM was originally envisioned as a way for UBS "to ride the hedge fund wave without taking more risk."

### 3. The Appointment of Costas, Hutchins and Karl as DRCM's Leadership

226. When Costas joined Union Bank in March 1996 as the U.S. head of fixed income, Union Bank said that his hiring was a "milestone" in the expansion of its trading activities and heralded it as a step in its plan to strengthen its global fixed income business. Costas became the global head of fixed income in 1997, and in 2000 UBS promoted him to president and COO of UBS Warburg, the predecessor to the IB. As COO of UBS Warburg, Costas was instrumental in the acquisition and integration of the PaineWebber brokerage in 2000-2001.

227. On or about December 18, 2001, UBS appointed Costas CEO of the IB and to the GEB. UBS also named Costas Chairman of the IB in 2002 and Deputy Group CEO, or Wuffli's heir apparent, in 2004. As CEO of the IB, Costas was the central force behind UBS's drive to compete with the top tier of U.S.-based investment banks, including Citi, Merrill and Goldman Sachs.

228. Defendant Costas's two lieutenants at the IB were Defendant Hutchins and Karl. They were based in Manhattan, NY and Stamford, CT. UBS hired Hutchins one month after Costas in 1996 to be UBS's head of global finance and debt capital markets. UBS subsequently tapped Hutchins to run UBS's U.S.-based FIRC unit in 2002. Prior to the creation of DRCM, Karl ran PFCA, the IB's New York and Connecticut based proprietary trading desk. A March 24, 2005 EUROWEEK column titled "Confessions of a Gossip Columnist" by Ian Kerr noted, that, by 2003, if a big decision needed to be made in the IB, "the final OK ha[d] to come from John Costas, Mike Hutchins or Ken Karl in Stamford."

229. When UBS decided to launch DRCM, Costas issued an ultimatum to UBS management, demanding control of DRCM or Costas would leave UBS to become Morgan

Stanley's CEO. Hutchins and Karl were also expected to leave with Costas.

230.     Faced with the possibility of losing Costas, Hutchins and Karl to a competitor, UBS, through Defendant Wuffli, decided to hand over the control of DRCM to Costas and his lieutenants.

### 4.     DRCM Takes Control of the IB's Real Estate Business

231.     The structure for DRCM, as envisioned by McKinsey and UBS in the summer of 2004 -- a UBS-run hedge fund for outside investors -- did not satisfy the ambitious Costas and his equally ambitious Manhattan, NY and Stamford, CT based associates, as they wanted UBS to profit from the potential appreciation of DRCM's investments and not simply earn management and success fees. As a result, UBS management, and specifically, Defendant Wuffli, made the decision to alter the focus of DRCM. DRCM would no longer be solely devoted to executing trades on behalf of UBS's clients. Instead, DRCM would manage UBS's proprietary positions on the behalf of the IB business in order to generate profits for UBS. To facilitate this transition, IB transferred to DRCM's control: (i) PFCA; (ii) Mortgage Origination Services Group ("MOSG"); and (iii) Commercial Real Estate ("CRE"). While DRCM was responsible for trading, the IB kept control of the Global CDO Group, which was responsible for originating and selling CDOs.

232.     As reported by *Bloomberg* in a June 4, 2007 article titled "UBS Hedge Fund Loss Ensnares Wuffli, Echoes LTCM," "[t]he proprietary trading group that [eventually] went to Dillon Read…produced an average of almost $1 billion a year in revenue for UBS…Because the bank couldn't afford to give up such a cash cow, it struck an agreement with Costas: The securities division would continue to record Dillon Read's trading gains as its own and pay set fees as if the venture were outside the bank." According to a July 2008 *Bloomberg* article, UBS

was "trying to have [its] cake and eat it, trying to create a hedge fund and trying to keep the revenues in [its] investment bank."

233.    In keeping with the core business shift of DRCM, UBS gave Costas and associates $3.5 billion of capital along with 80 of the IB's top fixed income traders and 40 support staff, for a total personnel infusion of 120 employees to run.  (*Id*.)  UBS also gave DRCM offices down the street from the IB's headquarters in New York City.

234.    UBS further motivated Costas like a hedge fund manager, tying his compensation to the percentage of assets under management and the profits earned by the fund on these assets. UBS guaranteed Costas and his associates a $1 billion bonus over three years, a 35% success fee and a guaranteed management fee of 3% of the assets under management. (Ian Kerr, *How Arrogance Broke the Dillon Dream*, EUROWEEK, July 27, 2007).  Thus, even if DRCM failed to turn a profit on the $3.5 billion worth of UBS assets, it would receive 3% of the total assets under management or $105 million in compensation.

235.    Costas, however, enjoyed a significant advantage over other hedge fund managers.  UBS authorized DRCM to use UBS capital for its funding, thus reducing its borrowing costs.  DRCM was able to garner a positive carry, *i.e.*, the difference between the yield of an investment and the cost of funding it, on even the lowest yielding investments because of the extremely low borrowing costs.  The Shareholder Report confirms that DRCM had access to up to $100 billion in leverage and, according to *Bloomberg News'* "The Mess at UBS," Costas used $70 billion of that $100 billion to leverage his trades on behalf of UBS.

236.    UBS still envisioned that DRCM would create and manage outside investor funds, but as reformulated by Costas, the IB's legacy positions provided the bulk of DRCM's investment capital.  Indeed, as explained *infra*, the first outside investor fund was not launched

until almost a year and a half after UBS created DRCM in June 2005. Moreover, while DRCM managed at least $3.5 billion of the IB's positions and leveraged $70 billion in UBS capital to obtain further positions on behalf of the IB, it only ever managed $1.3 billion on behalf of the OIF.

237.    Thus, by early 2005, the focus of DRCM had been completely shifted from a traditional hedge fund, in which external investors shouldered most of the risks of the investments, to a multi-billion dollar and high-risk investment vehicle for UBS.

238.    On June 30, 2005, UBS announced the formation of DRCM, stating, in part:

> John Costas, currently Chairman and CEO of UBS's Investment Bank, will lead this business as CEO. Dillon Read Capital Management will form part of UBS's Global Asset Management business led by Chairman and CEO John Fraser. John Costas will leave UBS's Group Executive Board at the end of 2005. He will remain as non-executive Chairman of its Investment Bank.
>
> This new initiative will see UBS's Principal Finance and Commercial Real Estate trading businesses move from the Fixed Income, Rates and Currencies area of its Investment Bank to form the core of the new unit within the Global Asset Management business. Approximately 120 staff will transfer, mainly based in New York. Subsequently, the trading strategies managed by the team will be opened up to co-investment from sophisticated, principally institutional clients, and will be supplemented by further new offerings.
>
> In this way UBS will build a new stream of investment management fees from what has until now been a purely in-house trading activity. UBS will retain its current direct investment in the relevant trading portfolios, with any incremental future investments subject to UBS's usual risk management processes. This new business is similar in concept to other highly successful alternative asset management units within UBS, based on trading strategies developed within UBS's Investment Bank.
>
> *       *       *
>
> Dillon Read Capital Management will be launched on or around 1 January 2006. All management changes concerning UBS's Investment Bank are effective 1 July 2005.

239.    UBS appointed Hutchins and Karl as DRCM's co-chief investment officers.

UBS also named Hutchins President of DRCM. Costas, Hutchins and Karl were responsible for the day-to-day implementation of the trading strategies at DRCM that they had previously used while at the IB.

240. On June 5, 2006, almost six months after UBS was scheduled to launch DRCM, UBS transferred the businesses and trading books of the former IB businesses, PFCA, MOSG and CRE to the control of DRCM.

241. DRCM reportedly earned significant revenue in the initial months following its launch. Based on reported revenue of $1.2 billion and assuming net asset value of $3.5 billion, DRCM would have garnered a success fee of $420 million plus 3% of the assets under management, for a grand total of $525 million in fees. (Stephanie Baker-Said and Elena Logutenkova, *UBS $100 Billion Wager*, Bloomberg, May 19, 2008).

242. As set forth above, DRCM launched the OIF on November 2, 2006. To create the OIF, Costas hired another 130 in staff and rented offices around the world, including offices in the Cayman Islands and Singapore. The OIF raised approximately $1.3 billion, including $40 million that was invested by UBS.

### 5. Risk Management Controls for DRCM

243. With Costas's hedge fund having access to UBS's balance sheet for its funding purposes, it was critical that UBS monitor the risks to which Costas's trading strategies exposed the Company. UBS recognized the need to assess the risk associated with DRCM, specifically assuring investors that the Company was adequately monitoring risk. As set forth below, however, Defendants wholly disregarded such risk controls and, undisclosed to shareholders, UBS took on billions of dollars of exposure to the U.S. residential mortgage market at both DRCM and the IB. When it became obvious to the bank that the value of these positions backed

by risky subprime and Alt-A mortgages were extremely compromised in early 2007, UBS endeavored to conceal its exposure from its shareholders.

244.    As noted above, as of June 2005, DRCM became a business unit of UBS's Global Asset Management division ("GAM").  GAM was one of UBS's three business groups; the other two being the Investment Bank and the Global Wealth Management and the Business Banking Division.

245.    During an August 9, 2005 conference call with analysts, Defendant Wuffli explained the new reporting structure of DRCM as follows:

> On your second question, the whole activity of principal finance and corporate real estate that is shown under this revenue bucket, will be transferred.  That means about 120 people of staff and the book. And in that transformation, or in that transfer, the business model will be transformed from a proprietary trading business into an asset management business. ***That means the investment bank will stay on as an investor [in DRCM] but it will be charged fees, both management fees as well as performance fees.*** The management fees and the performance fees of the current business and of the incremental business, that means of assets raised with third party clients, will accrue in the future to UBS global asset management.  Whereas the investment bank will basically just stay on as an investor, with the capital it has currently invested.  And maybe over time, if it goes well, we'll increase that capital.

(Emphasis added).

246.    Because the IB (as "owner") and GAM (as "manager") had stakes in DRCM, they both were required to impose their respective risk management procedures on the operations of DRCM.  Specifically, the IB's risk managers were responsible for risk managing DRCM's proprietary positions while GAM's risk managers were responsible for risk managing the OIF's portfolio.  Additionally, the GEB assumed risk management responsibilities over DRCM by resolving any risk management disputes between the IB and GAM.  Thus, according to this structure, UBS was supposed to subject the operations of DRCM to three levels of risk

management during the Class Period.

247. Despite the elaborate internal control structure that was supposed to manage DRCM's risk, in reality, UBS had ceded much of the risk management of DRCM's trading positions to DRCM itself, which was financially motivated to disregard risk management in the pursuit of profits. Indeed, following the Company's write-downs of more than $38 billion in subprime and Alt-A mortgage-backed assets, the Company admitted in the Shareholder Report that it gave DRCM "exceptional levels of autonomy." CW 1, a trader at DRCM during the Class Period, confirmed that DRCM maintained its autonomy from both the IB and UBS's headquarters in Zurich. Thus, Costas, Hutchins and Karl operated DRCM virtually independently from its main office in New York City.

### 6. UBS Secretly Doubles-Down on Fixed Income by Simultaneously Ramping-up Its IB With Personnel Inexperienced to Handle the Risks

248. According to the Shareholder Report, the creation of "DRCM was not viewed as an outsourcing of IB's Fixed Income capability. Rather, *the IB intended to grow its own Fixed Income business*, notwithstanding the loss of PFCA." (Shareholder Report) (emphasis added).

249. For example, UBS hired CW 2 in mid-2006 to work as a director in the Real Estate Finance group, which the IB set up to compete with DRCM. According to CW 2, the IB's "angle was to create another real estate group that could compete within UBS with Dillon Read." CW 1 further stated that the IB sought to create a new PFCA after the original PFCA was transferred to DRCM.

250. Thus, the creation of DRCM "added to the pressure to grow IB Fixed Income." (Shareholder Report p.33).

251. The IB attempted to replicate Costas's business strategy with a completely new

81

staff as Costas, Hutchins and Karl, and 80 of the most-experienced senior fixed income traders and risk management personnel transferred to DRCM. As such, the IB exposed the Company to tens of billions of dollars in high risk investments with inexperienced traders and risk management personnel beginning in 4Q 2005. For example, CW 3, a director at the IB during the Class Period, whose job responsibilities included purchasing pools of loan or collateral and structuring the aggregated loans into RMBS, was considered "one of the senior collateral people," with only a few years of experience at UBS.

252. To fill the void left by Costas, Hutchins and Karl, UBS appointed Defendant Jenkins, the former Global Head of Equities, as the new chairman and CEO of the IB. Simon Bunce, the former President and CEO of UBS Securities Japan Limited, replaced Defendant Hutchins as the head of FIRC. Defendant Jenkins and Bunce assumed their positions as of July 1, 2005.

253. Neither Jenkins nor Bunce was equipped to manage the IB, and particularly the FIRC business unit, which included the Rates business run by Defendant Martin, a Manhattan, NY based UBS executive, and the Global CDO Group, run by another New York based executive, Defendant Stehli. UBS later admitted in the Shareholder Report that neither Jenkins nor Bunce had any expertise in Fixed Income trading. Moreover, the Shareholder Report disclosed that Jenkins and Bunce took over the IB just as "considerable talents had moved from the IB to DRCM."

254. Significantly, neither Jenkins nor Bunce had a strong background in risk management. Additionally, "[a] senior risk manager in Fixed Income was not hired, even though this had been planned in 2006." (Shareholder Report). To make matters worse, the IB subordinated risk analysis to the maximization of profits. According to the Shareholder Report,

"[t]he IB was focused on the maximization of revenue" with an "asymmetric focus…on revenue and P&L, especially when compared to discussion of risk issues."

255.    With the departure of Costas's IB team, UBS realized that it had to counter market skepticism as to whether the IB was properly equipped to continue the lines of business that Costas had created.   On the day that UBS announced the creation of DRCM, "[a]nalysts voiced concern that high-flying Costas [was] leaving the investment bank after his strategy of hiring top talent during a downturn in 2002/2003 lifted the firm into the so-called bulge bracket of global investment banking groups." (Douwe Meidema, *John Costas to Build New Hedge Fund at UBS*, Reuters News, June 30, 2005 at 8:47 am).   According to *Reuters,* Vasco Moreno, a research director for Keefe, Bruyette & Woods, stated it was a "negative that John Costas is gone.   He was a charismatic leader and responsible for making the investment bank into the global force that it is today."

256.    In articles dated July 8, 2005 and August 19, 2005, Ian Kerr, a columnist for EUROWEEK, speculated that "if UBS Investment Bank was losing the services of more than 100 professionals to the new Dillon Read venture, including John Costas, Mike Hutchins and Ken Karl, wouldn't profitability decline, especially in key fixed income, rates and currencies division?" (Ian Kerr, *Minds Boggle in Zurich at UBS Hedge Fund*, EUROWEEK, July 8, 2005). Kerr asked a similar question in an August 19 article:   "If John Costas was throwing all his fancy titles to the wind and decamping to a separate floor with as many as 200 of his best people, surely this would have a damaging impact on UBS Investment Bank's core securities businesses?" (Ian Kerr, *UBS Needs to Show There is Life After Costas*, EUROWEEK, Aug. 19, 2005).

257.    In light of market's concern, Defendant Jenkins and Bunce sought outside

consulting help in an attempt to achieve the extremely high goals set by Defendants Ospel and Wuffli for the IB.

> **7.** **The IB's External Consultant's Report Identified UBS's Fixed Income Business as the Company's Biggest Competitive Gap**

258.    In July 2005, Defendant Jenkins, shortly after taking over for Costas, hired New York-based consulting firm Mercer Oliver Wyman ("Mercer"), to carry out a strategic review of UBS's fixed income business (the "Mercer Study").  As disclosed in the Shareholder Report, the Mercer Study revealed that "of all the businesses conducted by the IB, the biggest competitive gap was in Fixed Income, and that UBS's Fixed Income positioning had declined vis-à-vis leading competitors since 2002."

259.    Specifically, the Mercer Study concluded that the U.S.-based FIRC's, "revenues decreased since 2004" and, as a result, UBS's FIRC had "moved down in competitor league tables by revenue."  The Mercer Study further found that "the IB Fixed Income business grew its revenue at a slower rate than its peers" and identified "gaps in [UBS's] Credit, Securitized Products and Commodities businesses" and, to a lesser extent "gaps in Rates and Emerging Markets."

260.    The Mercer Study did not tell the IB anything it did not already know, as FIRC income before taxes was down 14% in 1Q 2005 compared to 1Q 2004.  In 2Q 2005, UBS reported FIRC pre-tax income down 18% compared to 2Q 2004.  According to UBS's 2Q 2005 press release that accompanied the results, because of "[d]ifficult trading conditions," FIRC experienced "lower revenues in credit fixed income and rates businesses lines."

261.    Moreover, as set forth above, throughout 2005 UBS was steadily losing market share in both the ABS/MBS market and the Global CDO market.  The poor 2005 results caused

UBS to fall "from its third place spot among ABS CDO underwriters in 2004." (Alison Pyburn, *UBS CDO Market Posts Gains Through 2005*, ASSET SECURITIZATION, Jan. 9, 2006).

262.     FIRC's decline in revenue and market share occurred at a time when the U.S. asset-backed securities CDO market grew by more than 66%.

263.     To address the foregoing revenue shortfall and decline in status as an ABS and CDO underwriter, the Mercer Study "recommended that UBS selectively invest in developing certain areas of its business to close key product gaps including…Rates [and] MBS Subprime and Adjustable Rate Mortgage products." According to the Shareholder Report, the Mercer Study "specifically identified" ABS, MBS and ARMs, the underlying assets of which were subprime mortgages.

264.     Significantly, the outside consultant did not review the effect of the recommended subprime mortgage-backed products on UBS's stress or market risk. Thus, it was left to UBS and the IB to assess the risks associated with the proposals in the Mercer Study and implement the necessary risk management policies to control those risks, which Defendants deliberately disregarded.

> **8.     The IB's Fixed Income Growth Strategy is Privately Endorsed by UBS's Global Executive Management Group Despite the Group's Concerns About Internal Controls**

265.     Following the receipt of the Mercer Study, Defendant Jenkins developed an ambitious strategy to build out the IB's Fixed Income business, focusing, in part on increasing UBS's exposure to securitized products and structured credit, including U.S. mortgage securities and CDOs. The strategy "replicat[ed] the proprietary trading strategies of [DRCM.]" (Stephanie Baker-Said and Elena Logutenkova, *The Mess at UBS*, BLOOMBERG MARKETS, July 2008).

266. The IB presented this strategy to the GEB led by Defendant Wuffli, in March 2006 for ratification. The GEB members also included (i) John Fraser, the chairman and CEO of GAM, (ii) Defendant Jenkins, (iii) Peter Kurer, the former general counsel and current Chairman of the Board of Directors, (iv) Defendant Rohner, in his capacity as the chairman and CEO of the Wealth Management division and deputy CEO, (v) Defendant Standish, (vi) Defendant Stuerzinger, (vii) Rory Tapin, the chairman and CEO of Asia Pacific and (viii) Raoul Weil, the head of Wealth Management. The GEB had executive management responsibility for UBS and was responsible for implementing the risk principles. The GEB also received regular updates on risk matters from Defendant Stuerzinger throughout the Class Period. *Id.*

267. When the IB presented the GEB with the Fixed Income growth strategy in March 2006, the GEB expressly considered the possibility that the strategy would likely mean "the increase in highly structured illiquid commitments" on the IB's balance sheet, and, as a result, decided that any additions to the balance sheet "***would need to be carefully analyzed and tightly controlled[.]***" (Shareholder Report) (emphasis added).

268. Even though UBS, told investors that it was monitoring risk so as to avoid high concentrations of assets types and recognized, through the GEB, that the IB's Fixed Income growth strategy was "ambitious" and required "tight control" and "careful analysis," UBS conceded in the Shareholder Report that Defendants made no "investment in the type of control resources and infrastructure commensurate with the significant increases in volumes, revenues and complexity" associated with the strategy. (Shareholder Report.)

269. In addition to management's failure to implement and misrepresentation that UBS was implementing proper risk management controls, internal sources interviewed by *Financial News Online* stated that "the pressure to build aggressively in fixed income came from

86

the very top" management of UBS. (William Wright and David Rothnie, *Inside the $37bn Losses at UBS*, Financial News Online, May 20, 2008 available at www.efinancialnews.com).

270.     In effect, UBS pressured the inexperienced IB to embark on an "aggressive" expansion campaign involving the investment of tens of billions of dollars and recognized that such a campaign involved a great deal of risk that should have been actively monitored and controlled, yet did nothing to monitor or control that risk and misrepresented that fact to investors.

271.     Worse yet, the GEB left the risk management responsibilities with the U.S.-based IB employees who saw risk management as a check on their compensation, and were thus motivated to manipulate UBS's limited risk management policies.  UBS admits the GEB, who exerted pressure to build the aggressive fixed income growth plan "relied on assurances of others rather than obtaining all of the facts and analytically reviewing the situation." (Shareholder Report).

272.     Moreover, while the GEB "was alert to general issues concerning the deteriorating US housing market, they did not demand a holistic presentation of UBS's exposure to securities referencing US real estate assets before July 2007" in part because the U.S.-based "IB Senior Management assured Group Senior Management that the risks in the IB were well managed."

**D. DRCM and FIRC Secretly Take on Enormous Risks as They Focus on Subprime and Alt-A Mortgage-Backed Assets as Their Principal Investment and Trading Strategy**

**1. DRCM's Trading Strategies Emphasize Immediate Profits at the Expense of Exposing UBS to Enormous Market Risks**

273. As set forth above, upon its creation, DRCM inherited approximately $3.5 billion of the IB's fixed income positions to manage on a proprietary basis. UBS further promised Costas, Hutchins and Karl a performance fee of 35% of any trading gains from DRCM's total assets, plus 3% of the net assets under management, also known as a management fee. More specifically, Costas, Hutchins and Karl would have received 3% of the net asset value, *i.e.,* the total value of assets on DRCM's books minus any liabilities.

274. Because of the structure of the hedge fund, Costas, Hutchins and Karl were motivated to grow DRCM's balance sheet exponentially in order to garner larger and larger fees from UBS. DRCM's trading strategies focused almost exclusively on investments in mortgage-backed securities. Exploiting its access to low cost funding, DRCM acquired large positions of low yielding CDO tranches as these still offered positive returns. The accumulation of those assets, however, exposed UBS to market risk, while DRCM's managers enjoyed the profits. Ultimately, DRCM's strategies led to the accumulation of billions of dollars in high-risk mortgage-backed securities from June 2006 through April 2007. UBS has since admitted that approximately 16% or $3 billion of UBS's write-downs as at December 31, 2007 were as a result of losses on DRCM's positions.

2.    **The IB Privately Adopts an Equally Risky Strategy of Originating Subprime-Backed Mezzanine CDOs and Retaining the Resulting Super Senior Tranches**

275.    UBS admits that DRCM "was not viewed as an outsourcing of the IB's Fixed Income capability. Rather, the IB intended to grow its own Fixed Income business" subsequent (and in addition) to the creation of DRCM.  Indeed, if UBS was going to be the most profitable IB by 2008, it would need to excel in fixed income, and specifically in the origination of RMBS and CDOs.  Thus, while DRCM exponentially increased UBS's exposure to high-risk subprime backed assets between May 2005 and May 2007, UBS's IB Global CDO and ABS Groups located in Manhattan, New York and run by Defendant Stehli and Defendant Martin, respectively, did the same starting no later than February 2006.

276.    During the Class Period, the Global CDO Desk originated CDOs by acquiring the collateral or "raw material" such as RMBS, using UBS's low cost funding.  The collateral would then be warehoused on UBS's balance sheet, exposing the Company to all the credit and market risk associated with these positions, for a period of 1-4 months.  Finally, UBS would transfer title to the assets to the CDO,  retaining the super senior tranche of the CDO while it placed the other tranches with third-party investors.

277.    The IB, and specifically the ABS and Global CDO Groups, received structuring fees for sourcing collateral and ramping up a CDO based on the notional value of the deal.  As noted above, UBS received higher structuring fees for originating Mezzanine CDOs as opposed to High Grade CDOs because the Mezzanine CDOs contained higher risk RMBS backed by subprime loans. (Shareholder Report). For this reason, the CDO Desk focused almost *exclusively* on structuring, and thus, acquiring tranches of Mezzanine CDOs during the Class Period.  According to CW 4, a director in the IB during the Class Period who dealt with CDOs,

"RMBS backed CDOs were [UBS's] forte" and, UBS was the most prolific Mezzanine CDO originators during the Class Period.

278.     Further compounding UBS's subprime exposure was its investment in synthetic CDOs.   As detailed above, while the IB originated additional cash CDOs and retained and purchased super senior tranches of those CDOs, the availability of loan pools and RMBS collateral with which to create RMBS and traditional cash CDOs, respectively, was diminishing. For example, CW 5, a transaction manager in the IB during the Class Period who routinely purchased Alt-A mortgage pools for UBS's securitization activities, confirmed that as early as 1Q 2006, s/he noticed that the amount of Alt-A mortgage pools for sale had started to slow down and that, increasingly, the loans were drying up.

279.     As a result, in pursuit of more structuring fees, UBS created and invested in synthetic and hybrid CDOs – the "assets" of which were the right to premium payments under a pool of CDS agreements referencing RMBS and CDO tranches, not the RMBS or CDO tranches themselves.   UBS admitted that more than 75% of the total CDOs originated by the IB during the Class Period were hybrid CDOs, which contained a combination of cash and synthetic CDO tranches.

280.     Prior to 2005, the CDO Group sold all of the tranches that made up the UBS-originated CDOs, including the super senior tranche, the junior tranche and the equity tranche. By late 2005, however, the IB executives, including, but not limited to, Defendant Stehli, began retaining *all* of the super-senior tranches from the CDOs it originated.

281.     According to the Shareholder Report, "[o]ne factor influencing this change was that the CDO desk viewed retaining the super senior tranche of CDOs as an attractive source of profit."   First, with respect to traditional cash CDOs, UBS purchased or "funded" the super

senior tranche for its stated value because the cost of obtaining the funds to purchase the tranche was less than the yield that the tranche generated, *i.e.*, the purchase "yield[ed] a positive carry (*i.e.* return) above the internal UBS funding rate."

282.    Second, with respect to the synthetic CDOs, UBS purchased the super senior tranche because UBS was not required to fund or pay for the position until an insurance triggering event associated with the underlying CDS required such, *i.e.*, the "unfunded" purchase generated revenue without creating an offsetting liability on UBS's balance sheet. UBS referred to the "unfunded" super senior tranche positions from synthetic CDOs as "Variable Funding Notes" ("VFN") because they required no initial payment on the part of the bondholder.

283.    Essentially, UBS was able to retain a super senior tranche of a synthetic CDO and receive the premium payments from the underlying pool of CDSs without having to put up any collateral, even though UBS agreed to commit funds should the CDOs insured by the underlying CDSs lose value requiring the payment of insurance proceeds.   UBS did not record the committed, but unpaid, funds as a liability on its balance sheet because Defendants believed that UBS was only required to record a liability to the extent of the replacement value of the derivative, which was initially zero.   Thus, the VFN allowed UBS to obtain regular interest payments without having the note appear on its balance sheet, even though it risked incurring a significant financial liability in the event that the underlying collateral performed poorly. According to the Company, the acquisition of VFNs was one of the three key drivers in the growth of UBS's super senior CDO inventory, along with its increased use of hybrid CDOs and AMPS trades (discussed below).

284.    UBS was further motivated to retain the super senior CDO tranches not only to build its asset base and revenue stream, but also to maintain the liquidity of the CDO market so that UBS could continue creating (and maintaining tranches in) CDOs.

285.    Indeed, CW 1 confirmed that UBS retained the super senior tranches of the CDOs it created to maintain liquidity in the market for its CDOs.  According to CW 1, the super senior tranches, were "harder to move" than the mezzanine or equity tranches, meaning that UBS was unable to sell them to third-party investors.  CW 1 stated that because counterparties were more interested in the higher yield associated with the lower level tranches, the super senior tranche – the lowest risk, lowest yield tranche – was not a sought-after investment.  As a result, to continue consummating CDO deals in an effort to drive profits, UBS had to retain the super senior tranches – and the risks associated with them – indefinitely.

286.    Due to UBS's drive for CDO origination fees and the profits that were supposed to be generated from the retained super senior tranches, the IB CDO Desk at the direction of Defendant Stehli, among others, accumulated tens of billions of dollars in super senior CDO positions collateralized by high-risk, subprime mortgages during the Class Period.  In retaining these positions, however, the CDO Desk, and specifically Defendant Stehli, disregarded the Company's stated policy of avoiding such highly concentrated exposure to one type of asset and recklessly disregarded the astronomical amount of risk UBS would be exposed to if defaults on the underlying mortgage collateral began to rise.

287.    CW 6, a director in the IB during the Class Period whose job responsibilities included subprime, prime and Alt-A securitizations and institutional sales, confirmed that even as UBS began to limit its purchase of subprime mortgages in early 2007, thereby recognizing the extensive deterioration that the U.S. subprime mortgage market had experienced throughout

2006, UBS continued to acquire BBB and BB bonds backed by the same high risk subprime loans, from RMBS deals for use as collateral in mezzanine CDOs.  Indeed, UBS admits that in Q2 2007, despite its own pessimistic view of the subprime mortgage market, UBS's CDO Desk run by Defendant Stehli acquired further substantial subprime RMBS. (Shareholder Report). At the same time that UBS was avoiding subprime loan purchases due to their inherent risk, but investing in subprime backed RMBS and CDOs, UBS's own analysts were advising the market that investing in Mezzanine CDOs backed by subprime RMBS was akin to "invest[ing] directly in the subprime securities" themselves.  (*CDO Insights*, Jan. 2, 2007).

288.    The effect on UBS's balance sheet of its frenzied investment in subprime-backed CDOs was immediately apparent.  For 1Q 2006, UBS reported that the amount of its debt instruments, which included RMBS and super senior CDO tranches, grew by ***CHF 5 billion*** from the previous quarter's level, "mainly due to higher positions in commercial paper and asset-backed securities."  In 2Q 2006, debt instruments rose by a whopping ***CHF 69 billion***, again, "mainly due to higher positions in…asset backed securities."  The exponential growth continued into 3Q 2006, when UBS reported that debt instruments had risen another ***CHF 50 billion***, "mainly due to higher positions in ABS."  By the time UBS reported its year end results for 2006, UBS had added a total of CHF 124 billion in debt instruments to its balance sheet – and that did not include UBS's unfunded positions in synthetic CDOs as UBS chose not to include those positions on its balance sheet as alleged above.

289.    In its 2006 Form 20-F, UBS confirmed that the rise in debt instruments in 2006 was "mainly in ABS in our mortgage trading and securitized products business" but concealed that (i) UBS invested the tens of billions of dollars in securities backed by subprime and Alt-A loans on which borrowers were defaulting at ever-increasing rates throughout the U.S., and (ii)

UBS refrained from investing in subprime and second lien loans directly due to the increase risk associated with them.

290. By secretly retaining tranches from the subprime and Alt-A mortgage-backed RMBS and CDOs it created, UBS directly exposed tens of billions of its asset portfolio to the deteriorating U.S. subprime and Alt- A mortgage markets.

291. Additionally, notwithstanding that UBS claimed to have extensive and strict risk management controls in place throughout the Class Period, UBS placed *no* notional limits on the amount or value of (i) the assets it maintained in its CDO Warehouse throughout 2006 and 2007, or (ii) the minimally hedged or unhedged super senior CDO positions it retained on its books. Without such risk management controls, UBS employees at the CDO Desk and the Global ABS Group, including, but not limited to, Defendants Martin and Stehli were motivated to grow the IB's RMBS and CDO positions to (i) compound the effect of the small positive carry spreads on each of its CDO investments, (ii) garner ever larger securitization and structuring fees and (ii) grow its ever-expanding balance sheet.

292. In fact, UBS's CDO Desk expanded UBS's CDO position beyond the tens of billions in super senior tranches of the subprime-backed mezzanine CDOs that UBS created by purchasing $20.8 billion in subprime super-senior CDO tranches that were structured by third-parties. These acquisitions further violated Company policy and exposed UBS to the enormous risks associated with holding debt backed by subprime mortgages.

293. According to CW 4, near the end of 2006, Defendant Stehli suggested that the CDO Desk put an end to growth in CDO origination at the Global CDO Group. At that time, CW 4 stated that Defendant Stehli attempted to "reign things in" as the CDO market became riskier as a result of the trends in the mortgage and securities markets, discussed above, which

first appeared in early 2006. Specifically, Defendant Stehli advised fellow CDO traders at the beginning of 2007 that in light of the rapid expansion of the IB's super senior positions, UBS's exposure to the U.S. residential mortgage market had increased. According to CW 4, however, Stehli's comments were ignored and the growth did not actually stop, in part, because UBS's compensation structure motivated the CDO traders to keep consummating CDO deals in order to increase their compensation.

294. According to CW 6, moreover, Defendant Stehli authorized and oversaw all of UBS's CDO originations and acquisitions throughout 2007. Indeed, despite the concentration of risk in subprime and known impairments in the market, the risk of UBS's exposure to these assets was wholly concealed until August 2007. Thus, Stehli was in a position to actually put a stop to the growth in CDO origination at the IB.

295. That IB's expansion into subprime CDOs was rapid and unchecked was confirmed by CW 7, a director and a trader at the IB division during the Class Period whose job responsibilities included, *inter alia*, the gathering of data on the IB's CDO holdings. CW 7 reported that, based on the IB's success with "higher risk products," including CDOs backed by mezzanine subprime RMBS, beginning in 2006 there was an effort to make a "rapid expansion" in the number of trades in order to substantially increase the size of the CDO Desk. According to CW 7 the goal was to be "the biggest group on the street" in terms of CDO trades. CW 7 described a "massive effort" known as "Project 750," the purpose of which was to upgrade the IB's systems to allow it to go from 100 trades per day on the CDO Desk to 750 trades per day. According to CW 7, as part of Project 750, the IB analyzed all the phases of trade processing for CDS on ABS in order to improve the IB's current processes so as to realize the goal of consummating 750 trades per day. CW 7 stated that Defendant Stehli and Lirenn Tsai ("Tsai")

oversaw *every single decision* that was made in the Global CDO Group and approved Project 750 as well as the trades stemming thereform. CW 7 further confirmed Defendant Stehli's and Tsai's participation in the project. Project 750 was disbanded only when the markets severely dislocated in the summer of 2007 – well after Defendant Stehli told the department to stop growing.

296.    All of the foregoing contradicted the Company's representations to the market that UBS would not acquire high concentrations of any asset type, let alone the type of illiquid assets generated and obtained by the CDO Desk.

297.    When the truth was finally disclosed, the public learned that UBS had amassed a $50 billion CDO portfolio in less than two years – which portfolio accounted for approximately 50% of UBS's total subprime losses as of December 31, 2007.

      **E.**      **UBS Risk Managers and Traders Within IB and DRCM Manipulated Risk Control Indicators to Conceal the True Risks to Which UBS was Exposed**

298.    UBS was able to amass a $50 billion portfolio of CDOs and $50 billion portfolio of subprime-backed RMBS, subprime loans, ABS, etc. in violation of Defendants' representations to the market, by manipulating the Company's stated risk management policies and controls. As noted above, UBS and DRCM maintained no notional limits on the amount of RMBS and CDOs they could possess. The main measure of market risk within DRCM and the IB that could have been used during the Class Period to keep the levels of high-risk RMBS and CDO position in check was UBS's VaR calculation. According to CW 8, a director at the IB during the Class Period whose job responsibilities included creating statistical models to support FIRC businesses, the Company relied almost exclusively on the VaR calculation in assessing its level of market risk exposure.

299.     As detailed below, VaR measures the amount of an asset's value that is at risk of loss due to market fluctuations.  To calculate VaR, UBS measured historic price fluctuations, *i.e.,* market risk in its assets and determined the maximum losses that the Company could suffer on those positions in a given 1- or 10-day period.  The resulting calculations were the VaR amounts associated with UBS's assets.

300.     Defendants stressed that they actively monitored the VaR associated with UBS's assets and that UBS's VaR figures were correctly represented to the public.  For example, Defendant Stuerzinger stated: "We apply our risk management and control principles rigorously to market risk….We are a distributor of risk, not a reinsurer." (*Bank Risk Manager of the Year – Walter Stuerzinger, UBS*, RISK MAGAZINE, Jan. 2005).  This statement was part of the total mix of information affecting the price of UBS's common stock at the outset of the Class Period.

301.     Contrary to Defendants' representations, and unbeknownst to investors, as set forth below, traders in the IB and DRCM, led by Defendant Hutchins, manipulated UBS's VaR value associated with CDO holdings by purchasing insurance for the portion of the CDO that UBS's internal model deemed to be "at risk."  This "insurance" caused the "at risk" portion of each asset to disappear for risk management purposes, thereby enabling UBS to continue amassing tens of billions of dollars in CDO tranches with no limit.     However, UBS senior management knew or recklessly disregarded the fact that the Company's own systems were being overridden in this manner as described below.

### 1.     VaR as an Externally Reported Indicator of UBS's Risk

302.     UBS defined VaR in the 2006 Annual Report as "a statistically based estimate of potential loss on the current portfolio from adverse market movements."  During the Class Period, market risk VaR (as opposed to Credit risk VaR) was a calculation of the amount of

money that UBS could have lost on its portfolio on any given day based on a model-based evaluation of the assets in the portfolio compared to historical market risks.  If a trading asset was deemed not to contribute to UBS's overall market risk, then it would not be included in the VaR calculation.

303.    UBS's VaR limit was one of the "principal portfolio risk measures and limits on market risk."  (Shareholder Report).   UBS apportioned the total VaR limit to each of its Divisions, with the IB receiving the largest allocation of the total VaR limit.   The portion that UBS allocated to the IB was then split amongst the IB's business areas (*i.e.,* Fixed Income), the businesses (*i.e.,* Rates) within those areas and specific business lines (*i.e.,* Mortgages US).  The effect of the VaR limit was to limit the amount of market risk to which UBS's asset portfolio was exposed.

304.    UBS reported its total VaR, as well as the VaR for each of its major business units, to the market every quarter and at year end.  Accordingly, any increase in VaR quarter-over-quarter or year-over-year was specifically disclosed to analysts and the market at large to assess the nature of the risks that UBS was taking and to reevaluate the suitability of an investment in UBS common stock.

305.    According to DRCM/UBS models, there was a statistical significance that the CDO would lose 2-4% of its value over the life of the investment.  This 2-4% of the CDO was considered to be "at risk" for risk management purposes, and, if left unhedged, would contribute to the Company's VaR.  As that risk percentage on each of UBS's CDO holdings compounded over time, UBS's risk management controls were supposed to have been triggered, thereby capping the amount of CDO holdings UBS could acquire.   As discussed below, UBS manipulated the true VaR associated with its assets (by acquiring "insurance" for the 2-4% at

risk value of the CDO), thereby enabling UBS to (i) issue materially misleading VaR numbers, and (ii) to amass tens of billions in subprime-backed assets in violation of Defendants' representations to the public.

2. **DRCM and IB Employees Manipulated VaR to Conceal the True Market Risks to Which UBS Was Exposed**

306. According to internal sources interviewed for an April 20, 2008 *Financial Times* article titled "Corroded to the core: How a staid Swiss bank let ambitions lead it into folly", Hutchins and traders at DRCM and within the IB utilized "tricks" to hide and materially understate UBS's external risk metrics, namely VaR and its regulatory capital ratio, in order to grow UBS's portfolio of subprime-backed assets, thereby garnering further revenues for themselves and the Company. With vital external risk metrics underreported and materially misrepresented as a result of the "tricks" employed by Hutchins and other traders within DRCM and the IB, the market was completely unaware that Defendants' statements concerning, *inter alia*, its commitment to being a risk-adverse bank that did not take on high concentrations of specific asset types were materially false and misleading.

307. One of UBS's "tricks" described by former UBS employees involved the manipulation of the stated market risk associated with the tens of billions of dollars in super senior CDO tranches that UBS acquired during the Class Period. According to the former employees, Hutchins and traders at DRCM and within the IB purchased and/or retained large quantities of super senior CDO tranches to enable the IB to continue originating CDOs, thus generating massive structuring fees and accumulating the yield generated from the CDO positions.

308.    Because the acquisition of these CDOs were reflected on UBS's balance sheet, the DRCM and IB traders had to mask any risk of loss in value or market risk associated with the CDO positions because an accumulation of market risk, as reflected by VaR, would have required UBS to curtail the future purchase of these CDO positions.  The solution for the DRCM and IB traders was to manipulate VaR and underreport that financial indicator to the market.

309.    DRCM and IB traders, including Hutchins, also were motivated to misstate UBS's VaR by their own greed as their compensation was tied to the number and size of the CDO transactions they structured.   According to CW 4, CDO traders were compensated solely based on the volume of CDOs they structured, and not on whether UBS was ultimately able to sell the bonds they structured.  The traders had no incentive to adjust the rate of CDO creation in response to lack of demand for the product nor were they motivated to consider the risks to which UBS was exposed if UBS had to carry unsold CDO positions on its balance sheet. Indeed, according to CW 4, traders also were compensated, in addition to their brokerage fees, for the yield that UBS earned on CDOs during the period in which these CDOs were warehoused for sale, thus motivating them to cause UBS to hold the bonds longer than necessary.

310.    CW 1 confirmed that UBS CDO traders were motivated to create larger and larger CDO deals in order to increase their compensation during the Class Period.  CW 1 further confirmed that UBS CDO traders were not motivated to manage the risks associated with originating a CDO or retaining a large percentage of the resulting bonds on UBS's balance sheet despite Defendants' representations that UBS was actively managing the risks associated with the assets UBS sought to purchase.   CW 1 also confirmed that the effect of the trader compensation structure was to motivate traders to create, and compensate them for creating,

larger and larger CDO deals which increased UBS's balance sheet precipitously during the Class Period.

311. The DRCM and IB traders, including high-level employees such as Hutchins, were able to manipulate UBS's risk management controls as follows. Super senior CDO tranches typically received AAA ratings from the ratings agencies such as Moody's and S&P. As such, UBS's risk models assumed that these positions, backed by the same subprime loans that UBS refused to acquire by early 2007 due to their high risk, would never lose more than 2-4% of their value. Knowing this, once UBS purchase or retained the super senior CDO tranches. Defendant Hutchins and traders at DRCM and within the IB executed what were called AMPS trades to offset the 2-4% VaR model-based risk, rendering the CDO invisible from UBS's risk controls and generating a materially understated VaR amount. UBS confirmed the use of this scheme during the Class Period in the Shareholder Report. The manipulation of VaR was responsible, in large part for UBS's accumulation of $50 billion in CDO holdings without triggering the risk metrics that would have alerted the market to the risk being undertaken by UBS.

312. The deceptiveness of the foregoing scheme is made clear by viewing it against UBS's past practices of insuring 100% of its CDO investments rather than the 2-4% that its model found to be at risk. Based on the Shareholder Report, in the past, UBS routinely purchased insurance for 100% of the CDO's value on its books. UBS realized during the Class Period, however, that obtaining the 2-4% insurance had the same effect of offsetting the UBS risk management triggers as did the 100% insurance, just at a much lower financial cost. Thus, UBS stopped insuring between 96-98% of the market risk of its CDO holdings, without disclosing to its investors that the Company was exposed to greater risk.

313.     Lowering the insurance thresholds needed to consider an asset "risk free" should have put UBS's risk managers on notice that its traders could manipulate UBS risk management controls as the 2-4% insurance was *half the cost* of the 100% insurance, but was viewed the same by UBS market risk controls.  *See* UBS Shareholder Report ("the cost of hedging through a NegBasis trade [*i.e.*, full insurance] was approximately 11 bps, whereas the cost of hedging through an AMPS trade [*i.e.*, insurance of the VaR associated with the position] was approximately 5-6 bps.").  Indeed, at some point during the Class Period, UBS knew that it had amassed a materially greater amount of CDO holdings than it had in the past, yet the cost of insuring those holding declined.  UBS ignored the apparent anomaly so that it could continue to build its multi-billion dollar CDO portfolio.

### 3.     Tier 1 Capital Ratio as an External Indicator of Risk

314.     VaR also affected another important UBS external risk metric – UBS's Tier 1 Capital Ratio.  Tier 1 Capital, which includes equity capital and reserves, is a commonly used indicator of a company's capital adequacy.  The Tier 1 Capital Ratio compares a company's (i) Tier 1 Capital, to its (ii) Risk Weighted Assets ("RWAs").

315.     International banking regulations known as Basel I and Basel II promulgated by the Bank for International Settlements ("BIS") required UBS's Tier 1 Capital to be at least 4% of its total risk-weighted assets ("RWA").  By way of example, a Tier 1 Capital Ratio of 4% would require a company to maintain $4 of Tier 1 Capital for every $100 of RWAs.  Thus, the smaller the RWAs, the greater the Tier 1 Capital Ratio and the more attractive its overall Tier 1 Capital appears.

316. RWAs are determined through a review and assessment of three elements of the asset in question: market risk, credit risk and "other" risk. UBS calculated the amount of RWAs for each of these three categories and aggregated them to determine UBS's total RWAs.

317. While banking regulations required UBS to maintain a Tier 1 Capital ratio above 4%, UBS led its clients, market analysts and regulators to expect that UBS would keep its Tier 1 Capital ratio above 10%. In this regard, the *Dow Jones International News* reported that "UBS won't want [its Tier 1 Capital Ratio] to slip to a single digit because it would tarnish the bank's reputation for solidity in the eyes of its private banking and institutional clients." (Nag, *The Skeptic: UBS Puts Investment Bankers on Notice*, Oct. 30, 2007 at 2:30 pm). Similarly, the *Associated Press* further reported that "UBS strives to keep its Tier 1 ratio above 10 percent to reassure rich individuals who keep money in its wealth management division that they are doing business with a super-sound institution." (Reilly, *UBS Is Latest To Seek Aid in Asia, Middle East*, The Associated Press, Dec. 11, 2007 at 3:30 pm)

318. Moreover, with respect to the expectations of the Swiss banking authorities, according to *Dow Jones International News,* "Swiss regulators prefer Switzerland's major banks to operate well north of that level [*i.e.*, 10%] because of their sizable private banking operations." (Bart, *Investors Eye More Sub-prime Pain From Europe Bks*, Dow Jones Int'l News, Nov. 5, 2007 at 12:57 pm). Likewise, according to a CIBC analyst quoted in a Nov. 19, 2007 *Reuters News* article by Andrew Hurst titled "UBS Edgy Over Subprime on Wealth Management," "[a] tier 1 ratio below 9 percent sets off alarm bells to regulators…." As a result, UBS led the entire market to believe that UBS's Tier 1 Capital Ratio would be above 10%.

319. "Regulatory capital" is the amount of capital that has to be held by a bank in order to ensure that the bank has enough capital to sustain operating losses associated with

investments. With respect to UBS, "regulatory capital" included the amount UBS had on hand "to support market risk arising on all foreign exchange, and energy, metals and commodity positions, and on all positions held for trading…including risks on individual equities and traded debt obligations such as bonds" as opposed to a portion of assets identified as credit or "other" risks. According to UBS's 2006 Annual Report, "[f]or market risk positions, ***UBS derive[d] its regulatory capital requirement from its internal Value at Risk (VaR) model.***" (Emphasis added). Thus, UBS's VaR amounts, as manipulated by Defendants, yielded an inaccurate RWA figure, which in turn led to an understated amount of regulatory capital that UBS was required to keep to cover its market risk, meet the market's expectations and comply with international banking regulations.

320.     UBS then added the amount of RWAs associated with its market risk positions to the Company's total amount of RWAs (which included the RWA amounts for credit risk and "other" risk).

321.     As set forth above, Hutchins and traders at DRCM and within the IB purchased minimal insurance on the retained super senior CDO tranches to make the positions invisible to UBS's VaR model. Thus, UBS materially understated the amount of its RWAs and, thus, the amount of regulatory capital that UBS needed to cover the true market risk associated with its assets. Additionally, because UBS understated the amount of regulatory capital required to offset all of its true market risk positions, as well as total RWAs, UBS ***overstated*** the Tier 1 Capital ratio figure that it represented to the public.

322.     The manipulation of UBS's market risk positions and RWAs materially affected UBS's financial statements and must have been known to Defendants. For the year ended 2005 – just as UBS began to increase the amount of RMBS and CDO positions held by the FIRC

division – the amount of UBS's Market Risk positions or RWAs covering the market risk associated with these positions totaled $21.035 billion. By the end of 2006, a year when UBS admittedly and exponentially increased its RMBS and CDO portfolio by tens of billions and the risk associated therewith, the value of UBS's asset portfolio subjected to market risk actually *fell* by $1.75 billion to $19.86 billion.

323. By the end of 2007, when UBS began to disclose that the value of its RMBS and CDO portfolios were overvalued and required a write-down, UBS reported that the amount of market risk positions had ***increased more than 100%*** to $42.11 billion. UBS also experienced a $30.51 billion increase in its RWAs (from $341.892 billion in 2006 to $372.398 billion in 2007), $22.25 billion of which was attributable to an increase in market risk positions.

324. With an inflated Tier 1 Capital ratio and understated VaR, UBS knowingly maintained the charade that it was growing its investment bank in line with its purported risk-averse philosophy throughout the Class Period.

> **4. A $1.31 Billion Credit Default Swap Transaction Between UBS and a Hedge Fund Restricted to a $40 Million Investment Evidences Defendants' Deceit**

325. A typical example of the manner in which the IB fraudulently manipulated UBS's risk protocols to disguise risk is evidenced by UBS's transactions with Paramax Capital International, Ltd.

326. According to a Complaint filed by UBS against Paramax in the case styled *UBS AG v. Paramax Capital International, Ltd*, No. 07-604233 (N.Y. Supr.) (the "Paramax Complaint"), UBS contacted Paramax on January 22, 2007 to inquire as to whether Paramax would be interested in entering into a CDS agreement referencing the $1.31 billion super senior tranche of TABS CDO 2007-7, a CDO that was backed in part by subprime mortgage assets and

set to soon close. UBS offered to pay Paramax 0.1% of the notional value of the tranche, or $1.31 million annually, in exchange for Paramax agreeing to assume a certain amount of default risk associated with UBS's holdings in the TABS CDO 2007-7. As negotiations continued throughout February, March and April 2007, Paramax told UBS that the total capital Paramax could ever pay on the CDS was $40 million because it was only a mid-sized hedge fund and these liability limitations were built into its limited partnership agreements. As such, Paramax told UBS that it would not be able to provide UBS with a true financial hedge for the $1.31 billion super senior tranche.

327. UBS's representative responsible for negotiating the CDS with Paramax, Eric Rothman ("Rothman"), a managing director of UBS, told Paramax that UBS was aware that the CDS would not be a "real hedge" on the $1.31 billion position given Paramax's built in limitations. (Paramax Compl. ¶ 78). Indeed, Rothman made it clear that if UBS ever required a "real hedge" for its $1.3 billion position, it would terminate the CDS with Paramax and enter into a "real hedge" with a more qualified counterparty. Paramax and UBS executed the CDS between May 11 and 17, 2007 and subsequently Paramax transferred $4,858,000 as collateral for the CDS.

328. Thus, by entering into a CDS with Paramax, UBS was able to conceal $1.31 billion of its exposure to its super senior tranche position despite knowing that it the counterparty to the hedge could only cover $40 million or 3% of this position. According to Paramax, "UBS's main purpose in entering into a credit default swap with Paramax was to put itself in a position to justify removing liabilities related to the super senior tranche of the TABS Notes from its books[.]" (Paramax Compl. ¶ 36).

**F.** **UBS Concealed the True Value of Its Subprime Exposure by Manipulating Its Asset Valuations Throughout the Class Period**

**1.** **UBS's Valuation Policies During the Class Period**

329. According to the Shareholder Report, UBS's valuation policies and procedures in place during the Class Period were "derived from applicable accounting standards" and provided "a framework supporting the principal accounting and valuation determinations such as P&L recognition, whether and how to apply fair value accounting to positions, and consideration of, and basis for, fair value adjustments." While investors were oblivious to the nature and extent of UBS's subprime and Alt-A backed asset portfolio, UBS included the portfolio's stated assets on its balance sheet at their purported value. Because UBS included the assets on its balance sheet, UBS had to value or "mark" the portfolio assets.

330. More specifically, during the Class Period UBS claimed to follow the accounting regulations governing "Level 2" assets, because UBS classified its subprime and Alt-A mortgage-backed securities as "Level 2" assets. According to UBS, "Level 2 assets are valued based on a valuation technique, which uses *market observable inputs*, where available, derived from similar assets in similar and active markets, from *recent transaction prices* comparable items or from other *observable market data.*" (Emphases added). Thus, if there were market prices available for UBS's subprime and Alt-A backed Level 2 assets, UBS was required to mark them to market; whereas if no market price was readily apparent, then UBS was required to mark the assets to its internal model using "market observable inputs," "recent transaction prices," and "observable market data." Despite UBS's assurances to the market that it followed the foregoing procedure, UBS did not. In fact and, as set forth in detail below, UBS blatantly ignored extensive evidence of "market observable inputs," "recent transaction prices," and

"observable market data," demonstrating that the Company's subprime and Alt-A asset portfolio during the Class Period was distressed and worth tens of billions less than reported to investors.

331.    Had UBS followed the valuation requirements governing Level 2 assets, its model for valuing its subprime-backed assets would have had to include at least the following "observable market data": (i) the ABX Index; (ii) any contemporaneous sale of similar assets; (iii) any contemporaneous write-down of similar assets; (iv) the delinquency rate of mortgage loans; (v) remittance data from mortgage service companies;  and (vi) the housing price index. Furthermore, UBS was required to consider and account for any recent sales of securities similar to those in UBS's subprime and Alt-A backed asset portfolio.  All of the foregoing evidence that existed during the Class Period demonstrated that UBS's subprime and Alt-A backed assets were materially overvalued on UBS's public financial statements.  By overvaluing assets, UBS was able to inflate financial figures presented to shareholders (including net profits, net trading income, earnings per share ("EPS") and operating income).

332.    By way of protocol, each trader at UBS, including Defendant Hutchins, was responsible for assessing the foregoing evidence and then marking his or her asset portfolio to current market prices on a daily basis. (Shareholder Report)  The trader would then report his or her marks to the IB's Business Unit Control or "BUC."  (Shareholder Report).

333.    Unbeknownst to the market, UBS's valuation procedures did not follow the foregoing Level 2 asset valuation mandate and representations to investors, and suffered from severe internal control lapses.  Specifically, UBS has admitted that until the third quarter of 2007, when UBS changed its valuation model in the face of having to take tens of billions in write-downs: (i) UBS suffered from "a reduced ability to source external prices to verify trader marks and general increases in the value of untested positions"; (ii) UBS failed "to challenge on

a timely basis the assertion for valuation purposes of the flat or low risk nature of the retained Super Senior positions"; and (iii) instances arose "where significant manual intervention and reconciliation was required to assess the relevant risk nature, or where data was fragmented or insufficiently granular." According to UBS, these "latent and significant risks" were identified by both BUC and "other independent internal control units" during the Class Period, but nothing was done to address them until it was far too late in Q3 2007.

### 2. External Market Conditions Required UBS to Adjust Its Carrying Values of Its Assets

334. The evidence contained herein demonstrates that UBS was aware of the deterioration in the Subprime and Alt-A mortgage markets and markets for securities backed by these mortgages no later than February 2007, and that there were sufficient market indicators throughout fiscal 2006 that should have put UBS at least on notice of a severely deteriorating subprime and Alt-A real estate market at that time. These external market indicators required UBS to adjust the carrying values of its subprime and Alt-A mortgage-backed assets long before UBS's first write-downs in October 2007.

335. By Q1 2007, UBS was well aware of the myriad of issues affecting the subprime and Alt-A mortgage markets, as well as the markets for the securities backed by these mortgages. In fact, UBS analysts themselves provided several warnings to the market by way of UBS's Fixed Income Research publication, *CDO Insights* stating on January 17, 2007 that, "*[u]nless you have been living under a rock for the past few months*, you've heard negative news about the subprime market. From elevated loan delinquencies to originator bankruptcies, dreadful news has been in good supply." (*CDO Insights,* Jan. 17, 2007) (emphasis added). Indeed, by 1Q 2007, UBS analysts stated that "it look[ed] as though most of the favorable credit

factors [had] run their course," causing the consumer credit environment to become more adverse and making "it likely that the credit performance of subprime loan collateral [would] continue to worsen" and "that the losses [would] be more severe[.]" (*Id.*).

336.    Also in Q1 2007, the market became aware of severe financial issues affecting mortgage originators culminating in write-downs of subprime loans at New Century and write-downs of securities backed by subprime loans at HSBC in February 2007.  UBS analysts further reported in the February 23, 2007 issue of *CDO Insights* that several CDO warehouses were forced to take write-downs on subprime and Alt-A backed assets in February 2007.

337.    Furthermore, the ABX Index, which tracks the cost of buying protection for subprime mortgage-backed assets, began to falter in February with the BBB rated tranche – which was comparable to tens of billions of UBS's mezzanine CDO holdings -- falling in value from 90 to 63 cents on the dollar.  The write-downs of subprime mortgages and securities backed by subprime mortgages by UBS and other banks and the fall of the ABX Index in February 2007 were external market indicators suggesting that UBS needed to write-down similar assets in its portfolio.  However, because UBS had concealed from the market the true nature of its investments in subprime and that it was overriding its own purported risk controls, the market was not aware of the extent of the over-valuation of UBS's balance sheet at this point in time.

338.    As alleged above, by Q2 2007 UBS knew from the write-downs and revaluations at DRCM that the publicly represented value of its subprime and Alt-A asset portfolio was materially misstated and that the Company had lied and continued to lie to its shareholders about the value of its assets.  In addition, market factors in 2Q 2007 put UBS on notice that its subprime and Alt-A backed asset portfolio required revaluation.  For example, the severity of

the financial issues experienced by mortgage originators had worsened, culminating in bankruptcies and further write-downs. Likewise, in June 2007, the market learned that two hedge funds run by Bear Stearns were heavily invested in the risky subprime mortgage-backed securities and teetered on the edge of extinction. As a result, investors issued margin calls, forcing Merrill Lynch to sell some of the Bear Stearns hedge funds' distressed assets in the open market in June 2007, and generating asset prices that UBS was required, but failed, to consider in valuing its Level 2 subprime and Alt-A backed assets.

339.    One of the Bear Stearns' funds averted dissolution only after Bear Stearns agreed at the end of June 2007 to infuse $3.5 billion in cash. Bear Stearns was forced to shutter the other fund. The financial difficulties experienced by the originators, the write-down of similar assets and the inability to make an open market sale of distressed assets at reasonable prices in Q2 2007 all were external market indicators of which UBS was aware and that UBS should have considered in revaluing (and writing-down) its subprime and Alt-A backed Level 2 assets. Once again, however, the investing public was left in the dark as UBS had not disclosed the true extent of its subprime investments and therefore, the market, while generally aware of worsening credit conditions, was not at all aware of the extent of over-valuation of UBS's financial statements.

> **3.    Internal Events Required UBS to Markdown the Carrying Value of its Assets Beginning in Q1 2007**

340.    Aside from the very public market indicators, internal events at DRCM and the IB demonstrated the need for a write-down UBS's assets.

341.    First, CW 9 confirmed that Defendants were aware as early as 2004, and by no later than 2005, that UBS's models for valuing its CDO holdings were flawed and had caused a

portfolio of at least notional value of $50 billion in ABS, CDOs and CDSs to be overvalued as early as 2005. Even though an investigation ensued after CW 9 reported the issues to Defendants, including Defendant Wuffli, on June 22, 2005, nothing came of it. Moreover, like Niblo in June 2007, UBS fired CW 9 in late 2007 because CW 9 had alerted Defendants about the overvaluation of UBS's ABS, CDO and CDS assets.

342. Furthermore, UBS admits in the Shareholder Report that in 2Q 2006, DRCM "began purchasing ABS tranches with underlying 2nd lien mortgages of higher credit quality…in response to increased credit concerns over subprime ABS securities," demonstrating that UBS was aware of the issues in the subprime market as early as Q2 2006.

343. Further evidence of Defendants' awareness that its subprime and Alt-A backed assets were distressed and overvalued arose as early as 3Q 2006 when DRCM also began taking a net short position on the ABX Index. By taking a net short position, DRCM believed that the subprime securities market was declining in value.

344. The foregoing examples are illustrative of many internal indicators of which UBS was aware, requiring the Company to reassess the carrying value of its subprime mortgage-backed assets well before the first write-downs in October 2007.

### a) The Eventual DRCM Write-downs

345. After HSBC reported write-downs in early February 2007, internal UBS sources interviewed by the *Financial Times*, which were corroborated by CW 1, stated that DRCM began to internally revalue its subprime mortgage-backed exposure in response.

346. According to the UBS sources cited in the *Financial Times* article, as a result of the HSBC write-downs, Defendant Hutchins and DRCM management conducted a very simple experiment to see whether the then-current asset values were correct. After attempting to sell

$100 million worth of DRCM securities backed by subprime mortgages and receiving only $50 million, or 50 cents on the dollar in return, DRCM executives recognized that DRCM's inventory of subprime mortgages was extensively overvalued.

347. CW 1 confirmed the *Financial Times* report as did multiple independent UBS sources interviewed for two other articles, one appearing in the *International Herald Tribune* and the other in *Bloomberg Magazine*.

348. Neither Defendant Hutchins nor the other Individual Defendants disclosed this 50% drop in value to the market. Furthermore, DRCM failed to properly revalue DRCM's entire portfolio in line with the 50% value decline. Moreover, none of the Defendants revalued the same or similar positions held by the IB as a result of Hutchins' findings.

349. According to the UBS sources interviewed for the *Financial Times* article, the $50 million one day trading loss on positions previously valued at $100 million led Hutchins to personally re-value only a $4 billion portion of the DRCM portfolio. (As noted above, DRCM held at least $20 billion in similar securities as that was the amount that UBS reacquired when it closed DRCM). By the end of March 2007, according to the UBS sources interviewed by the *Financial Times*, Hutchins wrote-down only an additional $204 million of the $4 billion asset portfolio. In sum, while a random valuation experiment of $100 million in subprime backed securities led to a 50% reduction in value, Hutchins chose to revalue less than one fifth of DRCM's total portfolio and further chose to write-down only 5% of the selected portfolio. Notwithstanding that the 5% reduction is a material write-down requiring disclosure to investors, it was just the tip of the problem then to known to and concealed by Defendants.

350. CW 1 confirmed that beginning in late February 2007 and continuing throughout March 2007, DRCM marked down its positions backed by subprime mortgages.

351.     The write-downs at DRCM continued into April 2007.  Indeed, according to internal sources interviewed for an October 12, 2007 *Wall Street Journal* article titled "US Investors Face an Age of Murky Pricing – Values of Securities Tougher to Pin Down: Discord at Dillon Read," a DRCM trader named John Niblo ("Niblo"), who was in charge of a $1 billion portfolio of U.S. residential mortgage backed securities, sought prices in April 2007 from at least a dozen Wall Street dealers to determine the value of the $1 billion portfolio.  Niblo sought the pricing data after witnessing the issues in the rising amount of subprime mortgage delinquencies and their affect on the mortgage-backed securities market in February and March 2007.  According to the internal sources interviewed, based on the prices that he was quoted, Niblo marked down his $1 billion portfolio by $20 million in April 2007.   Shortly thereafter, Niblo was forced to mark down his portfolio again due to market conditions – this time by $75 million, for total mark downs of just under $100 million.

352.     Immediately after Niblo's initial write-down, Defendant Singh "scoured" Niblo's marks and questioned Niblo about them.  Following Niblo's second write-down in April 2007, UBS realized that the application of similar write-downs across UBS's multi-billion dollar portfolio of assets backed by U.S. residential mortgages would lead to a catastrophic decline in book value.  According to the internal UBS sources interviewed by *The Wall Street Journal*, another UBS executive, Ramesh Chari, complained to Niblo that his valuations were lower than UBS's marks on similar securities.  Niblo responded by asking how UBS could value the similar securities at a higher level "'if we can't sell them at these prices.'"  According to the *Wall Street Journal's* sources, Niblo "priced many of the mortgage-backed securities in the range of 50-80 cents on the dollar, while UBS valued similar securities in the 80s."

353.     As detailed herein, UBS concealed the early 2007 write-downs at DRCM by

closing DRCM, buying out the DRCM outside investor fund, and firing Niblo and Hutchins.

354. CW 1 not only confirmed the April 2007 write-downs at DRCM, but also UBS's involvement in concealing them and refusing a similar revelation with the IB, noting that the write-downs beginning in February 2007 at DRCM sent "shockwaves" through UBS.

355. Again, like the UBS sources interviewed by the *Financial Times,* the statements regarding Niblo's write-downs by *The Wall Street Journal's* internal UBS sources were subsequently verified, at least in part, by UBS's own admissions in the Shareholder Report. As set forth herein, UBS admitted to $430 million of write-downs at DRCM prior to its reintegration on May 3, 2007.

356. The write-downs at DRCM provided the IB with observable market inputs as to the price of similar assets. Notwithstanding the fact that Defendants were in possession of material information that dramatically differed from that which was presented to the public, Defendants failed to disclose the write-downs at DRCM in a timely fashion. Their rationale for concealing such information is now obvious – there was no way to differentiate the value of the subprime assets held by DRCM from the massive positions of the IB of UBS in the same types of investments. As a result, to write-down DRCM securities would have required Defendants to write-down UBS securities in lock step. In violation of applicable accounting principles, as set forth in greater below, UBS ignored these internal write-downs and sought to conceal the effect of the DRCM write-downs from the market.

> **b)** **Defendants Publicly Acknowledged UBS's Exposure to Losses in the Subprime and Alt-A Mortgage Market**

357. On March 28, 2007, just days after DRCM wrote-down certain of its subprime backed securities, UBS held a "Fixed Income Investor Day" in New York. During the

conference top UBS executives acknowledged material concerns with the U.S. real estate market and fixed income assets backed by U.S. mortgage products, yet refused to disclose any adverse information concerning the DRCM write-downs or the $100 billion in subprime related assets that had accumulated on UBS's financial statements. Instead, they discussed generally the concerns of the market without letting on that UBS was at the center of the storm.

358. *First*, Glenn Schorr, a managing director of the financial groups of UBS's Investment Research gave a presentation titled "Will the Structural Growth Drivers Continue to Boost FICC Revenues?" With respect to issues in the mortgage-backed securities market, the slides that accompanied Schorr's presentation identified "headwinds" such as the "likely decline" of "[m]ortgage originations/securitizations," the likely slowing of "CDO issuance…in the near term", the fact that "[r]esidual interests/warehouse lines could cause headaches" and "[m]ore importantly, repricing of risk could stunt revenue growth – non-investment grade issuance has outpaced investment grade." None of these discussion points were applied to UBS's existing portfolio.

359. *Second,* Defendant Martin, the Global Head of Rates, also gave a presentation titled "Global MBS and ABS" during which he admitted that the market for global MBS and ABS had experienced "changes in 2006" that were "significant" but reassured those in the audience that those changes had been "***factored into [UBS's] strategic planning***." (Emphasis added). Those changes included the moderation of home prices which "exposed the looser underwriting standards that developed through the US housing boom" and the "***dramatic rise of delinquencies and losses from subprime loans***." (Emphasis added). According to Martin, "[o]riginators [had] high fixed costs and need[ed] to keep volumes high to remain profitable" causing them to "increase[] volumes by widening underwriting standards." Martin also told

116

investors during his presentation that UBS had to plan for the risk of ***"[l]ower global liquidity for structured products."*** (Emphasis added). Even though the foregoing, including the illiquidity of subprime and Alt-A backed assets, was known to UBS, as admitted in the UBS Shareholder Report, this was not known to the investing public at large because UBS did not account for such sub-prime market deterioration in its risk management controls or valuation monitoring, leaving tens of billions in materially over-valued assets on UBS's financial statements.

360. Defendant Martin also assured investors in attendance that UBS would avoid the high-risk activities in 2007 such as: (i) "Chase league tables"; (ii) "Provide excess liquidity to drive high margin business"; and (iii) "Grow business lines that rapidly expand the balance sheet." Unbeknownst to investors, however, UBS was, in fact, engaged in such activities at the time Martin made the statement, the consequence of which was a balance sheet swollen with $100 billion in subprime and Alt-A backed assets between February 2006 and September 2007. Likewise, UBS was focusing on originating and retaining high-risk mezzanine subprime and Alt-A backed RMBS and CDOs in its chase of competitors in an attempt to be the most profitable investment bank by 2008 and the dominant global intermediary for MBS and ABS. Additionally, by using its low cost funding and bloated balance sheet, UBS provided excess liquidity to its CDO Desk, enabling the desk to, unbeknownst to the market, concentrate on high margin Mezzanine CDOs, especially in 2Q 2007, as admitted in the Shareholder Report.

361. *Third,* Defendant Singh, who knew firsthand of the CDO write-downs at DRCM, also gave a presentation on Real Estate Finance. Amazingly, notwithstanding Hutchins' February and March 2007 write-downs, Defendant Singh's presentation identified CDOs as a "growing revenue opportunity" for 2007, noting UBS's "strong CDO structuring/distribution"

abilities and its "real estate mezzanine expertise." Singh stressed the already public mantra that UBS would proceed cautiously with its CDO investments, highlighting UBS's risk control strategy, including (i) "consistent global checks and balances via commitment committees"; and (ii) "highest concentration in most liquid sectors."

     **c) Defendants Had Actual Knowledge of the Impairment of UBS's Subprime Alt-A Mortgage-Backed Assets as Early as April 2007 Due to UBS's Secret Audit of DRCM and the IB**

  362. As noted above, the GEB internally advised the IB in March 2006 that UBS's entry into the fixed income markets needed to be "actively monitored" and "tightly controlled" due to the potential risk associated with fixed income investments. Notwithstanding the foregoing caution, it was not until early 2007 following the secret write-downs at DRCM that UBS even began to internally test the true values of its multi-billion dollar asset portfolio.

  363. According to UBS's Responses to Ethos on March 29, 2007 – the day after UBS's Investor Day Presentations and before Niblo's write-downs at DRCM – as a result of the issues cited by IB and GAM (that DRCM was losing money on UBS proprietary positions and that DRFP failed to raise a significant amount of outside investor funds), as well as the March 2007 losses at DRCM, Defendant Stuerzinger, with the knowledge and support of the Chairman's Office, asked UBS's General Internal Audit ("GIA") "to conduct a special analytical review of valuation adjustments in the DRCM home equity-linked books." The GIA provided a preliminary report of its findings to the GEB Risk Sub-committee ("GRSC") in April 2007. Defendants Stuerzinger, as well as a majority of the GEB, were all members of the GRSC, and, thus, would have received or had access to the GIA's preliminary report in April 2007.

  364. According to the Shareholder Report, and unbeknownst to the market in April

2007, the findings of the preliminary report "highlighted that (i) improvements were required in analyzing, measuring and reporting risks inherent in Subprime-related activities, and (ii) valuation uncertainties in both IB and DRCM portfolios were not sufficiently transparent and inherent risks not adequately analyzed." Thus, according to the non-public GIA preliminary report, which was available to the highest levels of UBS's senior management in April 2007, the GIA found that the losses at DRCM were related to issues with analyzing, measuring and reporting the risks of the subprime positions, as well as the uncertainties related to valuation.

365.    As a result of these findings, the GRSC charged the Group Head of Market Risk, Andrew Threadgold ("Threadgold"), and the IB Chief Risk Officer "to undertake an in-depth, portfolio-by-portfolio analysis of every trading book of the IB … to further understand the purpose and trading strategies of the businesses, the risk generated, the adequacy of risk capture and measurement."

366.    The Audit Committee also reviewed GIA's resulting report by no later than its June 5, 2007 meeting, and UBS presented the findings of the GIA to UBS's Board of Directors by no later than June 28, 2007.

367.    Notwithstanding the losses at DRCM and the secret disclosure of its portfolio, the short position taken by DRCM in September 2006, the statements by senior management about the worsening conditions in the market generally (which purposely did not apply to UBS's portfolio as it had managed for this risk), the foregoing study, and findings of the GIA, Defendants chose to conceal the extent and distressed nature of its multi-billion subprime and Alt-A backed securities portfolio from investors. Instead Defendants affirmatively elected to disclose, by the end of April 2007, only that DRCM had suffered some unspecified financial losses without attributing those losses to the write-downs of subprime and Alt-A backed assets

that were identical in nature to those on which UBS took $38 billion in write-downs in late 2007 and early 2008.

> **d)** **UBS's Closing of DRCM and the Termination of UBS Executives Concealed From the Market That the Carrying Values of UBS's Subprime and Alt-A Mortgage-Backed Assets Were Materially Inflated**

368.    On May 3, 2007, UBS surprised the market by pulling the plug on DRCM as a result of certain "operational issues" after the internal hedge fund reported losses of CHF150 million.  UBS did not inform the market that, *inter alia*: (i) the losses suffered by DRCM were the result of subprime and Alt-A asset write-downs; (ii) the IB held tens of billions in similar assets to those written-down at DRCM during 1Q 2007 at a materially inflated value; and (iii) the value of the DRCM assets retained by the IB were declining in value.  Furthermore, despite the sudden shuttering of DRCM, UBS told investors that the OIF was a success as the Company paid the outside investors a 16.5% return on their initial $1.3 billion investment.

369.    Once again presented with the opportunity to speak truthfully, UBS issued the following press release to announce DRCM's closure, blatantly concealing and misstating the true reason for DRCM's closure:

> **UBS announces reintegration of Dillon Read Capital Management Portfolios into the Investment Bank.  Outside investor funds to be redeemed**
>
> UBS announced today that the proprietary funds currently managed by Dillon Read Capital Management (DRCM) within Global Asset Management will transition to the Investment Bank.  DRCM's principal finance, credit arbitrage and commercial real estate businesses will be merged with relevant business lines within the Investment Bank. DRCM's third party funds will be redeemed.  UBS intends to work with DRCM investors to identify alternative investment opportunities for them.
>
> DRCM will continue operations until the transition period is complete which is anticipated to be in Q3 2007.

Peter Wuffli, Group CEO of UBS said, "UBS remains totally committed to alternative investment offerings for our clients. ***However, based on an assessment of a number of factors, we concluded that the DRCM initiative did not meet our expectations.*** Consequently we took this decisive action, which is in the best interests of our clients and shareholders."

"***Operating a proprietary trading platform outside the Investment Bank and managing client money alongside became too complex and expensive. That, among other reasons, is why we have chosen to reintegrate DRCM into the Investment Bank and to redeem the outside investor funds,***" said John Fraser, Chairman and CEO of Global Asset Management.

(Emphases added).

370.    With respect to the CHF 150 million in trading losses purportedly suffered by DRCM in 1Q 2007, UBS said nothing of the $430 million in subprime-backed asset write-downs or the inflated values of the RMBS and CDO assets held by the IB, choosing to, instead, claim that:  "Difficult market conditions in the US mortgage securities market led the business activities managed by DRCM to record losses."

371.    UBS did not inform the market that the IB held similar assets to those written down at DRCM during 1Q 2007 at a materially inflated value, nor that the value of the DRCM assets retained by the IB were also declining in value.  Compounding the deception was UBS's claim that the OIF was a success and the Company would pay its outside investors a 16.5% return on their initial $1.3 billion investment.  This disclosure omitted the material fact that as a result of the closure, and unknown to the market at the time, UBS had transferred *$20 billion* in "subprime positions" from DRCM back to the structured products group of the IB.  In reality, the OIF had been a complete disaster.

372.    As more fully set forth below, the DRCM positions that UBS assumed eventually

contributed to billions in write-downs at UBS, first disclosed in November 2007.

373.     The concealed debacle at DRCM resulted in (i) Costas's forced resignation as CEO of DRCM effective June 30, 2007; (ii) Hutchins' termination as of May 3, 2007; and (iii) Ken Karl's resignation on or about March 15, 2007.

374.     Furthermore, on July 6, 2007, UBS terminated Wuffli as CEO of UBS and replaced him with Rohner.

375.     Other firings followed UBS's revelation about the extent of DRCM's losses: (i) Defendant Jenkins, the Chairman and CEO of the IB on October 1, 2007; (ii) Simon Bunce, the Global Head of Fixed Income on October 1, 2007; (iii) Defendant Martin, the Global Head of the ABS Group on October 11, 2007; (iv) Defendant Stehli, the Head of the Global CDO Group on October 11; and (v) Defendant Ospel, the Chairman of UBS on April 23, 2007.

376.     While UBS has since acknowledged the obvious in the Shareholder Report that "the closure of DRCM could have been a basis for a more comprehensive review and assessment of all subprime positions in the IB, and for a review of UBS's risk assessment processes in connection with the same," they have not admitted that they intentionally avoided taking steps to discover what they already knew – that UBS's portfolio of subprime and Alt-A mortgage-backed assets was substantially overvalued and that risk metrics had been obliterated in attaining the massive subprime positions on UBS's financial statements.  UBS's further claim in the Shareholder Report that "[w]hile reviews for similar exposures within the IB were initiated as a result of the DRCM losses, those reviews did not succeed in identifying the latent issues within, among other positions, the IB's substantial portfolio of retained CDO super senior tranches," is simply without credence in light of the adverse, material information known to or recklessly disregarded by UBS at the time the DRCM losses were recorded.

122

**VIII. DEFENDANTS LEAK OUT THE TRUTH IN STAGES**

377. As set forth above, during the Class Period and notwithstanding Defendants' representations to the contrary, UBS actively concealed from investors the fact that it was accumulating a multi-billion dollar portfolio of highly concentrated and illiquid mortgage-backed securities collateralized by high-risk subprime and Alt-A mortgages. When the mortgage market began to deteriorate at an unprecedented pace, UBS continued to conceal the extent of its exposure by artificially inflating the value of the mortgage-backed assets it held on its books and making other related materially false and misleading statements.

378. Between August 14, 2007 and July 7, 2008, Defendants began to selectively leak out news regarding UBS's exposure to the subprime and Alt-A mortgage crisis, as well as the Company's misrepresentations to auction-rate securities and its role in helping clients evade U.S. tax laws, in the form of several partial corrective disclosures. Nevertheless, even during this time period, UBS continued to conceal and thereby minimize the true nature of its exposure to the risky subprime and Alt-A positions it had assumed and the fraudulent valuations of securities held on its balance sheet to the continued detriment of its shareholders.

**A. UBS Selectively Disclosed News Relating to Its Potential Subprime And Alt-A Exposure While Downplaying the True Impact on Its Financials**

379. On August 14, 2007, the Company announced its earnings for the second quarter of 2007. In a press release accompanying the announcement, the Company warned investors that troubles in the credit and equities markets likely would lead the Company to post lower earnings during the second half of the year.

380. On October 1, 2007, UBS selectively announced that it was taking a $4 billion write-down of its subprime mortgage-backed positions, and pre-announced a substantial

expected loss for the third quarter of 2007.

381.    Regarding the cause of this $4 billion loss, CEO Marcel Rohner noted in an interview on the same day that the write-downs arose in part because the Company "focused a lot on *very illiquid, long-dated risk* and at the same time let [its] balance sheet grow rather rapidly, and provided [its] funding resource almost freely."   However, seeking to reassure investors as to the accuracy of its valuations, he also stated that "all the valuations, in particular in the complicated products, are through. And we believe that we are prudent in our approach, and we have taken a mark-to-market approach as widely applicable as possible, prudent in our models."

382.    The market believed the Company's October 1, 2007 representations regarding the adequacy of its write downs, as evidenced by Helvea analyst Peter Thorne who, in reiterating his Company's "Accumulate" recommendation, noted that "UBS's disclosed write-downs will probably prove adequate."   Similarly, Credit Suisse analyst Ivan Vatchkov stated in an October 2, 2007 analyst report that he was "comforted by management's transparency" regarding the Company's exposure going forward.

383.    On October 4, 2007, a UBS spokesman was quoted in the *Wall Street Journal* as saying that the Company's expected third quarter write-downs "are appropriate and follow established accounting principles and industry standards."   (*Worries Shift to Overstating Summer Losses – Are Banks' Charges Result of Honest Tack, Or 'Big Bath' Strategy?,* Wall Street Journal, Oct. 4, 2007).

384.    Thereafter, on October 30, 2007, UBS reported a 3Q 2007 loss of CHF 726 million, in line with its October 1, 2007 warning.   Notably, the Company disclosed on October 30, 2007 that the notional amount of its exposure to subprime-backed super senior CDO

124

tranches was a startling $20.2 billion – approximately $30 billion less than the actual notional amount. Moreover, the Company deceptively noted that it was "very reluctant" to disclose this amount, in part because it felt that a disclosure of notional exposure was somehow misleading.

385. While some industry experts speculated that the Company would need to take 4Q 2007 write downs of approximately CHF 8 billion, the Company's statements directly attributed to UBS senior management, claimed that such speculation was overblown. In this respect, according to a November 16, 2007 report by Societe Generale analyst Alan Webborn, UBS's CFO, Defendant Suter, had specifically assured Webborn and other analysts that while "UBS would take markdowns in the fourth quarter of 2007," the "estimates in the analyst community of [CHF]8bn write-downs were too high." In reliance on these representations, research analyst Daniel Davies of Credit Suisse stated on November 28, 2007 that he was "less than convinced that big further write-downs will actually be necessary."

386. On December 10, 2007, UBS announced a staggering $10 billion in further write-downs due to losses on subprime mortgage-backed positions. This was a stark contradiction to UBS's assurances just two months earlier that its then $4 billion write-down was the result of a "cautious view of future developments" in the market.

387. Defendant Rohner assured investors that UBS's valuation of its remaining portfolio reflected "extreme loss protections," and that measures taken would "create maximum clarity on this issue and will have the effect of substantially eliminating speculation."

388. In light of the latest write downs, the Company also announced on December 10, 2007 that it would be seeking additional capital in order to elevate its Tier 1 Capital ratio. To that end, UBS revealed a plan to offer mandatory convertible bonds worth CHF 13 billion to two large investors, the Government of Singapore Investment Corporation ("GIC"), a sovereign

125

wealth fund based in Singapore, and an unnamed Middle Eastern investor. Similarly, the Company disclosed plans to distribute a share-based, as opposed to a cash-based, dividend of fiscal year 2007, and announced that the Board of Directors approved the resale of 36.4 million treasury shares previously intended to be cancelled.

389. According to Defendant Rohner, as quoted by *Reuters News* on December 11, 2007, these capital-raising measures were vital as they would "protect the bank against all scenarios" such that the Company "would not have to hike capital again after a large capital injection." Because shareholder approval was necessary to ratify certain of these measures, UBS announced that an Extraordinary General Meeting ("EGM") would convene on February 28, 2008 in Zurich.

390. On or about December 11, 2007, JP Morgan analyst, Kian Abouhossein, issued a report concerning UBS and stated, in relevant part, that if UBS were successful in consummating the foregoing capital-raising measures, it would be so well capitalized that it would be in a position to take an additional $4 billion write-down with little adverse effect to the Company.

391. On January 18, 2008, *Reuters* reported that Marcel Rohner issued an internal memorandum to UBS employees announcing that UBS was cutting its real estate securitization business in half. He further informed employees that the Company would be reducing the IB's balance sheet by two-thirds. Analysts interpreted this internal memorandum as a tacit admission that the Company's attempts to grow the fixed income business had failed.

392. Notably, approximately one month prior to the scheduled EGM, on January 30, 2008, UBS announced that it would be taking another subprime-related write-down of $4 billion, bringing the total amount of write-downs related to UBS's subprime mortgage-backed

positions to an astronomical $18.7 billion for the year-ended December 31, 2007. (UBS admits in the Shareholder Report that all $18.7 billion in write-downs for 2007 resulted from losses on its subprime mortgage-backed securities). On the same date, UBS pre-announced its results for 4Q 2007, along with an estimated CHF 4.4 billion loss for the year-ended December 31, 2007.

393.    Notwithstanding this additional partial disclosure, UBS continued to withhold the entire truth from investors – namely that at least approximately $19 billion in additional write-downs were required and that it was exposed to an additional $27 billion in assets backed by risky Alt-A mortgages – so as to obtain investor consent to the aforementioned CHF13 billion bond offering at the February 28, 2008 EGM.

394.    Notwithstanding Defendants' and other high-ranking UBS members' involvement in the fraud outlined herein, the debacle at DRCM and the terminations of UBS management as a result of the fraud, Defendant Suter deceptively attempted to persuade investors at a January 31, 2008 Investor Day Conference, that the Company's extensive write-downs were caused by a small group of low-level UBS employees:

> The positions that have cost us so much this year were established by a small number of people operating in one team and that team was a small part of one of our business lines in the investment bank. The positions were created in the interest of clients but were held in pursuit of proprietary trading. The people concerned and their supervisors failed to recognize properly the size and changing nature of the position that were being established and risk control and finance had the numbers but failed to realize at the time what they truly meant.

395.    On February 14, 2008, UBS filed its annual report with the SEC on Form 20-F, wherein it confirmed the previously-announced CHF 12.4 billion fourth quarter loss and CHF 4.3 billion loss for the year-ended December 31, 2007.

396.     That same day, the Company further disclosed that in addition to the subprime exposures revealed to date, it also possessed a massive $26.6 billion exposure to the crumbling U.S. Alt-A mortgage market.  UBS also disclosed that the Swiss Federal Banking Commission had launched an investigation into the circumstances surrounding its subprime losses, and that the Company was working to prepare a detailed report regarding the causes of its losses.

397.     Also on February 14, 2008, the Company released a set of Answers to Questions Submitted by Ethos ("UBS's Responses to Ethos"), Swiss Foundation for Sustainable Development ("Ethos").   Ethos, a Swiss corporate governance foundation, had previously submitted a list of detailed questions to the Company regarding its risk management policies and the circumstances which led to the 2007 write-downs.

398.     On February 27, 2008, the Company held the EGM.  During the meeting, the shareholders approved the plan to allow the Company to raise $12 billion in new capital through the issuance of convertible notes to the Singapore government and an unnamed Middle Eastern investor.  In addition, the shareholders also agreed to accept a stock dividend as opposed to a cash dividend in order to free up additional cash for the Company.  Unbeknownst to investors at the time, UBS was just one month away from *doubling* the size of its subprime and Alt-A backed asset write-downs.

399.     On March 14, 2008 UBS announced that it would release a summary of the full report it, and two law firms it retained, were preparing for the SFBC.  The Company agreed that the summary would contain the main conclusions of its internal investigation regarding the causes of its subprime losses.  In exchange for UBS's promise, Ethos elected not to ask the Swiss Courts to grant a external special audit of the Company.

128

400.    On March 18, 2008, the Company filed its Form 20-F with the SEC for the year-ended December 31, 2007, along with its Annual Report and 2007 Handbook.  The Annual Report disclosed a Group net loss of CHF 4.384 billion for 2007, resulting almost entirely from the Company's exposure to the U.S. residential mortgage market.  In addition, the Annual Report noted that Defendant Ospel's 2007 pay was reduced by 90%, while former CEO Defendant Wuffli, former CFO Defendant Standish and former IB CEO Defendant Jenkins shared $33 million in compensation in 2007, and would share an additional $60 million in compensation over the next two years.  The Company also admitted that while recent events had not "invalidate[d] UBS's risk management and risk control principles," they had demonstrated that the policies, measures and processes that implement the principles can be strengthened in some ways."

### B.     Additional Write Downs Continue to Reveal the Extent of UBS's Fraud and Necessitate Further Capital-Raising Plans

401.    On April 1, 2008, UBS once again shocked the market by announcing a fourth and colossal $19 billion write-down in connection with assets collateralized by subprime and Alt-A mortgages.  The Company's April 1, 2008 write-down, which brought the Company's total subprime and Alt-A related write-downs to approximately $38 billion, was larger than all of its previous write-downs combined, and followed assurances from Defendants that UBS had taken the worst of the write-downs.  Defendant Ospel also announced a $15 billion rights offering in order to shore up the Company's capital situation in light of the latest write down, and informed investors that he would not seek to be re-elected as Chairman at the Company's April 23, 2008 General Annual Meeting.  Pending shareholder approval, he stated that the Board would choose the Company's General Counsel, Peter Kurer, to succeed Ospel.    As a

consequence of the Company's further write downs, Fitch, S&P and Moody's each cut UBS's credit rating. S&P cited risk management lapses, earnings volatility and the need for new capital in support of its downgrade, while Moody's downgrade reflects the fact that the latest write downs have substantially weakened the bank's flexibility. Moreover, Fitch's outlook remained negative, on concerns that "the group may not report a full-year profit for the second consecutive year."

402. In analyzing UBS's multiple capital-raising strategies, industry analysts like David Williams of Fox-Pitt Kelton noted that, collectively, the rights offering, the convertible issuance, the sale of treasury shares and the stock-based dividend could dilute the value of existing shares by as much as 50%.

403. Following the Company's April 1, 2008 announcement, Luqman Arnold, former UBS CEO and current head of Olivant Partners, Ltd., a major stakeholder in UBS, characterized the selection of Peter Kurer as "hasty and flawed," and called on UBS to name an independent Swiss executive to replace outgoing UBS Chairman Defendant Ospel. Moreover, on April 3, 2008, Arnold drafted an open letter to UBS executives asking for a break-up of the troubled Company. In the letter, Arnold chided UBS for incurring the largest trading loss in European banking history and in complete disregard of UBS's "historic reputation for strong risk management." He criticized the IB's excessive use of leverage, and its emphasis on "proprietary trading activities totally divorced from any client business" which "exposed [UBS] to extreme concentration risk based on the single bet that US house prices would not fall." Arnold asked the Board to consider selling off UBS's global asset management division in order to boost its capital position.

404.    On April 16, 2008, the Company advised shareholders that they would receive a considerably lower dividend for 2007 than in previous years because of the subprime and Alt-A related write-downs.  The anticipated stock dividend amounted to CHF 1.69 at current market prices, as compared to a CHF 2.20 dividend for 2006.

## C.    UBS is Compelled by Swiss Authorities to Explain the Reasons for Its Write-downs in a Shareholder Report

405.    Two days prior to the annual meeting, on April 21, 2008, UBS released a 50-page document titled "Shareholder Report on UBS's Write-Downs," which purported to set forth the causes of the Company's $18.7 billion in write-downs between October 2007 and December 2007.  While the Shareholder Report was created, and thus cleansed, by approximately 20 UBS attorneys, it nonetheless made a number of startling admissions including, *inter alia*, that:

a.      Between 2005 and 2007, the Company retained on its books a staggering $50 billion in super senior CDO bonds backed by high-risk subprime mortgages (Shareholder Report at 15);

b.      These positions were accumulated by the IB as part of a growth plan that "focused on the maximization of revenue" and "did not consider the risk capacity…associated with the recommended product expansion" (Shareholder Report at 34); and

c.      As a consequence, there was an overarching "lack of challenge on the risk and reward to business area plans within the IB at a senior level," and an "asymmetric focus in IB Senior Management meetings on revenue and P&L, *especially when compared to discussions of risk issues.*" (Shareholder Report at 34) (emphasis added).

406.    According to the Shareholder Report, the Company's exposure to the U.S. subprime mortgage market was concentrated primarily within three business units:  (i) DRCM, which was responsible for approximately 16% of the 2007 write-downs; (ii) the IB's Fixed Income Rates business, which was responsible for approximately 66% of the 2007 write-downs; and (iii) the IB's Foreign Exchange/Cash Collateral Trading business, which was responsible for

10% of the 2007 write-downs. The remaining 8% of UBS's 2007 write-downs resulted from operations within the IB's Securitized Product Group and Credit Fixed Income businesses. (Shareholder Report).

407. In the Shareholder Report, the Company admitted that despite its countless statements to investors that it would avoid high concentrations of assets and employ stringent and specific risk management controls, UBS's risk control framework during the Class Period (as it pertained to the Company's acquisition of assets and, thus, exposure to subprime and Alt-A mortgage-backed securities) was severely flawed and deficient. Notably, the Company admitted that:

    a.    UBS failed to impose a Risk Factor Loss measure, designed specifically to limit risk concentrations, to address its subprime exposures (Shareholder Report at 38);

    b.    UBS failed to impose umbrella operational limits on the amount of residential mortgage-backed securities held across the IB and across the combined holdings of the IB and DRCM (Shareholder Report at 20);

    c.    UBS failed to impose notional or aggregate limits on the amount of AMPS super senior CDO positions UBS could retain on its books at any given time (Shareholder Report at 20, 21, 31);

    d.    UBS failed to impose authorization requirements or notional or aggregate limits on the amount of unhedged super senior positions UBS could retain on its books at any given time (Shareholder Report at 20, 21, 31);

    e.    UBS failed to impose notional or aggregate limits on the amount of RMBS UBS could hold on its books during the "ramping" process of a CDO (Shareholder Report at 13, 20, 29);

    f.    UBS failed to require approval via either the New Business Initiative ("NBI") or Transaction Requiring Prior Approval ("TRPA") processes to begin accumulating RMBSs, CDSs, or other assets in preparation for the creation of a CDO, and only required TRPA approval *after* the warehousing process was near completion, when a rejection "would have entailed expensive unwinding of the CDO warehouse and the deal" (Shareholder Report at 21, 29, 40);

132

g.    UBS failed to require the front office systems to gather the most basic of information about the mortgages underlying the asset-backed securities UBS held on its books, including FICO scores, $1^{st}/2^{nd}$ lien status, collateral vintage (Shareholder Report at 20);

h.    UBS failed to classify, at the most elementary level, the positions held on its books as either ABSs or as CDOs (Shareholder Report at 20);

i.    UBS failed to impose notional or operational limits either across the IB or the combination of the IB and DRCM, that limited overall exposure to the subprime sector (Shareholder Report at 21);

j.    UBS failed to provide risk managers with a comprehensive view of the IB's gross notional holdings with subprime exposure (Shareholder Report at 21);

k.    UBS failed to "implement additional risk methodologies" and enabled the CDO Warehouse to retain "greater volumes of securities…within existing overall stress limits" by changing the "stress methodology," even after losses occurred "in Q1 and Q2 2007 on retained securities in the CDO Warehouse" (Shareholder Report at 29-30);

l.    UBS failed to distinguish between liquid and illiquid assets when determining whether or not to fund a transaction using the Company's low internal funding rate (Shareholder Report at 36);

m.    UBS failed to curtail its investment in U.S. subprime RMBS and CDOs during the Class Period, even after (1) BUC reported "a substantial reduction in the coverage of independent price testing of Subprime securities" in February and March of 2007, and (2) GIA concluded that the Company needed to improve its analysis, measurement and reporting of risks inherent in subprime-related activities in April 2007 (Shareholder Report at 18, 23);

n.    UBS failed to scrutinize CDO transactions prior to entering into an agreement with a collateral manager, "as would be the case with analogous commitments elsewhere in the bank" (Shareholder Report at 29);

o.    UBS was warned in March 2006, that the fixed income growth plan was likely to "increase in highly structured illiquid commitments" these illiquid commitments "would need to be carefully analyzed and tightly controlled and an appropriate balance between incremental revenue and VaR/Stress Loss increase would need to be achieved to avoid undue dilution of return on risk performance." (Shareholder Report at 28);

p.      UBS did not take the necessary steps to address the risk of the Fixed Income growth plan or implement any risk controls to address these concerns expressed by the GEB as it did not invest "in the type of control resources and infrastructure commensurate with the significant increases in volumes, revenues, and complexity of the Fixed Income strategic objectives." According to UBS, "[t]he systems infrastructure was not capable of capturing the complexities associated with some of the more complex Fixed Income products." (Shareholder Report at 34);

q.      UBS admitted that during the Class Period there was "no indication that IB Senior Management seriously challenged the efficacy of pursuing [the CDO] business in the face of increasing concern about the US housing market and specifically the Subprime sector." (Shareholder Report at 38);

r.      Even though UBS's involvement in the subprime sector was a relatively new endeavor, UBS admitted that during the Class Period "Senior risk control did not seek to undertake a comprehensive risk assessment of UBS's Subprime exposure, including understanding gross notional and hedge coverage." (Shareholder Report at 39);

s.      UBS admitted that during the Class Period, Market Risk Control and Stuerzinger did not "substantively challenge[] the CDO desk when significant limit increases for the RMBS warehouse were requested initially in late 2006, and then again in Q2 2007, when the Subprime CDO business was undergoing significant growth." (Shareholder Report at 40);

t.      Even though the structure of DRCM was "relatively complex and reflected a non-standard governance model", UBS admitted that "the DRCM business case and internal agreements and arrangements to close the DRCM transaction were…effected with considerable speed and concluded with less opportunity for wider internal review that might have otherwise been the case." (Shareholder Report at 9-10);

u.      Even though IB management, including the Fixed Income Executive Committee, Market Control and the Risk and Governance Committee, raised concerns regarding the effectiveness of the TRPA and NBI processes in 2006 and the first half of 2007, UBS admitted that during the Class Period no one addressed these concerns and, as a result, no significant changes were made to these processes. (Shareholder Report at 22);

v.      UBS admitted that during the Class Period, that neither Defendant Stuerzinger and Market Risk Control nor the IB looked through "the CDO structure to analyze the risks of the underlying collateral." Instead, UBS

relied on the AAA rating of its U.S. residential mortgage backed securities, even though "the CDOs were built from lower rated tranches of RMBS" and continued to do so even when "question were being raised in relation to the subprime sector." UBS admitted that "a comprehensive analysis of the portfolios may have indicated that the positions would not necessarily perform consistent with their ratings." (Shareholder Report at 20, 38, 29);

w.     UBS admitted that during the Class Period UBS traders compromised the process by which it risk managed its positions by executing minimal hedges to disguise the accumulation of super senior tranches. As a result, UBS admitted that, "[a]s a consequence of this treatment" by the IB, there "was a lack of visibility to, and challenge of these positions by, Group and IB Senior Management." (Shareholder Report at 30-31);

x.     Notwithstanding a pessimistic report to the GEB and IB Senior Management in Q2 2007, UBS admitted that the MBS CDO business "acquired further substantial Mezzanine RMBS holdings." According to the Shareholder Report, UBS earned larger structuring fees from the creation of Mezzanine CDOs. (Shareholder Report at 13, 29);

y.     UBS retained the super senior tranche of CDO's it structured on its own books because UBS viewed the tranche as "an attractive source of profit" because (1) funded positions had a positive carry and unfunded positions generated a positive spread) and (2) retention of the tranches suggested liquidity in the market, thereby generating further CDO origination business for UBS.(Shareholder Report at 14);

z.     In Q2 2006, DRCM began purchasing ABS tranches with underlying 2nd lien mortgages of higher credit quality "in response to increased credit concerns over Subprime ABS securities." Thus, UBS admitted that as of Q2 2006, it knew that there were credit issues with subprime ABS securities. (Shareholder Report at 31);

aa.    Beginning in September 2006, the home equity desk at DRCM took a short position on the ABX Index. DRCM did not view these short positions as "hedges", "but rather a distinct shorting of perceived over-priced assets." Thus, UBS admitted that as of September 2006, UBS knew that some of its assets were over-valued on UBS's books.(Shareholder Report at 31);

bb.    During the Class Period there were "structural incentives to implement carry trades," i.e., trades that in the short term had slightly more yield than the cost to place the position on UBS's books, and "employee incentivization arrangements did not differentiate between return

generated by skill in creating additional revenue versus returns made by exploiting UBS's comparatively low cost of funding in what were essentially carry trades….UBS's funding framework amplified the incentives to pursue compensation through profitable carry trades." (Shareholder Report at 41-42);

cc.   In September 2006, Defendants "expressed general concerns about the US housing market within the GEB Risk Sub-committee" yet continued amass a $100 billion subprime and Alt-A asset portfolio in contravention of their assurances to investors that UBS employed stringent risk management and avoided high concentrations of any given asset type. (Shareholder Report at 35);

dd.   In mid-March, and again in late March 2007, DRCM traders informed Defendant Stuerzinger of losses at DRCM such that after "the first losses in DRCM became apparent in Q1 2007, the GEB Risk Subcommitee was alert to the issues associated with Subprime investments generally and keen to understand UBS's exposure to these markets." (Shareholder Report at 17);

ee.   In March 2007, GIA conducted an internal investigation of the subprime exposures of DRCM and the IB, and concluded, in part, that "valuation uncertainties" existed in both portfolios, as neither was "sufficiently transparent."(Shareholder Report at 17); and

ff.   UBS was aware of wider market difficulties in early 2007 and completed a "substantive reassessment of the ABS Trading Portfolio" in July 2007. (Shareholder Report at 18).

408.   The Shareholder Report was the subject of much in-depth coverage by both the financial media and industry analysts. Dirk Hoffman-Becking, an analyst at Sanford Bernstein in London, expressed his surprise that UBS had spread its exposure across three divisions – DRCM, the IB's Fixed Income Division and the IB's Foreign Exchange / Cash Collateral Trading Division. Dirk Becker, a Landsbanki-Kepler analyst, commented that the report provides "a nice lesson for banks about what not to do." (Vidya Ram, *UBS's Subprime Postmortem*, Forbes, April 21, 2008). Similarly, in critiquing the Shareholder Report, which he characterized as the "cherry on top of a demonic sundae," *Fortune* journalist Roderick Boyd

described DRCM a "veritable warren of contradictions" which "created a system of truly perverse incentives" that allowed DRCM and IB traders to accumulate massive subprime positions with little regard for the amount of risk they assumed in the process. (Roderick Boyd, *How UBS Came Undone*, FORTUNE, April 23, 2008)  Similarly, *Dow Jones Financial News* reporter Grant Clelland described the report as "a great big bath full of dirty water," and marveled at how UBS effectively "doubl[ed] its bets to play catch up in the sub-prime arena, just as US interest rates were peaking and warning signs were starting to emerge that all was not well in the sub-prime area." (Grant Clelland, *Comment: UBS throws the kitchen sink at its subprime woes*, *Dow Jones Financial News*, Apr. 21, 2008.)

409.    Following the release of the Shareholder Report, the Company held its General Annual Meeting on April 23, 2008 in Basel, Switzerland.  At the meeting, Defendant Rohner outlined plans to scale back the IB, and warned that UBS could cut additional jobs beyond the 1,500 layoffs already announced.  Rohner stated that the Company was also shrinking its exposure to risky subprime related assets, noting that the amount of subprime positions currently on UBS's books have been reduced by two thirds since the end of September 2007.  Finally, at the meeting, shareholders approved the selection of general counsel Peter Kurer to replace Defendant Ospel as Chairman of the Board of Directors.

410.    On May 6, 2008, the Company announced an $11.5 billion loss for the first quarter of 2008 as a result of the $19 billion write-down announced in April.  In response to these unsatisfactory results, the Company stated that it would layoff approximately 7% of its workforce, including approximately 2,600 individuals from the IB.  In addition, the Company also informed the market that it was in talks to sell roughly $15 billion in mortgage-backed assets.

411.    On May 14, 2008, the Company announced that Jerker Johansson, CEO of the IB, would take over the fixed-income, currencies and commodities business following the decision by Andre Esteves to step down as global head of the division.  Esteves remained with UBS as the CEO of UBS Latin America.  The Company also hired Thomas Daula as the Investment Bank's new Chief Risk Officer, and announced the creation of a new business unit called Group Portfolio and Concentration Risk to "control[] the firm's overall risk exposure across credit, market and country risk," and to evaluate risks at the overall portfolio level.  According to Chief Risk Officer Joseph Scoby, "[t]hese changes are designed to establish a best in class Risk Control team with an overall view of all risks."  Scoby also stated that "[t]he creation of an integrated portfolio and concentration risk group will help break down any remaining information silos between the different risk functions."

412.    On May 21, 2008, the Company announced that it had completed the sale of approximately $22 billion in subprime and Alt-A assets to BlackRock.  The $15 billion sale price for the assets represented a discount of approximately 32%.  In addition to selling the assets at a steep discount, UBS informed investors that BlackRock only agreed to provide $3.8 billion in equity to fund the deal, with the remaining funding coming in the form of an $11.2 billion collateralized loan from UBS to BlackRock.  In other words, UBS was only securing protection against loss in value for a portion of the assets it "sold" to BlackRock.

413.    The following day, in an effort to further shore up its capital position, the Company provided additional details regarding the $15.58 billion rights offering to existing shareholders.  Under the plan, current UBS shareholders were slated to receive seven new shares of UBS stock for every 20 shares held.  UBS priced the new shares at $20.40, roughly 33% below market value as of May 22, 2007.

414.    In the May 23, 2008 prospectus the Company filed in connection with the rights offering the Company warned investors that it may have to record losses in connection with both U.S. real estate and non-U.S. real estate.  The filing stated, in part, that conditions in the U.S. real estate and non-U.S. real estate market during the second quarter of 2008 were "volatile and challenging," and as a result, the Company's markdowns and losses "could increase" in the future.  Market analysts interpreted the statement to mean that UBS may have additional subprime exposure, particularly because "[t]he company hasn't said how much it holds in non-U.S. mortgage securities," and "[t]he U.K. housing market is almost as overheated as in the U.S., and could lead to losses for banks."  (Elena Logutenkova, *UBS Falls After Saying More Mortgage Losses Possible*, Bloomberg News, May 26, 2008).

415.    On the same day, UBS announced that Robert Morelli, executive director and head of RMBS CDOs, and Lirenn Tsai, managing director and head of ABS CDOs, would be leaving the Company.

416.    On July 1, 2008, UBS announced substantial changes to its corporate governance model in order to ensure "a clear separation of the roles and responsibilities between the Board of Directors and Executive Management and a strengthening of the oversight role of the Board through the operation of its Committees."  In addition, four members of the Board of Directors, Stephan Haeringer, Rolf Meyer, Peter Spuhler and Lawrence Weinbach, announced that they would resign from the Board effective October 2, 2008.  The Company also scheduled an extraordinary general meeting for October 2, 2008 to choose replacement directors.

417.    Finally, on July 4, 2008, UBS issued a press release announcing that its second quarter 2008 results "are likely to be at or slightly below break-even."  (the "July 4, 2008 Announcement").  The July 4, 2008 Announcement also stated that "[f]urther market

deterioration led to write-downs and losses on previously disclosed Investment Bank risk positions, in particular credit valuation adjustments on monoline insurance exposures. Write-downs were mitigated by continued exposure reductions and by hedge benefits. In connection with the losses to date, the second quarter results include a tax credit of approximately CHF 3 billion." Although July 4, 2008 Announcement did not quantify the amount written-down, some analysts have estimated that UBS's latest write-downs could be $7.5 billion. *See* Haig Simonian, *UBS faces more US credit writedowns*, Financial Times, Jul. 4, 2008 (stating that UBS "did not quantify the writedowns, which analysts have estimated at up to $7.5bn").

## IX.  UBS's Fraud Extends Beyond the Acquiring Subprime and Alt-A Mortgage-Backed Securities

### 1.  Defendants Conceal UBS's Multi-Billion Dollar Exposure to Auction Rate Securities

418.    UBS's pursuit of profits at the expense of its shareholders was not limited to its activities with subprime and Alt-A mortgage backed securities.  Indeed, UBS also misrepresented failed to inform investors that (i) UBS accumulated hundreds of billions of dollars in high risk, illiquid ARS, and (ii) counseled its clients that ARS had essentially the same liquidity as cash while knowing that the market for ARS had become illiquid.  When it became known that UBS possessed approximately $5.9 billion in ARS necessitating nearly $1 billion in write-downs, and that UBS employees deceptively advised clients desiring liquidity to purchase ARS in an illiquid market, UBS's stock price fell, damaging investors.

419.    ARS are long term bonds with interest rates that are reset and determined regularly through Dutch auctions overseen by the brokerage firms that originally sold them to

investors. ARS are issued by entities such as municipalities, student-loan companies, and tax exempt organizations like hospitals and museums.

420.     During the Class Period and unbeknownst to investors, the term "auction" was somewhat of a misnomer as the interest rates for UBS-issued ARS often were not set in a true bidding process. (*It's a Long, Cold, Cashless Siege*, New York Times, Apr. 13, 2008). Indeed, while UBS attempted to match up ARS sellers with willing buyers in a "auction" context, often there was insufficient interest on the buyers' side during the Class Period. In those instances, UBS generated false demand for and liquidity of ARS by purchasing the unwanted ARS. (*Id.*)

421.     UBS structured the auctions such that investors often were not aware of the number of other investors, how much the firm may be supporting the auction, or how the interest rates are set. (*Id.*; *UBS Won't Support Failing Auction-Rate Securities*, Bloomberg, February 14, 2008). UBS received fees for underwriting the shares and for conducting the auctions. (*It's a Long, Cold, Cashless Siege*, New York Times, April 13, 2008).

422.     As a result of this practice and unbeknownst to investors, UBS acquired at least ***$5.9 billion*** in ARS during the Class Period in direct contravention of its representations to investors, *inter alia*, that UBS avoided accumulating high concentrations of any given asset type and illiquid assets.

423.     Furthermore, evidence has surfaced, suggesting that UBS marketed ARS as very safe cash equivalents, (*see E-mail that Investors Might like to Read*, New York Times, June 29, 2008, and deliberately used these "cashlike arguments" as part of their sales campaign for the ARS. (*Suit Claims UBS Mislead Investors*, NEW YORK TIMES, June 27, 2008.

424.     Despite these assurances of liquidity from UBS, in February, 2008, the $300 billion ARS market crashed when corporations, which had previously been large buyers of ARS,

141

began selling them, leaving a dearth of willing buyers on the market.  (*E-mail that Investors Might like to Read*, New York Times, June 29, 2008).  Seeing the decline in value of its $5.9 billion ARS portfolio and having just written-down tens of billions in subprime backed securities, UBS internally decided it could not continue to subsidize new auctions with its own capital as it had done in the past.  (*Id*.; *Suit Claims UBS Mislead Investors*, NEW YORK TIMES, June 27, 2008).  As a result, investors were unable to sell securities that they had been told were highly liquid and UBS was left with a materially overvalued ARS portfolio.  (*Former UBS broker files suit in U.S. over Securities Investigation*, International Herald Tribune, July 3, 2008).

425.    Since the ARS market collapse, internal communications between UBS executives have come to light, indicating that as early as August, 2007, UBS executives knew that the demand for ARS was plummeting and UBS had less capital available to support future auctions.  (*Suit Claims UBS Mislead Investors*, New York Times, June 27, 2008).  UBS further knew that without its ability to fabricate demand and maintain continued liquidity in the auction, it would be saddled with a large inventory of ARS that it could not sell.  (*E-mail that Investors Might like to Read*, NEW YORK TIMES, June 29, 2008).

426.    As a result, UBS secretly began a panicked and aggressive campaign to unload UBS's ARS in an attempt to limit UBS's own risk exposure.  On August 30, 2007, David Shulman, UBS's global head of fixed income distribution, wrote an internal email stating "as you can imagine during these stressful times, the pressure is on to move our inventory." (*Id*.)  In another internal email on November 15, 2007, Joel P. Aresco, chief risk officer for the Americas, asked "why the continual increase [in the inventory of ARS?]  What measures are being taken to reduce this risk." (*Id*.)  On December 11, 2007, Shulman, wrote an email asking

for a sales force call and stating "***we need to move this paper and have to explore all angles***

***possible*** … we need to do this as quickly as possible … please work on this priority." (*Suit*

*Claims UBS Mislead Investors*, New York Times, June 27, 2008) (Emphasis added). Shulman

himself dumped all of his entire personal holdings in ARS on December 12, 2007. (*Id.*)

427. Throughout mid to late 2007, as UBS secretly attempted to unload its ARS due to

deteriorating market conditions, UBS's web site continued to refer to ARS as a liquid cash

alternative. (*E-mail that Investors Might like to Read*, New York Times, June 29, 2008). In

February 2008, just days before the market collapsed, internal emails between UBS executives

stated "we need to beat the bushes harder than ever to unload this paper." (*Id.*)

428. After the collapse of the ARS market, on March 28, 2008, UBS announced that it

would begin marking down the value of the ARS held by its clients and that starting in April,

2008, ARS would no longer be called "cash equivalents" on customer statements, and would

instead be called "fixed-income securities." (*UBS Lowers Price of Security seen as 'Cash'*,

Wall Street Journal, Mar. 29, 2008; *UBS to Lower Auction-Rate Securities' Values*, Reuters,

Mar. 29, 2008).

429. Subsequently, following an investigation by the Massachusetts Attorney General

into UBS's ARS, on May 7, 2008, UBS agreed to pay the Massachusetts Turnpike Authority

and 17 towns and cities a settlement of $37 million. (*Former UBS broker files suit in U.S. over*

*Securities Investigation*, International Herald Tribune, July 3, 2008). Also in May, 2008, UBS

wrote down its ARS by $974 million. (*Massachusetts Sues UBS Over Auction-Rate Securities*

OnWallStreet.com, June 26, 2008).

430. On June 26, 2008, the Massachusetts Securities Commission filed an

administrative proceeding against UBS alleging that UBS had knowingly defrauded its ARS

143

investors.  The foregoing announcements caused UBS's stock price to fall, thereby damaging unsuspecting investors.

### 2. UBS Counseled U.S.-based Clients to Evade U.S. Tax Laws

431.    Since 1998, UBS had been defined by its conservative approach to managing its client's private wealth.  During the Class Period, however, (i) senior UBS executives counseled U.S. clients to evade U.S. tax laws from 2000 through 2007, and (ii) the DOJ commenced an investigation in that regard by no later than January 2008, uncovering the sordid details of the tax evasion.  UBS concealed the forgoing from UBS investors and repeatedly misrepresented that UBS was complying with all applicable laws and regulations including U.S. tax laws.

432.    The activities of UBS's Wealth Management unit are currently under scrutiny as part of a U.S. DOJ investigation into whether UBS aided wealthy clients in evading more than $300 million in U.S. taxes between 2000 and 2007.

433.    As a result of the investigation, UBS's widespread practice of illegal and reckless activity has been revealed to the public, and UBS's Wealth Management unit has undergone a series of upheavals.  In January 2008, as the inquiry by the DOJ was on-going, UBS shut three of its Swiss offices that sold undeclared offshore banking services to American clients. (*Wealthy Americans Under Scrutiny in UBS case*, New York Times*, June 6, 2008*).

434.    It was not until May 7, 2008, however, that UBS announced in its quarterly filing that it was the subject of the DOJ investigation.  (*UBS Announces $10.9 Billion Loss, Job Cuts and Tax Probe*, New York Times, May 7, 2008).  On that same day, U.S. officers detained, questioned and released Martin Liechti ("Liechti"), a current UBS senior banker in connection with the DOJ's tax evasion probe.

435. Later in May 2008, it was revealed that a former senior UBS private banker, Bradley Birkenfeld ("Birkenfeld"), also was detained on May 7, 2008 and subsequently arrested upon entering the United States. Birkenfeld has since pled guilty to conspiring to defraud the United States by helping American clients evade taxes. (Michael Herman, *Ex-UBS banker to Admit Tax Evasion Charges*, TIMES UK, May 30, 2008).

436. Notwithstanding that in early May 2008, UBS released a statement that it was cooperating with the DOJ investigation, UBS warned its private banking team not to travel to the United States because of concern that additional UBS staff would be arrested or detained in connection with the investigation.

437. In late May 2008, over twenty advisors and staff in UBS's wealth management unit resigned. (*UBS Says More than 20 Leave Wealth Management Unit*, Reuters UK, May 29, 2008).

438. The information released to date indicates that UBS provided illegal advice to clients at senior levels within the Wealth Management unit. On June 19, 2008, Birkenfeld testified in federal court that UBS explicitly advised American clients on how to evade U.S. taxes, including: (i) urging clients to destroy banking records; (ii) advising clients to lie to customs officials; (iii) telling clients to hide watches, jewelry and artwork in hidden offshore safe deposit boxes in Switzerland; and (iv) advising clients to use Swiss credit cards so the U.S. IRS could not track their purchases.

439. Birkenfeld also testified that while at UBS, he often acted as a personal courier for American clients, helping them transport assets out of the United States -- once even smuggling diamonds in a tube of toothpaste. After Birkenfeld testified, his attorney stated that

"Mr. Birkenfeld was working at UBS where people knew exactly what was going on." (Lynnley Browning, *Ex-UBS Banker Pleads Guilty to Tax Evasion*, NEW YORK TIMES, June 20, 2008).

440.    As part of the DOJ investigation, prosecutors requested that the United States District Court for the Southern District of Florida (S.D. Fla.) order UBS to turn over the names of the American clients believed to have evaded U.S. taxes through secret offshore accounts.  In support of the request, the DOJ submitted a declaration by an IRS agent citing a November 2, 2002 letter from two senior UBS bankers to its clients stating that UBS would not disclose the identity of clients who did not wish to file W-9 forms, even if they were required to do so by U.S. tax law. (Lynnley Browning, *U.S. Asks Court to Force UBS to Provide Names*, NEW YORK TIMES, July 1, 2008).

441.    On July 1, 2008, the S.D. Fla. gave authority to federal prosecutors to issue a summons to UBS for the names of the American clients believed to have evaded U.S. taxes. (Lynnley Browning and Julia Werdigier, *Judge Clears U.S. Request for UBS Client's Names*, NEW YORK TIMES, July 2, 2008).

442.    Immediately following the issuance of the Court's Order, UBS shares trading on the NYSE fell over 5% to $19.93 (CHF 20.30), "their lowest level in almost a decade," and UBS announced it would replace four directors and revise its corporate governance rules.  (Otis Bilodeau, *UBS Faces U.S. Tax Evasion Probe*, Bloomberg, May 7, 2008).

443.    The SEC is also conducting a separate investigation into whether UBS employees in Switzerland who advised U.S. clients failed to comply with SEC registration rules. Additionally, German authorities are investigating allegations that UBS aided German clients in evading taxes.  (Otis Bilodeau, *UBS Faces U.S. Tax Evasion Probe*, Bloomberg, May 7, 2008).

# X. FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS DURING THE CLASS PERIOD

## A. Total Mix of Information Entering the Class Period

444. Prior to the beginning of the Class Period, UBS issued statements concerning the strength of its risk management controls and the contribution of its controls to shareholder value. Moreover, UBS also represented that it, as part of its risk management strategy, the Company avoided concentrated risks. These statements, of which a few are described below, contributed to the total mix of information communicated to investors at the start of the Class Period.

445. On May 4, 2005, the Company filed its quarterly earnings report for the first quarter of 2005 with the SEC on Form 6-K ("1Q 2005 Form 6-K"). Defendants Wuffli and Standish signed the Form 6-K. In a letter to shareholders, included in the 1Q 2005 Form 6-K, Defendants Ospel and Wuffli noted the following with respect to UBS's risk management:

> **Excellence in managing our daily operations creates value.**
> …Technological sophistication, combined with ever-increasing scale and complexity, increases our exposure to operational risk. Regulators have also become ever less tolerant of mistakes. Unfortunately, operational hazards are implicit in our business. That's why we are investing significantly in the processes for identifying, managing and controlling our exposure to potential operational risks. Effective operational risk management ensures that we can focus on what we are supposed to do – creating value for our shareholders and our clients, while minimizing the time, energy and attention paid to preventable "fire fighting" exercises.
>
> **We cannot sacrifice the way we manage risks for the sake of growth.** With our latest leadership appointments, we have enhanced the roles of the key individuals responsible for building the firm's risk control success over the last few years. On 1 March, Walter Stuerzinger, our Chief Risk Officer since 2001, joined UBS's Group Executive Board, assuming firm-wide responsibility for market, operational and credit risk control.

(Emphases in original).

446. The 1Q 2005 Form 6-K also reported "[m]arket risk for the Investment Bank, as

147

measured by the average 10-day 99% VaR, was CHF 371 million in first quarter 2005, slightly up from CHF 358 million in the previous quarter."

447. According to the 1Q 2005 Form 6-K, UBS executives:

…routinely assess and actively manage and control tail risks against a standard set of forward-looking scenarios supplemented by specific scenarios targeting individual sectors or reflecting current concerns, such as widening credit spreads or increased energy market volatility. Stress events modeled in our standard scenarios include crises in equity, corporate bond and emerging markets, and severe movements in currency, interest rate and energy markets. These scenarios are reviewed regularly and fine-tuned as necessary. Stress loss exposure ended the quarter higher than last quarter but the average was lower.

VaR and stress measures control our overall portfolio exposure *but we also apply concentration controls on exposure to individual market risk variables,* such as individual equity markets, currency, interest and foreign exchange rates, and single name issuers. *The diversification of risks and avoidance of undue concentrations remain key pillars of our risk control process.*

(Emphases added).

448. UBS also stated its commitment to "being one of the best-capitalized financial services firm in the world with sound capital ratios and strong debt ratings" in the 1Q 2005 Form 6-K.

449. That same day, UBS held a conference call for analysts and investors. During his introductory marks, Defendant Standish stated:

And finally a look at our capital position. This chart shows the steady increase in risk-weighted assets, since we increased our risk appetite just over a year ago. As we advise an ever-greater proportion of the world's corporations, expand the lending services we can offer to our wealthy clients, and develop our US bank, we obviously need to put some more capital behind these client commitments.

*That said, we're still running at lower levels than 1999, and can keep our Tier 1 ratio at a comfortably high level.* Since quarter end the ratio has been further supported by a 1b issue of preferred stock. *As you know, 1 of*

*our overriding risk management goals is the avoidance of concentration risks,* and while we have increased risk in the quarter, this chart shows that new commitments are widely spread from prime brokerage to derivatives, from Swiss mortgages to margin loans.

(Emphases added).

450.    In a June 30, 2005 press release, UBS announced the launch of DRCM, stating:

This new initiative will see UBS's Principal Finance and Commercial Real Estate trading businesses move from the Fixed Income, Rates, and Currencies area of its Investment Bank to form the core of the new unit within the Global Asset Management Business.

\*       \*       \*

In this way UBS will build a new stream of investment management fees from what has until now been a purely in-house trading activity. *UBS will retain its current direct investment in the relevant trading portfolios, with any incremental future investments subject to UBS's usual risk management processes.* This new business is similar in concept to other highly successful alternative asset management units within UBS, based on trading strategies developed within UBS's Investment Bank.

(Emphasis added).

451.    On August 9, 2005, the Company filed its quarterly earnings report for the second quarter of 2005 with the SEC on Form 6-K ("2Q 2005 Form 6-K"). Defendants Wuffli and Standish signed the Form 6-K.   In the 2Q 2005 Form 6-K, UBS reported that "[m]arket risk for the Investment Bank, as measured by the average 10-day 99% VaR, was CHF 362 million, slightly down from the CHF 371 million seen in the previous quar[ter]."

452.    UBS also renewed its commitment to "being one of the best-capitalized financial services firm in the world with sound capital ratios and strong debt ratings."

453.    On the same day, the Company held a conference call for analysts and investors. During the call, Peter Wuffli responded to a question regarding the Company's weak fixed income results for the quarter, stating:

149

**VASCO MORENO (KBW):** And then thirdly in terms of the Investment Bank, we would characterize this as a fixed-income revenue performance. Maybe a little bit disappointing in the second quarter given how weak versus the peers the first quarter was. Does this have something to do with obviously the low-risk appetite that you had in the second quarter? And what are the prospects to make up the difference in the second half of the year?

**WUFFLI:** …On fixed income I guess you answered the question also, to some extent, yourself. It is what we feel we deserved. ***That means we have positioned ourselves cautiously***. We were positioned -- positioning ourselves in February. And you see that clearly if you go into the VAR development for a very severe credit problem which did not turn out. We are happy for the industry that it did not turn out.

If it had turned out we would obviously have benefited relatively much more than others. ***But it does reflect in our philosophy not to go for the last franc, to control concentration risks and to focus on quality of earnings. And that's why our fixed income business is somewhat less volatile than the one of other competitors with the drawback for the opportunity loss of most others chasing the last free francs.***

Obviously, all this, combined with the fact that, as you know, we are not a major player in commodities. And at least for some players in the first half commodities was a major – was a major backdrop. We do not feel that we should change that. We feel comfortable with our risk position going forward. ***And we therefore obviously are analyzing our results and always looking for ways where we can improve, but fundamentally do not feel that we should increase our risk at the time in fixed income in order to change that fundamental picture.***

(Emphases added).

454. On November 1, 2005, the Company filed its quarterly earnings report for the third quarter of 2005 with the SEC on Form 6-K ("3Q 2005 Form 6-K"). Defendants Wuffli and Standish signed the Form 6-K. In the 3Q 2005 Form 6-K, UBS reported:

Average market risk for the Investment Bank, as measured by the average 10-day 99% Value at Risk (VaR) was CHF 343 million in third quarter, down from CHF 359 million in second quarter. Quarter end VaR fell to CHF 309 million from CHF 374 million in the previous quarter, but there were large fluctuations over the period.

455.	UBS also renewed its commitment to "being one of the best-capitalized financial services firms in the world with sound capital ratios and strong debt ratings."

456.	Also on November 1, 2005, UBS issued a press release accompanying the 3Q 2005 results.	In the press release, UBS noted that, with respect to FIRC, the "business successfully rebounded from third quarter 2004. Here, the Investment Bank is currently looking for ways to expand its presence into new areas in order to further develop its competitive position."

457.	Additionally, in a related analyst conference call, Defendant Standish discussed closing some of the gaps between UBS and some of its competitors with respect to its fixed income business:

>	**MARC RUBINSTEIN (CREDIT SUISSE):** Thanks. Good morning. A couple of questions. Firstly on the Global Asset Management division. You commented on the impact that performance fees had on revenues in that division this quarter. I guess a lot of that was due to A&Q. So I was wondering if you could give an indication on the profit contribution of A&Q to the Global Asset Management business.
>
>	And also related to that, what, if any, the impact on the strategy of that business will be from the sale of GAM. That's the first question.
>
>	Secondly, on the Investment Bank, the initiative in FIRC to investigate new areas is interesting. In the past when you have done similar initiatives, for example, U.S. investment banking, for example, the foreign exchange overhaul, you've talked about an investment of about $100m, I think, in each of those cases. Is that a similar investment this time around? Thanks.
>
>	*	*	*
>
>	**STANDISH:** With regards to your second question, we have taken the opportunity to have a look with the management changes in our Investment Bank at all our business lines there. FIRC being but one. Within FIRC we clearly, on a gap analysis to the virtual best player in FIRC in the world and also to our peer group, we do see some gaps.
>
>	These are mainly -- apart from the gap in our commodities activities which

are clearly not at the same level as some of our competitors that we've mentioned before, ***but elsewhere in terms of looking at that gap analysis we see that there is definite opportunities for us where our franchise is not broad enough and deep enough in the credit fixed income area,*** particularly in emerging markets and local bond trading activities around the world, and also some asset securitization.

Our approach to this will be clearly that we don't think we need to go out and buy anything to do that. This will be the acquisition of skills. So we will hire a few people from the market and reorganize internally. So we don't envisage this to be a major capital spending exercise. It really is the beefing up of skill base.

(Emphasis added).

458.    Prior to the beginning of the Class Period, therefore, UBS affirmatively represented to investors that it was committed to risk management and that its growth of its FIRC business would be consistent with the Company's traditional risk management principles. These statements contributed to the mix of information communicated to investors during the Class Period.

### B.    Class Period Statements

#### 1.    The 4Q 2005 Form 6-K

459.    On February 15, 2006, the Company filed its quarterly earnings report for the fourth quarter of 2005 with the SEC on Form 6-K ("4Q 2005 Form 6-K").  Defendants Wuffli and Standish signed the Form 6-K.

460.    The 4Q 2005 Form 6-K reported fourth quarter 2005 results as follows: net profits attributable to UBS's shareholders of CHF 6.487 billion, net trading income of CHF 2.251 billion, basic EPS of CHF 6.56, diluted EPS of CHF 6.28 and operating income of CHF 10.593 billion.  The 4Q 2005 Form 6-K also reported the following for the year ended December 31, 2005:  net profits attributable to UBS's shareholders of CHF 14.029 billion, net trading

income of CHF 7.996 billion, basic EPS of CHF 13.93, diluted EPS of CHF 13.36 and operating income of CHF 39.896 billion.

461. In a signed letter to shareholders included in the 4Q 2005 6-K, Defendants Ospel and Wuffli stated that:

> **In fourth quarter,** the attributable profit in our core financial businesses was CHF 6,337 million. Excluding the impact from Private Banks & GAM, the contribution from continuing operations was CHF 2,597 million, our best-ever quarterly performance. Compared to a year earlier, income rose in practically all our businesses.

(Emphasis in original.)

462. The Company also stated in its 4Q 2005 6-K that "[i]n fourth quarter 2005, the Investment Bank posted a solid result, with pre-tax profit of CHF 1,372 million, up 8% from the same period last year."

463. The reported net profits attributable to UBS's shareholders, net trading income, basic EPS, diluted EPS, operating income, and the IB's profits were materially false and misleading when reported because each of the financial figures included in the foregoing statement reflected the inflated value of UBS's subprime and Alt-A mortgage-backed assets. As set forth in Section XI.A., the models used by UBS to value subprime and Alt-A mortgage-backed assets failed to properly account for the impact of observable market inputs at the time the assets were being valued (such as increasing default rates in the United States mortgage market, and stagnant or declining housing prices within the United States). Additionally, CW 9 confirmed that the models used to value ABS, CDOs and CDSs backed by subprime and Alt-A mortgages were inaccurate beginning in 2004 because the models did not take into account the complex nature of these securities. CW 9 informed Defendants of these deficiencies by way of a June 22, 2005 letter. Thus, by failing to develop and employ appropriate models to value UBS's

subprime and Alt-A mortgage-backed assets, Defendants artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued. The inflated assets values were reflected in UBS's income statement and balance sheet as the values impacted each of the financial metrics cited above. Finally, these financial metrics were materially false and misleading when made because they violated international accounting standards as set forth in Section XIII.

464.    The 4Q 2005 Form 6-K stated the following about the Company's approach to assessing and managing tail risk as well as measuring VaR and stress loss for its positions:

> Market risk for the Investment Bank, as measured by the average 10-day 99% Value at Risk (VaR), fell to CHF 315 million in fourth quarter from CHF 343 million in third quarter, while quarter-end VaR was higher at CHF 355 million compared to CHF 309 million at the end of third quarter.
>
> *       *       *
>
> Market risk for UBS as a whole followed Investment Bank VaR. Average VaR was lower at CHF 334 million from CHF 367 million in third quarter, while quarter-end VaR increased to CHF 373 million from CHF 326 million at the end of the previous quarter.

465.    The Company further reported a Tier 1 Capital ratio of 12.9% and RWAs of CHF 310.409 billion.

466.    UBS's statements concerning the measurement of VaR and the risk metrics affected by the measurement of VaR, including Tier 1 Capital ratio and RWAs for the fourth quarter of 2005 were materially false and misleading when made because UBS-reported VaR, Tier 1 Capital ratio and RWAs failed to properly reflect the Company's exposure to subprime and Alt-A mortgage-backed securities, thereby understating the Company's exposure to maximum possible losses from risk. As alleged herein, UBS's employees at the IB were

154

intentionally manipulated UBS's VaR to conceal the true market risk to which UBS was exposed. *See* Section VII.E.

468. The 4Q 2005 Form 6-K, UBS also represented that "[t]he diversification of risks and avoidance of undue concentrations remain key pillars of our risk control process."

468. UBS's statement above was materially false and misleading when made because Defendants failed to maintain adequate reporting and financial controls to prevent and/or detect a high risk concentration in subprime and Alt-A mortgage-backed securities during the Class Period. In fact, UBS admits that, for example, it neither established nor maintained such risk concentration controls as risk factor and operational limits to monitor its exposure to subprime and Alt-A mortgage-backed securities. Moreover, confidential witnesses cited herein have detailed UBS's complete absence of internal reporting controls. Defendants' failure to maintain adequate controls led to, *inter alia*: (i) UBS employees, including, but not limited to, Defendants Costas, Hutchins and Martin and Stehli, amassing high concentrations of risky subprime and Alt-A mortgage-backed assets; (ii) the intentional misrepresentation of these assets' values by UBS employees, and the inclusion of the misrepresented assets' values in the Company's income statement and balance sheet; (iii) UBS employees at the IB intentionally manipulating UBS's VaR to conceal the true market risk to which UBS was exposed (*see* Section VII.E); and (iv) UBS misrepresenting its risk related losses to investors.

469. The Company stated the following about its adherence to IFRS in the 4Q 2005 Form 6-K:

> UBS AG's ("UBS") consolidated financial statements ("Financial Statements") are prepared in accordance with International Financial Reporting Standards (IFRS) and stated in Swiss francs (CHF). . . . In the opinion of management, all adjustments necessary for a fair presentation of the results of operations for the interim periods have been made.

470. UBS's statement concerning its adherence to IFRS was materially false and misleading when made because, as detailed in Section XIII, the Company's financial statements materially misrepresented the fair value of its subprime and Alt-A mortgage-backed positions in violation of IAS 39. As set forth in Section XIII, in violation of international accounting standards, the Defendants intentionally or with extreme recklessness failed to inform investors that the Company's balance sheet contained a significant, and excessive, concentration of subprime and Alt-A mortgage-backed securities and, further, were inflated from the start of the Class Period.

## 2.     The 2005 Annual Report

471. On March 21, 2006, UBS published its Annual Report for 2005 ("2005 Annual Report"). On the same date, UBS filed its results for the year ended December 31, 2005 with the SEC on Form 20-F ("2005 Form 20-F"). The 2005 Annual Report was also filed with the SEC as an exhibit to the 2005 Form 20-F. The 2005 Form 20-F was signed by Wuffli and Standish.

472. The 2005 Annual Report repeated the year end net profits attributable to UBS's shareholders, net trading income, EPS, diluted EPS and operating income figures set forth in the 4Q 2005 Form 6-K. The 2005 Annual Report also reported that the IB's operating income for the year as CHF 17.484 billion, fixed income (net trading) as CHF 5.741 billion, trading portfolio assets of CHF 499.2 billion, trading portfolio assets pledged as collateral of CFH 154.7 billion and trading portfolio liabilities of CHF 188.6 billion.

473. Each of the financial figures included in the foregoing statement were materially false and misleading when made because they reflected the inflated value of UBS's subprime

156

and Alt-A mortgage-backed assets. As set forth in Section XI.A, the models used by UBS to value subprime and Alt-A mortgage-backed assets failed to properly account for the impact of observable market inputs at the time the assets were being valued (such as increasing default rates in the United States mortgage market, and stagnant or declining housing prices within the United States). Additionally, CW 9 confirmed that the models used to value ABS, CDOs and CDSs backed by subprime and Alt-A mortgages were inaccurate beginning in 2004 because the models did not take into account the complex nature of these securities. CW 9 informed Defendants of these deficiencies by way of a June 22, 2005 letter. Moreover, UBS employees, including but not limited to Defendant Hutchins and Rothman disregarded UBS's available models and adopted subjective and intentionally inflated valuations of UBS's subprime and Alt-A mortgage-backed assets without regard to the actual values of these assets that proper modeling based on observable market inputs would yield. Thus, by failing to develop and employ appropriate models to value UBS's subprime and Alt-A mortgage-backed assets and by actively manipulating the value at which assets would be recorded on its balance sheet, Defendants artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued. The inflated assets values were reflected in UBS's income statement and balance sheet as the values impacted each of the financial metrics cited above. Finally, these financial metrics were materially false and misleading when made because they violated international accounting standards as set forth in Section XIII.

474. In terms of risk management and controls, the 2005 Annual Report described how important risk management and control was to UBS's business, noting that "[i]f we fail to adequately manage and control our risks, we may suffer significant financial losses." In

recognition of the dangers of poor risk controls, the Company represented to its shareholders that:

> We recognize that taking risk is core to our financial business and that operational risks are an inevitable consequence of being in business. Our aim is not, therefore, to eliminate all risks but to achieve an appropriate balance between risk and return. Thus, in our day-to-day business and in the strategic management of our balance sheet and capital, ***we seek to limit the scope for adverse variations in our earnings and exposure to "stress events" for all the material risks we face***.
>
> \*      \*      \*
>
> Comprehensive, transparent and objective risk disclosure to our senior management, the Board of Directors, shareholders, regulators, rating agencies and other stakeholders is the cornerstone of the risk control process.
>
> We *protect our earnings* by controlling risk at the level of individual exposures, at a portfolio level and in aggregate, across all risk types and businesses, relative to our risk capacity – the level of risk we are capable of absorbing, based on our earnings power.
>
> We *protect our reputation* by managing and controlling the risks incurred in the course of our business, and for this reason we avoid concentrations of exposure and limit potential stress losses, not only from credit, market and liquidity risks but also from operational risks. ***We avoid extreme positions in transactions that are sensitive for tax, legal, regulatory or accounting reasons***, and adopt a cautious approach to any risks that cannot be sensibly evaluated or priced. We adopt the highest standards in protecting the confidentiality and integrity of our client information, and aim to maintain the highest ethical standards in all our business dealings. ***All employees, but in particular those involved in risk decisions, must make UBS's reputation an overriding concern. Responsibility for our reputation cannot be delegated or syndicated***.

(Emphases added)

475.    UBS's statements concerning the effectiveness of its risk controls were materially false and misleading when made because UBS failed to maintain adequate reporting and financial controls to prevent and/or detect fraud within the Company and misrepresentations in

its financial reports. UBS admits that the Company's overall "Risk Control framework was insufficiently robust" during the Class Period. In fact, UBS admits that, for example, it neither established nor maintained risk concentration controls such as risk factor and operational limits to monitor its exposure to subprime and Alt-A mortgage-backed securities. Moreover, confidential witnesses cited herein have detailed UBS's complete absence of internal reporting protocols.

476. Moreover, the Company's representation that it avoided transactions that were sensitive for "tax, legal, regulatory or accounting" concerns and that it adhered to the "highest ethical standards" was materially false and misleading when made because the Company permitted its Wealth Management employees to direct clients to illegal tax shelters, thereby exposing UBS to massive potential losses due to regulatory fines, prosecution and reputational harm.

477. Regarding VaR, the Company's efforts to limit concentrations of risk and valuation practices, the 2005 Annual Report stated:

> In the Investment Bank, a comprehensive set of risk factor limits has been established. They are applied to potential losses arising from moves in a wide range of general market risk factors including exchange rates and interest rates, equity indices and credit spreads.
>
> *     *     *
>
> In addition to the standard portfolio and concentration limits, we have an array of "operational limits" – bespoke limits developed for a specific purpose where the standard portfolio and concentration limits may not provide comprehensive control. They may address concerns about, for example, market depth or liquidity, operational capacity, or exposure to complex products for which valuation parameters may not be observable with consequent difficulties in valuation and risk measurement.
>
> We adopt prudent valuation standards, and apply valuation adjustments where appropriate to reflect expected loss. Valuation adjustments are also

made for positions which rely on complex models for valuation or on models incorporating unobservable parameters. . . .

\*     \*     \*

Market risk for the Investment Bank, as measured by 10-day 99% confidence VaR, ended the year at CHF 355 million and averaged CHF 346 million for 2005, a slight increase on the 2004 year-end value of CHF 332 million but slightly below the 2004 average of CHF 358 million. The rise in period-end VaR was driven by the increase in our equities risk, but it was the increased diversification between the risk types which led to the reduction in average Investment Bank VaR.

478. UBS further reported that it had a Tier 1 Capital ratio of 12.9% and RWAs of CHF 310.409 billion.

479. The Company's statements concerning VaR and the risk metrics that incorporate the VaR calculation were materially false and misleading when made because UBS's reported VaR, its Tier 1 Capital ratio and RWAs failed to properly reflect the Company's exposure to subprime and Alt-A mortgage-backed securities, thereby understating the Company's exposure to maximum possible losses from risk. Moreover, the Company's statements that it adopted "operational limits" based on "market depth or liquidity, operational capacity, or exposure to complex products for which valuation parameters may not be observable" were materially false and misleading when made because the Company failed to establish any limits on the IB's building up of a concentration of risky, and illiquid, subprime and Alt-A mortgage-backed assets.

480. In addition, the Company's statements that "[i]n the Investment Bank, a comprehensive set of risk factor limits has been established" and that it "adopt[s] prudent valuation standards, and apply valuation adjustments where appropriate to reflect expected loss," were each false and misleading when made because, *inter alia* (i) UBS employees manipulated

VaR and thereby materially understated UBS's exposure to losses (*see* Section XII.E); (ii) UBS admits that it failed to establish and/or maintain risk concentration controls such as risk factor and operational limits to monitor its exposure to subprime and Alt-A mortgage-backed securities; (iii) UBS amassed high concentrations of risky subprime and Alt-A mortgage-backed assets; (iv) UBS intentionally misrepresented the value of UBS's subprime and Alt-A mortgage-backed assets, which were subsequently included in the Company's income statement and balance sheet.

481.    The 2005 Annual Report stated the following about UBS's adherence to accounting principles:

> We prepare UBS's financial statements according to International Financial Reporting Standards (IFRS), and provide additional information in our Financial Report to reconcile the UBS accounts to US Generally Accepted Accounting Principles (US GAAP).

> \*     \*     \*

> We are committed to maintaining the transparency of UBS's reported results and to ensuring that analysts and investors can make meaningful comparisons with previous periods. If there is a major reorganization of our business units or if changes to accounting standards or interpretations lead to a material change in the Group's reported results, we restate UBS's results for previous periods to show how they would have been reported according to the new basis, and provide clear explanations of all changes.

482.    UBS's statement concerning its adherence to IFRS was materially false and misleading when made because, as detailed in Section XIII, the Company's financial statements materially misrepresented the fair value of its subprime and Alt-A mortgage-backed positions in violation of IAS 39.   As set forth in Section XIII, in violation of international accounting standards, the Defendants intentionally or with extreme recklessness failed to inform investors that the Company's balance sheet contained a significant, and excessive, concentration of

161

subprime and Alt-A mortgage-backed securities and, further, were inflated from the start of the Class Period.

483. The 2005 Annual Report also assured investors UBS's controls were effective, stating:

> As of the end of the period covered by this Annual Report, an evaluation was carried out under the supervision of our management, including the Group CEO and Group CFO, of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a–15e) under the US Securities Exchange Act of 1934. Based upon that evaluation, the Group CEO and Group CFO concluded that these disclosure controls and procedures were effective as of the end of the period covered by this Annual Report. No significant changes were made in our internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation.

484. UBS's statements concerning the effectiveness of its risk controls were materially false and misleading when made because UBS failed to maintain adequate reporting and financial controls to prevent and/or detect fraud within the Company and misrepresentations in its financial reports. UBS admits that the Company's overall "Risk Control framework was insufficiently robust" during the Class Period. In fact, UBS admits that, for example, it neither established and/or maintained risk concentration controls such as risk factor and operational limits to monitor its exposure to subprime and Alt-A mortgage-backed securities. Moreover, confidential witnesses cited herein have detailed UBS's complete absence of internal reporting protocols. Defendants' failure to maintain adequate controls led to, *inter alia*: (i) UBS employees, including, but not limited to, Defendants Costas, Hutchins and Martin and Stehli, amassing high concentrations of risky subprime and Alt-A mortgage-backed assets; (ii) the intentional misrepresentation of these assets' values by UBS employees, and the inclusion of the misrepresented assets' values in the Company's income statement and balance sheet; (iii) UBS

employees at the IB intentionally manipulating UBS's VaR to conceal the true market risk to which UBS was exposed (*see* Section VII.E); and (iv) UBS misrepresenting its risk related losses to investors.

485. Moreover, as set forth in Section XI.J, *supra*, the absence of effective internal controls permitted UBS employees within the Company's Wealth Management business to assist clients in avoiding U.S. income taxes through illegal tax shelters prior to and during the Class Period, exposing UBS to massive potential losses due to regulatory fines, prosecution and reputational harm.

486. Touting UBS's commitment to ethical practices, the 2005 Annual Report stated:

> We make responsible behavior an important part of our culture, identity and business practice. As a leading global financial services firm, we want to provide our clients with value-added products and services, promote a corporate culture that adheres to the highest ethical standards, and generate superior but sustainable returns for our shareholders. We are committed to being an equal opportunity employer, protecting the environment, adhering to high social standards, and contributing to the communities that we are a part of.

487. UBS's statements concerning its adherence to high ethical standards were materially false and misleading when made because during this period, senior executives within the Company's Wealth Management division were advising and assisting UBS's clients to evade U.S. income taxes through illegal tax shelters, thus exposing the Company to massive potential losses due to regulatory fines, prosecution, and reputational harm.

488. Commenting on UBS's use of models to estimate the value of assets, the 2005 Annual Report stated:

> All valuation models are validated before they are used as a basis for financial reporting, and periodically reviewed thereafter, by qualified personnel independent of the area that created the model. Wherever

possible, we compare valuations derived from models with quoted prices of similar financial instruments, and with actual values when realized, in order to further validate and calibrate our models.

489. UBS's statements concerning the effectiveness of its valuation models were materially false and misleading when made because UBS knew that the models used to value UBS's subprime and Alt-A mortgage-backed assets failed to include observable market inputs at the time these assets were being valued (such as increasing default rates in the United States mortgage market, and stagnant or declining housing prices within the United States). By failing to include observable market inputs into the models valuing subprime related assets, UBS artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued. Additionally, CW 9 confirmed that the models used to value ABS, CDOs and CDSs backed by subprime and Alt-A mortgages were inaccurate beginning in 2004 because the models did not take into account the complex nature of these securities. CW 9 informed Defendants of these deficiencies by way of a June 22, 2005 letter. The inflated assets values were reflected in UBS's income statement and balance sheet as the values impacted each of the financial metrics cited above. Finally, these financial metrics were materially false and misleading when made because they violated international accounting standards as set forth in Section XIII.

490. UBS's 2005 Annual Report also stated in part, with respect to the Company's adherence to ethical and legal standards:

- "We ***aim to comply with all applicable provisions*** and to work closely and maintain good relations with regulators in all jurisdictions where we conduct business." (Emphasis added);

- "Our Vision and Values state that we are a member of the global community and should behave as a responsible corporate citizen. Our firm and its employees

164

should ***conduct themselves in a manner that is above reproach***, as preserving our integrity is vital to our most valuable asset – our reputation." (Emphasis added);

- "We make responsible behavior an important part of our culture, identity and business practice. As a leading global financial services firm, we want to provide our clients with value-added products and services, promote a corporate culture that ***adheres to the highest ethical standards***, and generate superior but sustainable returns for our shareholders." (Emphasis added);

- "[UBS] fosters the long-term financial stability of UBS by maintaining an appropriate balance between risk and reward, and establishes and controls UBS's corporate governance processes – ***including compliance with relevant regulations***." (Emphasis added); and

- In addition, UBS claimed to limit its risk by, among other things, "monitoring and enforcing compliance with risk principles, and with policies, limits, and ***regulatory requirements***." **(**Emphasis added)

491. The foregoing statements were materially misleading when made because during the entire Class Period, senior UBS executives within UBS Wealth Management division were incentivized, with the knowledge of senior UBS employees, to advise and assist UBS's clients to violate and/or evade applicable tax laws, and thus: (i) UBS was not "aim[ing] to comply with all applicable [regulatory] provisions"; (ii) UBS was not conducting itself in a "manner that is above reproach" so as to "preserv[e]" its "reputation;" (iii) UBS was not abiding by the "highest ethical standards"; and (iv) UBS was not "monitoring" or "enforcing compliance" with "regulatory requirements."

492. The Company's 2005 Form 20-F contained certifications by Defendants Wuffli and Standish as required by the Sarbanes-Oxley Act of 2002. Defendants Wuffli and Standish each certified as follows:

I, [Wuffli/Standish], certify that:

1. I have reviewed this annual report on Form 20−F of UBS AG;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary

to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) for the company and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) [Omitted in accordance with the guidance of SEC Release No. 33−8238];

> (c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: March 21, 2006

493.    Defendants Wuffli and Standish each further certified:

Pursuant to section 906 of the Sarbanes−Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), the undersigned officer of UBS AG, a Swiss banking corporation (the "Company"), hereby certifies, to such officer's knowledge, that:   The Annual Report on Form 20−F for the year ended December 31, 2005 (the "Report") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78m or 78o(d)) and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 21, 2006

494.    The statements set forth in the preceding paragraph were materially false and misleading when made because, *inter alia*: (i) Defendants failed to maintain adequate valuation models to determine the true value of its exposure to subprime and Alt-A mortgage-backed assets or its losses in connection with deteriorating values of these securities; (ii) the Company's reported valuations for its subprime and Alt-A mortgage-backed securities, as well as the financial metrics affected by those valuations were overstated (or understated) because Defendants intentionally inflated valuations of these assets;   (iii) UBS employees at the IB manipulated VaR and thereby materially understated UBS's exposure to losses (*see* Section VII.E); (iii) UBS failed to maintain adequate reporting and financial controls to prevent and/or

detect fraud within the Company and misrepresentations in its financial reports, thereby allowing employees within its Wealth Management division to steer clients to illegal tax shelters; and (iv) UBS employees, including, but not limited to, Defendants Costas, Hutchins and Martin and Stehli, amassed a concentration of risky subprime and Alt-A mortgage-backed positions on the Company's book contrary to its representations concerning the avoidance of concentration of risk.

### 3. 2005 Handbook

495. To accompany the 2005 Form 20-F, UBS published Handbook 2005/2006 (the "2005 Handbook") which was filed as an exhibit to the 2005 20-F.

496. With respect to "financial success, risk and capital management," UBS disclosed in the 2005 Handbook:

> **Financial success, risk and capital management**
>
> Our policy has been to maintain a strong balance sheet, protecting our capital ratios and credit ratings, while also putting capital to work to create value for shareholders. In normal circumstances, we generate capital well in excess of our requirements. As a first priority, this is used for investment in the growth of our businesses. In the absence of attractive reinvestment opportunities, we return excess capital to our shareholders, through either direct distributions or share buybacks. ***Because taking risk is an integral part of our business, our overriding goal is to achieve an appropriate balance between risk and return, limiting the scope for adverse variations in our earnings from exposure to major individual "stress" events.***

(Emphasis added).

497. Moreover, in the 2005 Handbook, the Company stated the following about UBS's risk management practices:

> We recognize that taking risk is core to our financial business and that operational risks are an inevitable consequence of being in business. ***Our aim is not, therefore, to eliminate all risks but to achieve an appropriate***

***balance between risk and return.*** Thus, in our day-to-day business and in the strategic management of our balance sheet and capital, ***we seek to limit the scope for adverse variations in our earnings and exposure to "stress events" for all the material risks we face.***

We base our approach to risk management and control on five principles.

\*     \*     \*

An *independent control process* is implemented ***when required by the nature of the risks, in particular to balance short-term profit incentives and the long-term interests of UBS. The control functions are responsible for providing an objective check on risk-taking activities.*** Comprehensive, transparent and objective *risk disclosure* to our senior management, the Board of Directors, shareholders, regulators, rating agencies and other stakeholders is the cornerstone of the risk control process.

We *protect our earnings* by ***controlling risk at the level of individual exposures, at a portfolio level and in aggregate, across all risk types and businesses, relative to our risk capacity*** – the level of risk we are capable of absorbing, based on our earnings power.

We *protect our reputation* by ***managing and controlling the risks incurred in the course of our business, and for this reason we avoid concentrations of exposure and limit potential stress losses, not only from credit, market and liquidity risks but also from operational risks.*** We avoid extreme positions in transactions that are sensitive for tax, legal, regulatory or accounting reasons, and ***adopt a cautious approach to any risks that cannot be sensibly evaluated or priced.*** We adopt the highest standards in protecting the confidentiality and integrity of our client information, and aim to maintain the highest ethical standards in all our business dealings. All employees, but in particular those involved in risk decisions, must make UBS's reputation an overriding concern. Responsibility for our reputation cannot be delegated or syndicated.

(Emphases added).

498. The foregoing statements were materially false are materially false and misleading for the reasons set forth in ¶ 484.

499. UBS also stated the following about its risk control process:

**The risk control process**

There are five critical elements in our independent risk control process:

-- we *identify risk,* through the **continuous monitoring of portfolios, by assessing new businesses and complex or unusual transactions, and by reviewing our own risks in the light of market developments and external events**

-- we *measure quantifiable risks,* using methodologies and models which have been independently validated and approved

-- we establish *risk policies* to reflect our risk principles, risk capacity and risk appetite, consistent with evolving business requirements and international best practice

-- we have comprehensive *risk reporting* to stakeholders, and to management at all levels, against the approved risk control framework and, where applicable, limits

-- we *control risk* **by monitoring and enforcing compliance with the risk principles, and with policies, limits and regulatory requirements.**

Coordinated processes involving all relevant control and logistics functions are applied before commencement of any new business or significant change in business, and before the execution of any transaction which is complex or unusual in its structure or is sensitive to tax, legal, regulatory or accounting considerations. These processes, which involve the business, risk control, legal, compliance, financial control and logistics functions, ensure that all critical elements are addressed in a comprehensive and holistic way, **including the assurance that transactions can be booked in a way that will permit appropriate ongoing risk monitoring, reporting and control.**

(Emphases added).

500. UBS further disclosed in the 2005 Handbook how it limits risk:

Our primary day-to-day quantitative controls govern normal periodic adverse results (statistical loss) and protect us from stress events. **These are the limits we apply to individual risk types, to portfolios and sub-portfolios, and to specific concentrations of risk and individual exposures. The identification of stress events and scenarios to which we are vulnerable and an assessment of their potential impact, and in particular the danger of aggregated losses from a single event through concentrated exposures, is therefore a key component of the risk control process.**

To complement these operating controls, *we also monitor and constrain our aggregate risk exposure across all risk types and businesses, relative to our risk capacity.*

\*　　\*　　\*

Although measurement of risk is clearly important, quantification does not always tell the whole story, and not all risks are quantifiable. *We therefore pay equal attention to "soft" risks, avoiding the temptation to ignore those that cannot be properly quantified. We also place great emphasis on qualitative controls and rigorous risk control processes to ensure that both quantifiable and unquantifiable risk is identified, assessed and reported.*

Stress situations can arise from many sources and when extreme events occur, quantitative and qualitative risk assessments alone are not sufficient. The essential complements are a tried and tested process which can be invoked immediately in response to any crisis, and well prepared business continuity management processes and plans. We continue to develop and refine these processes as we learn from our own and others' experience.

(Emphases added).

501.　UBS also made disclosures with respect to its controls over market risk in the 2005 Handbook:

> *We apply market risk measures, limits and controls at the portfolio level, and we apply concentration limits and other controls, where necessary, to individual risk types, to particular books and to specific exposures.* The portfolio risk measures are common to all market risks, but concentration limits and other controls are tailored to the nature of the activities and the risks they create.

(Emphasis added).

502.　The foregoing statement concerning risk and UBS's risk control procedure were materially false and misleading when made for the reasons set forth in ¶ 484.

### 4.　1Q 2006 Form 6-K

503.　UBS filed its 1Q 2006 results on Form 6-K with the SEC on May 4, 2006 (the

171

"1Q 2006 Form 6-K"). The 1Q 2006 Form 6-K was signed by Defendants Wuffli and Standish.

504.    The 1Q 2006 Form 6-K reported first quarter 2006 results as follows: net profits attributable to UBS's shareholders of CHF 3.504 billion, net trading income of CHF 3.701 billion, basic EPS of CHF 3.55, diluted EPS of CHF 3.39 and operating income of CHF 12.38 billion. The 1Q 2006 Form 6-K also reported net trading income of CHF 3.701 billion and total operating income for the IB of CHF 5.97 billion.

505.    In a signed letter to shareholders included in the 1Q 2006 6-K, Defendants Ospel and Wuffli stated that:

> Net profit for UBS totaled CHF 3,504 million [for the quarter]. . . .   The financial businesses contributed CHF 3,048 million to net profit, up 32% from the same quarter a year earlier and 17% higher than fourth quarter 2005 results (from continuing operations).
>
> *          *          *
>
> **Our growth strategy has proven to be successful, increasing our confidence in our ambition to be the best global financial services provider.**

(Emphasis in original).

506.    The reported net profits attributable to UBS's shareholders, EPS, diluted EPS, operating income, net trading income and the IB income figures reported in the 1Q 2006 Form 6-K and the net profit reported in Defendants Ospel and Wuffli's signed letter were false and misleading when made because each of the financial figures included in the foregoing statements reflected the inflated value of UBS's subprime and Alt-A mortgage-backed assets. As set forth in Section XI.A, the models used by UBS to value subprime and Alt-A mortgage-backed assets failed to properly account for the impact of observable market inputs at the time these assets were being valued (such as increasing default rates in the United States mortgage

market, and stagnant or declining housing prices within the United States). Thus, by failing to employ appropriate models to value UBS's subprime and Alt-A mortgage-backed assets and by actively manipulating the value at which assets would be recorded on its balance sheet, Defendants artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued. The inflated assets values were reflected in UBS's income statement and balance sheet as the values impacted each of the financial metrics cited above. Finally, these financial metrics were materially false and misleading when made because they violated international accounting standards as set forth in Section XIII.

507. The 1Q 2006 Form 6-K stated the following about market risk:

> Market risk for the Investment Bank, as measured by average 10-day 99% Value at Risk (VaR), increased to CHF 429 million in first quarter 2006, from CHF 315 million in fourth quarter 2005. Quarter-end VaR was also higher at CHF 436 million compared to CHF 355 million at the end of the previous quarter. Interest rate risk remained the largest portion of the overall Investment Bank VaR, but the contribution of equities gained in significance over the period.

508. UBS also reported a Tier 1 Capital ratio of 12.9% and RWAs of CHF 311.827 billion.

509. UBS's statements concerning its market risk measurements, including VaR, Tier 1 Capital ratio and RWAs were materially false and misleading because UBS's reported market risk measurements failed to properly reflect the Company's exposure to subprime and Alt-A mortgage-backed securities, thereby understating the Company's exposure to maximum possible losses from risk. As alleged herein, UBS employees at the IB were intentionally manipulated UBS's VaR to conceal the true market risk to which UBS was exposed. *See* Section VII.E.

510. The 1Q 2006 Form 6-K also contains statements substantially similar to those

contained in the Q4 2005 Form 6-K regarding the Company's use of concentration controls to manage market risk. These statements are materially false and misleading for the reasons set forth in ¶ 468 above.

511. The Company's 1Q 2006 Form 6-K also contained statements substantially similar to those set forth in ¶ 469 regarding the accuracy of its financial statements and its compliance with international accounting standards. These statements are materially false and misleading for the reasons set forth in ¶ 470 above.

### 5. 2Q 2006 Form 6-K

512. On August 15, 2006, the Company filed its quarterly report filed with the SEC on Form 6-K for the quarter ending June 30, 2006 ("2Q 2006 Form 6K"). The 2Q 2006 Form 6K was signed by Defendants Wuffli and Standish.

513. The 2Q 2006 Form 6-K reported second quarter 2006 results as follows: net profits attributable to UBS's shareholders of CHF 3.147 billion, net trading income of CHF 3.793 billion, basic EPS of CFH 1.58, diluted EPS of CHF 1.51 and operating income of CHF 12.409 billion. UBS also reported total operating income for the IB of CHF 5.715 billion.

514. The 2Q 2006 Form 6-K also stated:

> *Net income from trading activities*, at CHF 3,377 million in second quarter 2006, was up by 45% or CHF 1,049 million from CHF 2,328 million a year ago. At CHF 927 million, equities trading income in second quarter 2006 rose 29% from CHF 717 million in the same period a year earlier.
>
> \*       \*       \*
>
> Fixed income trading revenues, at CHF 1,919 million in second quarter 2006, rose 56% from CHF 1,227 million a year ago, when trading conditions were more difficult and market volumes low. The rates business, particularly in mortgage-backed securities and derivatives, saw performance improve significantly, although this was partially offset by decreased revenues in energy trading.

515.    Moreover, the 2Q 2006 Form 6-K stated:

> Between 31 March 2006 and 30 June 2006, trading assets increased CHF 59 billion to CHF 751 billion. Trading assets inventory in debt instruments rose by CHF 69 billion, mainly due to higher positions in government, corporate and asset−backed securities. In precious metals, they were up CHF 3 billion, and in traded loans they increased by CHF 2 billion. Equity instruments dropped by CHF 14 billion on declining equity markets.

516.    UBS's statements regarding reported net profits attributable to UBS's shareholders, net trading income, basic EPS, diluted EPS, operating income, and the IB's profits, its net income from trading activities and value of its trading assets were materially false and misleading when reported because these financial metrics reflected the inflated value of UBS's subprime and Alt-A mortgage-backed assets.  As set forth in Section XI.A, the models used by UBS to value subprime and Alt-A mortgage-backed assets failed to properly account for the impact of observable market inputs at the time these assets were being valued (such as increasing default rates in the United States mortgage market, and stagnant or declining housing prices within the United States.)  Additionally, CW 9 confirmed that the models used to value ABS, CDOs and CDSs backed by subprime and Alt-A mortgages were inaccurate beginning in 2004 because the models did not take into account the complex nature of these securities.  CW 9 informed Defendants of these deficiencies by way of a June 22, 2005 letter.  Thus, by failing to develop and employ appropriate models to value UBS's subprime and Alt-A mortgage-backed assets and by actively manipulating the value at which assets would be recorded on its balance sheet, Defendants artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued.  The inflated assets values were reflected in UBS's income statement and balance sheet as the values impacted each of the financial metrics cited above.  Finally, these financial metrics were materially false and

175

misleading when made because they violated international accounting standards as set forth in Section XIII.

517. The 2Q 2006 Form 6-K stated the following about market risk:

> Market risk for the Investment Bank, as measured by the average 10-day 99% confidence Value at Risk (VaR), fell to CHF 408 million in second quarter 2006 from CHF 429 million in first quarter 2006. Quarter-end VaR was also lower at CHF 390 million compared to CHF 436 million at the end of the previous quarter. Interest rate risk remained the largest contributor to overall Investment Bank VaR while the contribution of equities fell in significance over the period.

> \* \* \*

> Market risk for UBS followed Investment Bank VaR. Average VaR was lower at CHF 414 million in second quarter from CHF 442 million in first quarter, while quarter−end VaR decreased to CHF 396 million from CHF 443 million at the end of the previous quarter.

518. The 2Q 2006 Form 6-K also reported a Tier 1 Capital ratio of 12.2% and RWAs of CHF 315.924 billion.

519. UBS's statements concerning its market risk measurements, including VaR, Tier 1 Capital ratio and RWAs are materially false and misleading because UBS's reported market risk measurements failed to properly reflect the Company's exposure to subprime and Alt-A mortgage-backed securities, thereby understating the Company's exposure to maximum possible losses from risk. As alleged herein, UBS employees, including but not limited to Defendant Hutchins, intentionally manipulated UBS's VaR to conceal the true market risk to which UBS was exposed. *See* Section VII.E.

520. The 2Q 2006 Form 6-K also contains statements substantially similar to those contained in the 4Q 2005 Form 6-K regarding the Company's use concentration controls to manage market risk. These statements are materially false and misleading for the reasons set

forth in ¶ 468 above.

521.    The Company's 2Q 2006 Form 6-K also contained statements substantially similar to those set forth in ¶ 469 regarding the accuracy of its financial statements and its compliance with all international accounting standards.  These statements are materially false and misleading for the reasons set forth in ¶ 470 above.

### 6.    2Q 2006 Earnings Conference Call

522.    In a related conference call with analysts held on August 15, 2006, Wuffli said the following:

> On the fixed income, I have to disappoint you. I think Tom Hill already elaborated that it is, as you know, by the way, incredibly hard in fixed income and generally in investment banking to theoretically forecast revenue levels in the market environment such as this. ***I think that what we have always said is we are investing into client-driven, client-franchise-oriented activities. We are not investing into cyclical exaggerations***. … And then finally, we are looking into the whole real estate finance and infrastructure area. I think that is a business where we do see significant structural opportunities for expansion. We are talking about low three digit investment numbers. We are not talking about substantial investments in the billions, and we are primarily talking about organic investments, hiring teams and hiring individuals.

(Emphasis added)

523.    The statements set forth in the preceding paragraph were materially false and misleading at the time they were made because, *inter alia*: (i) as of February 2006, UBS employees, including but not limited to, Defendant Stehli, were in the process of amassing a $50 billion highly concentrated portfolio of super senior tranches of mezzanine CDOs backed by risky subprime mortgages within the IB; and (ii) as of 4Q 2005, UBS employees, including Defendants Costas, Hutchins, Martin and Stehli were in the process of amassing a $100 billion exposure to the crumbling U.S. real estate market through the purchase of ABS, CDO and CDS

177

backed by subprime and Alt-A mortgages.  As set forth in detail below, UBS was not investing in these positions as part of a client-driven, client-franchise-oriented strategy, but instead for proprietary purposes, since the Company has admitted that it viewed the super senior positions as an "attractive source of profit" for the IB and, therefore, UBS.

### 7.    1H 2006 Form 6-K

524.    UBS also filed its results for the first half of 2006 with the SEC on Form 6-K on September 29, 2006 ("1H 2006 Form 6-K").

525.    The 1H 2006 Form 6-K reported first half results as follows:  net profits attributable to UBS shareholders of CHF 6.651 billion, net trading income of CHF 7.494 billion, basic EPS of CHF 2.67, diluted EPS of CHF 2.55 and operating income of CHF 24.437 billion.

526.    With respect to the Investment Bank, the 1H 2006 Form 6-K reported a pre-tax profit of CHF 3.504 billion in the first half of 2006, up *45%* from a year earlier.

527.    The statements contained in the 1H 2006 Form 6-K regarding the Company's net profits attributable to UBS shareholders, net trading income, basic EPS, diluted EPS, operating income, and pre-tax profit were materially false and misleading when made because each of the financial figures included in the foregoing statement reflected the inflated value of UBS's subprime and Alt-A mortgage-backed assets.  As set forth in Section XI.A, the models used by UBS to value subprime and Alt-A mortgage-backed assets failed to properly account for the impact of observable market inputs at the time these assets were being valued (such as increasing default rates in the United States mortgage market, and stagnant or declining housing prices within the United States).  Additionally, CW 9 confirmed that the models used to value ABS, CDOs and CDSs backed by subprime and Alt-A mortgages were inaccurate beginning in 2004 because the models did not take into account the complex nature of these securities.  CW 9

178

informed Defendants of these deficiencies by way of a June 22, 2005 letter. Moreover, UBS employees, including but not limited to Defendant Hutchins and Rothman disregarded UBS's available models and adopted subjective and intentionally inflated valuations of UBS's subprime and Alt-A mortgage-backed assets without regard to the actual values of these assets that proper modeling based on observable market inputs would yield. Thus, by failing to develop and employ appropriate models to value UBS's subprime related assets and by actively manipulating the value at which assets would be recorded on its balance sheet, Defendants artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued. The inflated assets values were reflected in UBS's income statement and balance sheet as the values impacted each of the financial metrics cited above. Finally, these financial metrics were materially false and misleading when made because they violated international accounting standards as set forth in Section XIII.

528. UBS further reported average 10-day VaR of CHF 408.4 million, Tier 1 Capital ratio of 12.2% and RWAs of CHF 315.924 billion.

529. UBS's statements concerning its market risk measurements, including VaR, Tier 1 Capital ratio and RWAs are materially false and misleading because UBS's reported market risk measurements failed to properly reflect the Company's exposure to subprime and Alt-A mortgage-backed securities, thereby understating the Company's exposure to maximum possible losses from risk. As alleged herein, UBS's employees, including, but not limited to, Defendant Hutchins, intentionally manipulated UBS's VaR to conceal the true market risk to which UBS was exposed. *See* Section VII.E.

### 8. 3Q 2006 Form 6-K

530. On October 31, 2006, UBS filed its results for the third quarter of 2006 with the

SEC on Form 6-K ("3Q 2006 Form 6-K"). The 3Q 2006 Form 6-K was signed by Defendants Wuffli and Standish.

531. The 3Q 2006 Form 6-K reported third quarter 2006 results as follows: net profits attributable to UBS shareholders of CHF 2.118 billion, net trading income of CHF 2.423 billion, basic EPS of CHF 1.11, diluted EPS of CHF 1.07 and operating income of CHF 10.791 billion and net trading income from fixed income of CHF 440 million.

532. The Company also reported trading portfolio assets of CHF 600.096 billion, trading portfolio liabilities of CHF 222.363 billion, trading portfolio assets pledged as collateral of CHF 215.085 billion and total assets of CHF 2.299 trillion, along with positive replacement values of CHF 306.949 billion and negative replacement values of CHF 306.210 billion.

533. The 3Q 2006 Form 6-K stated the following about the IB's performance:

> The Investment Bank did not suffer any new impairments and posted a net recovery of CHF 6 million in third quarter 2006, compared with CHF 1 million in second quarter 2006 and CHF 21 million in third quarter 2005.

534. The Company also stated that "[i]n third quarter 2006, the Investment Bank's pre-tax profit was CHF 1,083 million, down 22% from the same period a year earlier."

535. The reported net profits attributable to UBS's shareholders, net trading income, basic EPS, diluted EPS, operating income, net trading income from fixed income and trading portfolio assets were materially false and misleading when made because each of the financial figures included in the foregoing statements reflected the inflated value of UBS's subprime and Alt-A mortgage-backed assets. As set forth in Section XI.A, the models used by UBS to value subprime and Alt-A mortgage-backed assets failed to properly account for the impact of observable market inputs at the time these assets were being valued (such as increasing default rates in the United States mortgage market, and stagnant or declining housing prices within the

United States). Additionally, CW 9 confirmed that the models used to value ABS, CDOs and CDSs backed by subprime and Alt-A mortgages were inaccurate beginning in 2004 because the models did not take into account the complex nature of these securities. CW 9 informed Defendants of these deficiencies by way of a June 22, 2005 letter. Moreover, UBS employees, including, but not limited to Defendant Hutchins and Eric Rothman disregarded UBS's available models and adopted subjective and intentionally inflated valuations of UBS's subprime and Alt-A mortgage-backed assets without regard to the actual values of these assets that proper modeling based on observable market inputs would yield. Thus, by failing to employ appropriate models to value UBS's subprime and Alt-A mortgage-backed assets and by actively manipulating the value at which assets would be recorded on its balance sheet, Defendants artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued. The inflated assets values were reflected in UBS's income statement and balance sheet as the values impacted each of the financial metrics cited above. Finally, these financial metrics were materially false and misleading when made because they violated international accounting standards as set forth in Section XIII.

536. The 3Q 2006 Form 6-K stated the following about the Company's approach to assessing and managing VaR:

> Market risk for the Investment Bank, as measured by the average 10−day 99% confidence Value at Risk (VaR), increased to CHF 453 million in third quarter 2006 from CHF 408 million in second quarter. VaR was reduced towards the end of the quarter to CHF 398 million, only slightly higher than the previous quarter−end level of CHF 390 million.

> \*    \*    \*

> Market risk for UBS broadly followed Investment Bank VaR. Average VaR was CHF 464 million in third quarter, up from CHF 414 million in

second quarter, while quarter−end VaR increased only slightly to CHF 398 million from CHF 396 million at the end of the previous quarter.

537.    The Company also reported a Tier 1 Capital ratio of 12.3% and RWAs of CHF 331.7 billion.

538.    UBS's statements concerning its market risk measurements, including VaR, Tier 1 Capital ratio and RWAs are materially false and misleading because UBS's reported market risk measurements failed to properly reflect the Company's exposure to subprime and Alt-A mortgage-backed securities, thereby understating the Company's exposure to maximum possible losses from risk.  As alleged herein, UBS's employees, including, but not limited to, Defendant Hutchins, intentionally manipulated UBS's VaR to conceal the true market risk to which UBS was exposed. *See* Section VII.E.

539.    The 2Q 2006 Form 6-K also contains statements substantially similar to those contained in the 4Q 2005 Form 6-K regarding the Company's use concentration controls to manage market risk.  These statements are materially false and misleading for the reasons set forth in ¶ 468 above.

540.    The Company's 2Q 2006 Form 6-K also contained statements substantially similar to those set forth in ¶ 469 regarding the accuracy of its financial statements and its compliance with applicable accounting principles.  Additionally, the Company stated:

> In June 2005, the IASB issued amendments to IAS 39 *Financial Instruments: Recognition and Measurement* in relation to the fair value option ("Revised Fair Value Option"). UBS adopted the Revised Fair Value Option for financial instruments on a prospective basis on 1 January 2006.

(Emphasis in original).

541.    UBS's statement concerning its adherence to IFRS was materially false and misleading when made because, as detailed in Section XIII, the Company's financial statements materially misrepresented the fair value of its subprime and Alt-A mortgage-backed positions in violation of IAS 39.   As set forth in Section XIII, in violation of international accounting standards, Defendants intentionally or with extreme recklessness failed to inform investors that the Company's balance sheet contained a significant, and excessive, concentration of subprime and Alt-A mortgage-backed securities and, further, were inflated from the start of the Class Period.

542.    UBS's increase in average VaR during the third quarter of 2006 led some in the market, including analyst Dirk Becker of Kepler Teather & Greenwood Merrion, to question whether the Company was staying true to its traditional conservative risk philosophy.   In light of the Company's reassurances, however, Becker concluded in a November 1, 2006 report that he would "advocate to trust management that this VAR expansion will happen in an orderly fashion and that the risks will be monitored closely."   He also noted that "the overwhelming majority of the [Company's] revenues are clearly not generated by proprietary trading, but from a large and ever-growing client franchise."

543.    Similarly, Ivan Vatchkov of Credit Suisse stated in a January 29, 2007 analyst report that the Company's "risk-taking productivity is still considerably below its peer group in fixed income."   Vatchkov also noted that UBS's low risk profile was "partly owing to…the bank's cautious stance towards proprietary trading," and opined that the Company's stance on risk was "best described by a phrase the bank's management used in a recent presentation – 'We are in the moving, not the storage business.'"

### 9.     4Q 2006 Form 6-K

544.    On February 13, 2007, UBS filed its quarterly earnings report for the fourth quarter of 2006 with the SEC on Form 6-K (the "4Q 2006 Form 6-K").  Defendants Wuffli and Standish signed the 4Q 2006 Form 6-K.

545.    Included in the 4Q 2006 Form 6-K was a Letter to Shareholders from Defendants Ospel and Wuffli.  The letter stated, in relevant part:

> ***Our mortgage- and asset-backed securities business saw revenues grow handsomely as it benefited from its strong presence outside the US, as the American housing market started to deteriorate in second half 2006.*** In structured credit, we have also broadened the product range and our geographical reach. This was complemented by a new risk management and reporting platform. Even at this early stage, we recorded a substantial rise in 2006 revenues.
>
> *         *         *
>
> ***The primary focus in our risk-taking activities is to ensure the adequate diversification of risk in order to avoid illiquid and concentrated positions, and to ensure that we are rewarded for the risks we take. We have transferred resources from businesses in illiquid markets into more liquid ones, and have actively pursued risk distribution strategies. Portfolios with poor returns on risk have been cut back and the quality of other portfolios has been enhanced.***  It is largely because of these efforts that we have, in the last couple of years, been in a position to speed up our entry into new markets and assume the related risk.
>
> *         *         *
>
> In the short term, as the economic cycle matures, investors might become more sensitive to any disappointing political or economic developments, so our top -class risk control remains paramount.

(Emphasis added).

546.    The 4Q 2006 Form 6-K also reported fourth quarter 2006 results as follows:  net profits attributable to UBS's shareholders of CHF 3.407 billion, net trading income of CHF 3.401 billion, basic EPS of CHF 1.73, diluted EPS of CHF 1.66 and operating income of CHF

12.542 billion. The 4Q 2006 Form 6-K also reported the following for the year-ended December 31, 2006: net profits attributable to UBS shareholders of CHF 12.257 billion, net trading income of CHF 13.318 billion, basic EPS of CHF 6.20, diluted EPS of CHF 5.95, and operating income of CHF 48.165 billion.

547. The 4Q 2006 Form 6-K stated the following about IB's performance:

In fourth quarter 2006, the Investment Bank posted a pre−tax profit of CHF 1,356 million, down 1% from the same period last year, but up 6% in US dollar terms. Revenues increased in all three business areas, particularly in equities and investment banking. This was matched by higher costs, for both personnel and general and administrative expenses, as we continued to expand our range of products and services.

548. UBS's statements concerning the performance of the IB and its reported net profits attributable to UBS's shareholders, net trading income, basic EPS, diluted EPS, operating income and the IB's profits were materially false and misleading when reported because each of the financial figures included in the foregoing statements reflected the inflated value of UBS's subprime and Alt-A mortgage-backed assets. As set forth in Section XI.A, the models used by UBS to value subprime and Alt-A mortgage-backed assets failed to properly account for the impact of observable market inputs at the time these assets were being valued (such as increasing default rates in the United States mortgage market, and stagnant or declining housing prices within the United States). Additionally, CW 9 confirmed that the models used to value ABS, CDOs and CDSs backed by subprime and Alt-A mortgages were inaccurate beginning in 2004 because the models did not take into account the complex nature of these securities. CW 9 informed Defendants of these deficiencies by way of a June 22, 2005 letter. Moreover, UBS employees, including, but not limited to Defendant Hutchins and Eric Rothman disregarded UBS's available models and adopted subjective and intentionally inflated valuations of UBS's

subprime and Alt-A mortgage-backed assets without regard to the actual values of these assets that proper modeling based on observable market inputs would yield. Thus, by failing to employ appropriate models to value UBS's subprime and Alt-A mortgage-backed assets and by actively manipulating the value at which assets would be recorded on its balance sheet, Defendants artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued. The inflated assets values were reflected in UBS's income statement and balance sheet as the values impacted each of the financial metrics cited above. Finally, these financial metrics were materially false and misleading when made because they violated international accounting standards as set forth in Section XIII. The statement that UBS's MBS portfolio was growing as a result of a strong presence outside the U.S. was materially misleading as it suggested to investors that UBS was unaffected by the deteriorating U.S. housing market.

549. The 4Q 2006 Form 6-K stated the following about the Company's approach to assessing and managing tail risks as well as measuring VaR and stress loss for its positions:

> Market risk for the Investment Bank, measured by the average Value at Risk or VaR (10−day, 99% confidence, 5 years of historical data), decreased to CHF 391 million in fourth quarter 2006 from CHF 453 million in third quarter. The lower average reflected a reduction in risk at the end of the previous quarter which was maintained for the first two months of this quarter. Following the integration of Pactual into the Investment Bank from 1 December 2006 VaR increased and ended the quarter at CHF 473 million, up from CHF 398 million at the end of third quarter.
>
> *    *    *
>
> Changes in market risk levels for UBS as a whole followed the Investment Bank. Average VaR was lower at CHF 395 million in fourth quarter from CHF 464 million in third quarter, while quarter−end VaR increased to CHF 464 million from CHF 398 million at the end of the prior period. Late in the quarter, UBS VaR fell below Investment Bank VaR as Corporate Center exposures provided some offset to Investment Bank positions.

186

*   *   *

We also run a set of macro stress scenarios daily to assess and control tail risks. ***These are supplemented as necessary by specific scenarios targeting individual sectors or reflecting current concerns.*** Stress events modeled in our standard scenarios include crises in equity, corporate bond and emerging markets, and severe movements in currency, interest rate and energy markets. ***These scenarios are reviewed regularly and adjusted as necessary.*** Investment Bank stress loss exposure, like VaR, was lower on average but ended the quarter higher than in third quarter. The changes were driven by the same factors as VaR – primarily lower credit spread exposure throughout the quarter, and increases at quarter end due to the Pactual integration and equities risk

VaR and stress measures control our overall portfolio exposure but ***we also apply concentration controls on exposure to individual market risk variables***, such as individual equity markets, individual currency interest and exchange rates, and single names. ***The diversification of risks and avoidance of undue concentrations remain key pillars of our risk control process.***

(Emphases added).

550.    The Company also reported a Tier 1 capital ratio of 11.9% and RWAs of CHF 341.9 billion.

551.    UBS's statements concerning its market risk measurements, including VaR, Tier 1 Capital ratio and RWAs are materially false and misleading because UBS's reported market risk measurements failed to properly reflect the Company's exposure to subprime and Alt-A mortgage-backed securities, thereby understating the Company's exposure to maximum possible losses from risk.  As alleged herein, UBS's employees, including, but not limited to, Defendant Hutchins, intentionally manipulated UBS's VaR to conceal the true market risk to which UBS was exposed.  *See* Section VII.E.

552. The 4Q 2006 Form 6-K also contains statements substantially similar to those set forth in ¶ 467 regarding the Company's use of risk concentration controls. These statements are materially false and misleading for the reasons set forth in ¶ 468 above.

553. The Company's 4Q 2006 Form 6-K also contained statements substantially similar to those set forth in ¶ 469 regarding the accuracy of its financial statements and its compliance with applicable accounting principles. In addition, the Company stated:

> In June 2005, the IASB issued amendments to IAS 39 *Financial Instruments: Recognition and Measurement* in relation to the fair value option ("Revised Fair Value Option"). UBS adopted the Revised Fair Value Option for financial instruments on a prospective basis on 1 January 2006.

554. UBS's statement concerning its adherence to IFRS was materially false and misleading when made because, as detailed in Section XIII, the Company's financial statements materially misrepresented the fair value of its subprime and Alt-A mortgage-backed positions in violation of IAS 39. As set forth in Section XIII, in violation of international accounting standards, the Defendants intentionally or with extreme recklessness failed to inform investors that the Company's balance sheet contained a significant, and excessive, concentration of subprime and Alt-A mortgage-backed securities and, further, were inflated from the start of the Class Period.

### 10. 4Q 2006 Earnings Conference Call

555. On February 13, 2007, the Company held its Q4 2006 Earnings Conference Call for analysts and investors. During the call, Defendant Wuffli discussed the Company's risk management policies, stating:

> ***We have grown our business without compromising any of the risk disciplines that are the foundation of prudent management.*** This slide compares the development of our risk exposure, meaning the total amount

we would lose under extreme scenarios with our risk capacity. Meaning the amount we could lose without constraining our capacity to pay dividends. *As you can see, our expansion has not increased the proportion of our total risk capacity that we use.* This has been achieved by changing the way we manage and control our risks. *We have scaled back our ill-equipped (sic) [illiquid] and concentrated positions*, including Private Equity. Our earnings have become more stable, and we have improved the diversification of business risks. *This has allowed us to increase the amount of credit, market and other issue risk we take, especially in the Investment Bank. But at the same time maintain our overall risk discipline.*

(Emphases added).

556. Defendant Wuffli's statements concerning UBS's risk disciplines were materially false and misleading at the time they were made because, *inter alia*, UBS employees, including, but not limited to, Defendant Hutchins were manipulating UBS's VaR to conceal the true market risk to which UBS was exposed. *See* Section VII.E. Moreover, Defendant Wuffli's statement that they had "scaled back our ill-equipped (sic) [illiquid] and concentrated positions" was materially false and misleading when made because, *inter alia*: (i) as of February 2006, UBS employees, including but not limited to, Defendant Stehli, were in the process of amassing a $50 billion highly concentrated portfolio of super senior tranches of mezzanine CDOs backed by risky subprime mortgages within the IB; and (ii) as of 4Q 2005, UBS employees, including Defendants Costas, Hutchins, Martin and Stehli were in the process of amassing a $100 billion exposure to the crumbling U.S. real estate market through the purchase of ABS, CDO and CDS backed by subprime and Alt-A mortgages. In addition, Defendant Wuffli's statements were materially false and misleading at the time they were made because, *inter alia*, the controls in place as of February 13, 2007 motivated UBS employees, including, but not limited to Defendants Costas, Hutchins, Martin and Stehli to aggregate an illiquid, concentrated position in

189

securities backed by subprime and Alt-A mortgages, since such positions generated a positive carry over UBS's low internal cost of funding.

557. With respect to risk exposure from other parts of the Company's business, UBS failed to disclose that its Wealth Management business had adopted highly risky advisory strategies, in that senior bankers within that division were advising wealthy clients about ways to evade U.S. tax laws. This omission failed to disclose the potential regulatory, civil and criminal penalties to which UBS was exposed.

558. Defendant Wuffli returned to the subject of risk later in the conference call, during the following exchange with Ivan Vatchkov, a Credit Suisse analyst:

> **IVAN VATCHKOV (CREDIT SUISSE)**: …Secondly, risk appetite. I remember that you raised the VaR level in the Investment Bank last year, but it looks like the average VaR has fallen in the fourth quarter. I was wondering if you could comment on where you are in terms of risk appetite. Are you planning to ramp that up over the course of this year?
>
> \*       \*       \*
>
> **WUFFLI**: …Risk, we have tried in the presentation to broaden the perspective on risk, to not just include VaR because, if you look at the presentation, VaR is actually a relatively minor proportion of our total risk. ***And the overall risk exposure relative to the risk capacity in recent years has rather been declining than increasing***. Obviously VaR, on a quarterly basis, fluctuates with market environments. And we don't have a general direction that we now say we paid more back or we paid it up. We have a strategic direction now with our Investment Bank, which is that we emphasize client-driven businesses, all the proprietary-driven businesses. But obviously we do have some position taking, and these conditions [lend themselves] [inaudible] might go up or down in the fourth quarter, [depends rather] on them.
>
> \*       \*       \*
>
> **VATCHKOV**: Just to quickly follow up, just on the risk question, Mr. Wuffli, ***are we to understand then that in terms of your risk exposure versus risk capacity, you will continue to keep that at around half capacity or are you planning to overall change your risk profile a bit?*** I understand that not very much changes that.

190

**WUFFLI**:  *There are no plans on an aggregated basis.*

\* \* \*

The philosophy that we have applied to all our investments, particularly obviously the Investment Banking investments in fixed income, were three.  On one hand, they should not invest into the cycle, but into opportunities which are attractive in the cycle.  So we, for example, have not invested in U.S. [prime] origination, as you all know.  But we do invest into areas where we feel there is a 10-year plus opportunity.  The second is we invest into opportunities that are client-driven and not into proprietary trading.  Sometimes, using the balance sheet, at least in a temporary sense, obviously comes with servicing clients.  *But we do not invest into initiatives that the prime purpose is to invest the Bank's capital.*  And the third is we continue to apply our very strong philosophy of originating and distributing as opposed to holding on our balance sheet large chunks of liquid, in effect, or equity positions.  *And as a consequence of these directions, you see that you will not see us essentially growing substantially illiquid positions on the balance sheet.*

*You may continue to see us add risk-weighted assets, but more in terms of temporarily holding assets up to distribution.*  We had a risk-weighted asset growth of around 10% this year which compares to revenue growth of 18%.  So substantially below revenue and we expect that to continue more or less around this level.

\* \* \*

So in that sense we would see an extension of that business which is essentially continuing the trend that we have seen over the past three to four years.  *Somewhat more risk-weighted assets, somewhat higher VaR, but not more long [weighted] structured illiquid positions on the balance sheet of any significant extent*.

(Emphases added).

559.    Also on February 13, 2007, the Company held a separate afternoon conference call for U.S. investors.  During this call, after being asked about certain losses suffered by the IB, Defendant Wuffli touted the IB's client-centered focus and downplayed the significance of UBS's proprietary trading activities:

**STEVE GLUCKSTEIN (OPPENHEIMER & CO):**  My question's on the Investment Bank. And I understand that this is somewhat of a crude

191

measure, but if I look at the chart that you have in the financial report that shows the trading P&L on a daily basis for the year, if I just do some quick counting, it looks like about 78 days roughly where you had a loss. And, like I said, I know it's a crude measure and it doesn't show -- it shows relative magnitude, it's not absolute. To lose money one in every three days roughly in what's supposed to be a client-focused or client-centric enterprise sort of seems odd to me. And maybe you can just talk a little bit about the dynamics there and what I'm missing?

**WUFFLI**: …one of the major reasons for, obviously, having good and bad days is that we do manage inventories very actively for our clients, on behalf of our clients, and clients expect us to take risk with them and on their behalf. And, therefore, ***being client-focused in an Investment Bank does not mean that you don't take risks, but you usually take them with a purpose. And, so, the pure proprietary characteristics of a business where you, essentially, have a team that invests the Bank's capital just to make money, they're relatively rare and they're not very important for our business. They do exist as well but they're not -- they're not of significance in terms of overall contribution.*** The significance is where we are asked from clients and on behalf of clients to take risks and, obviously, there you do have some volatility. On the other hand, if you look at the overall structure of our returns and at a very high level of [accretion] income that, obviously, does show a very strong increase in trends there, [especially when you] have some volatile characteristics. I guess that shows, maybe in an even better way, the kind of client-focused strategy that we apply in [our business].

(Emphasis added).

560.    The statements in the preceding paragraphs were false and misleading at the time they were made because, *inter alia,* at this time: (i) through the execution of minimal hedges, UBS employees, including, but not limited to Defendant Hutchins, could effectively render billions of dollars in illiquid subprime and Alt-A mortgage-backed positions entirely invisible for the purpose of calculating VaR and for other risk-reporting purposes; (ii) UBS employees, including, but not limited to Defendants Costas, Hutchins, Martin and Stehli, were making numerous highly-concentrated long-term investments into illiquid positions backed by subprime and Alt-A mortgages, including amassing $50 billion in exposure to super senior tranches of mezzanine CDOs backed by subprime because it was an "attractive source of profit" for the IB,

and therefore, UBS; and (iii) in direct contravention of Defendant Wuffli's statements, UBS employees, including, but not limited to, Defendants Costas, Hutchins, Martin and Stehli were utilizing UBS's balance sheet and low cost of funding to amass a highly concentrated position in risky, illiquid assets for proprietary purposes and not as part of a client-driven strategy.

## 11.    The 2006 Annual Report

561.    On March 21, 2007, the Company published its Annual Report for 2006 (the "2006 Annual Report"). On the same date, UBS filed its results for the year-ended December 31, 2006 with the SEC on Form 20-F ("2006 Form 20-F"). The 2006 Annual Report was filed with the SEC as an exhibit to the 2006 Form 20-F. Defendants Wuffli and Standish signed the 2006 Form 20-F.

562.    In a letter to shareholders accompanying the 2006 Annual Report and the 2006 Form 20-F, Defendants Ospel and Wuffli discussed the importance of risk management in expanding the Company's business. The letter states:

> Our recent entry into new markets and the launch of new business ventures is, of course, associated with some risk. However, it is only as a result of our diligent effort to improve our risk profile over the last nine years that we have been able to assume them comfortably.

563.    The 2006 Annual Report repeated the year-end profits attributable to UBS shareholders, net trading income, EPS, diluted EPS, operating income. The 2006 Annual Report also reported the IB's operating income for the year as CHF 21.787 billion, fixed income (net trading) as CHF 2.945 billion, trading portfolio assets of CHF 627.036 billion, trading portfolio assets pledged as collateral of CHF 251.478 billion and trading portfolio liabilities of CHF 204.773 billion.

564.    Regarding the Company's use of models to estimate the fair value of assets, the

2006 Annual Report stated:

> All valuation models are validated before they are used as a basis for financial reporting, and periodically reviewed thereafter, by qualified personnel independent of the area that created the model. Wherever possible, we compare valuations derived from models with quoted prices of similar financial instruments, and with actual values when realized, in order to further validate and calibrate our models.

> \* \* \*

> Management therefore establishes valuation adjustments to cover the risks associated with the estimation of unobservable input parameters and the assumptions within the models themselves. Valuation adjustments are also made to reflect such elements as deteriorating creditworthiness (including country−specific risks), concentrations in specific types of instruments and market risk factors (interest rates, currencies etc), and market depth and liquidity. Although a significant degree of judgment is, in some cases, required in establishing fair values, management believes that the fair values recorded in the balance sheet and the changes in fair values recorded in the income statement are prudent and reflective of the underlying economics, based on our established fair value and model governance policies and the related controls and procedural safeguards we employ.

565.     Each of the figures set forth in the UBS's statements concerning the performance of DRCM and the IB and its reported net profits attributable to UBS's shareholders, net trading income, basic EPS, diluted EPS, operating income and the IB's profits, and UBS's statements concerning its valuation models were materially false and misleading when reported because each of the financial figures included in the foregoing statements reflected the inflated value of UBS's subprime and Alt-A mortgage-backed assets.  As set forth in Section XI.A, the models used by UBS to value subprime and Alt-A mortgage-backed assets failed to properly account for the impact of observable market inputs at the time these assets were being valued (such as increasing default rates in the United States mortgage market, and stagnant or declining housing prices within the United States).  Additionally, CW 9 confirmed that the models used to value

ABS, CDOs and CDSs backed by subprime and Alt-A mortgages were inaccurate beginning in 2004 because the models did not take into account the complex nature of these securities. CW 9 informed Defendants of these deficiencies by way of a June 22, 2005 letter. Moreover, UBS employees, including, but not limited to Defendant Hutchins and Eric Rothman disregarded UBS's available models and adopted subjective and intentionally inflated valuations of UBS's subprime and Alt-A mortgage-backed assets without regard to the actual values of these assets that proper modeling based on observable market inputs would yield. Thus, by failing to employ appropriate models to value UBS's subprime and Alt-A mortgage-backed assets and by actively manipulating the value at which assets would be recorded on its balance sheet, Defendants artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued. The inflated assets values were reflected in UBS's income statement and balance sheet as the values impacted each of the financial metrics cited above. Finally, these financial metrics were materially false and misleading when made because they violated international accounting standards as set forth in Section XIII.

566. Moreover, the 2006 Annual Report stated the following about UBS's internal controls:

> [t]he Board of Directors and management of UBS AG (UBS)….UBS's internal control over financial reporting is designed to provide reasonable assurance regarding the preparation and fair presentation of published financial statements in accordance with International Financial Reporting Standards (IFRS) including a reconciliation of net profit and equity attributable to UBS shareholders to US Generally Accepted Accounting Principles (US GAAP).
>
> UBS's internal control over financial reporting includes those policies and procedures that:

--     Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect transactions and dispositions of assets;

--     Provide reasonable assurance that transactions are recorded as necessary to permit preparation and fair presentation of financial statements, and that receipts and expenditures of the company are being made only in accordance with authorizations of UBS management; and

--     Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

*     *     *

UBS management assessed the effectiveness of UBS's internal control over financial reporting as of December 31, 2006 based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework. Based on this assessment, management believes that, as of December 31, 2006, UBS's internal control over financial reporting was effective.

567.    The Company's 2006 Annual Report contains statements substantially similar to those set forth in the 2005 Handbook regarding the need to achieve an appropriate balance between risk and return, as set forth *supra*. The 2006 Annual report goes on to state:

The underlying objective is the creation and protection of shareholder value and the framework is built around the following principles:

*     *     *

–     an independent control process is implemented to provide an objective check on risk-taking activities when required by the nature of the risks, in particular to balance short term profit incentives and the long term interests of UBS. All exposures are independently monitored and reviewed and, depending on the nature of the risks, may also require pre-approval

–     comprehensive, transparent and objective risk disclosure to senior management, the Board of Directors, shareholders, regulators, rating agencies and other stakeholders is the cornerstone of the risk control process

*    *    *

> –     managing and controlling risks, and ***in particular avoiding undue concentrations of exposure***, limiting potential losses from stress events, and restricting significant positions in less quantifiable risk areas, are essential elements of the risk management and control framework and the protection of UBS's reputation.

(Emphasis added).

568.     The 2006 Annual Report also contains statements substantially similar to those set forth in the 2005 Annual Report with respect to the Company's use of risk factor limits, concentration limits, and prudent valuation standards.

569.     The 2006 Annual Report also stated:

> ***Controls and restrictions are placed on risk concentrations in trading books, taking into account variations in price volatility and market liquidity.***

(Emphasis added).

570.     UBS's statements set forth above concerning the effectiveness of its risk controls were materially false and misleading when made because UBS failed to maintain adequate reporting and financial controls to prevent and/or detect fraud within the Company and misrepresentations in its financial reports. UBS admits that the Company's overall "Risk Control framework was insufficiently robust" during the Class Period. In fact, UBS admits that, for example, it neither established nor maintained risk concentration controls such as risk factor and operational limits to monitor its exposure to subprime and Alt-A mortgage-backed securities across DRCM and the IB, even though the GEB and GRCS advised the IB in March 2006 that the accumulation of subprime and Alt-A mortgage-backed assets needed to be "actively monitored" and "tightly controlled" due to the illiquidity of such assets. Moreover, confidential

197

witnesses cited herein have detailed UBS's complete absence of internal reporting protocols. UBS's failure to maintain controls led to, *inter alia*: Moreover, confidential witnesses cited herein have detailed UBS's complete absence of internal reporting controls. Defendants' failure to maintain adequate controls led to, *inter alia*: (ii) UBS employees, including Defendants Costas, Hutchins, Martin and Stehli, amassing high concentrations of risky subprime and Alt-A mortgage-backed assets; (ii) the intentional misrepresentation of these assets' values by UBS employees, including, but not limited to, Defendant Hutchins and Rothman and the inclusion of the misrepresented assets' values in the Company's income statement and balance sheet; (iii) UBS employees, including, but not limited to Defendant Hutchins were intentionally manipulating of UBS's VaR to conceal the true market risk to which UBS was exposed (*see* Section VII.E); and (iv) UBS misrepresenting its risk-related losses to investors.

571.    In fact, the representation that "[a]ll exposures are independently monitored and reviewed and, depending on the nature of the risks, may also require pre-approval" failed to disclose that UBS's employees, including, but not limited to Defendant Hutchins, intentionally manipulated UBS's VaR to conceal the true market risk to which UBS was exposed. *See* Section VII.E. Nor did UBS monitor, contrary to its representations, the "risk concentrations in trading books, taking into account variations in price volatility and market liquidity". Rather, UBS permitted its traders in the IB and in DRCM, including but not limited to Defendants Costas, Hutchins, Martin and Stehli, to amass positions in highly risky and illiquid subprime and Alt-A mortgage-backed securities, based on low cost funding obtained from the bank, without adequately testing the risks to which these trading positions exposed UBS during the Class Period.

572.    With respect to risk exposure from other parts of the Company's business, the

Company failed to disclose that its Wealth Management business had adopted highly risky advisory strategies, in that senior bankers within that division were advising wealthy clients about ways to evade U.S. tax laws. This omission failed to disclose the potential regulatory, civil and criminal penalties to which UBS was exposed.

573. In addition, the Company stated in the 2006 Annual Report:

> In mid−2006 we reported that some of our strategic initiatives would naturally lead to an increase in our risk profile, especially in emerging markets where our exposure had been too low in recent years. The impact of these initiatives – combined with the excellent trading conditions in first and fourth quarters – can be seen in the Investment Bank's market risk. For 2006 as a whole, average VaR (10−day, 99% confidence, 5 years of historical data), increased to CHF 420 million, up from CHF 346 million in 2005. Both interest rate and equities VaR were higher than in the preceding year. The integration of Pactual from 1 December 2006 contributed to this increase – without Pactual, 2006 year−end VaR for the investment Bank would have been CHF 445 million, rather than CHF 473 million.

574. The 2006 Annual Report also reported the Tier 1 Capital ratio and RWAs set forth in the 4Q 2006 Form 6-K.

575. UBS's statements concerning its market risk measurements, including VaR, Tier 1 Capital ratio and RWAs are materially false and misleading because UBS's reported market risk measurements failed to properly reflect the Company's exposure to subprime and Alt-A mortgage-backed securities, thereby understating the Company's exposure to maximum possible losses from risk. As alleged herein, UBS's employees, including, but not limited to, Defendant Hutchins, intentionally manipulated UBS's VaR to conceal the true market risk to which UBS was exposed. *See* Section VII.E.

576. Regarding securitization during 2006, UBS disclosed that any "continuing involvement" in securitization transactions involving residential mortgage loans and securities by UBS "was primarily limited to the temporary retention of various security interests." UBS

199

further disclosed that as of the year ended December 31, 2006, it had retained CHF 3.5 billion "in agency residential mortgage securities, backed by" Ginnie Mae, Fannie Mae and Freddie Mac. Moreover, according to UBS, "[t]he fair value of investment-grade retained interests [was] generally determined using observable market prices."

577. The statements in the paragraph above were materially false and misleading when made because, as set forth herein: (i) UBS admitted in the Shareholder Report that beginning in February 2006 UBS employees, including, but not limited to Defendant Stehli, retained the super senior tranche of each CDO that it originated through September 2007; (ii) these illiquid positions were not held temporarily, but were retained indefinitely because UBS viewed them as an "attractive source of profit"; and (iii) UBS failed to disclose that UBS employees, including but not limited to Defendants Costas, Hutchins, Martin and Stehli, had amassed a material amount of non-agency residential mortgage-backed securities on DRCM and the IB's books as at December 31, 2006.

578. The 2006 Annual Report contains statements substantially similar to those set forth in the 2005 Annual Report, as detailed in ¶ 483, regarding the Company's financial disclosure policy. The Company's statements concerning its disclosure policy are materially false and misleading for the reasons set forth in ¶ 484.

579. The 2006 Annual Report also contains statements identical to those set forth in ¶ 474 with respect to the effectiveness of UBS's risk controls. These statements are materially false and misleading for the reasons set forth in ¶ 475, above.

580. UBS's 2006 Annual Report also stated, in part, with respect to the Company's adherence to ethical and legal standards:

- "We **aim to comply with all applicable provisions** and to work closely and maintain good relations with regulators in all jurisdictions where we conduct business." (Emphasis added).

- "Our Vision and Values state that we are a member of the global community and should behave as a responsible corporate citizen. Our firm and its employees should **conduct themselves in a manner that is above reproach**, as preserving our integrity is vital to our most valuable asset – our reputation. The Code of Business Conduct and Ethics of UBS sets forth the policies and practices which we expect all employees of UBS to follow. It outlines the required standards of fairness, honesty, and integrity in a general manner. It is the basis for all UBS policies." (Emphasis added).

- "As a leading financial services firm, one of our main purposes is to create long-term value. We achieve this by providing our clients with value-added products and services, promoting a corporate culture that **adheres to high ethical standards**, and by generating superior and sustainable returns for our shareholders. We firmly believe that sustainable growth and investment for any business is also dependent on what it does **above and beyond what laws and regulations require**. It is why we are committed to creating a working environment based on the values of equal opportunity, diversity and meritocracy." (Emphasis added).

- "[UBS] maintain[s] an appropriate balance between risk and reward, and establishes and controls UBS's corporate governance processes – **including compliance with relevant regulations**." (Emphasis added).

- In addition, UBS claimed to limit its risk by, among other things, "monitoring and enforcing compliance with the risk principles, [its] policies and limits, and **regulatory requirements**." (Emphasis added).

581. The foregoing statements were materially misleading when made because during the entire Class Period, senior UBS executives within UBS Wealth Management division were incentivized, with the knowledge of senior UBS employees, to advise and assist UBS's clients to violate and/or evade applicable tax laws, and thus: (i) UBS was not "aim[ing] to comply with all applicable [regulatory] provisions"; (ii) UBS was not conducting itself in a "manner that is above reproach" so as to "preserv[e] ... [its] reputation;" (iii) UBS was not abiding by "high ethical standards" and by what "laws and regulations require;" and (iv) UBS was

not "monitoring" or "enforcing compliance" with "regulatory requirements."

582.    In the Financial Report of the 2006 Annual Report, UBS reiterated that its:

> Financial Report comprises the audited financial statements of UBS for 2006, 2005 and 2004, prepared according to International Financial Reporting Standards (IFRS) and reconciled to the United States Generally Accepted Accounting Principles (US GAAP).

583.    UBS's statement concerning its adherence to IFRS was materially false and misleading when made because, as detailed in Section XIII, the Company's financial statements materially misrepresented the fair value of its subprime and Alt-A mortgage-backed positions in violation of IAS 39.   As set forth in Section XII, in violation of international accounting standards, the Defendants intentionally or with extreme recklessness failed to inform investors that the Company's balance sheet contained a significant, and excessive, concentration of subprime and Alt-A mortgage-backed securities and, further, were inflated from the start of the Class Period and certainly by no later than the end of February 2007.

584.    The Company's 2006 Form 20-F also included a Note to the Financial Statements regarding Post-Balance Sheet events:

> There have been no material post-balance sheet events which would require disclosure or adjustment to the 31 December 2006 Financial Statements.

585.    The statements set forth in the preceding paragraph are materially false and misleading because the Company failed to disclose information regarding write-downs taken at DRCM or the IB prior to March 21, 2007 in the Post-Balance Sheet events section of its 2006 Form 20-F.

586.    The Company's 2006 Form 20-F contained Sarbanes-Oxley required certifications, signed by Defendants Wuffli and Standish, which are substantially similar to those set forth in ¶¶492-493, above.   These statements are materially false and misleading for

the reasons set forth in ¶ 494.

### 12. 2006 Handbook

587. To accompany the 2006 Form 20-F, UBS published its Handbook 2006/2007 ("2006 Handbook"), which was referenced in the 2006 Form 20-F. In the 2006 Handbook, UBS stated the following about its risk policy:

> **Sound risk management**
>
> Because taking risk is an integral part of our business, ***our overriding goal is to achieve an appropriate balance between risk and return, limiting the scope for adverse variations in our earnings. The primary focus in our risk-taking activities is to ensure an adequate diversification of risk and to restrict illiquid and concentrated positions, while ensuring that we are rewarded for the risks we take. In recent years, we have transferred resources from businesses in illiquid markets into more liquid ones, and have actively pursued risk distribution strategies. Portfolios with poor returns on risk have been cut back and the quality of other portfolios has been enhanced.***
>
> As a result, UBS's average risk-weighted assets are today at a similar level to 1998, just after the UBS-SBC merger, but our underlying risk profile is not.

(Emphasis added).

588. The 2006 Handbook also contained statements substantially similar to those set forth in the 2005 Handbook with respect to balancing risks and return, the Company's independent risk control process and its avoidance of risk concentrations, as detailed in ¶ 497, above. These statements are materially false and misleading for the reasons set forth in ¶ 468.

589. Further, the 2006 Handbook contained statements substantially similar to those set forth in the 2005 Handbook regarding the critical elements of the Company's independent risk control process. The Company went on to state in the 2006 Handbook:

> Our risk policies are principle-based, specifying minimum requirements, high level controls and standards, and broad authorities and

responsibilities. They are never a substitute for the exercise of common sense and good business judgment but, rather, guide and determine actions and decisions to ensure the safe and sound conduct and control of our business. Our risk policies have widespread application, cover ongoing activities, and are developed in close consultation between the business and control functions. ***Before starting any new business, making a significant change to an existing business or the way it is conducted, or executing any transaction which is complex or unusual in its structure or is sensitive to tax, legal, regulatory or accounting considerations, we thoroughly review and assess all the implications.*** The process involves the business, risk control, legal, compliance, treasury, finance, tax and logistics functions as necessary, and ensures that all critical elements are comprehensively addressed across disciplines, ***including the assurance that transactions can be booked in a way that will permit appropriate ongoing risk monitoring, reporting and control.***

(Emphases added).

590.    Regarding qualitative risk controls, the Company represented the following in the 2006 Handbook:

**Qualitative Controls**

Although measurement of risk is clearly important, quantification does not always tell the whole story, and not all risks are quantifiable. ***We therefore pay equal attention to "soft" risk, avoiding the temptation to ignore those that cannot be properly quantified. We also place great emphasis on qualitative controls and rigorous risk control processes to ensure that both quantifiable and unquantifiable risk is identified, assessed and reported.***

(Emphasis added).

591.    With respect to UBS's development of a risk profile, the 2006 Handbook disclosed the following:

**Development of our risk profile**

UBS's average risk-weighted assets (as measured for regulatory capital purposes) are, today, at a similar level to 1998, just after the UBS-SBC merger….

***The primary focus in our risk-taking activities is to ensure adequate***

*diversification of risk, and to restrict illiquid and concentrated positions, while ensuring that we are rewarded for the risks we take.* We have transferred resources from businesses in illiquid markets into more liquid ones and have actively pursued risk distribution strategies. Portfolios with poor returns on risk have been cut back and the quality of other portfolios has been enhanced – we have, for example, wound down the Investment Bank's non-core loan portfolio, repositioned our private equity business and introduced risk-adjusted pricing in our Swiss lending business.

\*    \*    \*

*Trading assets contribute substantially to our balance sheet but they are very liquid and the major part of the inventory consists of highly rated securities* – we have eliminated pockets of low quality, low liquidity exposure, and continuously monitor the portfolio to identify stale and problem positions.

It is largely as a result of these efforts that we have, in the last couple of years, been in a position to speed up our entry into new markets and assume the related risk. But while we are willing to expand into new and potentially higher risk areas such as emerging markets, *we will continue to exercise caution where this might involve illiquid and concentrated exposures.*

(Emphases added).

592.    In addition to making statements substantially similar to those set forth in the 2005 Annual Report, as detailed *supra*, regarding its use of concentration limits and prudent valuation standards, UBS stated in the 2006 Handbook:

The market risk VaR and stress loss limits are the principal portfolio controls on UBS's exposure to day-to-day movements in market prices, but *measures are also applied to control risk concentrations*, taking into account variations in price volatility and market depth and liquidity. They include controls on exposure to general market risk factors and to single names.

In the Investment Bank, a comprehensive set of risk factor limits has been established. They are applied to individual general market risk factors or groups of highly correlated factors based on market moves broadly consistent with the basis of VaR, i.e. 10-day 99% confidence moves. Each limit applies to exposures arising from all instrument types in all trading businesses of the Investment Bank. Both the market moves and the limits are reviewed annually or as necessary to reflect market conditions.

205

The Investment Bank carries exposure to single names, and therefore to event – including default – risk. ***We measure this risk across all relevant instruments (debt and equity, in physical form and from forwards, options, default swaps and other derivatives) as the aggregate change in value resulting from an event affecting a single name or group***. We also track the maximum amount we could lose if all underlying debt and equity of each name became worthless. ***Positions are controlled in the context of the liquidity of the market in which they are traded, and all material positions are kept under constant scrutiny in light of changing market conditions and specific, publicly available information on individual names.***

\*      \*      \*

***In addition to the standard portfolio and concentration limits, we have an array of limits developed for specific purposes where the standard limits may not provide comprehensive control.*** They address concerns about, for example, market liquidity, operational capacity, or exposure to complex products for which valuation parameters may not be observable with consequent difficulties in valuation and risk measurement.

**Other applications of market risk measures**

***Our portfolio and concentration risk measures are generally applied to trading activities and general market risks in nontrading activities to set and monitor utilization of limits, or to determine approval authorities.***

(Emphases added).

593. The foregoing statements were materially false are materially false and misleading when made for the reasons set forth in ¶ 484.

### 13. 2007 Fixed Income Investor Day

594. On March 28, 2007, UBS held its Fixed Income Investor Day conference in New York City. On that date, Defendant Martin, the Global Head of Rates, gave a presentation titled "Global MBS and ABS." In the power point slides that accompanied his presentation, Martin stated that UBS's "securitization model compliments [its] risk management structure" and that

UBS's "integrated securitization model allows [it] to service clients with superior risk management."

595. Martin's presentation slides further identified three things that UBS was "not going to do in 2007", including "chase league tables", provide excess liquidity to drive high margin business", and "grow business lines that rapidly expand the balance sheet."

596. Also on March 28, 2007, Defendant Singh, the Global Head of the Structured Products Group, gave a presentation titled "Real Estate Finance." In the power point presentation slides, Defendant Singh identified CDOs as a "growing revenue opportunity" for 2007, noting UBS's "strong CDO structuring/distribution" abilities and its "real estate mezzanine expertise." Singh stressed that UBS would proceed cautiously with its CDO investments, highlighting UBS's risk control strategy, including, *inter alia*: (i) "consistent global checks and balances via commitment committees"; and (ii) "highest concentration in most liquid sectors."

597. The statements in the preceding paragraphs were materially false and misleading at the time they were made because, *inter alia*, Defendant Rohner has since admitted that during the Class Period, UBS was operating under a "me too" strategy that caused it to aggressively chase its competitors in the ABS and CDO marketplace, substantially grow its balance sheet exposure by amassing concentrations of subprime and Alt-A mortgage-backed securities, and sacrifice its risk management policies in the relentless pursuit of revenue related to, *inter alia*, the origination and retention of mezzanine CDOs backed by subprime mortgages. At the time that these statements were being made, UBS employees, including Defendants Costas, Hutchins, Martin and Stehli, in fact, amassed on the Company's overall balance sheet a concentrated, illiquid subprime and Alt-A mortgage-backed position in excess of $100 billion.

### 14. 1Q 2007 Earnings Press Release and Form 6-K

598.    On May 3, 2007, the Company filed its quarterly earnings report with the SEC on Form 6-K for the first quarter of 2007 ("1Q 2007 Form 6-K").  Defendants Wuffli and Standish signed the 1Q 2007 Form 6-K.

599.    In a press release released in conjunction with the 1Q 2007 Form 6-K, Defendant Standish stated: "Over the course of 2007, we will concentrate on consolidating the investments we initiated last year.  We will also continue to manage capital, risk and costs in a disciplined fashion – and in line with market developments."

600.    UBS also issued a press release on May 3, 2007, announcing the reintegration of DRCM into the IB.  The press release discussed the reason for the closure of DRCM, stating that:

> Operating a proprietary trading platform outside the Investment Bank and managing client money alongside became too complex and expensive. ***That, among other reasons, is why we have chosen to reintegrate DRCM into the Investment Bank and to redeem the outside investor funds.***

(Emphasis added).

601.    The statements set forth in the preceding paragraph are materially false and misleading because, *inter alia*, and as set forth below, the Company chose to reintegrate DRCM in order to conceal losses suffered in both the proprietary fund and the OIF, and UBS's massive exposure to the plummeting U.S. subprime and Alt-A mortgage market through positions held on both DRCM and the IB's balance sheets.

602.    The 1Q 2007 Form 6-K reported first quarter 2007 results as follows:  net profits attributable to UBS shareholders of CHF 3.275 billion, net trading income of CHF 4.535 billion, basic EPS of CHF 1.69, diluted EPS of CHF 1.62, net trading income from fixed income of CHF 318 million and operating income of CHF 13.596 billion.

603.    The 1Q 2007 Form 6-K also reported total IB operating income of CHF 6.26 billion and pre-tax profit at an "all-time quarterly record of CHF 1,801 million, up 3% from the performance a year earlier."

604.    The reported net profits attributable to UBS's shareholders, net trading income, basic EPS, diluted EPS, operating income and the IB's profits were materially false and misleading when the statements were made  because each of the financial figures included in the foregoing statements reflected the inflated value of UBS's subprime and Alt-A mortgage-backed assets.  As set forth in Section XI.A, the models used by UBS to value subprime and Alt-A mortgage-backed assets failed to properly account for the impact of observable market inputs at the time these assets were being valued (such as increasing default rates in the United States mortgage market, and stagnant or declining housing prices within the United States).  Additionally, CW 9 confirmed that the models used to value ABS, CDOs and CDSs backed by subprime and Alt-A mortgages were inaccurate beginning in 2004 because the models did not take into account the complex nature of these securities.  CW 9 informed Defendants of these deficiencies by way of a June 22, 2005 letter.  Moreover, UBS employees, including, but not limited to Defendant Hutchins and Eric Rothman disregarded UBS's available models and adopted subjective and intentionally inflated valuations of UBS's subprime and Alt-A mortgage-backed assets without regard to the actual values of these assets that proper modeling based on observable market inputs would yield.   Thus, by failing to employ appropriate models to value UBS's subprime and Alt-A mortgage-backed assets and by actively manipulating the value at which assets would be recorded on its balance sheet, Defendants artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued.  The inflated assets values were reflected in UBS's income statement and balance sheet

as the values impacted each of the financial metrics cited above.  Finally, these financial metrics were materially false and misleading when made because they violated international accounting standards as set forth in Section XIII.

605.    Moreover, by May 3, 2007, Defendants knew, *inter alia*: (i) that empirical tests of UBS's valuation assumptions by Defendant Hutchins, in February and March 2007 and by Niblo in April 2007 demonstrated that the Company's valuation models for its subprime and Alt-A mortgage-backed securities were wholly unreliable and vastly overstated the market value of its subprime positions; and (ii) the GIA had concluded in its preliminary report available to Defendants in April 2007 that the valuations at DRCM and the IB lacked transparency.  Finally, these financial metrics were materially false and misleading when made because they violated international accounting standards as set forth in Section XIII.

606.    Regarding VaR, the 1Q 2007 Form 6-K stated:

> Investment Bank Value at Risk (VaR) continued the upward trend seen at the end of 2006 and was generally more volatile than in previous quarters. Average VaR (10−day, 99% confidence, 5 years of historical data) increased to CHF 517 million from CHF 391 million in fourth quarter 2006, while the range (the difference between maximum and minimum VaR) increased to CHF 258 million from CHF 162 million.

> *      *      *

> Average VaR for UBS as a whole was CHF 516 million in first quarter, up from CHF 395 million in fourth quarter 2006. As in the previous quarter, Investment Bank VaR exceeded UBS VaR on occasions − including quarter−end − as Corporate Center exposures provided some offset to Investment Bank positions.

607.    The Company also reported a Tier 1 capital ratio of 11.7% and RWAs of CHF 354.6 million.

608. UBS's statements concerning its market risk measurements, including VaR, Tier 1 Capital ratio and RWAs were materially false and misleading because UBS's reported market risk measurements failed to properly reflect the Company's exposure to subprime and Alt-A mortgage-backed securities, thereby understating the Company's exposure to maximum possible losses from risk. As alleged herein, UBS's employees, including, but not limited to, Defendant Hutchins, intentionally manipulated UBS's VaR to conceal the true market risk to which UBS was exposed. *See* Section VII.E.

609. The 1Q 2007 Form 6-K contained statements substantially similar to those set forth in ¶ 467 above with respect to the Company's use of concentration controls. These statements were materially false and misleading when made for the reasons set forth in ¶ 468 above.

610. The 1Q 2007 Form 6-K contained statements substantially similar to those set forth in ¶ 469 above regarding the Company's adherence to all applicable accounting principles.

611. UBS's statement concerning its adherence to IFRS was materially false and misleading when made because, as detailed in Section XIII, the Company's financial statements materially misrepresented the fair value of its RMBS and RMBS CDO related positions in violation of IAS 39. As set forth in Section XIII, in violation of international accounting standards, Defendants intentionally or with extreme recklessness failed to inform investors that the Company's balance sheet contained a significant, and excessive, concentration of nonprime-related subprime and Alt-A mortgage-backed securities and, further, were inflated from the start of the Class Period and certainly by no later than the end of February 2007.

### 15.    1Q 2007 Earnings Conference Call

612.    On May 3, 2007, the Company held both morning and afternoon conference calls with investors and analysts.

613.    During the morning analyst conference call, UBS executives concentrated on the results, preferring to explain DRCM in more detail during the afternoon analyst conference call. However, analysts asked questions regarding DRCM's closure.

> **CHRISTOPHER WHEELER (BEAR STEARNS):**  Yes good morning gentlemen. Thank you for that. I've got three areas I'd like to touch on. The first one I guess is fairly straightforward; you appeared to have taken no provisions against your sub-prime exposure, I just wondered if you could perhaps comment on that and why that is and why you're so confident there's not an issue there?

> **STANDISH**: Your first question was, have we taken any provisions against sub-prime across the Bank? We have taken a very, very non material credit loss as a result of exposure to the sub-prime mortgage lender. This is related to the new [centric] [*sic* New Century] situation. This was an amount of approximately CHF20 million, that is always taken and we feel confident in our position going forward.

614.    Kinner Lakhani, an analyst for ABN AMRO also asked about the DRCM revenue run rate going forward.

> **KINNER LAKHANI (ABN AMRO)**:  …I wanted to ask you about the DRCM revenue run rate going forward.  It does look like you've made, on average, around CHF400 million per quarter, clearly, when the quarters have been good.  Is this something that you see as being a reasonable run rate to expect?  And clearly in the interim period can we expect further dislocation?

> **TOM HILL (CCO)**: In terms of – we have shown before, as you know, the contribution out of DRCM to the Investment Bank, which you're right adds a sort of run rate around about CHF350 million to CHF400 million a quarter.  ***We see no reason whatsoever why while – we see no reason whatsoever that, that run rate, historical run rate, should not actually continue into the future.***  Clearly, when transpositioning [sic] this business back into the Investment Bank we may have a little dislocation as a result of that but, taking in the – looking into the future quarters we see no reason whatsoever why that historical run rate should not come.  And

indeed we do see potential synergies in revenue of running these proprietary funds alongside other activities within our FIRC business in the Investment Bank.

(Emphasis added).

615. Jon Peace, an analyst from FPK asked how should the market "think about the risk limits you're giving [DRCM] as you bring it back into the Investment Bank to keep that revenue run rate going?" UBS's CCO Tom Hill responded as follows:

\*      \*      \*

***We see lots of opportunity in this sector in the market place, so with all the traders and the people and the systems and the platform on that, we have no reason to think that it shouldn't produce similar types of run rate revenues as it has done in the past.***

(Emphasis added).

616. A Helvea analyst, Peter Thorne, had still further questions about DRCM:

**PETER HORNE (HELVEA):** …Secondly you talked about redeeming the funds. Could you say how much the funds have actually – what the size of them were and what the performance was like? And if there's issues or compensation to those people for perhaps poor performance?

And then finally, is it too much to guess that the poor performance of DRCM had something to do with the sub-prime blow up in the US?

**HILL**: As it relates to the external funds, we said that we will redeem those, we take this obviously extremely seriously as to how we do this. We have, in terms of the raising of third party funds, raised approximately $1.5 billion of third party funds. ***Those that-- the performance of the bulk of those funds which relate to the similar -- the kind of trading strategies as the proprietary funds were raised, as you know late last year, they've actually had a very satisfactory performance over the period of time. And from inception to now the performance has been approximately 11% after costs. So we see now reason whatsoever for compensation issues arising relating to poor performance because in fact the performance has been good.***

(Emphasis added).

617. The foregoing statements were false and misleading at the time they were made because, *inter alia*: (i) according to admissions in UBS's Responses to Ethos the OIF also experienced losses in market value related to its subprime holdings in Q1 2007; and (ii) Defendants had no reasonable basis for concluding that DRCM's historic run rate would continue into the future because:

a. As early as September 2006, Group Senior Management expressed concerns about the U.S. housing market. Further, from the time the first losses in DRCM became apparent in 1Q 2007, the GRSC was alert to the issues associated with subprime investments generally and keen to understand UBS's (and thus DRCM's) exposure to these markets;

b. UBS data, research and analysis showed that the downturn in the subprime and Alt-A markets was likely to continue into the future;

c. The value of DRCM's holdings was rapidly deteriorating, causing the mid-March 2007 write-downs at DRCM to be increased by late-March; and

d. GIA's review of DRCM had uncovered "inherent risks" in its subprime positions that were not adequately analyzed (thus leaving it increasingly exposed to losses in a declining market).

618. UBS executives on the morning conference call continued to get peppered with DRCM related questions, including the following exchange with Kian Abouhossein, an analyst for JP Morgan:

**KIAN ABOUHOSSEIN (JP MORGAN):** The second question is I'm afraid coming back to Dillon Read. I'm interested if this is a mark to market loss or is this a realized loss as I understand that a lot of sub-prime issues are related to structured financial CDOs which are not mark to market. So I'm really trying to understand is that it, should we assumer there's a -- we should draw a line under these losses or is this mark to market rather than a realized loss? And do you have securities related to sub-prime which are not mark to market as underregulation [sic] you don't have to on some of these issues?

**STANDISH:** Okay I'll take the Dillon Read question and Tom will take your question related to Wealth Management International -- I'll take the first question. We have been extremely careful to look at the valuation of

all the assets in Dillon Read, both the proprietary funds and also the outside investor funds. They -- in terms of valuing these portfolios, they are both as a result of realized losses or realized transactions, completed transactions, sold transactions if you like and also mark to market. ***All these are genuine mark to markets, we've been extremely careful on the valuation process where we do a lot of discovery and a lot of transparency so we go out to the market to get quotes on what it would actually cost to move these positions and extrapolate some of those across the portfolio***.

Clearly looking forward I can't make a prognostication as to what the various valuations of positions will do going into the future. They could be both positive and negative. ***But what I can say is this a very genuine valuation as at the end of the first quarter.***

(Emphases added)

619.   The statements in the preceding paragraph were materially false and misleading at the time they were made because UBS's valuations of its subprime and Alt-A mortgage-backed securities were not genuine marks to market and were instead materially overstated by Defendants.  Specifically, by this time: (i) DRCM management, including Defendant Hutchins had already conducted their $100 million "experiment," where they lost $50 million in one day trying to sell subprime-related assets in the open market; (ii) DRCM trader John Niblo had already written down his portfolio by 10% and expressed his concerns about DRCM's marks; (iii) by virtue of CW 9's June 22, 2005 letter, at this time Defendants knew that the valuation models they used to value CDOs and other structured financial assets were inaccurate; and (iv) Defendants had received GIA's preliminary report in April 2007 which concluded that the valuations at DRCM and the IB lacked transparency and that risk management issues existed at both DRCM and the IB.

620.   Matthew Clark, an analyst with KBW requested further clarification as to the proprietary fund loss and the outside investor fund gain at DRCM as follows:

215

**MATTHEW CLARK (KBW)**:  The first question just on DRCM. Just trying to reconcile the proprietary loss you took here in the Investment Bank versus the performance of the third party funds and the fact that there are performance fees being reported in the Asset Management division. Presumably is this because just differing strategies and the strategies you invested in did worse than the broader strategies that the third parties could participate in?

**STANDISH:** Okay, the first question related to DRCM was a question relating to the performance of the proprietary fund versus the performance of the outside investor funds. What you must appreciate is that the proprietary fund transferred across the DRCM were from the portfolios that pre-existed in the Investment Bank prior to obviously DRCM being established. So, they have a whole load of legacy positions in there built up over a period of time.

The outside investor fund, because the monies were only raised second part of 2006, clearly had a different construction of portfolio, because they didn't have the same positions that UBS had in the proprietary funds. ***The turbulence in the sub-prime market where we experienced the difficulties impacted those legacy or previous vintage positions in the proprietary fund much more significantly than the more recent trading positions put on in the outside fund. So that's the primary -- that's the real driver for the differential performance.***

(Emphasis added).

621.    The statements in the preceding paragraph were materially false and misleading at the time they were made because the Company has since admitted in its Responses to Ethos that the OIF had, in fact, sustained losses on positions in home equity-linked instruments in Q1 2007, which, "resulted from a combination of extraordinary market developments, long positions in increasingly illiquid, primarily low-rated, sub-prime securities and short positions that did not substantially offset the losses on the long positions due to differing credit ratings." Moreover, Defendants omitted the fact that the redemption paid to the investors in the OIF did not truly reflect the performance of the OIF and in fact, the OIF had actually experienced losses similar to those suffered by the proprietary funds.

622.	Also during the afternoon call, Defendant Jenkins remarked:

> …Turning to DRCM, so we have assumed control of the risk management and operations of DRCM, with effect from the close of business last night. ***As you know, these portfolios were managed on our [IB] behalf by DRCM over the course of the last couple of years. So the entire risk positions are up and operating on our operating platform. We have therefore our risk control and infrastructure, both in terms of finance and in terms of option settlement, overseeing these platforms.*** From one point of view a relatively easy acquisition for us to make in terms of reintegrating that business.

(emphasis added).

623.	The statements in the preceding paragraph were materially false and misleading at the time they were made, *inter alia*, for the reasons set forth in ¶ 468 above.

624.	Once the UBS executives finished with their prepared remarks, they answered questions from analysts. Peter Thorne, an analyst from Helvea inquired about the risk control systems of DRCM:

> **PETER THORNE (HELVEA):** …. Secondly, in DRCM are we right to think that you had no idea about these losses that they occurred right at the end of March? And was the risk control systems of DRCM completely outside the rest of the UBS group?
>
> **WUFFLI**: …. ***On risk control for DRCM, the risk control framework was fully integrated with UBS, so we did not have any surprises there.*** We obviously did notice the losses. ***Of course, with some of the portfolios they are relatively difficult to value because they are either marked to model or they are marked to market prices that may not be easily available. But the risk control framework here worked. And the issue was not a risk control break*** the issue, as we try to explain before, was essentially that the business initiative for the whole sort of reasons that I tried to explain did not meet our expectations. ***So it was not a risk control issue,*** it was a business -- overall business performance issue why we took the action that we have taken. …

(Emphases added).

625.	The statements in the preceding paragraph were false and misleading at the time

they were made because, *inter alia*: (i) DRCM Management, including Defendant Hutchins had already conducted their $100 million "experiment," where they lost $50 million in one day trying to sell subprime-related assets in the open market; (ii) DRCM trader John Niblo had already written down his portfolio by 10% and expressed his concerns about DRCM's marks; (iii) by virtue of CW 9's June 22, 2005 letter, at this time Defendants knew that the valuation models they used to value CDOs and other structured financial assets were inaccurate; and (iv) Defendants had already received a preliminary report which concluded that the valuations at DRCM and the IB lacked transparency and that risk management issues existed at both DRCM and the IB.

626. UBS executives John Fraser and Defendant Jenkins also answered questions with respect to the closing of the OIF:

> **STEPHAN STALMANN (DRESDNER):** …would have a few follow up questions on the Dillon Read Capital Management situation. ***Did I understand it correctly that you are essentially buying out the outside investors out of their positions? Why would you do that? Why would you not liquidate these positions at the risk of those outside investors?***
>
> I am also a bit puzzled by the divergence of performance that is apparently there between the money you manage on your own account where you have the prop losses, and the performance of the outside funds which seems to have held up quite well. Why is there this divergence? And is there possibly an indication that there will be losses on the outside money that -- can you make this [read] across from your existing positions that have already suffered?
>
> And finally, if you were to take out these outside investors and to hold onto that money, that would essentially mean you put another $2 billion of capital roundabout into these activities, which would probably add up to roundabout $6 billion. Do you feel comfortable with that level of capital commitments to these activities for a longer period of time or is it just an interim situation?
>
> **FRASER:** I will take the first two, and perhaps Huw can help us grab up the third. We looked at a number of options. Foremost in our mind was to

218

make sure that the interest of the outside investors, the third-party investors was paramount. The decision that we came to was to propose to the outside investor fund board, which we have the power as I described earlier, ***namely to point cash into the outside investor fund so that we can have a compulsory redemption process that should be finished by the 8th of May on the NAVs struck at the end of April. We believe this is in the best interest of the outside investors and the most efficient and expedient way to do it.***

Second, on the diversions of the performance between the outside investor funds and what we called the controlled funds, or the UBS proprietary capital, ***this is predominately a reflection of historical positions. Positions that have been built up prior to the launch of the outside investor fund on the 2nd of November 2006. So positioned through '05 and earlier through '06. This is the main reason for it.***

I would add that there is no inherent indicator of losses from that. It was really the assets are going into the Investment Bank for Huw's people to manage going forward. ***The last thing we wanted to do in terms of liquidating the outside investor fund was put us in a position where we would put the assets at risk in what is a thin market in many cases.*** Huw, can you take the third part of the question please?

**JENKINS**: I certainly don't want to talk in detail about our trading strategies, ***but I think the first thing to say is quite rightly the existing investment has always been part of the balance sheet of Investment Bank, albeit managed by DRCM. So that really is no change in our risk position from the numbers that you have seen reported historically for the IB.***

***We are clearly increasing our risk by taking the portfolio out from the outside investor fund. We are increasing our positions, let's put it that way. We obviously get some offsets and some diversification effect against the rest of the IB's portfolio, but less so given that these positions are similar to the ones that were already held in the controlled portfolios based on the algorithm for generating allocations between the outside fund and the internal fund. Obviously we're going to be very actively looking to manage our risk and to maintain a reasonably normalized risk profile based on our historic activities over the fullness of time.***

(Emphases added).

627.    Jennifer Berg, analyst from Wellington Management inquired further into the

UBS's decision to buy out the OIF, noting that typically with "acquisitions of broken hedge

funds…the assets [are acquired] at discount" and "[t]he fund shareholders have taken the biggest piece of the hit. And that doesn't seem to be the case in this scenario. And I'm just trying to make sure I understand that." Defendant Jenkins responded:

> *…And by the way, one thing I haven't mentioned in my comments so far, we were very pleased when which the Investment Bank was able to trade through February 26, and indeed trade through the sub prime market.* We have been pleased with robustness of our earnings. *And we continue to see the market broadly as being pretty benign*. …

> *…We don't think that this is a distressed portfolio*. I don't want to go into the details of the portfolio, because I think that prejudices our ability to risk manage it. But I would not -- I would reiterate what Peter Wuffli said earlier on, *the decisions that the Group Executive Board have made have been predicated on a business model issue, not on a quality or substance of this portfolio. I don't see any reason why we would see a disorderly series of marks or behavior within the portfolio now that is back under our control.*

(Emphases added).

628.    The statements in the two preceding paragraphs were materially false and misleading at the time they were made because the Company has since admitted in its Responses to Ethos that the OIF had, in fact, sustained losses on positions in home equity-linked instruments in Q1 2007, which "resulted from a combination of extraordinary market developments, long positions in increasingly illiquid, primarily low-rated, sub-prime securities and short positions that did not substantially offset the losses on the long positions due to differing credit ratings." Moreover, Defendants omitted the fact that the redemption paid to the investors in the OIF did not truly reflect the performance of the OIF and in fact, the OIF had actually experienced losses similar to those suffered by the proprietary funds.

629.    Finally, Kian Abouhossein, an analyst for JP Morgan circled back to UBS's risk controls:

220

**KIAN ABOUHOSSEIN (JP MORGAN):** I have two questions. The first one is related to your CHF150 million loss. *I'm not exactly understanding how your risk management system could let that go through, considering that even market to model is done on a daily basis -- correlation to a model is done on a daily basis*. What I'm wondering is how you are managing risk within DRCM, and hence within Dillon Read going forward, i.e. *should we assume there will be a material risk decline or risk decomposition of the portfolio and hence the revenues that you used to generate, which I think were estimated around CHF400 million in the past from your Dillon Read operation?* …

**WUFFLI:**… *On the first one the risk control of DRCM was not different from the risk control everywhere else.* The minus CHF150 million is a negative net revenue contribution to the Investment Bank, which obviously is the net result of a series of positive revenues and trading losses.

*And you get a sense of the pattern in our first quarter report where you see the back half results and you see that we had one day where we had a loss that exceeded 100 million. Other than that, the losses were less than that. Obviously partly related to sub prime and the U.S. mortgage market turbulence that we have seen.*

But there is no change in risk control methodology, in risk framework, in risk systems.

630.    The foregoing statements were materially false and misleading at the time they were issued because, *inter alia*: (i) the Company admits in the Shareholder Report that the losses suffered by DRCM and the reintegration of its portfolio did not spawn "a more comprehensive review and assessment of all Subprime positions in the IB", and for a review of UBS's risk assessment processes in connection with the same; (ii) as evidenced by the testimony of CW 2 and CW 13, the enforcement of risk management procedures within the IB and DRCM was materially deficient throughout the Class Period, as traders at the IB and DRCM routinely found ways to circumvent the risk management review process in order to push RBMS and CDO deals through; and (3) as set forth in ¶¶ 468, 484, the risk management procedures within both the IB and DRCM were severely deficient during the Class Period.

631.     Also on May 3, 2007, *Bloomberg News* reported on the Company's disclosures. Included in the article, titled "UBS's Costas, Fraser Say Legacy Positions Caused Fund Losses," is a quote from Costas stating:

> We can't comment on specific trade management processes especially on UBS's proprietary capital.  I think the important thing going forward is UBS is in complete control from a risk management standpoint, a control standpoint, of all these assets.  And is managing those with the same care and attention they do elsewhere in the investment bank.

632.     Costas further stated:

> The portfolio that was the proprietary trading business [at DRCM] we had run for a very long time at UBS, in fact since 1999.  And there were positions, just to expand upon John's comments, there were positions in that book that had been established in 2001, 2002, and so there was idiosyncratic risk that was in the book.

633.     The statements in the preceding paragraphs were false and misleading at the time they were made UBS failed to maintain adequate reporting and financial controls to prevent and/or detect fraud within the Company and misrepresentations in its financial reports. UBS admits that the Company's overall "Risk Control framework was insufficiently robust" during the Class Period. In fact, UBS admits that, for example, it neither established and/or maintained risk concentration controls such as risk factor and operational limits to monitor its exposure to subprime and Alt-A mortgage-backed securities across DRCM and the IB, even though the GEB and GRCS advised the IB in March 2006 that the accumulation of subprime and Alt-A mortgage-backed assets needed to be "actively monitored" and "tightly controlled" due to the illiquidity of such assets.  Moreover, confidential witnesses cited herein have detailed UBS's complete absence of internal reporting protocols.  UBS's failure to maintain adequate controls led to, *inter alia*: (i) UBS employees, including, but not limited to, Defendants Costas, Hutchins, Martin and Stehli amassing high concentrations of risky subprime and Alt-A mortgage-backed

assets; (ii) UBS employees, including but not limited to Defendant Hutchins and Eric Rothman, intentionally misrepresenting the value of UBS's subprime and Alt-A mortgage-backed assets and the inclusion of the misrepresented assets' values in the Company's income statement and balance sheet; (iii) UBS employees, including, but not limited to, Defendant Hutchins, intentionally manipulating UBS's VaR to conceal the true market risk to which UBS was exposed (*see* Section VII.E); and (iv) UBS misrepresenting its risk related losses to investors.

### 16.     June 4, 2007 Risk Management Presentation

634.     On June 4, 2007, UBS provided investors with presentations on its risk management and controls. According to Philip Higson of UBS's Investor Relations, the aim of the presentations was "to help investors analysts and the media understand UBS's approach to risk and capital management in the context of the firm's growth strategy."   Several UBS executives, including Defendant Stuerzinger and Andrew Threadgold ("Threadgold"), the Global Head of Market Risk gave presentations.   The slides that accompanied Defendant Stuerzinger's  presentation titled "Risk & Capital Management at UBS" stated that, as of that date, UBS had a "strong risk management and risk control culture" and "highly integrated risk management and control process" which "focus[ed] on managing and controlling concentration and liquidity risk."  Stuerzinger stated during his presentation that UBS was "executing on [its] grow agenda, without jeopardizing [its] risk principles."  Stuerzinger further stated that UBS's "risk culture has not changed."

635.     Defendant Stuerzinger further stated that UBS was "clearly" invested in "highly liquid assets" and that UBS had "moved out of…certain illiquid assets."   With respect to concentrations, Defendant Stuerzinger stated: "We rigorously want to avoid risk concentrations of all kinds.  We are basically obsessed with risk diversification."

636.    Threadgold further stated:

> I can attest to the strong risk management and risk control culture…it runs throughout the organization and we have a very effective team of controllers overseeing risk taking…with a particular focus on concentrations…

637.    The statements in the preceding paragraphs were false and misleading at the time they were made because UBS failed to maintain adequate reporting and financial controls to prevent and/or detect fraud within the Company and misrepresentations in its financial reports. UBS admits that the Company's overall "Risk Control framework was insufficiently robust" during the Class Period. In fact, UBS admits that, for example, it neither established and/or maintained risk concentration controls such as risk factor and operational limits to monitor its exposure to subprime and Alt-A mortgage-backed securities across DRCM and the IB, even though the GEB and GRCS advised the IB in 2006 that the accumulation of subprime and Alt-A mortgage-backed assets needed to be "actively monitored" and "tightly controlled" due to the illiquidity of such assets. Moreover, confidential witnesses cited herein have detailed UBS's complete absence of internal reporting protocols. UBS's failure to maintain adequate controls led to, *inter alia*: (i) UBS employees, including, but not limited to, Defendants Costas, Hutchins, Martin and Stehli amassing high concentrations of risky subprime and Alt-A mortgage-backed assets; (ii) UBS employees, including but not limited to Defendant Hutchins and Eric Rothman, intentionally misrepresenting the value of UBS's subprime and Alt-A mortgage-backed assets and the inclusion of the misrepresented assets' values in the Company's income statement and balance sheet; (iii) UBS employees, including, but not limited to, Defendant Hutchins, intentionally manipulating UBS's VaR to conceal the true market risk to which UBS was exposed (*see* Section VII.E); and (iv) UBS misrepresenting its risk related losses to investors.

638.   During his presentation Threadgold answered questions about the closure of DRCM and its reported losses.  He said,

> We don't go into detail about individual businesses but I think we've said before that we had losses related to the mortgage market those were in turn connected with subprime events but not just.  There has been a significant dislocation in mortgage related securities in the US subprime and Alt-A second lien, the whole works.  We suffered from that.  The market has become rather illiquid in some parts and I think we have been appropriately conservative in the valuations that we have set [for] those positions.

639.   The statements in the preceding paragraph with respect to DRCM were false and misleading when made because they failed to reveal that UBS's positions on the IB's balance sheet were similar to those for which DRCM had taken write-downs and reported losses.

### 17.   2Q 2007 Form 6-K

640.   On August 14, 2007, the Company filed its quarterly report with the SEC on Form 6-K for the second quarter of 2007 ("2Q 2007 Form 6-K").  Defendants Rohner and Standish signed the 2Q 2007 Form 6-K.

641.   Included in the 2Q 2007 Form 6-K was a Letter to Shareholders.  In the letter, Defendants Ospel and Rohner stated that "[d]uring the quarter, stock markets recovered form the lows reached in mid-March.  However, credit market conditions deteriorated sharply from the middle of June onwards.  As in first quarter, UBS demonstrated that it is prepared for such mixed conditions, and showed increased results."

642.   The foregoing statements were materially false and misleading when made because, far from being prepared for the deterioration of credit markets, the Company failed to inform investors that its lack of adequate risk management controls and its massive accumulation of illiquid, subprime and Alt-A mortgage-backed assets left it exposed to

225

staggering amounts of both credit risk and market risk associated with the subprime and Alt-A mortgage markets.

643.    The 2Q 2007 Form 6-K reported second quarter 2007 results as follows:  net profits attributable to UBS's shareholders of CHF 5.622 billion, net trading income of 4.121 billion, EPS of CHF 2.90, diluted EPS of CHF 2.82, net trading income from fixed income of (CHF 273 million) and operating income of CHF 16.12 billion.

644.    The Company also stated that "the Investment Bank achieved another record pre-tax profit of CHF 1.185 billion, up 3% from a year earlier."

645.    The 2Q 2007 Form 6-K also reported trading portfolio assets of CHF 706.221 billion, trading portfolio assets pledged as collateral of CHF 251.700 billion, trading portfolio liabilities of CHF 229.840 billion and total assets of CHF 2.540 trillion.  Moreover, the Company reported positive replacement values of CHF 334.95 billion and negative replacement values of CHF 343.135 billion.

646.    The reported net profits attributable to UBS's shareholders, net trading income, basic EPS, diluted EPS, operating income and Investment Bank profits were materially false and misleading when reported because each of the financial figures included in the foregoing statements reflected the inflated value of UBS's subprime and Alt-A mortgage-backed assets. As set forth in Section XI.A, the models used by UBS to value subprime and Alt-A mortgage-backed assets failed to properly account for the impact of observable market inputs at the time these assets were being valued (such as increasing default rates in the United States mortgage market, and stagnant or declining housing prices within the United States). Additionally, CW 9 confirmed that the models used to value ABS, CDOs and CDSs backed by subprime and Alt-A mortgages were inaccurate beginning in 2004 because the models did not take into account the

complex nature of these securities. CW 9 informed Defendants of these deficiencies by way of a June 22, 2005 letter. Moreover, UBS employees, including, but not limited to Defendant Hutchins and Eric Rothman disregarded UBS's available models and adopted subjective and intentionally inflated valuations of UBS's subprime and Alt-A mortgage-backed assets without regard to the actual values of these assets that proper modeling based on observable market inputs would yield. Thus, by failing to employ appropriate models to value UBS's subprime and Alt-A mortgage-backed assets and by actively manipulating the value at which assets would be recorded on its balance sheet, Defendants artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued. The inflated assets values were reflected in UBS's income statement and balance sheet as the values impacted each of the financial metrics cited above. Finally, these financial metrics were materially false and misleading when made because they violated international accounting standards as set forth in Section XIII.

647. Moreover, by August 14, 2007, Defendants knew, *inter alia*: (i) that empirical tests of UBS's valuation assumptions by Defendant Hutchins, in February and March 2007 and by Niblo in April 2007 demonstrated that the Company's valuation models for its subprime and Alt-A mortgage-backed securities were wholly unreliable and vastly overstated the market value of its subprime positions; and (ii) the GIA had concluded in its preliminary report available to Defendants in April 2007 that the valuations at DRCM and the IB lacked transparency. Finally, these financial metrics were materially false and misleading when made because they violated international accounting standards as set forth in Section XIII.

648. The 2Q 2007 Form 6-K stated the following about the Company's approach to measuring VaR for its positions:

While average Investment Bank 10−day VaR was broadly unchanged from first quarter, active switching of equities and interest rate positions increased the range between maximum and minimum VaR, and reduced the diversification effect to 26% from 30% compared with first quarter.

Following the announcement on 3 May 2007 that, as part of the closure of DRCM, we would redeem outside investor interests, the portfolios were integrated into the Investment Bank. This introduced additional risk but other position changes on the same day resulted in an overall reduction in Investment Bank VaR. From that point, the general trend was downward and 10−day VaR closed the quarter at CHF 454 million, more than 20% down from the previous period−end.

*   *   *

Average VaR for UBS as a whole was not materially changed from first quarter. Once again, Corporate Center exposures have tended to provide some offset to Investment Bank positions, and UBS VaR was slightly lower than Investment Bank VaR on a number of occasions.

649.    The Company further stated with respect to its market risk management:

*VaR and stress measures control our overall portfolio exposure but we also monitor and control exposures to individual market risk variables* (such as individual equity markets and the interest and exchange rates of individual currencies) *and to single names. The diversification of risks and avoidance of undue concentrations are key components of our risk control process.*

(Emphases added).

650.    The Company also reported a Tier 1 capital ratio of 12.3% and RWAs of CHF 378.43 billion.

651.    UBS's statements concerning its market risk measurements, including VaR, Tier 1 Capital ratio and RWAs were materially false and misleading because UBS's reported market risk measurements failed to properly reflect the Company's exposure to subprime and Alt-A mortgage-backed securities, thereby understating the Company's exposure to maximum possible losses from risk.  As alleged herein, UBS's employees, including, but not limited to, Defendant

Hutchins, intentionally manipulated UBS's VaR to conceal the true market risk to which UBS was exposed.  *See* Section VII.E.

652.    The 2Q 2007 Form 6-K also discussed additional losses suffered by DRCM: "Revenues in our fixed income, rates and currencies business fell, driven by weak results in rates, municipal securities and precious metals.  Portfolios managed by DRCM (including the former outside investor fund) showed negative revenues of approximately CHF 230 million."

653.    In the 2Q 2007 Form 6-K, the Company attributed its 20% decline in revenues in its FIRC business to "losses in the portfolios that were managed by DRCM as well as the difficult market environment for our rates business in the US."

654.    The 2Q 2007 Form 6-K also stated:

> [FIRC] revenues were CHF 1,814 million in second quarter 2007, down 31% from the same quarter a year ago.  In connection with the closure of the DRCM business, the management of all portfolios (including the former outside investor fund) was integrated into the Investment Bank in second quarter 2007.  Continued market difficult conditions in the US mortgage-backed and asset-backed securities market led to further losses in the portfolios.  Net revenues from DRCM's business activities were approximately negative CHF 230 million, compared with approximately negative CHF 150 million reported in first quarter 2007.  Revenues from other parts of the FIRC business overall were flat compared with a year earlier…Performance in the rates business was down in government bonds and mortgage-backed and asset-backed securities in the context of difficult market conditions caused by the US sub-prime market."

655.    The statements contained in the 2Q 2007 Form 6-K regarding the performance of FIRC are materially false and misleading for the reasons set forth in ¶ 646.

656.    The 2Q 2007 Form 6-K contains statements substantially similar to those set forth in ¶ 469 above regarding the Company's adherence to relevant international accounting standards.  These statements are materially false and misleading for the reasons set forth in ¶ 470.

229

### 18.     2Q 2007 Earnings Conference Calls

657.   On August 14, 2007, after announcing its financial results for the second quarter of 2007, UBS held an "Interim 2007 UBS Earnings Conference Call" where executives were questioned by investors and analysts.   During the call, Defendant Standish discussed the Company's current risk position, stating:

> *Our underwriting criteria and risk preference have remained entirely stable throughout the quarter*, though credit line at Group level showed a recovery of CHF 14 [million].  Moving to market risk.  *Average VaR was the same this quarter as last quarter, both for the Investment Bank and for the Group, but was lower at the end of the quarter compared to the beginning of the quarter.  Our system for estimating risk is robust*, as is clear from the fact that we have had no back-testing exceptions.  However, the third quarter has seen some extreme market dislocations, and these are likely to produce some back-testing exceptions, we believe.

(Emphases added).

658.   During the call, UBS's CEO Defendant Rohner addressed the Company's risk management and control given the uncertainties in the mortgage market, stating:

> *Lately the U.S. mortgage-backed business is obviously more challenging and as shown by the write downs we had in DRCM in the first and second quarter.*  The markets are, of course, extremely volatile.  And this makes it naturally very difficult to make any forecast.  I can, however, say four things about the U.S. mortgage-backed securities markets.  Let me start with a general statement.  *We monitor and manage our risks very closely in all positions,* and we are well within our earnings capacity which we always derive by an assessment of how exposure works within a wide range of extreme scenarios.

(Emphases added).

659.   During the call, Claudia Meier, an analyst for Bank Vontobel, inquired about the losses at DRCM.

> **CLAUDIA MEIER (BANK VONTOBEL)**:   …So if this has now everything come through or is there still something coming through probably in the Investment Banking number within fixed income in the third quarter on the CHF 230 million you have alluded you had in second

230

quarter? I understand its now fully integrated. I would like to know is there a probability that you will have to take further write backs on the performance.

**ROHNER**: If I could just put that in context of the risk situation, we were obviously not just DRCM, a hedge fund in the fixed income business, we are also broker dealer in the mortgage backed securities business all along the way. And, in that sense, we clearly had exposures in both parts of our businesses. And these positions and these businesses, they will continue to be there. And in that sense we are exposed to market disruptions in this area. Within the context of our risk management, risk control framework, the way I've alluded to in my closing remarks, and this basically is the situation where we currently are, pretty much along the line of the industry.

660. Later in the same call, Christian Stark, an analyst from Cheuvreux inquired as to UBS's position in subprime CDOs.

**CHRISTIAN STARK (CHEUVREUX)**: Could you just maybe give us, first question would be just on some updates on the sub-prime exposure beyond DRCM, what your exposures are, particularly with regards to conduits with CDOs sub-prime underlying. …

**ROHNER**: Yes. Let me put the first one a little bit into context. And I have to say here I think you'll understand that in these market environments and conditions, we are not particularly keen to disclose our trading positions and where we do have paper and where we don't have paper, which is why we try to put it in context of our risk control framework, which is what we have done*. I can say that we do know the positions. We monitor them very closely. We are also very, I should say, cautious in terms of the analysis of our risk. I think standard characteristics such as ratings and similar things have to be taken with great cautiousness because there are underlying concentration risks. We know all of them very well. And my statement there is within these exposures which we monitor, closely manage as proactively as you can in very choppy markets where some of the markets disappear, we are well within our earnings capacity, as I've said before.*

661. The foregoing statements by Defendant Rohner were false and misleading when made because, *inter alia*, far from being cautious with respect to its analysis of risk, UBS failed to maintain adequate reporting and financial controls to prevent and/or detect fraud within the

Company or misrepresentations in its financial reports. UBS admits that the Company's overall "Risk Control framework was insufficiently robust" during the Class Period. In fact, UBS admits that, for example, it did not establish and/or maintain risk concentration controls such as risk factor and operational limits to monitor its exposure to subprime and Alt-A mortgage-backed securities across DRCM and the IB, even though the GEB and GRCS advised the IB in March 2006 that the accumulation of subprime and Alt-A mortgage-backed assets needed to be "actively monitored" and "tightly controlled" due to the illiquidity of such assets. Moreover, confidential witnesses cited herein have detailed UBS's complete absence of internal reporting protocols. UBS's failure to maintain adequate controls led to, *inter alia*: (i) UBS employees, including, but not limited to, Defendants Costas, Hutchins, Martin and Stehli amassing high concentrations of risky subprime and Alt-A mortgage-backed assets, including more than $100 billion in subprime and Alt-A backed securities; (ii) UBS employees, including but not limited to Defendant Hutchins and Eric Rothman, intentionally misrepresenting the value of UBS's subprime and Alt-A mortgage-backed assets and the inclusion of the misrepresented assets' values in the Company's income statement and balance sheet; (iii) UBS employees, including, but not limited to, Defendant Hutchins, intentionally manipulating UBS's VaR to conceal the true market risk to which UBS was exposed (*see* Section VII.E); and (iv) UBS misrepresenting its risk related losses to investors.

662. Additionally, during the call, Jeremy Sigee, a Citigroup analyst, inquired after the "mechanics of DRCM":

> **JEREMY SIGEE (CITIGROUP)**: …could I talk about the mechanics of DRCM and those losses, and various sub questions to that. Number one, are all the losses on sub-prime? Number two, are the losses reflecting a mark to market or mark to model? And number three, have the positions been trimmed at any point, or are they just being maintained as they were

in health and maturity.  So if you can talk about the mechanics of DRCM.

**ROHNER**: …And before we go into the DRCM evaluation, I should just say in terms of risk management of the product, this is not just a transfer A to B in terms of doing anything.  Clearly we managed the exposure.  We reduce the exposure, hedge the exposure as and if opportunities arise.  But, at the same time it's also clear that everybody knows in these fixed income markets, managing these positions through these turbulent times is a very challenging undertaking.

Clive on the mark to model, mark to market.

**STANDISH**:  Okay, just some comments on that.  Within the DRCM portfolios, they were not just subprime portfolios.  There were some other portfolios in there related to real estate and other bits and pieces.  Predominantly though they were sub-prime.

In terms of the question about are they mark to market, are they mark to model, the whole issue about being – marking portfolios is one that we put a massive amount of focus and emphasis on.  And as the CFO, the person has to front up to the audit committee and get absolutely grilled by the audit committee on the fair value of our positions in the Investment Bank, which is something that my and my finance team put a lot of emphasis on.

***Our first priority is, wherever possible, to get a marking that is completely transparent, i.e., marked to a price that is observable within the marketplace.  And the vast bulk of our positions are mark to market in that sense.  Where we cannot get an observable price in the marketplace, we then default back to various other mechanisms, and notably mark to model, where we then have to validate against a model.  That doesn't mean that we just look at our own model and go that's fine.  We actually then do a lot of price testing relating to the validity of that mark to model.***

(Emphases added).

663.    The statements by Defendant Standish relating to UBS's purported protocols for marking subprime and Alt-A positions were materially false and misleading at the time they were made because UBS's valuations of its subprime and Alt-A mortgage-backed securities were not genuine marks to market and were instead materially overstated by Defendants.  Specifically, by this time: (i) DRCM management, including Defendant Hutchins had already

233

conducted their $100 million "experiment," where they lost $50 million in one day trying to sell subprime-related assets in the open market; (ii) DRCM trader John Niblo had already written down his portfolio by 10% and expressed his concerns about DRCM's marks; (iii) by virtue of CW 9's June 22, 2005 letter, at this time Defendants knew that the valuation models they used to value CDOs and other structured financial assets were inaccurate; and (iv) Defendants had received GIA's preliminary report in April 2007 which concluded that the valuations at DRCM and the IB lacked transparency and that risk management issues existed at both DRCM and the IB. Finally, the models used by the Company to value subprime and Alt-A mortgage-backed assets failed to include observable market inputs at the time the assets were being valued (such as increasing default rates in the United States mortgage market, stagnant or declining housing prices within the United States, subprime related profit warnings by UBS's peers and declines in the ABX Index). By failing to include observable market inputs into the models valuing subprime and Alt-A mortgage-backed assets, Defendants artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued.

664. Kian Abouhossein, an analyst for JP Morgan, also asked pointed questions about DRCM and UBS's subprime exposure:

> **KIAN ABOUHOSSEIN (JP MORGAN)**: Just coming back to, first of all, Dillon Read Capital Management, I'm trying to understand if you are continuously mark-to-market, or if you've taking some reserves in your numbers as well. Because if I look at you – if you look at the subprime indices, since the end of the quarter, they have moved massively. I mean the single A spreads have gone from less than 500 to 20%, meaning that if the bulk of the positions, or subprime mortgage related, there will be material mark to market issues still to come in the second half. So, based on these spreads that we're seeing today in the synthetic market, is that a correct, a rational conclusion?

And is that included in your second half outlook, any dislocation within the old Dillon Read Capital Management book?

The second question is relating to your overall DRCM book or the old book. If I look at the Annual Report at 20-F, you talked about 88b of increase in assets under management on the balance sheet relating to DRCM. I'm very interested in overall assets invested now within your prop trading business within the UBS Investment Bank.

**ROHNER**: Well let me start with the first one on marking the positions. As Clive mentioned before, our positions are now managed on an integrated way, which basically means that we cannot reasonably disclose separate parts of which, of something which is now like an integrated and – which is now a trading book which is managed in an integrated way.

**ABOUHOSSEIN**: But I mean internally. I'm 100% sure you split it out as portfolio management, so, in a way, you could if you would like to.

**ROHNER**: Well parts of that are visible but parts of that are not visible. And the question is, if you have a trading desk responsible for two books and they manage the risk in an integrated way, what would be the purpose if you took one book off if the risk is basically see it for both books together? That's basically the statement we are making. I think this would not be, would not be a reasonable signal.

But with respect to your points on where the spreads go and the indices go, clearly, these are the dislocations you have seen end of July. They were actually, at the end of today, even sharper than the one you've – we've see in the first wave at the end of March. And, clearly, those dislocations and changes in the prices of bonds and the resulting ABX indices have an effect on how we mark our portfolios and books.

665. Thereafter, Derek De Vries, an analyst from Merrill Lynch followed up on Abouhossein's questions:

**DEREK DE VRIES (MERRILL LYNCH)**: Essentially, by the time the Q2 books closed, presumably you had pretty good insight into the developments in July and August, so the Q2 books closed with mark-to-market losses or gains, I guess of – reflecting the current environment. Is that correct? Or is it Q2 reflects how the books closed on June 30, and anything subsequent to that would be in the following quarters?

**STANDISH**: It's very clear. Our obligation for reporting is to have fair values as at June 30. So that's my responsibility as CFO to ensure that the

prices will fully reflect the market values as at June 30.

666. The statements in the preceding paragraphs were materially false and misleading at the time they were made because UBS's valuations of its subprime and Alt-A mortgage-backed securities were not genuine marks to market and were instead materially overstated by Defendants. Specifically, by this time: (i) DRCM management, including Defendant Hutchins had already conducted their $100 million "experiment," where they lost $50 million in one day trying to sell subprime-related assets in the open market; (ii) DRCM trader John Niblo had already written down his portfolio by 10% and expressed his concerns about DRCM's marks; (iii) by virtue of CW 9's June 22, 2005 letter, at this time Defendants knew that the valuation models they used to value CDOs and other structured financial assets were inaccurate; and (iv) Defendants had received GIA's preliminary report in April 2007 which concluded that the valuations at DRCM and the IB lacked transparency and that risk management issues existed at both DRCM and the IB. Moreover, by August 14, 2007, UBS had extensive information indicating that the losses recorded at the end of the quarter ended June 30, 2007 would be materially larger for the IB and for DRCM. Finally, the models used by the Company to value subprime related assets failed to include observable market inputs directly impacting the value of the assets at the time the assets were being valued (such as increasing default rates in the United States mortgage market, stagnant or declining housing prices within the United States, subprime related profit warnings by UBS's peers and declines in the ABX Index). By failing to include observable market inputs into the models valuing subprime related assets, UBS artificially inflated the value of these assets throughout the Class Period and specifically at the time the foregoing statement was issued.

### 19.     October 1, 2007 Press Release

667.     In an October 1, 2007 press release, UBS announced its first write-downs in connection with its subprime holdings:

> In the third quarter, UBS will recognize substantial losses in FIRC within the Investment Bank, mainly on its holdings of securities related to the US sub prime residential mortgage (RMBS) market. Overall, FIRC will record negative revenues in the order of CHF 4 billion.
>
> These write downs are mainly of (a) legacy positions of the now closed Dillon Read Capital Management subsidiary and (b) positions entered into as part of the Investment Bank's mortgage backed securities business.
>
> There are other, smaller, losses in equities proprietary trading within an overall satisfactory result.

668.     UBS also undertook to disclose a portion of its subprime holdings.  According to the October 1, 2007 press release:

> The remaining relevant positions in direct sub prime RMBS have a current net value of USD 19 billion.  These positions consist overwhelmingly of AAA-rated tranches, 80% with a weighted average life of less than three years.   There is also a smaller position of below USD 4 billion net exposure to sub prime securities through warehouse lines and retained CDOs.   These securities are either AAA-rated or High Grade, and have a short weighted average life.
>
> In addition, UBS has taken significant write downs on positions in Super Senior AAA-rated tranches of CDOs, based on level 3 valuation models.

669.     With respect to risk management, the October 1, 2007 press release states that while the market for mortgage-backed securities is illiquid and UBS has suffered substantial valuation losses, ***"[m]anagement action has been taken to make certain these positions are appropriately valued and risk managed."***   (Emphasis added).

670.     The Company further assured investors that it was being "as transparent as possible," and that, in determining the proper valuations for its mortgage-related assets, it took "a cautious view of future developments in the US mortgage market."

671. The statements in the preceding paragraphs were materially false and misleading at the time they were made by virtue of Defendants failure to disclose that, *inter alia*: (i) the Company's super senior exposure which lead to 50% of the write downs as at December 31, 2007, was more than $20 billion; (ii) in addition to subprime exposure, the Company also held approximately $30 billion in RMBS backed by Alt-A mortgages which, was concealed from the market until February 14, 2008 and which, according to UBS's own research analysts, was deteriorating at the same rate as subprime mortgages; (iii) UBS had significant additional exposure to the subprime and Alt-A sectors by virtue of its Reference-Linked Notes program and exposure to monoline insurers, which, was concealed from the market until February 14, 2008; and (iv) that the Company had significant exposure to auction-rate securities which were accumulating on its balance sheet because the Company's traders could not find buyers for these securities.

### 20.    1H 2007 Form 6-K

672. UBS also filed its results for the first half of 2007 with the SEC on Form 6-K on October 1, 2007 ("1H 2007 Form 6-K").

673. The 1H 2007 Form 6-K reported first half results as follows:  net profits attributable to UBS's shareholders of CHF 8.897 billion, net trading income of CHF 8.656 billion, basic EPS of CHF 4.31, diluted EPS of CHF 4.17, average 10-day VaR of CHF 520 million and operating income of CHF 29.716 billion.

674. The 1H 2007 Form 6-K figures for trading portfolio assets, trading portfolio assets pledged as collateral, positive replacement values, negative replacement values, trading portfolio liabilities and total assets are identical to those reported in the 2Q 2007 Form 6-K. Each of those figures are materially false and misleading for the reasons set forth in ¶ 646.

675.     Regarding the Investment Bank, the 1H 2007 Form 6-K, stated that "[t]he first six months of 2007 were the most profitable ever, with pre−tax profit in first half 2007, at CHF 3,616 million, rising 3% from the same period in 2006."

676.     With respect to its securitization activity, in the 1H 2007 Form 6-K the Company stated:

> At 31 December 2006, the total position of retained interests in CDO/CLO was CHF 7.9 billion. The primary underlying valuation assumptions were expected credit loss, which on a weighted average basis was approximately 0.1 % p.a., and weighted average life, 6.3 years. The impact on the fair value of these retained interests of 10% and 20% adverse changes in expected credit loss would be approximately CHF 97.8 million and CHF 195.7 million, respectively.

677.     The statements in the preceding paragraphs were materially false and misleading at the time they were made by virtue of Defendants failure to disclose that, *inter alia*: (i) the Company's super senior exposure which led to 50% of the write-downs as at December 31, 2007, was more than $20 billion; (ii) in addition to subprime exposure, the Company also held approximately $30 billion in RMBS backed by Alt-A mortgages which, was concealed from the market until February 14, 2008 and which, according to UBS's own research analysts, was deteriorating at the same rate as subprime mortgages; (iii) UBS had significant additional exposure to the subprime and Alt-A sectors by virtue of its Reference-Linked Notes program and exposure to monoline insurers, which, was concealed from the market until February 14, 2008; and (iv) that the Company had significant exposure to auction-rate securities which were accumulating on its balance sheet because the Company's traders could not find buyers for these securities.

## 21.     October 1, 2007 Conference Call

678.     UBS also held a conference call for analysts and investors on October 1, 2007 to

discuss its write-downs. In his prepared remarks, Defendant Rohner stated that the goal of the conference call was:

> to create maximum possible clarity and transparency about what has happened and where we are in our current position, to demonstrate the rigorous approach we take in terms of our evaluation, risk management, to leave as much as we can of this substantially behind us, and also to show you how we accelerate the necessary changes in order to address the main weaknesses in our businesses…

679. In response to a question from Peter Thorne, a Helvea analyst, Rohner stated:

> Well, the (inaudible) refers to the $19 billion in direct residential mortgage-backed securities. These positions are over 90% AAA positions. More than 80% have a weighted average, life below three years. So, in order to get a sense of the riskiness of the position you want to convert it into something like a trader would trade in., and if you adjust for the duration in the instruments and the risk, it would be equivalent to $5.5 billion AAA ABX Index equivalent. And that's actually also hinting to one way you can actually hedge in trade deposition because these are volumes you can actually trade. Given the fact that we've marked them to matrix, which basically means inferred prices from traded securities, the few traded securities in their very illiquid markets we get to levels which reflect where you can trade at fairly well, and that is basically the statement at these levels. ***We feel comfortable owning these positions, and we feel we can risk management them and also trade them within the normal trading volatility and the normal expectation that we can also make profit with them.***

(Emphasis added).

680. One analyst asked about the possibility of future write-downs. As a result, the following exchange occurred:

> **KEN BUHOSI (JP MORGAN)**: What I'm concerned about it how do I get comfort that the 19 billion plus the 4 billion plus the level three assets, we won't see any further mark to market write downs in that book in the fourth quarter, first quarter of next year, etc.? How can you ensure me that this won't happen?
>
> **ROHNER:** Well, total assurance that there is never ever an additional step I can't give you. What I can give you is the total transparency and tell you these are the books, the 19 [billion in residential mortgage-backed

240

securities] and the 4 [billion in CDO warehouse/retained]. I told you what write-downs we have and these are the levels. We actually like to own these positions. We're comfortable with it, and the second statement I can make that we have mark to modeled these other assets, which have an indirect subprime exposure based on assumptions which prudently reflects the current concerns in the market about future developments in the US mortgage-backed securities market, the subprime market in particular. So that tells us that should these expectations along these lines materialize, that the levels of valuation we have in are the right levels.

681. Derek De Vries, a Merrill Lynch analyst, asked UBS executives to "break down the 4 billion you have on the trading side" and specifically the break down between the unrealized and realized losses, including "[h]ow much of this have you sold off and how much of it is still on the books?" Rohner responded as follows:

…the write-downs before in terms of realized and unrealized losses, I think – I understand where you're coming from. One thing I can say is that we had some positions in a portfolio which we called Relative Value Portfolio where we held ABCP positions, asset backed commercial paper of the relative value book which was essentially investing excess liquidity and therefore creating some typical carriage rate additional income. We took a hit there today in the aftermath of the day when 693 issues were downgraded, and we have largely closed out that. So that's something which is gone.

But the rest is getting really complicated because you have hedge gains and they have hedge losses. And they you close it, you reenter the hedges and you will be almost impossible to like to get a complete deterioration of chain back. So I think we should leave it with the transparency I have created around these write-downs.

682. The preceding statements were materially false and misleading at the time they were made by virtue of Defendants failure to disclose that, *inter alia*: (i) the Company's super senior exposure which lead to 50% of the write-downs as at December 31, 2007, was more than $20 billion; (ii) in addition to subprime exposure, the Company also held approximately $30 billion in RMBS backed by Alt-A mortgages which, was concealed from the market until February 14, 2008 and which, according to UBS's own research analysts, was deteriorating at

241

the same rate as subprime mortgages; (iii) UBS had significant additional exposure to the subprime and Alt-A sectors by virtue of its Reference-Linked Notes program and exposure to monoline insurers, which, was concealed from the market until February 14, 2008; and (iv) that the Company had significant exposure to auction-rate securities which were accumulating on its balance sheet because the Company's traders could not find buyers for these securities.

### 22.    3Q 2007 Form 6-K

683.    On October 30, 2007, UBS filed is results of for 3Q 2007 with the SEC on Form 6-K ("3Q 2007 Form 6-K").  Defendants Rohner and Suter signed the 3Q 2007 Form 6-K.

684.    The 3Q 2007 Form 6-K reported third quarter 2007 results as follows:  net profits attributable to UBS shareholders of (CHF 830 million), net trading income of (CHF 3.546 billion), basic EPS of (CHF 0.43), diluted EPS of (CHF 0.44), net trading income from fixed income of (CHF 5.75 billion) and operating income of CHF 6.466 billion.

685.    The 3Q 2007 Form 6-K also reported trading portfolio assets of CHF 611.730 billion, trading portfolio assets pledged as collateral of CHF 234.381 billion, trading portfolio liabilities of CHF 209.743 billion and total assets of CHF 2.484 trillion.   In addition, the Company reported positive replacement values of CHF 415.781 billion and negative replacement values of CHF 420.394 billion.

686.    The reported net profits attributable to UBS's shareholders, net trading income, basic EPS, diluted EPS, operating income, and trading portfolio assets were materially false and misleading when made because each of the financial figures reflected inflated valuations of UBS's subprime related assets.  At the time these statements were made, the Defendants knew that (i) the Company's super senior exposure which led to 50% of the write downs as at December 31, 2007, was more than $20 billion; (ii) in addition to subprime exposure, the

Company also held approximately $30 billion in RMBS backed by Alt-A mortgages which, was concealed from the market until February 14, 2008 and which, according to UBS's own research analysts, was deteriorating at the same rate as subprime mortgages; (iii) UBS had significant additional exposure to the subprime and Alt-A sectors by virtue of its Reference-Linked Notes program and exposure to monoline insurers, which, was concealed from the market until February 14, 2008; (iv) Merrill Lynch, who possessed just a third of UBS's exposure to mezzanine CDO positions backed by subprime mortgages, had written-down these assets by $12.4 billion as of October 26, 2007, thereby providing UBS with notice that its $4 billion write-down of similar assets was insufficient to correct its material overvaluation of these assets; and (iv) that the Company had significant exposure to auction-rate securities which were accumulating on its balance sheet because the Company's traders could not find buyers for these securities

687. The 3Q 2007 Form 6-K further stated:

> Investment Bank Value at Risk (VaR−10−day, 99% confidence based on 5 years of historical data) ended the quarter at CHF 676 million, up from CHF 454 million at the prior period end, mainly driven by increased market volatility. The largest contributor to Investment Bank VaR at quarter end was credit spread on mortgage−related positions.
>
> Average 10−day VaR, by contrast, was lower at CHF 447 million compared with CHF 520 million in second quarter. The change in market conditions, which began in August, is only partly reflected in third quarter average VaR − the full impact will not be felt until fourth quarter.
>
> \*        \*        \*
>
> Average VaR for UBS as a whole decreased to CHF 444 million from CHF 518 million in the previous quarter. Once again, Corporate Center exposures have tended to provide some offset to Investment Bank positions, and UBS VaR was slightly lower than Investment Bank VaR on a number of occasions.

688.     The Company also reported a Tier 1 Capital ratio of 10.6% and RWAs of CHF 390.32 billion.

689.     UBS's statements concerning its market risk measurements, including VaR, Tier 1 Capital ratio and RWAs are materially false and misleading because UBS's reported market risk measurements failed to properly reflect the Company's exposure to subprime and Alt-A mortgage-backed securities, thereby understating the Company's exposure to maximum possible losses from risk.  As alleged herein, UBS's employees, including, but not limited to, Defendant Hutchins, intentionally manipulated UBS's VaR to conceal the true market risk to which UBS was exposed.  *See* Section VII.E.

690.     The 2Q 2007 Form 6-K contains statements substantially similar to those set forth in ¶¶ 469 above regarding the Company's compliance with the relevant international accounting standards.  These statements are materially false and misleading for the reasons set forth in ¶ 470.

### 23.     3Q 2007 Earnings Conference Calls

691.     On the same day, the Company held its regularly scheduled "Q3 2007 UBS Earnings Conference Call."  In his prepared remarks, Defendant Rohner described, in greater detail, the character and the extent of UBS's subprime related exposure:

> We have disclosed the [$20.2 billion] notional value of our super senior positions for the first time.  We were very reluctant to do so, simply because the notional amounts can be very misleading.  The health warning we have to put on this number is that it compares, to some extent, apples with oranges.  The total includes quite a wide range of different securities, with different subordination levels, maturities, and also substantial differences in the rights – of the rights in the event of a default, so I, therefore, tried to give you a bit more detail so we can better understand and interpret this number.

Of the CHF 20.2 billion, CHF 3.2 billion are actually high grade ABS super senior positions. A further CHF 2.7 billion has a substantial first loss protection of 12%. About CHF 13.2 billion are mezzanine ABS CDOs. Almost all of our net losses of CHF 1.65 billion go against the mezzanine ABS CDO, ***but even within the market, due to different vintages, subordination levels, and collateral quality, the valuations are effectively somewhere between 70% and 100%***.

(Emphasis added).

692.    In his prepared remarks, Defendant Rohner also predicted a profitable fourth quarter for UBS despite the issues in the subprime mortgage market. Specifically, Rohner stated:

So these are the effects these recent events will have on this various pockets of our position. And given all we know today, which is the very preliminary analysis of the impact of the downgrades, and the very latest remittance data as of last Thursday on all our positions, we think it is unlikely that the Investment Bank will contribute positively to the Group.

At the same time, however, we believe that the Group as a whole should deliver a positive result in the Group as a whole should deliver a positive result in the fourth quarter.

To summarize the overall results, clearly, overall profits, i.e., losses, are obviously unsatisfactory. But beneath the headline number, there are good results for most of our businesses, outweighed by substantial losses in a small number of business lines.

*        *        *

….As we have said, we believe overall we will return to profitability in the fourth quarter 2007.

693.    Defendant Rohner's statements set forth above were materially false and misleading at the time they were made by virtue of Defendants' failure to disclose and/or reckless disregard of the fact that, *inter alia*: (i) the Company's super senior exposure which led to 50% of the write-downs as at December 31, 2007, was more than $20 billion; (ii) in addition to subprime exposure, the Company also held approximately $30 billion in RMBS backed by

Alt-A mortgages which, was concealed from the market until February 14, 2008 and which, according to UBS's own research analysts, was deteriorating at the same rate as subprime mortgages; (iii) UBS had significant additional exposure to the subprime and Alt-A sectors by virtue of its Reference-Linked Notes program and exposure to monoline insurers, which, was concealed from the market until February 14, 2008; (iv) Merrill Lynch, who possessed just a third of UBS's exposure to mezzanine CDO positions backed by subprime mortgages, had written down these assets by $12.4 billion as of October 26, 2007, thereby providing UBS with notice that its $4 billion write-down of similar assets was insufficient to correct its material overvaluation of these assets; and (iv) that the Company had significant exposure to auction rate securities which were accumulating on its balance sheet because the Company's traders could not find buyers for these securities.

694. During the same conference call, Defendants Rohner and Suter each addressed the Company's exposure to monoline insurers. Each stated that while some exposure exists, it is being controlled:

> **ROHNER:** Monoline insurers, we obviously do have also trade where we do have protection from monoline insurers. *We have, obviously, a tight control over this exposure, we also manage this exposure*, but we would not name by name or in any way be in a position to say that. Marco?

> **SUTER:** We have bought protection on some of our exposures from monolines. *It's not a big order magnitude, and the protection we have bought from monolines is typically on exposures where the underlying exposure is already better quality in the first place. So we do not consider our exposure to monolines to be of any significance.*

(Emphases added).

695. The statements set forth in the preceding paragraph were materially false and misleading at the time they were made because Defendants failed to disclose that the Company's

net exposure to monoline insurers exceeded $11 billion.

696.    Later in the "Q3 2007 UBS Earnings Conference Call," Rohner was questioned regarding the accuracy of the Company's write-downs to date.

> **HUW VAN STEENIS**: Three questions. The first is on, again on your write-downs. Could you give us a bit more color about the super senior risk we saw, which was the largest piece. If I add CHF1.6 billion negative impact on the CHF20.2 billion, it appears you're taking a seven point mark, and yet some of your competitors. and probably -- whilst I realize the markets are very, very liquid [sic] and have deteriorated, and my sense is some capacities are taking a 20 point haircut or more, which would imply another CHF3 billion of write-downs. Perhaps could you just give some color on why you wouldn't be more conservative, and perhaps whether there'd be further write-downs in the current quarter?

> > \*        \*        \*

> **ROHNER**: First of all, the write-down of CHF1.65 billion goes (inaudible) largely against the mezzanine, which is the CHF13 billion. So that's an important part to note. And secondly, we also had a 2% protection on the entire portfolio to [read through] in the first place.

> And thirdly, I can't really say what others do. ***What I can say that some write-downs are as much down as 30% in this portfolio and others are up. So it really depends very much on which vintage you hold, which subordination levels you have.*** Some have attachment points of 30%, others have attachment points of 55%. So there's a wide range in there which makes a big -- great deal of a difference where you end up with the valuation. I don't really know what others apply, but what we can say is, our write-downs they go largely against the CHF13 billion, just to put it a bit in perspective. But again, I think it has to be taken with great caution with respect to what it actually is.

(Emphasis added).

697.    At least one analyst, Stefan Stalmann of Dresdner Kleinwort, asked for "reassurance about the worst case losses that you could see piling up on this position maybe over the next few quarters or until this is solved?"  Defendant Rohner responded:

> First, on the worst case scenario, I think what we do here is we provide you with the maximum, really ***the maximum possible*** transparency to the ***bare bone*** so you can make your calculations the way you think is appropriate. ***We feel that the way we go about the modeling of this, the***

247

*way we apply the data which comes in, the fundamental data, is a reasonable and prudent way forward which will incorporate what we really know in that, and you basically see what the results of these procedures are and you also see what there is, at least broadly.* I could give you the impact of the recent very extreme event on what we have here, and I think the rest we should leave to you, because you see there is a wide range of approaches out there, and it would be I think inappropriate if we just put out a number here which could be taken out of context.

(Emphases added).

698.    Rohner's statements set forth above were materially false and misleading at the time they were made by virtue of the fact that Defendants failed to disclose and/or knew or recklessly disregarded that, *inter alia*: (i) the Company's super senior exposure which led to 50% of the write downs as at December 31, 2007, was more than $20 billion; (ii) in addition to subprime exposure, the Company also held approximately $30 billion in RMBS backed by Alt-A mortgages which, was concealed from the market until February 14, 2008 and which, according to UBS's own research analysts, was deteriorating at the same rate as subprime mortgages; (iii) UBS had significant additional exposure to the subprime and Alt-A sectors by virtue of its Reference-Linked Notes program and exposure to monoline insurers, which, was concealed from the market until February 14, 2008; (iv) Merrill Lynch, who possessed just a third of UBS's exposure to mezzanine CDO positions backed by subprime mortgages, had written down these assets by $12.4 billion as of October 26, 2007, thereby providing UBS with notice that its $4 billion write-down of similar assets was insufficient to correct its material overvaluation of these assets; and (iv) that the Company had significant exposure to auction rate securities which were accumulating on its balance sheet because the Company's traders could not find buyers for these securities

699.    On November 15, 2007, after speculation by Lehman Brothers analyst Jon Peace

that UBS would take $8 billion in write-downs in the fourth quarter was reported in the *Wall Street Journal*, a UBS spokesman stated: "UBS does not expect write-downs greater than those implied in its outlook which means write-down numbers like $8 billion are not expected." (Andrew Hurst, *UBS-says not expect massive Q4 write-down numbers*, Reuters News, November 15, 2007 at 7:17 pm GMT). The same spokesman also said that "UBS was not holding back further write-downs with the intention of spreading charges over subsequent quarters." (*Id.*)

700. On the same date, analysts met with Defendant Suter in London. When questioned about possible further write-downs at UBS, Defendant Suter stated to analysts that he did "not think the $8 billion (write-down) number mentioned in the press is the one they will book." (*Id.*) Suter further stated that UBS was "not being disingenuous and that they will take what write-downs need to be done in the fourth quarter and are not trying to defer the pain here", according to analysts who met with him. (*Id.*)

701. Also on November 15, 2007, the *AP* reported that UBS stated that it "expects to post profits for the fourth quarter" and, specifically, spokesman Christoph Meier stated that "[t]he bank continues to stand by the outlook it posted last month." (*UBS expects profitable fourth quarter despite speculation*, Associated Press, November 15, 2007 at 6:35 pm GMT").

702. The statements set forth above were materially false and misleading when made for the reasons set forth in ¶ 693.

703. On December 10, 2007, UBS issued a press release titled "UBS strengthens capital base and adjusts valuations." According to the press release, UBS was set to write-down its subprime mortgage backed holdings by an additional $10 billion. The press release stated, in part:

In response to continued deterioration in the US sub-prime mortgage securities market, partly driven by increased homeowner delinquencies but mainly fuelled by worsening market expectations of future developments, UBS has revised the assumptions and inputs used to value US sub-prime mortgage related positions. This will result in further write-downs of around USD 10 billion, primarily on CDO and "super senior" holdings. ***In light of continued deterioration in the sub-prime market, valuations of UBS's remaining sub-prime positions reflect the extreme loss projections implied by the prices achieved in the very limited number of observable market transactions in US sub-prime related securities and indices up to the end of November.***

(Emphasis added).

> 704.    The press release also quoted Defendant Rohner:

Marcel Rohner, Group Chief Executive Officer, UBS, said: "Conditions in the US mortgage and housing markets have continued to deteriorate, ***and we have updated our loss assumptions to the levels implied by the current distressed market for mortgage securities.*** In the last several months, continued speculation about the ultimate value of our sub-prime holdings – which remains unknowable – has been distracting. ***In our judgement [sic] these write-downs will create maximum clarity on this issue and will have the effect of substantially eliminating speculation….***"

(Emphases added).

> 705.    Thereafter, on December 11, 2007, UBS held an Investor Day conference. During Defendant Ospel's prepared remarks, he stated:

You might think our risk culture is broken. This is not the case. UBS has always emphasized risk management so much so that from time to time we have turned away business that other banks are happy to do. Of course that sometimes creates friction but it is my firm belief that our tough approach to risk creates values for both UBS shareholders and UBS clients.

*        *        *

We are not in the SIV business and we have refrained from loosening the standards we require to take on new clients in our prime brokerage business even though prime brokerage is an important area of growth for us. But in spite of our conservative appetite for risk, the current credit market crisis has hurt us and I will discuss the reasons for that in a minute. Naturally we are all very disappointed and I am very much aware that nobody expected this from UBS.

706.     Also   during   the   Investor   Day   conference,   Defendant   Suter   discussed   the

Company's remaining subprime exposure and the Company's current market valuations of its

various subprime-related assets:

> The first and current largest bucket [of subprime exposure] is our direct
> RMBS exposures. At the end of November, it was roughly US$16 billion.
> While this is our largest remaining exposure in nominal terms, it is also the
> least risky one as this bucket is dominated by AAA rated tranches with a
> short rated average expected life.
>
> The next largest bucket is our super senior exposure. You will note that
> this exposure has decreased significantly from 20.2 billion at the end of the
> third quarter to now approximately 13 billion. I will get to this in just a
> moment. The third bucket is our CDO warehouse exposure. Our net
> exposure to this bucket sit at $1.8 billion at the end of September and it has
> now reduced to almost zero on a net basis meaning that we still hold
> approximately 1 billion long exposure offset by about 1 billion in short. As
> you can see, the additional markdowns from our subprime related
> positions amount to approximately US$10 billion. The majority or
> approximately 8 billion comes from marking down our super senior
> positions.
>
> This slide now provides you with more granularity on our super senior
> exposure. We have bucketed it into four categories showing you current
> net exposure, face value and at what levels we currently are valuing each
> of these positions measured against the face value of the position. These
> are   average   marks.   Individual   marks   vary   dependent   upon   the
> characteristics   of   the   securities   like   vintage,   different   levels   of
> subordination, maturities, collateral, and different levels of rights that you
> have in the event of default.
>
> In terms of vintages, approximately one-third of the mortgages are 2005
> and earlier and around 60% are 2006 with a small remaining amount being
> 2007 mortgages. ***While our super senior tranches of high-grade ABS
> CDOs are still marked at $0.81 on the dollar, our tranches of mezzanine
> ABS CDOs are now at $0.55.*** And this clearly -- this is clearly the area
> where we have taken the most pain.
>
> ***If you take our total super senior exposure, you will come to an average
> valuation of around $0.60 on the dollar. To make the valuation picture
> complete, the marks we apply to our RMBS positions and I am now
> talking about the long only marks, are at $0.77 on the dollar and for the***

> ***CDO warehouse, they now stand at $0.18 -- that is one 1-8 cents on the dollar.***

(Emphases added).

707.    The statements above were materially false and misleading at the time they were made because while the Company was purportedly disclosing the full extent of its exposure to subprime, it still continued to conceal that: (i) the Company held approximately $30 billion in RMBS backed by Alt-A mortgages which, according to UBS's own research analysts, was deteriorating at the same rate as subprime mortgages; (iii) UBS had significant additional exposure to the subprime and Alt-A sectors by virtue of its Reference-Linked Notes program and exposure to monoline insurers; and (iii) that the Company had significant exposure to auction-rate securities which were accumulating on its balance sheet because the Company's traders could not find buyers for these securities.

### 24.    4Q 2007 Form 6-K

708.    On February 14, 2008, the Company filed its quarterly earnings report for the fourth quarter of 2007 with the SEC on Form 6-K ("4Q 2007 Form 6-K").

709.    The 4Q 2007 Form 6-K reported fourth quarter 2007 results as follows:  net profits attributable to UBS shareholders of (CHF 12.45 billion), net trading income of (CHF 13.915 billion), basic EPS of (CHF 6.50), diluted EPS of (CHF 6.51) and operating income of (CHF 4.067 billion).  The 4Q 2007 Form 6-K also reported net trading income of (CHF 15.696 billion) in fixed income, and total operating income for the IB of (CHF 11.615 billion).

710.    The 4Q 2007 Form 6-K also reported the following for the year-ended December 31, 2007:  net profits attributable to UBS shareholders of (CHF 4.384 billion), net trading

income of (CHF 8.353 billion), basic EPS of (CHF 2.28), diluted EPS of (CHF 2.28) and operating income of CHF 31.980 billion.

711.    The 4Q 2007 Form 6-K went on to state:

> In fourth quarter 2007, the Investment Bank recorded a loss of CHF 15,461 million, compared with a pre−tax profit of CHF 1,356 million in fourth quarter 2006. This was due to net revenues of negative CHF 15,534 million in the fixed income, currencies and commodities area, mainly related to the inventory of securities linked to the US sub−prime residential mortgage markets.

712.    The 4Q 2007 Form 6-K also reported total assets of CHF 2.273 trillion, and stated that "*Net income from trading businesses* was negative CHF 14,420 million in fourth quarter 2007, down from positive CHF 3,375 million in fourth quarter 2006. This quarter, like the last, was severely impacted by losses on positions related to the US residential mortgage market." (Emphasis in original)

713.    Additionally, the 4Q 2007 Form 6-K reported:

> In fourth quarter 2007, the Investment Bank recorded a credit loss expense of CHF 223 million, of which CHF 131 million related to valuation adjustments taken in connection with the securitization of certain US commercial real estate assets. These adjustments were a reflection of the repricing of risk observed in the markets during the fourth quarter. Credit loss expense in third quarter 2007 was CHF 26 million, whereas in fourth quarter 2006 net recoveries of CHF 10 million were recorded.

714.    The Company also reported trading portfolio assets of CHF 610.061 billion, trading portfolio assets pledged as collateral of CHF 164.311 billion, trading portfolio liabilities of CHF 164.788, and total assets of CHF 2.273 trillion.  In addition, the 4Q 2007 Form 6-K also reported positive replacement values of CHF 428.217 billion and negative replacement values of CHF 443.539 billion.

715.    The figures set forth in UBS's 4Q 2007 Form 6-K were materially false and misleading when made because the Company's financial metrics continued to incorporate the overvaluations of UBS's Alt-A mortgage-backed assets and its Auction Rate Securities.  While the Alt-A mortgage market was considered to be just as bad as the subprime market, UBS took only $2 billion in write downs on its Alt-A positions in 2007, compared to approximately $16.7 billion on a subprime mortgage-backed asset portfolio of similar size.  UBS would eventually take a further $7 billion in write downs related to Alt-A mortgages in 1Q 2008.  Moreover, UBS continued to overvalue its ARS despite the fact that UBS employees had been manipulating the auctions in order to prevent them from failing since August 2007.

### 25.    2007 Annual Report

716.    On March 18, 2008, the Company published its Annual Report for 2007 (the "2007 Annual Report").  On the same date, UBS filed its results for the year-ended December 31, 2007 with the SEC on Form 20-F ("2007 Form 20-F").  The 2007 Annual Report was filed with the SEC as an exhibit to the Form 20-F.

717.    The 2007 Annual Report reported the year-end profits attributable to UBS shareholders of (CHF 4.384 billion), net trading income of (CHF 8.353 billion), basic EPS of (CHF 2.28), diluted EPS of (CHF 2.28) and operating income of CHF 31.980 billion.  The 2007 Annual Report also reported the IB's operating income for the year as (CHF 804 million), fixed income (net trading) as (CHF 20.949 billion), trading portfolio assets of CHF 610.061 billion, total assets of CHF 2.273 trillion, trading portfolio assets pledged as collateral of CHF 164.311 billion and trading portfolio liabilities of CHF 164.788 billion.  Additionally, the 2007 Annual Report disclosed positive replacement values of CHF 428.217 billion and negative replacement values of 443.539 billion.

718.     UBS's 2007 Annual Report also stated in part, with respect to the Company's adherence to ethical and legal standards:

- "UBS **aims to comply with all applicable provisions** and to work closely and maintain good relations with regulators in all jurisdictions where the firm conducts business." (Emphasis added).

- "UBS's vision and values state that the firm is a member of the global community and should behave as a responsible corporate citizen. The firm and its employees should **conduct themselves in a manner that is above reproach**, as preserving UBS's integrity is vital to its most valuable asset – its reputation. The firm has a code of business conduct and ethics, which sets forth the policies and practices UBS expects all its employees to follow. The code outlines the required standards of fairness, honesty and integrity in a general manner. It is the basis for all UBS policies." (Emphasis added)

- "As a leading financial services firm, one of UBS's main purposes is to create long-term value. UBS believes this can be best achieved by providing clients with value-added products and services and by promoting a corporate culture that adheres to **high ethical standards**. The firm also firmly believes that, for any business, long-term value creation is also dependent on **what it does above and beyond what laws and regulations require**. It is why UBS dedicates itself to creating a working environment based on the values of equal opportunity, diversity and meritocracy." (Emphasis added)

- "[UBS] strives to maintain an appropriate balance between risk and return while establishing and controlling UBS's corporate governance processes, including **compliance with relevant regulations**." (Emphasis added).

- In addition, UBS claimed to limit its risk by, among other things, "monitoring and enforcing compliance with risk principles, policies and limits, and with **regulatory requirements**." **(**Emphasis added)

719.     The foregoing statements were materially misleading when made because during the entire Class Period, senior UBS executives within UBS Wealth Management division were incentivized, with the knowledge of senior UBS employees, to advise and assist UBS's clients to violate and/or evade applicable tax laws, and thus: (i) UBS was not "aim[ing] to comply with all applicable [regulatory] provisions"; (ii) UBS was not conducting itself in a "manner that is above reproach" so as to "preserv[e] ... its reputation;" (iii) UBS was not abiding by "high

ethical standards" and by what "laws and regulations require;" and (iv) UBS was not "monitoring" or "enforcing compliance" with "regulatory requirements."

720.    The 2007 Annual Report also contained the following representation:

**Note 32 Post−Balance Sheet Events**

\*        \*        \*

There have been no further material post−balance sheet events which would require disclosure or adjustment to the 31 December 2007 Financial Statements.

721.    The statements set forth in the preceding paragraph were materially false and misleading when made because the value of the Company's subprime and Alt-A related assets and its Auction Rate Securities had suffered further material deteriorations between December 31, 2007 and March 18, 2008, as evidenced by a February 15, 2008 analyst report from Oppenheimer stating that "the market for almost every mortgage-related security as well as corporate loan has deteriorated enough since [December 31, 2007] to be material" and by the fact that UBS stopped supporting the Auction Rate Securities market on February 14, 2008.

722.    In addition, the 2007 Annual Report failed to disclose, in its recitation of legal risks, that in January 2008, the Company was under investigation by the U.S. Department of Justice in connection with advice and assistance it provided to its U.S. clients in evading U.S. tax laws. In connection with this investigation, UBS closed three Swiss offices that had sold offshore banking services to U.S. clients. Under IAS 37, the fact of this investigation was a contingent liability that UBS was required to disclose and its omission rendered UBS's disclosures false and misleading.

### 26. April 12, 2008 Kurer Interview

723. On April 1, 2008, the Company announced a further $19 billion write down on its subprime and Alt-A exposures. In an article published on April 12, 2008, Peter Kurer, the Company's general counsel and successor to Chairman Marcel Ospel, discussed the Company's write downs to date and its prospects for the future. Regarding the need for future write downs, Kurer stated: "The remaining positions have been written down so much that more value reductions on them even under bad market conditions would mathematically not be as large as before." Kurer further stated: "We've basically got a grip on the UBS-specific problems…I don't think we are any worse positioned than our competitors."

724. The statements set forth in the preceding paragraph are materially false and misleading because UBS continued to conceal the fact that it held as much as $1 billion in worthless auction rate securities on its balance sheet that it had been accumulating since August 2007 and which were known losses by at least February 2008 when UBS had to shut down its auction rate securities market.

## XI. UBS'S AND THE INDIVIDUAL DEFENDANTS' SCIENTER

725. The Individual Defendants and other employees of UBS, specified herein, by virtue of their receipt of information reflecting the improper and fraudulent behavior described above and/or their failure to review information they had a duty to monitor, their actual issuance of and/or control over UBS's materially false and misleading statements, and their association with UBS which made them privy to confidential proprietary information concerning UBS, the IB and DRCM, were active, culpable, and primary participants in the fraudulent scheme and issuance of material misrepresentations alleged herein. The Individual Defendants knew or recklessly disregarded the materially false and misleading nature of the information they caused

to be disseminated to the public.

726. The Individual Defendants and other employees of UBS, specified herein, also knew or recklessly disregarded that the misleading statements and omissions contained in UBS's public statements would adversely affect the integrity of the market for UBS's common stock and would cause the price of UBS's common stock to be artificially inflated. The Individual Defendants and employees of UBS acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiffs and the other members of the Class.

727. The scienter of UBS and the Individual Defendants is supported by the following facts, which are described in detail herein:

a. Defendants were specifically informed that UBS's valuation policies failed to properly value UBS assets and affirmatively concealed these facts from the market;

b. The secret write-downs at DRCM in March and April 2007 of DRCM's positions, and the subsequent efforts to cover up those valuations, evidence that the Defendants knew that their valuations of DRCM's and the IB's RMBS and CDO Holdings were materially overvalued;

c. The Defendants' closure of DRCM and the OIF, claiming only that DRCM's closure was warranted as a result of "operational" problems was a ruse intended to conceal the fact that DRCM had suffered large losses due to a deterioration of its subprime and Alt-A trading positions. To further conceal DRCM's losses, the Defendants paid the outside investor fund a flat 16.5% return on their investments, notwithstanding that those investments actually suffered losses, so as to cover up the outside fund's actual performance to the market;

d. The Defendants were specifically warned of, and recklessly disregarded the fact that, UBS's policy of providing low cost funding to the IB and DRCM was exposing UBS to high levels of illiquid securities;

e. The extensive inquiries into UBS's conduct by various governmental agencies and the institution of lawsuits by third parties as a result of UBS's conduct related to subprime and Alt-A assets;

f. The resignation and termination of key executives and employees involved

258

in and following the revelations of UBS's massive write-downs;

g.    Corroboration by Plaintiffs' Confidential Witnesses confirms that the Individual Defendants and employees within UBS, DRCM and the IB were aware of, *inter alia*, the overvaluation of UBS's RMBS and CDO assets, and the deficiencies in UBS's risk controls and thus, the misrepresentations Defendants issued to the market concerning, among other things, UBS risk management and the value of its subprime and Alt-A assets;

h.    Numerous red flags warning Defendants of the deterioration in value of UBS's RMBS and CDO assets;

i.    Throughout the Class Period, senior UBS executives in the Wealth Management Business counseled UBS clients to evade the tax laws of the jurisdictions in which UBS operated. These activities were knowingly fraudulent and have led to criminal indictments of senior UBS employees; and

j.    By at least August 2007, senior employees with the Municipal Securities Group of the IB, and the divisions Chief Risk Officer, knew that the market for auction rate securities ("ARS") was becoming increasingly illiquid and that UBS was building an inventory of positions in these securities because they were unable to find buyers for these securities. At the same time, these employees knowingly misled potential buyers regarding the liquidity of these securities in a desperate effort to reduce UBS's exposure. Between August 2007 and December 2007, the build-up of ARS reached critical levels, requiring intervention by the GEB. All massive position in ARS was concealed until May 7, 2007 when UBS was forced to write down $974 million in positions. UBS's deceptive practices in selling these securities have exposed it to criminal and civil liability.

A.    **Defendants Were Specifically Informed That UBS's Valuation Methodologies Failed to Properly Value UBS's Subprime and Alt-A Mortgage-Backed Assets**

1.    **A Senior UBS Employee Warned Defendants as Early as 2004 That UBS's Valuation Models for its ABS, CDOs and CDSs Were Improper Causing UBS's Subprime and Alt-A Mortgage-Backed Assets to be Materially Overvalued**

728.    CW 9 worked as a Director of Quantitative Analysis at UBS during the Class Period, until UBS terminated CW 9 for complaining about the inadequacy of risk management

policies at UBS. As a Quantitative Analyst, CW 9's responsibilities included reviewing the methodologies used by UBS to value credit derivatives and structured finance transactions, including ABS, CDOs and CDS.

729. With respect to valuing CDOs, CW 9 stated that UBS's individual trading desks initially developed a methodology to value the assets held by each desk. CW 9 then independently certified whether the valuation methodology developed by the trading desk was correct. CW 9 also was responsible for calculating the risk associated with the security.

730. CW 9 determined as early as 2004 that the methodologies employed to value assets such as CDOs and credit derivatives and assess their risks were not appropriate and led to the over-valuation of UBS's assets. Specifically, CW 9 noted that the methodologies that UBS used to value CDOs were the same ones that were used to value simple bond transactions. According to CW 9 the methodologies applied to simple bond transactions were not well suited for valuing complex CDOs and credit derivatives. For example, CW 9 stated that the VaR calculations, which were aggregated to compute the bank's regulatory capital requirements, did not consider the proper parameters, including credit spread, which is a measure of how the market views the risk of the assets.

731. Despite CW 9's determination, UBS continued to use these methodologies. For example, beginning in the summer of 2004, CW 9 repeatedly told his or her supervisors at UBS (and his or her supervisors' supervisors) that UBS was using an improper methodology for valuing ABS, CDOs and CDSs, significantly overvaluing a portfolio of these assets having a notional value of well over $50 billion. CW 9's complaints were ignored by UBS management. As a result, on June 22 2005, CW 9 wrote a letter to Defendant Wuffli and other GEB members, warning them that UBS's valuation models for ABS, CDOs and CDS materially overvalued a

portfolio with a notional value of well over $50 billion.

732. According to CW 9, as a result of his or her communication to Defendant Wuffli and other Board Members, UBS claimed to commence an internal investigation, during which CW 9 was interviewed several times. Nothing came of the internal investigation, and UBS subsequently moved CW 9 off of his/her then-current assignment. In November 2007, UBS fired CW 9.

733. Subsequently, one of the CDOs that CW 9 claimed was overvalued at the time – North Street-4, is the subject of fraud litigation in the United States District Court for the Southern District of New York.

### 2. A UBS Executive Admitted That UBS Applied Subjective Marks to its CDOs Positions During the Class Period

734. As set forth above, Paramax filed a complaint seeking remuneration for losses accrued under the CDS it entered into with UBS in May 2007. Paramax alleges that a UBS executive, Eric Rothman, assured Paramax that UBS was able to "subjectively" manage its marks so as not to reflect market value fluctuations. Rothman assured Paramax that he would be able to manage the marks because he was responsible for obtaining marks for all of UBS's super senior positions. According to CW 7, Rothman maintained a separate desk on the CDO trading floor for the purpose of purchasing and retaining the super senior tranches originated by CW 7 and the rest of the CDO Group.

735. According to the Paramax Complaint, during a February 22, 2007 telephone call with Paramax, Rothman stated that UBS did not move its marks on its super senior positions more than once a month, therefore failing to properly value the positions in accordance with IFRS and company policy. (Paramax Comp. ¶ 86). Rothman further stated that when UBS did

mark its positions, it did so based on "subjective" evaluations rather than observable market inputs in order to prevent market fluctuations from impacting UBS's marks on its portfolios. (Paramax Comp. ¶ 87). Paramax further alleged that in later correspondence with the hedge fund, Rothman stated that even in a worst case scenario, UBS's would manage its marks such that any movement in the marks "might not be as bad as you'd first think." (Paramax Comp. ¶ 89). Rothman confirmed his representations to Paramax in early July 2007. (Paramax Comp. ¶ 107).

736. Thus, according to the UBS executive (Rothman) who was responsible for marking all of UBS's super senior CDO positions, during the Class Period, UBS (i) did not mark-to-market its super senior positions on a daily basis as required by accounting principles and as UBS represented to the investors; and (ii) subjectively marked its super senior positions so as to avoid "market fluctuations" in contravention of accounting principles and UBS's representations to the market.

737. According to CW 7, UBS was forced to begin taking into account market fluctuations in Q2 2007, even though, however, the market was not aware that UBS would have to take write-downs until October 2007. According to CW 7, UBS began internally downgrading bonds during the summer of 2007 and "was not going to stop" in the future. CW 7 confirmed that prices of some of the subprime backed bonds held by the IB declined in Q2 2007 and again in Q3 2007. CW 7 was responsible for documenting the decisions to write down positions and the related pricing.

### 3. The Preliminary Results of the Secret Internal Audit of DRCM Identified Issues With UBS's Valuation of Subprime Positions

738. As set forth below, the admissions in UBS's Responses to the Ethos and in the

Shareholder Report corroborate the statements of CW 7.

739.    On March 29, 2007, as a result of the write-downs taken at DRCM (discussed *supra*), Defendant Stuerzinger tasked Group Internal Audit "to perform an analytical review of valuation adjustments made in [DRCM's home equity] book, and assess whether further significant valuation risk existed with respect to sub-prime lending activities of the IB and DRCM."  (UBS's Responses to Ethos).   The preliminary results of the review were presented to the GEB Risk Subcommittee, which included at least Defendant Stuerzinger, in April 2007. According to the Shareholder Report, the results of the review "highlighted…valuation uncertainties in both IB and DRCM portfolios" and exposed the fact "that there was no policy in place with respect to either minimal independent price testing coverage or an escalation procedure for substantial positions that could not be independently tested."

740.    With respect to "independent price testing coverage," IB's Business Unit Control reported to UBS's Audit Committee in April 2007 that because of "diminished market liquidity and transparency" in the subprime market in February and March 2007, there had been a substantial reduction in the ability to obtain independent pricing in order to verify traders valuations.  IB's BUC also informed the Audit Committee in April 2007 that: (i) there was "a reduced ability to source external prices to verify trader marks and general increases in the value of untested positions"; (ii) because of "limitations in data, BUC were not in a position to challenge on a timely basis the assertion for valuation purposes of the flat or low risk nature of the retained Super Senior positions"; and (iii) along with other independent internal control units, BUC was aware of "examples where significant manual intervention and reconciliation was required to assess the relevant risk nature [of these assets], or where data was fragmented or insufficiently granular." (Shareholder Report). These issues, according to BUC, were not recent

developments but had plagued UBS for "some time" and were "latent and significant risks" in the way UBS valued and accounted for risk of the subprime-mortgage backed positions. (Shareholder Report).

741.   Despite identifying "latent and significant risks" regarding the valuation of subprime portfolios held by DRCM and the IB in April 2007 and despite the write-downs that occurred at DRCM during Q1 2007, Defendants did not seek to re-value either the DRCM portfolio or the IB portfolio until no earlier than September 2007.

    **B.**    **The Write-Downs at DRCM Provide a Strong Inference of Defendants' Knowledge and Deliberate Disregard That UBS's RMBS and CDO Holdings Were Materially Overvalued During the Class Period**

742.   As alleged above, DRCM and the IB were engaged in substantially the same trading strategies during the Class Period and, thus, held virtually identical types of assets, including CDOs and RMBS backed by subprime and Alt-A mortgages.

743.   Beginning in February 2007, events at DRCM made Defendants further aware that the same type of subprime and Alt-A backed securities held by DRCM and the IB were materially overvalued.  Specifically, hundreds of millions of dollars in undisclosed RMBS and CDO write-downs at DRCM in February, March and April 2007 put Defendants on notice that UBS's multi-billion dollar RMBS and CDO portfolio was overvalued and should have been written at that time.

    **1.**    **The March 2007 Write-Downs**

744.   As set forth above, in March 2007, according to internal sources interviewed by the *Financial Times*, following HSBC's write-downs of sub-prime mortgage-backed assets in February 2007, DRCM management, including Hutchins, set up an experiment to test the value

of sub-prime mortgage-backed securities in DRCM's portfolios. Specifically, Hutchins sold a random selection of securities backed by U.S. residential mortgages that UBS valued at $100 million, for 50 cents on the dollar – a 50% decrease in the stated value.

745. As a result of the experiment, Hutchins personally set about valuing $4 billion of DRCM's subprime mortgage backed positions. Notwithstanding the 50% decrease in stated value that arose from Hutchins' "random" testing, Hutchins' follow-up valuation in March 2007 found that DRCM's subprime-backed positions were overvalued by $204 million – a much smaller, albeit material, 5% decrease. As a result of the findings, DRCM wrote-down its subprime-backed portfolio by $204 million in Q1 2007.

746. CW 1 confirmed that DRCM took write-downs in March 2007, but stated that the write-downs at DRCM actually began in February 2007. CW 1 described the valuation process at DRCM as "mark[ing] your positions to where you can sell them," by obtaining feedback from the market regarding what a particular position was worth and at what price a position could be sold to a third party. According to CW 1, "the market moved" in mid to late February 2007, leading DRCM traders to try to sell subprime-backed RMBS and CDO assets in an effort to determine the proper value of the assets. The traders' findings led to the initial write-downs of mortgage related investments, including ABS and CDO products in February, March and April 2007.

747. CW 1 confirmed that senior management in Zurich was upset that DRCM wrote-down its positions in early 2007 and were unhappy with the resulting losses. According to CW 1, the write-downs at DRCM caused "shockwaves" with UBS senior management, causing them to become more involved with decisions regarding DRCM's operations. As a result, UBS senior management sent in two of its top New York-based IB executives, Ramesh Singh and Ramesh

Chari to ascertain what was happening at DRCM.

748. Notwithstanding that the DRCM assets were reported on UBS's financial statements, UBS never disclosed the nature or scope of the write-downs to investors. In fact, UBS's sole disclosure to investors was that UBS was closing DRCM as a result of "operational issues" and because DRCM suffered CHF 150 million in "losses" in 1Q 2007.

749. Furthermore, Defendants refused to conduct a similar valuation of the remaining DRCM or IB sub-prime or Alt-A related holdings despite the requirement that UBS use such observable market inputs, such as the market prices that DRCM obtained in February and March 2007, to assess the value of its multi-billion dollar "Level 2" asset portfolio. Defendants' refusal to follow applicable accounting rules provides further indicia of scienter as set forth *infra*.

750. According to CW 10, an IT contractor/consultant at DRCM during the Class Period whose job responsibilities included supporting DRCM's general management systems that tracked DRCM's daily trading numbers. Brian Shubert, one of the IT supervisors, told CW 10 in December 2006 and again in January 2007 that DRCM's financial positions as recorded on the general management systems "didn't look good."

751. According to internal sources interviewed by *Bloomberg*, in mid-March 2007, DRCM traders called Defendant Stuerzinger and John Fraser to inform them that they marked down DRCM's portfolio of subprime mortgage backed securities by $50 million. This was corroborated by UBS's admission in the Shareholder Report that DRCM informed Defendant Stuerzinger in mid-March and again in late March of losses at the hedge fund.

752. Because Defendants knew that the stated value of DRCM's RMBS and CDO holdings was materially overstated, Defendants also knew that the IB's virtually identical subprime-related holdings were similarly overvalued, requiring write-downs.

## 2. The April 2007 Write-Downs

753. As set forth above in Section VII.F.3.a, based on internal sources interviewed by the *Wall Street Journal,* in April 2007, after witnessing the rise in subprime mortgage delinquencies, DRCM trader John Niblo sought prices from at least a dozen Wall Street dealers for his $1 billion portfolio of assets backed by subprime mortgages to assess whether their stated value was accurate. Based on the dealers' responses, Niblo marked down the $1 billion portfolio by $20 million. Shortly thereafter, Niblo marked down the portfolio by an additional $75 million due to further market deterioration and illiquidity at the assets' stated values. According to sources of *The Wall Street Journal,* Niblo "priced many of the mortgage-backed securities in the range of 50-80 cents on the dollar, while UBS valued similar securities in the 80s."

754. UBS knew of Niblo's marks-downs as UBS Manhattan-based executives, Ramesh Singh and Ramesh Chari, questioned Niblo at length about the lower valuations and complained to Niblo that his marks were lower than UBS's for similar securities.

755. CW 1, who worked at UBS from 2004 through October 2007, confirmed the involvement of Singh and Chari. According to CW 1, while UBS had authority over DRCM, senior management in Zurich "never got involved as long as [DRCM was] making money." As a result, CW 1 stated that DRCM remained "independent" from UBS senior management until at least the beginning of 2007. In March 2007, in response to the DRCM markdowns, UBS forced its Manhattan-based IB employees to step in and "grill" DRCM management about their valuation methodologies. CW 1 stated that neither the New York-based UBS executives nor UBS senior management had any understanding of the MBS portfolio, CDO structures and the high risks that DRCM needed to take in order to remain "in the game."

267

756. When valuing a CDO, CW 1 stated that s/he would look at a CDO and try to determine its fundamental value based on recent and topical financial indices and current market conditions. CW 1 stated that the IB, by contrast, valued the same or similar investments using out-of-date models that considered only past market events that were not indicative of current market conditions.

757. Soon after his "grilling" from Defendant Singh and Chari, Niblo was put on administrative leave by UBS. When UBS closed DRCM less than one month later, UBS named Singh as the interim chief investment officer of DRCM.

758. Singh's involvement with DRCM was nothing new. According to CW 11, an administrative analyst in the IB during the Class Period who stated that Singh dealt regularly with DRCM. In fact, CW 11 confirmed that as of February 2007, Singh and his assistants maintained offices at both DRCM's headquarters in Stamford and the IB's headquarters in New York City. According to CW 11, in March 2007, Singh moved his office so that he was only working at DRCM in Stamford.

759. As a result of Defendant Hutchins, Chari and Defendant Singh's involvement in the DRCM write-downs, Defendants clearly knew of or recklessly disregarded that the virtually identical assets backed by subprime mortgages on the IB's books were materially overvalued.

### 3. UBS's Secret Audit of DRCM

760. On March 29, 2007, as a result of the losses incurred at DRCM, Defendant Stuerzinger and the Chairman's Office tasked UBS's General Internal Audit "to conduct a special analytical review of valuation adjustments in the DRCM home equity-linked books." The subsequent report, reviewed by the GEB Risk Subcommittee in April 2007, "highlighted that (i) improvements were required in analyzing, measuring and reporting risks inherent in

Subprime-related activities, and (ii) valuation uncertainties in both IB and DRCM portfolios were not sufficiently transparent and inherent risks not adequately analyzed."

761.    Thus, by April 2007, Defendants knew of or recklessly disregarded that the measures in place to analyze and report risks related to subprime mortgage backed securities, as well as valuations for both DRCM and the IB were inadequate.

<strong>C.      The Circumstances Surrounding the Closure of DRCM and the OIF<br>Provide a Strong Inference of Scienter</strong>

762.    Defendants closed DRCM, paid off the OIF investors, and terminated Hutchins and Niblo to conceal their material misstatements to the market regarding UBS's risk management and controls and its inflated valuations of its U.S. residential mortgage-backed securities from the market.

763.    As set forth above, prior to the closure of DRCM, Hutchins acted as the President and, prior to Karl's departure on or about March 15, 2007, as co-chief investment officer of DRCM.  As set forth above, Hutchins sold $100 million in mortgage backed securities for $50 million in March 2007, causing Hutchins to write down a $4 billion portfolio by $204 billion. Moreover, Niblo, despite being confronted by both Singh and Chari, wrote-down his $1 billion portfolio of mortgage backed securities by just under $100 million in April 2007.

764.    UBS announced the closure of DRCM on May 3, 2007 after DRCM sustained a CHF 150 million loss for Q1 2007.  According to Costas, DRCM previously had three straight quarters of positive returns; this was its first loss.  Moreover, CW 12, employed at DRCM and the IB as an underwriter during the Class Period, stated that DRCM's demise was unexpected given that by 1Q 2007, the CRE group appeared to be "making a killing – a ton of money" for DRCM.  UBS's decision to shutter DRCM after its first loss when other parts of DRCM were

269

clearly profitable caught the market completely by surprise.

765. On the same day that DRCM closed, UBS announced Hutchins' termination. Thereafter, UBS placed Niblo on administrative leave and subsequently terminated his employment. After failing to convince Hutchins and Niblo to act in the Defendants' best interests – *i.e.*, choosing to ignore the necessity of write-downs at DRCM on positions that were substantially the same as positions that the IB had on its books – Defendants removed the potential whistleblowers from their jobs and appointed Singh as the interim chief investment officer. Clearly, Defendants trusted Singh to prevent further write-downs at DRCM and cloak the need to write-down the same or substantially the same positions held by the IB.

766. Additionally, by closing DRCM and reintegrating its positions into the IB, Defendants prevented the market from obtaining any further transparency as to value of DRCM's positions going forward, and, as a result, prevented the market from learning of the true value of similar positions held on the IB's books. UBS rebuffed at least one analyst's request for information previously provided by the Company regarding DRCM's positions during an August 14, 2007 conference call. Kian Abouhossein of JP Morgan inquired as to whether there was "any dislocation within the old Dillon Read Capital Management book." The following exchange occurred:

> **ROHNER**: …our positions are now managed on an integrated way, which basically means that we cannot reasonably disclose separate parts of which, of something which is now like an integrated and – which is now a trading book which is managed in an integrated way.

> **ABOUHOSSEIN**: But I mean internally. I'm 100% sure you split it out as portfolio management, so in a way, you could if you would like to.

> **ROHNER**: Well, parts of that are visible but parts of that are not visible. And the question is, if you have a trading desk responsible for two books and they manage the risk in an integrated way, what would be the purpose if you took one

book off if the risk is basically see[n]…for both books together?  That's basically the statement we are making.

767.    Furthermore, by closing DRCM in May 2007, and reassuring the market it was for "operational" issues, Defendants actively concealed the fact that DRCM's losses and closure sparked a wide ranging internal audit that uncovered significant risk control and valuation issues at both DRCM and the IB in March 2007.  By April 2007, Defendants received a preliminary report which concluded that valuations at DRCM and the IB lacked transparency and that risk management issues existed at both DRCM and the IB.  By reintegrating DRCM as they did, Defendants prevented the market from learning the true nature of the losses at DRCM, as well as the true character of the "issues" plaguing the hedge fund, and, as it turns out, the IB.

768.    After removing Defendant Hutchins and Niblo and reintegrating DRCM back into the IB, there was only one group left who could inform the public about the issues at DRCM – the investors in the OIF.  DRCM launched the OIF on November 2, 2006.  By May 3, 2007 – just six months later – UBS closed the OIF.  UBS took the positions held by the OIF onto its books and returned the reported $1.3 billion originally invested, plus a hefty 16.5% return on the investment.

769.    During the May 3, 2007 afternoon analyst conference call, Stefan Stalmann, an analyst for Dresdner Kleinwort inquired as to UBS's decision to take the OIF's positions on its balance sheet:

> **STEFAN STALMANN (DRESDNER KLEINWORT):**  I would have a few follow up questions on the Dillon Read Capital Management situation.  Did I understand it correctly that you are essentially buying out the outside investors out of their positions?  Why would you do that?  Why would you not liquidate these positions at the risk of those outside investors?
>
> **FRASER**: …*Foremost in our mind was to make sure that the interest of the outside investors, the third-party investors was paramount.*  The decision that we

came to was to propose to the outside investor fund board, which we have the power as I described earlier, namely to point cash into the outside investor fund so that we can have *a compulsory redemption process* that should be finished by the 8th of May on the NAVs struck at the end of April. We believe this is in the best interest of the outside investors and the most efficient and expedient way to do it.

(Emphasis added).

770. Thus, UBS admitted that the appeasement of the outside investors – to the determinant of UBS shareholders – was its top priority in closing the OIF so as to buy their silence.

771. At the time of the announcement, the market learned that DRCM proprietary funds recorded a CHF 150 million loss due in part to so-called "legacy" positions (or positions created prior to the transfer of the former-IB units to DRCM's control in June 2006) and the OIF recorded a 16.5% return based positions entered into on behalf of the fund between November 2006 and May 3, 2007.

772. According to UBS, the legacy positions performed more poorly than the newer positions entered into on behalf of the outside investors:

> **STALMANN**: I am also a bit puzzled by the divergence of performance that is apparently there between the money you manage on your own account where you have the prop losses, and the performance of the outside funds which seems to have held up quite well. Why is there this divergence? And is there possibly an indication that there will be losses on the outside money that – can you make this [read] across from your existing positions that have already suffered?

> **FRASER**: …on the diversions of the performance between the outside investor funds and what we called the controlled funds, or the UBS proprietary capital, this is predominantly a reflection of historical positions. Positions that have been built up prior to the launch of the outside investor fund on the 2nd of November 2006. So positioned through '05 and earlier through '06. This is the main reason for it.

> I would add that there is no inherent indicator of losses from that. It was really the assets are going into the Investment Bank for Huw's people to manage going forward. *The last thing we wanted to do in terms of liquidating the outside investor fund was put us in a position where we would put the assets at risk in*

272

*what is a thin market in many cases*….

(Emphasis added)

773.     UBS knew, therefore, that if it sold the positions in the open market, it was likely that it would be unable to give the outside investors a return, let alone a 16.5% return on their investment.

774.     Moreover, UBS admitted in its 2008 Responses to Ethos that the OIF sustained losses on positions in home equity-linked instruments in Q1 2007 just like those suffered by the DRCM proprietary fund.  Given that 2006 and 2007 vintage sub-prime securities performed far worse than older vintage sub-prime securities, UBS's explanation for the disparity between the results of DRCM's proprietary funds and the OIF is implausible.

775.     In truth, investors in the OIF were never entitled to a 16.5% return on their investment.   Even after the OIF sustained losses on home-equity linked positions, UBS purchased those positions at a premium, thereby allowing investors to receive a return on their investment.  Put simply, UBS paid more than the positions were worth and upped its exposure to risky U.S. residential mortgage backed securities just as the market was dislocating to the detriment of UBS shareholders so as to prevent UBS from disclosing OIF-related losses.

### D.     UBS's Failure to Regulate the Extension of Its Low Cost Funding to the IB Throughout the Class Period is Additional Evidence of Scienter

#### 1.     UBS's Funding Policy

776.     UBS's Group Executive Board approved UBS's overall funding arrangements in 2004.  UBS tasked Group Treasury to manage its financial resources and infrastructure.   In 2006, UBS appointed Stephen Keller, the former chief risk officer of the IB, to the position of Group Treasurer.   Keller reported to Standish during the Class Period.   According to the

Shareholder Report, UBS's "Policy on Funds Transfer Pricing Methodology" (the "Funding Policy") "define[d] the conditions under which secured and unsecured cash is transferred between" the various business groups, and under this policy, UBS required the FX/CCT business to quote an internal funding rate for all transactions.

777. Because UBS had access to low-cost funding, as well as access to a centralized treasury, UBS made available "significant funding" to its businesses at a rate that was lower than the LIBOR or London Inter-Bank Offered Rate (the rate that banks are willing to lend to each other) on any given day.

778. During the Class Period, however, while the Funding Policy "ensured that businesses within UBS always received funding at a better rate than market rate," it "failed to differentiate between liquid and illiquid assets or full adjusted funding rates according to the risk of what was being financed." (William Wright and David Rothnie, *Financing Growth And Failing to Risk Manage*, FINANCIAL NEWS ONLINE, May 19, 2008). Specifically, UBS admitted in the Shareholder Report that there no "formal matching requirements between the tenor of the funds provided…and the nature or liquidity of the assets acquired." Additionally, while a UBS business received better pricing if it was purchasing "eligible collateral" or collateral that could be used to secure short term loans from a central bank, UBS did not subject its businesses to higher prices for funding if the business sought to purchase assets that were not eligible collateral.

779. Thus, under UBS's funding model, the CDO desk "enjoyed artificially low funding rates, which encouraged it to pursue higher margin business such as mezzanine CDOs and to hold some CDOs on its books as a profitable carry trade." (*Financing Growth And Failing to Risk Manage*). For example, a super senior CDO tranche may have a very low yield,

but because of UBS's low cost of funding, the tranche would have the thinnest possible positive carry of 20 bps, for example. To that end, the Shareholder Report disclosed, the Funding Policy "made trades more profitable than they would otherwise have been as even investment in instruments generating small yields still were profitable." UBS also admitted in the Shareholder Report "[m]ore demanding internal transfer pricing requirements could have made several cash positions unattractive due to negative carry, which may have resulted in closer scrutiny of the overall carry strategy."

780.    Moreover, by not penalizing the UBS business for using funding to add less liquid positions to the balance sheet, the model did not promote the addition of liquid assets over illiquid assets to UBS's books. Indeed, "[a] number of IB Businesses (including those generating Subprime losses) grew in 2006 by creating portfolios with relatively low returns on assets." Thus, the Funding Model virtually assured the use of UBS funding to build up large illiquid positions on the balance sheet.

### 2.    Defendants Knew or Recklessly Disregarded the Negative Effects of the Funding Policy

781.    Defendants knew or were extremely reckless in not knowing that UBS's Funding Policy allowed the IB to amass $50 billion of super senior CDO tranches from February 2006 through September 2007 on UBS's balance sheet in contravention of the Company's representations that it was avoiding high concentrations of specific illiquid assets.

782.    According to the Shareholder Report, Group Treasury warned Defendants Wuffli, Jenkins, Standish, Stuerzinger and Rohner not once, but twice, of the negative effects of the Funding Policy. They were informed first in late 2006 by Keller and Group Treasury that "top quality collateral was reducing and that asset growth over the past 12 to 18 months was

involving a build up of less liquid assets." Group Treasury also reported to Defendants that the "high level of tradable assets included, amongst other things, the build up in IB's ABS and MBS positions." Thus, by late 2006, Defendants Wuffli, Jenkins, Standish, Stuerzinger and Rohner knew or recklessly disregarded that the Funding Policy enabled and resulted in the build-up of a high concentration of illiquid assets.

783.    According to the Shareholder Report, Group Treasury once again warned Defendants Wuffli, Jenkins, Standish, Stuerzinger and Rohner of the negative effects of the Funding Policy in March 2007, providing additional analysis of their concerns.  Based on their analysis, Group Treasury proposed a hard limit on the IB's illiquid assets and a freeze on the IB's balance sheet.  UBS admits that Wuffli and Jenkins ignored the warning and rejected the proposal.

784.    Having been ignored by Wuffli and Jenkins, Group Treasury informed the Chairman's Office, including Defendant Ospel of its concerns in April 2007, at which time, according to the Shareholder Report, the Chairman's Office expressed concern about the issues with the Funding Policy.   Even though he had been warned in late 2006, and again in March 2007, and no doubt knew of the write-downs at DRCM, Wuffli told the Chairman's Office that he wanted to take a "wait-and-see" approach to these issues and only reconsider a general freeze on illiquid assets and adding to the balance sheet in June/July.  As a result, the Chairman's Office stated that it wanted to be updated again in July/August, at which time it would consider the proposed cap on illiquid assets in the IB.

785.    A May 20, 2008 *Bloomberg* article quoted Wegelin Hummler, one of the ten members of the counsel overseeing the Swiss National Bank as saying that "[t]here was too much leverage, too much warehousing" and "[w]hy was there no one to say 'no' in terms of

allocating capital to this warehouse?"

786.     Thus, Defendants Wuffli, Jenkins, Standish, Stuerzinger and Rohner had knowledge or recklessly disregarded by late 2006 the negative effects of the Funding Policy, including the build up tens of billions of dollars of illiquid assets, but refused to address the issue at that time, or in March 2007 or again in April 2007.

787.     Moreover, Defendants were aware of or recklessly disregarded the negative effects of the Funding Policy as it pertained to the IB even as Defendants implemented restrictions on DRCM's access to UBS's low cost funding.  While DRCM, a UBS business that engaged in the same or substantially the same trading strategies as the IB, tapped into $100 billion funding at UBS's normally low cost, UBS required DRCM to secure up to 80% of the $100 billion via pledge.  Moreover, under UBS's funding guidelines for the hedge fund, DRCM "manage[d] the tenor of their funding and report utilization against agreed guidelines."  As a result, DRCM could not use UBS's funding to amass large illiquid positions without UBS knowing about it.  The Shareholder Report disclosed that "there were no such guidelines or requirements applicable to the IB businesses."

788.     UBS admitted in the Shareholder Report that "a more stringent funding model for the IB could have resulted in different investment decisions by the IB" Division, but IB Senior Management, including Huw Jenkins, rejected such a model because it could "potentially impact[] their growth plans."

789.     In the end, due in part to the unrestricted access to UBS low cost funding, DRCM contributed only 16% of the $18.7 billion in losses for the year ended December 31, 2007, while the IB's trading activities accounted for the other 84% of the losses.

**E.**     **The Government Investigations Launched by U.S. and Swiss Government Agencies Further Evidences Defendants' Scienter**

790.     The investigations launched by the SEC, the U.S. Attorney for the Eastern District of New York, and the Swiss Federal Banking Commission create a strong inference of Defendants' fraud.  Each investigation is examining UBS's failure to correctly value its U.S. mortgage backed securities during the Class Period.

**1.     The SEC Investigation**

791.     In late 2007, the SEC began a probe into whether (i) "financial firms were valuing mortgage-related securities differently on their own books compared to the valuations they applied to the holdings of their customers such as hedge funds"; (ii) "securities firms would price the same or similar mortgage securities at higher prices for their in-house trading desks than for their asset-management groups, for instance, or the repurchase desk, where large slugs of securities are sold on a short term basis"; (iii)  "some of these entities should have been required to be placed back on the books of banks and securities firms earlier"; and (iv) "a firm changed its valuation methodology to one that was more favorable in order to avoid or forestall taking big losses." (Pulliam and Scannell, *Pricing Probes on Wall Street Gather Steam – SEC-Lead Investigations Focus on Public Notice, In-House Discrepancies*, WALL STREET JOURNAL, Dec. 21, 2007).

792.     The SEC began investigating UBS specifically in October 2007, shortly after the publication of the October 12, 2007 *Wall Street Journal* article publicizing Niblo's previously undisclosed write-downs and subsequent termination. According to a February 2, 2008 *Wall Street Journal* article, "the agency is examining, among other things, a situation last year in which a trader at a now-defunct hedge fund of UBS's Dillon Read unit was confronted and

ousted after he valued mortgage securities at prices below the value assigned to the same securities elsewhere at UBS." (*The Subprime Cleanup Intensifies – Did UBS Improperly Book Mortgage Prices?*, THE WALL STREET JOURNAL, Feb. 2, 2008). *The Wall Street Journal* confirmed that the SEC interviewed Niblo in late October 2007 and that the SEC has issued subpoenas to UBS. (*Id.*)

793. On February 2, 2008, *The Wall Street Journal* reported that the SEC had upgraded its probe of UBS into a formal investigation. As of the date of the Complaint, the SEC investigation is ongoing.

794. While the SEC investigation into UBS's valuations is ongoing, the U.S. government indicted and the SEC has brought charges against representatives of one of the banks that is the subject of the same investigation. On June 19, 2008, the SEC filed a civil complaint for securities fraud naming Ralph Cioffi and Matthew Tannin, the former managers of the two Bear Stearns' hedge funds that imploded last summer. The similarities between the SEC complaint against Cioffi and Tannin and the conduct within UBS involving Niblo are striking. *First,* Bear Stearns created the first of the two hedge funds in 2003 in order to keep Cioffi from leaving to start his own hedge fund is akin to UBS's decision to keep Costas at the Company by ceding control to the newly created DRCM in June 2005. *Second*, like DRCM and the IB, the Bear Stearns funds began investing heavily in AAA-rated CDOs backed by subprime and ABS backed by BBB-rated subprime bonds in 2006 in order to take advantage of the larger yields. *Third*, Cioffi and Tannin became increasingly concerned about the subprime-backed securities market throughout February-April 2007 yet continued to amass risky subprime backed assets into Q2 2007. As set forth in detail above, UBS executives, including the Individual Defendants, knew or recklessly disregarded that there were both internal and external indicators

279

demonstrating a deterioration of the subprime-backed securities market. Moreover, as set forth above, UBS admits that despite these concerns, the IB continued to amass the securities through Q2 2007. *Fourth*, even while Cioffi and Tannin expressed concerns internally, they told their investors that the Funds assets were protected and that the Funds were well-placed to profit in the subprime sector. Similarly, as set forth above, UBS executives, including the Individual Defendants, repeatedly reassured the market beginning in May 2007 that UBS's assets were protected and not exposed to the issues in the subprime securities sector.

795. Thus, while the market awaits the results of the UBS investigation, the U.S. Government has made it clear that it believes conduct identical to that detailed herein amounts to securities fraud.

## 2. The U.S. DOJ Investigation

796. On February 2, 2007, *The Wall Street Journal* reported that the U.S. Attorney for the Eastern District of New York was investigating "whether UBS AG mislead investors by booking inflated prices of mortgage bonds it held despite knowledge that the valuations had dropped" bringing, for the first time, the specter of possible criminal prosecutions related to UBS's write-downs. (*The Subprime Cleanup Intensifies – Did UBS Improperly Book Mortgage Prices?*, The Wall Street Journal, Feb. 2, 2008).

797. Additionally, the Department of Justice announced on March 21, 2008 that it is conducting a broad review into the mortgage meltdown to see if there is a "larger criminal story." (Robert Schmidt, *U.S. Weighing Criminal Response to Mortgage Crisis*, Bloomberg News, Mar. 21, 2008).

### 3.   The SFBC Investigation

798.   On December 23, 2007, *Reuters News* reported that Switzerland's federal banking regulator, the SFBC, was investigating how UBS ran up losses in the U.S. subprime mortgage market causing billions of dollars in write-downs, seeking answers as to how the enormous write-downs could arise as well as who was responsible for them.  (Jonathan Lynn, *Swiss Bank Regulator to Probe UBS*, Reuters News, Dec. 23, 2007 at 12:25 pm).  As part of that investigation, the SFBC required UBS to complete an internal investigation into the events surrounding the Company's $18.7 billion write-downs as of December 31, 2007.  UBS completed that investigation and submitted a 400-page report to the SFBC in early April.  On April 18, 2008, due to investor outrage, UBS released a 50 page summary of that report to shareholders.

799.   The SFBC's investigation into UBS broadened significantly in early April, 2008, after UBS announced $19 billion in further write-downs.  According to *The Times,* the SFBC announced that it was "preparing the groundwork for investigation into whether UBS…has breached market disclosure regulations" by "preparing material on behalf of the Swiss Exchange (SWX) and [SEC] ahead of an official investigation."  According to the article, the SFBC decided to expand their investigation to look into whether UBS timely disclosed "price-sensitive announcements" over the last year, including the April 1, 2008 announcement of an additional $19 billion in write-downs.  (McLachlan, *Regulators To Look At Potential UBS Breaches*, THE TIMES, Apr. 7, 2008).

800.   As of the date of the Complaint, the SFBC's investigation of UBS and the events surrounding its $38 billion write-downs.

**F.** **The Termination and Resignation of Key Members of UBS's Senior Management Team and Other Participants in the Fraud is Further Evidence of Defendants' Scienter**

801.    Beginning in March 2007 with the resignation of Karl from DRCM and culminating in Defendant Ospel's resignation as Chairman of UBS's Board on April 23, 2008, UBS terminated and/or caused several key executives involved in the fraud to resign. The suspiciously timed resignations and terminations is further evidence of Defendants' scienter.

802.    The first of these suspicious departures occurred on or about March 15, 2007. Karl, the co-chief investment officer at DRCM, unexpectedly resigned from his position. Karl's departure was well-timed: UBS paid his year-end bonus in late February, he received deferred stock from previous bonuses in early March and he resigned 1.5 months before UBS shuttered DRCM, transferred Defendant Costas and terminated Defendant Hutchins. (*How Arrogance Broke the Dillon Dream*, EUROWEEK, July 27, 2007) At the time of his resignation, speculation in the media and the investment banking community was rampant – why would Karl "step off the gravy train" that was DRCM? (Ian Kerr, *Ken Karl Steps Off the Gravy Train*, EUROWEEK, Mar. 16, 2007). Unbeknownst to the market at the time, DRCM lost confidence in its valuations in March 2007, reporting losses to Defendant Stuerzinger in mid-March and again in late March. Thus, Karl's departure was truly well-timed.

803.    On May 3, 2007, the same day that UBS announced that it had shuttered DRCM and the OIF, UBS terminated Defendant Hutchins, the President and chief investment officer of DRCM. Along with Karl, Hutchins was responsible for DRCM's trading strategies. Moreover, Hutchins' personal valuation of DRCM's books in March 2007 led to $204 million in write-downs. As set forth above, these write-downs provided Defendants with actual knowledge that the IB's positions were materially overvalued. With Hutchins terminated, UBS appointed

282

Defendant Singh, a New York-based UBS executive, to act as interim chief investment officer while UBS reintegrated DRCM's positions onto its balance sheet.

804.    On the same day, UBS removed Costas as CEO of the IB and appointed Suneel Kalami, another New York-based UBS executive to act as interim CEO while UBS reintegrated DRCM's positions onto its balance sheet.  UBS gave Costas, the former chairman and CEO of the IB and Deputy Group CEO, a "senior advisory role" effective June 30, 2007.  Costas eventually left UBS in October 2007.

805.    UBS placed Niblo, the DRCM trader who sparred with New York-based UBS executives Singh and Chari over marks on his $1 billion portfolio of U.S. residential mortgage backed securities, on administrative leave in June 2007.  UBS subsequently terminated Niblo. The *Wall Street Journal* has since confirmed that the SEC interviewed Niblo in October 2007.

806.    Perhaps the most shocking and unexpected termination, however, was the ouster of Defendant Wuffli.  On or about July 5, 2007, the Company's Board of Directors voted to terminate Wuffli, appointing Marcel Rohner as CEO.  Ospel had been grooming Wuffli to take over as Chairman of UBS's board when he retired, possibly as early as the following year.  UBS refused to comment publicly as to why the Board suddenly lost confidence in its CEO. According to media reports, however, UBS terminated Wuffli because of his involvement in the creation of DRCM and authorization of huge compensation packages for Costas, Hutchins and Karl.  Unbeknownst to the market at the time, Wuffli was also involved in the ramping up of the IB and the $100 billion bet made by UBS on U.S. residential mortgage backed securities.

807.    In mid-August 2007, just one day before UBS announced a profit warning for the second half of 2007 because of issues in the U.S., UBS terminated Simon Bunce, its head of Fixed Income, replacing him with Andre Esteves.  As set forth above, the IB's Fixed Income

283

business was responsible for building up UBS's exposure to super senior CDO tranches during the Class Period. As head of Fixed Income, Bunce was responsible for the Rates business, including the CDO desk. An August 13, 2007 *Dow Jones Newswires* article titled "UBS Eyed for Fixed Income Losses After Head Departs", quoted Helvea analyst Peter Thorne as saying that "'[t]he omens are not good for second quarter results,' as UBS suddenly sacked Bunce who was presenting growth plans to analysts and investors as recently as March." Significantly, UBS terminated Bunce just before it gave its first profit warning on August 14, 2007.

808.     On October 1, 2007, in tandem with its announcement that UBS would have a loss for the third quarter and would have to take a $4 billion write-down on assets tied to the U.S. sub-prime mortgage market, the Company announced that Defendant Jenkins, the CEO of the IB was stepping down. As set forth herein, Jenkins either knew by no later than 2007 of the build up of highly risky and illiquid assets backed by U.S. subprime mortgages.

809.     On the same date, UBS further announced that Defendant Standish, the CFO of UBS, was set to step down. As CFO during the Class Period, Standish certified that the Company's statements and financial results were accurate and that UBS had properly designed and implemented internal controls, and as a member of the GEB learned of, but failed to disclose, UBS's subprime exposure.

810.     On October 11, 2007, UBS terminated two other New York-based executives from the IB:   Defendants Martin and Stehli.   Until his termination, Martin ran the Rates business, reporting to Bunce.   Prior to his termination, James Stehli ran UBS's CDO desk, reporting to Defendant Martin. As set forth throughout the Complaint, the Rates business, and specifically the CDO, was the epicenter for the IB's build-up of tens of billions of dollars in risky, illiquid assets backed by U.S. subprime mortgages.

811.    Finally, on April 1, 2008, after announcing a further $19 billion in write-downs (bringing the total to $38 billion in write-downs since October 2007) and the need for a second capital infusion of $15 billion (bringing the total in cash infusions since February 2008 to $17 billion), Marcel Ospel, the Chairman of UBS, announced that he would step down effective April 23, 2008.

812.    The chart below depicts the Company's upper-level management structure as it stood following the terminations and resignations set forth above:



### G.     Confidential Witnesses Confirm UBS's Admitted Lack of Risk Management and Internal Controls During the Class Period

813.    Confidential former employees of UBS, with whom Plaintiffs conferred in preparing this Complaint, provided information confirming that Defendants knowingly issued materially false statements concerning risk management during the Class Period.     The statements of these witnesses were corroborated by the Company's own admissions in the Shareholder Report.

814.    CW 13 stated that "there was no culture of risk management" at FIRC during the Class Period.     CW 13 characterized FIRC's risk management procedures as "comical". According to CW 13, effectuating profitable business transactions, such as the origination of RMBS and CDOs, was paramount to following risk management policies and procedures. Indeed, according to CW 13, bankers and traders often ignored the risk management and credit teams to consummate a deal.

815.    CW 4 agreed, stating that "CDO bankers are not incented from a risk management perspective."   According to CW 4, the only way that CDO bankers were able to add to their yearly compensation was to originate more deals, therefore there was no real incentive in place for CDO bankers to slow their origination of CDOs in order to properly contemplate the risks of entering into an agreement to originate a CDO.   As a result, CW 4 stated that during the Class Period "CDO bankers were pushing to do deals and didn't care about the risk."

816.    UBS confirmed the reports of CW 13 and CW 4 when it admitted that, during the Class Period, the IB was "focused on the maximization of revenue" and that there was a failure by the IB senior management, including at least Defendant Jenkins, to challenge the risks and rewards of the fixed income growth plan.   (Shareholder Report).   UBS further confirmed the

reports of CW 13 and CW 4 when it admitted, for example, that there was a structuring/trading conflict among the Global CDO Group. (Shareholder Report). Specifically, UBS stated that the origination team and the desk that purchased super senior tranches of CDOs that were retained on UBS's books had the same reporting lines. According to UBS, this conflict and the "misincentives regarding investment strategy" were discussed at the GEB Risk Subcommittee meeting in 1Q 2007 but no action was taken at that time.

817. CW 13 explained that when the risk management team would "nix" a deal presented by FIRC traders based on UBS's risk policies, the traders would either finalize the deal in complete disregard for risk management's warnings or "go up the chain" of command for deal approval – the FIRC trader would go to the head of trading and then the head of trading would speak with the head of risk management to have the impediment to the deal removed. CW 13 stated that this was a common occurrence during the Class Period at FIRC, which, as noted above, was responsible in large part for amassing tens of billions of dollars in RMBS and CDOs on UBS's balance sheet.

818. UBS confirmed CW 13's account when it admitted that the Global CDO Group did not seek authorization to source and warehouse collateral for a forthcoming CDO until almost all of the collateral had already been sourced and placed on UBS's balance sheet, thereby exposing UBS to the risks related to the collateral. (Shareholder Report). Because it "would have entailed expensive unwinding of the CDO Warehouse and deal" authorization sought by UBS traders at this juncture was invariably granted. Indeed, UBS admits that no CDO deal was prevented from going forward because the traders involved failed to get the necessary authorization.

819. Former employees confirmed that a similar culture of disregarding risk

management controls existed at DRCM during the Class Period.  For example, according to CW 2 "when it came to actual risk management of business decisions [at DRCM] it was a joke." CW 2 claimed that DRCM traders "were cowboys who would do whatever they wanted."  CW 2 stated that every deal at DRCM would get through the risk management review process because DRCM bullied UBS's risk management personnel, questioning the internal checks and balances meant to properly assess the business transactions proffered for risk management approval.  CW 2 further offered that DRCM traders were able to force approval for the majority of their proposed business transactions, stating that "if risk management raised concerns, they squashed it."

820.    CW 3 stated that in his/her experience, UBS's internal controls were "mediocre to weak."  According to CW 3, colleagues in the IB's due diligence group stated that UBS's due diligence standards were deficient and allowed UBS to accrue a large market exposure to U.S. residential mortgage-backed assets than the Company should have had during the Class Period.  For example, CW 3 stated that the IB's reporting of the Debt-to-Income ("DTI") ratio for each loan purchased by UBS was a prime example of the Company's substandard controls.  Specifically, CW 3 explained that when loans were purchased and pooled in advance of securitization, the DTI ratio for the group was taken and reported.  If, however, the DTI ratio for one loan in the pool was too high, it could throw off the ratio for the entire pool.  If the discrepancy was caught by an analyst and reported to a trader, then the traders were required to "sticker" the document, meaning make disclosures regarding the discrepancy.  Notwithstanding the disclosure requirement, according to CW 3 when a discrepancy was discovered it was just easier to "smooth out the numbers" for any numbers that seemed "odd or weird."  CW 3 further explained that simply ignoring the discrepancies or "smoothing out the numbers" made life

easier for analysts and traders at UBS.  Indeed, if a discrepancy in DTI was identified and UBS notified investors who purchased the bonds as required, the investors would be allowed to "put back the bonds" pursuant to the original disclosures.  According to CW 3, everyone at UBS knew that the practice of smoothing out DTI ratios was done during the Class Period.

821.    CW 3 confirmed CW 13's and CW 2's experiences with traders at UBS, stating that the traders were only worried about pricing and trading bonds resulting from the securitization of loan pools and did not want UBS analysts to catch any discrepancies.

**H.      Defendants Knew of or Recklessly Disregarded Red Flags Indicating That Subprime and Alt-A Mortgage-Backed Securities Were Risky and That UBS's Valuations of These Securities Were Materially Overstated**

822.    Throughout the Class Period, Defendants were aware of, or with extreme recklessness disregarded, information in the market that strongly indicated that subprime mortgage-backed securities were highly illiquid and risky investments.  Despite their knowledge or reckless disregard of this information, described in detail below, Defendants accumulated large concentrations of these risky, illiquid assets in direct contravention of their explicit statements to the market that UBS avoided large concentrations of risky and illiquid assets.

823.    Moreover, these same market indicators were red flags that UBS's valuations of securities backed by subprime loans were materially overvalued during the Class Period.  UBS has admitted that "the value" of its subprime and Alt-A securities "depend[s] on developments in the underlying mortgage pools."  (October 30, 2007 Press Release).  Furthermore, as set forth above, if there was no readily available market price for subprime securities, UBS utilized a model based on observable market inputs such as the ones described below.  Each of the indicators listed below demonstrated that the securities held on UBS's books should have been marked down in 2006, and certainly no later than Q1 2007.

### 1. UBS Analysts Repeatedly Warned the Market of Trouble Ahead In U.S. Residential Mortgage Markets

824. UBS's own analysts repeatedly warned the market of disturbing trends in the sub-prime and Alt-A mortgage market including rising delinquency rates and lower underwriting standards. UBS knew or recklessly disregarded the fact that its own fixed income analysts in 2005 began making statements regarding the demise of the subprime and Alt-A real estate markets and the rise of loan defaults that were adversely affecting the values of all real estate related asset from homes to RMBS to CDOs.

825. The media also cited to and quoted from UBS analysts reports throughout the Class Period, including the following sample excerpts (as early as 2005):

    a.    "In another report issued this month, mortgage strategists at UBS AG called the shift to ARMs and nontraditional mortgage products such as interest-only loans *'symptomatic of...the end of the housing cycle.* The thing that all of these loans have in common is that they allow homeowners to buy a more expensive home than they could have qualified for with a "traditional" loan.'" (Simon, *Concerns Mount About Mortgage Risks – Latest Data Show Move Toward Alternative Loans Is More Pronounced Than Previously Thought*, THE WALL STREET JOURNAL, May 17, 2005) (emphasis added);

    b.    With respect to option ARMs "David Liu, a mortgage strategist for UBS in New York, notes that after similar products were introduced in the red-hot California market in the late 1980s, they ultimately incurred a default rate that was three times as high as conventional mortgages when the local economy went into recession in the early '90s. Already there are signs that current option ARM borrowers are straining to make their monthly payment: *Liu notes that among a bundle of mortgages originated by Washington Mutual and securitized into the secondary market last year, fully 60% of borrowers made only the minimum payment this past March. 'That's definitely a sign that people are stretching,' says Liu.*" (*The Mortgage Trap; Lenders are cranking out an ever-growing array of financing schemes and lowering standards to keep the housing book going*, BUSINESS WEEK ONLINE, June 16, 2005) (emphasis added).

    c.    "As the housing market slows, evidence continues to build that borrowers with less than perfect credit are struggling more this year than one or two years ago...Higher loan defaults and delinquencies are of concern to bond

investors who could face losses if loans are paid off early due to foreclosures…some borrowers with higher credit scores than traditional subprime borrowers - those who qualify for so-called 'Alt-A' loans - are having more difficulty keeping up with payments, noted UBS in a recent report. *As of August, 2006, the rate of delinquencies in subprime loans backing mortgage bonds issued in the first quarter of 2006 reached 4.00%, nearly twice as high as the delinquency rate for subprime bonds issued in the first quarters of 2004 and 2005 at a similar age, said UBS in the report."* (Reed, *Delinquency Rates Higher For 2006 Subprime, Alt-A Loans*, DOW JONES CAPITAL MARKETS REPORT, Oct. 11, 2006) (emphasis added).

d.  *"Delinquency rates have been rising steadily since the middle of 2005. But the trend has accelerated sharply in the past two to three months, according to an analysis by UBS*. The figures don't include loans that lenders were forced to repurchase because the borrower went into default in the first few months; such repurchases also have increased sharply this year. *In October, borrowers were 60 days or more behind in payments on 3.9% of the subprime home loans packaged into mortgage securities this year, UBS says. That's nearly twice the delinquency rate on new subprime loans recorded a year earlier."* (*More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Markets Soared; Now, Delinquencies Mount*, The Wall Street Journal, December 5, 2006) (emphases added); and

e.  UBS's Tom "Zimmerman said the industry has gone from a situation where EPDs [early payment defaults] were 'unusual and unexpected' and less than 1% of securitization packages had loans that were put back to the originator, to where now 6% to 10% of loans in packages are put back. There is a standard loan default curve.  But for the 2005-2006 vintage, the loss trajectory will not come back down, he said.  'EPDs are evidence of loose underwriting during that period.'" (Finkelstein, *Reinventing Subprime*, National Mortgage News, Vol. 31, No. 34, May 21, 2007)

826.   Thus, even while UBS was adding more and more securities backed by subprime and Alt-A mortgages to its balance sheet and failing to properly mark down these assets based on observable market inputs, its own analysts were warning the market that there were severe issues in the quality of the underlying mortgage collateral.

2.     **UBS's "Investor Optimism" Press Releases Warned That Investors Were Concerned With the Developments in the U.S. Residential Mortgage Market**

827. UBS released multiple press releases during the Class Period tracking "investor optimism" through the "index of investor optimism" in conjunction with Gallup. According to the press releases, which were distributed once a month until December 2007, UBS and Gallup conducted a poll to assess investor enthusiasm for the market in general and to identify any specific concerns that investors felt were affecting the market. Based on a review of the press releases, by at least mid-summer 2006, UBS was aware of investors concerns with the U.S. residential mortgage market as well as the market's sentiment that market conditions were only going to get worse throughout 2006 and early 2007.

828. For example, on June 26, 2006, UBS reported that 63% of investors polled by UBS and Gallup expected conditions in the U.S. residential real estate mortgage market to worsen over 2006. In a press release date July 24, 2006, UBS reported that "concerns about the real estate market are strong and growing." On August 28, 2006, UBS noted that "one key issue of growing concern to investors is the residential real estate market," reporting that 70% of investors believed that the conditions in the market would only get worse. By September 25, 2006, 74% of investors thought that the real estate market would get worse and 73% believed that the potential for housing or real estate crunch was affecting the market. This sentiment continued throughout October and November 2006. On December 22, 2006, UBS reported that investors believed that the residential real estate market was "continuing to deteriorate" and that it had "not reached bottom" as of yet. By February 27, 2007, UBS reported that "real estate continu[ed] to weigh heavily on investors minds." Conditions only got worse throughout March-July 2007, with, on average, 70% of investors thought that conditions in the real estate market were getting worse.

829. The statements made by UBS press releases demonstrate that UBS knew of, or with extreme recklessness disregarded, that there were significant concerns in the U.S. residential mortgage market that were adversely affecting their U.S. subprime and Alt-A backed holdings during the Class Period.

### 3. UBS Attempted To Mitigate Losses Associated With Defaulted Loans Beginning in 2006

830. UBS's numerous and repeated requests for mortgage originators to repurchase defaulted loans during 2006 and 2007 was a further red flag to UBS that there was a systematic breakdown in the mortgage market.

831. UBS purchased pools of loans from mortgage originators via agreements that allowed UBS to require the originator to "repurchase" or "buyback" loans where there was an "early payment default" or EPD. Loans were classified as "EPDs" when, for example, the mortgagee failed to make the first three payments on the loan. If UBS discovered that it had EPD loans on its books, it would contact the originator who sold it the loans and request that the originator repurchase those loans. According to complaints filed by UBS in Federal District Court and State Court in New York, UBS began requesting mortgage originators and sellers to repurchase loans that experienced early defaults in January 2006.[3] The same type of loans were the crumbling cornerstone of UBS's $100 billion asset portfolio.

832. These repurchase requests escalated throughout 2006. CW 13 confirmed that by the end of 2006, CW 13's responsibilities shifted from purchasing and securitizing pools of subprime mortgages to "loss mitigation" or seeking repurchase of EPD loans based on the sale agreement's representations and warranties. As subprime originators started to have financial

difficulties, and some went bankrupt towards the end of 2006, CW 13 explained that it became a race for UBS to get its buy-back claims to the subprime originators before the subprime originators could no longer satisfy the repurchase requests.

833. At times, UBS was unsuccessful in enforcing the repurchase requests and sought court intervention. In May 2007 and again in June and August 2007, UBS filed suit against Fairmont Funding, Ltd., (March 6, 2007),[4] Silver State Financial Services (May 10, 2007),[5] County Trust Mortgage Bankers (May 10, 2007),[6] American Fidelity Mortgage (May 10, 2007), Lancaster Mortgage Bankers (June 5, 2007)[7] and Meridian Residential Capital (August 22, 2007).[8] UBS also sought repurchase of loans that had experienced early payment defaults from two recently bankrupted subprime mortgage originators, New Century and American Home Mortgage Corporation in 3Q 2007. All told, UBS sought damages of at least $44 million as a result of the Company's attempts to practice loss mitigation in 2006 and 2007.

834. The up tick in repurchase request caused many mortgage originators to go out of business beginning as early as April 2006, and continuing throughout 2006 and 2007. Indeed, the amount of reserve capital that subprime mortgage originators had to keep on hand in order to satisfy repurchase requests grew throughout 2006 according to the SEC filings of the public companies that had subprime mortgage origination units. This caused many mortgage originators to close their operations.

---

[3] *See UBS Real Estate Sec., Inc. v. Am. Fidelity Mortgage Corp.*, No. 07 Civ. 3701 (RJH) (S.D.N.Y.) filed May 10, 2007.
[4] *See UBS Real Estate Sec., Inc. v. Fairmont Funding, Ltd*, No. 600698/07 (N.Y. Super.) filed March 6, 2007.
[5] *See UBS Real Estate Sec., Inc. v. Silver State Fin. Servs. Inc.*, No. 07 Civ. 3702 (MGC) (S.D.N.Y.) filed May 10, 2007.
[6] *See UBS Real Estate Sec., Inc. v. County Trust Mortgage Bankers Corp.*, No. 07 Civ. 3700 (SAS) (S.D.N.Y.) filed May 10, 2007.
[7] *See UBS Real Estate Sec., Inc. v. Lancaster Mortgage Brokers, LLC*, No. 07 Civ. 4815 (AKH) (S.D.N.Y.) filed June 5, 2007.
[8] *See UBS Real Estate Sec. Inc. v. Meridian Residential Capital LLC*, No. 650246/07 (N.Y.) filed August 22, 2007.

835.     Thus, UBS's own repurchase requests, "loss mitigation" attempts described by CW 13, and the failure of subprime originators were further red flags alerting Defendants that the subprime mortgage market was on the verge of collapse, causing the securities backed by subprime loans to be more risky and harder to value throughout the Class Period.

### 4.     Mortgage Market Indices Indicated Severe Downturn in the Subprime Sector Beginning in Q4 2005

836.     In the final quarter of 2005, several U.S. real estate and mortgage market indicators began to turn downward, suggesting that the anticipated market slowdown had begun. After hovering around 2.40% for the better part of a year, the Office of Federal Housing Enterprise Oversight ("OFHEO") Housing Price Index ("HPI") dropped to 2.25%, suggesting a deceleration in the rate of housing price growth.  In addition, the national delinquency rate rose substantially during this quarter to 4.70%, 26 basis points higher than the previous quarter and 32 basis points higher than the fourth quarter of 2004.  Moreover, the prime rate increased half a percentage point during the quarter, moving from 6.75% in September to 7.25% by mid-December.

837.     By the end of the first quarter of 2006, further signs of a slowdown in the U.S. mortgage market began to surface.  The HPI showed that the quarterly appreciation in home prices had once again slowed dramatically, falling to 1.59% from 2.25%.  In reacting to the decrease, OFHEO Director James Lockhart stated that it was evident that price growth was moderating, in part because of increased demand and higher interest rates.  During the first quarter, the prime interest rate increased by 0.50%, rising from 7.25% in December of 2005 to 7.75% by March 28, 2006.

838.    By the second quarter, the slowdown had become much more palpable.   The mortgage delinquency rate rose slightly year-over-year, with subprime delinquencies rising 20 basis points over its first quarter figures to 11.70%.   Moreover, the foreclosure rate also rose one basis point to 0.99% in the second quarter.   Again, the HPI level fell considerably, with quarterly home appreciation falling from 1.59% to 0.99%.   Lockhart said this drop represented "a strong indication that the housing market is cooling in a very significant way."   In addition, interest rates continued to increase during the second quarter, with the prime rate rising a full percentage point to 8.25% by June of 2006.

839.    In the third quarter, the national delinquency rate rose 28 basis points, and 23 basis points year-over year.   The subprime delinquency rate increased a startling 86 basis points during the third quarter to 12.56%, while the national foreclosure rate rose 6 basis points to 1.05%.   Moreover, while the prime interest rate remained steady at 8.25%, the HPI showed further deceleration in quarterly housing price appreciation, with appreciation levels dropping 50%, from 0.99% to 0.55%.   According to Lockhart, the third quarter figures "confirm last quarter's data that the housing market is in a decidedly different stage" and "provide[] more evidence that the long-forecasted national deceleration in housing prices is occurring."

840.    While the quarterly house price appreciation rate rose from 0.55% to 0.90% in the fourth quarter of 2006, the remaining mortgage market variables continued to deteriorate. Interest rates remained at 8.25%, while the national delinquency rate once again increased 28 basis points, and 25 basis points year-over-year.   The subprime delinquency rate increased at a much higher rate than the national average, rising 75 basis points to 13.33%.   The foreclosure rate also rose steeply, increasing 14 basis points and 20 basis points year-over-year to 1.19%.

Mortgage Bankers Association's Chief Economist Doug Duncan stated the following in response to the fourth quarter delinquency and foreclosure data:

> As we had expected, in the fourth quarter, delinquency rates again increased across the board. Increases in delinquency and foreclosure rates were noticeably larger for subprime loans. Subprime borrowers are more likely to be susceptible to the cumulative increases in interest rates that we have experienced and the resultant nationwide slowing of home price appreciation including outright declines in some markets. The significant increases in delinquency rates has in some cases led to unexpected increases in credit losses and the failures of some subprime specialist firms. Credit spreads on lower-rated tranches of subprime securities widened appreciably over the quarter as investors demanded a higher return for exposure to this credit risk. As we have noted before and as recent events have made clear, market discipline in this industry is swift, can be severe, and is more effective at changing lending practices than any potential changes in regulation.

841. The deterioration of mortgage market indicators continued into 2007, with the foreclosure rate rising another 9 basis points over the fourth quarter 2006, and a startling 30 basis points year-over-year to 1.28%. The number of foreclosures instituted during this quarter was the highest in the history of the Mortgage Bankers Association's survey. While the delinquency rate dropped 11 basis points over the fourth quarter, the rate was still 43 basis points higher than the first quarter of 2006, with subprime delinquencies rising 44 basis points to 13.77%. The HPI continued to show a deceleration in housing price appreciation, falling to 0.83% on a quarterly basis.

842. The slow down in the real estate and mortgage markets continued in the second quarter of 2007. The foreclosure rate jumped to 1.40%, 12 basis points over the first quarter and 41 basis points over the second quarter of 2006. The number of foreclosures started during this quarter eclipsed the all-time record set in the first quarter of 2007. The national delinquency rate rose 28 additional basis points to 5.12%, an increase of over 70 basis points

year-over-year, with subprime delinquencies skyrocketing 102 basis points to 14.82%. The HPI fell significantly in this quarter as well, dropping from 0.83% to 0.53%. The prime rate remained steady during the second quarter at 8.25%.

843.   During this quarter, UBS admits that certain managers and business units were offering a relatively pessimistic view of the U.S. subprime mortgage market. Nevertheless, as these indicators continued to illustrate the rapid deterioration of the real estate and mortgage markets, the IB CDO Desk acquired a substantial quantity of BBB-rated RMBS backed by subprime mortgages.

844.   In 3Q 2007, the HPI declined again, falling from 0.53% to -0.34%, representing the first time in nearly thirteen years where U.S. home prices experienced a quarterly decline. Foreclosure and delinquency rates also deteriorated, with foreclosures rising 29 basis points to 1.69% (a 64 basis point increase year-over-year), and delinquencies increasing 47 basis points to 5.59% (a 92 basis point increase year-over-year). Subprime mortgages continued to deteriorate at a historic pace, with the delinquency rate rising 149 basis points to 16.31%. For the first time in over a year, the prime rate was decreased on September 18, 2007 to 7.75%.

845.   In the final quarter of 2007, all major indicators experienced further deterioration. The foreclosure rate eclipsed 2%, rising 35 basis points over the third quarter and 85 basis points year-over year. The national delinquency rate rose 23 basis points over the third quarter and 87 basis points over the fourth quarter of 2006 to 5.82%. The subprime delinquency rate spiked another 100 basis points to 17.31%, while the HPI showed that housing prices fell by an average of 1.29% in the fourth quarter. OFHEO Director Lockart noted that 2007 "showed the first four-quarter decline in the purchase-only index since its earliest data in 1991." Further, Chief Economist Patrick Lawler warned that the worst was not over, stating that "[w]hile

declines are significant and quite large in some areas, the market still needs to work through its overhang of unsold inventory." In response to the market downturn, the prime rate fell an additional 0.5% during the fourth quarter to 7.25%.

## I. Confidential Witnesses Confirm UBS's Knowledge of Problems in the Subprime Mortgage Market

846. Confidential former employees of UBS universally represented that UBS was aware of the issues in the subprime and Alt-A mortgage markets, including but not limited to worsening underwriting standards and increasing loan delinquency rates, beginning at the end of 2006.

847. CW 6 explained that, in late 2006, "the tide began to turn" in the subprime mortgage market and that in response, UBS started to limit its subprime exposure and subprime business. According to CW 6, there was "considerable slowing" and "performance was deteriorating" in the subprime mortgage sector in 2006. As a result, CW 6 was moved from the residential subprime mortgage group, which was responsible for purchasing pools of loans and securitizing them, to the institutional sales group, which was responsible for working with clients and trading bonds on the secondary market, in late 2006 early 2007 in order "to protect" CW 6 from imminent layoffs in the subprime group. CW 6 further explained, however, that while UBS limited its exposure to subprime mortgages themselves, UBS continued to take on more risk with CDOs in 2007 by sourcing BBB and BB bonds off subprime deals for use as Mezzanine CDO collateral.

848. According to CW 13, who, as part of his/her employment in the IB purchased subprime mortgages, packaged them and sold the resulting bonds to investors, UBS experienced the effects of the downturn in the subprime mortgage market *in late 2006 when investors*

299

***willing to purchase bonds backed by subprime collateral all but disappeared.*** Additionally, by Q4 2006, CW 13 stated, UBS "knew that [the mortgage market] was going south" because interest rates were going up and the home prices were not appreciating, necessarily leading to increased loan defaults.

849. Moreover, CW 13 further stated that Mike Boyle ("Boyle"), another trader who, like CW 13, specialized in the purchase of subprime loan pools and securitizing them into bonds, raised several "red flags" or concerns to the managing directors of the ABS Group, including Defendant Martin, regarding the subprime mortgage market beginning in Q4 2006. Specifically, Boyle made statements at weekly meetings attended by managing directors of the ABS Group, including Defendant Martin, that the "sky is falling," the subprime mortgage market was turning and the ABS Group was having trouble selling subprime MBS. As a result of his concerns, Boyle stopped buying subprime mortgages in 1Q 2007. Fellow traders, however, continued to purchase pools of subprime mortgages. According to CW 13, senior management in the ABS Group, including Defendant Martin, were well aware of Boyle's warnings, yet did nothing.

850. Additionally, CW 5, a Transaction Manager dealing exclusively in the purchase of pools of Alt-A loans, stated that the high default rate on Alt-A loans became "very noticeable" at the end of 2006. Additionally, by March 2007, according to CW 5, "volume was down and what loans were out there were starting to default." CW 5 stated that by March 2007 the default rate on Alt-A loans had doubled. CW 5's statements are corroborated by a contemporaneous news article appearing in the *Wall Street Journal* on March 1, 2007, which states, in part: ***"Data from UBS AG [analysts] show that the [market] default rate for Alt-A mortgages had doubled in the past 14 months. 'The credit deterioration has been almost***

*parallel to what's been happening in the subprime market,' says UBS mortgage analyst David Liu."* (*Mortgage Default Starts to Spread*, Wall Street Journal, Mar, 1, 2007) (Emphasis added).

851. According to CW 7, in response to higher loan default rates and mortgage originator bankruptcies in early 2007, UBS began to advise its employees to "cut off" originators, meaning that UBS told its employees to stop acquiring subprime and Alt-A loans from certain mortgage originators.

852. CW 7 further confirmed that Defendant Stehli and CW 7's immediate bosses, Lirenn Tsai and Robert Morelli were aware of the risky nature of the IB's CDO holdings during the Class Period. Specifically, CW 7 was responsible for compiling statistics on collateral for a new CDO project in the Global CDO Group in New York. According to CW 7, based on the statistics that UBS compiled, "there were so many subprimes going into those deals," and on average 62% of the mortgages that backed the collateral were no documentation or "no-doc" loans where there was no paperwork to substantiate a consumer's salary declaration. CW 7 also gathered information regarding where the underlying loans were originated because the more mortgages from lower income regions, the more likely the collateral would experience defaults. According to CW 7, even though the majority of the CDOs originated by UBS were comprised of subprime mortgages that came with little or no documentation and were often backed by loans originated in high-risk regions of the U.S., "nobody seemed to question this." CW 7 confirmed that Defendant Stehli had access to the statistical data CW 7 compiled. Moreover, CW 7 confirmed that during the Class Period, CW 7 provided the foregoing information to Defendant Stehli, and Stehli had unlimited access to the information.

853. According to CW 14, a director in the IB during the Class Period whose job responsibilities included managing other underwriters, UBS knew of the increase in subprime

loan defaults in early 2007. In fact, UBS's knowledge of increases in defaults in the U.S. residential mortgage market led it to tighten underwriting policies at UBS Home Finance in March 2007. UBS Home Finance originated prime and Alt-A mortgages, beginning in January 2006 until it was shut down by UBS in November 2007.

854. According to CW 4, in 2005 there was a shift towards using the cheapest possible collateral to originate CDOs, which meant that UBS and other banks were originating CDOs backed solely by subprime loans. Without diversification, the CDOs originated in 2005, 2006 and 2007 were riskier than their 2004 counterparts because they were far more exposed to the subprime market. CW 4 stated that it was well known at UBS that the CDOs on its books were heavily backed by subprime mortgages.

## 1. UBS Analysts Repeatedly Warned the Market of Liquidity and Valuation Concerns in the RMBS and CDO Market

855. UBS's own analysts repeatedly warned the market of issues with warehousing mezzanine RMBS backed by subprime and Alt-A mortgages and retaining tranches of Mezzanine CDOs, as well as the severe drops in the ABX Index (as set forth above), beginning in September 2006. Defendants recklessly disregarded their colleagues' warnings.

856. For example, on November 21, 2006, UBS analysts held a conference call titled "How Bad is Subprime Collateral?" During the call, Tom Zimmerman ("Zimmerman"), the Head of ABS research at UBS and David Liu ("Liu"), the Head of Mortgage Credit Research at UBS "discussed how much higher loan delinquencies and foreclosures [were] for 2006 subprime loans compared with similar subprime loans from earlier years – the result of deteriorating underwriting quality from lenders combined with a slower housing market." (Reed, *UBS: 2006 Subprime Loan Performance Surprisingly Bad*, DOW JONES NEWSWIRES, Nov. 21, 2006).

According to the *Dow Jones Newswires*, the conference call included the following statements by UBS analysts:

a. Zimmerman stated that while it was "'not a secret that subprime collateral ha[d] performed pretty disastrously so far,'… 'I must say we were a bit surprised by the magnitude with which' the loans 'deteriorated this year.";

b. Liu concurred with Zimmerman's assessment noting that "'[a] lot of deals are performing badly'" citing the recent downgrade warnings related to class of subprime-backed bonds originated by Fremont Investment & Loan. According to Liu, "the rate of subprime loan delinquencies of 60 days or more…has climbed to about 8.00%, up from about 4.5% a year ago.";

c. According to UBS research, "[t]hese 60-day plus delinquencies jumped up fairly sharply in the past few months, to 3.63% for the loans in October, up from 2.95% in September and 1.62% in July.";

d. Liu also reported during the conference call that "not only have delinquencies risen faster in 2006 than in earlier years…but 2006 loans have entered the foreclosure process faster. In October 2006, the foreclosure rate was about 2.0%, while a year earlier it was 1.00%."; and

e. Liu further reported that "[w]ith home price appreciation slowing and interest rates higher than they were in prior years, the opportunities for subprime borrowers to refinance their loans are also decreasing."

857. In a December 2006 report titled "Alt-A Credit – The Other Shoe Drops?" published in LoanPerformance's *The Market Pulse*, Liu and Shumin Li ("Li"), Director, UBS Prepayment Research make the following statements:

a. "***[T]he structured finance community has been fixated with the dramatic credit deterioration in the past 6 months***…[in the] subprime sectors" noting that "subprime is the first sector where performance worsening was spotted." (emphasis added);

b. Liu and Li further reported that "***non-Agency credit performance has taken a dramatic turn for the worse since Q3 2005***…[in] the lower end of the credit spectrum" *i.e.,* subprime and Alt-A mortgages. According to Liu and Li, "***delinquency rates on subprime and Alt-A mortgages have roughly doubled in the past year***", i.e., since December 2005 "and show no signs of moderation." (emphases added); and

303

c.     With respect to Alt-A mortgages, Liu and Li warned that "the 2006 vintage Alt-A is on track to be one of the worst vintages in recent years (alongside the 2000 and 2001 vintages)."

858.    During the same period, the media often quoted UBS analysts' statements and reports regarding negative developments in the subprime mortgage-backed securities market:

a.     "U.S. medium-term interest rate swaps were wider Friday amid better paying against mortgage-backed securities, rate locks and amid concerns about not only sub-prime but also Alt-A lenders, sources said…Swap spreads opened up wider amid growing chatter in the Treasury market about the spreading problems in lower grade MBS products. This includes not only sub-prime issues which cropped up last week, but more recently in the Alt-A sector…. *'These creeping concerns are almost certainly behind at least some of the recent bid for Treasury paper from domestic and international investors,' according to fixed-income research at UBS.* Late Thursday S&P announced it will take a more aggressive approach to rating residential mortgage loans. They also said they have placed 11 residential mortgage-backed securities that were issued in 2006 on notice for possible downgrade. *These securities include one Alt-A deal from 2006, which raised 'eyebrows among many,' UBS said."* (Andres, <u>US Swaps: Spreads Widen on Payers vs MBS, Rate Locks, Alt-As</u>, The Main Wire, Feb. 16, 2007 at 11:54am) (emphases added);

b.     "Profit warnings from mortgage lenders are hardly surprising at this point, but American Home Mortgage Investment Corp.'s warning last week stood out…[because] the crop of loans it said investors had pushed back were not subprime, but alternative A. And the loans were of 2007 vintage, meaning they were underwritten after last year's crop, which has produced most of the industry's pain….Thomas Zimmerman, the head of asset-backed securities research at UBS AG, said Thursday on a conference call sponsored by the newsletter Inside Mortgage Finance that during the first five months of this year, *'we've seen…a deterioration of the total credit picture' in the alt-A market. 'I think we are seeing a delayed reaction' to the deterioration in the subprime sector 'in other parts of the market, so we're going to see increased difficulty on the part of alt-A issuers in the next year….'"* (Terris & Berry, *Warning Puts Alt-A Loans in Spotlight*, American Banker, July 2, 2007) (emphasis added);

c.     "As the implosion of the subprime mortgage market spread unexpectedly last month to wider credit markets, Laurie Goodman, global co-head of fixed income research for UBS, hastily assembled a conference titled 'Sifting Through the Rubble.' The New York meeting attracted 120

investors with 473 more listening via telephone. Her focus then – and for the foreseeable future – has been to help clients figure out 'how to tell the good investments from the bad,' she says. ***That is an issue Goodman has been discussing with greater urgency since November, when UBS's 11-member structured products research squad started sounding the alarm about an impending crisis in the US housing market.*** (Abramowitz, *The 2007 All-America Fixed-Income Research Team*, Institutional Investor, Sept. 2007) (emphasis added); and

d.    "An analysis prepared for the [WSJ] by UBS AG shows that 3.55 percent of option ARMs originated by Countrywide in 2006 and packaged into securities sold to investors are at least 60 days past due. That compares with an average option-ARM delinquency rate of 2.56 percent for the industry as a whole and is the highest of the six companies analyzed by UBS….at Countrywide, 'they were giving these loans to riskier and riskier borrowers,' says UBS analyst Shumin Li." (Simon, *Countrywide Faces New 'Option ARM' Scare*, AP, Oct. 24, 2007)

859.    UBS analysts also made a prodigious amount of statements concerning U.S. MBS in the Global Fixed Income Research Group's signature publication, *CDO Insight*. Significantly, during the Class Period, *CDO Insights* lists Defendant Stehli and Lirenn Tsai in Manhattan, N.Y. and Ji-mei Ma and Fred Engel in Stamford, CT as "Cash CDO Business Contacts," meaning that the Fixed Income Group derived information regarding the Cash CDO Business that is reflected in the issues of *CDO Insight* from these individuals. UBS analysts made the following statements in the *CDO Insight* issues published during 2007:

a.    "[F]uture issuance of HG ["High Grade"] and mezz SF ["Structured Finance"] CDOs are vulnerable to concerns about subprime mortgage securities: Mezz CDOs because they invest directly in subprime securities and HG CDOs because they have a large exposure to mezz CDOs." (Jan. 2, 2007);

b.    "[C]oncern about subprime mortgage credit has pushed out the BBB and A spreads of mezz ABS CDOs 40 and 55 bps, respectively, over the last seven weeks." (Jan. 17, 2007);

c.    "The main topic of conversation is subprime mortgage credit and spreads. The 06-2 ABX BBB index rose from 240 to 360 bps over the month and A and BBB mezz ABS CDOs widened 70 bps." (Feb. 1, 2007);

d.  "Mark-to-market losses on several CDO warehouses caused some underwriters to downsize deals, or issue deals in a less ramped up state, or even liquidate the collateral." (Feb. 27, 2007);

e.  "Super senior liquidity remains poor and some ABS CDO managers await the arrival of more credit worthy 2007 subprime mortgage issuance before reentering the market." (Apr. 12, 2007);

f.  "Another unique aspect of 2007 downgrades is how recently some of the downgraded mortgage bonds were issued. Only one mortgage bond downgraded in 2006 had been issued the previous year. All other mortgage bonds downgraded in 2006 had been issued in 2004 and before. But among year-to-date 2007 downgrades, 566 mortgage bonds were issued in 2006. In fact, eight downgraded mortgage bonds were both issued and downgraded in 2007! In total, 66% of all mortgage bonds downgraded in 2007 were issued in 2006 and 2007. Many of the mortgage bonds downgraded so quickly are second lien securitizations, whose losses tend to be more front-loaded than first lien securitizations. But most downgraded bonds are first lien securitizations." (July 11, 2007);

g.  "[W]e discount the effect of [interest] rate reduction will have on ABS and ABS CDOs in particular, since the issues plaguing these securities have little to do with the cost of capital. Rather, ABS and ABS CDO investors are grappling with more fundamental problems of credit quality and market valuation. With respect to credit quality, it seems the only parties left doubting the overall severity of the subprime disaster are, improbably, found among the credit rating agencies." (Oct. 3, 2007); and

h.  "Our view of ABS CDO credit is decidedly more pessimistic. In the following article, we predict that 16% of senior AAA tranches from 2006-7 vintage mezzanine ABS CDOs will default." (*Id.*).

860.  The January 17, 2007 *CDO Insight* also contained an article titled "The Bad and the Ugly in Mezz ABS CDO Portfolios." This article was significant because a large portion of UBS's CDO holdings were Mezzanine ABS CDO tranches. In the article, UBS analysts made the following statements:

a.  "Unless you have been living under a rock of the past few months, you've heard negative news about the subprime mortgage market. From elevated loan delinquencies to originator bankruptcies, dreadful news has been in good supply.";

b.  "In previous articles by our sister publication, the *Mortgage Strategist*, UBS' mortgage research team discussed the accelerating credit deterioration of newer vintage loan collateral originated in 2006. Data continues to show the fast deterioration of newer vintage loan collateral. In fact, delinquencies in 2006-vintage subprime loan collateral are higher than on any predecessor vintage at comparable seasoning.";

c.  "The 2006 vintage is one of the worst in recent years; on par with, if not worse than, the 2000 vintage, which had been the worst performing vintage of the past ten years. Since the 60+ day delinquency rate is a widely used predicator of subprime loan collateral losses, it seems that the 2006 vintage is headed for higher losses than have been seen in a while. And if the underlying loan collateral is likely to have higher losses, it's reasonable to be concerned about future performance of 2006-vintage subprime mezzanine bonds.";

d.  "The subprime loan originator is an important driver of subprime credit performance. Originators' underwriting loan standards heavily influence the default and loss performance of subprime loan collateral, and hence the performance of subprime mezzanine bonds…In general, the concentration of underperforming subprime originators in mezz ABS CDOs has increased over time. This trend is likely a function of a CDO manager's ability to source collateral. Given the general market demand for subprime bonds, it has been increasingly difficult to source better bonds from originators (both cash and synthetic). Therefore, it is possible that CDO managers have been forced to knowingly purchase larger quantities of bonds from bad originators to fully ramp their CDOs.";

e.  "[T]he troublesome originators we singled out in our analysis[9] have consistently underperformed the market over a relatively long timeframe (five years). Therefore, we maintain that mezz ABS CDOs that include high concentrations of bonds issued by these originators warrant extra scrutiny by investors.";

f.  "[L]ate-2005 loan collateral is only marginally better than 2006 loan collateral, if at all. Thus, we maintain that overall, 2006-vintage subprime bonds are more troubling than previous vintages.";

g.  "[O]ur mortgage research team recently compared the collateral characteristics of subprime loan pools originated in the first half of 2006

---

[9] The originators included: Asset Backed Securities Corp; AEGIS SRL; Bear Stearns Asset Backed Securities; GSAMP Trust; Home Equity Asset Trust; Morgan Stanley ABS Capital; Park Place Securities; Peoples Choice Home Loan Securities; Renaissance Home Equity Loan Trust; and Structured Asset Investment Loan Trust. Fremont Home Loan Trust was also included in UBS's assessment.

versus the third quarter of 2006, and found no sign that underwriting standards that lead to the poor performance of deals from the first half of 2006 have been tightened.";

h.     "Currently, it looks as though most of the favorable credit factors have run their course, and the consumer credit environment is expected to become more adverse.  So not only is it likely that the credit performance of subprime loan collateral will continue to worsen as time goes by, but it is also likely that losses will be more severe, depending in large part on HPA."; and

i.     "[T]he credit behavior of subprime deals is fairly volatile, and once this volatility is factored in, the likelihood of BBB subprime bonds getting hit increases."

861.    The October 3, 2007 issue of *CDO Insights* contained an article titled "ABS CDO Collateral Losses Version 3.0" which predicted losses within ABS CDO portfolios.  UBS analysts stated, in part:

a.     "Collateral losses will affect the very top of ABS CDO capital structure. We predict that 16% of senior AAA tranches from 2006-7 vintage mezzanine ABS CDOs will default.  Among BBB tranches, we predict 94% will default, up from 85% we predicted in August.  Any of these figures is horrific from a ratings and risk management point of view; and as we have said, *the greatest ratings and credit risk management failure ever.*" (emphasis in original);

b.     "Losses on mortgage loans underlying bonds owned by ABS CDOs vary greatly in vintage.  Subprime loans originated 2006-7 will have twice the losses of subprime loans originated in 2005.  The effect is multiplied at the mortgage bond level.  2006 subprime mortgage bonds in the CDOs we study will have three time the losses of 2005 subprime mortgage bonds."; and

c.     "The results of our tranche by tranche analysis are depressing from a credit standpoint.  Subprime mortgage bonds and ABS CDOs are the biggest credit and risk management failure ever."

862.    UBS employees also raised red flags -- that went unheeded by Defendants -- concerning the need to properly value CDO positions like the tens of billions of positions held by UBS.  For example, in a June 26, 2007 conference call hosted by UBS Fixed Income

Research for CDO investors titled "CDO and ABX Spread Conditions," Keith Grimaldi, a managing director at UBS, stated that an important consideration for holders of CDOs is "really a working out of **what the fundamental value of the collateral in these CDOs is worth**, and consequently what the fundamental value of tranches of the CDOs themselves that Bear Stearns and others have invested in are worth, and what the ultimate terminal value is going to be." (emphasis added). Grimaldi noted "four or five elements to the valuation of these securities…any one of which could greatly affect the value of the underlying security" are (i) interest rates; (ii) losses and the timing of losses; (iii) downgrades in the underlying collateral; and (iv) manager reactions.

863.    Notwithstanding the facts that (i) UBS's own employees represented that valuing the collateral underlying a CDO is fundamental to assessing the value of a CDO, and (ii) the head of UBS's CDO desk was listed as a contact on the *CDO Insight* publications containing that representation, UBS did not employ this type of model and did little to assess the value of the RMBS and subprime loans underlying its CDO positions until September 2007 and ignored valuations performed in February – April 2007 at DRCM. Moreover, as explained in more detail *infra*, because UBS's MBS and CDO holdings were "Level 2" assets, UBS was required to consider the DRCM valuation from early 2007 and use a model such as the one described by Grimaldi during the June 2007 conference call.

864.    Thus, as a result of its own analysts' publications throughout 2007, UBS knew or recklessly disregarded by late 2006 / early 2007 that (i) RMBS and CDOs, like those held by UBS, were declining in value and were becoming illiquid, and (ii) the valuations of its RMBS and CDO holdings were incorrect as UBS did not employ a proper valuation model.

## 2. UBS Received Monthly Trustee Reports from the CDO Asset Managers

865. As an investor in CDOs, UBS received monthly trustee reports from the managers of the CDOs in which it held positions, containing: (i) the results of all cash diversion and collateral quality tests that were conducted during that month pursuant to the CDO circular; (ii) a list of the collateral portfolio; and (iii) detail regarding trading activity over the last month. The trustee reports also contained the rating agencies' "weighted average rating factor" or "WARF" for the CDO. The WARF is the rating agencies' assessment of any trends in the risk profile and the likelihood of default of the underlying collateral.

866. According to a July 6, 2006 *CDO Insight* article titled <u>CDO Performance Monitoring</u>, trustee reports are "[t]he basic tool of CDO analysis." Moreover, the article noted that "[t]he portfolio picture provided by trustee reports is good at showing credit trends in a particular CDO portfolio over time and whether a portfolio is improving, holding even or deteriorating." According to the article, the trustee reports included the information listed above, as well as (i) "portfolio measures such as weighted average rating factor, diversity score, weighted average coupon or spread, and the proportion of CCC[-rated] and defaulted assets in the portfolio;" and (ii) "[p]ortfolio trading information" including "the pattern of trading" which "can provide insight as to how the CDO got into its current state as well as valuable insight into the CDO manager's ability to effectively manage the portfolio."

867. Given that UBS's $100 billion portfolio of U.S. residential mortgage backed securities, of which at least $50 billion was super senior CDO tranches, was written-down by approximately $38 billion, the trustee reports put Defendants on notice of the problems associated with the collateral backing UBS's CDO holdings on a ***monthly basis*** throughout the Class Period.

### 3. Publicly Reported Write-downs and Asset Sales During 1Q 2007 and 2Q 2007 Were Red Flags

868.    Any announcement that a mortgage originator or bank had either written-down subprime related assets or sold subprime backed assets at a discount was a red flag that put Defendants on notice that the subprime-backed securities on UBS's books were overvalued.

869.    One of the earliest examples of a write-down of subprime assets occurred at IndyMac.  On January 17, 2007, IndyMac Bancorp, Inc. announced a downward revision of its 4Q 2006 earnings guidance, in part, because of the decline in the values of loans and mortgage securities held by the bank.  (*Weak Forecasts Mount in Housing Industry – IndyMac Bankcorp, Centex Are Hurt by Loan Losses, Write-downs in Land Value*, WALL STREET JOURNAL, Jan. 17, 2007).  CW 16, a surveillance analyst in the IB during the Class Period, confirmed that UBS purchased loans originated and serviced by Indymac during the Class Period.  Shortly thereafter, on January 23, 2007, National City Corporation announced that its subprime mortgage originator subsidiary, First Franklin, experienced losses in 4Q 2006 totaling $172 million as the result of the sale and write-down of subprime loans held for sale.  (*National City Reports Fourth Quarter and Full Year 2006 Results*, PR Newswire, Jan. 23, 2007).  These write-downs were a prelude of what was to come.

870.    On February 7, 2007, New Century announced that it expected "to record a fair value adjustment" to the equity tranches of mortgage-backed securities it held on its books "to reflect revised prepayment, loss and discount rate assumptions with respect to the loans underlying these residual interests, based on indicative market data."  CW 15, a director at the IB during the Class Period whose job responsibilities included securitizing mortgage-backed securities, confirmed that UBS purchased mortgages originated by New Century during the Class Period.  For example, CW 15 stated that in 1Q 2007, UBS and New Century entered into

an agreement whereby UBS agreed to finance New Century's origination of mortgages for securitization by UBS. According to CW 15, during 1Q 2007 New Century began experiencing problems which caused the mortgage originator to violate its lending agreement with UBS. As a result, UBS took over the loans that New Century had originated thus far and securitized them. The New Century deal was one of three RMBS securitizations that occurred during 1Q 2007. Thus, as a result of their deal with New Century, CW 15 and other IB employees were intimately aware of New Century's valuation issues as a result of the issues in the subprime market during Q1 2007.

871.     On February 8, 2007, HSBC announced that it would take $10.56 billion in impairments on its subprime loan portfolio for 4Q 2006, up 20% from the $8.8 billion that the market expected HSBC to take. (*HSBC Trading Update – Mortgage Securities*, HSBC, Feb. 8, 2007). Not only was the HSBC impairment charge well publicized, but, according to confidential UBS sources, the announcement of the HSBC impairment change caused Defendant Hutchins and DRCM senior management to sell $100 million of mortgage backed securities in order to ascertain their true value, garnering only $0.50 on the dollar.

872.     After HSBC, the 4Q 2006 write-down announcements continued, including: (i) approximately $21 million in write-downs and impairment charges at NovaStar Financial announced on February 20, 2007; (ii) $29 million write-down at H&R Blocks' subsidiary, OptionOne, announced on March 13, 2007; and (iii) $1 billion write-down at Residential Capital, LLC, GMAC's residential lending unit, announced on March 14, 2007.

873.     Write-down announcements continued to proliferate the market in Q2 2007, including, *inter alia*, write-downs at IKB Deutsche Industriebank AG, Commerzbank's €40

million write-down on a €1.2 billion CDO/RMBS position, and a $13 million write-down of subprime loans at Sun Trust.

874.     In March 2007, the market learned that at least two mortgage originators were forced to sell subprime loans at a discount to their par value.  Specifically, on March 16, 2007, Accredited Home Lenders announced the sale of $2.7 billion in subprime mortgages at a substantial discount, noting that the company was forced to sell the loans at bargain prices to alleviate margin call pressures.  On March 21, 2007 and again on April 16, 2007, Fremont General Corp. ("Fremont") was forced to sell $4 billion and $2.9 billion in subprime loans, respectively, at a discount that according to the company reflected current market conditions. Fremont booked losses of $140 million and $100 million on the sales, respectively.

875.     In addition to its write-downs in February 2007, on April 2, 2007, New Century filed for Chapter 11 bankruptcy in the federal bankruptcy court in Delaware.

876.     In June 2007, the market learned that two hedge funds run by Bear Stearns would be forced to liquidate some of its mortgage-backed securities portfolio in order to meet margin calls.  Moreover, Merrill Lynch seized $850 million in CDO tranches backed by subprime mortgages with plans to sell those assets in the open market.  After circulating bid lists in mid-June 2007, however, Merrill was only able to sell the high grade positions for market value. According to media reports, bids were as low as 30% of par value for some of the positions.

877.     On October 5, 2007 Merrill announced that it would write-down its Mezzanine ABS CDOs by $4.5 billion.  Thereafter, on October 24, 2007, Merrill announced that its write-downs had increased to $7.9 billion, for total write-downs of its Mezzanine ABS CDO positions of $12.4 billion.  According to analysts, UBS's exposure to Mezzanine ABS CDOs was *triple* that of Merrill's exposure to the same type of assets in October 2007.  However, on October 1,

2007 and again on October 30, 2007, UBS announced only $4 billion in write-downs or 25% of Merrill's write-downs.

### 4. The Decline of the ABX Index Served as a Red Flag to UBS

878. As alleged above, the decline of the ABX Index during the Class Period provided UBS with evidence concerning (i) the pricing patterns of, and (ii) investor confidence in subprime mortgage-backed assets, such as UBS's RMBS and CDO holdings. During the Class Period, the ABX referenced the market pricing of tranches of U.S. subprime non-agency RMBS, like those held by UBS. Indeed, the BBB tranche referenced by the ABX Index experienced steep declines, which (through UBS's monitoring and shorting of the ABX Index throughout the Class Period) put UBS on notice that its similar BBB-rated positions were materially impaired and required a write-down.

879. By the end of the first quarter of 2007, it was clear from the value of the ABX Index that investor confidence in bonds backed by subprime mortgages was at an unprecedented low and deteriorating rapidly, putting UBS on notice that its CDO holdings were materially overvalued. For example, by February 12, 2007, the value of the ABX-HE-BBB 06-2 Index, a BBB-rated subprime-backed bond similar to the BBB-rated subprime bonds that made up UBS's multi-billion dollar Class Period portfolio, had fallen from 95.25 on December 29, 2006 to 80.35, meaning that in a span of only 45 days, the cost of purchasing protection for bonds backed by U.S. subprime mortgages had risen by almost 15%. This rapid decline suggests that the markets' confidence in bonds backed by subprime collateral weakened quite substantially.

880. During a question and answer session following the risk management presentations on June 4, 2007, Defendant Stuerzinger admitted that he was aware that as the value of the ABX tranches fell, the credit spreads on the ABX Index had widened considerably in Q1

2007, stating that "the ABX Index increase[d]…from January to March from 550 to 1600 bps." UBS did nothing to revalue its CDO portfolio.

881.    UBS analysts were also well aware of the decline of the ABX Index.  Indeed, Alex Pritchartt, a UBS ABX Index trader was often quoted by media articles regarding the issues experienced by the ABX Index starting in Q1 2007:

<blockquote>

a.    "'Early delinquency data shows that third quarter 2006 subprime loans are already performing worse than the first and second quarter vintages,' UBS said in a report. 'Given this, we would expect the new index to trade no better than ABX 06-2 has traded, and probably slightly worse.'" (Leinfuss, *Default Risk to Pressure New US Subprime Loan Index*, Reuters News, Jan, 11, 2007 at 8:24 p.m.);

b.    "Panic hit a small corner of the asset-backed derivatives market Friday after investors rushed in to buy credit protection, forcing some benchmark derivative indexes that measure subprime mortgage risk to fresh record levels…'It's a pretty wild day,' said Alex Pritchartt, an asset-backed securities trader at UBS, who characterized the trade a 'panic selling.'  He added, 'We saw sellers from the opening bell.'…***Investors, already concerned about a deteriorating residential real estate market, were spooked by data showing poor collateral performance on the loans that ultimately influence the ABX Index, said Pritchartt, who has seen the data.***" (Shrivastava, *ABX Index Under the Gun As New Record is Hit*, Dow Jones Capital Markets Report, Jan. 26, 2007 at 9:26 p.m.) (emphasis added);

c.    In the last two weeks, the spread on the riskiest BBB- segment of the current benchmark index has widened by more than 100 basis points, closing at 645 basis points on Feb. 2…***Spreads got 'very wide very quickly,' said Alex Pritchartt, a trader of the ABX Index at UBS, who found himself scrambling to keep up not only with the trades, but also the nonstop speculation about a deteriorating subprime sector***." (Shrivastava, *Asset-Backed Derivative Index Goes Mainstream in US Bond Mkt*, Dow Jones Capital Markets Report, Feb. 5, 2007 at 8:59 p.m.) (emphasis added);

d.    "Concerns over further deterioration in the U.S. housing market gave way to more protection buying from investors on Tuesday after prices in the ABX Index were driven higher for two straight sessions.  The sell-off in the index, used by investors to hedge their subprime mortgage risks, has driven the cost of protection higher for investors.  ***'There are definitely***

</blockquote>

*concerns about the credit quality of underlying deals and where the levels are where people think they're being fairly compensated for the risks they're taking,' said Alexander Pritchartt, ABX trader at UBS Securities."* (Leinfuss, *ABX Trades Down, Cash Spreads Firm*, Reuters News, Feb. 6, 2007) (emphasis added);

e.    The benchmark subprime ABX Index sank to new lows on Tuesday, plunging 34 percent since it was launched in January, as data showed the riskiest borrowers were struggling to make mortgage payments and Freddie Mac said it would tighten its subprime lending standards*...'The sell-off was led by growing concerns over credit,' said Alex Pritchartt, ABX trader at UBS Securities in New York. 'The latest remittance reports played a part in that because they confirmed the recent trend that people are late with their mortgage payments and there's still a lot of problems out there.*' (Leinfuss, *ABX Index Hits New Lows on Growing Credit Concerns*, Reuters News, Feb. 27, 2007 at 9:33p.m.) (emphasis added); and

f.    "On Tuesday, spreads on the BBB- tranche of the [ABX] index based on loans made in the second half of 2006 reached 1,450 basis points, up from 1,375 basis points on Friday, in active trade. By late afternoon, it recovered some ground to trade at 1,390 basis points. *Alex Pritchartt, a trader at UBS said the widening of the index was a 'negative reaction' to remittance reports released Friday that showed delinquencies and foreclosures rose at a faster pace than they did in April.* The reports, which Pritchartt has seen, are released monthly by trusts holding the loans to investors in the asset-backed securities where they reside. These securitized loans are indirectly linked to the ABX." (Shrivastava, *Subprime ABX Index Under Pressure on Loan Data*, Dow Jones Capital Markets Report, May 29, 2007 at 9:19 p.m.) (emphasis added).

882.    Moreover, throughout the Class Period, UBS used the ABX Index to both hedge market risk on its MBS and CDO positions and to express a short position in the MBS/CDO market. Indeed, UBS admits in the Shareholder Report that DRCM began shorting the ABX Index in September 2006, demonstrating that (i) DRCM believed that the value of subprime-backed bonds would fall, and (ii) that DRCM monitored the ABX Index, which plunged from [ADD] through the end of the Class Period in February 2008. With respect to UBS's use of the ABX Index to hedge market risk, UBS would have necessarily monitored the index so that it

could make a determination as to whether its hedges remained effective over time. Furthermore, by holding short positions, UBS necessarily monitored the ABX Index.

883.     Thus, UBS analysts' statements about the ABX Index, UBS's use of the ABX Index to hedge the market risk of its positions and UBS's decision to short the ABX Index is evidence of its knowledge of the index's unprecedented lows in Q1 2007. Finally, as set forth in detail below, because the ABX Index was an observable market input as to the value of UBS's "Level 2" subprime backed RMBS and CDO portfolio, UBS was obligated to and should have considered the ABX Index in valuing its Level 2 assets throughout the Class Period. *See* Section VII.F.1 *infra*. UBS's disregard of the ABX Index in valuing its holdings provides further indicia of Defendants' scienter.

### J.     Senior UBS Executives Counseled Clients to Evade U.S. Taxes

884.     UBS knew that (i) senior UBS executives had counseled U.S. clients to evade taxes between 2000-2007, and (ii) the DOJ had commenced an investigation in that regard, yet concealed the investigation from shareholders in the Company's 2007 Form 20-F filed with the SEC on March 18, 2008, and represented that UBS was complying with all applicable laws and regulations throughout the Class Period.

885.     For example, the *New York Times* reported on June 6, 2008, that "UBS shut three of its Swiss offices that sold undeclared offshore banking services to American clients" in January, 2008, "as the inquiry by the DOJ was going on." *Wealthy Americans Under Scrutiny in UBS case*, NEW YORK TIMES, June 6, 2008.

886.     Additionally, U.S. officers arrested a former senior UBS bankers, Martin Liechti and Bradley Birkenfeld for conspiring to defraud the United States by helping American clients evade taxes. (*Ex-UBS banker to Admit Tax Evasion Charges*, TIMES UK, May 30, 2008).

Birkenfeld pled guilty and testified on June 19, 2008 that UBS explicitly advised American clients on how to evade U.S. taxes, including: urging clients to destroy banking records; advising clients to lie to customs officials; telling clients to hide watches, jewelry and artwork in hidden offshore safe deposit boxes in Switzerland; and even to use Swiss credit cards so the IRS could not track their purchases. (*Ex-UBS Banker Pleads Guilty to Tax Evasion*, NEW YORK TIMES, June 20, 2008).

887. Birkenfeld also testified that while at UBS, he often acted as a personal courier for American clients, helping them transport assets out of the United States, once even smuggling diamonds in a tube of toothpaste. (*Id*). After Birkenfeld testified, his attorney stated that "Mr. Birkenfeld was working at UBS where people knew exactly what was going on." (*Id*.)

888. Furthermore, evidence has surfaced demonstrating that UBS's practice of counseling clients to evade taxes traces back to at least 2002 as a November 4, 2002 letter from two senior UBS executive directors, Michel P. Guingnard and Daniel H. Perron, to UBS's clients stated that UBS would not disclose the identify of clients who did not wish to file W-9 forms even if they were required to do so by U.S. tax law – "a promise that itself violates United States laws." (*U.S. Asks Court to Force UBS to Provide Names*, NEW YORK TIMES, July 1, 2008).

889. Evidence also has surfaced demonstrating that UBS possessed knowledge as of June 2007 that its Swiss-based employees had violated U.S. tax laws and potentially were subject to arrest upon traveling in the U.S. as a result of its tax evasion consulting. For example, UBS circulated an eight page document entitled "Country Paper USA" in June 2007 that was three times the size of its predecessor document in an attempt to "tighten up compliance for private wealth managers traveling to … America." "Former UBS employee assists US in Tax Probe," *Times Online*, May 7, 2008.

890.     The SEC is conducting a separate investigation into the matter.

### K.     UBS Knowingly Accumulated and Failed to Properly Value $5.9 Billion in ARS

891.     As detailed above, UBS acquired at least $5.9 billion in ARS during the Class Period in contravention of its Class Period representations that, *inter alia*, UBS would avoid accumulating high concentrations of any given asset type and illiquid assets.  When the market for ARS began to deteriorate in August 2007, UBS concealed the distressed value of its ARS portfolio and secretly commenced a frantic campaign to sell its portfolio.  Like UBS's build-up and failure to timely write-down its subprime assets, both phases of UBS's ARS fraud were effectuated with knowing intent to defraud UBS investors.

892.     First, UBS accumulated billions in ARS in violation of Company representations, which in and of itself evidences UBS's scienter – *i.e.*, by purchasing high concentrations of ARS, UBS knew that it violated its contrary representations to the public.

893.     Second, UBS was motivated to accumulate billions in ARS in contravention of Company policy, due to its desire to profit from lucrative underwriting fees, fees associated with ARS auctions and fees from ARS purchasers.

894.     Third, the fraudulent and contrived nature of the ARS auctions evidences UBS's knowledge that it was acquiring high concentrations of illiquid assets in violation of UBS policy. Specifically, by August 2007, the market for ARS had deteriorated, leaving more sellers than buyers.  To maintain liquidity in the market, UBS generated false demand by purchasing the unwanted ARS and taking more than $5.9 billion in illiquid assets on its books. Moreover, as detailed in internal UBS emails attached as exhibits to the Massachusetts Complaint, the Municipal Securities Group, headed by David Shulman ("Shulman") was constantly asking

UBS's risk officers, including Joel Aresco ("Aresco"), a managing director in the IB and the Chief Risk Officer, Americas, for limit increases beginning in August 2007 and continuing throughout 2007 and the beginning of 2008. Despite this, Shulman himself dumped all of his entire personal holdings in ARS on December 12, 2007.

895. Fourth, UBS knew that the ARS market was deteriorating and, thus, its ARS portfolio was materially overvalued starting in August 2007. The following examples of Defendants' knowledge of issues in the ARS market were taken from emails attached as exhibits to the Massachusetts Complaint:

     a.    On August 8, 2007, Shulman attended a GEB meeting where municipal securities were discussed at length. According to an email from Shulman to Michael Weisner on August 30, 2007 at 3:38pm, Defendants Standish and Stuerzinger were tasked with addressing the issues presented by the eroding municipal securities market. As a result of the meeting, the GEB asked "to be presented with a true P&L of the [municipal securities] business in the end of the year 2007.";

     b.    On August 21, 2007, two employees of the IB municipal securities group, Ross Jackman and Ilissa Herskowitz communicated via email about "Muni Term Funding." During the email exchange, at 9:23 am Jackman stated: "We are seeing minimal increase in Auctions….we could have a large increase and we hope to move them quickly but the market is very dislocated.";

     c.    On August 30, 2007, Shulman, wrote an internal email stating "as you can imagine during these stressful times, the pressure is on to move our inventory.";

     d.    Shulman stated in an September 6, 2007 email to colleagues that there "was a conscious decision to bring risk down" in municipal securities "because we did not see value and were concerned about market developments.";

     e.    On October 31, 2007, Kenneth LaBarge, a UBS employee, stated that he has "another client CFO who wants to sell all his AAA ARCs because his auditor, PwC is telling him there are problems with auction securities and to get out now. I expect other clients to call knowing that PwC started the whole reclassification mess and how many corporate clients they have.";

f.     On November 5, 2007, Phillip Olesen, a UBS employee involved with Investment Grade Credit Trading in the IB, sent an email to David Shulman, et al informing them that "a significant number of companies are adding disclosures regarding their auction rate exposure.  Most companies are now reclassifying exposure as assets for sale instead of the prior classification of cash and cash equivalents."  Shulman responded: "[v]ery helpful…thank you phillip…please keep us posted…very important," but UBS continued to deem and promote them as cash equivalents;

g.     On November 15, 2007, Aresco asked in an email "why the continual increase [in the inventory of ARS?]  What measures are being taken to reduce this risk.";

h.     On December 11, 2007, Ross Jackman emailed Shulman, among others, stating:  "We are very concerned about the max rate issue and to continue to support this product (as we own all the tail risk) we need to find a long term solution…The auction product is flawed….the turn of the calendar will not correct the problems in this market place."  In a later exchange, Jackman wrote to Jeff Scruggs: "I think eventually most of the book needs to be converted as auctions aren't going to come back.";

i.     Also on December 11, 2007, Joseph Scoby, UBS's Chief Risk Officer, emailed Andre Esteves, the Global Head of Fixed Income and Shulman.  Scoby stated:  "I am very nervous about getting long a bunch of paper.  As I understand it, we are now slightly over limit in ARCs….***We can't afford to have another blow up at the IB and if this means that you need to burn $50 million to reduce your inventory now, go ahead.***"  Scoby further states:  "I know there are year end pressures, but do [what] u must keep a lid on inventory.  You must get below your limit also." (Emphasis added);

j.     Just one day later, on December 12, 2007, Jeff Scruggs calls a mandatory meeting of the entire municipal security group staff due, in part, to "the continued deterioration of the auction rate market.";

k.     Also on December 12, 2007, Ross Jackman emailed Shulman, among others stating, in part: "This conversation with Amy implies that we should support auctions if they hit the max rate at below market rates for the taxables….instead of forcing the issuers to open the trusts up b/c that could have a negative rating effect for issue (which means we are taking credit risk and not getting paid for the risk).  We would likely have a tremendous amount of paper come back from all corps that are holders if this happened.  The auction product does not work and we need to use our

leverage to force the issuers to confront this problem our options are to resign as remarketing agent or fail or ?";

l.  On December 19, 2007, the GEB met to discuss the ARC situation, among other things. As a result of the meeting which produced "many questions and a sense of urgency", Scoby emailed Shulman and Aresco, among others seeking to provide the GEB with information regarding the size of UBS's municipal securities programs, a description of UBS's "current inventory in pretty good detail", a detailed explanation as to what happens when an auction fails and a description of "an ugly scenario and how much money we will lose.";

m.  On the same day, Chris Long wrote a suggested response to Question 9 – "Where would failed auction paper be able to be sold? Where would we mark it?" Long states: "*In the event of a failed auction* [which UBS historically manipulated]*, the securities in questions would be rendered illiquid*…..While in failed mode we would have difficulty establishing fair market prices, due to the lack of outside pricing services as well as the lack of inter broker marketplace. Our risk in essence, resulting from failed auctions, would be a required reclassification of the assets on the book from current mode (i.e., 7, 28 or 35 day) to an asset (FRN) with a 30-40 year final maturity. This reclassification would be accompanied by significant increases in VaR, Stress and Capital charges." (Emphasis added);

n.  On January 2, 2008, Aresco stated in an email to UBS's risk officers, that the "ARC situation continues to worsen.";

o.  On January 13, 2008, Shulman drafted a summary of discussion points regarding ARCs, noting that there is "a liquidity issue based on concern for the auction structure and mechanism."; and

p.  On February 8, 2008, just five days before UBS stopped supporting ARS, Shulman wrote Robert Wolf, the President of the IB, stating: "I need to write this note to you to express that I am extremely conflicted in the role that I currently am in as Head of the MSG within the IB. While as a shareholder and dedicated employee, I am trying to walk the fine line and balance between managing market risk with overall franchise risk for UBS….I must communicate that I am not comfortable at all with the current risks that we in the IB are taking on with respect to ARCS…exposure. To me, for the IB – the risks of accumulating more positions are real and very significant….I do not like the risk nor would I look to accumulate this risk."

896.    Fifth, UBS's scienter also is evidenced by the fact that UBS continued to counsel its clients from August 2007 through February 2008 that ARS had essentially the same liquidity as cash while knowing that the market for ARS had become illiquid, and that UBS was frantically selling its own ARS portfolio.  According to the internal UBS emails attached as exhibits to the Massachusetts Complaint, the IB was constantly pushing the Wealth Management division to hold customer calls with financial advisors in order to push ARS product on UBS's clients.  For example, on December 11, 2007, Shulman wrote an email asking for a sales force call and stating "***we need to move this paper and have to explore all angles possible*** … we need to do this as quickly as possible … please work on this priority."

897.    Sixth, UBS's write-down of its $5.9 billion ARS portfolio by $974 million is further evidence of the Company's scienter.

898.    Seventh, the Massachusetts Attorney's General investigation into UBS's ARS business and UBS's May 7, 2008, payment of $37 billion to the Massachusetts Turnpike Authority and 17 towns provides further evidence of UBS's scienter.

899.    Eighth, the Massachusetts Security Commission filed an administrative proceeding against UBS on June 26, 2008, alleging that UBS had knowingly defrauded its ARS investors.

## XII.    ADDITIONAL SCIENTER ALLEGATIONS AGAINST THE INDIVIDUAL DEFENDANTS AND UBS

900.    In addition to the foregoing allegations, the following facts support a strong inference that the Individual Defendants and UBS issued, inter alia, Class Period misstatements concerning risk exposure, asset concentrations and financial results with scienter.

### A. The Executive Officer Defendants

901. Defendants Ospel, Rohner, Wuffli, Jenkins, Stuerzinger, Standish, and Suter (collectively "Executive Officer Defendants"), as members of UBS's GEB, GEB Risk Sub-Committee ("GRSC"), the Chairman's Office ("ChO") and/or UBS's Board of Directors, knew or with extreme recklessness disregarded the deficiencies in UBS risk controls that enabled the Company's traders and risk managers in the IB and DRCM to inflate UBS's financial statements and take on high concentrations of risky assets in violation of Class Period statements. Moreover, the Executive Officer Defendants affirmatively misrepresented and concealed information from the market concerning the true value of UBS's hedged positions.

902. UBS admits in its responses to Ethos' questions regarding the Company's risk controls that during 2007 and 2008, the GEB, the GEB Risk Sub-Committee ("GRSC") and the ChO were "kept informed" and participated in "regular discussions on UBS's exposures and the potential losses" associated with the Company's $100 billion bet on the U.S. residential mortgage market. (UBS's Responses to Ethos). The Shareholder Report and UBS's Responses to Ethos' Questions provide substantial admissions as the knowledge possessed by UBS during the Class Period.

### B. Defendants Wuffli, Rohner, Jenkins, Stuerzinger, Standish and Suter Were Responsible for Implementing UBS's Risk Management Protocols As Members of the GEB

903. During the Class Period, the GEB had executive management responsibility for UBS and was tasked with the approval and implementation of UBS's core risk policies. (UBS's Responses to Ethos). As set forth above, Defendants Wuffli, the president of the GEB until his resignation on July 5, 2007, Rohner, who became president of the GEB on Wuffli's resignation,

Jenkins, Stuerzinger, Standish and Suter were members of the GEB during the Class Period. Along with the knowledge ascribed to each of these Individual Defendants elsewhere herein, the GEB Defendants and the other members of the GEB, possessed knowledge as a result of their participation on the GEB. Because the GEB had executive management responsibility for UBS throughout the Class Period, the knowledge of the individual members of the GEB, including the GEB Defendants, can also be imputed to UBS.

904. Specifically, the GEB possessed the following information during the Class Period:

a. The GEB had knowledge of and approved both UBS's consolidated 5 Year Strategic Plan and 1 Year Operational Plan for 2006 and 2007. (Shareholder Report). As a result, the GEB had knowledge of and approved the implementation of DRCM as one of the key growth initiative for 2006-2010, and the development of syndicated finance, real estate and fixed income businesses as one of the key growth initiative for 2007-2011. (Shareholder Report);

b. The GEB's approval and establishment of UBS's funding arrangements in effect during the Class Period at the end of 2004 provided its members with knowledge of how both the IB and DRCM could take advantage of UBS's low cost of funding, as set forth above. (Shareholder Report);

c. As a result of its receipt of monthly and quarterly reporting detailing comprehensive analysis of UBS's balance sheet development, the GEB, as well as the GRSC, had knowledge of the growth in the overall balance sheet and the growth of RWAs during the Class Period. (Shareholder Report).

d. In late 2006, UBS admits that the GEB and the GRSC were aware that "top quality collateral was reducing and that asset growth over the past 12 to 18 months was involving a build up in less liquid assets being funded mainly by unsecured liabilities with a lesser term" and that "the high level of tradable assets included…the build out of the IB's ABS and MBS positions." (Shareholder Report);

e. As a result of its approval of the IB's Fixed Income growth plan in March 2006, the GEB knew that the growth plan contemplated an "increase in highly structured illiquid commitments" that "would need to be carefully

analyzed and tightly controlled." UBS admits that the GEB further recognized at that time that there needed to be a balance between the risks and rewards associated with the plan in order "to avoid undue dilution of return on risk performance." (Shareholder Report);

f.  As a result of its review and approval or modification of UBS's U.S. residential real estate risk limits related to annual and interim reviews in 2006 and 2007, the GEB, as well as the GRSC, had knowledge of UBS's exposure to the U.S. residential real estate market as early as 2006. (UBS's Responses to Ethos);

g.  As a result of its review and approval of the IB's decision to develop new business lines to replace the businesses transferred to DRCM, including, specifically, the creation of the Real Estate Finance Unit in mid-2006, the GEB, as well as the GRSC, was aware that the IB was attempting to double down on the U.S. real estate investment strategies already employed by DRCM. (UBS's Responses to Ethos);

h.  As a result of a report provided by Group Treasury in Q1 2007, the GEB had knowledge by 1Q 2007 that the IB's Fixed Income growth plan was creating an unsustainable burden on UBS's balance sheet. (UBS's Responses to Ethos); and

i.  By August 2007 the GEB was aware that UBS was exposed to issues in the ARS market, and by no later than December 19, 2007 were fully informed of UBS's massive exposure to ARS.

905.    During the Class Period, the GEB set up a subcommittee, called the GRSC, tasked with identifying and monitoring risks that required increased management attention by the GEB and reviewing UBS's risk controls. (UBS's Responses to Ethos).   Defendant Stuerzinger was a member of the GRSC together with the majority of the members of the GEB.  Other non-GEB members on the GRSC included the Group Chief Credit Officer, Phil Lofts ("Lofts"), the Group Head of Market Risk, Andrew Threadgold ("Threadgold") and the Group Treasurer, Stephen Keller ("Keller").   (UBS's Responses to Ethos).   During the Class Period, UBS admits that members of the GRSC were specifically informed of risk control deficiencies within the IB, the deterioration of the housing markets, and the critical build up of positions that could be impacted

by this deterioration.  For example:

a. As a result of its review of UBS's market risk stress framework in 2006, which examined, in part, the state of the U.S. housing market, the GRSC was aware of mounting issues in the subprime market as early as 2006. Also, UBS admits that members of the GRSC began expressing concerns about the U.S. housing market within the GRSC in 2006. (Ethos; Shareholder Report);

b. The GRSC had knowledge of the risks associated with exposure to the subprime market in early 2007 as demonstrated by the GRSC's direct questions of the CDO Desk regarding UBS's subprime exposure. (Shareholder Report);

c. The GRSC had knowledge about the issues associated with subprime-backed investments and was "keen to understand UBS's exposure to these markets" as a result of the losses at DRCM in Q1 2007.  (Shareholder Report);

d. The GRSC had knowledge of the growing issues in the subprime-backed securities market by no later than March 2007 as a result of the CDO Desk's presentation which was "pessimistic" on certain aspects of the market and noted, specifically, that the "inventory was challenging." (Shareholder Report);

e. The GRSC had knowledge by no later than 1Q 2007 that the IB's Fixed Income growth plan was creating an unsustainable burden on UBS's balance sheet. (Ethos);

f. By Q1 2007, the GRSC had knowledge that the IB's reporting structure for the Global CDO Group (*i.e.,* that the CDO origination team and the CDO Desk that purchased the Super Senior positions, which was run by Eric Rothman, had the same reporting lines to Defendant Stehli) had the potential to cause misincentives in UBS's trading strategies. (Shareholder Report); and

g. As of April 2007, based on the receipt of the preliminary results of a secret audit of DRCM's 1Q 2007 valuations, the GRSC was aware of the reports conclusions that there were significant valuation and risk management issues at DRCM and the IB associated with UBS's mortgage-backed assets.  (Ethos; Shareholder Report).

906.     Furthermore, as set forth herein, Defendant Stuerzinger, while a member of the GRSC and while reporting to the GEB, was specifically informed no later than mid-March 2007 that the value of DRCM's trading portfolios had deteriorated:

    a.    In mid-March and again in late March 2007, DRCM management informed Defendant Stuerzinger of the losses experienced on DRCM's mortgage-backed portfolios, thereby alerting Defendant Stuerzinger that there were valuation issues with similar securities held by UBS on the IB's books.  (Shareholder Report); and

    b.    On March 29, 2007, Defendant Stuerzinger tasked GIA to conduct a secret audit into the valuation adjustments taken at DRCM during 1Q 2007 and "assess whether further significant valuation risk existed with respect to sub-prime lending activities of the IB and DRCM" (Ethos).

907.     Furthermore, during the June 4, 2007 risk management presentations to investors, analysts and media, Defendant Stuerzinger admitted that he was aware of and followed several mortgage market indicators in Q1 2007, including remittance reports, delinquency rates and the ABX Index.  Defendant Stuerzinger further admitted that he not only had access to but reviewed daily VaR reports, which would have alerted him to positions that were above limit or approaching the limit set by UBS.  Additionally, Defendant Stuerzinger stated that he worked closely with those individuals responsible at the business group level for monitoring and controlling market risk, stating that he was especially aware of any issues related to concentrations, limits, VaR, issuer risk and stress loss.

**C.     Defendant Ospel's and Defendant Suter's Knowledge and/or Extremely Reckless Disregard of UBS's Risk Control Deficiencies Based on Their Positions in the Chairman's Office ("ChO")**

908.     The ChO is responsible for overseeing UBS's risk profile and implementation of its risk controls on a company-wide basis. (UBS's Responses to Ethos)  Until April 23, 2008, Defendant Ospel was the Chairman of UBS's Board of Directors and thus, the head of the ChO.

The ChO was disbanded after Defendant Ospel resigned in April 2008. Serving with Defendant Ospel was Defendant Suter (until he assumed the position of CFO on October 1, 2007) as well as Stephan Haeringer, one of four UBS directors who was asked to resign from UBS on July 1, 2008 due to the rampant internal control deficiencies that were ultimately disclosed by the Company.

909.     During the Class Period, the ChO was specifically informed of the build up of the IB's CDO portfolio, was aware of the deterioration of the market for these securities and, as the ultimate decision maker concerning UBS's risk controls, received specific information about the deficient manner in which UBS's risk controls were being implemented. For example, during the Class Period, the members of ChO possessed the following knowledge:

a.      As a result of receiving formal updates from the GRSC approximately monthly throughout 2006 and 2007, and as a result of informal updates from the GRSC on July 13, August 20, August 28, September 4 and September 24, 2007, the ChO possessed knowledge regarding any issues with UBS's risk controls. (Ethos);

b.      As a result of receiving formal updates from the ChO approximately bi-monthly throughout 2006 and 2007, and as a result of ad-hoc updates from the ChO on August 8, September 6, September 28, November 11, November 26, December 2 and December 9, 2007, the Board of Directors ("BoD") and Defendant Ospel possessed knowledge regarding any issues with UBS's risk controls. (Ethos);

c.      Furthermore, as a result of regular quarterly reports received during the Class Period, the BoD was also aware of any risk management issues at UBS. (Ethos);

d.      Once the GEB approved the 5 Year Plan for 2006-2010 and 2007-2011, which included key growth initiatives regarding the implementation of DRCM and the growth of the IB's Fixed Income business, respectively, the BoD and Defendant Ospel reviewed and approved the 5 Year Plans providing the BoD and Defendant Ospel with knowledge of the Company's growth initiatives in 2006 and 2007. (Shareholder Report);

e.      The ChO had knowledge by 1Q 2007 that the IB's Fixed Income growth plan was creating an unsustainable burden on UBS's balance sheet. (Ethos);

f.      By of March 29, 2007, as a result of its support of Defendant Stuerzinger request for a special audit of DRCM, the ChO was aware of the valuation adjustments taken at DRCM during 1Q 2007 as well as Defendant Stuerzinger's concern that "further significant valuation risk existed with respect to sub-prime lending activities of the IB and DRCM." (Ethos);

g.      By April 2007 when the ChO expressed concern regarding the size of the balance sheet as a result of the IB's growth plan and the expectation that the balance sheet would not continue to grow to Group Treasury, the ChO possessed information regarding the negative effects of the IB's Fixed Income growth plan. (Shareholder Report);

h.      As a result of its decision to close DRCM, by the end of April the BoD and Defendant Ospel were aware of the preliminary findings of the GIA secret audit of DRCM. Moreover, the members of the BoD including Defendant Ospel participated in discussion, analysis and review related to the decision to close DRCM in April 2007. (Shareholder Report); and

i.      As of August 6, 2007, the ChO had comprehensive knowledge of UBS's exposure to CDOs. (Shareholder Report).

## D.      The DRCM Defendants' and the IB Defendants' Knowledge and/or Extremely Reckless Disregard of the Fraud

910.      As set forth above, the IB, and specifically the MBS and ABS business and Global CDO Group, and DRCM contributed to the vast majority of UBS's historic $38 billion in write-downs. Defendants Jenkins, Singh, Martin and Stehli (the "IB Defendants") were all involved in the management of the IB and/or the business lines within the IB that contributed to the write-downs. Defendants Costas and Hutchins (the "DRCM Defendants") were involved in the day-to-day management of DRCM's portfolios. Moreover, any knowledge regarding the fraud possessed by the IB Defendants and/or the DRCM Defendants, as set forth below and elsewhere herein, can be imputed to UBS.

911.      In addition to the evidence cited above, IB employees, including IB traders, IB management and the IB Defendants possessed the following knowledge regarding the fraud:

a.     IB management had knowledge of the IB's real estate securities and loan exposure as a result of formal reports generated within the IB during the Class Period. (Shareholder Report);

b.     IB Market Risk Control identified the IB's CDO Warehouse as a "significant contributor" to the IB's VaR as well as "one of the main sources of market risk" in Q4 2005 and Q3 2006. (Shareholder Report);

c.     IB's Business Unit Control ("BUC") was aware of the IB traders' valuation marks and the fact that they were materially overvalued, as a result of BUC's independent verification of the traders' daily valuations. BUC was also aware of all independent price verification result (*e.g.*, Niblo's attempt to obtain pricing from other banks in April 2007) and valuation adjustments (*e.g.*, Hutchins' re-valuation of $4 billion of DRCM's portfolio in March 2007) as a result of formal monthly and quarterly valuation reports. (Shareholder Report);

d.     IB management was aware of valuation issues at the IB as a result of quarterly reports from BUC during the Class Period. These reports were also reviewed by senior Group Finance, Risk and Treasury personnel, which would have included, *inter alia*, Defendant Stuerzinger. (Shareholder Report);

e.     IB management was aware of the amount of NegBasis and VFN trades as a result of the "new business initiative" ("NBI") process requiring CDO traders to obtain approval before obtaining monoline insurers or committing UBS to the retention of a unfunded super senior position. (Shareholder Report);

f.     IB management was aware of the amount of assets that were warehoused for any given CDO as a result of the "transaction requiring prior approval" process which required a CDO Desk employee to receive approval to originate a new CDO. (Shareholder Report);

g.     The IB Fixed Income Executive Committee, which during the Class Period included Defendant Singh and Suneel Kamlani, who was named interim CEO of DRCM during the reintegration of DRCM's positions, was aware by 2006 that there were issues with the effectiveness of the TRPA and NBI processes in providing the IB with "a broad, holistic risk assessment" because IB employees were manipulating the processes to their benefit. (Shareholder Report);

h.     IB management had knowledge that its U.S. real estate backed investments managed by DRCM were performing poorly in early 2007. (Shareholder Report);

i.  IB BUC was aware in February and March 2007 of diminished market liquidity and transparency for U.S. residential mortgage backed securities as a result of "a substantial reduction in the coverage of independent price testing of Subprime securities." IB BUC reported this fact to UBS's Audit Committee in April 2007 along with its own assessment of the valuation issues then effecting UBS's mortgage securities held by the IB. (Shareholder Report);

j.  IB BUC sought guidance as to whether it should take mark-to-market losses on its warehouse positions in Q1 and Q2 2007 demonstrating that the IB had knowledge that the assets in its warehouses were materially overvalued. (Shareholder Report);

k.  As a result of reintegrating DRCM's positions into the IB's Structured Products Group, Defendant Jenkins and IB management, including Defendant Singh, as both the interim CIO of DRCM and the Global Head of the Structured Products Group, knew or recklessly disregarded the fact that DRCM's assets were distressed and/or materially overvalued at the time the IB resumed control over them. (Shareholder Report);

l.  By July 2007, Defendant Jenkins and IB management were aware that some of the hedges that the IB traders had put in place to protect UBS against loss of value were ineffective. As a result, Jenkins and IB management knew or recklessly disregarded the fact the IB's CDO assets were materially overvalued because the stated values depended on the hedges remaining effective. (Shareholder Report);

m.  By July 2007, Defendant Jenkins and IB management possessed knowledge regarding UBS's exposure to subprime-backed assets and the associated risks of having such a large exposure as a result of their active involvement in "reviewing and monitoring efforts" to reduce UBS's exposure. (Shareholder Report);

n.  Former UBS employees had knowledge of the deterioration in the subprime market by Q4 2006, including *inter alia*, growing default rates, an uptick in the need to seek for the mortgage originator to repurchase loans with early defaults and an inability to sell bonds backed by subprime mortgages. Due in part to the weekly trader meetings, Defendant Martin and other managing directors in the Rates division were also aware of these issues as early as Q4 2006;

o.  Defendants Hutchins knew or recklessly disregarded the fact that the DRCM portfolios of subprime assets were materially overvalued in Q1 2007 as a result of the HSBC write-down, his own attempt to sell $100

million in subprime securities only to receive $0.50 on the dollar and his selective re-valuation of $4 billion worth of DRCM's subprime assets;

p.      Former UBS employees, including CW 6 and 7 confirm that Defendant Stehli signed off on every CDO transaction and also implemented growth programs in the CDO Group during the Class Period;

q.      Eric Rothman, a UBS executive who reported to Defendant Stehli (who in turn reported to Defendant Singh) and was responsible for running the CDO Desk that purchased and retained CDO tranches knew that the valuations for these tranches were applied subjectively in order to minimize the effect of market fluctuations on the assets' carrying values throughout the Class Period;

r.      Defendant Singh was aware of the write-downs taken by Niblo in April 2007 and, as a result, was aware that the same or similar positions on the IB's books were materially overvalued.

## XIII.  UBS'S FINANCIAL STATEMENTS FAILED TO COMPLY WITH IFRS, GAAP AND SEC REGULATIONS

912.    Each of the Company's annual and interim financial reports issued during the Class Period misrepresented UBS's financial position and/or results of operations and failed to present UBS's financial reports in compliance with applicable accounting principles and SEC regulations.  As detailed herein, UBS's Class Period financial reports violated at least the following accounting principles and SEC Regulations:

- SEC Regulation S-X – stating that financial reports filed with the SEC that fail to comply with GAAP or, for foreign issuers, a comprehensive body of accounting principles (such as IFRS) are presumed to be misleading and inaccurate;

- IAS 39 – requiring that financial instruments which are classified as held for trading be reported at fair value and that changes in fair value be recognized in earnings;

- IAS 34 – requiring that interim financial statements conform with IFRS;

- IAS 10 – requiring disclosure of certain events arising after the close of the balance sheet date but prior to the issuance of the financial statements;

- IAS 32 – requiring disclosure of information to allow users of financial statements (e.g., investors) to assess risk;

- IAS 30 – requiring disclosure of significant concentrations of assets, liabilities and off-balance sheet items and other concentrations of risk;

- IAS 37 – requiring disclosure of contingent liabilities where a possible obligation gives rise to a risk of loss that is not remote; and

- Numerous fundamental accounting principles (e.g., Framework ¶12, 14, 16, 17, 31, 37, 38, 39, 43, 46).

### A.  Applicable Accounting Principles And SEC Regulations

913.  IFRS are those principles adopted by the International Accounting Standards Board ("IASB") and recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted international accounting practices at a particular time. IFRS are promulgated by the IASB (formerly the Board of the International Accounting Standards Committee ("IASC")).  Narrowly, IFRS refers to the numbered series of pronouncements currently being issued by the IASB, as distinct from the International Accounting Standards ("IASs") numbered series of pronouncements issued by its predecessor. Broadly, IFRS refers to the entire body of IASB pronouncements, including IFRS and IASs, as well as interpretations of those standards as approved or adopted by the IASB.  IFRIC, as used herein, refers to the International Financial Reporting Interpretations Committee of the IASB, and the numbered interpretations of IFRS issued by that committee as approved by the IASB. Further, SIC, as used herein, refers to the Standing Interpretations Committee of the IASC, and the numbered interpretations of IASs issued by that committee as adopted by the IASB. In addition to the numbered pronouncements, IFRS provides other authoritative pronouncements including, *inter alia*, the Framework for the Preparation and Presentation of Financial Statements ("Framework").

914.  Under SEC rules, foreign private issuers are permitted to file financial reports in conformity with IFRS.

915.    As a publicly traded company, UBS is responsible and required to maintain books and records in sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with IFRS, as applicable to the Company.  Specifically, the Exchange Act requires public companies to:

(A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

i. transactions are executed in accordance with management's general or specific authorization;

ii. transactions are recorded as necessary to (I) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) maintain accountability for assets;

iii. access to assets is permitted only in accordance with management's general or specific authorization; and

iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences... (15 U.S.C. § 78m(b)(2))

916.    Prior to March 4, 2008, financial statements of foreign private issuers filed with the SEC and prepared in conformity with IFRS (i.e., including the Company's relevant financial statements) were required to provide a reconciliation to U.S. GAAP and certain other provisions of Regulation S-X as part of their financial disclosures filed with the SEC.  (17 C.F.R. § 210.4-01(a)(1)-(2))    Additionally, Regulation S-X requires that interim financial statements, with certain exceptions, must follow the general form and content of presentation prescribed by Regulation S-X. (17 C.F.R. § 210.10-01(a))

917.    The primary responsibility for the preparation and presentation of the financial

statements rests with the Company's management. (Framework ¶ 11)

918.    As alleged and discussed in greater detail herein, prior to and throughout the Class Period, Defendants caused the Company to take positions in financial instruments whose values were linked to inherently risky loans, primarily U.S. residential subprime and Alt-A mortgages (collectively, the "nonprime-related securities"). In addition, the Company, no later than August 2007, began assuming increasingly illiquid positions in auction rate securities that were intended for sale but which the Company could not find buyers. The Company's positions in such financial instruments exposed the Company to a significant and excessive concentration of risk.

919.    From the start of the Class Period and certainly no later than the end of February 2007, the undisclosed concentration of risk on UBS's books, in combination with certain prevailing market conditions (such as declining home values and increasing credit delinquencies and defaults) and UBS's asset valuation methods, impaired the Company's financial position requiring the disclosure of losses in connection with these impairments. Nonetheless, during the Class Period, the Company's interim and annual financial statements failed to timely recognize these known losses, and neglected to disclose that the Company had exposure to such a significant and excessive concentration of risk.

920.    In violation of IFRS, the Company materially overstated the value of the nonprime-related securities and ARS carried as assets (or materially understated liabilities, as applicable), thereby overstating its Class Period results of operations. Additionally, in violation of IFRS, and in connection with the Company's exposure to known losses on its nonprime-related securities and ARS, the Company's Class Period financial statements lacked required disclosures, and omitted material facts regarding the Company's exposure to a significant and

excessive concentration of risk in nonprime-related securities and ARS. Furthermore, the Company lacked adequate disclosure controls and procedures, as well as internal control over financial reporting, despite certifications signed by certain Defendants and the issuance of other statements to the contrary.

921. Further, the Company's Class Period financial statements presented the Company's financial position and/or results of operations in a manner which violated the following fundamental accounting principles:

(a)     The principle that financial statements should "provide information about the financial position, performance and changes in financial position of an entity that is useful to a wide range of users in making economic decisions" (Framework ¶ 12);

(b)     The principle that financial statements should "show the results of the stewardship of management, or the accountability of management for the resources entrusted to it" (Framework ¶ 14);

(c)     The principle that financial statements should provide information about the "economic resources" controlled by an entity, as well as "its financial structure, its liquidity and solvency, and its capacity to adapt to changes in the environment in which it operates" (Framework ¶ 16);

(d)     The principle that financial statements should provide information about an entity's performance during a period, "in particular its profitability . . . in order to assess potential changes in the economic resources that it is likely to control in the future" and, importantly, "the variability of its performance" (Framework ¶ 17);

(e)     The principle that the information in the financial statements should be reliable in that it represents what it purports to represent (i.e., "free from material error and bias"). That information should be reliable as well as relevant is a notion that is central to accounting (Framework ¶ 31);

(f)     The principle that prudence should be exercised in preparation of financial statements in response to the "uncertainties that inevitably surround many events and circumstances". "Prudence the is inclusion of degree of caution" in such preparation "such that assets or income are not overstated and liabilities or expenses are not understated" (Framework ¶ 37);

(g)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that the financial statements meet the criteria of reliability and relevance (Framework ¶ 38);

(h)     The principle that financial statements have the characteristic of comparability in that "the financial effect of like transactions and other events must be carried out in a consistent way throughout an entity… and for different entities" (Framework ¶ 39);

(i)     The principle that the timeliness of reporting should be considered, as an "undue delay" may impair the relevance of financial information (Framework ¶ 43); and

(j)     The principle that "the application of principal qualitative characteristics and or appropriate accounting standards normally results in financial statements that convey what is generally understood as a true and fair view of, or as presenting fairly" "the financial position, performance and changes in financial position of an entity" (Framework ¶ 46).

Each of the improper accounting practices, misrepresentations and omissions engaged in by Defendants, as discussed further herein, standing alone, was a material breach of IFRS and/or SEC regulations.

**B.      UBS's Failure to Follow Applicable Accounting Principles Misrepresented Its Financial Appearance**

922.    As set forth herein, UBS's valuations of its fixed income assets, specifically, UBS's non-prime related securities (e.g., subprime and Alt-A mortgage-backed assets), were materially overstated during the Class Period. The failure to properly value these assets resulted in the overstatement of UBS's reported net trading income from fixed income activities. In turn, this overstated metric caused the amounts reported as net trading income, total operating income, net profit attributable to UBS shareholders and earning per share (basic and diluted) to be overstated as well. As such, the Company's consolidated financial statements and related footnotes issued during the Class Period (collectively, the "relevant financial statements") did

338

not present fairly the Company's financial position and/or results of operations in conformity with IFRS and SEC rules and regulations. Likewise, beginning no later than August 2007, the Company inflated the value of ARS held on its balance sheet, which also resulted in the Company's net profit and earnings per share to be overstated.

### C. UBS's Valuation of its RMBS and RMBS CDO Related Positions Violated Applicable Accounting Principles

923. As a result of the conduct alleged herein, UBS's Class Period financial statements materially overstated (or materially understated the reported values carried as liabilities, as applicable) the Company's nonprime-related positions in U.S. RMBS, CDOs, nonprime-related components of reference-linked notes ("RLN"), monoline credit protection on U.S. RMBS CDOs (e.g., CDSs) and other nonprime-related securities (collectively, the "RMBS and RMBS CDO related positions") that the Company carried as assets, including ARS. The RMBS and RMBS CDO related positions were reported in the Company's relevant financial statements as trading portfolio instruments, as well as positive and negative replacement values (for derivatives) on the balance sheets and the changes in fair value were reflected in net trading income on the income statements. (*See e.g.*, Form 6-K October 30, 2007 p. 22) During the Class Period, the Company's RMBS and RMBS CDO related positions were classified as held for trading.

924. IAS 39 Financial Instruments: Recognition and Measurement ("IAS 39") provides the criteria for a financial instrument to be classified as held for trading as follows, in relevant part:

> A financial asset or financial liability is classified as held for trading if it is:

(i) acquired or incurred principally for the purpose of selling or repurchasing it in the near term;

(ii) part of a portfolio of identified financial instruments that are managed together and for which there is evidence of a recent actual pattern of short-term profit-taking; or

(iii) a derivative (except for a derivative that is a financial guarantee contract or a designated and effective hedging instrument). (IAS 39 ¶ 9)

925.    IFRS required the Company's financial instruments that were classified as "held for trading", including the RMBS and RMBS CDO related positions, to be reported at fair value and the changes in fair value to be recognized in earnings.  *See* IAS 39 ¶¶ 43, 46, 47, 55.

926.    IAS 39 describes fair value as follows, in relevant part:

The best evidence of fair value is quoted prices in an active market. If the market for a financial instrument is not active, an entity establishes fair value by using a valuation technique. **The objective of using a valuation technique is to establish what the transaction price would have been on the measurement date in an arm's length exchange motivated by normal business considerations.** Valuation techniques include using recent arm's length market transactions between knowledgeable, willing parties, if available, reference to the current fair value of another instrument that is substantially the same, discounted cash flow analysis and option pricing models. If there is a valuation technique commonly used by market participants to price the instrument and that technique has been demonstrated to provide reliable estimates of prices obtained in actual market transactions, the entity uses that technique. **The chosen valuation technique makes maximum use of market inputs and relies as little as possible on entity-specific inputs. It incorporates all factors that market participants would consider in setting a price and is consistent with accepted economic methodologies for pricing financial instruments.** Periodically, an entity calibrates the valuation technique and tests it for validity using prices from any observable current market transactions in the same instrument (i.e. without modification or repackaging) or based on any available observable market data.

(IAS 39 ¶ 48A) (Emphases added).

927.    IAS 34 *Interim Financial Reporting* ("IAS 34") provides the requirements for

interim financial statements prepared in conformity with IFRS. Regarding recognition and measurement in interim financial statements, IAS 34 provides the following, in relevant part:

> An entity shall apply the same accounting policies in its interim financial statements as are applied in its annual financial statements, except for accounting policy changes made after the date of the most recent annual financial statements that are to be reflected in the next annual financial statements. (IAS 34 ¶ 28)

928. The Company's Class Period financial statements materially overstated (or understated, as applicable) the fair value of its RMBS and RMBS CDO related positions and ARS. As detailed herein, Defendants recklessly disregarded that its RMBS and RMBS CDO related positions were exposed to a significant, and excessive, concentration of nonprime-related risk. The Defendants intentionally or with extreme recklessness disregarded the inherent credit risk and the market factors relevant to calculating the true fair value of its RMBS and RMBS CDO related positions from the start of the Class Period. Additionally, CW 9 confirmed that the models used to value ABS, CDOs and CDSs backed by subprime and Alt-A mortgages were inaccurate beginning in 2004 because the models did not take into account the complex nature of these securities. In addition to economic data and report from CWs suggesting that UBS's valuations of its RMBS and RMBS CDO related positions were not accurate, in mid-March 2007, DRCM management advised the "Group CRO" that certain RMBS and RMBS CDO related positions had to be marked down (Shareholder Report p. 17). The larger implication of the March 2007 markdown was that, relative to DRCM's portfolio, the Company as whole had an immense (albeit undisclosed to investors) portfolio of similar RMBS and RMBS CDO related positions which required mark-downs. The Shareholder Report effectively acknowledged that, at that time, there were issues in the larger Investment Bank portfolio which went unidentified:

> Lack of full capitalization on the DRCM loss experience: It appears that although the DRCM losses were often in asset classes that were rated

lower than Subprime positions in the IB, the closure of DRCM could have been a basis for a more comprehensive review and assessment of all Subprime positions in the IB, and for a review of UBS's risk assessment processes in connection with the same. **While reviews for similar exposures within IB were initiated as a result of the DRCM losses, those reviews did not succeed in identifying the latent issues within, among other positions, the IB's substantial portfolio of retained CDO Super Senior tranches.** (Shareholder Report pp. 33-34) (Emphasis added.)

929.   Also as discussed in greater detail herein, in March 2007, in response to "direct questions" regarding "UBS's potential Subprime exposure" from the GEB Risk Sub-committee ("GRSC"), the IB segment CDO desk, the largest holder of RMBS and RMBS CDO related positions in the Company, "presented a relatively pessimistic view on certain aspects of the Subprime market and advised that UBS was suffering along with other players and the inventory was challenging." Further, the Shareholder Report acknowledged that:

> The home equity book [of DRCM] had taken **a net short position on Subprime exposure since September 2006**. Short positions in CDS on single ABS, spreadlocks and on the ABX were not considered to hedges by the DRCM traders, but rather **distinct shorting of perceived overpriced assets**. (Shareholder Report p. 12) (Emphasis added.)
>
> ***
>
> In **September 2006**, Group Senior Management expressed general concerns about the US housing market with the GRSC. (Shareholder Report p. 35) (Emphasis added.)

930.   The Company also failed to accurately or timely assess whether or not it had the ability to accurately assess the value of its assets—i.e. its valuation risk, a departure from IFRS. As set forth in the Shareholder Report:

> Inability to accurately assess valuation risk on a timely basis: **A number of key indicators in relation to valuation issues over structured Fixed Income products were identified and reported in the period prior to**

**Q3 2007.** These included a reduced ability to source external prices to verify trader marks and general increases in the value of untested positions. Due to limitations in data, BUC were not in a position to challenge on a timely basis the assertion for valuation purposes of the flat or low risk nature of the retained Super Senior positions. BUC reported (as have other independent internal control units) that **there were examples where significant manual intervention and reconciliation was required to assess the relevant risk nature, or where data was fragmented or insufficiently granular. These conditions existed for some time and represented latent and significant risks that were not reported by BUC as being of the highest priority until Q3 2007, after the impact of the Subprime crisis had become apparent.**

(Shareholder Report p. 41) (Emphases added.)

931. Furthermore, relying upon court documents in the Paramax matter. *The New York Times* reported that the Company's valuations may not have reflected the true fair value:

> To allay the fund's concerns, the documents say, Eric S. Rothman, the UBS managing director who arranged the deal, assured Paramax that mark-to-market risk was low. During a Feb. 22, 2007, phone call, Paramax contends in the filing, it was informed by Mr. Rothman that "UBS set its marks on the basis of **'subjective' evaluations that permitted it to keep market fluctuations from impacting its marks.**" The filing also says: "Rothman explained that he was responsible for all marks on UBS's super senior positions and that he could justify 'subjective' marks on the Paramax swap because of the unique and bespoke nature of the deal."
>
> ***
>
> In later discussions, according to court documents, Mr. Rothman contended that **even if significant defaults arose in the underlying mortgages, UBS's marking of the position "might not be as bad as you'd first think."** (*First Comes the Swap. Then It's the Knives.*, New York Times, June 1, 2008) (Emphasis added.)

932. Additionally, The Defendants also performed empirical market testing of their valuation assumptions by so-called "experiments" to sell positions in the market. These tests— in February 2007 and in April 2007 – yielded dramatically lower valuations than the marked value of the non-prime related assets. Nonetheless, the Defendants recklessly disregarded these material declines in the fair value of its RMBS and RMBS CDO related positions and avoided

343

timely recognizing the related losses, thereby materially overstating its RMBS and RMBS CDO related positions carried as assets (or materially understated its RMBS and RMBS CDO related positions carried as liabilities) and artificially inflating its net trading income from fixed income activities in the Company's Class Period financial statements in violation of IFRS (IAS 39).

933.    As a result of the material overstatement (or understatement, as applicable) of the Company's RMBS and RMBS CDO related positions, and the related net trading income from fixed income activities, the Company's Class Period financial statements also materially overstated net trading income, total operating income, net profit attributable to UBS shareholders and earning per share (basic and diluted).

934.    Thus, the Company's statements regarding UBS's results of operations, and more specifically, but not exclusively, net trading income from fixed income activities, net trading income, total operating income, net profit attributable to UBS shareholders, and earnings per share (basis and diluted), during the Class Period, were materially false and misleading because those disclosed amounts were not derived in conformity with IFRS.  Further, statements made by the Defendants regarding the value and/or valuation of the Company's RMBS and RMBS CDO related positions, during the Class Period were materially false and misleading as those values disclosed were not derived in conformity with IFRS.

935.    The Company, eventually, recognized substantial losses because of its previously undisclosed exposure to the significant concentration of nonprime-related securities when it announced write-downs totaling $38 billion (as of July 11, 2008).

936.    Similarly, the Company failed to properly value its holdings in ARS held on its balance sheet after August 2007.  As set forth herein, beginning in August 2007, UBS's employees within the Municipal Securities Group alerted their supervisors that UBS was

344

accumulated large positions in illiquid ARS because UBS could not buyers for these securities in monthly auctions. Senior risk officers permitted these employees to extend UBS's risk limits so that UBS could acquire these securities from their clients and not cause the ARS market to freeze up completely. The lack of a liquid market for these securities was a market input that impaired the value of these securities requiring UBS to report a loss no later than October 2007, when it published its October 30, 2007 Form 6-K.

    **D.**     **UBS's Disclosures Regarding Its RMBS and RMBS CDO Related Positions, And Concentrations of Risk, Violated Applicable Accounting Principles And SEC Regulations**

937. In addition to the fundamental principles of financial reporting established by the Framework above, IFRS requires certain specific disclosures to prevent financial statements from being materially false and misleading. Specifically IAS 10, *Events after the Balance Sheet Date*, requires disclosure of certain events that arise after the balance sheet date, but prior to the issuance of the financial statements (non-adjusting events after the balance sheet date). IAS 10 provides as follows, in relevant part:

> **An example of a non-adjusting event after the balance sheet date is a decline in market value of investments between the balance sheet date and the date when the financial statements are authorized for issue.** The decline in market value does not normally relate to the condition of the investments at the balance sheet date, but reflects circumstances that have arisen subsequently. Therefore, an entity does not adjust the amounts recognised in its financial statements for the investments. Similarly, the entity does not update the amounts disclosed for the investments as at the balance sheet date, although **it may need to give additional disclosure under paragraph 21.** (IAS 10 ¶ 11) (Emphasis added.)
>
>             **\*\*\***
>
> **If non-adjusting events after the balance sheet date are material, non-disclosure could influence the economic decisions of users taken on the basis of the financial statements. Accordingly, an entity shall disclose the following for each material category of non-adjusting event after the balance sheet date:**

345

(a) the nature of the event; and

(b) an estimate of its financial effect, or a statement that such an estimate cannot be made.

The following are examples of non-adjusting events after the balance sheet date that would generally result in disclosure:

…(h) **abnormally large changes after the balance sheet date in asset prices** or foreign exchange rates… (IAS 10 ¶¶ 21-22) (Emphasis added.)

938.    For the reasons alleged elsewhere herein, Defendants recklessly disregarded the inherent credit risk, market factors, and the internal indicators signifying the true value of its RMBS and RMBS CDO related positions *until at least the end of February 2007* (when internal UBS tests showed that subprime related assets were overvalued) which was subsequent to the date of the 2006 annual financial statements (December 31, 2006), but prior to the date of issuance of such financial statements.  As such, disclosure of the material decline in the fair value and related losses of the RMBS and RMBS CDO related positions, because of the significance to the financial statements, was necessary to prevent these financial statements from being misleading.  The Company's 2006 annual financial statements, in violation of IFRS (IAS 10), did not include such a subsequent event disclosure.

939.    In addition IAS 32 *Financial Instruments: Disclosure and Presentation* ("IAS 32") requires disclosure regarding financial instruments. IAS 32 provides:

Transactions in financial instruments may result in an enterprise's assuming or transferring to another party one or more of the financial risks described below. **The required disclosures provide information that assists users of financial statements in assessing the extent of risk** related to both recognized and unrecognized financial instruments:

(a) Price risk – There are three types of price risk: currency risk, interest rate risk and market risk.

***

(iii) Market risk is the risk that the value of a financial instrument will fluctuate as a result of changes in market prices whether those changes are caused by factors specific to the individual security or its issuer or factors affecting all securities traded in the market.

\*\*\*

(b) Credit risk – **Credit risk is the risk that one party to a financial instrument will fail to discharge an obligation and cause the other party to incur a financial loss.**

(c) Liquidity risk - Liquidity risk, also referred to as funding risk, is the risk that an enterprise will encounter difficulty in raising funds to meet commitments associated with financial instruments. Liquidity risk may result from an inability to sell a financial asset quickly a close to its fair value.

\*\*\*

(IAS 32 ¶ 43) (Emphasis added.)

For each class of financial asset, financial liability and equity instrument, both recognized and unrecognized, an enterprise should disclose:
(a) information about the extent and nature of financial instruments, **including significant terms and conditions that may affect the amount, timing and certainty of future cash flows**… (IAS 32 ¶ 47) (Emphasis added.)

940.    Additionally, IAS 32 required UBS to disclosure in its financial statements the exposure of its financial assets to credit risk, including significant concentrations of credit risk.

(IAS 32 ¶66)  Specifically, IAS states:

**Concentrations of credit risk are disclosed when they are not apparent from other disclosures about the nature and financial position of the business and they result in a significant exposure to loss in the event of default by other parties.** Identification of significant concentrations is a matter for the exercise of judgment by management taking into account the circumstances of the enterprise and its debtors…

**Concentrations of credit risk may arise from exposures to a single debtor or to groups of debtors having a similar characteristic such that their ability to meet their obligations is expected to be affected by changes in economic or other conditions. Characteristics that may give rise to a concentration of risk include the nature of the activities undertaken by debtors**, such as the industry in which they operate, the

347

geographic area in which activities are undertaken **and the level of creditworthiness of groups of borrowers…**

**Disclosure of concentrations of credit risk includes a description of the shared characteristic that identifies each concentration and the amount of the maximum credit risk exposure** associated with all recognised and unrecognised financial assets sharing that characteristic. (IAS 32 ¶¶ 74-76) (Emphasis added.)

941.    IAS 30 *Disclosures in the Financial Statements of Banks and Similar Financial Institutions* ("IAS 30") specifically addresses disclosures of concentrations of assets, liabilities and off-balance sheet items at banks and similar financial institutions. (IAS 30 ¶ 7)  Regarding such concentrations, IAS 30 states:

> **A bank should disclose any significant concentrations of its assets, liabilities and off balance sheet items.** Such disclosures should be made in terms of geographical areas, customer or industry groups **or other concentrations of risk**…
>
> **A bank discloses significant concentrations in the distribution of its assets and in the source of its liabilities because it is a useful indication of the potential risk inherent in the realisation of the assets** and funds available to the bank. Such disclosures are made in terms of geographical areas, customer or industry groups **or other concentrations of risk which are appropriate in circumstances of the bank**… (IAS 30 ¶¶ 40-41) (Emphasis added.)

942.    Additionally, regarding required disclosures in interim financial statements, IAS 34 provides:

> **An entity shall include the following information, as a minimum, in the notes to its interim financial statements, if material and if not disclosed elsewhere in the interim financial report.** The information shall normally be reported on a financial year-to-date basis. However, **the entity shall also disclose any events or transactions that are material to an understanding of the current interim period**:
>
> (a) a statement that the same accounting policies and methods of computation are followed in the interim financial statements as compared

with the most recent annual financial statements or, if those policies or methods have been changed, a description of the nature and effect of the change;

(b) explanatory comments about the seasonality or cyclicality of interim operations;

(c) **the nature and amount of items affecting assets, liabilities, equity, net income, or cash flows that are unusual because of their nature, size, or incidence;**

(d) the nature and amount of changes in estimates of amounts reported in prior interim periods of the current financial year or changes in estimates of amounts reported in prior financial years, if those changes have a material effect in the current interim period;

(e) issuances, repurchases, and repayments of debt and equity securities;

(f) dividends paid (aggregate or per share) separately for ordinary shares and other shares;

(g) segment revenue and segment result for business segments or geographical segments, whichever is the entity's primary basis of segment reporting (disclosure of segment data is required in an entity's interim financial report only if IAS 14 Segment Reporting requires that entity to disclose segment data in its annual financial statements);

(h) **material events subsequent to the end of the interim period that have not been reflected in the financial statements for the interim period;**

(i) the effect of changes in the composition of the entity during the interim period, including business combinations, acquisition or disposal of subsidiaries and long-term investments, restructurings, and discontinued operations. In the case of business combinations, the entity shall disclose the information required to be disclosed under paragraphs 66–73 of IFRS 3 *Business Combinations*; and

(j) changes in contingent liabilities or contingent assets since the last annual balance sheet date. (IAS 34 ¶ 16) (Emphasis added.)

943.    Furthermore, Regulation S-X, requires that material contingencies be disclosed in interim financial statements regardless of whether a significant change from the previous year

had occurred. (17 C.F.R. § 210.10-01(a)(5))

944. Here, the Company had an exposure to a significant, and excessive, concentration of nonprime-related securities from the start of the Class Period. As discussed in greater detail elsewhere herein, in January 2006 the Company directly entered the wholesale mortgage market – brokering its own loans – to provide further collateral to its securitization desks. In the Shareholder Report, the Company disclosed that in March 2006 the IB had planned significant growth initiatives, including ramping up RMBS and RMBS CDO related positions and further acknowledged that "in percentage terms, both resources and profits from [the IB CDO desk] increased significantly year on year from 2005 to 2006." (Shareholder Report pp. 11, 13) Furthermore, the Company's Form 6-K dated August 15, 2006, reported that debt instruments, primarily government, corporate and asset-backed securities increased by CHF 69 billion during the quarterly period ended June 30, 2006. (Form 6-K August 15, 2006 p. 52) That increase was significant relative to the previous quarterly period which had only a CHF 5 billion increase in similar debt instruments. (Form 6-K May 4, 2006 p. 50) The Company's Class Period financial statements, however, in violation of IFRS (IAS 30, IAS 32, IAS 34) and SEC rules, lacked any disclosure regarding its exposure to a significant, and excessive, concentration of nonprime-related securities.

945. Notwithstanding lack of disclosure regarding such concentration of risk, as required by IFRS, the Company's relevant financial statements lacked even the inclusion of the terms "subprime", "sub-prime", "Alt-A", "nonprime", or "non-prime" until September 30, 2007.

946. Although previously undisclosed, Defendants eventually acknowledged the Company had exposure to a significant, and excessive, concentration of nonprime-related securities. On Form 6-K October 30, 2007, Defendants referred to the Company's positions as

"sizeable" holdings which resulted in "substantial losses".  Regarding such losses, Defendants further acknowledged that:

> The losses in a few areas in our Investment Bank **outweighed the sustained strength in all our other businesses**. (Form 6-K October 30, 2007 p. 2) (Emphasis added.)

947.    In its Form 6-K (February 14, 2008), Defendants admitted the Company had a "large exposure in sub-prime mortgage-related securities and derivatives", which (i) resulted in a "devastating development" in the IB and (ii) caused the Company as a whole to report a net loss for the full-year 2007.  (Form 6-K February 14, 2008 p. 2).

948.    In addition to not including the disclosures required by IFRS, certain disclosures in UBS's financial statements were materially false and misleading because they falsely represented that the Company had implemented protocols to sufficiently monitor, limit, and disclose concentrations of risk.  For instance, in the 2006 annual financial statements, Defendants stated:

> In day-to-day business and in the strategic management of the balance sheet and capital position, **UBS seeks, through its risk management and control framework, to limit the scope for adverse variations in earnings and exposure to "stress" events.**
>
> The underlying objective is the creation and protection of shareholder value and the framework is built around the following principles:
>
> – business management is accountable for all risks assumed and is responsible for their continuous and active management
>
> – an independent control process is implemented to provide an objective check on risk-taking activities when required by the nature of the risks, in particular to balance short term profit incentives and the long term interests of UBS. **All exposures are independently monitored and reviewed** and, depending on the nature of the risks, may also require pre-approval

**– comprehensive, transparent and objective risk disclosure to senior management, the Board of Directors, shareholders, regulators, rating agencies and other stakeholders is the cornerstone of the risk control process**

**– risks are controlled at the level of individual exposures, at a portfolio level, and in aggregate across all businesses and risk types to protect the Group's earnings**

**– managing and controlling risks, and in particular avoiding undue concentrations of exposure, limiting potential losses from stress events, and restricting significant positions in less quantifiable risk areas, are essential elements of the risk management and control framework and the protection of UBS's reputation.**

Excellence in risk management is fundamentally based upon a management team that makes risk identification and control critical components of its processes and plans.

\*\*\*

Stress loss measures are run daily. **They quantify exposure to more extreme market movements** than are normally reflected in VaR, **under a variety of scenarios**, and are an essential complement to VaR.

**Controls and restrictions are placed on risk concentrations in trading books, taking into account variations in price volatility and market liquidity.** They include measures of exposure to individual market risk variables, such as the exchange rates and interest rates of particular currencies ("market risk factors"), and on positions in the securities and other tradable obligations of individual names or groups, or derivatives referenced to such names ("issuer risk" – see section b)(v)).

\*\*\*

(v) Issuer risk

Issuer risk is the risk of loss on securities and other obligations in tradable form (including traded loans), and on derivatives based on such assets. It arises from credit-related and other events and, ultimately, default of the issuer, obligor or reference name.

As an active trader and market maker, the Investment Bank holds positions in these instruments, which are included in VaR and are also **subject to controls on concentrated exposure to individual names and groups.**

949.    As acknowledged by the Defendants, despite the contrary representations in the

2006 Annual Report concerning the lack of concentrated risk, the Company had severe risk

concentrations on its books. The Company's Class Period financial statements, in violation of IFRS, failed to provide any indication that the Company had such significant exposure to nonprime-related securities. As such, the Company's Class Period financial statements failed to comply with IFRS (IAS 10, IAS 30, IAS 32, IAS 34).

950. In addition to the applicable IFRS requirements, Regulation S-K requires the Company to include certain disclosures in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of the Company's filings with the SEC. Regulation S-K states that the MD&A must:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations... (17 C.F.R. § 229.303(a)(3)(i-ii))

> The discussion… also shall provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations. (17 C.F.R. § 229.303(a))

951. Regarding interim periods, Regulation S-K states:

> …a management's discussion and analysis of the financial condition and results of operations shall be provided so as to enable the reader to assess material changes in financial condition and results of operations between the periods specified in paragraphs (b) (1) and (2) of this Item. The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item [refer to preceding excerpt], except that the impact of inflation and changing prices on operations for interim periods need not be addressed.

Discuss any material changes in financial condition from the end of the preceding fiscal year to the date of the most recent interim balance sheet provided…

Discuss any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided and the corresponding year-to-date period of the preceding fiscal year. If the registrant is required to or has elected to provide an income statement for the most recent fiscal quarter, such discussion also shall cover material changes with respect to that fiscal quarter and the corresponding fiscal quarter in the preceding fiscal year. In addition, if the registrant has elected to provide an income statement for the twelve-month period ended as of the date of the most recent interim balance sheet provided, the discussion also shall cover material changes with respect to that twelve-month period and the twelve-month period ended as of the corresponding interim balance sheet date of the preceding fiscal year… (17 C.F.R. § 229.303(b)(1-2))

The registrant's discussion of material changes in results of operations shall identify any significant elements of the registrant's income or loss from continuing operations which do not arise from or are not necessarily representative of the registrant's ongoing business. (17 C.F.R. § 229.303(b)(4)).

952.    The Company's MD&A, filed with the SEC as part of the Company's Forms 20-F and Forms 6-K for the annual and interim periods, respectively, as filed throughout the Class Period failed to sufficiently describe material changes in the Company's financial condition and/or results of operations, nor did such filings disclose that the reported financial information was not indicative of the Company's future financial condition and/or results of operations because of the significant, and excessive, exposure to nonprime-related securities and the subsequent material declines in the fair value and related losses of the Company's RMBS and RMBS CDO related positions.

953.    The Company's failure to report its concentration of risk in ARS despite risk managers approving the accumulation of these positions in an illiquid market also violated the

above referenced accounting provisions. No later than August 2007, UBS risk managers were informed about the concentration of ARS positions on UBS's balance sheet and UBS's exposure to losses from these assets. The Company should have disclosed these concentrations in its Form 6-K October 30, 2007 and its failure to do so violated the above accounting principles and SEC regulations.

> **E.** **UBS's Failure to Maintain Adequate Controls Over Its Financial Reporting And Disclosures Violated Applicable Accounting Principles And SEC Regulations**

954. The SEC defines "disclosure controls and procedures" as follows, in relevant part:

> controls and other procedures of an issuer that are designed to ensure that **information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a *et seq.* ) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms**… (17 C.F.R. § 240.13a-15(e)) (Emphasis added.)

955. "Internal control over financial reporting" is defined by the SEC:

> A process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and **the preparation of financial statements for external purposes in accordance with generally accepted accounting principles** and includes those policies and procedures that:

> (1) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements. (17 C.F.R. § 240.13a-15(f)) (Emphasis added.)

956.     Exchange Act Rule 13a-15 requires the Company's principal executive officer and principal financial officer to annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures, and provide management's assessment of the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's internal controls over financial reporting, as of the end of each fiscal year. (17 C.F.R. § 240.13a-15(b)(1) and (c))

957.     During the Class Period, the Defendants caused the Company to mislead investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting. Certain Defendants falsely represented that the Company's disclosure controls and procedures, and internal control over financial reporting were effective as of December 31, 2005.  These assurances were repeated throughout the Class Period.

958.     The Company's disclosure controls and procedures, and internal control over financial reporting were not effective as of December 31, 2005 as the Defendants caused the Company to issue the 2005 annual financial statements on Form 20-F as filed with the SEC, which, in violation of IFRS and SEC rules, were materially false and misleading with respect to the valuation of the RMBS and RMBS CDO related positions and the lack of disclosure of the Company's significant, and excessive, exposure concentrated in nonprime-related securities.

959.     Additionally, the Shareholder Report outlines in great detail significant lapses in UBS's internal controls that, according to the Company, contributed "to the build up of UBS's Subprime positions which subsequently incurred losses." (Shareholder Report p. 28)  Those lapses

are discussed in greater detail elsewhere herein, but include, among numerous others, the following:

- The "fragmented approval structure", "absence of risk management" and "incomplete risk control methodologies", and "lack of operational / notional limits" regarding the Company's CDO warehouse (Shareholder Report p. 29);

- "The CDO desk did not carry out sufficient fundamental analysis as market conditions deteriorated, or conduct 'look-through' analysis to re-assess potential issues in the AMPS structure or the underlying CDO structure" (Shareholder Report p. 30);

- "Insufficient accounting for the risk of divergent movements between previously correlated asset classes or instruments ("basis risk")" and the lack of "risk management, risk control and valuation systems and data" regarding DRCM's ABS / MBS Relative Value Trading losses (Shareholder Report p. 31); and

- generally, overriding issues related "principally to implementation and effectiveness" of governance, and insufficient risk management and controls, including, among numerous others, issues with reporting, "healthy skepticism", and the "inability to accurately assess valuation risk on a timely basis" (Shareholder Report pp. 35, 37-42).

960. Furthermore, the Company's true financial condition and results of operations were further masked by false reassurances that the Company maintained an effective risk management process. In addition, statements made by the Defendants during the Class Period regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting, and more specifically, but not exclusively, the identification, measurement, monitoring, management, and disclosure of risk, and the valuation of the Company's RMBS, RMBS CDO related positions, were materially false and misleading for the reasons set forth above.

**F.  UBS Violated IFRS By Failing to Disclose a Contingent Liability In Connection with Its Wealth Management Services**

961.    Because UBS was advising and/or assisting its clients on evading U.S. tax laws, under IFRS the required the Company to record a contingent liability for the possibility that these practices could expose UBS to civil and criminal fines, penalties, and/or liability.

962.    IAS 37, *Provisions, Contingent Liabilities and Contingent Assets* ("IAS 37"), provides authoritative literature regarding, among other things, when a Company must account for "provisions" and/or disclose "contingent liabilities."  Both provisions and contingent liabilities arise from past events (i.e. the obligating event occurred prior to the balance sheet date).  (IAS 37 para 10.)

963.    Provisions are such "present obligations" that are *probable* and *reasonably estimable* and, therefore, are recognized as liabilities in a company's financial statements.

964.    Contingent liabilities are obligations that are merely *possible* or are "present obligations which are not probable and/or reasonably estimable." (IAS 37 ¶ 13)

965.    Contingent liabilities existing at the balance sheet date are required to be disclosed, *regardless of the existence of a present obligation or the ability to determine a reliable estimate*, unless the probability of loss is *remote*. (IAS 37 ¶ 28).

966.    Disclosures for each class of provision and contingent liability must include, among other things, a brief description of the nature of the obligation/contingent liability. (IAS 37 ¶¶ 85(a), 86).  The required disclosure may be excluded if such disclosure can be expected to "prejudice seriously" the reporting entity's position in a dispute related to a provision or contingent liability, however, these cases are "extremely rare", and the entity is still required to disclose the general nature of the dispute and why the other information has not been disclosed. (IAS 37 ¶ 92)

967. Additionally, IAS 37 provides that provisions must be adjusted at each balance sheet date to reflect the current best estimate and contingent liabilities must be continually assessed to determine whether a loss has become probable. (IAS 37 ¶¶ 59, 30).

968. UBS, over the last seven years, has encouraged and incentivized its employees within its Wealth Management Division to advise and assist its clients on how to evade applicable tax laws. These activities have included setting up private offshore accounts with the explicit goal to conceal assets, smuggling assets out of the United States on behalf of clients, and stated policy of concealing the identities of clients from the U.S. tax authorities that did not file W-9 forms.

969. Given that UBS's activities created a possible obligation in so far as these activities violated the laws of countries in which UBS operated, and that the probability of losses from civil and criminal fines, penalties and/or other liabilities was not remote, IFRS required the Company to disclose, in its financial statements, this potential risk of loss to investors in the form of, among other things, a brief description of the nature of the contingent liability. Its failure to do so constitutes a violation of IFRS.

## XIV. ADDITIONAL JURISDICTION ALLEGATIONS

970. In this case, the locus of the fraudulent conduct was the United States. As demonstrated by the Defendants' admissions in its Shareholder Report and information available on its website, in the financial media, and from confidential witnesses cited to herein, this fraud was masterminded and implemented by Defendants (and other UBS employees) in the United States through the IB and DRCM in Manhattan, NY and Stamford, CT. The DOJ's investigation into UBS's employees' role in helping the Company's clients evade U.S. tax obligations and

UBS's misrepresentations relating to auction-rate securities further solidify the ties between UBS's fraudulent conduct and the United States.

971. At the heart of this case is the Defendants' accumulation and overvaluation of over $100 billion in U.S. asset-backed securities, which has resulted in $38 billion in write-downs of UBS assets as of April 1, 2008. As stated above, UBS took $18.7 billion in write downs in 2007, and discussed the origins of those in the Shareholder Report. According to the Shareholder Report, U.S.-based employees of UBS were responsible for at least 90 percent of the 2007 write-downs, and all of the write-downs related to U.S.-created and U.S.-traded assets. Taking advantage of recklessly inadequate supervision and insufficient risk control systems, U.S.-based employees accumulated billions of dollars in highly risky assets and knowingly overstated these assets' values, thereby directly causing the losses suffered by the Class while enriching themselves through UBS's obtuse compensation and incentive structure detailed herein.

972. The domestic origin of the fraud detailed herein is acknowledged by Defendants in the Shareholder Report:

> In 2007 and in relation to the first quarter of 2008, UBS AG ("UBS") has made several announcements of losses incurred in relation to structuring, trading and investment activities in mortgage and asset-backed securities, ***in particular with respect to securities referencing US "Subprime" residential mortgages.***
>
> UBS first announced Subprime-related losses in connection with the closure of Dillon Read Capital Management ("**DRCM**") in May 2007. UBS ultimately reported net losses of USD 18.7 bn ***in relation to US residential mortgage sector*** exposures for the year ended 31 December 2007 (the "Subprime Losses").

(Emphases added).

973. As further discussed in the Shareholder Report, at least 90 percent of the 2007 write-downs involved misconduct within the U.S. by U.S.-based employees of UBS, and 100 percent related to asset-backed securities heavily biased toward U.S. underlying assets:

360

Losses on the DRCM [with its leadership in Stamford, Connecticut and the majority of employees in New York] trading strategies contributed approximately 16% of UBS's Subprime Losses for the year ended 31 December 2007. The IB's CDO desk [based in New York with some employees in Stamford, Connecticut] contributed approximately 66% of UBS's Subprime Losses in the same period, and losses from the [Foreign Exchange/Cash Collateral Trading] business [attributable primarily to ] a further 10%.

974.     Throughout the Shareholder Report, UBS makes it clear that this case does not present a situation where all or even most of the key decisions relating to the fraud were made abroad, as the Company's U.S.-based managers and trades retained nearly all decision-making authority in connection with its subprime-backed assets:

> ***There was not, at the Group level, a particular and specific decision either to develop business in, or to increase exposure to, Subprime markets.*** Additionally, there was no specific decision substantially to increase UBS's overall risk taking in connection with these growth initiatives.

(Emphasis added).

975.     In fact, as explained in the Shareholder Report, UBS considered the retention of autonomy by UBS's U.S.-based divisions and lack of challenge from London and Zurich-based Senior Management to be an overarching cause of the losses:

**6.3 Overarching Causes**

*           *           *

- Insufficient challenge of the business case and governance approach: . . . . [UBS] allowed exceptional levels of autonomy within a complex and nonstandard governance model.

*           *           *

- Failure to demand a holistic risk assessment: . . . ***Group Senior Management relied on assurances of others rather than obtaining all of the facts and analytically reviewing the situation.***

(Emphasis added).

976.     Further, as explained throughout this Complaint, these circumstances allowed a

fraud masterminded in the United States, which ultimately destroyed tens of billions of dollars in shareholder value, to be carried onto UBS's books.

977.    All of the major players associated with accumulating and valuing the ABS and CDO portfolios held by UBS and DRCM were U.S.-based, including Costas, the charismatic head of DRCM and himself a New Jersey native.  Upon accepting his position with DRCM, a Delaware limited liability company, in 2005, Costas resigned from his position as Chairman and CEO of the IB.  At the time, *The* NEW YORK TIMES commented that Costas "propelled a foreign bank [UBS] to the upper echelons of Wall Street" while serving as Chairman and CEO of the IB.  One commentator noted at the time of Costas's departure from the IB that to observers "Costas, by his achievement and the sheer force of his character, *was* UBS Investment Bank."

978.    As head of the IB, Costas maintained the IB's power base and key employees in Stamford, Connecticut and Manhattan, NY.  He spent $600 million to hire 50 senior bankers and opened the largest trading floor in the world, the size of two football fields, at UBS's Stamford headquarters.  At the time UBS founded DRCM, one commentator noted that "the UBS fixed-income business [had been] built by Costas, Mike Hutchins, and Ken Karl."  Further, even after DRCM was created and began operating out of its headquarters in New York, the power center of the IB nonetheless remained in Stamford and New York.

**A.    The Locus of DRCM's Fraudulent Conduct was the United States**

979.    Notwithstanding the materiality of this portion of UBS's business, DRCM was afforded near complete autonomy from UBS risk control.  The Shareholder Report cites this autonomy as an "overarching cause" of the write-downs attributable to the hedge fund:

> Insufficient challenge of the business case and governance approach:  The manner in which DRCM was established did not correctly weigh the strength of UBS as an organisation [sic] against the perceived importance, interests and demands of a

few individuals, and allowed exceptional levels of autonomy within a complex and nonstandard governance model.

980. DRCM's autonomy was confirmed by CW 2, who described how DRCM bullied UBS risk-management personnel, questioning the internal checks and balances meant to keep DRCM under control: "The Dillon Read guys were able to get through a lot of what they sought" because "if risk management raised concerns, they squashed it."  CW 10 also described how DRCM had only exclusive meetings, never with IB Fixed Income or other UBS employees present.  This same witness described how DRCM seemed to have no controls on its operating budget and how DRCM employees received the newest most-expensive technology whereas the IB used refurbished computers and supplies.

981. DRCM's control and influence over UBS's risk-management personnel allowed it to systematically overstate the value of its assets from its offices in New York without interference from UBS risk managers.  DRCM's unfettered ability to overvalue its assets during the Class Period ultimately led to 16 percent of UBS's total write-downs in 2007, but more importantly, served as a guidepost by which UBS should have been valuing its own portfolio.

**B.      The Locus of the IB's Fraudulent Conduct was the United States**

982. As stated above, the power center for UBS IB Fixed Income's CDO business— trading desk, warehouse, back office, and research—remained in New York and Stamford after DRCM was created.  After the departure of the DRCM managers, Defendants Martin (Head of Mortgages and ABS and, eventually, the Rates division), Singh (Global Head of Securitized Products) and Stehli (Global Head of the CDO Group) continued to run the ABS and CDO desks at the IB.  All were based in Manhattan, NY.  It was these individuals who reviewed and

approved of all CDO deals done by the IB during the Class Period; deals which ultimately gave rise to 66 percent of the Company's 2007 asset write-downs.

983.    UBS's U.S.-based personnel were able to execute the fraudulent actions detailed above because, as set forth in the Shareholder Report, UBS's severely deficient risk management system vested those in charge of the U.S.-based IB with exceptional levels of decision-making authority.  For example, CDO deals were not subject to a comprehensive NBI review, and were only presented for TRPA approval at a time when denying approval was cost prohibitive.  Moreover, there were no aggregate notional limits on the sum of CDO Warehouse positions, or on the amount of retained AMPs or unhedged super senior positions. This effectively left the U.S.-based IB Fixed Income managers with the unrestrained authority to determine key factors in the securitization process, to decide whether to purchase or retain super senior CDO tranches, and to determine the ultimate value and risk assigned to particular positions.  This lack of oversight was highlighted by Company in the Shareholder Report as a key cause of the losses:

> The CDO business model involved structuring a CDO for a manager and retaining as much as 60% of the capital structure on UBS's own books. The deal size would frequently be in excess of USD 1 bn.  In other parts of the IB (or elsewhere in UBS) a commitment of that size would be subject to intensive management scrutiny, either in the form of a "Commitment Committee" or other express IB Senior Management approval. . . .

984.    Moreover, U.S.-based IB managers and traders, encouraged by executives in New York and Stamford, marketed the sale of fixed income assets, even if that required the Company retaining large portions of the CDOs, without regard to the exposure to UBS.   As explained throughout the Shareholder Report, a key to increasing the growth of the Investment

Bank's sales of fixed income assets was understating the risks associated with retaining tranches of these assets on UBS's balance sheet.

985.    Indeed, UBS's U.S.-based personnel were instrumental in understating these risks.  By way of example, through the execution of AMPs trades, the U.S.-based CDO desk was able to knowingly misrepresent certain retained super senior positions as being fully hedged when in fact only a minimal amount of protection existed.  This tactic, which was responsible for 32 percent of the Company's 2007 write-downs, was developed and implemented by Hutchins and other U.S.-based traders in order to conceal the risks associated with these positions and thereby facilitated the accumulation of billions of dollars in subprime and Alt-A backed bonds.

986.    In part because of this misrepresentation, the Shareholder Report characterized the New York-based CDO desk and others in the U.S.-based IB Fixed Income division as the "key drivers" behind the losses attributable to the super senior inventory, which constituted 50 percent of the total 2007 write-downs:

> Key drivers of the growth of the Super Senior inventory included:
>
> • **_Increasing use by the CDO desk of hybrid CDO issuance_**, both in number and size of deals – more than 75% of total CDOs were hybrids (hybrid CDOs are backed by a combination of cash and synthetic assets);
>
> • Increasing volumes of Variable Funding Note ("VFN") Super Seniors. The VFN Super Seniors did not require up-front UBS funding, and only the replacement value showed on the UBS balance sheets; and
>
> • Growth in the AMPS business.  **_A hedging methodology enabled the desk to buy relatively low levels of market loss protection (generally 2 to 4% and sometimes more), and the desk considered the position as fully hedged._**  All AMPS trades except for one were made before July 2007.

(Emphases added).

987.    As explained by the April 24, 2008 issue of *The Economist*, the Shareholder

Report implicates the New York-based trading desk of 35-40 people (at its peak) in the creation

of two-thirds of UBS total write-downs as at December 31, 2007:

> The primary contributor to UBS's write-downs in the IB was the
> [Collateralized Debt Obligation or] CDO desk within the IB's Fixed
> Income business.  As at 31 December 2007, ***approximately two thirds of
> the total UBS losses were attributable to the CDO desk.***
>
> The CDO desk entered into ***transactions related to US Subprime
> residential mortgages principally through CDO securitization and
> through the purchase or retention of CDO Super Senior positions.***

(Emphases added).

988.    Further, based on the Shareholder Report and its own investigation and analysis,

*Bloomberg Markets Magazine* characterized the U.S. source of UBS's $38 billion in write-

downs as emanating from UBS's U.S. operations:

> The investment bank's biggest bets came from the CDO desk, run by
> James Stehli, who was based at UBS's New York offices, around the
> corner from Radio City Music Hall. Under the direction of David Martin,
> his boss in the fixed-income unit, Stehli's group parked residential-
> mortgage-backed securities for one to four months in what the bank called
> a "warehouse" before securitizing them into CDOs and selling them to
> investors.
>
> By early 2006, Martin and Stehli, who both left UBS last year, had gone a
> step further, according to the UBS report. Instead of just securitizing and
> selling the CDOs, Stehli's unit began retaining the highest-rated tranches,
> known as "super seniors," on UBS's books and buying more on the open
> market so that the bank could profit from their relatively high yields. To
> buy the CDOs, the bank borrowed tens of billions of dollars at low rates,
> taking advantage of UBS's AA+ credit rating from Standard & Poor's.
> From February 2006 to September '07, the CDO desk amassed a $50
> billion inventory of super senior CDO tranches.
>
> *                *                *
>
> UBS's risk management team never capped the size of the CDO positions,
> partly because most of them were rated AAA and didn't throw up any red

366

flags, according to the UBS report. Stehli's CDO desk recorded two-thirds of UBS's losses in 2007, or $12.5 billion, the bank says.

989.    From various perspectives of the relevant events, it is evident that U.S.-based officers and employees were responsible for intentionally and/or recklessly overstating the value of, and understating the risk associated with, various complex financial positions tied to U.S. real estate that were warehoused, originated, valued, and traded in the IB's New York and Stamford offices.  As explained by *Reuters*, in the Shareholder Report "UBS underscores how complicated formulae such as Value At Risk, or VAR, failed to prevent financial engineers from modifying methodologies in order to pack even more risk into existing stress limits."  As stated above, these financial engineers were located in the United States, as it was Hutchins and other U.S.-based traders who knowingly manipulated the Company's VaR calculation in order to drastically understate the Company's risk exposure.  Further, other U.S.-based UBS employees took part in the concealment, as explained by the statement of CW 3, a senior collateral analyst at the Company.  CW 3 stated that, in reporting on collateral quality, collateral analysts were encouraged to "smooth out" certain non-conforming figures rather than "sticker" a pool of loans that would become a mortgage-backed security.  CW 3 explained that "smoothing out" was far preferable than reporting problems with the pool and that everyone knew that the practice was regularly done.  Had CW 3 and other UBS employees stickered the document to alert RMBS investors of issues, the investors would have been entitled to request UBS repurchase the bonds – something that UBS did not want to have to do.  Although aware of the practice, "bosses" did not have the tools to know specifically when and where the practice occurred.  According to CW 3, UBS's was particularly ill equipped to deal with such issues: "There was a complete lack of controls."

990. Further, the primary responsibility for valuing portfolios rested with the individual U.S.-based managers and traders. As explained in the Shareholder Report, the traders at the CDO desk in New York would determine the value of their positions: "Under UBS's policy, traders are responsible for determining the fair value of their positions on a daily basis. . . ." In addition, because the market for CDOs is so thinly traded and nothing like, the U.S.-based CDO desk traders' marking to market would ultimately determine the value carried on UBS's books. Thus, by both controlling the daily valuation and manipulating the risk assigned to positions without interference, U.S.-based IB employees' inflated asset valuations were ultimately carried onto UBS's books, thus rendering the Company's Class Period financial statements materially false and misleading.

991. Moreover, this exceptional authority was coupled with an obtuse compensation structure that motivated the U.S.-based employees to accumulate and overvalue the Company's CDO holdings. According to the Shareholder Report, the compensation structure "did not differentiate between return generated by skill in creating additional returns versus returns made from exploiting UBS's comparatively low cost of funding" and under which "treatment of many of the transactions meant that employee remuneration (including bonuses) was not directly impacted by the longer term development of positions created" and "bonuses were measured against gross revenue after personnel costs, with no formal account taken of the quality or sustainability of those earnings."

992. The Shareholder Report is replete with descriptions of U.S.-based officers' and employees' role in misrepresenting risk and value as to super senior positions with senior management effectively acting as a rubber stamp:

In monitoring and reporting positions, IB [Market Risk Control ("MRC")] took data feeds from the front-office systems. *In analyzing the retained positions, MRC generally did not "look through" the CDO structure to analyze the risks of the underlying collateral.* In addition, the CDO desk does not appear to have conducted such "look through" analysis and the static data maintained in the front-office systems did not capture several important dimensions of the underlying collateral types. For example, the static data did not capture FICO scores, $1^{st}/2^{nd}$ lien status, collateral vintage (which term related to the year in which the assets backing the securities had been sourced), and did not distinguish a CDO from an ABS. *MRC did not examine or analyze such information on a regular or systematic basis.*

\*　　\*　　\*

*The AMPS model was certified by IB Quantitative Risk Control ("QRC"), but with the benefit of hindsight appears not to have been subject to sufficiently robust stress testing.* Further, the CDO desk did not carry out sufficient fundamental analysis as market conditions deteriorated, or conduct "look-through" analysis to re-assess potential issues in the AMPS structure or the underlying CDO structure. . . .

\*　　\*　　\*

Once hedged, either through NegBasis or AMPS trades, the Super Senior positions were VaR and Stress Testing neutral (i.e., because they were treated as fully hedged, the Super Senior positions were netted to zero and therefore did not utilize VaR and Stress limits). *The CDO desk considered a Super Senior hedged with 2% or more of AMPS protection to be fully hedged.* In several MRC reports, the long and short positions were netted, and the inventory of Super Seniors was not shown, or was unclear. *For AMPS trades, the zero VaR assumption subsequently proved to be incorrect as only a portion of the exposure was hedged* . . . although it was believed at the time that such protection was sufficient. *A consequence of this treatment was a lack of visibility to, and challenge of these positions by, Group and IB Senior Management*.

\*　　\*　　\*

Other than the general TRPA process for CDOs, *there was no approval process or particular restriction on retaining or purchasing unhedged Super Senior positions (including unhedged positions acquired in anticipation of execution of AMPS hedges)*. The CDO desk did not submit an NBI [New Business Initiative] request for the AMPS business, although in total eleven AMPS trades were executed.

369

*　　*　　*

UBS believes that the ABS/MBS [Asset Backed Securities/Mortgage Backed Securities] relative value *trading losses arose from insufficient attention being paid to fundamental risk factors specific to the Subprime section within DRCM's home equity-linked trading book (idiosyncratic risks – such as vintage, 1st/2nd lien, etc.), and to basis risk errors made in hedging those positions.* Risk management, risk control and valuation systems and data appear to have been lacking.

*　　*　　*

Relevant IB business management do not appear to have imposed a framework of additional limits on the business under review beyond those set by risk control functions. . . . *There is no indication that IB Senior Management seriously challenged the efficacy of pursuing this business in the fact of increasing concern about the US housing market and specifically the Subprime sector.*

*　　*　　*

*MRC appears not to have substantially challenged the CDO desk* when significant limit increases for the RMBS warehouse were requested initially in late 2006, and then against in Q2 2007, when the Subprime CDO business was undergoing significant growth.

*　　*　　*

*There is no indication that MRC sought to review the quality of existing portfolios as questions were being raised in relation to the Subprime sector more generally.* A comprehensive analysis of the portfolios may have indicated that the positions would not necessarily perform consistent with their ratings.

*　　*　　*

*Due to limitations in data, BUC were not in a position to challenge on a timely basis the assertion for valuation purposes of the flat or low risk nature of the retained Super Senior positions.* . . . These conditions existed for some time and represented latent and significant risks that were not reported by BUC as being of the highest priority until Q3 2007, after the impact of the Subprime crisis had become apparent.

(Emphases added).

993.    In addition, U.S.-based Defendants continued to conceal their overvalued assets well into 2007.  UBS's subprime crisis was undeniable by March 2007 according to an article published in the *Wall Street Journal* on October 12, 2007; however, the Company allowed its IB managers in the U.S. to orchestrate a last-ditch valuation cover up in hopes that the market would rebound before shareholders and customers became aware of the Company's tremendous losses.  As set forth in detail above, U.S.-based DRCM manager Niblo twice slashed mortgage and asset-backed fund valuations in April 2007, reducing values by 20 percent.  According to traders with knowledge of the matter, it was New York-based IB Fixed Income managers Singh and Chari who immediately challenged Niblo's valuations because the IB was carrying similar securities on its books at a higher value.  As a result, on May 3, 2007, UBS closed DRCM and reintegrated its business back into the IB, and in June, UBS put Mr. Niblo on administrative leave and then let him go in August.

994.    Other valuation issues also arose in April 2007 and were ignored by U.S.-based IB Fixed Income managers with the blessing of UBS Group Accounting Policy.  As reported in the Shareholder Report, valuation questions as to securities in the CDO Warehouse pipeline were affirmatively resolved by the CDO desk in New York:

> The question of whether to take mark-to-market losses on the CDO Warehouse securities was escalated by BUC/IB Finance to Group Accounting Policy in early April 2007 and the treatment was confirmed, as the trading desk confirmed that there was at least a 90% probability that the CDO securitizations would be completed. . . .

995.    Shortly thereafter, on May 14, 2007, UBS hosted its 2007 Global Financial Services Conference at the Pierre Hotel in New York.  At this conference, UBS IB CEO and Chairman Jenkins assuaged fears about the recent termination of DRCM and the IB's financial

footing. In addition to making false statements about IB's contribution to UBS's bottom line, his presentation boasted that for IB Fixed Income "Our growth investments are gaining momentum . . .What we have delivered to date . . . MBS & ABS – Right side of the US subprime market." Another slide falsely represented that "Fixed Income – record Q1 revenues and growth initiatives on track."

996. Finally, after mark-to-market valuation became absolutely impossible because of near-complete illiquidity for mortgage-backed securities, the Company began determining asset values through a Fundamental Model created by UBS IB Fixed Income's Research Group:

> At the start of September 2007, UBS determined to adopt a "Fundamental Model" approach to valuing certain positions. This approach was based on published research by UBS's Fixed Income Research Group.

(Shareholder Report at 22). Not surprisingly, the Fixed Income CDO Research Group was also based in New York. The group was led by Laurie Goodman ("Goodman"), the Global Head of Fixed Income Research and Douglas Lucas ("Lucas"), the Head of CDO Research, who has co-authored several books on CDOs and researched and wrote the Company's publicly available *CDO Insight* newsletter previous to and during the relevant time period. The *CDO Insight* publication shows that UBS IB's "CDO, RMBS, ABS & CMBS Strategy Group" was comprised entirely of New York-based employees. That research group was renamed "Global Fixed Income Research—Americas, Securitized Products & CDO Research" in June 2006 and, throughout the remainder of the relevant period, remained staffed by New York-based UBS employees. This publication also shows that, throughout the Class Period, the Global CDO Group was led by Stehli and was comprised of New York and Stamford-based employees with only one or two exceptions. At least since June 2006, UBS Securities LLC, a Delaware limited liability company, has prepared this publication.

### C.     The Locus of the Auction-Rate Securities Fraud is the United States

997.     Likewise, UBS's fraudulent ARS scheme is plainly a U.S.-centric fraud, as it was hatched by U.S. employees, was facilitated through the use of U.S. securities traded in U.S. markets, and was perpetrated on U.S. investors.

998.     As alleged above, the ARS fraud involved UBS deliberately marketing ARS to U.S. clients as safe, cash-like alternatives.  The ARS at the core of this issue were securities issued by U.S. municipalities, U.S.-based loan companies and U.S.-based tax-exempt organizations.  Further, the interest rates for these securities were determined via U.S.-based Dutch auctions.  UBS sold these securities to U.S. investors without informing those investors that UBS itself was almost single-handedly supporting the auction for these securities, and was thus artificially maintaining their value.

999.     UBS continued marketing the ARS to U.S. investors as cash alternatives, even after it had reason to believe that the market for these securities was collapsing.   At that point, U.S.-based UBS executives began a frenzied campaign to sell these securities to unwitting investors, thereby reducing their ARS inventories to the material detriment of both the ARS investors and UBS shareholders.  These fraudulent sales were made to U.S. investors, such as the Massachusetts Turnpike Authority and the various other U.S. towns and cities that were involved in UBS's $37 million settlement.  Also, on June 26, 2008, the Massachusetts Securities Division filed a lawsuit against UBS alleging that the Company knowingly sold risky ARS while portraying them as safe investments.

### D.     The Locus of the Tax Evasion Scheme is the United States

1000.   Finally, the Company's tax evasion scheme is also a U.S.-centric fraud.  As stated above, the DOJ is investigating whether UBS aided wealthy U.S. clients in evading more than

$300 million in U.S. income taxes. In addition to potential criminal charges for several UBS wealth managers, the DOJ's investigation has caused UBS's widespread illegal activities to be revealed to the public, thereby causing its shareholders to suffer losses.

The tax evasion scheme was based almost entirely in the United States. The sole purpose of the scheme had the effect of defrauding the United States government by assisting U.S. customers in violating U.S. tax laws. The fraudulent scheme was carried out within the United States, in violation of U.S. law. Further, the fact that the U.S. DOJ is investigating the Company's actions provides further evidence that the locus of this scheme rests squarely within the United States.

## XV. INAPPLICABILITY OF SAFE HARBOR

1001. As alleged herein, the Defendants acted with scienter because at the time that they issued public documents and other statements in UBS's name, they knew or with extreme recklessness disregarded the fact that such statements were materially false and misleading or omitted material facts. Moreover, the Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

1002. As set forth in detail throughout this Complaint, the Defendants, by virtue of their control over, and/or receipt of UBS's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to artificially inflate UBS's financial results. The Defendants created, were informed of, participated in and knew of the scheme alleged herein to distort and suppress material information pertaining to UBS's financial condition, profitability and present and future

prospects of the Company. With respect to non-forward looking statements and omissions, the Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

1003. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. None of the statements pleaded herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be materially false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

1004. In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or with extreme recklessness disregarded the fact that forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of UBS who actually knew or with extreme recklessness disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made nor were any

375

of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XVI. APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-MARKET DOCTRINE

1005. The market for UBS's securities was open and efficient at all relevant times for the following reasons (among others):

- The Company's securities met the requirements for listing, and were listed and actively traded on, among others, the NYSE, the SWX and the LSE;

- As a regulated issuer, UBS filed periodic public reports with the SEC;

- UBS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- The market reacted to public information disseminated by UBS;

- UBS was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public market place;

- The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of UBS's securities; and

- Without knowledge of the misrepresented or omitted material facts, Plaintiffs and the other members of the Class purchased or otherwise acquired UBS securities between the time Defendants made the material misrepresentations and omissions and the time the fraudulent scheme was being disclosed, during which time the price of UBS securities was inflated by Defendants' misrepresentations and omissions.

376

1006.  As a result of the foregoing, the market for UBS's securities promptly digested current information regarding UBS from all publicly available sources and reflected such information in UBS's securities prices.  Under these circumstances, all purchasers and acquirers of UBS's securities during the Class Period suffered similar injury through their purchase or acquisition of UBS's securities at artificially inflated prices and a presumption of reliance applies.

## XVII.  LOSS CAUSATION / ECONOMIC LOSS

1007.  Class members were damaged as a result of the UBS Defendants' fraudulent conduct as set forth herein.  During the Class Period, Defendants engaged in a scheme to deceive the market by issuing a series of misrepresentations (and omitting material facts) relating to, *inter alia*: (i) the existence and adequacy of UBS's internal risk management policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure; (ii) UBS's amassing of high risk subprime related assets; (iii) the extent of UBS's exposure to the crumbling U.S. subprime and Alt-A mortgage-backed securities markets; (iv) the inflated values of UBS's subprime and Alt-A assets throughout the Class Period which resulted in the Defendants misrepresenting UBS's financial figures; (v) the extent to which UBS's fixed income operations included the accumulation and storage of illiquid mortgage-backed securities and super senior CDO positions; (vi) the reasons UBS closed DRCM and its outside investor fund; (vii) the performance of DRCM's outside investor fund; (viii) UBS's level of exposure to market risk as measured by VaR;  (ix) the accuracy of UBS's models and methodologies for valuing assets; (x) the value of UBS's risk-weighted assets; (xi) control deficiencies within the Company which permitted senior employees within UBS's Wealth Management division to advise and assist UBS clients to evade applicable tax laws and thereby exposing UBS to losses

stemming from regulatory, civil and criminal liability and reputational harm; and (xii) losses stemming from the Company's market-making activities in auction-rate securities and the accumulation of such securities on UBS's balance sheet.

1008.    As a direct result of the Defendants' scheme, misrepresentations, and omissions of material facts, the price of UBS's common stock was artificially inflated throughout the Class Period.

1009.    Class members unwittingly and in reliance upon Defendants' materially false and misleading statements and/or omissions purchased UBS stock at artificially inflated prices on, among other exchanges, the NYSE, the SWX and the LSE.    But for the Defendants' misrepresentations, omissions and fraudulent acts, Lead Plaintiffs and other Class members would not have purchased UBS stock, nor would they have purchased it at the artificially inflated prices at which it traded during the Class Period.  As the Defendants' material misrepresentations and omissions were gradually revealed to investors through a series of partial corrective disclosures beginning on August 14, 2007, UBS stock fell precipitously as the artificial inflation caused by the Defendants' conduct was removed from UBS's stock price.

1010.    The declines in the Company's stock price between August 14, 2007 and July 7, 2008, including, but not limited to, the declines summarized below are directly attributable to the market absorbing information correcting the Defendants' fraudulent misrepresentations and omissions (and/or the materialization of risks concealed by the Defendants from UBS's investors).

1011.    Lead Plaintiffs and other members of the Class suffered economic losses as the price of UBS's stock fell in response to the issuance of partial corrective disclosures and/or the materialization of risks concealed by the Defendants from UBS's investors.  The following list of disclosures that caused UBS's stock to drop, thereby damaging investors, is representative, not

exclusive, of the partial corrective disclosures and/or the materialization of concealed risks that led to Plaintiffs' damages for which relief is sought in this matter.

### A. The August 14, 2007 Announcement

1012. On August 14, 2007, the Company filed its quarterly report for the second quarter of 2007 with the SEC on Form 6-K (the "August 14, 2007 Announcement"). The August 14, 2007 Announcement reported UBS's earnings for the quarter and warned investors that "current turbulent conditions" could cause it to report "a very weak trading result in the Investment Bank" for the second half of 2007. The August 14, 2007 Announcement also stated that the Company's results were impacted by a "charge of CHF 229 million after tax related to the closure of [DRCM]."

1013. While the August 14, 2007 Announcement continued to conceal material adverse facts regarding the Company, the announcement partially corrected the Defendants' misrepresentations concerning: (i) the existence and adequacy of UBS's internal risk management policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure; (ii) UBS's amassing of highly risky subprime related assets; (iii) the extent of UBS's exposure to the crumbling U.S. subprime and Alt-A mortgage-backed securities markets; (iv) the inflated values of UBS's subprime and Alt-A assets throughout the Class Period which resulted in the Defendants misrepresenting UBS's financial figures; (v) the extent to which UBS's fixed income operations included the accumulation and storage of illiquid mortgage-backed securities and super senior CDO positions; (vi) the reasons UBS closed DRCM and its outside investor fund; (vii) the performance of DRCM's outside investor fund; (viii) UBS's level of exposure to market risk as measured by VaR; (ix) the accuracy of UBS's models and methodologies for valuing assets; and (x) the value of UBS's risk-weighted assets.

1014.    As the market absorbed the information in the August 14, 2007 Announcement,

shares in UBS trading on the NYSE fell $3.11, or 5.75%, from their close of $54.09 on August 13,

2007, to close at $50.98 on August 15, 2007.  Similar drops in UBS's stock price were recorded

on the SWX and the LSE as a result of the August 14, 2007 Announcement.

### B.    The October 30, 2007 Announcement

1015.    On October 30, 2007, the Company filed its quarterly report for the third quarter

of 2007 with the SEC on Form 6-K (the "October 30, 2007 Announcement").  In the October 30,

2007 Announcement, UBS reported a "[quarterly] loss for the group, before tax and minority

interests, of CHF 726 million."

1016.    In explaining UBS's performance, the Company stated:

> What happened to UBS in third quarter? The difficulties which surfaced in
> the US sub-prime mortgage market in the first half of 2007 spilled over
> into the wider global markets in late July, and have continued. As widely
> reported, this led to losses in several parts of the financial services
> industry. In some affected areas, such as leveraged lending, UBS saw
> relatively modest losses. Our exposure to hedge funds as counterparties
> did not pose any problems. We also did not have material exposure to the
> widely discussed "conduit business" - an area we deliberately avoided.
>
> We did see substantial losses, though, in our inventory of trading positions
> related to the US sub-prime residential mortgage-backed securities market.
> These were mostly in our Investment Bank's mortgage-backed securities
> business and in positions taken over from the now closed Dillon Read
> Capital Management business. When these positions, which are sizeable
> and of which UBS still holds a proportion, were taken, we offset them to
> some extent with hedges that were designed to mitigate risk in normal
> market conditions. However, the deterioration in the US sub-prime market,
> especially in August, was so severe and sudden that markets turned
> illiquid. There was a substantial deterioration in the value of these
> securities - including those with high credit ratings. Conditions in the US
> housing market continued to be weak in the quarter, and the end-
> September valuations we have put on our holdings of US mortgage-linked
> securities reflect this. The value of these holdings in the future will,
> nevertheless, depend on developments in the underlying mortgage pools.
> The losses led to revenues of negative CHF 4.2 billion in our fixed

income, currencies and commodities business (FICC). In addition, we recorded proprietary trading losses in equities statistical arbitrage. Following the announcement of the expected loss for third quarter, Standard & Poor's lowered our long-term credit rating to AA. The rating agency's decision was not wholly unexpected - although we would re-emphasize that UBS remains one of the best capitalized banks with one of the strongest credit ratings in the industry.

1017. The October 30, 2007 Announcement also disclosed that in addition to subprime exposure the Company had previously disclosed, it is also disclosed that the notional amount of the UBS's super senior CDO positions stood at CHF 20.2 billion.

1018. Although the October 30, 2007 Announcement continued to conceal material adverse facts regarding the Company, the announcement partially corrected the Defendants' misrepresentations concerning: (i) the existence and adequacy of UBS's internal risk management policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure; (ii) UBS's amassing of highly risky subprime related assets; (iii) the extent of UBS's exposure to the crumbling U.S. subprime and Alt-A mortgage-backed securities markets; (iv) the inflated values of UBS's subprime and Alt-A assets throughout the Class Period which resulted in the Defendants misrepresenting UBS's financial figures; (v) the extent to which UBS's fixed income operations included the accumulation and storage of illiquid mortgage-backed securities and super senior CDO positions; (vi) the reasons UBS closed DRCM and its outside investor fund; (vii) the performance of DRCM's outside investor fund; (viii) UBS's level of exposure to market risk as measured by VaR;  (ix) the accuracy of UBS's models and methodologies for valuing assets; and (x) the value of UBS's risk-weighted assets.

1019. As the market absorbed the information in the October 30, 2007 Announcement, shares in UBS trading on the NYSE fell $3.84, or 7.23%, from their close of $53.11 on October

30, 2007, to close at $49.27 on November 2, 2007. Similar drops in UBS's stock price were recorded on the SWX and the LSE as a result of the October 30, 2007 Announcement.

### C. The November 15, 2007 and November 19, 2007 Analyst Reports

1020.    On November 15, 2007, *The Wall Street Journal* reported that Jon Peace, a Lehman Brothers analyst, had published a report stating that UBS would have write-downs totaling $7 billion in 4Q 2007. *See* Carrick Mollenkamp, David Reilly and Edward Taylor, *Subprime Hits Seem Likely to Keep Coming – Banks Like UBS, Citi May Face More Charges Than They've Yet Taken*, The Wall Street Journal, November 15, 2007. Peace's analysis was based on a review of UBS's and Merrill's exposure to mezzanine CDOs which demonstrated that UBS's exposure to this risky CDO was triple that of Merrill's yet UBS has only taken a quarter of the write-downs Merrill had to date. (*Id.*)

1021.    On the following Monday, November 19, 2007, *Reuters News* reported that CreditSights, an independent capital structure research firm, issued a report stating that based on UBS's admitted exposure to CDOs of $20.2 billion, UBS should have at least $9 billion in further write-downs. *See Substantial CDO Write-downs Likely at UBS,* Reuters News, November 19, 2007 at 4:16 PM GMT.

1022.    The November 15, 2007 and November 19, 2007 Analyst Reports partially corrected the Defendants' misrepresentations concerning: (i) the existence and adequacy of UBS's internal risk management policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure; (ii) UBS's amassing of highly risky subprime related assets; (iii) the extent of UBS's exposure to the crumbling U.S. subprime and Alt-A mortgage-backed securities markets; (iv) the inflated values of UBS's subprime and Alt-A assets throughout the Class Period which resulted in the Defendants misrepresenting UBS's financial figures; (v) the extent to which UBS's

fixed income operations included the accumulation and storage of illiquid mortgage-backed securities and super senior CDO positions; (vi) the reasons UBS closed DRCM and its outside investor fund; (vii) the performance of DRCM's outside investor fund; (viii) UBS's level of exposure to market risk as measured by VaR; (ix) the accuracy of UBS's models and methodologies for valuing assets; and (x) the value of UBS's risk-weighted assets.

1023. As the market absorbed the information in the November 15, 2007 and November 19, 2007 Analyst Reports, shares in UBS trading on the NYSE fell $1.51, or 3.45%, from their close of $43.80 on November 14, 2007, to close at $42.29 on November 16, 2007. The stock continued to fall on November 19, 2007 as a result of the November 19, 2007 analyst report. Shares in UBS trading on the NYSE fell $3.72, or 8.8%, from their close of $42.29 on November 16, 2007, to close at $38.85 on November 21, 2007. Between November 15, 2007 and November 21, 2007, the information in the November 15, 2007 and November 19, 2007 Analyst Reports caused UBS shares trading on the NYSE to drop by $4.95 or 11.3%. Similar drops in UBS's stock price were recorded between November 15, 2007 and November 21, 2007 on the SWX and the LSE as a result of the November 15, 2007 and November 19, 2007 Analyst Reports.

### D. The December 10, 2007 Announcement

1024. On December 10, 2007, the Company issued a press release announcing that UBS "will write down its US sub-prime holdings by approximately a further USD 10 billion" (the "December 10, 2007 Announcement"). The December 10, 2007 Announcement also stated:

> UBS revises its outlook for its fourth quarter 2007 from an overall Group profit, as anticipated in its announcement of 30 October 2007, to a loss. It is now possible that UBS will record a net loss attributable to shareholders for the full year 2007.
>
> In response to continued deterioration in the US sub-prime mortgage securities market, partly driven by increased homeowner delinquencies but

mainly fuelled by worsening market expectations of future developments, UBS has revised the assumptions and inputs used to value US sub-prime mortgage related positions. This will result in further write-downs of around USD 10 billion, primarily on CDO and "super senior" holdings. In light of continued deterioration in the sub-prime market, valuations of UBS's remaining sub-prime positions reflect the extreme loss projections implied by the prices achieved in the very limited number of observable market transactions in US sub-prime related securities and indices up to the end of November.

1025.    The December 10, 2007 Announcement partially corrected the Defendants' misrepresentations concerning: (i) the existence and adequacy of UBS's internal risk management policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure; (ii) UBS's amassing of highly risky subprime related assets; (iii) the extent of UBS's exposure to the crumbling U.S. subprime and Alt-A mortgage-backed securities markets; (iv) the inflated values of UBS's subprime and Alt-A assets throughout the Class Period which resulted in the Defendants misrepresenting UBS's financial figures; (v) the extent to which UBS's fixed income operations included the accumulation and storage of illiquid mortgage-backed securities and super senior CDO positions; (vi) the reasons UBS closed DRCM and its outside investor fund; (vii) the performance of DRCM's outside investor fund; (viii) UBS's level of exposure to market risk as measured by VaR;  (ix) the accuracy of UBS's models and methodologies for valuing assets; and (x) the value of UBS's risk-weighted assets.

1026.    As the market absorbed the information in the December 10, 2007 Announcement, shares in UBS trading on the NYSE fell $2.88, or 5.57%, from their close of $51.66 on December 10, 2007, to close at $48.78 on December 11, 2007.  Similar drops in UBS's stock price were recorded on the SWX and the LSE as a result of the December 10, 2007 Announcement.

### E. The January 18, 2008 Announcement

1027. On January 18, 2008, *Reuters* reported that Defendant Rohner issued a memorandum to UBS employees dated January 16, 2008 announcing that UBS was slashing its real estate securitization business by half and scaling down the balance sheet of the business by two-thirds. Andrew Hearst, *UBS to revamp investment bank, cut risk*, Reuters, January 18, 2008. (the "January 18, 2008 Announcement").

1028. The January 18, 2008 Announcement partially corrected the Defendants' misrepresentations concerning: (i) the existence and adequacy of UBS's internal risk management policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure; (ii) UBS's amassing of highly risky subprime related assets; (iii) the extent of UBS's exposure to the crumbling U.S. subprime and Alt-A mortgage-backed securities markets; (iv) the inflated values of UBS's subprime and Alt-A assets throughout the Class Period which resulted in the Defendants misrepresenting UBS's financial figures; (v) the extent to which UBS's fixed income operations included the accumulation and storage of illiquid mortgage-backed securities and super senior CDO positions; (vi) the reasons UBS closed DRCM and its outside investor fund; (vii) the performance of DRCM's outside investor fund; (viii) UBS's level of exposure to market risk as measured by VaR; (ix) the accuracy of UBS's models and methodologies for valuing assets; and (x) the value of UBS's risk-weighted assets.

1029. As the market absorbed the information in the January 18, 2008 Announcement shares in UBS trading on the NYSE fell $0.80, or 2.18%, from their close of $36.37 on January 17, 2008, to close at $35.57 on January 18, 2008. The NYSE was closed on January 21, 2008 in honor of Martin Luther King, Jr. On the SWX, shares in UBS fell CHF 4.63, or 11.76%, from their close of CHF 40.46 on January 17, 2008, to close at CHF 35.84 on January 21, 2008.

Similar drops in UBS's stock price were also recorded on the LSE as a result of the January 18, 2008 Announcement.

### F. The January 30, 2008 Announcement

1030.    On January 30, 2008, the Company issued a press release "pre-announc[ing]" its results for the full and fourth quarter of 2007 (the "January 30, 2008 Announcement").

> In the January 30, 2008 Announcement UBS stated that:
>
> On 10 December 2007, UBS indicated it may record a net loss for full-year 2007.
>
> UBS now expects to report a net loss attributable to shareholders of approximately CHF 4.4 billion for full-year 2007.
>
> For fourth quarter 2007, the net loss attributable to UBS shareholders will be approximately CHF 12.5 billion. These results reflect weak trading revenues in the Fixed Income, Currencies and Commodities (FICC) business in the Investment Bank. FICC numbers will include around USD 12 billion (CHF 13.7 billion) in losses on positions related to the US sub-prime mortgage market and approximately USD 2 billion (CHF 2.3 billion) on other positions related to the US residential mortgage market.

1031.    Although the January 30, 2008 Announcement continued to conceal known adverse material facts about the Company, the announcement partially corrected the Defendants' misrepresentations concerning: (i) the existence and adequacy of UBS's internal risk management policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure; (ii) UBS's amassing of highly risky subprime related assets; (iii) the extent of UBS's exposure to the crumbling U.S. subprime and Alt-A mortgage-backed securities markets; (iv) the inflated values of UBS's subprime and Alt-A assets throughout the Class Period which resulted in the Defendants misrepresenting UBS's financial figures; (v) the extent to which UBS's fixed income operations included the accumulation and storage of illiquid mortgage-backed securities and super senior CDO positions; (vi) the reasons UBS closed DRCM and its outside investor fund; (vii) the

performance of DRCM's outside investor fund; (viii) UBS's level of exposure to market risk as measured by VaR; (ix) the accuracy of UBS's models and methodologies for valuing assets; and (x) the value of UBS's risk-weighted assets.

1032.    As the market absorbed the information in the January 30, 2008 Announcement shares in UBS trading on the NYSE fell $2.93, or 6.80%, from their close of $43.05 on January 29, 2008, to close at $40.12 on February 4, 2008.  Similar drops in UBS's stock price were recorded on the SWX and the LSE as a result of the January 30, 2008 Announcement.

### G.    The February 14, 2008 Announcement

1033.    On February 14, 2008, the Company filed its quarterly report for the fourth quarter of 2007 with the SEC on Form 6-K (the "February 14, 2008 Announcement").   The February 14, 2008 Announcement stated that for the fourth quarter 2007, UBS suffered a loss of CHF 12.4 billion.   The Company also reported a CHF 4.3 billion loss for the year ended December 31, 2007.

1034.    The February 14, 2008 Announcement also revealed, for the first time, that the Company had a $26.6 billion exposure to mortgage-backed securities collateralized by Alt-A mortgages, as well as additional subprime exposure through its reference-linked notes program and its exposure to monoline insurers.  The February 14, 2008 Announcement further included a letter from Defendants Rohner and Ospel who stated: "The sudden and serious deterioration in the US housing market, in combination with our large exposure in sub-prime mortgage-related securities and derivatives, has deeply impacted us."

1035.    Although the February 14, 2008 Announcement continued to conceal known adverse material facts concerning the Company, the announcement partially corrected the Defendants' misrepresentations concerning: (i) the existence and adequacy of UBS's internal risk

management policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure; (ii) UBS's amassing of highly risky subprime related assets; (iii) the extent of UBS's exposure to the crumbling U.S. subprime and Alt-A mortgage-backed securities markets; (iv) the inflated values of UBS's subprime and Alt-A assets throughout the Class Period which resulted in the Defendants misrepresenting UBS's financial figures; (v) the extent to which UBS's fixed income operations included the accumulation and storage of illiquid mortgage-backed securities and super senior CDO positions; (vi) the reasons UBS closed DRCM and its outside investor fund; (vii) the performance of DRCM's outside investor fund; (viii) UBS's level of exposure to market risk as measured by VaR; (ix) the accuracy of UBS's models and methodologies for valuing assets; and (x) the value of UBS's risk-weighted assets.

1036.    On February 14, 2008, published reports revealed that UBS also issued a notice to its 8,200 broker dealers that UBS would no longer buy auction rate securities from its clients to whom it had sold these securities if it could not find buyers for their securities at auctions. This was the first indication from UBS, the second largest underwriter of these securities, that the market for these securities was no longer as liquid as it had previously represented.

1037.    As the market absorbed the information disclosed in UBS's February 14, 2008 announcements, shares in UBS trading on the NYSE fell $3.05, or 8.25%, falling from their close of $36.99 on February 13, 2008, to close at $33.94 on February 14, 2008. The stock trading on the NYSE continued to fall over the next two trading days to close at $32.71 on February 19, 2008. Between February 13, 2008 and February 19, 2008, UBS's stock lost 11.5% of its value. Similar drops in UBS's stock price were recorded on the SWX and the LSE as a result of the February 14, 2008 Announcement.

### H.    The February 27, 2008 Announcement

1038.     On February 27, 2008, the Company issued a press release announcing the outcome of its "Extraordinary General Meeting" (the "February 27, 2008 Announcement"). The February 27, 2008 Announcement stated that:

> the shareholders of UBS AG approved the issuance of mandatory convertible notes and the distribution of a stock dividend. Both measures are key components of the program announced on 10 December 2007 to strengthen UBS AG's capital base.
>
> *     *     *
>
> Marcel Ospel, Chairman of the UBS Board of Directors, thanked shareholders for their trust and their far-sighted decision, and described the capital increase as a "correct and important step in securing the future development of UBS."

1039.     The February 27, 2008 Announcement, announcing UBS's need to raise additional capital, partially corrected the Defendants' misrepresentations concerning: (i) the existence and adequacy of UBS's internal risk management policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure; (ii) UBS's amassing of highly risky subprime related assets; (iii) the extent of UBS's exposure to the crumbling U.S. subprime and Alt-A mortgage-backed securities markets; (iv) the inflated values of UBS's subprime and Alt-A assets throughout the Class Period which resulted in the Defendants misrepresenting UBS's financial figures; (v) the extent to which UBS's fixed income operations included the accumulation and storage of illiquid mortgage-backed securities and super senior CDO positions; (vi) the reasons UBS closed DRCM and its outside investor fund; (vii) the performance of DRCM's outside investor fund; (viii) UBS's level of exposure to market risk as measured by VaR; (ix) the accuracy of UBS's models and methodologies for valuing assets; and (x) the value of UBS's risk-weighted assets.

1040.    As the market absorbed the information in the February 27, 2008 Announcement, shares in UBS trading on the NYSE fell $4.05, or 11.62%, falling from a closing price of $34.85 on February 27, 2008, to close at $30.80 on March 4, 2008.  Similar drops in UBS's stock price were recorded on the SWX and the LSE as a result of the February 27, 2008 Announcement.

## I.    UBS Is Sued Over Its Auction-Rate Securities While Bear Stearns Collapses

1041.    On March 14, 2008, published reports disclosed that an investor had filed a lawsuit against UBS for the sale of auction-rate securities (the "Auction-rate Lawsuit"). According to articles discussing the Auction-rate Lawsuit, the plaintiff alleged that "[a]s a result of defendants' deceptive and manipulative marketing of ARSs, plaintiff and other members of the class are now financially stranded with illiquid investments - deceptively marketed as 'cash equivalents' - and are unable to meet immediate financial obligations and thus have been damage, and those damages are continuing."  *See* Chad Bray, *UBS, Brokerage Arm Sued Over Marketing Of Auction-Rate Sec*, DOW JONES NEWSWIRES, Mar. 14, 2008.  The plaintiff filed suit against UBS after the Company refused to redeem his auction-rate securities.  The lawsuit partially corrected UBS's concealment of its exposure to losses in connection with the accumulation of auction rate securities it had acquired from its clients.  At around the same time that the news regarding the Auction-rate Lawsuit was released to the market, the market was jolted by news of the collapse of Bear Stearns, and that company's acquisition by JP Morgan.

1042.    As the market absorbed the information contained in the Auction-rate Lawsuit and news of Bear Stearns' collapse, shares in UBS trading on the NYSE fell $5.63, or 18.58%, falling from a closing price of $30.29 on March 13, 2008, to close at $24.66 two trading days later (on March 17, 2008).  Drops in UBS's stock price were recorded on the SWX and the LSE as a result of the filing of the Auction-rate Lawsuit.

### J.     The 2007 Annual Report

1043.     On March 18, 2008, the Company filed its annual report for the year ended

December 31, 2007, with the SEC on Form 20-F (the "2007 Annual Report").  The 2007 Annual

Report included a signed letter from Ospel and Rohner stating:

> In this year's annual report we present a Group net loss of CHF 4,384
> million. This resulted almost completely from our exposure to the US
> residential real estate market through positions in mortgage-backed
> securities and related structured products. The losses on these positions
> overshadow the outstanding 2007 performance in the majority of our other
> businesses. This makes this year's financial result even more difficult for
> us to accept.

1044.     The 2007 Annual Report also admitted that "The creation of Dillon Read Capital

Management (DRCM) led to an overweight exposure to the US mortgage market."

> The 2007 Annual Report also stated:

> In 2007, UBS recorded markdowns on other assets carried at fair value
> including leveraged underwriting commitments – particularly
> commitments made prior to the credit market dislocation in July 2007 –
> and positions related to Alt-A residential mortgages and commercial
> mortgages in the US. In the future, UBS could record negative fair value
> adjustments on these assets and on other asset classes to which the effect
> of the crisis in the credit markets may spread, such as other US asset-
> backed securities or securities issued by US states and municipalities and
> student loan programs, including auction rate certificates (ARCs) and
> others.

1045.     While the 2007 Annual report continued to conceal material adverse information

regarding UBS's business, the 2007 Annual Report partially corrected the Defendants'

misrepresentations concerning: (i) the existence and adequacy of UBS's internal risk management

policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure; (ii)

UBS's amassing of high risk subprime related assets; (iii) the extent of UBS's exposure to the

crumbling U.S. subprime and Alt-A mortgage-backed securities markets; (iv) the inflated values

of UBS's subprime and Alt-A assets throughout the Class Period which resulted in the Defendants

misrepresenting UBS's financial figures; (v) the extent to which UBS's fixed income operations included the accumulation and storage of illiquid mortgage-backed securities and super senior CDO positions; (vi) the reasons UBS closed DRCM and its outside investor fund; (vii) the performance of DRCM's outside investor fund; (viii) UBS's level of exposure to market risk as measured by VaR; (ix) the accuracy of UBS's models and methodologies for valuing assets; (x) the value of UBS's risk-weighted assets; and (xi) control deficiencies at the Company which allowed UBS to intentionally misrepresent the risk associated with auction-rate securities.

1046.    As the market absorbed the information in 2007 Annual Report, shares in UBS trading on the NYSE fell $2.20, or 7.62%, falling from a closing price of $28.85 on March 18, 2008, to close at $26.65 on March 19, 2008.    Similar drops in UBS's stock price were recorded on the LSE as a result of the March 18, 2008 Announcement.

**K.    UBS Announces Writes-Down The Value Of Auction-Rate Securities**

1047.    On March 28, 2008, published reports disclosed that UBS advised clients that the Company would be "marking down the value of auction-rate securities in brokerage accounts." This announcement revealed that UBS had harmed its reputation among its clients through representations regarding the cash-equivalency of these securities and that its actions exposed the bank to "a rash of lawsuits."    Wallace Witkowski, *UBS marking down value of auction-rate securities: report*, CBSMarketwatch, March 28, 2008 (the "March 28, 2008 Announcement").

1048.    As the market absorbed the information in the March 28, 2008 Announcement, shares in UBS trading on the NYSE fell $1.36, or 4.67%, from their closing price of $29.13 on March 27, 2008, to close at $27.77 on March 28, 2008.  Drops in UBS's stock price were recorded on the SWX and the LSE as a result of the March 28, 2008 Announcement.

## L. The Shareholder Report

1049. On April 21, 2008, the Company issued the Shareholder Report. UBS's admissions in the Shareholder Report are summarized *supra*, Section VIII. C.

1050. The Shareholder Report partially corrected the Defendants' misrepresentations concerning: (i) the existence and adequacy of UBS's internal risk management policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure; (ii) UBS's amassing of highly risky subprime related assets; (iii) the extent of UBS's exposure to the crumbling U.S. subprime and Alt-A mortgage-backed securities markets; (iv) the inflated values of UBS's subprime and Alt-A assets throughout the Class Period which resulted in the Defendants misrepresenting UBS's financial figures; (v) the extent to which UBS's fixed income operations included the accumulation and storage of illiquid mortgage-backed securities and super senior CDO positions; (vi) the reasons UBS closed DRCM and its outside investor fund; (vii) the performance of DRCM's outside investor fund; (viii) UBS's level of exposure to market risk as measured by VaR; (ix) the accuracy of UBS's models and methodologies for valuing assets; and (x) the value of UBS's risk-weighted assets.

1051. As the market absorbed the information in Shareholder Report, shares in UBS trading on the NYSE fell $1.38, or 3.85%, from their close of $35.84 on April 21, 2008, to close at $34.46 on April 23, 2008. Similar drops in UBS's stock price were recorded on the SWX and the LSE as a result of the issuance of the Shareholder Report.

## M. The May 6, 2008 Announcement

1052. On May 6, 2008, the Company filed its quarterly results for the first quarter of 2008 on Form 6-K (the "May 6, 2008 Announcement").

1053. The May 6, 2008 Announcement reported a $974 million loss associated with

UBS's inventory of auction rate securities held on its balance sheet. In disclosing this loss, UBS stated that "[t]he USD 330 billion market for auction rate securities (ARSs) in the US experienced a significant disruption in February 2008. For the first time in the 20 year-plus history of the ARS market, auctions for a large percentage of these securities failed. This has resulted in illiquidity of the majority of ARSs, with clients unable to sell their securities. The auction failures followed a decrease in demand for these securities, as a result of pressure in the credit markets at the end of 2007 which persisted through first quarter 2008." The Company also declared, "In the early part of first quarter, UBS built up significant inventory through its support for these markets, which in the case of ARCs has since been discontinued and in the case of VRDOs [variable rate demand obligations] is limited. The inventory was marked down to account for the market's illiquidity, resulting in a loss of USD 974 million in first quarter 2008, mainly in ARCs."

1054. With respect to UBS's role in helping clients evade tax obligations, the May 6, 2008 Announcement stated:

> The Department of Justice ("DOJ") and the SEC are examining UBS's conduct in relation to cross-border services provided by Swiss-based UBS client advisors to US clients during the years 2000-2007. In particular, DOJ is examining whether certain US clients sought, with the assistance of UBS client advisors, to evade their US tax obligations by avoiding restrictions on their securities investments imposed by the Qualified Intermediary agreement UBS entered into with the US Internal Revenue Service in 2001. The SEC is examining whether Swiss-based UBS client advisors engaged in activities in relation to their US-domiciled clients that triggered an obligation for UBS Switzerland to register with the SEC as a broker-dealer and/or investment advisor. UBS is cooperating with these investigations.

1055. The May 6, 2008 Announcement partially corrected the Defendants' misrepresentations concerning UBS's exposure to losses from auction-rate securities held on UBS's balance sheet.

1056.    The May 6, 2008 Announcement's revelation of the investigation into UBS's illegal tax shelters also served as a partial corrective disclosure of UBS's misrepresentations concerning its adherence to high ethical standards and applicable legal requirements.

1057.    As the market absorbed the information in the May 6, 2008 Announcement, shares in UBS trading on the NYSE fell $2.72, or 8.05%, from their closing price of $33.77 on May 6, 2008, to close at $31.05 on May 8, 2008.  Similar drops in UBS's stock price were recorded on the SWX and the LSE as a result of the May 6, 2008 Announcement.

### N.    The May 21, 2008 Announcement

1058.    On May 21, 2008, the Company issued a press release announcing that the Company "has closed on the sale of approximately USD $15 billion of primarily Subprime and Alt-A US residential mortgage-backed securities to a newly created distressed asset fund. . . ." (the "May 21, 2008 Announcement").  According to the May 21, 2008 Announcement, "UBS sold positions with a nominal value of approximately USD $22 billion to the new fund for an aggregate sale price of approximately USD $15 billion. Based on UBS categorizations, the vast majority of the positions are Subprime and Alt-A in roughly equal parts and the remainder is Prime."

1059.    The May 21, 2008 Announcement partially corrected the Defendants' misrepresentations concerning the Company's exposure to additional write downs and price deteriorations in the Company's securities, by disclosing that assets marked at $22 billion would be sold for $15 billion, a $7 billion loss.

1060.    As the market absorbed the information in the May 21, 2008 Announcement, shares in UBS trading on the NYSE fell $1.27, or 4.15%, from their closing price of $30.61 on the prior day, to close at $29.34 on May 21, 2008.  Similar drops in UBS's stock price were recorded on the SWX and the LSE as a result of the May 21, 2008 Announcement.

### O. UBS Advises Employees Not To Travel To The United States

1061.     On May 27, 2008, published reports surfaced revealing that UBS had advised its employees to avoid traveling to the United States to prevent the employees from being swept up in federal investigations concerning UBS's involvement in helping clients evade paying taxes.  *See* Haig Simonian, *UBS Tells Unit Staff to Avoid US Visits*, Financial Times, May 27, 2008 (the "May 27, 2008 Article").   According to the May 27, 2008 Article, "UBS's travel restrictions suggest it is concerned that the investigations by the US Department of Justice and the Securities and Exchange Commission may widen." *Id.*

1062.     The May 27, 2008 Article partially corrected the Defendants' misrepresentations concerning the adequacy of UBS's internal risk management policies and controls as they relate to the Company's adherence to following applicable laws.   UBS's control deficiencies allowed UBS's employees to construct products and schemes allowing clients to evade applicable tax laws.   UBS employees involved in helping UBS's clients defraud the United States have stated that their actions were known by the Company.

1063.     As the market absorbed the information in the May 27, 2008 Article, shares in UBS trading on the NYSE fell $2.35, or 9.2%, from their closing price of $25.39 on May 27, 2008, to close at $23.04 on June 2, 2008.  Drops in UBS's stock price were recorded on the SWX and the LSE as a result of the May 27, 2008 Article.

### P. The June 9, 2008 Article

1064.     On June 9, 2008, *The Boston Globe* published a story revealing that "UBS . . . knew as early as December that a segment of the municipal bond business was in trouble, but [that] the Wall Street firm kept selling the investments to some clients without warning them of

the risk."  Beth Healy, *Wall St. firm told only some about risk*, The Boston Globe, June 9, 2008

(the "June 9, 2008 Article").  According to the June 9, 2008 Article:

> By February, the $330 billion auction-rate securities market had collapsed,
> locking out the nonprofits and municipalities that had used the market for
> years to issue inexpensive debt, as well as the investors who had purchased
> it. UBS brokers have said they were as surprised as anyone about the
> market's shutdown.
>
> But on the other side of the firm, UBS was advising some large investment
> banking clients of the looming problems at least three months before all
> trading stopped, according to a letter to investors by one of those clients, a
> New Hampshire bond issuer.
>
> It is a conflict that could mean UBS bears more responsibility for its role
> in the auction-rate securities debacle than it has acknowledged so far. The
> Swiss firm is under investigation by Massachusetts and New Hampshire
> regulators, and the Securities and Exchange Commission for allegedly
> misleading investors in the auction-rate market. These officials are also
> examining whether UBS played a role in allowing the market to fail.

1065.    The June 9, 2008 Article partially corrected the Defendants' misrepresentations

relating to the adequacy of the Company's internal controls.   The June 9, 2008 Article suggests

that, *inter alia*, control deficiencies within the Company allowed UBS to intentionally

misrepresent the risk associated with auction-rate securities.

1066.    As the market absorbed the information contained in the June 9, 2008 Article,

shares in UBS trading on the NYSE fell 3.39%, falling from a closing price of $23.91 on June 6,

2008, to close at $23.10 on the following trading day (June 9, 2008).     Similar drops in UBS's

stock price were recorded on the SWX and the LSE as a result of the June 9, 2008 Article.

### Q.    UBS Faces Additional Write-Downs

1067.    On June 10, 2008, published reports stated that UBS may need to take billions of

dollars in additional subprime related write-downs.  *See* Katharina Bart, *International Finance:*

*More Pain Ahead for UBS?*, The Wall Street Journal, June 10, 2008   (the "June 10, 2008

397

Article").  According to the June 10, 2008 Article, "[some analysts estimate that] UBS will have to take write-downs worth several hundred million francs given the unfavorable market movements in recent weeks. That figure may rise before the quarter closes June 30. . . ."

1068.    The June 10, 2008 Article partially corrected the Defendants' misrepresentations concerning the adequacy of UBS's internal risk management policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure and the extent of UBS's exposure to the crumbling U.S. subprime and Alt-A mortgage-backed securities markets, as well as UBS's  need to take additional subprime related write-downs above the amounts already written-down by the Company.

1069.    As the market absorbed the information in the June 10, 2008 Article, shares in UBS trading on the NYSE fell 3.5%, from their closing price of $23.45 on June 10, 2008, to close at $22.62 on June 11, 2008.  Similar drops in UBS's stock price were recorded on the SWX and the LSE as a result of the June 10, 2008 Article.

### R.    UBS Banker Pleads Guilty

1070.    On June 19, 2008, reports surfaced stating that a former UBS banker "pleaded guilty . . . to helping a billionaire hide $200 million in assets from U.S. tax authorities."  *See* Tom Brown, "UPDATE 4-Ex-UBS banker pleads guilty to US tax evasion scheme," *Reuters*, June 19, 2008.  News of banker's plea was repeated on June 20, 2008.  *See* Evan Perez, *Guilty Plea By Ex-Banker Likely to Aid Probe of UBS*, The Wall Street Journal, June 20, 2008 (collectively, the "Guilty Plea Articles").   According to the June 20, 2008 Article, "[t]he banker, Bradley Birkenfeld, 43 years old, answered softly when U.S. District Judge William Zloch asked why he had participated in the scheme. 'I was employed by UBS. . . . I was incentivized to do this business. . . .'" *Id.*

1071.    The Guilty Plea Articles partially corrected the Defendants' misrepresentations concerning the existence and adequacy of UBS's internal risk management policies and controls as they relate to the Company's compliance with applicable laws.  UBS's control deficiencies allowed UBS's employees to construct products and schemes allowing clients to evade applicable tax laws.

1072.    As the market absorbed the information in the Guilty Plea Articles, shares in UBS trading on the NYSE fell $1.17, or 5.07%, from their closing price of $23.07 on June 19, 2008, to close at $21.90 on June 20, 2008.  The shares continued to fall on the following trading day, falling an additional 5.94% to close at $20.60 on June 23, 2008.  Similar drops in UBS's stock price were recorded on the SWX and the LSE as a result of the Guilty Plea Articles.

### S.    UBS Is Sued By Massachusetts Over Its Auction-Rate Securities

1073.    On June 26, 2008, *Reuters* reported that the state of Massachusetts filed a lawsuit charging that UBS "misled investors about how safe auction rate securities were."  The complaint, filed by William Galvin, the state's top securities regulator, "accuses UBS Securities LLC and UBS Financial Services UBS of aggressively selling the instruments to customers at a time when large money managers were losing faith in them and a top UBS executive was dumping them from his personal holdings." (the "Mass. Auction-rate Lawsuit").  The *Wall Street Journal* published a story on the Mass. Auction-rate Lawsuit on June 27, 2008.

1074.    The filing of the Mass. Auction-rate Lawsuit partially corrected the Defendants' misrepresentations relating to the adequacy of the Company's internal controls.   The filing of the Mass. Auction-rate Lawsuit suggests that, *inter alia*, control deficiencies within the Company allowed UBS to intentionally misrepresent the risk associated with its auction-rate securities.

1075.    As the market absorbed the information contained in the Mass. Auction-rate Lawsuit (including information from the June 27, 2008 articles reporting on the lawsuit), shares in UBS trading on the NYSE fell 9.1%, falling from a closing price of $22.73 on June 25, 2008, to close at $20.66 three trading days later (on June 30, 2008).   Similar drops in UBS's stock price were recorded on the SWX and the LSE as a result of the filing of the Mass. Auction-rate Lawsuit.

**T.    Judge Joan A. Lenard Allows Federal Authorities To Seek Names Of UBS's Clients**

1076.    On July 1, 2008, The Honorable Joan A. Lenard, United States District Judge for the Southern District of Florida, cleared the way for federal prosecutors to force UBS to disclose names of wealthy clients as part of an investigation of its offshore private banking practices.  *See* Lynnley Browning, *Judge Clears U.S. Request for UBS Clients' Names*, The NEW YORK TIMES, Jul. 2, 2008 (the "July 1, 2008 Order").   The *Times* article discussing the July 1, 2008 Order also stated that "[UBS,] which is struggling against investor concerns about further write-downs and its ability to retain vital private clients, also announced a major overhaul of its corporate governance rules on Tuesday."

1077.    The July 1, 2008 Order and the July 2, 2008 *Times* article partially corrected the Defendants' misrepresentations concerning the existence and adequacy of UBS's internal risk management policies and controls as they relate to the Company's adherence to following applicable laws.   UBS's control deficiencies allowed UBS's employees to construct products and schemes allowing clients to evade applicable tax laws.   Also, the July 2, 2008 *Times* article partially corrected the Defendants' misrepresentations concerning the adequacy of UBS's internal risk management policies and controls as they relate to the Company's U.S. subprime and Alt-A exposure and the extent of UBS's exposure to the crumbling U.S. subprime and Alt-A mortgage-

backed securities markets, as well as UBS's need to take additional subprime related write-downs above the amounts already written-down by the Company.

1078.    As the market absorbed the information in the July 1, 2008 Order and the July 2, 2008 *New York Times* article, shares in UBS trading on the NYSE fell 4.01%, from their closing price of $20.66 on June 30, 2008, to close at $19.83 on July 2, 2008.

### U.    The July 4, 2008 Announcement

1079.    On July 4, 2008, UBS issued a press release announcing that its second quarter 2008 results "are likely to be at or slightly below break-even."    (the "July 4, 2008 Announcement").    The July 4, 2008 Announcement also stated that "[f]urther market deterioration led to write downs and losses on previously disclosed Investment Bank risk positions, in particular credit valuation adjustments on monoline insurance exposures. Write-downs were mitigated by continued exposure reductions and by hedge benefits. In connection with the losses to date, the second quarter results include a tax credit of approximately CHF 3 billion."    Although July 4, 2008 Announcement did not quantify the amount written-down, some analysts have estimated that UBS's latest write-downs could be $7.5 billion.    *See* Haig Simonian, *UBS faces more US credit writedowns*, FINANCIAL TIMES, Jul. 4, 2008 (stating that UBS "did not quantify the write downs, which analysts have estimated at up to $7.5bn").

1080.    The July 4, 2008 Announcement partially corrected Defendants' misrepresentations concerning the Company's exposure to additional write-downs.

1081.    As the market absorbed the information in the July 4, 2008 Announcement, shares in UBS trading on the NYSE fell 6.99%, from their closing price of $20.32 on July 3, 2008, to close at $18.90 on July 7, 2008, the following trading day.    Drops in UBS's stock price were also recorded on the SWX and the LSE as a result of the July 4, 2008 Announcement.

1082.    To date, the Company's stock price has not recovered from losses resulting from the Company's partial corrective disclosures.  As of July 10, 2008, UBS's shares were trading under $20 per share on the NYSE.

## XVIII. CLASS ACTION ALLEGATIONS

1083.    Lead Plaintiffs brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased UBS registered securities during the Class Period and who suffered damages as a result of their purchases (the "Class").  Excluded from the Class are (1) the Company and the Individual Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) the subsidiaries or affiliates of the Company or any of the Defendants; (4) any person or entity who is, or was during the Class Period, a partner, officer, director, employee or controlling person of the Company or any of the Defendants; (5) any entity in which any of the Defendants has a controlling interest; and (6) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

1084.    The members of the Class are so numerous that joinder of all members is impracticable.  As of the date of this Complaint, there were over two billion shares of UBS common stock outstanding.  While Lead Plaintiffs do not know the exact number of Class members, Lead Plaintiffs believe that there are, at minimum, thousands of members of the Class who purchased UBS securities during the Class Period.

1085.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

1086.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Among the

questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by the Defendants' acts as alleged herein;

- Whether the SEC filings, and other public statements published and disseminated by the Defendants to the investing public and purchasers of UBS's securities during the Class Period omitted and/or misrepresented material facts about UBS's financial condition, profitability, risks of investing in the Company, effectiveness of its controls or present and/or future prospects of the Company;

- Whether the Defendants omitted to state and/or misrepresented material facts about the financial condition, profitability, risks of investing in the Company, effectiveness of its controls or present and/or future prospects of the Company;

- With respect to Plaintiffs' claims under the Exchange Act, whether the Defendants acted willfully or with extreme recklessness in omitting to state and/or misrepresenting material facts about the financial condition, profitability, risks of investing in the Company, effectiveness of its controls or present and/or future prospects of the Company;

- Whether the market price of UBS's securities during the Class Period was artificially inflated due to the non-disclosures and/or misrepresentations complained of herein; and

- Whether the members of the Class have sustained damages, and, if so, what is the proper measure thereof.

1087. Lead Plaintiffs' claims are typical of the claims of the members of the Class. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that are adverse or antagonistic to the Class.

1088. A class action is superior to other available methods for fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because damages suffered by the individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the Defendants' wrongful conduct. Furthermore, there will be no difficulty in the management of this litigation as a class action.

## XIX.   COUNTS

### COUNT I

**For Violation of Section 10(b) of the 1934 Act and
Rule 10b-5(b) Promulgated Thereunder For Issuing
Materially False and Misleading Statements
(Against All Defendants)**

1089.   Plaintiffs repeat and reallege each and every allegations in the foregoing paragraphs of this Complaint as if fully set forth herein. This claim is asserted against all Defendants.

1090.   During the Class Period, the Defendants: (a) deceived the investing public, including Plaintiffs, as alleged herein; (b) artificially inflated the market price of UBS's securities; and (c) caused Plaintiffs and the Class to purchase or otherwise acquire UBS securities at artificially inflated prices.

1091.   Each of the Defendants, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), made untrue statements of material facts and/or omitted to state material facts necessary to make the statements made by the Rule 10b-5(b) Defendants not misleading, and/or substantially participated in the creation of the alleged misrepresentation, which operated as a fraud and deceit upon Plaintiffs and the Class, in an effort to maintain the artificially inflated price of UBS's securities during the Class Period. The Defendants' false and misleading statements (and omissions of material facts) are set forth in Section X, *supra*.

1092.   As a result of their making and/or substantially participating in the creation of

404

affirmative statements to the investing public, the Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

1093. The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, made or substantially participated in the creation/dissemination of, untrue statements of material fact as set forth herein, or with extreme recklessness failed to ascertain and disclose truthful facts, even though such facts were available to them.

1094. The facts alleged herein give rise to a strong inference that each of the Defendants acted with scienter. Each of the Defendants knew or with extreme recklessness disregarded that the Class Period statements set forth in Section X, *supra*, were materially false and misleading for the reasons set forth herein.

1095. The Defendants carried out a deliberate scheme to misrepresent the value of UBS's assets, the risks the Company's investors were being exposed to, the effectiveness of UBS's controls and the UBS's compliance with applicable laws.

1096. In addition to having actual knowledge, and/or with extreme reckless disregard for the fraudulent nature of their statements and conduct, each of the Defendants also had a strong motive to engage in the fraudulent scheme set forth herein.

1097. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of UBS's securities was artificially inflated throughout the Class Period. Unaware that the market price of UBS's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the markets in which

UBS's securities traded, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or in the absence of material adverse information that was known, or with deliberate recklessness disregarded, by the Defendants but not disclosed in their public statements, Plaintiffs purchased or acquired UBS's securities at artificially inflated prices. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of UBS securities during the Class Period, when the inflation in the price of UBS's securities was gradually corrected as the truth regarding Defendants' conduct was revealed.

1098. By reason of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiffs and the Class for damages suffered in connection with their transactions in UBS's securities during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### (Against Wuffli, Ospel, Standish, Suter, Stuerzinger, Jenkins and Rohner
### (the "Section 20(a) Defendants"))

1099. Plaintiffs repeat and reallege each and every allegations in the foregoing paragraphs of this Complaint as if fully set forth herein. This claim is asserted against the Section 20(a) Defendants.

1100. UBS is primary violator of Section 10(b) and Rule 10b-5, promulgated thereunder.

1101. The Section 20(a) Defendants acted as controlling persons of UBS within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By reason of their positions as

officers and/or directors of UBS, their ability to approve the issuance of statements, their ownership of UBS's securities and/or by contract. As such, the Section 20(a) Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of the Company as set forth herein. The Section 20(a) Defendants were provided with or had unrestricted access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Each of the Section 20(a) Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein, and exercised the same. The Section 20(a) Defendants prepared, or were responsible for preparing, the Company's press releases and SEC filings and made statements to the market in SEC filings, annual reports, press releases, news articles and conference calls. The Section 20(a) Defendants controlled UBS and each of its employees.

1102. By virtue of their positions as controlling persons of UBS, and by reason of the conduct described in this Count, the Section 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act for controlling primary a violator of the federal securities laws. The facts set forth herein establish that the Section 20(a) Defendants culpably participated in the fraudulent activities detailed herein.

1103. As a direct and proximate result of the Section 20(a) Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, including preliminary and permanent injunctive relief, as follows:

A.    Determining that this action is a proper class action, and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding preliminary and permanent injunctive relief in favor of Plaintiffs and the Class against all defendants and their counsel, agents and all persons acting under, in concert with or for them;

C.    Restitution of investors' monies of which they were defrauded;

F.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' conduct set forth herein, in an amount to be proven at trial, including interest thereon;

G.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

H.    Such other and further relief as the Court may deem just and proper.

## XXII.  JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: July 11, 2008

Respectfully Submitted,

**MOTLEY RICE, LLC**

*Gregg S. Levin*

Joseph S. Rice
William H. Narwold
Gregg S. Levin
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450

**SCHIFFRIN BARROWAY TOPAZ
& KESSLER, LLP**

*Andrew L. Zivitz*

Gregory M. Castaldo
Andrew L. Zivitz
Sharan Nirmul
Naumon A. Amjed
Jennifer L. Keeney
Richard A. Russo, Jr.
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

**COUGHLIN STOIA GELLER
ROBBINS & RUDMAN, LLP**

*Robert M. Rothman*

Robert M. Rothman
58 South Service Road
Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173

**GRANT & EISENHOFER, P.A.**

*Geoffrey C. Jarvis*

Jay W. Eisenhofer
Geoffrey C. Jarvis
Charles T. Caliendo
Brenda F. Szydlo
485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8500
Fax: 646-722-8501

# APPENDIX

**CERTIFICATION OF TEAMSTERS LOCAL #500 SEVERANCE FUND**
**PURSUANT TO FEDERAL SECURITIES LAWS**

Teamsters Local #500 Severance Fund ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the Complaint filed in connection with this matter.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Attached are Plaintiff's transactions in UBS AG (NYSE: UBS) securities during the Class Period.

5.      I, James E. Kelly, Secretary - Treasurer, am authorized to make legal decisions on behalf of the Teamsters Local #500 Severance Fund.

6.      Plaintiff has neither sought to serve nor served as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _9_ day of July, 2008.

Teamsters Local #500 Severance Fund

By: _____
James E. Kelly
*Secretary - Treasurer*

## SCHEDULE A

| DATE | BUY/SELL | TYPE | QUANTITY | PRICE |
|------|----------|------|----------|-------|
| 7/27/2006 | BUY | Com Stk | 665 | 53.1300 |
| 8/16/2006 | BUY | Com Stk | 610 | 56.6700 |
| 11/2/2006 | BUY | Com Stk | 655 | 59.5800 |
| 2/22/2007 | BUY | Com Stk | 155 | 61.8200 |
| 5/10/2007 | BUY | Com Stk | 400 | 62.8525 |
| 7/27/2007 | BUY | Com Stk | 705 | 54.8000 |
| 8/2/2007 | BUY | Com Stk | 400 | 54.8700 |
| | | | | |
| 6/12/2007 | SELL | Com Stk | 1,035 | 60.9629 |
| 10/24/2007 | SELL | Com Stk | 220 | 52.9800 |
| 11/5/2007 | SELL | Com Stk | 210 | 47.5700 |
| 11/16/2007 | SELL | Com Stk | 30 | 47.2800 |
| 12/10/2007 | SELL | Com Stk | 130 | 51.5300 |
| 1/30/2008 | SELL | Com Stk | 1,965 | 41.9800 |