UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE UBS AG SECURITIES LITIGATION | No. 07 CV 11225 (RJS) |

**DECLARATION OF CHRISTIAN ALSØE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT PURSUANT TO RULE 12(B)(1)**

Christian Alsøe, hereby declares as follows:

## I. SUMMARY OF OPINION

1. I have been requested by counsel for Defendants in this U.S. litigation to examine under prevailing Danish law (1) whether a Danish court would enforce a judgment by the United States District Court, Southern District of New York ("U.S. Court"), as to the claims asserted in the Complaint in this action, and (2) whether a Danish investor later could bring suit in Denmark against Defendants based on identical or similar claims to the ones in the Complaint in this action.

2. I conclude that (1) under prevailing Danish law, a judgment delivered by a United States court would be unenforceable in the Kingdom of Denmark, and (2) Danish investors could bring legal proceedings in Denmark against the Defendants in this U.S. litigation based on identical or similar claims to those alleged in the Complaint. Thus, I

conclude that a judgment delivered by this U.S. Court in favor of Defendants would not bar Danish investors from bringing a similar suit in Denmark against Defendants.

## II.  PERSONAL QUALIFICATIONS

3.  Since September 1996, I have been certified and admitted to practice as a Danish attorney. I am a practicing attorney with the law firm of Gorrissen Federspiel and have been admitted to appear before the Danish High Courts and the Maritime and Commercial Court of Copenhagen since 1998 and before the Danish Supreme Court since 2003. I have a Master's Degree in Law (candidatus juris) from the University of Aarhus (from 1993) and have been certified as a mediator by the Danish Law Society. My detailed curriculum vitae is attached as Exhibit (Ex. 1) to this declaration.

4.  I am head of the Litigation Department of Gorrissen Federspiel. I appear regularly before the Danish Courts (including the Danish High Courts, the Maritime and Commercial Court of Copenhagen and the Supreme Court) and in arbitration tribunals in matters concerning both national and international disputes. I have been appointed by the Danish Supreme Court to act on appointment by the Supreme Court in matters under legal aid. I am – by appointment by Her Majesty, the Queen of Denmark – a member of the panel of the Danish Extraordinary Appeal Board, Legal Aid Division, which decides on appeal in requests for public legal aid.

## III. BASIS FOR OPINION

5. I possess extensive experience in Danish civil procedure, including the provisions relating to enforcement and preclusive effect of foreign judgments, including United States judgments in Danish courts.

6. In preparing this declaration, I have received and read the Consolidated Securities Class Action Complaint and the Amended Consolidated Securities Class Action Complaint ("Complaint") in *In re UBS AG Securities Litigation*, 07-cv-11225 (RJS) (S.D.N.Y.), filed on July 11, 2008 and May 8, 2009 respecitvely, as well as Mr Rostock-Jensen's declaration of 30 January 2009 and the declaration of Lars Rohde and Bjarne Graven Larsen in support of the Danish Lead Plaintiff's - Arbejsmarkedets Tillægspension ("ATP") - opposition.

## IV. DANISH SHAREHOLDERS COULD FILE SUIT AGAINST UBS AG IN DENMARK REGARDLESS OF ANY U.S. JUDGMENT

### A. A U.S. Judgment Would Not Be Enforced in Denmark According to Danish Statute Law

7. It is clear Danish law that a judgment delivered in the United States of America, by a New York court, is unenforceable in Denmark under the provisions of Danish law as in force as of today.

8. Under Sections 223a and 479 of the Danish Administration of Justice Act, see Consolidated Act No. 1069 of November 6, 2008 with amendments (in Danish "*Retsplejeloven*") (*hereinafter the "AJ ACT*") (Ex. 2), the Minister of Justice may, under certain criteria, issue Executive Orders or other provisions according to which decisions by foreign courts or administrative bodies may be recognised and/or enforced in

Denmark. With the exception of the specific provisions under the Brussels I Regulation, the Lugano Convention and certain specific provisions concerning court decisions from other Nordic countries, there is under prevailing Danish law no Executive Order or other order from the Danish Minister of Justice allowing for the recognition or enforcement of any foreign judgments in civil or commercial matters. Thus, there is no provision under Danish law allowing for the recognition or enforcement of judgments delivered by a court from the United States of America.

9. Despite this clear law, Mr Rostock-Jensen's declaration opposes my conclusion and contends that it is *"more likely than not that a judgment by the NY District Court in the Class Action in which ATP is both a member and Co-lead Plaintiff of the putative class will be deemed to meet the requirements which Danish scholars have laid down for non-statutory recognition of a foreign judgment based on the Danish High Court's judgment published in U.2001.1949Ø"*.

10. Mr Rostock-Jensen's arguments concerning recognition by Danish courts of a judgment of this U.S. Court against a party that consented to its jurisdiction appears to be based wholly on a specific interpretation (by a few Danish scholars) of *one* case heard by the Eastern High Court (U.2001.1949Ø). His analysis is flawed for three reasons. *First*, the decision itself did not enforce a foreign judgment, but rather looked to it for guidance on the foreign country's law. *Second*, even if Mr. Rostock-Jensen's interpretation of that Judgment were correct, the Judgment has not been reviewed by the Danish Supreme Court, and so under Danish law is not a binding precedent. Accordingly, in the face of numerous other Danish court rulings on restrictions on

enforcement of foreign judgments, this one decision, even if read as Rostock-Jensen says it should, cannot be said to reflect settled Danish law. *Third*, the requirements laid down by the legal literature to which Rostock-Jensen refers for a Danish court to recognize a U.S. judgment are not met by a U.S. judgment such as this one, where all parties have not agreed to the jurisdiction of this U.S. court or the law to be applied to the dispute.

        (i)    *The Eastern High Court's Ruling Did Not Recognize a Foreign Judgment — Rather It Looked to the Foreign Judgment As Evidence of Foreign Law.*

11.    In the case relied on by Mr. Rostock-Jensen (U.2001.1949Ø), an Argentine plaintiff named Gargantini filed a petition for bankruptcy in Denmark against a Danish company, Taster Wine A/S, on the basis of a judgment rendered by an Argentine court against the company. By decision in November 1997, the Danish Eastern High Court found that Gargantini's claim was sufficiently substantiated to commence bankruptcy proceedings against Taster Wine A/S, and a trustee of the estate was appointed. The trustee recommended that the plaintiffs' claim against the estate in bankruptcy be approved. However, the parent company of the bankrupt company objected to the recommendation of the trustee, arguing that the Argentine Court of Appeal's judgment should not be acknowledged by the Danish court as proof of the claim.

12.    In reviewing the parent company's objection, the Eastern High Court stated that the starting point was that it was proper for the bankruptcy court to recognize the claim of the Argentine plaintiff's against the estate in bankruptcy, because the relevant agreement between the parties was to be construed as a jurisdiction agreement

favouring Argentine forum and law. Subject to the evidence presented to the Eastern High Court, the Eastern High Court found that the Argentine judgment was detailed, well-argued and in accordance with legal principles. Against that background, and after having heard witnesses, the Eastern High Court ruled that the Argentine Appeal Judgment should be accepted as a matter of fact when making up the size of the claim in the estate in bankruptcy.

13. The Eastern High Court's judgment in U.2001.1949Ø illustrates only that a foreign judgment may be relied upon as evidence of that country's laws and how that country might resolve the issue under its laws where the foreign judgment has been rendered by a court, to the jurisdiction of which the parties have consented, and where the parties have agreed that the foreign law of that court's jurisdiction should apply to the dispute. The wording of the Eastern High Court's decision in the matter is the following (in my translation):

> "....the Argentine Appeal Judgment . . . should be laid down as a matter of fact when making up the size of the claim in the bankruptcy estate".

14. The Eastern High Court's conclusion is not surprising or abnormal. When dealing with a case subject to foreign law, the Danish courts will require evidence of foreign law. Such evidence can be provided in several ways. The parties can, *e.g.*, each submit their own analysis or request a joint expert opinion. In a case in which a foreign court has already decided the same or similar dispute and delivered a judgment it is natural and likely that Danish courts (and in particular a bankruptcy court when dealing with the proof of claims in a bankruptcy estate) will not only assess whether under

Danish private international law, the foreign court has jurisdiction in the case, and whether the dispute is to be determined according to the substantive law of the country in which the court is sitting, but further, if this is the case, and the judgment appears to be correct and adhered to general principles of law, it is very likely that the Danish courts in its assessment of foreign law will be influenced by the foreign courts. This does not, however, imply that the Danish Court has enforced the foreign judgment: the Court has made an assessment of the case and relied upon the judgment as evidence.

15. If, on the other hand, the application of Danish private international law to the dispute points to Danish law, Danish Courts will not restrict themselves in their assessment of the case and a foreign judgment will therefore be of limited if any value as evidence. As it appears from the wording of the judgment referred to by Mr. Rostock-Jensen, the court did not rule that the judgment should be "recognized" (in Danish "*anerkendt*"), but merely that as a matter of fact, the conclusion of the foreign judgment in that particular case could form the basis for the Danish court's decision ("*lægges til grund ved opgørelsen*")

16. Accordingly, if the Danish courts were to take the same approach as in the above Eastern High Court decision, a decision of this U.S. Court would not bind a Danish Court, but rather might inform its view about U.S. law if such law were to be applied to a dispute between ATP and the Defendants in a Danish Court. My understanding here is that the parties neither agree that the U.S. court has jurisdiction over ATP's claims nor

that U.S. law should govern the dispute.[1] Accordingly, it is not even clear that this U.S. Court's judgment would have persuasive effect on, let alone bind, the Danish Courts.

17. This conclusion is unsurprising given the fact that (i) pursuant to the Danish Administration of Justice Act, Section 479, a foreign judgment may only be enforced if the Minister of Justice issues an executive order according to which decisions by foreign courts or administrative bodies may be enforced in Denmark, and (ii) the Minister of Justice has never used this authorization to enforce a foreign judgment from the United States.[2] Since Danish Courts are to apply the law and do not have a legislative authority to issue rules, it is not plausible to read the Eastern High Court's opinion as recognizing the Argentine judgment as binding on the Danish court.

18. Indeed, based on the statutory provision described above, Danish courts have held that foreign judgments cannot be enforced in Denmark. From the Danish decisions that have been published on this issue,[3] I refer to the Danish Supreme Court judgment published in U.1964.74H and the Eastern High Court judgment published in U.1982.227Ø. It is evident from both cases that absent binding Treaty obligations, the

---

[1] I understand that ATP has submitted a declaration stating that it submits to the jurisdiction of this Court and the use of U.S. laws, but that the Defendants dispute the Court's jurisdiction over ATP's claims and the use of U.S. laws to resolve it.

[2] Under Danish law, statute takes precedence over case law, and the courts may only set aside legislation if the Courts deem this legislation to be in breach of the Danish constitution (*Grundloven*). There has never been a ruling by any Danish Court that the law restricting the enforcement of foreign judgments in the Kingdom of Denmark is unconstitutional.

[3] Danish Court decisions are not generally published; only certain selected decisions primarily from the Maritime and Commercial Court, the High Courts and the Supreme Court are published. Decisions from the District Courts and especially decisions from the Bailiff's Court are almost never published. Since the Bailiff's Court is responsible for enforcing foreign judgments (under the relevant Treaty provisions) and since the legal position is so clear it is to be assumed that only very few decisions on the subject would be eligible for publishing.

Danish Courts will not give binding effect to a foreign Court decision, but rather will make their own assessment of the case at hand.

19. Accordingly, I conclude that the opinion of Danish Eastern High Court in U.2001.1949Ø does not alter the basic law that a U.S. judgment is not enforceable in Denmark.

(ii) *The Eastern High Court's Judgment Does Not Bind Other Courts.*

20. As stated above, I disagree that the Eastern High Court's judgment in U.2001.1949Ø can be construed as establishing a principle of non-statutory recognition of foreign judgments. But even if that Judgment could be read to hold that a U.S. Court's judgment can be enforced in Denmark even where, as here, the parties did not agree on its jurisdiction or the application of the substantive law of that court's home country to the dispute at hand, the Eastern High Court's Judgment does not have any binding effect on other Danish courts.

21. The Danish court system is organized in a three-tier system: (1) the district courts, (2) the High Court of Western Denmark, the High Court of Eastern Denmark, and the Maritime and Commercial court, and (3) the Supreme Court. Normally actions are tried by the districts courts (first tier) with the possibility of appeal to the High courts. Certain actions may be heard by the High Courts or the Maritime and Commercial Court in first instance with direct appeal to the Supreme Court. Actions decided on appeal by the High Courts can be heard by the Supreme Court when extraordinary relief for a third hearing is granted.

22. The Eastern High Court's judgment in U.2001.1949Ø referred to above and the understanding of this judgment has not been confirmed in case law. Under Danish law, the Supreme Court has no means of calling up a decision for review even if ist believes that the lower court decision is incorrect, violating mandatory law or the constitution. Furthermore, it is not possible to establish a principle of law based on one single judgment, especially if the area of law is regulated by statute. This is recognized by Peter Arnt, on whose textbook "International Handelsret" (International Commercial Law) Mr. Rostock-Jensen bases his conclusion. Thus, at page 511 of the text-book Peter Arnt states that (my translation):

> *"It must be admitted that the [Eastern High Court's] judgment so far is the only one where the courts have recognized a foreign judgment without reciprocity or statutory basis. There is therefore a risk that other courts or the Supreme Court will deliver conflicting case law or reject the principles concerning recognition of foreign judgments laid down in the High Courts judgment U.2001.1949Ø".*

23. Furthermore, in Denmark, Court decisions may be used as precedents, but only on a narrow scope in relation to an identical or quasi-identical subject matter, see *inter alia* Joseph Lookofsky, Precedents and the Law, reports to the XVIIth Congress of the International Academy of Comparative Law, Utrecht, 16-22 July 2006, p. 262, where it is stated that under Danish law "...*only 'similar' cases have precedential potential, [...] so the facts of a case are obviously important, inter alia, for purposes of "distinguishing" the case at the bar from prior decisions*".

24. The legal tradition and the wording of Danish court decisions are such that all matters are decided on a restricted contextual fact basis and the reasoning strictly related thereto. It is seen, but held to be contrary to legal tradition, that the Supreme Court on rare occasions provides some limited general guidelines in their reasoning – so called "obiter dicta". But Danish courts refrain from, and have no competence to provide, legal opinions or general guidelines on an abstract level. Within the very limited room for precedential effect of a court decision, it is in legal theory held that the Supreme Court decisions are superior in order to decisions from other courts.

25. Accordingly, even if U.20010.1949Ø was misread to allow enforcement of a judgment of this U.S. Court in Denmark, it does not establish a principle of law to be applied by Danish courts.

> (iii) *The Criteria Suggested in the Literature Cited in Mr Rostock-Jensen's Declaration Are Not Comparable to A Judgment By This U.S. Court's In This Matter.*

26. The literature cited in Mr. Rostock-Jensen's declaration does not confirm a general principle of recognition and enforcement of foreign judgments. The literature argues that, in light of the Eastern High Court judgment in U.2001.1949Ø, judgments where the parties have made an agreement on jurisdiction can be compared to arbitral awards, because as with arbitrations the forum and applicable law have been agreed between the parties.

27. While foreign judgments under Danish law cannot be enforced absent a binding treaty obligation or an executive order issued by the Minister of Justice, under section 38 of the Danish Arbitration Act, an arbitral award, irrespective of the country in

which it was made, can be enforced in Denmark. According to the Danish Ministry of Justice, the reason behind Denmark's different approach towards enforcement of judgments and arbitral awards is that an arbitral award is a private dispute resolution system agreed between the parties. A judgment from a foreign court, on the other hand is generally not agreed between the parties. If the parties however have agreed on jurisdiction and choice of law, it could be argued that such a judgment can be compared to an arbitral award, and therefore should be enforced under Danish law.

28. The statement from *Retsplejerådet* (the Danish advisory Council on procedural law) of 12 August 2004, to which Mr. Rostock-Jensen refers in his declaration, was specifically provided in the context of the preparation of the Bill for a new arbitration act. In the statement, *Retsplejerådet* deals only with judgments where the parties have agreed on the jurisdiction, since such judgments in the opinion of Retsplejerådet may be compared to arbitral awards. Retsplejerådet's statement in paragraph 3.19.2 reads as follows in its entirety (my translation):

> "*Retsplejerådet is not of the opinion that there necessarily is a connection between the rules concerning recognition and enforcement of foreign judgments and the rules concerning recognition and enforcement of foreign arbitral awards. Thus, Sweden and Norway's approach to recognition and enforcement of foreign judgments are identical to Denmark's approach, while Sweden and Norway recognize and enforce arbitral awards from all countries of the world. Moreover, arbitral awards can only be compared to a very limited number of foreign judgments, i.e. judgments <u>where the parties have made an</u>*

*agreement that the country in question shall have jurisdiction. It is noted in this connection that recent case law and theory have presumed that Danish courts on a non-statutory basis recognize a foreign judgment rendered by a court, the jurisdiction of which the parties have agreed upon, especially if the parties have also agreed that any disputes are to be determined according to the substantive law of the country in which the court is sitting*" (emphasis added).

29. Along the same line, the statement by Lookofsky and Hertz in the textbook "International Privatret på Formuerettens område" (International Private Law within the law of property, contract and tort), 2008 cited by Jens Rostock-Jensen in his declaration, page 5, deals only with judgments where the parties have agreed that the country in question shall have jurisdiction. Thus, under the headline "*agreements on jurisdiction*" the statement in the textbook reads as follows in its entirety (my translation):

> "*Danish courts recognize agreements concerning jurisdiction in countries outside the EU/ Lugano area on a non-statutory basis, since Danish courts – if requested by the parties – will dismiss a law suit which is brought in Denmark contrary to such agreement. It is assumed that Danish Courts similarly on a non-statutory basis will recognize a judgment rendered by a court, the jurisdiction of which the parties have agreed upon, especially if the parties have agreed that the dispute is to be settled by the law of the forum state.*

Under the headline, *de lege ferenda* (*i.e.*, what the law ought to be as opposed to what the law is), Lookofsky and Hertz continue by stating that (my translation):

> *"It is gratifying that the Danish courts on this issue show openness towards foreign judgments. At the same time, there appears to be no good reason for Denmark <u>to continue</u> with the restrictive course [of not recognizing foreign judgments]"* (empahasis added),

30. Thus, even according to these scholars' theory, if the Eastern High Court judgment were to be held out as a precedent establishing a principle of enforcement of foreign judgments on a non-statutory basis, this principle would only apply to judgments where the parties have agreed that the country in question shall have jurisdiction, and that the law of this country applies to the dispute. Such judgments can, in the view of these commentators, be compared to arbitral awards, as the parties themselves have agreed upon jurisdiction and choice of law.

31. The parties in this case have made no agreement on jurisdiction or choice of law. It is my understanding that while ATP says it consents to the U.S. Court's jurisdiction over its claims, Defendants do not. Further, I also understand that Defendants claim that ATP's claims should be brought in Denmark or Switzerland, if at all, and thus Danish or Swiss substantive law should apply. As the jurisdiction of the U.S. Court is not based upon an agreement between the Plaintiffs and the Defendant, as it would in an arbitration, and as the Plaintiffs and the Defendant have made no agreement on choice of law, the present case cannot be compared to arbitral proceedings. Consequently, any precedent or principle concerning enforcement of foreign judgments

-14-

based on the Eastern High Court decision referred to in U.2001.1949Ø would in no event apply to this case.

### B. Danish Investors in UBS AG Securities Likely Could Bring a Claim Against the Defendants in Danish Courts

32. Under Danish law, a shareholder who invests in securities may bring actions against a corporation for alleged misrepresentations or omissions and may seek to recover monetary damages. Whether Danish law or another (*e.g.*, Swiss) substantive law will in fact be applicable to an alleged claim will be governed by the Danish conflict of law rules, if the matter is brought before a Danish court. The proper venue for such a claim is generally governed by the AJ ACT. However, Section 247 of the AJ ACT (Ex. 3) defers (by way of a separate implementing Act) to the rules in the Convention on Jurisdiction and Enforcement in Civil and Commercial Matters of September 16, 1988 ("*Lugano Convention*") (Ex. 4) and the Council and the Parliament of the European Community's Regulation 44/2001 of December 22, 2000 ("*Brussels Regulation*") (Ex. 5) for all venue questions falling within the scope of these international rules, hereunder in respect of civil actions involving a defendant that is domiciled (or has its corporate seat) in another European Union or European Economic Area Member State. Under such circumstances a claim shall primarily be brought in the courts of the defendant's domicile (or seat) (Section 1 of Article 2 of the Brussels Regulation/Section 1 of Article 2 of the Lugano Convention). Thus, Danish investors in UBS AG stock would primarily need to lodge a claim against defendants in the Swiss courts competent for UBS AG's corporate seat.

33. However, pursuant to Article 5 of the Brussels Regulation/Lugano Convention, a venue may be established, *inter alia*, in the jurisdictional courts where the harmful event occurred in matters relating to tort, delict or quasi-delict (No. 3 of Article 5 of the Brussels Regulation/No. 3 of Article 5 of the Lugano Convention).

34. The expression "*place where the harmful event occurred*" in article 5 (3) of the Brussels Regulation/Lugano Convention is construed by the European Court of Justice as being intended to cover both the place where the damage occurred and the place of the event giving rise to it. Thus, the defendant may be sued, at the option of the plaintiff, either in the courts competent for the place where the damage occurred or in the courts competent for the place of the event which gives rise to and is origin of that damage, see the European Court of Justice's decision of 30 November 1976 in Case C-21/76; Bier (Mines de Potasse d'Alsace), ECJ Report 1976-1735, recitals 24-25 (Ex. 6) and of 7 March 1995 in case C-68/93; (Fiona Shevill), ECJ Report 1995 I-415 (Ex. 7).

35. The expression "*matters relating to tort*" must, according to the European Court of Justice, be regarded as an independent concept covering all actions which seek to establish the liability of a defendant and which are not related to a "contract" within the meaning of Article 5 (1) of the Brussels Regulation/Lugano Convention, see the European Court of Justice's decision in Case C-189/87; Kalfelis, ECJ Report 1988-5565, recitals 16-18 (Ex. 8).

36. Based on the above decisions, investors who decided to acquire UBS shares based on information made available to them in Denmark should, depending on the specific facts of the case, be able to establish a proper venue before the Danish courts.

## V. CONCLUSION

37. Thus, I conclude that a judgment delivered by this U.S. Court will not bar Danish investors from commencing legal proceedings in Denmark against Defendants in this action based on identical or similar claims to the ones brought in the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Copenhagen, Denmark on September 29, 2009.

/Christian Alsøe