**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE UBS AG SECURITIES
LITIGATION

No. 07 CV 11225 (RJS)

**ORAL ARGUMENT
REQUESTED**

**UBS DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION TO DISMISS ALL CLAIMS BASED ON
PURCHASES OF UBS SHARES OUTSIDE THE UNITED STATES**

Robert J. Giuffra, Jr.
Maite Aquino
Suhana S. Han
Matthew A. Schwartz
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:   (212) 558-3588

*Counsel for Defendants*

August 31, 2010

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ....................................................................................................................6

    A.    The Parties ...........................................................................................................6

        1.    The Lead Plaintiffs ............................................................................ 6

        2.    The Named Plaintiffs ........................................................................ 6

        3.    UBS ................................................................................................... 7

    B.    This Action .........................................................................................................8

ARGUMENT ......................................................................................................................10

I.    *MORRISON* REQUIRES DISMISSAL OF ALL CLAIMS BASED ON PLAINTIFFS' PURCHASES OF UBS SECURITIES OUTSIDE THE UNITED STATES ..........................................................................................................10

    A.    Under *Morrison*, This Court Must Dismiss Foreign Plaintiffs' Foreign-Cubed Claims .......................................................................................11

    B.    *Morrison* Also Requires Dismissal of Oregon's Foreign-Squared Claims ..........15

II.    THIS COURT SHOULD NOT PERMIT PLAINTIFFS TO END-RUN *MORRISON* .............................................................................................................17

    A.    Foreign Plaintiffs' "Listing" Theory Is a Clear Distortion of *Morrison*'s Transactional Test ..............................................................................................17

    B.    Allowing Plaintiffs' Claims Based on Foreign Transactions To Proceed in This U.S. Court Cannot Be Squared with *Morrison*'s Holding .......................22

    C.    Plaintiffs' "Listing" Theory Is Inconsistent with the Supreme Court's Policy Concerns ..................................................................................................26

CONCLUSION ...................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)..................................................................................6

*Bersch* v. *Drexel Firestone, Inc.*,
  519 F.2d 974 (2d Cir. 1975)................................................................................9

*Cedeno* v. *Intech Group, Inc.*,
  No. 09 Civ 9716, 2010 WL 3359468 (S.D.N.Y. Aug. 25, 2010) ........................15

*Copeland* v. *Fortis*,
  685 F. Supp. 2d 498 (S.D.N.Y. 2010) ................................................................25

*Cornwell* v. *Credit Suisse Group*,
  666 F. Supp. 2d 381 (S.D.N.Y. 2009) ..........................................................15-16

*Cornwell* v. *Credit Suisse Group*,
  689 F. Supp. 2d 629 (S.D.N.Y. 2010) ................................................................16

*Cornwell* v. *Credit Suisse Group*,
  No. 08 Civ. 3758, 2010 WL 3069597 (S.D.N.Y. July 27, 2010) ....................3, 16

*Cornwell* v. *Credit Suisse Group*,
  No. 08 Civ. 3758, 2010 WL 3291800 (S.D.N.Y. Aug. 11, 2010) ......................22

*Cornwell* v. *Credit Suisse Group*,
  No. 08 Civ. 3758, slip op. (S.D.N.Y. Aug. 20, 2010) ..................................15, 16

*EEOC* v. *Arabian Am. Oil Co.*,
  499 U.S. 244 (1991).........................................................................................11

*F. Hoffmann-La Roche Ltd.* v. *Empagran S. A.*,
  542 U.S. 155 (2004) .........................................................................................13

*Foley Bros., Inc.* v. *Filardo*,
  336 U.S. 281 (1949) .........................................................................................20

*In re Alstom S.A. Sec. Litig.*,
  406 F. Supp. 2d 246 (S.D.N.Y. 2005) .............................................................5, 25

*In re Austl. and N.Z. Banking Group Ltd. Sec. Litig.*,
  No. 08 Civ. 11278, 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ......................24

Page(s)

*In re Banco Santander Sec.—Optimal Litig.*,
No. 09-MD-2073, 2010 WL 3036990 (S.D. Fla. July 30, 2010)......................................15, 22

*In re Bayer AG Sec. Litig.*,
423 F. Supp. 2d 105 (S.D.N.Y. 2005) .............................................................................25, 27

*In re China Life Sec. Litig.*,
No. 04 Civ. 2112, 2008 WL 4066919 (S.D.N.Y. Sept. 3, 2008) ..........................................25

*In re Nat'l Austl. Bank Sec. Litig.*,
No. 03 Civ. 6537, 2006 WL 3844465 (S.D.N.Y. Oct. 25, 2006) ....................................11, 27

*In re NovaGold Res. Inc. Sec. Litig.*,
623 F. Supp. 2d 272 (S.D.N.Y. 2009) .................................................................................25

*In re PXRE Group, Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009) .................................................................................29

*In re Rhodia S.A. Sec. Litig.*,
531 F. Supp. 2d 527 (S.D.N.Y. 2007) .................................................................................25

*In re Sadia, S.A. Sec. Litig.*,
No. 08 Civ. 9528, 2010 WL 2884737 (S.D.N.Y. July 20, 2010) ..........................................25

*In re SCOR Holding (Switzerland) AG Litig.*,
537 F. Supp. 2d 556 (S.D.N.Y. 2008) .............................................................................25, 26

*In re Yukos Oil Co Sec. Litig.*,
No. 04 Civ. 5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ..........................................25

*Itoba Ltd.* v. *Lep Group PLC*,
54 F.3d 118 (2d Cir. 1995) ...............................................................................................24

*Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*,
501 U.S. 350 (1991)...........................................................................................................18

*Lauritzen* v. *Larsen*,
345 U.S. 571 (1953) ....................................................................................................... 20-21

*Morrison* v. *Nat'l Austl. Bank Ltd.*,
130 S. Ct. 2869, 561 U.S. __ (2010)............................................................................ passim

*Morrison* v. *Nat'l Austl. Bank Ltd.*,
547 F.3d 167 (2d Cir. 2008)...........................................................................................2, 24

*Pozniak* v. *Imperial Chem. Indus. PLC*,
No. 03 Civ. 2457, 2004 WL 2186546 (S.D.N.Y. Sept. 28, 2004) ................................... 25-26

Page(s)

*Sgalambo* v. *McKenzie*,
　No. 09 Civ. 10087, 2010 WL 3119349 (S.D.N.Y. Aug. 6, 2010) ........................14-15, 21-22

*Stackhouse* v. *Toyota Motor Co.*,
　No. 10 Civ. 922, 2010 U.S. Dist. LEXIS 79837 (C.D. Cal. July 16, 2010) ...........................16

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*,
　552 U.S. 148 (2008) ....................................................................................... 13, 26, 28-29

*Superintendent of Ins.* v. *Bankers Life & Cas. Co.*,
　404 U.S. 6 (1971) ..........................................................................................................18

*Tradex Global Master Fund SPC Ltd.* v. *Rieden*,
　No. 09 Civ. 6395, slip op. (July 30, 2010).....................................................................15, 29

## STATUTES, RULES, AND REGULATIONS

Additional Rules for the Listing on the SWX Europe Limited  ...................................................7

American Depositary Receipts, Securities Act Release No. 33-6894,
　1991 SEC LEXIS 936 (May 23, 1991) ................................................................................25

Dodd-Frank Wall Street Reform and Consumer Protection Act Sec. 929P(b)(2)
　Pub. L. No. 111-203, 124 Stat. 1376, July 21, 2010, codified at 15 U.S.C. § 78aa(b)............20

Federal Rules of Civil Procedure
　Rule 12(b)(1)...................................................................................................................9
　Rule 12(b)(6)...................................................................................................................1

Listing Rules of the Swiss Stock Exchange.............................................................................7

Rules, Registration and Annual Report Form for Foreign Private Issuers, Exchange Act
　Release No. 16371, 1979 WL 169934 (Nov. 29, 1979) ........................................................8

Securities Act of 1933
　Rule 901, 17 C.F.R. § 230.901 .......................................................................................19

Securities Exchange Act of 1934
　Section 10(b), 15 U.S.C. § 78j(b)  ........................................................................... passim
　Section 20(a), 15 U.S.C. § 78t(a)....................................................................................29
　Section 30(a), 15. U.S.C. § 78dd(a)................................................................... 12-13, 19, 20

Securities and Exchange Commission Rules
　Rule 10b-5, 17 C.F.R. § 240.10b-5 .................................................................................11

Swiss Stock Exchange Directive on *Ad Hoc* Publicity...............................................................7

Page(s)

**OTHER AUTHORITIES**

Edward F. Greene, et al.,
  U.S. Regulation of the Int'l Secs. and Derivatives Mkts.  ....................................................17

Harold S. Bloomenthal & Samuel Wolff,
  Int'l Capital Mkts. and Secs. Regulation (2010) ...................................................18

John C. Coffee, Jr., *Securities Policeman to the World? The Cost of Global Class
  Actions*, N.Y.L.J., September 18, 2008.................................................................28

Mayor Michael Bloomberg & Sen. Charles Schumer, *Sustaining New York's and the
  US's Global Financial Services Leadership*.........................................................28

Pursuant to Fed. R. Civ. P. 12(b)(6), UBS AG ("UBS") and the Individual Defendants[1] (jointly, the "UBS Defendants") move to dismiss with prejudice all claims in Counts I and II of the Amended Consolidated Securities Class Action Complaint (the "Amended Complaint" or "AC") brought by Foreign Lead Plaintiffs,[2] Named Plaintiff Council of the Borough of South Tyneside of the United Kingdom ("Tyneside"; with Foreign Lead Plaintiffs, the "Foreign Plaintiffs"), and Named Plaintiff Oregon Public Employees Board ("Oregon") based on their purchases of UBS ordinary shares *outside the United States*. By this motion, the UBS Defendants do not seek dismissal of claims based on purchases of UBS ordinary shares inside the United States.[3]

## PRELIMINARY STATEMENT

Lead Plaintiffs—four institutional investors, three of which are foreign—bring this putative class action in this U.S. Court against UBS, a Swiss bank, and the Individual Defendants on behalf of *all* purchasers of UBS ordinary shares on *all* "[w]orldwide exchanges," including the Swiss Stock Exchange ("Swiss Exchange") and the New York Stock Exchange ("NYSE"). (AC at 1.) Based on alleged misstatements that UBS issued from its Swiss

---

[1]    The Individual Defendants are Marcel Ospel, Peter Wuffli, Marcel Rohner, Clive Standish, Marco Suter, Walter Stuerzinger, Huw Jenkins, Ramesh Singh, David Martin, James Stehli, John Costas, and Michael Hutchins.

[2]    Foreign Lead Plaintiffs are Lead Plaintiffs Arbejdsmarkedets Tillægspension ("ATP"), Union Asset Management Holding AG ("Union"), and International Fund Management S.A. ("IFM"). Other Plaintiffs in this action are Lead Plaintiff City of Pontiac Policemen's and Firemen's Retirement System ("Pontiac"), and Named Plaintiffs Tyneside, Oregon, Teamsters Union Local 500 Severance Fund ("Teamsters"), and Alaska Laborers-Employers Retirement Fund ("Alaska Laborers").

[3]    Pursuant to this Court's July 14, 2010 order, following this Court's ruling on this motion to dismiss, all Defendants in this action, including the underwriters of UBS's May 2008 Rights Offering, will renew their motions to dismiss for failure to plead adequately the required elements of scienter, misstatement, and/or loss causation.

headquarters, Foreign Lead Plaintiffs seek to litigate in this U.S. Court, under Section 10(b) of the Securities Exchange Act of 1934, the claims of thousands of (i) foreign investors (ii) who elected to buy UBS's shares (iii) on a foreign exchange ("foreign-cubed claims").

The UBS Defendants have twice moved to dismiss Foreign Plaintiffs' foreign-cubed claims for failure to meet the Second Circuit's then-threshold for applying Section 10(b) to such claims under the "conduct" and "effects" tests, which turned on where the alleged fraudulent conduct occurred and whether there were any effects in the United States. Before this Court could rule on the UBS Defendants' motion, the Supreme Court granted *certiorari* to review the Second Circuit's dismissal of foreign-cubed claims in *Morrison* v. *National Australia Bank Ltd.*, 547 F.3d 167 (2d Cir. 2008), and this Court dismissed the UBS Defendants' motion with leave to renew after the Supreme Court ruled.

On June 24, 2010, the Supreme Court issued its decision in *Morrison*, sweeping away the multi-factored "conduct" and "effects" tests and replacing those tests with a bright-line rule that requires this Court to dismiss not only Foreign Plaintiffs' foreign-cubed claims, but also the claims of Named Plaintiff Oregon based on its purchases of UBS shares on the Swiss Exchange ("foreign-squared claims"). *Morrison*, 561 U.S. __, 130 S. Ct. 2869 (2010). In *Morrison*, the Supreme Court held that the "conduct" and "effects" tests violated the "longstanding principle of American law" that, unless a statute gives a "clear indication of an extraterritorial application," the statute "is meant to apply *only within the territorial jurisdiction of the United States*," *id.* at 2877-78 (emphasis added; quotation omitted). The Supreme Court reasoned that these tests had to go, because Section 10(b) "contains nothing to suggest that it applies abroad," and "silence means no extraterritorial application." *Id.* at 2881.

Applying "the presumption against extraterritoriality," *Morrison* concluded that "the focus of the Exchange Act is not upon the place where the deception originated, but upon *purchases and sales of securities in the United States*." *Id.* at 2884 (emphasis added). It observed that "[n]othing suggests that [the] *national* public interest pertains to transactions conducted upon *foreign* exchanges and markets," and that "no one . . . thought that the Act was intended to regulate *foreign securities exchanges*." *Id.* at 2882, 2884 (emphasis added). And so the Supreme Court "reject[ed] the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad." *Id.* at 2885. The Supreme Court highlighted two benefits of its new, bright line rule: (i) no longer would Section 10(b)'s application to foreign transactions cause "interference with foreign securities regulation," and (ii) no longer would America run the risk of being turned into "the Shangri-La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets." *Id.* at 2886.

*Morrison*'s bright-line, location-of-the-transaction rule requires dismissal of the Foreign Plaintiffs' foreign-cubed claims here, because, as in *Morrison*, Foreign Plaintiffs are foreign investors who purchased their UBS shares on a foreign exchange. *Morrison* also requires this Court to dismiss all foreign-squared claims against the UBS Defendants. Although the *Morrison* plaintiffs were foreign, that fact was irrelevant to the Supreme Court's reasoning. Thus, in *Cornwell* v. *Credit Suisse Group*, Judge Marrero dismissed foreign-squared claims brought by U.S. investors based on purchases of Credit Suisse ordinary shares on the Swiss Exchange, because "under [*Morrison*'s] new test § 10(b) would not extend to foreign securities trades executed on foreign exchanges *even if purchased or sold by American investors*, and even if some aspects of the transaction occurred in the United States." No. 08 Civ. 3758, 2010 WL 3069597, at *5 (S.D.N.Y. July 27, 2010) (emphasis added).

Foreign Plaintiffs and Oregon have advised the UBS Defendants that they intend to try to end-run *Morrison* on the basis of the Supreme Court's use of a single word—"listed"—in the transactional test expressed in *Morrison*:  Section 10(b) applies to "the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."  130 S. Ct. at 2888.  Plaintiffs claim that the Supreme Court used the word "listed" to create a rule—never before dreamed of by a U.S. court in the 76 years since Section 10(b)'s enactment—that foreign issuers that list shares on both a foreign exchange and a U.S. exchange are subject to "worldwide" class actions in U.S. courts by investors who purchased their shares *on foreign exchanges*, even if the alleged fraud occurred outside the United States.

There is no support in the text of Section 10(b), its legislative history, or *Morrison*, for such an unprecedented, expansive interpretation of Section 10(b)'s extraterritorial scope.  *Morrison* plainly used the word "listed," because Section 10(b) covers only two types of securities that can be bought in the United States: (1) a *listed* security that trades on a U.S. exchange, or (2) an unlisted security that trades "face to face" or over the counter in the United States.  *Id.* at 2882 ("transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest").  Plaintiffs' misreading of the word "listed" to authorize worldwide class actions based on purchases of securities on a foreign exchange would fly in the face of *Morrison*'s repeated statements that Section 10(b) does not "regulat[e] *foreign securities exchanges*."  *Id.* at 2884 (emphasis added).

And, Plaintiffs cannot escape that, if their "listed" securities theory were correct, then *Morrison* itself would be *wrongly decided*.  As the record before the Supreme Court indisputably reflects, the issuer in *Morrison*, National Australia Bank ("NAB"), itself had (i) registered its ordinary shares and American Depositary Receipts ("ADRs") with the Securities

-4-

and Exchange Commission ("SEC") and the NYSE, (ii) listed its ADRs for trading on the NYSE, and (iii) listed its ordinary shares on the NYSE, although not for trading.

Plaintiffs' "listed" securities theory would not only overturn the result in *Morrison* itself, but, if correct, would mean that *Morrison* actually *broadened* Section 10(b)'s extraterritorial reach. Under the "conduct" and "effects" tests, foreign-cubed purchasers could not "piggyback on the harm caused by [an] alleged fraud to investors and markets in the United States." *In re Alstom S.A. Sec. Litig.*, 406 F. Supp. 2d 246, 369 (S.D.N.Y. 2005) (Marrero, J.). As a result, when the "conduct" test was not met, courts in this District dismissed foreign-cubed claims against issuers that had listed ordinary shares or ADRs on a U.S. exchange. All of those cases, if presented today on plaintiffs' theory, would *survive*. Thus, a Supreme Court decision meant to sharply *curtail* the extraterritorial application of Section 10(b) would sharply *expand* it.

There is no way the Supreme Court so held or intended that outcome. Over 850 foreign issuers, including NAB and UBS, list and register their shares on both a foreign exchange and a U.S. exchange. (Declaration of Robert J. Giuffra, Jr., dated August 31, 2010 ("Giuffra Decl."), Exs. 1, 2.) It defies logic to believe that Justice Scalia, without explanation and contrary to the rest of his majority opinion, included the word "listed" to expand Section 10(b) in a way that will discourage foreign issuers from listing their shares on U.S. exchanges and make the United States the "Shangri-La" for worldwide securities class actions.

Because *Morrison* squarely held that Section 10(b) applies only to "purchases and sales of securities *in the United States*," this Court should dismiss both (i) Foreign Plaintiffs' foreign-cubed claims—which are based solely on purchases of UBS shares on the Swiss Exchange—as well as (ii) the 80% of Oregon's claims that are foreign-squared and likewise based on purchases of UBS shares on the Swiss Exchange.

# BACKGROUND[4]

### A.     The Parties

#### 1.     The Lead Plaintiffs

Foreign Lead Plaintiffs Union (a German asset manager), IFM (a Luxembourg asset manager), and ATP (a Danish pension fund) allege aggregate losses totaling $277,017,160—based solely on their purchases of UBS shares on the Swiss Exchange.[5]  By contrast, the lone U.S. Lead Plaintiff, Pontiac (a pension fund), alleges losses of just $257,704[6] based on its purchases of UBS shares on the NYSE.  Thus, *over 99%* of the Lead Plaintiffs' alleged damages rests on purchases of UBS shares by *foreign* plaintiffs on a *foreign* exchange.

#### 2.     The Named Plaintiffs

Foreign Named Plaintiff Tyneside (a U.K. pension fund) alleges losses of $11,092,321 based on purchases of UBS shares on the Swiss Exchange.[7]  U.S. Named Plaintiff Oregon (a U.S. pension fund) alleges losses of $48,386,932 on purchases of UBS shares on the

---

[4]    In deciding this motion to dismiss, this Court  may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[5]    Union alleges losses of $109,374,282 trading shares of UBS on the Swiss Exchange. (Docket No. 94 (Declaration of Sharan Nirmul in Support of Motion for an Order (1) Consolidating the Tag-Along Actions with the Existing In re UBS AG Securities Litigation and Declaring Lead Plaintiffs as Lead Plaintiffs over the Entire Consolidated Class Action or, (2) in the Alternative, Appointing the UBS Litigation Group as Lead Plaintiffs over the Tag-Along Actions and Consolidating the Tag-Along Actions with In re UBS AG Securities Litigation ("Nirmul Decl."), filed on April 1, 2009) Ex. E.)  IFM alleges losses of $41,366,632 trading shares of UBS on the Swiss Exchange.  (Nirmul Decl. Ex. F.)  ATP alleges losses of $2,688,295 trading shares of UBS on the Swiss Exchange.  (Nirmul Decl. Ex. D.)

[6]    (Nirmul Decl. Ex. C.)

[7]    (Docket No. 12 (Aff. of David A. Rosenfeld in Support of the Global Funds Group's Motion for Appointment as Lead Plaintiff, filed on Feb. 11, 2008) Ex. B.)

Swiss Exchange and losses of $5,215,396 on purchases on the NYSE.[8]  U.S. Named Plaintiffs Teamsters and Alaska (both U.S. pension funds) allege losses totaling $1,679,479 on purchases of UBS shares on the NYSE.[9]

Thus, in total, **97%** of Plaintiffs' alleged losses (including those of *all* Lead and Named Plaintiffs) is based on purchases of UBS shares on the Swiss Exchange.[10]

### 3.     UBS

UBS is headquartered in Basel and Zurich, Switzerland and incorporated there as an *aktiengesellschaft*, a corporation that has issued ordinary shares to investors.  (Giuffra Decl. Ex. 3 (UBS AG, 2005 Annual Report (Form 20-F), at 5 (March 21, 2006)).)  As alleged in the Amended Complaint, UBS's Swiss-based executives were responsible for UBS's public statements to its investors, including UBS's annual and quarterly reports and press releases. (*E.g.*, AC ¶¶ 119-122.)  As a Swiss company, UBS must follow Swiss law and Swiss Exchange rules that regulate its disclosures to investors.[11]

From August 13, 2003 to February 23, 2009 (the "putative Class Period"), UBS's ordinary shares were listed for trading on the Swiss Exchange, the Tokyo Stock Exchange, and NYSE (Giuffra Decl. Ex. 4 (UBS AG, 2007 Annual Report (Form 20-F), at 10 (March 18, 2008))), permitting investors to purchase and sell UBS shares on all three exchanges.

---

[8]     (Nirmul Decl. Ex. G.)

[9]     Teamsters alleges losses of $175,350 in UBS shares purchased on the NYSE (Consolidated Sec. Class Action Compl. App'x 1).  Alaska Laborers alleges losses of $1,495,129 in UBS shares purchased on the NYSE.  (Nirmul Decl. Ex. H.)

[10]    In total, Lead Plaintiffs and Named Plaintiffs allege losses of $220,052,040 on UBS shares purchased on the Swiss Exchange, and losses of just $7,143,578 on UBS shares purchased on the NYSE. *See supra* at pages 6-7 & nn.5-9.

[11]    (Giuffra Decl. Exs. 5 (Listing Rules of the Swiss Exchange), 6 (Additional Rules for the Listing on the Swiss Exchange), 7 (Swiss Exchange Directive on *Ad Hoc* Publicity).)

Approximately *88%* of the worldwide trading volume in UBS's ordinary shares during the putative Class Period occurred *outside the United States*.  (Declaration of Allen Ferrell, dated Sept. 22, 2009, ¶ 12.)

In 2000, upon registering its ordinary shares with the SEC and NYSE and listing those shares on the NYSE for trading (Giuffra Decl. Ex. 4 (UBS AG, 2007 Annual Report, at 11)), UBS became subject to U.S. reporting requirements for foreign issuers.  Recognizing that the primary obligations of foreign private issuers like UBS and NAB are to their home country regulators, the SEC permits UBS, NAB, and other foreign issuers to satisfy their SEC requirements by filing with the SEC annual reports that are identical in all material respects to their annual reports filed with their home-country regulators, and furnishing to the SEC copies of other documents made public within their home-country jurisdictions.  *See* Rules, Registration and Annual Report Form for Foreign Private Issuers, Exchange Act Release No. 16731, 1979 WL 169934, at *1 (Nov. 29, 1979).

**B.**     **This Action**

In the original Consolidated Securities Class Action Complaint ("Consolidated Complaint"), Lead Plaintiffs brought Counts I and II on behalf of "all other persons and entities who purchased or otherwise acquired registered securities issued by UBS . . . on [w]*orldwide exchanges*."  (Consolidated Complaint at 1 (emphasis added).)  Plaintiffs alleged that the UBS Defendants violated Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 thereunder by issuing fraudulent statements, *almost entirely from Switzerland*, concerning (i) UBS's positions and losses in U.S. mortgage-related securities; (ii) UBS's positions and losses in auction rate securities; and (iii) compliance with U.S. tax and securities laws by UBS's small, Swiss-based private wealth management business for U.S. clients.  (Consolidated

Complaint ¶¶ 1089-1103.)  Plaintiffs further alleged that the revelation of UBS's supposed fraud caused a decline in the value of the UBS ordinary shares that Plaintiffs had purchased.  (*Id.*)

On November 19, 2008, the UBS Defendants moved to dismiss the Foreign Plaintiffs' claims for lack of subject matter jurisdiction[12] (Docket No. 54 (Defs.' Mem. of Law in Support of Their Rule 12(b)(1) Motion to Dismiss Foreign Lead Pls.' Claims)) and to dismiss the entire Consolidated Complaint for failure to state a claim.  (Docket No. 62 (Defs.' Mem. of Law in Support of their Motion to Dismiss the Complaint Pursuant to Rules 9(b) and 12(b)(6)).)

In March 2009, before this Court could rule on the UBS Defendants' motions to dismiss, several other purported investors in UBS shares (who had not previously been part of this lawsuit) moved to take over the position of lead plaintiffs in this action, in part because the Foreign Lead Plaintiffs—who alleged over 99.9% of the Lead Plaintiffs' claimed losses—could not successfully bring their foreign-cubed claims under the Second Circuit's "conduct" and "effects" tests, and the only remaining Lead Plaintiff would be Pontiac, which alleged damages of only $257,703.  (Letter from Joseph A. Fonti to Hon. Richard J. Sullivan, dated March 10, 2009, at 7.)  The Court denied the new investors' motion, and reserved judgment on whether Foreign Lead Plaintiffs could bring their foreign-cubed claims until it could consider the briefing submitted on that issue by the Lead Plaintiffs and UBS Defendants. (April 7, 2009 Order.)

This Court then granted Lead Plaintiffs leave to amend their complaint to include new allegations and new claims (styled as Counts III, IV, and V) under Sections 11, 12(a)(2),

---

[12]   Pursuant to the Second Circuit's prior holdings, *see, e.g.*, *Bersch* v. *Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975), Defendants previously moved to dismiss Foreign Plaintiffs' foreign-cubed claims under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. *Morrison*, however, held that the issue was not whether federal courts have *jurisdiction* over Section 10(b) claims based on foreign purchases, but whether Section 10(b) provides *relief* for such claims.  *See Morrison,* 130 S. Ct. at 2877.

and 15 of the Securities Act of 1933 ("Securities Act") relating to alleged misstatements in UBS's Registration Statements and Prospectuses concerning UBS's compliance with U.S. tax and securities laws in its U.S. cross-border business. (April 23, 2009 Order.)[13] The parties proceeded to re-brief both of these motions. Ultimately, the Court dismissed both of those motions without prejudice to their renewal after the Supreme Court issued its opinion in *Morrison*. (March 19, 2010 Order.) On July 14, 2010, the Court ordered that the parties "shall first brief Defendants' motions to dismiss on the basis of the *Morrison* decision only. After resolving those motions, the Court will address . . . (1) whether there is any need to appoint additional or new Lead Plaintiffs and (2) the schedule for Defendants' motions to dismiss based upon grounds other than the *Morrison* decision." (July 14, 2010 Order at 1.)

## ARGUMENT

**I.  *MORRISON* REQUIRES DISMISSAL OF ALL CLAIMS BASED ON PLAINTIFFS' PURCHASES OF UBS SECURITIES OUTSIDE THE UNITED STATES.**

In *Morrison*, the Supreme Court made clear that Section 10(b) does not apply to "transactions conducted upon *foreign* exchanges and markets." 130 S. Ct. at 2882 (emphasis in original). Accordingly, this Court must dismiss (i) all claims of the Foreign Plaintiffs, and (ii) all claims of Oregon based on purchases on the Swiss Exchange.

---

[13]  *Morrison* does not require dismissal of Counts III, IV, and V of the Amended Complaint, because Lead Plaintiffs bring these Counts under the Securities Act on behalf of only investors that purchased UBS shares pursuant to the Registration Statement and Prospectus filed with the SEC, which were specifically limited to sales inside the United States. (AC at 1.) Indeed, Plaintiffs have expressly acknowledged that their proposed class for purposes of Counts III, IV, and V "does *not* include foreign investors." (Docket No. 138 (Lead Pls.' Mem. of Law in Opposition to Defs.' Rule 12(b)(1) Motion to Dismiss Foreign Lead Pls.' Claims) at 1 n.2.)

A.      **Under *Morrison*, This Court Must Dismiss Foreign Plaintiffs' Foreign-Cubed Claims.**

In *Morrison*, foreign investors who purchased NAB ordinary shares on the Australian Stock Exchange brought claims in the Southern District of New York under Section 10(b), alleging that defendants made fraudulent misstatements concerning the financial performance of one of NAB's U.S. subsidiaries.  *In re Nat'l Austl. Bank Sec. Litig.*, No. 03 Civ. 6537, 2006 WL 3844465, at *1-2 (S.D.N.Y. Oct. 25, 2006) (Jones, J.).[14]

In dismissing the NAB plaintiffs' foreign-cubed claims, the Supreme Court concluded that Section 10(b) does not apply to purchases of shares made outside the United States.[15]  In doing so, the Court rejected the Second Circuit's "conduct" and "effects" tests.  The Court held that those tests improperly "disregard[ed] the presumption against extraterritoriality," *Morrison*, 130 S. Ct. at 2878—the "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  *Id.* at 2877 (quoting *EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).  As the Court emphasized:  "When a statute gives no *clear indication* of an extraterritorial application, it has none."  *Id.* at 2878 (emphasis added).

Looking to Section 10(b)'s text referring to purchases of "any security registered on a national securities exchange or any security not so registered," *id.* at 2881 (quoting 15

---

[14]   A U.S. investor who purchased NAB's ADRs on the NYSE also brought claims against NAB.  The District Court dismissed his claims for failure to allege damages, and the U.S. investor did not challenge that ruling on appeal.  *Morrison*, 130 S. Ct. at 2876 n.1.

[15]   The Supreme Court also dismissed the NAB plaintiffs' claims under SEC Rule 10b-5, because "Rule 10b-5 . . . was promulgated under § 10(b), and does not extend beyond conduct encompassed by § 10(b)'s prohibition."  *Morrison*, 130 S. Ct. at 2881 (internal quotation marks and footnote number omitted).  Accordingly, this Court also should dismiss (i) all claims brought under Rule 10b-5 by Foreign Plaintiffs, and (ii) all claims brought under Rule 10b-5 by Oregon based on purchases of UBS shares on the Swiss Exchange.

U.S.C. § 78j(b)), the Supreme Court found "no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially," *id.* at 2883; *see also id.* at 2878 (noting that "the Exchange Act is silent as to the extraterritorial application of § 10(b)").  Rather, the Supreme Court held, "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities *in the United States*."  *Id.* at 2884 (emphasis added).

> The Supreme Court rejected the NAB plaintiffs' argument that Section 10(b) should apply to transactions abroad because such transactions affect prices on U.S. exchanges, noting that "[n]othing suggests that this *national* public interest pertains to transactions conducted upon *foreign* exchanges and markets." *Id.* at 2882 (emphasis in original).  The Court emphasized that it "kn[e]w of no one who thought that the Act was intended to 'regulat[e]' *foreign* securities exchanges—or indeed who even believed that under established principles of international law Congress had the power to do so." *Id.* at 2884-85 (emphasis in original).

> The Court found support for its conclusion in the text of Section 30(a) of the Exchange Act, which authorizes the SEC to prescribe rules for broker-dealers who seek to transact in shares of *U.S. issuers* outside the United States.  Specifically, Section 30(a) applies to broker-dealers that:

> > make use of the mails or of any means or instrumentality of interstate commerce *for the purpose of effecting on an exchange not within or subject to the jurisdiction of the United States*, any transaction in any security the issuer of which is a resident of, or is organized under the laws of, or has its principal place of business in, a place within or subject to the jurisdiction of the United States, in contravention of such rules and regulations as the Commission may prescribe.

*Id.* at 2883 (emphasis added) (quoting 15 U.S.C. § 78dd(a)).  The Supreme Court stressed that Section 30(a)'s "explicit provision for a specific extraterritorial application" of the Exchange Act to certain types of transactions on foreign exchanges "would be quite superfluous if the rest of the Exchange Act," including Section 10(b), "already *applied to transactions on foreign*

*exchanges.*" *Id.* at 2883 (emphasis added).[16]  Under Section 30(a), the Court observed, "it is the foreign location of the *transaction* that establishes . . . the Act's inapplicability." *Id.* at 2885 (emphasis in original).

In addition to relying on the presumption against extraterritoriality, Justice Scalia's majority opinion followed the Supreme Court's rule of considering "[t]he practical consequences of an expansion" of the Section 10(b) private right of action, *Stoneridge*, 552 U.S. at 163, and identified two practical grounds supporting its holding that Section 10(b) does not "reach[] conduct in this country affecting exchanges or transactions abroad." *Morrison,* 130 S. Ct. at 2885.

*First*, citing the *amici* briefs of foreign governments and trade organizations, including a diplomatic note by the Swiss government,[17] *Morrison* stressed that restricting Section 10(b) to transactions in securities on U.S. exchanges and other domestic transactions in securities would avoid the "the probability of incompatibility with the applicable laws of other countries," which was "so obvious that if Congress intended such foreign application it would have addressed the subject of conflicts with foreign laws and procedures." *Id.* at 2885 (internal quotation marks omitted); *see also F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155,

---

[16]    The Supreme Court's conclusion that Section 10(b) does not provide relief for purchasers of securities outside the United States is consistent "with the narrow dimensions" that the Supreme Court gives to Section 10(b) private rights of action, which "Congress did not authorize when it first enacted the statute and did not expand when it revisited the law." *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 552 U.S. 148, 167 (2008).

[17] *See* Brief of the Int'l Chamber of Commerce, et al., as *Amici Curiae* at App'x A (Swiss Diplomatic Note No. 17/2010) in *Morrison*, 130 S. Ct. 2869 (No. 08-1191), 2010 WL 719334, at *3a ("providing non-U.S. investors in Swiss companies with a private right of action for securities fraud in U.S. courts may result in conflicting judicial decisions, as U.S. and Swiss law may differ. It is not in the interest of Nations to have different regulations apply to the same case and thus invite plaintiffs to forum shop").

164 (2004) ("[T]his Court ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations").

Foreign governments, the Supreme Court reasoned, "regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction. And the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, what discovery is available in litigation, what individual actions may be joined in a single suit, what attorney's fees are recoverable, and many other matters." *Morrison*, 130 S. Ct. at 2885. Accordingly,

> [The foreign governments] all complain of the interference with foreign securities regulation that application of § 10(b) abroad would produce, and urge the adoption of a clear test that will avoid that consequence. The transactional test we have adopted—whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange—meets that requirement.

*Id.* at 2886.

*Second*, the Supreme Court rejected the notion that barring foreign-cubed claims would promote frauds originating from the United States, finding "no reason to believe that the United States has become the Barbary Coast for those perpetrating frauds on foreign securities markets." *Id.* at 2886. Rather, the Supreme Court was "repulsed by [the] adverse consequences" of applying Section 10(b) extraterritorially, contrary to Congress's domestic focus, and turning the United States into "the Shangri-La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets." *Id.*

This Court's application of *Morrison* mandates dismissal of all claims brought by Foreign Plaintiffs here, who, like the foreign plaintiffs in *Morrison*, are foreign investors who purchased their UBS shares on a foreign exchange. Indeed, following *Morrison*, every court that has addressed this issue, including in this District, has held that foreign investors cannot bring Section 10(b) claims based on purchases of securities outside the United States. *See Sgalambo*

-14-

v. *McKenzie*, No. 09 Civ. 10087, 2010 WL 3119349, at *17 (S.D.N.Y. Aug. 6, 2010) (Scheindlin, J.) (dismissing Section 10(b) claims based on purchases of securities outside the United States); *Credit Suisse*, 2010 WL 3069597 (same); *Tradex Global Master Fund SPC Ltd.* v. *Rieden*, No. 09 Civ. 6395, slip op. at 2 (S.D.N.Y. July 23, 2010) (Daniels, J.) (same) (attached as Exhibit 8 to the Giuffra Declaration); *In re Banco Santander Sec.—Optimal Litig.*, No. 09-MD-2073, 2010 WL 3036990, at *5-6 (S.D. Fla. July 30, 2010) (same); *see also Cedeno* v. *Intech Group, Inc.*, No. 09 Civ. 9716, 2010 WL 3359468, at *2 (S.D.N.Y. Aug. 25, 2010) (Rakoff, J.) (noting that, after *Morrison*, "the focus of the Exchange Act is on domestic purchases and sales of securities"). This Court should do the same here.

## B. *Morrison* Also Requires Dismissal of Oregon's Foreign-Squared Claims.

While *Morrison* involved only *foreign* investors purchasing the shares of a foreign issuer on a foreign exchange, 130 S. Ct. at 2875, the nationality of the plaintiffs in no way limited the Supreme Court's analysis. Under *Morrison*, it is the location of the *transaction* that matters. Thus, like their foreign counterparts, U.S. investors are barred from bringing Section 10(b) claims based on purchases of a foreign issuer's shares on a foreign exchange. Indeed, the Supreme Court criticized the Second Circuit's conduct test for applying Section 10(b) "differently depending on whether the harmed investors were Americans or foreigners." *Id.* at 2879. That distinction no longer survives.

Since *Morrison*, federal courts have "uniformly" dismissed foreign-squared claims based on purchases on foreign exchanges. *Credit Suisse*, No. 08 Civ. 3758, slip op. at 3 (S.D.N.Y. Aug. 20, 2010) (attached as Exhibit 9 to the Giuffra Declaration). In *Credit Suisse*, plaintiffs brought claims based on purchases of Credit Suisse shares on the Swiss Exchange. Before the Supreme Court's opinion in *Morrison*, Judge Marrero (i) dismissed all foreign-cubed claims under the conducts and effects tests, because "most of the [alleged] [mis]statements

originated abroad," *Credit Suisse*, 666 F. Supp. 2d 381, 391 (S.D.N.Y. 2009), but (ii) allowed the claims of all U.S. investors to proceed under the "effects" test, *Credit Suisse*, 689 F. Supp. 2d 629, 634 (S.D.N.Y. 2010).

Following *Morrison*, Judge Marrero granted the defendants' motion to dismiss the foreign-squared claims of the U.S. investors who purchased Credit Suisse shares on the Swiss Exchange, holding that Section 10(b) no longer "extend[s] to foreign securities trades executed on foreign exchanges *even if purchased or sold by American investors*." 2010 WL 3069597, at *5 (emphasis added). Judge Marrero rightly emphasized that "[t]he standard the *Morrison* Court promulgated to govern the application of § 10(b) in transnational securities purchases and sales does not leave open any of the back doors, loopholes or wiggle room to accommodate the distinctions Plaintiffs urge to overcome the decisive force of that ruling on their § 10(b) claims here." *Id.* at *2. Judge Marrero then denied the U.S. plaintiffs' request for interlocutory appeal of his dismissal of their foreign-squared claims, noting that the "district courts which have addressed the issue to date have uniformly applied *Morrison*'s new rule to securities transactions involving purchasers in the United States where the sale occurred on foreign exchanges." No. 08 Civ. 3758, slip op. at 3-4 (S.D.N.Y. Aug. 20, 2010) (collecting cases).

Likewise, in *Stackhouse* v. *Toyota Motor Co.*, U.S. investors who purchased ordinary shares of Toyota on a Japanese exchange sought lead plaintiff status. No. 10 Civ. 922, 2010 U.S. Dist. LEXIS 79837, at *1 (C.D. Cal. July 16, 2010). The court there denied lead plaintiff status to those investors, because *Morrison* barred their Section 10(b) claims based on transactions in "foreign-traded securities where the ultimate purchaser or seller has physically remained in the United States." *Id.* at *2.

-16-

Following *Morrison*, *Credit Suisse*, and *Toyota*, this Court should dismiss that portion of Oregon's claims resting on its purchases of UBS shares on the Swiss Exchange.

## II.    THIS COURT SHOULD NOT PERMIT PLAINTIFFS TO END-RUN *MORRISON*.

In an attempt to escape *Morrison*, Foreign Plaintiffs and Oregon apparently intend to claim that even though they affirmatively chose to purchase their UBS ordinary shares on the Swiss Exchange, and thereby to have their purchases governed by Swiss law and regulations, they still can bring their claims under Section 10(b) in the United States, because UBS listed its ordinary shares on the NYSE as well as the Swiss and Tokyo Exchanges.   In advancing this unprecedented theory, Plaintiffs (1) misread *Morrison*'s transactional test, (2) contradict *Morrison*'s very holding, which dismissed the claims against NAB, even though NAB registered its ordinary shares and ADRs with the SEC and the NYSE, listed its ordinary shares on the NYSE, but not for trading,[18] and listed the ADRs on the NYSE for trading and (3) contradict *Morrison*'s rationale for not applying Section 10(b) to trades on foreign exchanges.

### A.    Foreign Plaintiffs' "Listing" Theory Is a Clear Distortion of *Morrison*'s Transactional Test.

Recognizing that Section 10(b) focuses on "purchases and sales of securities *in the United States*," 130 S. Ct. at 2884 (emphasis added), the Supreme Court in *Morrison* set forth a bright-line transactional test to guide lower courts:  Section 10(b) applies to "the purchase or

---

[18]    Because NAB registered and listed its ADRs for trading on the NYSE, NAB also registered and listed on the NYSE (though not for trading) its ordinary shares.   (Giuffra Decl. Exs. 10 (NYSE ADR Sample Form Listing Agreement); 11 (Greene, et al., U.S. Regulation of the Int'l Secs. and Derivatives Mkts. § 2.02[2][b][ii] n.85 (9th ed. 2008) ("A company is also required to list the shares underlying listed ADRs, although the share listing is not for trading purposes.")).)

sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States," *id*. at 2888.[19]

    Apparently clinging to the Court's use of the single word "listed," Plaintiffs claim that, because UBS lists its ordinary shares for trading on the NYSE as well as the Swiss and Tokyo Exchanges, Section 10(b) reaches all "worldwide" purchases of UBS shares, whether *inside or outside* the United States.  But *Morrison*'s transaction test used the word "listed" simply to describe one of the two types of securities that an investor can purchase in the United States: (i) securities *listed* on a U.S. exchange, or (ii) unlisted securities that trade over the counter or face to face in the United States.  *See id*. at 2882 ("transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest") (quoting 15 U.S.C. § 78j(b)).[20]

    The second prong of *Morrison*'s transactional test—"the purchase or sale of *any other security in the United States*"—confirms the Court's clear intent to limit covered transactions, whether listed on a U.S. exchange or traded over the counter or face to face, to

---

[19]  *See also id.* at 2884 ("it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies"); *id.* at 2886 ("whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange").  While Justice Stevens' concurrence pointed out that the transactional test barred claims "whenever the relevant securities were purchased or sold abroad and are not listed on a domestic exchange," *id.* at 2894, Justice Scalia's majority opinion avoided that formulation.

[20]  *See also Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U.S. 350, 360-361 (1991) (central goal of Section 10(b) is "to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets, and to impose regular reporting requirements on companies whose stock is listed on national securities exchanges") (quotation omitted); *Superintendent of Ins.* v. *Bankers Life & Cas. Co.*, 404 U.S. 12 (1971) (Section 10(b) applies to "the purchase or sale of securities whether conducted in the organized markets or face to face"); *see also* 10A Harold S. Bloomenthal & Samuel Wolff, Int'l Capital Mkts. and Secs. Regulation § 26:86 (2010) ("[t]he Exchange Act, in general, allows an exchange to trade only securities listed on the exchange") (citing 15 U.S.C. § 78l).

purchases and sales *in the United States*.  This conclusion is inescapable from the Court's statement that:

> [W]e think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities *in the United States* . . . .  And it is in our view only transactions in securities *listed on domestic exchanges*, and domestic transactions in other securities, to which § 10(b) applies.

*Id.* at 2884 (emphasis added).

Because the Exchange Act's focus is on "purchases and sales of securities in the United States," Plaintiffs have no basis to argue that the phrase "listed on domestic exchanges" includes purchases that investors choose to make *on foreign exchanges outside the United States*. To the extent there is any doubt, *Morrison*'s repeated statements making clear that Section 10(b) does not apply to foreign exchanges fully resolve it:

- "the focus of the Exchange Act is . . . upon purchases and sales of securities *in the United States*," *id.* at 2884 (emphasis added);

- "[n]othing suggests that this *national* public interest pertains to transactions conducted upon *foreign* exchanges and markets," *id.* at 2882 (emphasis in original);

- "the Exchange Act is silent as to the extraterritorial application of § 10(b)," *id.* at 2878;

- "[w]e know of no one who thought that the Act was intended to 'regulat[e]' *foreign securities exchanges*—or indeed who even believed that under established principles of international law Congress had the power to do so," *id.* at 2884 (emphasis added);

- "we reject the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad," *id.* at 2885; and

- Section 30(a)'s "explicit provision for a specific extraterritorial application would be quite superfluous if the rest of the Exchange Act already applied to transactions on foreign exchanges," *id.* at 2883.[21]

---

[21]   Indeed, the Supreme Court pointed to Securities Act Rule 901 interpreting the territorial reach of the registration requirements of the Securities Act of 1933 ("Securities Act") "not to include . . . sales that occur outside the United States." *Morrison*, 130 S. Ct. at 2885 (quoting 17 C.F.R. § 230.901 (2009)).  As the Securities Act and the Exchange Act "form[] part of the same

*(footnote continued...)*

-19-

Moreover, nothing in *Morrison* or any prior court opinion construing Section 10(b)'s reach, much less Section 10(b)'s text or its legislative history, clearly and affirmatively indicates that a foreign issuer's "listing" of its shares on a U.S. exchange makes all purchases of its shares subject to Section 10(b), regardless of where such purchases took place.[22] Indeed, *Morrison* specifically emphasized that "the Exchange Act is silent as to the extraterritorial application of § 10(b)," *id.* at 2878, and that Section 10(b), unlike Section 30(a), has no "explicit provision for a specific extraterritorial application," *id.* at 2883.

And, the fact that Section 10(b) refers to "the purchase or sale of any security registered on a national securities exchange," 15 U.S.C. § 78j(b), does not save Plaintiffs here. Under the presumption against extraterritoriality, "[w]ords having universal scope . . . will be taken, as a matter of course to mean only every one subject to such legislation, not all that the legislator subsequently may be able to catch." *Foley Bros., Inc.* v. *Filardo*, 336 U.S. 281, 287 n.3 (1949) (citation and internal quotation marks omitted).  Thus, for example, laws prohibiting acts "by 'any person or persons,'" while "broad enough to comprehend every human being," must, despite their "literal universality," be "limited to cases within the jurisdiction of the state"

---

(*...footnote continued*)

comprehensive regulation of securities trading," *id.*, Plaintiffs' "listing theory" would lead to the incongruous results that the Securities Act does not apply extraterritorially, but the Exchange Act does.

[22]    Following *Morrison*, Congress amended the Exchange Act to give the SEC and Department of Justice the power to enforce the statute's antifraud provisions as to transactions outside the United States.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act § 929P(b)(2). While Congress erroneously couched this amendment in terms of whether federal courts have subject matter jurisdiction over such transactions, as opposed to whether Section 10(b) provides relief, Congress clearly understood *Morrison* to bar Section 10(b) claims based on transactions outside the United States, and wanted to provide a basis for such claims by the SEC and DOJ, but *not* by private plaintiffs.

-20-

and "to those objects to which the legislature intended to apply them." *Lauritzen* v. *Larsen*, 345 U.S. 571, 577-78 (1953) (citation omitted).

Similarly, the presumption against extraterritoriality commands that, despite Section 10(b)'s reference to "any security registered on a national securities exchange," the statute cannot be held to apply to transactions in such securities that take place on foreign exchanges and in foreign countries. That conclusion is reinforced by the Supreme Court's observation in *Morrison* that "[w]e know of no one who thought that the Act was intended to 'regulat[e]' foreign securities exchanges—or indeed who even believed that under established principles of international law Congress had the power to do so." 130 S. Ct. at 2884. In short, the reference to transactions in securities "registered on a *national* exchange" cannot suffice to establish an intent to regulate transactions on *foreign* exchanges, even if the securities being traded here and abroad are the same.

The only post-*Morrison* court to address this issue agrees that Section 10(b) does not cover purchases on a foreign exchange, even if the issuer lists its shares on a U.S. exchange. In *Sgalambo*, the plaintiffs purchased shares of Canadian Superior, a Canadian issuer whose shares are listed on *both* the Toronto Stock Exchange *and* the American Stock Exchange. After *Morrison*, defendants moved to dismiss the claims of the investors that purchased shares on the Toronto Stock Exchange, and plaintiffs did not oppose defendants' motion. In dismissing the claims based on purchases on the Toronto Stock Exchange, Judge Scheindlin explained:

> The parties concede that the Supreme Court's recent decision in *Morrison* v. *National Australia Bank Ltd.* forecloses any potential class members who purchased Canadian Superior common stock on a foreign exchange—in this case, the Toronto Stock Exchange ("TSX")—from recovering in this action. *The parties are correct that Morrison prevents such plaintiffs from recovering in this Court, and the claims of any potential class members who purchased Canadian Superior common stock on a foreign exchange are therefore dismissed.*

-21-

2010 WL 3119349, at *17 (emphasis added; footnote numbers omitted).  *See also Banco Santander*, 2010 WL 3036990, at *5 (dismissing foreign-cubed claims, because plaintiffs "neither purchased shares on an American stock exchange, nor . . . in the United States.").[23]

**B.      Allowing Plaintiffs' Claims Based on Foreign Transactions To Proceed in This U.S. Court Cannot Be Squared with *Morrison*'s Holding.**

Justice Scalia derived his statement that Section 10(b) applies to "the purchase or sale of any security *listed* on an American stock exchange," *Morrison*, 130 S. Ct. at 2888 (emphasis added), from Section 10(b)'s statement that it applies to transactions in "a security *registered* on a national securities exchange or any security not so *registered*," *id.* at 2883 (emphasis added).  In this way, the Supreme Court used the terms "listed" and "registered" interchangeably.  In *Morrison*, the Supreme Court dismissed the claims brought against NAB by plaintiffs who purchased NAB's ordinary shares on the Australian Stock Exchange, even though NAB submitted to the Supreme Court as part of the Joint Appendix the cover page of its Form 20-F filing showing that NAB had registered its ordinary shares and related ADRs with the SEC and listed its ADRs for trading on the NYSE:

---

[23]   In *Credit Suisse*, No. 08 Civ. 3758, 2010 WL 3291800, at *1 (S.D.N.Y. Aug. 11, 2010), plaintiffs moved Judge Marrero to reconsider his holding dismissing their foreign-squared claims under *Morrison* on the ground that Credit Suisse dual-lists its shares on the NYSE.  Judge Marrero refused to address this "novel argument," because plaintiffs did not raise it in their opposition to the defendants' motion to dismiss their claims under *Morrison*.



00 09 4147

**Securities and Exchange Commission**
Washington, D.C. 20549
**FORM 20-F**

(Mark One)  [  ] Registration Statement pursuant to Section 12(b)
or (g) of the Securities Exchange Act of 1934

or

[X] Annual Report pursuant to Sections 13 or 15(d)
of the Securities Exchange Act of 1934

RECEIVED S.E.C.
NOV 16 2000

For the fiscal year ended _____ September 30, 2000 _____

or

[  ] Transition Report pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

For the transition period from _____ to _____

Commission file number _____ 1-9945 _____

**National Australia Bank Limited**
(Exact name of Registrant as specified in its charter)

Australia
(Jurisdiction of incorporation or organization)

500 Bourke Street, Melbourne, VICTORIA, 3000 AUSTRALIA
(Address of principal executive offices)

PROCESSED BY
NOV 27 2000
PRIMARK CORPORATION

Securities registered or to be registered pursuant to Section 12(b) of the Act.

| Title of each class | Name of each exchange on which registered |
|---|---|
| Ordinary Shares | New York Stock Exchange |
| American Depositary Shares, each representing five Ordinary Shares | New York Stock Exchange |
| Fully paid, Non Cumulative Preference Shares, Liquidation Preference of US$12.50 per share | New York Stock Exchange |
| American Depositary Shares, each representing two Fully Paid, Non Cumulative Preference Shares, Liquidation Preference of US$12.50 per share | New York Stock Exchange |
| Exchangeable Capital Units consisting of 7¼% Perpetual Capital Securities and Purchase Contracts | New York Stock Exchange |

Securities registered or to be registered pursuant to Section 12(g) of the Act.

None
(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.

None
(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the Annual Report.

| | |
|---|---|
| Ordinary Shares | 1,514,360,722 |
| Staff Share Scheme Shares | 1,749,673 paid to 25 Australian cents |
| Preference Shares | 36,008,000 |
| National Income Securities | 20,000,000 |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ___ x ___   No _____

Indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 _____   Item 18 ___ x ___

*Page 1 of 180 Pages*



(Giuffra Decl. Ex. 12 (Supp. Joint App'x at SA-58, *Morrison*, 130 S. Ct. 2869 (No. 08-1191)).)

SA-58

-23-

If the Supreme Court intended Section 10(b) to apply to purchases on foreign exchanges where those securities also were registered on a domestic exchange, the Supreme Court would have *reversed* the Second Circuit's decision and reinstated the NAB plaintiffs' claims.

Rather, the fact that the Supreme Court acknowledged that NAB's ADRs were listed and traded on the NYSE, *Morrison*, 130 S. Ct. at 2875, and still affirmed dismissal of the NAB plaintiffs' claims, confirms that Section 10(b) does not apply to purchases of securities outside the United States simply because the security is listed on a U.S. exchange.  There is nothing in *Morrison* suggesting that the difference between listing ADRs on a U.S. exchange and listing ordinary shares on a U.S. exchange was at all relevant to the Supreme Court's holding.

Indeed, "[a]n ADR is a security denominated in U.S. dollars that represents a certain number of shares, or fraction of shares, of ordinary stock in a foreign corporation."  *In re Austl. and N.Z. Banking Group Ltd. Sec. Litig.*, No. 08 Civ. 11278, 2009 WL 4823923, at *2 (S.D.N.Y. Dec. 14, 2009) (Cote, J.).  "If [an  investor] own[s] an ADR, [he] ha[s] the right to obtain the foreign stock it represents."  *Morrison*, 547 F.3d at 168 n.1 (quotation omitted).  As the Second Circuit has explained, "there [i]s a direct linkage between the prices of ADRs representing [] ordinary shares and the prices of the single ordinary shares themselves.  If the ordinary share price fell on the [foreign] Exchange, the market price of an ADR would decrease in similar manner, and visa versa."  *Itoba Ltd.* v. *Lep Group PLC*, 54 F.3d 118, 123 (2d Cir. 1995).[24]  Moreover, foreign issuers that sponsor ADRs in the United States must file the same

---

[24]  Plaintiffs may point to the Supreme Court's observation that NAB's ordinary shares were not traded on the NYSE.  *Morrison*, 130 S. Ct. at 2875.  All this observation shows is that none of NAB's ordinary shares traded directly on the NYSE (though they traded indirectly through ADRs), and so it would be impossible for any investor holding NAB's ordinary shares to have bought them in the United States and, thus, to bring claims under Section 10(b).

documents with the SEC as foreign issuers with ordinary shares that trade in the United States.[25]

Thus, for purposes of Section 10(b), there is no economic or practical difference between ADRs

and ordinary shares.[26]

Indeed, the implausibility of Plaintiffs' "listed" securities theory is made clear by

the fact that Plaintiffs actually posit that *Morrison* greatly *expanded* the extraterritorial

application of Section 10(b).  Under the old "conduct" and "effects" tests that the Supreme Court

cast aside in *Morrison* as violating the presumption against extraterritoriality, *see supra* at pages

10-11, courts in this District dismissed numerous foreign-cubed claims as exceeding the

territorial scope of the federal securities laws.[27]  This was equally true when the issuer

defendants had listed and registered ADRs in the United States, because "foreign purchasers of []

shares listed on exchanges" could not "piggyback on the harm caused by the alleged fraud to

investors and markets in the United States."  *Alstom*, 406 F. Supp. 2d at 369.[28]  But, as Plaintiffs

---

[25] *See* American Depositary Receipts, Securities Act Release No. 33-6894, 1991 SEC LEXIS 936, at *40-41 (May 23, 1991) ("When a foreign private issuer lists ADRs on a national securities exchange . . . it becomes subject to the periodic reporting requirements under the Exchange Act.").

[26] Indeed, courts in this District routinely allow claims to proceed under Section 10(b) based on purchases of ADRs.  *See, e.g., In re Sadia, S.A. Sec. Litig.*, No. 08 Civ. 9528, 2010 WL 2884737, at *9 (S.D.N.Y. July 20, 2010) (Scheindlin, J.) (certifying a class of ADR holders in a Section 10(b) securities fraud class action).

[27] *See, e.g., In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 304-06 (S.D.N.Y. 2009) (Cote, J.) (dismissing foreign-cubed claims, because the alleged misstatements were issued primarily from abroad); *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 560-69 (S.D.N.Y. 2008) (Cote, J.) (same); *In re China Life Sec. Litig.*, No. 04 Civ. 2112, 2008 WL 4066919, at *3, 9 (S.D.N.Y. Sept. 3, 2008) (Griesa, J.) (same); *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 537-41 (S.D.N.Y. 2007) (Batts, J.) (same); *In re Bayer AG Sec. Litig.*, 423 F. Supp. 2d 105, 110-15 (S.D.N.Y. 2005) (Pauley, J.) (same).

[28] *In re Yukos Oil Co Sec. Litig.*, No. 04 Civ. 5243, 2006 WL 3026024, at *2 (S.D.N.Y. Oct. 25, 2006) (Pauley, J); *Rhodia*, 531 F. Supp. 2d at 537; *China Life*, 2008 WL 4066919, at *1 n.1; *Credit Suisse*, 666 F. Supp. at 385; *Copeland* v. *Fortis*, 685 F. Supp. 2d 498, 506 (S.D.N.Y. 2010) (Chin, J.); *Pozniak* v. *Imperial Chem. Indus. PLC*, No. 03 Civ. 2457, 2004 WL 2186546,

*(footnote continued...)*

would have it, these foreign-cubed claims would survive—as long as the foreign company had listed its shares, directly or through ADRs, in the United States.  Worse yet, before *Morrison*, a foreign-cubed plaintiff at least had to point to some quantum of fraudulent activity in the United States to sustain its claims under the conduct test.  But now, according to Plaintiffs here, with the conduct test abrogated, such foreign plaintiffs would have to make no such showing.  Section 10(b) would have extraterritorial effect like never before.  That is not, and cannot have been, what the Supreme Court intended.

### C.   Plaintiffs' "Listing" Theory Is Inconsistent with the Supreme Court's Policy Concerns.

The "practical consequences" of extending Section 10(b)'s private right of action to purchases of securities on foreign exchanges strongly weigh against Plaintiffs' "listing" theory.  *Stoneridge*, 552 U.S. at 163.  Accepting Plaintiffs' "listing" theory of *Morrison* would force this U.S. Court to apply U.S. securities law and U.S. class action procedures to this case in which 97% of the Plaintiffs' alleged damages occurred on the Swiss Exchange—an exchange policed by Swiss regulators and Swiss courts.  As noted *supra* at pages 13-14, the Supreme Court recognized the concern of foreign governments that imposing U.S. securities laws on transactions on foreign exchanges effectively would nullify the choices of sovereign governments as to how their capital markets should be regulated.  This would be true not only for UBS,[29] but for more than 850 other foreign issuers that list shares or ADRs on a U.S. exchange.

---

*(...footnote continued)*

at *8 (S.D.N.Y. Sept. 28, 2004) (Buchwald, J.); *SCOR*, 537 F. Supp. 2d at 559.

[29]  Here, the prospect of conflict between the determinations of this Court and the determinations of Swiss regulators is not theoretical.  The Swiss Federal Banking Commission ("SFBC") extensively investigated the allegations against UBS and made findings that would require dismissal of Plaintiffs' Section 10(b) claims for failure to prove scienter.  (Giuffra Decl.

*(footnote continued...)*

Plaintiffs' theory ignores that the transactional test clearly was designed to "meet[] th[e] requirement" of avoiding "interference with foreign securities regulation that application of § 10(b) abroad would produce." *Morrison*, 130 S. Ct. at 2886.

Moreover, allowing claims based on purchases of securities on foreign exchanges to proceed would turn the United States into "the Shangri-La of class-action litigation for lawyers representing those allegedly cheated *in foreign securities markets*." *Id.* at 2886 (emphasis added). Hundreds of foreign issuers would be impacted, including companies with billions of dollars in market capitalization, such as the Royal Bank of Canada, Toronto Dominion Bank, and Deutsche Bank (all foreign issuers with ordinary shares listed on a U.S. exchange), and Vodafone, Toyota, Royal Dutch Shell, and Royal Bank of Scotland (all foreign issuers with ADRs listed on a U.S. exchange). (Giuffra Decl. Exs. 1, 2.) Under Plaintiffs' "listing" theory, investors could bring foreign-cubed worldwide class actions against all these foreign companies in the United States, even though only a small percentage of their securities actually trade in the United States.[30] Here, only 12% of UBS's ordinary shares traded inside the United States during the putative Class Period. *See supra* at pages 7-8.

---

(...footnote continued)

Exs. 13 (SFBC, *Subprime Crisis: SFBC Investigation Into the Causes of the Write-Downs of UBS AG* ¶¶ 4-5, 7 (Sept. 30, 2009)) ("UBS was not aware of the extent and nature of its risk exposure to the Subprime mortgage and related markets until the beginning of August 2007, and was thus unable to take appropriate measures in a timely manner")); 14 (*SFBC Investigation of the Cross-border Business of UBS AG with its Private Clients in the USA* at 2, 16 (Feb. 18, 2009) (the "top management of UBS AG" did not know about the alleged misconduct within the U.S. cross-border business, and that "UBS AG undertook great efforts between 2001 and 2002 to ensure that it meets its obligation under [its relevant agreement with the IRS] in its entirety").)

[30] *See also In re Nat'l Austl. Bank*, 2006 WL 3844465, at *4 (noting that the "aggregate value of the ADRs represented a mere 1.1% of NAB's nearly one-and-a-half billion ordinary shares"); *Bayer*, 423 F. Supp. 2d at 113 (8% of Bayer's shares were held as ADRs in the United States).

Exposing these foreign issuers to worldwide class actions will encourage the over 850 foreign issuers who list their ordinary shares or ADRs on a U.S. exchange to de-list, and discourage other foreign issuers from ever listing their shares or ADRs here.  This is especially so for foreign issuers like UBS, who would suffer worldwide exposure to Section 10(b), when only 12% of the trading volume in its shares occurs in the United States.  *See supra* at pages 7-8.  The harm to U.S. markets would be grave.  Even prior to *Morrison*, foreign issuers were rapidly leaving U.S. capital markets: since the SEC amended its rules in June 2007 to remove barriers to delisting, 15 out of 27 French companies registered in the United States at the end of 2006 had delisted by the end of 2008, as had 19 of 44 United Kingdom companies, 7 of 20 German companies, 6 of 11 Italian companies, and 15 of 24 Australian companies.[31]  As Professor Coffee has noted, "while the press and others attribute the growing concern of foreign issuers with the U.S. market to Sarbanes-Oxley Act, closer analysis and interview data suggests that fear of U.S. private antifraud litigation may be the better explanation [for the flight of foreign private issuers from U.S. markets]."  (Giuffra Decl. Ex. 15 (John C. Coffee, Jr., *Securities Policeman to the World? The Cost of Global Class Actions*, N.Y.L.J., Sept. 18, 2008).)[32]

If this Court were to adopt Plaintiffs' flawed "listing" theory and somehow hold that foreign issuers are subject to worldwide class actions simply because they list shares or ADRs on a U.S. exchange, then even more foreign issuers will leave U.S. exchanges.  The

---

[31]  *See SEC*, International Registered and Reporting Companies, available at http://www.sec.gov/divisions/corpfin/internatl/companies.shtml (last visited August 30, 2010).

[32]  *See also* Mayor Michael Bloomberg & Sen. Charles Schumer, *Sustaining New York's and the US's Global Financial Services Leadership*, at 73 available at http://www.nyc.gov/html/om/pdf/ny_report_final.pdf ("the increasing extraterritorial reach of US law and the unpredictable nature of the legal system were . . . significant factors that caused New York to be viewed negatively" by business leaders).

Supreme Court did not intend this result. *See, e.g., Stoneridge*, 552 U.S. at 164 (an expansive private right of action under the securities laws would mean that "[o]verseas firms with no other exposure to our securities laws could be deterred from doing business here," which, in turn, "may raise the cost of being a publicly traded company under our law and shift securities offerings away from domestic capital markets").

## CONCLUSION

For the foregoing reasons, this Court should dismiss (i) all of Foreign Plaintiffs' claims, and (ii) all of Oregon's claims based on purchases of UBS shares outside the United States, and deny leave to amend. *See Tradex*, No. 09 Civ. 6395, slip op. at 2 (denying leave to amend as futile under *Morrison*, because plaintiffs' claims were based on purchased securities outside the United States).[33]

Respectfully,

Robert J. Giuffra, Jr. (Giuffra@SullCrom.com)
Maite Aquino (AquinoM@SullCrom.com)
Suhana S. Han (HanS@SullCrom.com)
Matthew A. Schwartz (SchwartzMatthew@SullCrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
*Counsel for Defendants*

August 31, 2010

---

[33] Because *Morrison* bars Foreign Plaintiffs from bringing any claims under Section 10(b), the Court also should dismiss their claims under Section 20(a) against Messrs. Wuffli, Ospel, Standish, Suter, Stuerzinger, Jenkins, and Rohner. *See In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 548 (S.D.N.Y. 2009) (Sullivan, J.) ("Since the Court has held that there is no primary violation under section 10(b) of the Exchange Act, Defendants' motion to dismiss the section 20(a) claim is granted.").