**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE UBS AG SECURITIES LITIGATION

No. 07 CV 11225 (RJS)

**BRIEF OF *AMICUS CURIAE* NYSE EURONEXT IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS ALL CLAIMS BASED ON PURCHASES OF UBS SHARES OUTSIDE THE UNITED STATES**

Richard A. Martin
Patryk J. Chudy
Katherine L. Maco
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
Phone: (212) 506-5000
Facsimile: (212) 506-5151

Holly K. Kulka
NYSE EURONEXT
11 Wall Street
New York, New York 10005
Phone: (212) 656-3000

*Attorneys for NYSE Euronext*

## TABLE OF CONTENTS

**Page**


INTEREST OF *AMICUS CURIAE* .......... 1

ARGUMENT .......... 3

I. *MORRISON* MANDATES DISMISSAL OF PLAINTIFFS' CLAIMS BASED ON FOREIGN TRANSACTIONS .......... 3

A. Plaintiffs' Interpretation of *Morrison* Would Interfere with Foreign Securities Regulation .......... 5

B. Plaintiffs' Interpretation of *Morrison* Would Interfere with Foreign Private Enforcement of Foreign Securities Laws .......... 7

II. EXPOSING ISSUERS THAT CROSS-LIST IN THE U.S. TO WORLDWIDE CLASS ACTIONS DETERS CAPITAL INVESTMENT IN THIS COUNTRY .......... 8

CONCLUSION .......... 10

## TABLE OF AUTHORITIES

**Page**

### CASES

*Morrison v. National Australia Bank Ltd.*,
561 U.S. __, 130 S. Ct. 2869 (2010)........................................................ passim

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008)........................................................................................9

### STATUTES AND RULES

Securities Exchange Act of 1934

15 U.S.C. § 78c(a)(26)........................................................................................1

15 U.S.C. § 78f(b)(5)..........................................................................................1

15 U.S.C. § 78l....................................................................................................4

15 U.S.C. § 78m..................................................................................................4

15 U.S.C. § 78o(d)..............................................................................................4

Securities and Exchange Commission Rules

17 C.F.R. § 240.12g3-2(b)...................................................................................5

17 C.F.R. § 240.3b-4...........................................................................................4

Exemption from Registration Under Section 12(g) of the Securities Exchange Act of 1934 for Foreign Private Issuers, Exchange Act Release No. 34-58465, 73 Fed. Reg. 52752 (Sept. 5, 2008).........................................................................5

### OTHER AUTHORITIES

Behrens, Mark A., et al., *Global Litigation Trends*, 17 MICH. ST. J. INT'L L. 165, 167 (2008-2009)..................................................................................................7

Bloomberg, Michael R. & Schumer, Charles E., *Sustaining New York's and the US' Global Financial Services Leadership* ii, 12, 43-54 (2006), http://www.nyc.gov/html/om/pdf/ny_report_final.pdf. ........................................................................9

Buxbaum, Hannah L., *Multinational Class Actions Under Federal Securities Law: Managing Jurisdictional Conflict*, 46 COLUM. J. TRANSNAT'L L. 14, 63 (2007)..........8

Coffee, John C., *Racing Towards the Top?: The Impact of Cross-Listings and Stock Market Competition on International Corporate Governance,* 102 COLUM. L. REV. 1757, 1770 & n.40 (2002) ....................4

Davis, Kenneth B., *The SEC and Foreign Companies–A Balance of Competing Interests,* 71 U. PITT. L. REV. 457, 469 (2010) ....................4

Division of Corporate Finance: International Registered and Reporting Companies, http://sec.gov/divisions/corpfin/internatl/companies.shtml ....................9

Memorandum of Understanding Concerning Consultation, Cooperation and the Exchange of Information Related to Market Oversight, SEC-Euronext, Preamble, Jan. 25, 2007 ....................6

Memorandum of Understanding, U.S. SEC-Switz., Aug. 31, 1982 ....................7

*More European Companies Delist From NYSE,* http://topforeignstocks.com/2010/05/18/more-european-companies-delist-from-the-nyse ....................9

Mutual Legal Assistance Treaty With Switzerland, U.S.-Switz., Dec. 23, 1975, 27 U.S.T. 2019. ....................7

Opinion of the European Economic and Social Committee on Defining the Collective Actions System and its Role in the Context of Community Consumer Law, 2008 O.J. (C 12/1) ....................8

Saunders, Mark A., *American Depositary Receipts: An Introduction to U.S. Capital Markets for Foreign Companies,* 17 FORDHAM INT'L L.J. 48, 62 (1993) ....................4-5

The United States Library of Congress Treaties Search Page, http://thomas.loc.gov/home/treaties/treaties.htm ....................7

U.S. SEC, Cooperative Arrangements with Foreign Regulators, http://www.sec.gov/about/offices/oia/oia_cooparrangements.shtml ....................7

## INTEREST OF *AMICUS CURIAE*[1]

NYSE Euronext owns and operates the largest and most diverse exchange group in the world. In the United States, NYSE Euronext operates the New York Stock Exchange ("NYSE"), the world's largest cash equities exchange, as well as NYSE Arca, NYSE Amex, and the NYSE Liffe U.S. futures market. In Europe, NYSE Euronext operates Euronext, a single market comprised of the combined stock exchanges of Paris, Amsterdam, Brussels and Lisbon, the NYSE Liffe derivatives markets in London, Paris, Amsterdam, Brussels and Lisbon, and NYSE Alternext, a listing market for emerging growth companies.

The domestic NYSE exchanges and the foreign Euronext exchanges operate separately and independently from each other. The domestic NYSE stock exchanges are registered with and regulated by the U.S. Securities and Exchange Commission ("SEC") as national securities exchanges and self-regulatory organizations ("SROs") as defined in Section 3 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78c(a)(26).[2] Likewise, each of the Euronext exchanges holds an exchange license granted by its home national regulatory authority, and each operates under that authority's supervision as well as the national laws and regulations of the jurisdiction in which it operates.

NYSE Euronext has a significant interest in whether investors who purchased UBS shares on foreign exchanges can bring Section 10(b) claims in the United States for several reasons. First, NYSE Euronext has an interest in this Court's interpretation of

---

1 NYSE Euronext was granted leave to file this *amicus curiae* brief by the Court by memo endorsement on September 7, 2010.

2 The Exchange Act mandates that SROs "protect investors and the public interest," 15 U.S.C. § 78f(b)(5).

*Morrison* as it may impact the autonomy of the foreign authorities that govern the exchanges where it operates. The legal and regulatory regimes in those countries are designed to protect the integrity of the securities markets and provide clear guidance to market participants and investors. Extending private rights of action under Section 10(b) to claimants who purchased UBS securities on foreign exchanges, as Plaintiffs apparently urge this Court to do here, would not only fail to give proper deference to such foreign regulatory regimes, but would actually interfere with their operation. In fact, the very problems that the Supreme Court in *Morrison* was concerned about and sought to avoid through adoption of a transactional test—namely, the clashes between U.S. and foreign law, and an overexpansion of the extraterritorial reach of Section 10(b) caused by the "conduct" and "effects" tests—would be resuscitated, and worse, magnified.

NYSE Euronext also has an interest in the impact of the Court's decision on U.S. exchanges, particularly the NYSE. NYSE Euronext wants to attract additional foreign issuers to cross-list their securities on U.S. exchanges, and to maintain the investments foreign issuers have already made through such cross-listing. However, extending the right to bring Section 10(b) actions to investors who purchase securities of a cross-listed company on a foreign exchange would strongly discourage companies from cross-listing on U.S. exchanges.[3] Accordingly, and for the reasons set forth in greater detail below, NYSE Euronext respectfully urges the Court to dismiss the claims of all investors, foreign or domestic, who purchased UBS shares on the Swiss Exchange.

[3] The NYSE does not dispute that investors—whether foreign or domestic—that purchase securities on a U.S. exchange may bring Section 10(b) claims in the U.S. courts.

**ARGUMENT**

The Supreme Court in *Morrison v. National Australia Bank Ltd.*, 561 U.S. __, 130 S. Ct. 2869 (2010) held that Section 10(b) applies only to transactions of securities where "the purchase or sale is made in the United States" or "involves a security listed on a domestic exchange." *Morrison*, 130 S. Ct. at 2886. In establishing those limits, the Court was guided by its interpretation of Congressional intent restricting Section 10(b)'s extraterritorial reach, as well as by its interest in avoiding "interference with foreign securities regulation that application of § 10(b) abroad would produce." *Id.*

As Defendants argue in their Memorandum of Law in Support of Their Motion to Dismiss All Claims Based on Purchases of UBS Shares Outside the United States ("UBS Mem."), Plaintiffs' myopic focus on a single word—"listed"—to argue that the Court intended to create a rule that foreign issuers that cross-list on domestic exchanges are subject to worldwide U.S. class actions is unsupportable. NYSE Euronext urges the Court to reject Plaintiffs' interpretation of *Morrison* because it is inconsistent with the plain meaning of the decision, and because this reading would have a devastating effect on the orderly conduct of the global securities markets.

## I. ***MORRISON* MANDATES DISMISSAL OF PLAINTIFFS' CLAIMS BASED ON FOREIGN TRANSACTIONS**

Plaintiffs' suggestion that a foreign issuer that cross-lists its securities on a U.S. exchange thereby subjects itself to worldwide class actions in U.S. courts would transform the *Morrison* Court's "transaction" test into a mechanism for extending the reach of Section 10(b) to securities transactions occurring anywhere in the world, thereby supplanting the law of the country where the transaction actually occurred. That interpretation distorts *Morrison's* reasoning, and finds no support in the legislation and

regulations governing cross-listing.

In order to enter the U.S. capital markets by "cross-listing" on a U.S. exchange, a foreign issuer must register its securities under the Exchange Act as a "foreign private issuer."[4] Like UBS, a foreign issuer may list Global Registered Shares ("GRSs"), which are identical to shares that are traded in multiple jurisdictions in multiple currencies, directly on a U.S. exchange.[5] In virtually all cases, GRSs are listed in the United States, only if also listed on a foreign exchange. Alternatively, a foreign issuer may establish an American Depositary Receipt ("ADR") program, such as the ADR program established by National Australia Bank in the *Morrison* case.[6] To do so, the issuer deposits a certain number of its foreign shares into a depositary receipts facility in the U.S., which then issues ADRs to investors in the U.S.[7]

---

4 *See* 15 U.S.C. §§ 78l, 78m, 78o(d); *see also* U.S. SEC, Form 20-F, General Instruction A(a). A "foreign private issuer" is defined as a foreign issuer, other than a foreign government, except where: (1) more than 50 percent of the outstanding voting securities of the issuer are directly or indirectly held of record by residents of the United States and (2) the majority of its executive officers or directors are United States citizens or residents, more than 50 percent of its assets are located in the United States or its business is administered principally in the United States. 17 C.F.R. § 240.3b-4 (2010). As of December 31, 2009, there were 966 foreign private issuers registered and reporting with the SEC. *See* Division of Corporate Finance: International Registered and Reporting Companies, http://sec.gov/divisions/corpfin/ internatl/companies.shtml (follow "Market Summary" hyperlink) (last visited Sept. 9, 2010). Of these, 368 companies were listed on the NYSE. *Id.*

5 *See* Kenneth B. Davis, Jr., *The SEC and Foreign Companies–A Balance of Competing Interests*, 71 U. PITT. L. REV. 457, 469 (2010).

6 In 1990, 352 ADR programs from 24 countries were in effect in the U.S.; by March 2001, there were 1,951 "active" programs from 80 countries. John C. Coffee, Jr., *Racing Towards the Top?: The Impact of Cross-Listings and Stock Market Competition on International Corporate Governance*, 102 COLUM. L. REV. 1757, 1770 & n.40 (2002).

7 *See* Mark A. Saunders, *American Depositary Receipts: An Introduction to U.S. Capital Markets for Foreign Companies*, 17 FORDHAM INT'L L.J. 48, 62 (1993). In 2008, the SEC revised its provisions to allow certain foreign issuers of ADRs on the over-the-counter market to electronically publish information in English on the company's website where the issuer, *inter alia*, maintains a listing of the subject class of securities on a

Such U.S. listings (whether GRSs or ADRs) generally rely on the primary foreign listing of the foreign issuer's securities, and are appropriately described in the U.S. as *secondary listings*. In all cases, the foreign issuers, such as UBS here, remain subject to the laws and regulations of their home jurisdictions to the extent securities are sold there, and purchasers who acquire securities on those foreign exchanges are afforded the protections under the laws of those countries (for UBS, Switzerland). Therefore, while cross-listing subjects a foreign private issuer to the oversight of the SEC, and investors who purchase cross-listed shares on a U.S. exchange can bring claims here, there is nothing in the Exchange Act that expresses any clear Congressional intent to extend the reach of Section 10(b) extraterritorially, as *Morrison* requires. Nor do these provisions alter the laws governing issuers who market their shares on the foreign exchanges, or purchasers who acquired their shares on the foreign exchanges.

### A. Plaintiffs' Interpretation of *Morrison* Would Interfere with Foreign Securities Regulation

Allowing investors who purchased securities on a foreign exchange to avoid adjudication of their disputes in the courts of the country in which the transaction occurred, and instead to litigate in the U.S., undermines the authority of the country that regulates the primary listing of those securities. Foreign jurisdictions have established their own regulatory and legal regimes, and investors who purchase on foreign exchanges

foreign exchange, which constitutes the primary trading market for those securities. *See* 17 C.F.R. § 240.12g3-2(b) (2010); Exemption from Registration Under Section 12(g) of the Securities Exchange Act of 1934 for Foreign Private Issuers, Exchange Act Release No. 34-58465, 73 Fed. Reg. 52752 (Sept. 5, 2008). These revisions reflect a trend toward making dual listings more efficient and less costly, and further reflect a general deference toward the foreign regulators' ability to regulate the companies operating within their jurisdictions.

have consciously chosen to abide by the rules of those regimes, which take into account the particular policy considerations important to those jurisdictions. Although the contours of liability may differ from the U.S.'s, as the *Morrison* Court stated:

> Like the United States, foreign countries regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction. And the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, what discovery is available in litigation, what individual actions may be joined in a single suit, what attorney's fees are recoverable, and many other matters.

*Morrison*, 130 S. Ct. at 2865.

Not only is Plaintiffs' position at odds with *Morrison*'s admonition against "interference with foreign securities regulation" *id.* at 2886, Plaintiffs' argument would undermine the decades-long effort by U.S. authorities to promote cooperation with foreign governments in the regulation of securities transactions. The U.S. has entered into dozens of cooperation agreements with foreign regulators and governments to facilitate the international enforcement of securities laws. Those agreements reflect the judgment of the U.S., and particularly the SEC, that foreign nations can (and do) effectively regulate their own securities markets, and they evidence a profound commitment to cooperate with the regulatory efforts of foreign governments.[8]

---

8 *See, e.g.*, Memorandum of Understanding Concerning Consultation, Cooperation and the Exchange of Information Related to Market Oversight, SEC-Euronext, Preamble, Jan. 25, 2007 (expressing the SEC's and Euronext's "willingness to cooperate with each other in the interest of fulfilling their respective regulatory mandates, particularly in the areas of investor protection, fostering market integrity, and maintaining investor confidence and systematic stability"). The SEC has entered into memoranda of understanding ("MOUs") with dozens of foreign regulatory commissions. *See* U.S. SEC, Cooperative Arrangements with Foreign Regulators, http://www.sec.gov/about/offices/oia/oia_cooparrangements.shtml (last visited Sept. 9, 2010) (listing countries).

The *Morrison* Court specifically referred to the *amicus curiae* briefs of foreign governments, including the United Kingdom, Australia, and France, and international organizations, such as the Swiss Bankers Association and the European Banking Federation, all of whom were concerned with U.S. interference with their regulatory regimes. 130 S. Ct. at 2885-86. Accordingly, the Supreme Court "reject[ed] the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad." *Id.* at 2885. This Court must reject Plaintiffs' theory for the same reasons.

**B. Plaintiffs' Interpretation of *Morrison* Would Interfere with Foreign Private Enforcement of Foreign Securities Laws**

Permitting investors who purchased their securities on a foreign exchange to bring class action claims in the United States also interferes with private class or representative action mechanisms that have been, and are being, increasingly adopted in Europe and other jurisdictions. *See* Mark A. Behrens et al., *Global Litigation Trends*, 17 MICH. ST. J. INT'L L. 165, 167 (2008-2009) ("More recently, the number of countries with class action or other aggregative litigation procedures has mushroomed."). Those class and representative action mechanisms provide purchasers of securities with a local remedy, and there is no good reason to avoid the application of the law of the country where the securities transaction occurred.

As the *Morrison* Court eloquently noted, an overbroad application of Section

---

Likewise, the United States has entered into Mutual Legal Assistance Treaties ("MLATs") with no fewer than 55 countries. *See* The United States Library of Congress Treaties Search Page, http://thomas.loc.gov/home/treaties/treaties.htm (search "Word/Phrase" for "mutual legal assistance") (last visited Sept. 9, 2010) (listing countries). Switzerland, where UBS is primarily listed, has signed both an MOU and an MLAT with the U.S. *See* Memorandum of Understanding, U.S. SEC-Switz., Aug. 31, 1982; Mutual Legal Assistance Treaty With Switzerland, U.S.-Switz., Dec. 23, 1975, 27 U.S.T. 2019.

10(b) has caused some, including several *amici*, to "fear that [the U.S.] has become the Shangri-La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets." 130 S.Ct. at 2886. Limiting access to the U.S. courts to only investors who purchased their securities in the U.S., rather than investors worldwide, avoids this result and is consistent with *Morrison*'s reasoning.

Furthermore, there is a substantial risk that once a class action judgment or settlement has been reached in the U.S., it may not be enforceable outside the U.S., because many nations do not recognize the binding effect of U.S.-style opt-out class actions. *See* Opinion of the European Economic and Social Committee on Defining the Collective Actions System and its Role in the Context of Community Consumer Law, 2008 O.J. (C 12/1) 7.2.2.3.1 (opt-out class action mechanisms are "at variance with the constitutional principles of a number of states and with the European Convention on Human Rights"); Hannah L. Buxbaum, *Multinational Class Actions Under Federal Securities Law: Managing Jurisdictional Conflict*, 46 COLUM. J. TRANSNAT'L L. 14, 63 (2007) ("U.S. entrepreneurial-style lawyering is viewed with hostility in many other countries. . . . When coupled with class actions–whose opt-out mechanism is seen as contrary to public policy in most countries–it triggers particularly adverse reactions.").

## II. EXPOSING ISSUERS THAT CROSS-LIST IN THE U.S. TO WORLDWIDE CLASS ACTIONS DETERS CAPITAL INVESTMENT IN THIS COUNTRY

Adopting Plaintiffs' interpretation of *Morrison* would deter foreign private issuers from raising capital in the U.S. markets, and cause those companies that are already

cross-listed, which include major global corporations,[9] to de-list from U.S. exchanges. For years, commentators have observed that foreign issuers have elected not to list their securities on U.S. exchanges precisely to avoid exposure to the U.S. legal system.[10] Indeed, as the Supreme Court recognized in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 164 (2008), in the context of addressing the contours of so-called "scheme liability" under Section 10(b):

> Overseas firms with no other exposure to our securities laws could be deterred from doing business here, . . . [which] in turn, may raise the costs of being a publicly traded company under our law and shift securities offerings away from domestic capital markets. (*citing* Brief for The NASDAQ Stock Market, Inc. and NYSE Euronext as *Amici Curiae* In Support of Respondents at 12-14).

Indeed, in recent years, several major corporations (including Daimler AG and Deutsche Telekom AG, for example) have either delisted or expressed their intent to delist from the NYSE.[11] If companies are exposed to expansive liability where, as here, only a small proportion of their shares trade on a U.S. exchange, the ability of the U.S. exchanges to attract and retain foreign issuers would be gravely impaired. *See, e.g.*, UBS Mem. at 26 (noting 97% of the Plaintiffs' damages occurred on the Swiss Exchange).

---

[9] *See* Division of Corporate Finance: International Registered and Reporting Companies, http://sec.gov/divisions/corpfin/internatl/companies.shtml (follow "Alphabetical Listing by Company Name" hyperlink) (last visited Sept. 9, 2010) (listing global companies that are registered and reporting with the SEC, including BP, Credit Suisse, Deutsche Bank, ABN Amro, GlaxoSmithKline, and others).

[10] *See* Michael R. Bloomberg & Charles E. Schumer, Sustaining New York's and the US' Global Financial Services Leadership ii, 12, 43-54 (2006), http://www.nyc.gov/html/om/pdf/ny_report_final.pdf.

[11] *See, e.g., More European Companies Delist From NYSE,* http://topforeignstocks.com/2010/05/18/more-european-companies-delist-from-the-nyse/

**CONCLUSION**

For the foregoing reasons, NYSE Euronext respectfully requests that the Court dismiss the claims of those investors who purchased UBS shares on the Swiss Exchange.

Dated: New York, New York
September 10, 2010

Respectfully,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: /s/ Richard A. Martin

Richard A. Martin
Patryk J. Chudy
Katherine L. Maco

51 West 52nd Street
New York, New York 10019
Phone: (212) 506-5000
Facsimile: (212) 506-5151

*Attorneys for NYSE Euronext*