UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE UBS AG SECURITIES LITIGATION | MASTER FILE NO. 1:07-CV-11225-RJS<br>ELECTRONICALLY FILED |

## LEAD PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO UBS DEFENDANTS' MOTION TO DISMISS CLAIMS BASED
## ON PURCHASES OF UBS SHARES OUTSIDE THE UNITED STATES

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
Gregory M. Castaldo
Andrew L. Zivitz
Sharan Nirmul
Naumon A. Amjed
Jennifer L. Joost
Richard A. Russo, Jr.
280 King of Prussia Rd.
Radnor, PA  19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
*Co-Lead Counsel For Lead Plaintiffs*

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer
Geoffrey C. Jarvis
Charles T. Caliendo
Brenda F. Szydlo
Natalia D. Williams
485 Lexington Avenue, 29th Floor
New York, NY  10017
Tel:  (646) 722-8500
Fax:  (646) 722-8501
*Co-Lead Counsel For Lead Plaintiffs*

ROBBINS GELLER
RUDMAN & DOWD LLP
Samuel H. Rudman
Robert M. Rothman
58 South Service Road
Suite 200
Melville, NY  11747
Tel:  (631) 367-7100
Fax:  (631) 367-1173
*Liaison Counsel*

MOTLEY RICE LLC
Joseph F. Rice
William H. Narwold
Gregg S. Levin
James M. Hughes
Badge Humphries
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Tel:  (843) 216-9000
Fax:  (843) 216-9450
*Co-Lead Counsel For Lead Plaintiffs*

**TABLE OF CONTENTS**                                                  **Page(s)**

TABLE OF AUTHORITIES ................................................................................................iii

PRELIMINARY STATEMENT .......................................................................................... 1

RELEVANT FACTUAL BACKGROUND ........................................................................ 6

    A.    The Parties.............................................................................................. 6

        1.    Plaintiffs And The Putative Class ............................................. 6

        2.    UBS Voluntarily Registered All Of Its Ordinary Shares
            With The NYSE ........................................................................ 6

    B.    Defendants' Fraud In The United States ................................................ 9

    C.    U.S. Law Enforcement Proves UBS Engaged In Frauds In
        The U.S. ................................................................................................. 9

ARGUMENT ..................................................................................................................... 10

I.    DEFENDANTS' MOTION TO DISMISS SHOULD BE
    DENIED BECAUSE WHEN, AS HERE, STOCK IS REGISTERED
    ON AN AMERICAN EXCHANGE, SECTION 10(b) APPLIES
    REGARDLESS OF THE LOCATION OF THE EXCHANGE
    WHERE THE PURCHASE ORDER WAS EXECUTED ............................... 10

    A.    The Relevant Facts And Decision In *Morrison* Demonstrate
        That The Court Was Addressing A Situation When The
        Securities At Issue Were Not Registered On A U.S. Exchange ........................... 10

    B.    Ample Evidence From Both Within And Outside The
        *Morrison* Opinion Dictates That When U.S. Exchange-Registered
        Securities Are At Issue, Section 10(b) Applies Regardless
        Of The Location Of The Transaction.................................................... 12

        1.    Justice Scalia Recognized That The Statute's Plain
            Language Makes Section 10(b) Applicable To U.S.
            Exchange-Registered Securities No Matter Where
            The Purchase Or Sale Occurs.................................................... 13

        2.    The *Morrison* Opinion Elsewhere Recognized
            The Distinction Between Registered Shares
            And Unregistered Shares .......................................................... 16

3.      The Concurring And Dissenting Opinions
        In *Morrison* And A Recent Decision In This
        District Recognize That The *Morrison* Majority's
        Holding Is Not Applicable To U.S.
        Exchange-Registered Securities ............................................................ 19

4.      The Presumption Against Extraterritorial Application
        Of The Exchange Act Is Not Implicated When, As Here,
        Securities That Are Registered On A National
        Securities Exchange Are At Issue ............................................................ 22

C.   The Policy Concerns Raised By Defendants
     (And Their *Amicus*) Are Meritless ........................................................ 27

D.   None Of The Cases Defendants Cite Rejected The
     Argument Presented Here ........................................................................ 31

II.   EVEN IF PURCHASERS OF U.S. EXCHANGE-REGISTERED
      SECURITIES OUTSIDE THE UNITED STATES CANNOT
      BRING CLAIMS UNDER SECTION 10(b), OREGON STATES
      A SECTION 10(B) CLAIM BECAUSE ITS PURCHASES AND
      SALES OF UBS SHARES OCCURRED WITHIN THE UNITED STATES ................. 32

A.   Oregon's Purchases Occurred In The United States ............................................. 33

B.   Oregon Was Injured In The United States ........................................................ 36

CONCLUSION ........................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Adams v. Dick,
226 Mass. 46, 115 N.E. 227 (1917) ...................................................................... 35

In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,
398 F. Supp. 244 (S.D.N.Y. 2005) ................................................................ 34, 35

Alfadda v. Fenn,
935 F.2d 475 (2d Cir. 1991) ................................................................................. 29

In re Alstom SA Sec. Litig.,
406 F. Supp. 2d 346 (S.D.N.Y. 2005) .................................................................. 29

In re Alstom SA Sec. Litig.,
2010 WL 3718863 (S.D.N.Y. Sept. 14, 2010) ..................................................... 13

Anwar v. Fairfield Greenwich Ltd.,
2010 WL 3022848 (S.D.N.Y. July 29, 2010) ...................................................... 39

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
493 F.3d 87 (2d Cir. 2007) ................................................................................. 6-7

In re Banco Santander Sec. – Optimal Litig.,
2010 WL 3036990 (S.D. Fla. July 30, 2010) ...................................................... 32

Cedeno v. Intech Group, Inc.,
2010 WL 3359468 (S.D.N.Y. Aug. 25, 2010) .................................................... 32

Connecticut Nat'l Bank v. Germain,
503 U.S. 249 (1992) ............................................................................................. 16

Cooper Indus., Inc. v. Aviall Servs., Inc.,
543 U.S. 157 (2004) ............................................................................................. 10

Cornwell v. Credit Suisse Group,
2010 WL 3069597 (S.D.N.Y. July 27, 2010) ......................................... 31, 37, 38

Dura Pharms., Inc. v. Broudo,
544 U.S. 336 (2005) ............................................................................................. 36

Envtl. Def. Fund v. Massey,
986 F.2d 528 (D.C. Cir. 1993) ............................................................................ 24

*Foley Bros., Inc. v. Filardo,*
   336 U.S. 281 (1949) ................................................................................................ 2

*In re Gaming Lottery Sec. Litig.,*
   58 F. Supp. 2d 62 (S.D.N.Y. 1999) ................................................................. 29, 30

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,*
   501 U.S. 350 (1991) .............................................................................................. 37

*Leasco Data Processing Equipment Corp. v. Maxwell,*
   468 F.2d 1326 (1972) ............................................................................................ 17

*Lee v. Bankers Trust Co.,*
   166 F.3d 540 (2d Cir. 1999) .................................................................................. 16

*Maryland v. Wilson,*
   519 U.S. 408 (1997) .............................................................................................. 38

*In re Maxwell Commc'n Corp. plc,*
   186 B.R. 807, 815-16 (S.D.N.Y. 1995) ................................................................ 22

*Morrison v. Nat'l Australia Bank Ltd.,*
   130 S. Ct. 2869 (2010) ................................................................................... *passim*

*Pinker v. Roche Holdings Ltd.,*
   292 F.3d 361 (3d Cir. 2002) ................................................................................ 7-8

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,*
   2010 WL 3860397 (S.D.N.Y. Oct. 4, 2010) ......................................................... 39

*Rakas v. Illinois,*
   439 U.S. 128 (1978) .............................................................................................. 38

*In re Royal Ahold, N.V. Sec. & ERISA Litig.,*
   351 F. Supp. 2d 334 (D. Md. 2004) ...................................................................... 29

*Schoenbaum* v. *Firstbrook,*
   405 F. 2d 200, *modified on other grounds en banc*, 405 F.2d 215 (1968) ............ 16

*SEC v. Credit Bancorp, Ltd.,*
   2010 WL 3582906 (S.D.N.Y. Sept. 13, 2010 and Order Adhering To
   Opinion dated Sept. 30, 2010) .................................................................. 20, 21, 22

*SEC v. Zanford,*
   535 U.S. 813 (2002) .............................................................................................. 33

*Sgalambo v. McKenzie,*
   2010 WL 3119349 (S.D.N.Y. Aug. 6, 2010) ........................................................ 31

*Shaw v Dreyfus*,
  172 F.2d 140 (2d Cir. 1949) ........................................................... 34-35

*In re Societe Generale Sec. Litig.*,
  2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ...................................... 39

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) ......................................................................... 36

*Stackhouse v. Toyota Motor Co.*,
  2010 WL 3377409 (S.D. Cal. Jul. 16, 2010) ........................... 37, 38, 39

*Stella v. Graham-Paige Motors Corp.*,
  232 F.2d 299 (2d Cir. 1956).......................................................... 34, 36

*Touregman v. Collins Fin. Servs., Inc.*,
  2009 WL 6527757 (S.D. Cal. Aug. 6, 2009) ....................................... 22

*Tradex Global Master Fund SPC Ltd. v. Rieden*,
  No. 09 Civ. 6395, slip op. (S.D.N.Y. July 23, 2010) ........................... 32

**STATUTES**

15 U.S.C. § 78 .........................................................................*passim*

Dodd-Frank Wall Street Reform Act § 929P(b)(2)
  Pub. L. No. 111-203, 124 Stat. 1376, July 21,2010, codified at 15 U.S.C. § 78aa(b)...... 27, 28

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ........................... 32

**OTHER AUTHORITIES**

17 C.F.R. § 240.12d1-1(a) ..................................................................... 8

44B Am. Jur. 2d Int'l Law § 71 (2010) ................................................. 23

Restatement (First) of Conflict of Laws § 377 ................................. 36, 37

Treaty of Friendship with Switzerland, 11 Stat. 587 (1850)....................... 28

## PRELIMINARY STATEMENT

Four Court-appointed lead plaintiffs represent the putative class of defrauded UBS AG ("UBS" or the "Company") investors with respect to the claims asserted under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act").[1]  The putative class for purposes of the Exchange Act claims comprises U.S. and foreign residents who purchased UBS shares on the New York Stock Exchange ("NYSE") and foreign exchanges.

While Defendant UBS is a Swiss bank, in 2000, it voluntarily chose to "list" its ordinary shares (the equivalent of common stock) for trading on the NYSE in connection with UBS's $6.3 billion acquisition of U.S. investment banking firm Paine Webber Group, Inc. ("Paine Webber") and, thus, registered those shares with the NYSE and U.S. Securities and Exchange Commission ("SEC") pursuant to Section 12(b) of the Exchange Act.  The Amended Consolidated Securities Class Action Complaint ("Complaint" or "Compl.") alleges that UBS and certain current and former executives of UBS and/or its U.S. subsidiaries ("Defendants") engaged in fraud in the United States that began almost immediately following the Paine Webber acquisition. Defendants do not dispute that § 10(b) of the Exchange Act ("§ 10(b)") covers purchases by

---

[1] Lead plaintiffs are:  (1) City of Pontiac Policemen's and Firemen's Retirement System ("Pontiac"), a Michigan pension plan; (2) Arbejdsmarkedets Tillægspension ("ATP"), a Denmark pension fund; (3) Union Asset Management Holding AG ("Union"), a German investment company; and (4) International Fund Management, S.A. ("IFM"), a Luxembourg financial institution.  Teamsters Union Local 500 Severance Fund ("Teamsters"), Oregon Public Employees Board ("Oregon") and Alaska Laborers-Employers Retirement Fund ("Alaska Laborers"), each of which is a U.S. pension fund, and Council of the Borough of South Tyneside ("Tyneside"), an England pension fund, are representative plaintiffs.  Lead Plaintiffs and the representative plaintiffs are referred to as "Plaintiffs."  ATP, Union, and IFM are referred to as "Foreign Lead Plaintiffs," or along with Tyneside, "Foreign Plaintiffs."

defrauded U.S. and foreign class members who purchased their UBS shares on the NYSE.[2]

Defendants move, however, to dismiss the Exchange Act claims brought by Foreign Plaintiffs

and Oregon, a U.S. citizen, who placed orders for UBS's NYSE-registered shares that were

executed on non-U.S. exchanges.

Defendants argue that the Supreme Court's recent decision in *Morrison v. National

Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), created a "bright line" rule that, *under all

circumstances*, "Section 10(b) does not apply to 'transactions conducted upon *foreign* exchanges

and markets.'"  DB at 10 (quoting *Morrison*, 130 S. Ct. at 2882 (emphasis in original)).

Defendants take an overly broad view of *Morrison's* holding.

In *Morrison*, Australian shareholders who purchased stock of an Australian bank on

Australian stock exchanges sued the bank and others for fraud under § 10(b).  The Supreme

Court emphasized that the Australian bank's stock was not registered on any U.S. exchange.  The

Supreme Court found that § 10(b) was ambiguous as to whether it applies to purchases of

securities that are *not* registered on a U.S. exchange or traded in the U.S.  Consequently, the

Supreme Court resorted to canons of statutory construction and consulted legislative history to

ascertain Congress' intent.  *See infra* at 11-12.  In the context of the unregistered securities at

issue in *Morrison*, the Supreme Court stated that the Exchange Act is silent as to § 10(b)'s

extraterritorial application.  130 S. Ct. at 2883.  Thus, *Morrison* found that the presumption

against extraterritorial application of a statute*, see Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285

(1949) ("legislation of Congress, unless a contrary intent appears, is meant to apply only within

---

[2] *See* UBS Defs.' Mem. Of Law In Support Of Their Mot. To Dismiss All Claims Based On
Purchases Of UBS Shares Outside The United States (hereafter "DB") at 1 ("Defendants do not
seek dismissal of claims based on purchases of UBS ordinary shares inside the United States.").
Thus, Defendants' motion to dismiss is not relevant to the Securities Act claims because the

the territorial jurisdiction of the United States"), precluded § 10(b)'s application to purchases and sales of such unregistered securities in foreign markets, even though there was some fraudulent conduct that occurred in the United States (i.e., at the Australian bank's subsidiary in Florida).  If Congress wanted § 10(b) to apply in cases where fraudulent conduct in the United States taints the value of *unregistered* securities traded exclusively in foreign markets, the Supreme Court reasoned, it was legislating as to foreign matters and, thus, would have made (and based on the presumption against extraterritorial application of U.S. statutes, was required to make) such application explicit.  Since as to unregistered securities there was no explicit statement that Congress intended to regulate foreign transactions in such securities, *Morrison* found that § 10(b) did not reach such transactions.  *See infra* at 12.

Here, by contrast, there is no ambiguity in the statute and no question that in drafting § 10(b) to prohibit deceptive conduct "in connection with the purchase or sale of any security *registered on a national securities exchange*….[,]" 15 U.S.C. § 78j(b) (emphasis added), Congress was legislating as to domestic matters.  Thus, as Justice Scalia — who wrote for the majority in *Morrison* — recognized, it does not matter where the purchase or sale occurred when *U.S.-exchange registered* securities are at issue.  Justice Scalia made this unequivocal when he stated:

> The transactional test we have adopted—whether the purchase or sale is made in the United States, *or involves a security listed on a domestic exchange*—meets that requirement [i.e., the requirement that Section 10(b) avoid extraterritorial regulation of foreign securities exchanges].

*Morrison*, 130 S. Ct. at 2886 (emphasis added); and when he stated:

> Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American

---

putative class of plaintiffs asserting Securities Act claims does ***not*** include investors (foreign or U.S.) who purchased their UBS shares outside the United States.

stock exchange, and the purchase or sale *of any other security* [i.e., an unregistered security] in the United States.

*Id.* at 2888 (emphasis added).

*Morrison*, thus, identifies two separate categories of transactions in securities — clearly delineated by use of the disjunctive connector "or" — to which § 10(b) applies: (1) when the security is registered with a U.S. exchange, regardless of whether the purchase or sale occurred in the United States or abroad; and (2) when the purchase or sale of the security is made in the United States, regardless of whether the security trades on (i.e., is registered with) a domestic exchange or, in other words, the purchase was made in the *domestic* over-the-counter market. The foreign plaintiffs in *Morrison* met the criteria for neither category because they purchased securities that did not trade in the domestic over-the-counter market and that the Supreme Court deemed to be *unregistered* on a U.S. exchange. Foreign Plaintiffs here, by contrast, are within *Morrison's* first category because UBS's ordinary shares are registered on the NYSE. Since § 10(b) is plain concerning its applicability to purchases of UBS's *U.S.-exchange registered* securities, Defendants' motion to dismiss must be denied.

Defendants (and their *amicus curiae* NYSE Euronext) assert that Plaintiffs' entire argument is based solely on a narrow reading of Justice Scalia's words cited above and that Plaintiffs ignore the broader thrust of the Court's opinion that it is the location of the securities transactions that are critical. *See* DB at 18-19; Br. of Amicus Curiae NYSE Euronext In Supp. Of Defs.' Motion To Dismiss All Claims Based On Purchases Of UBS Shares Outside The United States ("NYSE Euronext Br.") at 3. This is false.

While Justice Scalia's carefully chosen words cited above (and the plain words of § 10(b)) are certainly enough to establish that § 10(b) is applicable to purchases and sales of U.S. exchange-registered securities regardless of where the transactions occur, there is ample other

evidence, including, *inter alia*:  (1) other portions of the *Morrison* opinion, which expressly recognize the distinction between foreign issuers who have "dually listed" securities (i.e., stock that is registered on an American exchange and on an exchange in the foreign issuer's home jurisdiction) and those that do not, and also make clear that the *Morrison* location-of-the-transaction test is not applicable to U.S. exchange-registered securities; (2) *Morrison's* concurring and dissenting opinions and a recent decision in this District, which also recognize that the location of the transaction is irrelevant when U.S. exchange-registered securities are at issue; and (3) the fact that in interpreting § 10(b)'s meaning there is no reason to apply the presumption against extraterritoriality, as *Morrison* did concerning unregistered securities, because as to the registered securities at issue here, §10(b)'s applicability is unambiguous and, thus, no resort to canons of construction is necessary.  *See infra* at 12-16.  Indeed, with respect to *U.S. exchange-registered securities* (like UBS's ordinary shares), Congress was legislating as to *domestic matters* and, therefore, the presumption against extraterritoriality is not implicated.  *See infra* at 22-27.

Defendants' other arguments also fail.  Contrary to Defendants' assertions, none of the cases they cite rejected the foregoing argument,[3] and *Morrison* did not recognize that the Australian bank's securities were registered on a U.S. exchange.  *See infra* at 10-11, 31-32.  Furthermore, the policy concerns Defendants (and NYSE Euronext) raise are meritless.  *See infra* at 27-31.

Alternatively, if this Court concludes that § 10(b) does not apply to purchases of *NYSE-registered* securities that were executed on non-U.S. exchanges, the claims of U.S. residents

---

[3] While a recent decision in this District (decided after Defendants submitted their brief) did reject a similar argument, the decision was based on a very limited 5-page letter submission in

(such as Oregon) who purchased on foreign exchanges should not be dismissed because their "purchases" occurred within the United States, despite the fact that the purchase order was ultimately executed on a foreign exchange. *See infra* at 32-39. Therefore, such purchases come within § 10(b) even if Defendants' erroneous interpretation of *Morrison* is accepted.

## RELEVANT FACTUAL BACKGROUND

### A.   THE PARTIES

#### 1.   Plaintiffs And The Putative Class

The putative class for the Exchange Act claims is defined as Plaintiffs and other purchasers of UBS shares "on Worldwide exchanges, including, but not limited to, the . . . NYSE [and] the Swiss Exchange ("SWX"). . . from August 13, 2003 to February 23, 2009, inclusive (the "Class Period")." Compl. at 1. The Foreign Plaintiffs purchased their UBS ordinary shares in transactions that were executed on exchanges outside the United States. *See id.* Oregon, a U.S. citizen, purchased some of its UBS ordinary shares pursuant to purchase orders that were ultimately executed on the Swiss Stock Exchange and suffered more than $48 million in losses as a result of those transactions.[4] Compl. ¶ 113; Dkt. No. 94, Ex. G.

#### 2.   UBS Voluntarily Registered All Of Its Ordinary Shares With The NYSE

Defendant UBS is a global investment banking and wealth management powerhouse. Although based in Zurich, Switzerland, UBS has extensive operations in the U.S., *see* FY 2007 Form 20-F, at pp. 96-99, Ex. I,[5] and is subject to extensive U.S. state and federal regulatory

---

which arguments could not be adequately presented, and the decision is not binding here. *See infra* at 13 n. 11.

[4] Oregon also suffered substantial losses from NYSE transactions, which Defendants concede come within § 10(b) and, thus, are not subject to their motion to dismiss. *See* DB at 1.

[5] Although this is a motion to dismiss and reference to matters outside the pleadings are generally not permitted, the Court may properly refer to UBS's SEC filings. *See ATSI*

regimes relating to banking, *see* FY 2007 Form 20-F, at pp. 45-46, Ex. I (explaining regimes and noting that in bankruptcy, UBS's U.S. assets would likely be used to satisfy creditors of its U.S. branches before being available in Swiss insolvency proceedings).

UBS currently has no American Depositary Receipts (or "ADRs") listed on any U.S. exchange.[6]  Instead, in connection with its acquisition of Paine Webber, UBS terminated its ADR program.  *See* UBS Form FY 1999 Form 20-F, at p. 43, Ex. A.  UBS then voluntarily chose to register all of its "ordinary shares" (the equivalent of common stock) with the SEC on May 16, 2000, *see* FY 2007 Form 20-F, at p. 11, Ex. I, and filed a Form F-4 registration statement under the Securities Act of 1933 with the SEC on September 21, 2000 to register 45,232,592 of its ordinary shares at a proposed maximum offering price exceeding $6.3 billion, *see* Form F-4, filed with the SEC on 9/21/00, cover page, Ex. M.   UBS's ordinary shares are concurrently listed on the Swiss Exchange.

UBS's subsequently filed Forms 20-F reflecting that UBS's ordinary shares have been continuously registered from 2000 through 2009, which encompasses all years included within the Class Period.  *See* UBS's Forms 20-F for FY 1999 through FY 2009, Exs. A through L.  As an example, UBS's FY 2007 Form 20-F, filed with the SEC on March 17, 2008, reflects that UBS had "2,073,547,344 ordinary shares (including 158,105,524 treasury shares)" and the "[o]rdinary shares [have a] par value [of] CHF 0.10 per share."  *See* FY 2007 Form 20-F, at p. 1, Ex. I.  The FY 2007 Form 20-F further indicates that all of these ordinary shares were "registered or to be registered pursuant to Section 12(b) of the [Exchange] Act" and that all of these shares

---

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  References to Ex. __ are to the exhibits to the Declaration of Geoffrey C. Jarvis unless otherwise noted.

[6] "An ADR is a receipt…issued by a depositary bank that represents a specified amount of a foreign security that has been deposited with a foreign…agent of the depositary, known as the

are registered with the NYSE.  *See id.*, at p. 2.  As a consequence of the registration of its

ordinary shares, UBS is required to make (and makes) periodic filings with the SEC.[7]

In registering its ordinary shares simultaneously on the Swiss and New York exchanges

— which UBS termed "Global Registered Shares" — and abandoning its ADR program, UBS

enabled its investors to freely trade its ordinary shares such that an ordinary share purchased in

Switzerland could be sold in the United States or vice versa:

> A "Global Registered Share" is a security that can be traded and
> transferred across applicable borders without the need for conversion. This
> means that identical shares can be traded on different stock exchanges in
> different currencies.  For example, the same share purchased on the SIX
> Swiss Exchange can be sold on the New York Stock Exchange or vice
> versa

http://www.ubs.com/1/e/investors/faq/share.html.  Moreover, UBS specifically recognized that

cross-border trading of UBS's dually-listed ordinary shares would subject it to regulation by the

SEC in addition to Swiss regulators, but specifically stated that such dual-regulation is not

burdensome because international regulatory structures continue to align.  According to UBS:

> UBS is pioneering the Global Registered Share (GRS), which allows for
> cross-market portability at minimized cost to investors. The concept
> behind American Depository Receipts (ADRs) is the creation of tailor-
> made securities for individual unlinked markets, following local
> regulations. UBS believes that, with the globalization of financial markets,
> this concept is becoming less valid for securities, which will increasingly
> be traded in multiple markets. UBS believes that a global fungible security
> can best track liquidity across the globe. *UBS also believes that regulatory
> structures of different markets will continue to align, reducing the need to*

---

custodian…."  *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 367 (3d Cir. 2002) (citations
omitted).

[7] Section 12(b) of the Exchange Act provides that a security may be registered on a national
securities exchange if an application is filed with such exchange and the SEC.  *See* 15 U.S.C.
§ 78*l*(b).  SEC regulations provide that an "application filed pursuant to section 12(b) and (c) of
the act for registration of a security on a national securities exchange shall be deemed to apply
for registration of the entire class of such security."  17 C.F.R. § 240.12d1-1(a).  Section 12
registration gives rise to SEC reporting requirements identified in Section 13.  *See* 15 U.S.C. §
78m.

> *have individual securities in each market to comply with different local*
> *regulations.*

*Id.* (emphasis added).

### B.   DEFENDANTS' FRAUD IN THE UNITED STATES

The Defendants engaged in substantial fraud in the United States, including (a) making misleading statements in the U.S. to conceal massive losses in mortgage backed and other securities and by deliberately overvaluing these securities, (b) concealing a scheme to fraudulently market auction rate securities in the United States to thousands of U.S. investors, (c) executing a plan, devised in Switzerland, to enable UBS to act as an unlicensed investment adviser in the U.S., which included training UBS bankers in methods to evade U.S. law enforcement efforts and regularly dispatching these bankers to the U.S. to conspire with U.S. tax evaders, who evaded billions in U.S. taxes during the Class Period, and (d) filing with the SEC, as UBS was required to do since its ordinary shares were registered, almost a decade's worth of false and misleading financial statements and other filings that concealed the fraud.  ¶¶ 531-956.[8]

### C.   U.S. LAW ENFORCEMENT PROVES UBS ENGAGED IN FRAUDS IN THE U.S.

UBS's frauds led to a nationwide mobilization of U.S. civil and criminal law enforcement agencies at the federal and state levels.  With regard to mortgage-related fraud, the SEC and federal criminal authorities investigated UBS's conduct.  ¶¶ 1023-29.  The ARS fraud ultimately led to the settlement of lawsuits filed by the New York Attorney General ("NYAG"), SEC and other U.S. regulators, pursuant to which UBS agreed to repurchase over $22 billion of fraudulently-marketed ARS that were sold to approximately 40,000 U.S. investors and pay a

---

[8] Defendants attempt to contradict the Complaint's allegations by asserting that Plaintiffs' claims are based exclusively on UBS's false and misleading *Swiss-issued* financial statements.  *See* DB at 1-2.  This is wrong.  The Complaint also alleges the falsity of UBS's SEC filings and certain certifications filed with the SEC by certain individual defendants as well as numerous other false and misleading statements made in the United States.  *See* Compl. ¶¶ 531-956.

$150 million fine.  *See* UBS's Form 6-K dated August 12, 2008 at 89, Ex. N.  Dedication of

further scarce law enforcement resources was required to put a stop to UBS's fraud in the U.S. in

assisting some 52,000 U.S. tax cheats evade U.S. income taxes.  UBS entered into a Deferred

Prosecution Agreement with federal prosecutors to stave off indictment and admitted to a

lengthy list of criminal acts that has enabled numerous U.S. taxpayers to evade U.S. income

taxes.  In a related action, the SEC charged that from at least 1999 through 2008, UBS

knowingly acted as an unregistered broker-dealer and investment adviser to aid wealthy

taxpayers in evading taxes.  In addition to paying a total of $780 million to resolve the

investigations, UBS was permanently enjoined from further violations of the U.S. securities

laws.  *See* Compl. ¶¶ 1116-41, 1254-66.

## ARGUMENT

I.  **DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED BECAUSE WHEN, AS HERE, STOCK IS REGISTERED ON AN AMERICAN EXCHANGE, SECTION 10(b) APPLIES REGARDLESS OF THE LOCATION OF THE EXCHANGE WHERE THE PURCHASE ORDER WAS EXECUTED**

   A.  THE RELEVANT FACTS AND DECISION IN *MORRISON* DEMONSTRATE THAT THE COURT WAS ADDRESSING A SITUATION WHEN THE SECURITIES AT ISSUE WERE NOT REGISTERED ON A U.S. EXCHANGE

Defendants claim that *Morrison* addressed securities that were registered on the NYSE

because its ADRs were registered there and cite to a single page of the voluminous record that

indicates (in miniscule-sized type) that NAB's ordinary shares were NYSE-registered, although

not for trading.  *See* DB at 23.  They are wrong.

First, there is no indication whatsoever in *Morrison* that the Court recognized this oblique

reference in the record or much less weighed its significance.  The reference, therefore, cannot be

properly considered in interpreting the meaning of the decision.  *See Cooper Indus., Inc. v. Aviall

Servs., Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)

("'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'"). On the contrary, as shown below, the Court specifically determined that no U.S. exchange-registered securities were at issue.

In *Morrison*, foreign investors in National Australia Bank, Ltd. ("NAB"), an Australian bank, asserted claims in U.S. district court under § 10(b) because much of the fraudulent conduct at issue occurred within U.S. borders at the Florida location of a NAB subsidiary. *See* 130 S. Ct. at 2875-76. The Supreme Court stated at the outset of its opinion that the ordinary shares issued by NAB and purchased by the foreign investor-plaintiffs were <u>not</u> listed on the NYSE. *See id.* at 2875. In addition to not being listed or traded on an American exchange, these ordinary shares were purchased by foreigners on a foreign (Australian) stock exchange, not anywhere inside the United States. *See id.* at 2875-76. The Court specifically noted that there were ADRs that had been purchased by NAB investors in connection with trades executed on the NYSE, but expressly pointed out that those ADR purchasers were not parties to the lawsuit at the time of the appeal because they had no damages:

> Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States. *This case involves no securities listed on a domestic exchange*, and all aspects of the purchases complained of *by those petitioners who still have live claims* occurred outside the United States.

*Id.* at 2888 (emphases added); *see id.* at 2876 n.1.[9]

---

[9] *See also id.* at 2875 (NAB's "Ordinary Shares — what in America would be called 'common stock' — are traded on the Australian Stock Exchange Limited and on other foreign securities exchanges, *but not on any exchange in the United States*.") (emphasis added); *id.* at 2875 ("We decide whether § 10(b)…provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct *in connection with securities traded on foreign exchanges*.") (emphasis added).

With respect to unregistered securities, *Morrison* examined whether by including the words "not so registered" in § 10(b),[10] Congress intended for § 10(b) to capture the purchase and sale of securities that are not registered on a U.S. exchange and are not traded in the domestic over-the-counter market.  Applying the presumption against extraterritoriality, the Court concluded that Congress did not.  *See id.* at 2877-86.  Indeed, the Supreme Court held that the remaining plaintiffs' claims did not come within § 10(b)'s purview because the *unregistered* NAB shares were not purchased or sold within the United States.  *See id.* at 2888.  In reaching its conclusion, the Court emphasized that it was applying the presumption against extraterritorial application of a U.S. law.  *See id.* at 2877-83 (citing, among other cases, *Foley Bros.*).  The Court cited the conflict between foreign and U.S. law that would be created if § 10(b) were extended to securities that are not registered on a U.S. exchange (and, indeed, do not even trade over-the-counter in the U.S.), and reasoned that if Congress intended application of U.S. law to transactions in unregistered securities simply based on the occurrence of some fraudulent conduct within the U.S. (i.e., at NAB's Florida subsidiary), it would have addressed conflicts of laws issues.  *See* 130 S. Ct. at 2885-86 (citation omitted).   Since Congress did not, the Supreme Court dismissed the case.

B.    **AMPLE EVIDENCE FROM BOTH WITHIN AND OUTSIDE THE *MORRISON* OPINION DICTATES THAT WHEN U.S. EXCHANGE-REGISTERED SECURITIES ARE AT ISSUE, SECTION 10(b) APPLIES REGARDLESS OF THE LOCATION OF THE TRANSACTION**

Throughout their brief, Defendants argue that the location of the purchase or sale transaction is the only relevant consideration in determining whether § 10(b) is applicable.  DB

---

[10] In relevant part, § 10(b) makes it unlawful to, in contravention of SEC rules, use "any manipulative or deceptive device" "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered… ."  15 U.S.C. § 78j(b).

at 10-29.  When, as in *Morrison*, unregistered securities that do not trade in U.S. markets are at issue, Defendants are correct.  But, as shown below, when, as here, U.S. exchange-registered securities are at issue, *Morrison* itself recognized that the location-of-the-transaction test on which Defendants so heavily rely is entirely irrelevant, as recognized by a recent decision in this District interpreting *Morrison*. [11]

> ### 1.   Justice Scalia Recognized That The Statute's Plain Language Makes Section 10(b) Applicable To U.S. Exchange-Registered Securities No Matter Where The Purchase Or Sale Occurs

With respect to securities registered on a U.S. exchange, which were not at issue in *Morrison*, the Supreme Court clearly stated that § 10(b)'s anti-fraud provisions apply.  Justice Scalia, in his majority opinion, specifically delineated a bright line between registered and unregistered securities.  He addressed this distinction multiple times in the opinion of the Court:

> And it is in our view only transactions in *securities listed on domestic exchanges, **and** domestic transactions in other securities*, to which §10(b) applies.

130 S. Ct. at 2884 (emphasis added);

> The transactional test we have adopted—whether the purchase or sale is made in the United States, ***or** involves a security **listed** on a domestic exchange*—meets that requirement [i.e., the requirement that Section 10(b) avoid regulation of foreign securities exchanges]

*id.* at 2886 (emphasis added);

---

[11] Defendants may seek to rely upon *In re Alstom SA Securities Litigation*, No. 03 Civ. 6595 (VM), 2010 WL 3718863, at *2-3 (S.D.N.Y. Sept. 14, 2010), which reached a conclusion similar to that espoused by Defendants herein.  *Alstom* is inapplicable here, however, because the case involved ADRs that were listed on the NYSE, not "dually-listed" common stock like UBS's ordinary shares.  Moreover, Judge Marrero's decision was based on a very limited, 5-page letter submission by Plaintiffs where the arguments presented herein could not be adequately developed.  Respectfully, what Judge Marrero missed is that, as Judge Sweet acknowledged in a subsequently decided case, Justice Scalia understood the difference between registered and unregistered securities and clearly and unequivocally limited the Supreme Court's focus on the location of the transaction to *Morrison's* facts (i.e., where the foreign purchases and sales were of unregistered securities).  *See infra* at 20-22 (discussing *Credit Bancorp* opinion).

> Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security **listed** on an American stock exchange, and the purchase or sale **of any other security** [i.e., an unregistered security] in the United States.")

*id.* at 2888 (emphasis added).

Defendants agree that by "listed," Justice Scalia referred to securities that trade on a U.S. exchange and, thus, are registered with that exchange and the SEC.  In fact, all parties agree that Justice Scalia used the terms interchangeably.  *See* DB at 22 ("[T]he Supreme Court used the terms "listed" and "registered" interchangeably.").[12]  Nonetheless, Defendants (and NYSE Euronext) erroneously assert that Plaintiffs' *entire argument* is based solely on "the Court's use of the single word 'listed'" in this passage from the majority's opinion.  DB at 18-19; NYSE Euronext Br. at 3.  This is simply not so.

To be sure, Justice Scalia's deliberate choice of the word listed (and his recognition of its interchangeability with the word "registered") is more than enough to support the undeniable conclusion that § 10(b) reaches transactions in securities that are registered on a U.S. exchange (no matter where the trade is actually executed).  If Justice Scalia had wanted to limit the test the Supreme Court adopted to whether the transaction occurred in the United States *under all circumstances*, he would have written:  "The transactional test we have adopted—whether the purchase or sale is made in the United States—meets that requirement."  Justice Scalia did not do that.  Instead, he deliberately inserted "or involves a security listed on a domestic exchange" because he, being no stranger to construing statutes based on the plain meaning of their words,

---

[12] *See, e.g.*, 130 S. Ct. at 2885 ("The Act's registration requirements apply only to securities listed on national securities exchanges. 15 U.S.C. §78*l*(a).").  The Exchange Act also uses the terms interchangeably.  *See* 15 U.S.C. §78*l*(d) ("If the exchange authorities certify to the Commission that the security has been approved by the exchange for listing and registration, the registration shall become effective….); *id.* ("A security registered with a national securities exchange may be…stricken from listing and registration in accordance with [SEC and exchange rules]…."); *see also* 15 U.S.C. §78*l*(e)&(f).

recognized that Congress unequivocally stated that § 10(b) applies to transactions in securities registered on a U.S. exchange under all circumstances.  There is simply no rational explanation for why Justice Scalia would insert "or involves a security listed on a domestic exchange" if he was not construing what § 10(b) makes plain — that the statute applies to all transactions in U.S. exchange-registered securities.

Justice Scalia's analysis — holding that all transactions (regardless of location) in shares listed/registered on a U.S. exchange are within the ambit of § 10(b) — does nothing more than follow the clear language of the statute.  Section 10(b) states in relevant part that it prohibits deceptive conduct "in connection with the purchase or sale of any security *registered on a national securities exchange* …." 15 U.S.C. § 78j(b) (emphasis added).  Where U.S. exchange-registered securities are at issue, there is simply no ambiguity in the statute, unlike in *Morrison* in which the Court was construing the phrase "not so registered."

As the foregoing passage written by Justice Scalia recognized, Congress said § 10(b) applies to U.S. exchange-registered securities, without limitation by where the purchase or sale transaction occurs.  Indeed, Congress – which recognized in the Exchange Act that securities sometimes trade in both domestic and foreign exchanges (e.g., are dually-listed)[13] – could have said that such conduct is prohibited only if the transaction in the U.S. exchange-registered security *also occurs* on the domestic exchange.  It did not.  Thus, as to securities registered on a U.S. exchange (like UBS's ordinary shares here), *where* the transaction occurred is simply not relevant to determining whether the statute applies.  Consequently, resorting to canons of construction, as the Supreme Court did in *Morrison* in interpreting the meaning of the remainder

---

[13] *See* 15 U.S.C. § 78b(2) ("The prices established and offered in such transactions [e.g., transactions on U.S. exchanges and in the U.S. over-the-counter market] are generally

of § 10(b) (*i.e.*, the meaning of "in connection with the purchase or sale of…any security not so registered"), simply is not necessary.  As the Supreme Court explained in *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992):

> [C]anons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. ***When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete***.

(emphasis added; citations and quotation marks omitted); *see also Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls…, and that judicial review must end at the statute's unambiguous terms.  Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous.").

The evidence does not stop at Justice Scalia's words or the plain language of the statute, however, as numerous other factors support this conclusion, as discussed below.

### 2.  The *Morrison* Opinion Elsewhere Recognized The Distinction Between Registered Shares And Unregistered Shares

Justice Scalia specifically recognized the importance of the distinction between shares that are simultaneously listed and traded in the United States and other countries (i.e., "dual listed" shares, like UBS's ordinary shares) and shares that are not.  *See* 130 S. Ct. at 2878-79 (discussing the Second Circuit's decision in *Schoenbaum* v. *Firstbrook*, 405 F. 2d 200, 208, *modified on other grounds en banc*, 405 F.2d 215 (1968)).   Justice Scalia explained:

> *Schoenbaum* involved the sale in Canada of the treasury shares of a Canadian corporation whose publicly traded shares (***but not, of course, its treasury shares***) were listed on both the American Stock Exchange and the Toronto Stock Exchange.

---

disseminated and quoted throughout the United States and foreign countries and constitute a basis for determining and establishing the prices at which securities are bought and sold….").

130 S. Ct. at 2878 (emphasis added).  Justice Scalia noted that the district court in *Schoenbaum*

properly dismissed the case because § 10(b) does not apply extraterritorially to *unlisted*

securities, such as the Canadian issuer's treasury shares, *see* 130 S. Ct. at 2878, and explained

that in creating what would develop into the conduct and effects test (which the Supreme Court

rejected in *Morrison*), the Second Circuit improperly reversed the district court.  According to

*Morrison*, the Second Circuit erroneously believed that, in an effort to protect American

investors, "[i]t sufficed to apply §10(b) . . . [because, ] although the transactions in treasury

shares took place in Canada, they affected the value of the common shares publicly traded in the

United States."  130 S. Ct. at 2878 (citation omitted).  The Supreme Court found that the Second

Circuit failed to properly apply the presumption against extraterritoriality because the Second

Circuit erroneously believed that it could use adverse effects on American investors from

transactions involving unregistered securities in foreign markets (i.e., the treasury shares) to

change the plain meaning of § 10(b), which clearly has no application where *unregistered*

securities are at issue.  *See id.* at 2878.

Justice Scalia similarly criticized the Second Circuit's decision in *Leasco Data*

*Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (1972), in which the Second Circuit

found there was subject matter jurisdiction under the conduct/effects test to hear a § 10(b) claim

even though "the corporation whose securities were traded (abroad) was ***not*** listed on any

domestic exchange."  *Morrison*, 130 S. Ct. at 2878 (emphasis added).  The Supreme Court's

discussion of *Schoenbaum* and *Leasco* demonstrates that Justice Scalia (and the majority) made a

clear distinction between U.S. exchange-registered securities (which were not at issue in

*Morrison*) and unregistered securities that did not even trade in the domestic over-the-counter

market (which were at issue in *Morrison*).  The purpose of doing so was to emphasize that

*Morrison's* holding is not applicable when U.S. exchange-registered securities are at issue, as the concurrence and dissent also recognize, *see infra* at 19-20.

Justice Scalia also recognized this critical distinction in discussing §§ 30(a) and (b) of the Exchange Act.[14] The majority opinion states: "With regard to securities *not* registered on domestic exchanges, the exclusive focus on *domestic* purchases and sales is strongly confirmed by § 30(a) and (b), discussed earlier." 130 S. Ct. at 2885 (emphases in original). Clearly, given the emphases supplied, Justice Scalia viewed securities that are registered on domestic exchanges differently from those that are not.

Defendants assert that the Court's observation, in discussing Sections 30(a) and (b), that "it is the foreign location of the *transaction* that establishes…the Act's inapplicability,'" DB at 13 (quoting 130 S. Ct. at 2885) (emphasis in original)), supports the notion that the Court held that § 10(b) does not apply to transactions that occur on foreign exchanges under all circumstances. Defendants ignore, however, that (as explained above) Justice Scalia's discussion of §§ 30(a) and (b) began with the phrase: "With regard to securities *not* registered on domestic exchanges…." *See* 130 S. Ct. at 2885 (emphasis in original). This lead-in phrase that was deliberately inserted by the majority makes it clear that the Court was limiting its holding to situations in which the foreign transaction is in a security that has not been registered on a U.S. exchange. Put differently, Justice Scalia clearly recognized that the location of the

---

[14] Section 30(a) makes it unlawful for a broker or dealer to use interstate commerce to effect transactions in securities issued by U.S. issuers on exchanges located outside the United States. *See* 130 S. Ct. at 2883 (citing 15 U.S.C. § 78dd(a)). Section 30(b), by contrast, states that the Exchange Act does not apply to a person who "transacts a business in securities without the jurisdiction of the United States," unless he does so in violation of SEC promulgated rules. *See* 130 S. Ct. at 2883-84 (citing 15 U.S.C. § 78dd(b)).

transaction only matters when *unregistered* securities are at issue.[15]  *Morrison's* holding,

therefore, does not extend to foreign purchasers of UBS's ordinary shares here because the

shares are registered on the NYSE.

<blockquote>

**3.     The Concurring And Dissenting Opinions In *Morrison* And A Recent Decision In This District Recognize That The *Morrison* Majority's Holding Is Not Applicable To U.S. Exchange-Registered Securities**

</blockquote>

In his concurrence, Justice Breyer also viewed § 10(b) as creating two categories:  one for

registered securities and one for securities that are "not so registered."  *See* 130 S. Ct. at 2888

(citing § 10(b)'s "not so registered" language").  Justice Breyer stated that the first category of §

10(b), relating to securities "registered on a national securities exchange," was not at issue in

*Morrison* because the securities purchased by the foreigners in that case were unregistered.  *See*

130 S. Ct. at 2888 ("The first category therefore does not apply.").  Justice Breyer then stated:

> Further, the relevant purchases of ***these unregistered securities*** took place
> entirely in Australia and involved only Australian investors.  And in accordance
> with the presumption against extraterritoriality, I do not read *the second category*
> [i.e., the "not so registered" category] to include such transactions.  Thus, while
> state law or other federal fraud statutes…may apply to the fraudulent activity
> alleged here to have occurred in the United States, I believe that § 10(b) does not.
> ***This case does not require us to consider other circumstances.***

*Id.* (emphasis added).  Clearly, Justice Breyer agreed with the two categories that the

majority's decision created.  The "other circumstances" are the ones presented by this

case — that is, whether the first category of § 10(b) involving U.S. exchange-registered

securities is applicable when the purchase transaction occurred on a foreign exchange.

---

[15] Indeed, the fact that Justice Scalia emphasized that he was writing about un̲registered
securities when he stated that the exclusive focus of Section 10(b) is on purchases and sales
occurring domestically in the United States logically suggests that the opposite is also true (i.e.,
that with respect to American exchange-registered securities, the focus of Section 10(b) need not
be on domestic purchases and sales, but rather is on whether the claim involves a security
registered on a national securities exchange).  Otherwise, there was no valid reason to include the
lead-in phrase.

The dissent also held the view that the majority's decision did not cover transactions in U.S.-exchange registered securities.  Justice Stevens, with whom Justice Ginsburg joined, stated:

> Repudiating the Second Circuit's approach in its entirety, the Court establishes a novel rule that will foreclose private parties from bringing § 10(b) actions whenever the relevant securities were purchased or sold abroad ***and*** are not listed on a domestic exchange.

130 S. Ct. at 2894 (emphasis added).  Plainly, since the connector "and" was added, the dissent interpreted the majority's decision as requiring *two* things:  (1) purchases and sales abroad; and (2) the absence of U.S. exchange-registered securities.  Thus, the dissent also recognized that the majority's holding is not applicable to foreign purchases of U.S. exchange-registered securities.[16]

Judge Sweet's recent decision in *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2010 WL 3582906 (S.D.N.Y. Sept. 13, 2010 and Order Adhering To Opinion dated Sept. 30, 2010), similarly recognizes that the holding in *Morrison* does not preclude application of § 10(b) when U.S. exchange-registered securities are at issue, even if the securities purchases occur in foreign markets.  In *Credit Bancorp*, the SEC brought a § 10(b) claim against an executive at the U.S. subsidiary of Credit Bancorp, Ltd. ("CBL"), a foreign corporation based in Switzerland.  CBL set up a credit facility program in Europe targeted at CEOs of public companies.  Investors could purchase interests in the credit facility by posting securities and other assets as collateral in exchange for which the investors received lump sum loans at attractively low interest rates.  *See id.* at *2-6 (S.D.N.Y. Sept. 13, 2010).  Several investors who purchased interests in the credit facility transferred the stock of public companies that were listed, registered and traded on U.S.

---

[16] Defendants seek to place great emphasis on the Court's statement that "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States…."  *See* DB at 18-19 (quoting 130 S. Ct. at 2884).  However, as the concurrence and dissent recognize, this statement was made in the context of the *Morrison* decision, which involved an *unregistered* security and, thus, it is not binding in this case.

exchanges as collateral.  *See id.* at \*8-11.  Interests in the credit facility were bogus as CBL was engaged in a Ponzi scheme.  Contrary to CBL's and the individual defendant's representations that the pledged collateral was held in trust in the United States and could not be encumbered, investors' assets were held in foreign banks and routinely used by CBL to engage in a variety of risky investment transactions in Europe to earn profits exclusively for CBL's benefit.  Judge Sweet entered summary judgment for the SEC finding that the individual defendant made numerous false statements concerning the credit facility and, thus, violated § 10(b).  *See id.* at \*15-16.

The defendant subsequently sought reconsideration based on *Morrison* and argued that the relevant transactions occurred abroad and, therefore, *Morrison* required dismissal of the SEC's claims.  *See id.* at \*19.  Judge Sweet disagreed and found that the purchases of the foreign investment facility occurred in the United States, but even if they did not, *Morrison* is nevertheless satisfied because the purchases of the foreign credit facility involved securities listed on domestic exchanges.  In relevant part, Judge Sweet explained:

> [Defendant] argues that because [CBL's CEO's] purchases and sales [of securities] in Europe were the actual fraud in this case, § 10(b) does not apply to [defendant's] conduct.  This contention is unavailing, as *Morrison* states that § 10(b) applies to securities transactions in the United States or transactions involving securities listed on an American exchange, both of which are present here….

> \*          \*          \*

> Plainly, the transactions of securities through which domestic investors entered the Insured Credit Facility Program at Credit Bancorp took place within the United States.

> Furthermore,…the securities which were transferred into Credit Bancorp's possession were…securities on American stock exchanges.  [Defendant] does not suggest that the other securities he brought into the Insured Credit Facility Program were not also listed on domestic exchanges.

> Therefore, the transactions for which [defendant] was…sued satisfied both approaches to the application of § 10(b) under *Morrison*:  they involved a securities transaction occurring domestically, and they involved the exchange of securities listed on domestic exchanges.

*Id.* at *19-20 (citations omitted).

### 4. The Presumption Against Extraterritorial Application Of The Exchange Act Is Not Implicated When, As Here, Securities That Are Registered On A National Securities Exchange Are At Issue

Defendants assert that even where a foreign issuer voluntarily registers its shares on a U.S. exchange, investors who purchase outside the U.S. do not have a remedy under § 10(b).  In their view, because *Morrison* noted that the Exchange Act is silent as to the extraterritorial application of § 10(b), the presumption against extraterritorial application of § 10(b) applies.  *See* DB at 20.  This argument is without merit for two reasons.

First, as explained above, the unambiguous language of § 10(b) makes it clear that it applies to transactions in securities that are registered on a U.S. exchange (like UBS's ordinary shares).  Thus, there is no need to resort to canons of construction and the statute must be applied as written.  *See supra* at 13-16.

Second, even if this Court were to conclude that there is some ambiguity in the statute requiring it to analyze the presumption against extraterritoriality, Defendants' argument still fails.  When domestic conduct is at issue, as is the case with respect to § 10(b), the law is clear that the presumption against extraterritoriality is not implicated.  *See In re Maxwell Commc'n Corp. plc*, 186 B.R. 807, 815-16 (S.D.N.Y. 1995) ("[A] court must determine if the presumption applies at all: after identifying the conduct proscribed or regulated by the particular legislation in question, a court must consider if that conduct occurred outside of the borders of the U.S."); *see also Touregman v. Collins Fin. Servs., Inc.*, No. 08-cv-01392, 2009 WL 6527757, at *2 (S.D. Cal. Aug. 6, 2009) ("Before considering whether a statute should be applied extraterritorially, a

court must first address whether [its] application…presents an issue of extraterritoriality at all.")

(citing *Envtl. Def. Fund v. Massey*, 986 F.2d 528, 532 (D.C. Cir. 1993); 44B Am. Jur. 2d Int'l

Law § 71 (2010) ("the presumption has no bearing when the conduct that Congress seeks to

regulate occurs largely within the United States").

It is indisputable that in making § 10(b) applicable to purchases and sales of securities

registered on U.S. exchanges, Congress was in fact legislating with respect to *domestic* matters.

It was legislating to prohibit specific conduct by issuers (foreign or domestic) who voluntarily

come to the United States and list their shares for trading on U.S. exchanges.  More specifically,

in § 10(b), Congress (given the SEC's promulgation of Rule 10b-5) made it unlawful for "any

person" to make false and misleading statements in connection with the purchase or sale of U.S.

exchange-registered securities (and also unregistered securities that trade in the American over-

the-counter market).[17]  *See* 15 U.S.C. § 78m; *Morrison*, 130 S. Ct. at 2882.  Elsewhere in the

Exchange Act, Congress created an obligation for issuers who elect to register their securities

with a U.S. exchange to make periodic reports and file them with the SEC.  *See* 15 U.S.C. § 78m.

That obligation applies to both U.S. and foreign issuers alike (although the specific reporting

obligations differ slightly).[18]  Thus, when applied to securities registered on a U.S. exchange,

---

[17] Defendants agree that § 10(b)'s reference to "any security not so registered" means a security traded in the over-the-counter market in the United States.  *See* DB at 18 & n.20.

[18] It is useful to examine, by contrast, what Congress was not doing in enacting § 10(b). Congress did not make it unlawful for foreign issuers whose securities are *not* listed on a "national securities exchange" or traded in the U.S. over-the-counter market to make misleading statements (the situation in *Morrison*).  In other words, Congress was not enacting a law telling a foreign issuer what it must do (or refrain from doing) with respect to a security that it is not registering on an American exchange or issuing for trading in the U.S. over-the-counter market. Such laws are, of course, the province of the lawmakers who regulate such foreign markets, not Congress, and such extraterritorial application of § 10(b) would cause the interference with foreign law recognized in *Morrison*.  *See* 130 S. Ct. at 2887-88.  Indeed, as *Morrison* held with respect to foreign (i.e., non-U.S. exchange-registered) securities, legislation causing such interference would require a specific statement of Congressional intent before a court would

there is simply no manner in which Congress can be deemed to have been legislating "extraterritorially." Therefore, the presumption against extraterritorial application is not implicated.

In this case, conduct prohibited by § 10(b) (i.e., the making of false and misleading statements with respect to securities registered on a U.S. exchange) occurred in the United States because (i) after UBS registered its securities for trading on the NYSE, it filed a multitude (more than six years worth) of false financial statements with the SEC in Washington, D.C., and (ii) certain other defendants also made false and misleading statements in the United States. *See supra* at 9. With respect to the U.S. exchange-registered securities at issue here, it is of no moment that the victims of the domestic fraud suffered injury outside the United States when they purchased UBS's U.S.-exchange registered shares in transactions that occurred on exchanges outside the U.S. As a consequence, § 10(b) is, unlike in *Morrison*, not being applied extraterritorially here. *See Envtl. Def. Fund v. Massey*, 986 F.2d at 531-32 ("[T]he presumption against extraterritoriality is not applicable when the conduct regulated by the government occurs within the United States. By definition, an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders. Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within U.S. borders.").

Defendants will no doubt assert that there also were fraudulent acts that occurred in Switzerland (e.g., mailing and/or preparation of UBS's false and misleading financial statements

---

apply the legislation extraterritorially. *Morrison* found such a statement as to unregistered securities to be lacking. Thus, even though there was fraudulent conduct within U.S. borders, §10(b) did not apply. *See id.*

to UBS shareholders from/in Switzerland).  But this makes no difference.  Even assuming

*arguendo* that UBS simply filed its false and misleading financial statements that were prepared

in Switzerland with the SEC, this is still a domestic tortious act that is condemned by § 10(b).  In

other words, while UBS may also have committed fraud in other jurisdictions by violating the

requirements of a statute or law in those jurisdictions, that does not mean that Congress was not

legislating with respect to domestic matters or that UBS did not engage in a domestic fraud

prohibited by § 10(b).

Defendants further claim that *Morrison* foreclosed the ability of purchasers outside the

United States to assert a § 10(b) claim under all circumstances because the Court stated:  "[w]e

know of no one who thought that the Act was intended to 'regulat[e] *foreign securities*

*exchanges* — or indeed who believed that under established principles of international law

Congress had the power to do so."  DB at 19 (quoting 130 S. Ct. at 2884 (emphasis added by

Defendants).  This observation is misplaced here.

Plaintiffs are not suggesting that Congress set out to extend (and extended) § 10(b) to

securities, like those in *Morrison*, that are *not* registered with a U.S. exchange or that are not,

whether registered or unregistered, purchased or sold within the United States.  But, that is not

the situation in this case because UBS voluntarily registered its shares with the SEC and listed its

shares for trading on the NYSE, and Swiss financial regulators knowingly allowed UBS to do it.

By providing an entirely optional remedy to those who purchased NYSE-registered securities

outside the United States, there is no sense in which the Exchange Act would be impermissibly

"regulating" foreign stock exchanges.  *See infra* at 26.  Indeed, UBS's entire purpose in

registering its ordinary shares on the NYSE was so that the shares would freely trade in both

U.S. and Swiss markets such that ordinary shares purchased in one exchange could be sold on

the other.  Such transactions necessarily entail — as UBS recognizes — being subject to regulation in the multiple jurisdictions in which the ordinary shares are registered regardless of where the purchase or sale of the security occurred.  *See supra* at 8.

Defendants (and NYSE Euronext) also overstate the sense in which *Morrison* was discussing "regulation" of foreign securities exchanges.  *See* DB at 26 (*Morrison* recognized "that imposing U.S. securities laws on transactions on foreign securities exchanges effectively would nullify the choices of sovereign governments as to how their capital markets should be regulated").  Merely because § 10(b) applies to transactions in *U.S. exchange-registered securities* outside the United States (i.e., on foreign exchanges) does not mean that the SEC or some other U.S. regulator is now free to poke their noses onto the floor of the Swiss Stock Exchange and tell Swiss traders what they can or cannot do when trading U.S. exchange-registered securities.  Nor does such application imply U.S. regulation of what the Swiss executives who run the Swiss Stock Exchange must do in creating or applying exchange trading rules as to NYSE-registered securities or what fraud remedies its courts should provide with respect to securities that Swiss corporations chose *not* to list on a U.S. exchange.

Similarly, Defendants' argument that "Plaintiffs' 'listing theory' would lead to the incongruous results that the Securities Act does not apply extraterritorially, but the Exchange Act does, *see* DB at 19-20 n. 21, misses the mark because § 10(b) is not being applied extraterritoriality with respect to U.S. exchange-registered securities.[19]

---

[19] Defendants note that after *Morrison*, the Exchange Act was amended to expressly provide that federal courts have *subject matter jurisdiction* over claims by the SEC and Department of Justice.  They then assert that this amendment shows that "Congress clearly understood *Morrison* to bar Section 10(b) claims based on transactions outside the United States, and wanted to provide a basis for such claims by the SEC and DOJ, but *not* by private plaintiffs."  DB at 20 n. 22 (citing Dodd-Frank Wall Street Reform Act § 929P(b)(2)).  This assertion is without merit.  This amendment dealt with the *subject matter jurisdiction* of the federal courts, not the text of

In sum, because *Morrison* does not preclude the application of § 10(b) to purchases and sales of the U.S. exchange-registered securities at issue here, the presumption against extraterritoriality is of no consequence.

### C.     THE POLICY CONCERNS RAISED BY DEFENDANTS (AND THEIR *AMICUS*) ARE MERITLESS

The parade of horribles to which the Defendants (and NYSE Euronext) point if this Court finds, as it should, that § 10(b) covers transactions in U.S. exchange-registered securities even if they occur outside the U.S. lack merit.  Indeed, their so-called concerns are simply not realistic.

NYSE Euronext asserts that if a foreign issuer that "cross-lists" its securities on a U.S. exchange can be sued by foreign plaintiffs, such a result would "supplant[] the law of the country where the transaction actually occurred." NYSE Euronext Br. at 3; *see also id.* at 7-8 ("[T]here is no good reason to avoid the application of the law of the country where the securities transaction occurred.").  This is not so.  The law of foreign jurisdictions is not supplanted or avoided — it is merely *supplemented* with an *optional* remedy that can be pursued by the defrauded purchaser of a U.S. exchange-registered security.  Such a foreign plaintiff still can elect to bring a fraud lawsuit in the foreign country where the exchange was located or perhaps in his own country of residence, if (as is likely given the globalization of markets) the two are different.  Indeed, in the class action context, the investor is always free to opt out of any class that is certified in the United States.[20]

---

§ 10(b).  The Supreme Court made clear in *Morrison* that the federal courts already have jurisdiction to hear the § 10(b) claims of both the SEC and private plaintiffs, *see* 130 S. Ct. at 2876-77 & n. 3, and, therefore, this amendment has no bearing on § 10(b)'s applicability here.

[20] Such a supplemental remedy is perfectly consistent with U.S. treaties that provide foreigners the same access to U.S. courts and rights to sue as are afforded to U.S. citizens.  *See, e.g.*, Treaty of Friendship with Switzerland, 11 Stat. 587 ("The citizens of the United States of America and the citizens of Switzerland…shall be at liberty to prosecute and defend their rights before courts of justice in the same manner as native citizens….").

NYSE Euronext further asserts that "Plaintiffs' argument would undermine the decades-long effort by U.S. authorities to promote cooperation with foreign governments in the regulation of securities transactions."  NYSE Euronext Br. at 6.  Yet, neither NYSE Euronext nor Defendants offer any example of how any of the agreements between the SEC and foreign regulators to which they cite, NYSE Euronext Br. at 6-7 & n.8, would be affected at all, let alone adversely.   As stated earlier, nothing this Court finds with respect to the ability of private investors who purchased U.S. exchange-registered securities to sue under § 10(b) empowers federal regulators to do anything that Congress has not already empowered them to do, *see* Dodd-Frank Wall Street Reform and Consumer Protection Act § 929P(b)(2) (SEC and Department of Justice has jurisdiction to enforce Exchange Act's antifraud provisions outside the United States).  Likewise, nothing this Court decides will require the SEC or any other federal regulator to take any action contrary to the agreements to which NYSE Euronext cites.

Next, both Defendants and NYSE Euronext claim that allowing purchasers of U.S. exchange-registered securities whose transactions were executed on exchanges outside the United States to sue under § 10(b) would deter capital investment in this country because it would create fear among such issuers.  *See* NYSE Euronext Br. at 9 ("[T]he ability of the U.S. exchanges to attract and retain foreign issuers would be gravely impaired."); DB at 28 ("Exposing these foreign issuers to worldwide class actions will encourage the over 850 foreign issuers who list their ordinary shares or ADRs on a U.S. exchange to de-list, and discourage other foreign issuers from ever listing their shares or ADRs here….The harm to U.S. markets would be grave.").  This argument is self-refuting.  Defendants pretend that a ruling from this Court that purchasers outside the United States (including U.S. citizens) can avail themselves of a § 10(b) remedy would result in a radical change in the law.  But this simply is not so.  Prior to

*Morrison*, numerous courts allowed suits by foreign purchasers of foreign securities on foreign exchanges, *see, e.g.*, *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 362-63, 387 (S.D.N.Y. 2005); *In re Royal Ahold, N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334 (D. Md. 2004); *In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 74 (S.D.N.Y. 1999), and certainly the ability of U.S. investors to sue regardless of where the security was purchased was unquestioned.  And yet, as Defendants point out, no less than 850 foreign issuers listed their ordinary shares or ADRs on U.S. exchanges *despite that risk*.  DB at 28.  Thus, it is obvious that this Court's ruling will not encourage delisting.[21]  The loss of a § 10(b) remedy as to U.S. exchange-registered securities would, however, deter U.S. investors from purchasing such shares in foreign markets, where they often go in search of the best available price.  Indeed, Oregon purchased numerous shares on the Swiss Stock Exchange and suffered extensive losses as a result.  *See supra* at 6.

Defendants' citation to an article by Professor Coffee and remarks by U.S. business leaders to the effect that foreign issuers fear U.S. antifraud litigation, *see* DB at 28 & n. 32, are similarly flawed.  The "fear" of U.S. anti-fraud litigation is present in this case and others regardless of whether purchasers of securities outside the United States have the option of participating in § 10(b) litigation in the U.S.  Since, as Defendants concede, purchasers of UBS securities in the United States unquestionably may assert § 10(b) claims, foreign issuers will still "fear" U.S. litigation.  The ruling of this Court will not change whether a foreign issuer may be sued under § 10(b) — it will only change the number of investors who may sue.  As a consequence, the "fear" to which Defendants and NYSE Euronext point will not be eliminated

---

[21] Indeed, Defendants contradict themselves by noting that several companies recently delisted not as a result of fears regarding how many shareholders can bring § 10(b) claims, but due to

regardless of this Court's ruling.  Rather, the reason for any delistings by foreign issuers is, as

Professor Coffee suggested, equally as likely to be attributable to the costs of complying with the

strict regulatory requirements set forth in the Sarbanes-Oxley Act,[22] which, of course, has

nothing at all to do with who may bring private claims for § 10(b) violations.

Finally, Defendants complain that Plaintiffs' interpretation "mean[s] that *Morrison*

actually broadened § 10(b)'s extraterritorial reach[,]" DB at 5.  In this regard, they note that prior

to *Morrison*, under the "conduct" and "effects" test, certain courts held that purchasers of foreign

securities on foreign exchanges sometimes were not permitted to sue in the U.S. if they were

unable to prove that the U.S. conduct caused their losses.  *See id.*  Defendants then assert that if

Plaintiffs' argument is correct, the *Morrison* decision actually expanded § 10(b)'s application

beyond what was previously permitted by the conduct and effects test, a result which Defendants

claim simply cannot be.  *See id.*  ("All of those cases [involving foreign issuers and decided

under the conduct and effects test], if presented today on plaintiffs' theory, would *survive*.  Thus,

a Supreme Court decision meant to sharply *curtail* the extraterritorial application of § 10(b)

would sharply *expand* it.") (emphasis in original).  This is less a policy argument than it is an

observation.  In any event, Defendants' assertion is flawed by the assumption embedded in it —

that the Supreme Court in *Morrison* set out to curtail the extraterritorial application of § 10(b)

*under all circumstances*.  As explained earlier, U.S. exchange-registered securities were not at

issue in *Morrison*.  To the extent the Supreme Court set out to curtail the extraterritorial

application of § 10(b) in *Morrison*, it did so only with respect to unregistered securities that do

not trade in U.S. markets.  There is no indication that the Supreme Court was keeping a

---

amendments to SEC rules that made delisting easier.  *See* DB at 28; *see also* NYSE Euronext Br.
at 9 & n. 11.

scorecard of how many § 10(b) claims involving purchasers on foreign exchanges survived prior to *Morrison* and then rendered a decision with the intention of curtailing that number, sharply or otherwise.  Rather, the Supreme Court created a bright-line test based on the plain language of the statute which is not in any way dependent upon the results reached by courts using the conduct and effects test.  The first prong of that test begins and ends with whether the security is registered on a U.S. exchange, and UBS's ordinary shares are here.

       D.        NONE OF THE CASES DEFENDANTS CITE REJECTED THE ARGUMENT PRESENTED HERE

Defendants assert that "following *Morrison*, every court that has addressed this issue…has held that foreign investors cannot bring Section 10(b) claims based on purchases of securities outside the United States."  DB at 14-15.  The cases cited, however, are inapposite.

*Sgalambo v. McKenzie*, No. 09 Civ. 10087 (SAS), 2010 WL 3119349 (S.D.N.Y. Aug. 6, 2010), dismissed the § 10(b) claims of purchasers of a Canadian issuer's common stock on foreign exchanges, but there the plaintiffs conceded the issue and presented no argument to the contrary.  *See id.* at *17.  Similarly, *Cornwell v. Credit Suisse Group*, No. 08 Civ. 3758 (VM), 2010 WL 3069597 (S.D.N.Y. July 27, 2010), dismissed the § 10(b) claims of purchasers of a Swiss company's ordinary shares on foreign exchanges, but Judge Marrero did not address the critical argument and distinction from *Morrison* that is presented here — i.e., that the foreign issuer's ordinary shares were registered on the NYSE.

Similarly, *Tradex Global Master Fund SPC Ltd. v. Rieden*, No. 09 Civ. 6395 (S.D.N.Y. July 23, 2010) (attached to the Declaration of Robert Giuffra as Ex. 8), is inapposite because,

---

[22] *See* John C. Coffee, Jr., *Securities Policeman to the World?  The Cost of Global Class Actions*, N.Y.L.J., Sept. 18, 2008, at 1 (attached to the Giuffra Decl. as Ex. 15).

unlike here where UBS's shares are registered on the NYSE, *Tradex* "involve[d] no securities listed on a domestic exchange, nor any securities purchased in the United States."  Slip Op. at 2.

*Cedeno v. Intech Group, Inc.*, No. 09 Civ. 9716, 2010 WL 3359468 (S.D.N.Y. Aug. 25, 2010), is not on point because it was not a § 10(b) case and did not even involve securities or stock exchanges, foreign or domestic.  The case involved claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68, asserted by foreign plaintiffs against Venezuelans relating to certain alleged schemes by the Venezuelan government.  The schemes only contacts to the United States were the limited movement of funds into and out of U.S.-based bank accounts.  Thus, Judge Rakoff cited *Morrison* for the general proposition that statutes should not be applied extraterritorially unless there is an indication in the text that it should apply outside the United States, and merely found that this RICO case did not have the requisite U.S. connections to be heard in a U.S. court.  *Id.* at *1-3.

*In re Banco Santander Sec. – Optimal Litig.*, No. 09-2073, 2010 WL 3036990 (S.D. Fla. July 30, 2010), is also inapposite because it merely dismissed §10(b) claims of foreign plaintiffs who purchased foreign securities that were not registered on a U.S. exchange.  *See id.* at *5-6.

## II. EVEN IF PURCHASERS OF U.S. EXCHANGE-REGISTERED SECURITIES OUTSIDE THE UNITED STATES CANNOT BRING CLAIMS UNDER SECTION 10(b), OREGON STATES A SECTION 10(b) CLAIM BECAUSE ITS PURCHASES AND SALES OF UBS SHARES OCCURRED WITHIN THE UNITED STATES

Unlike here, in *Morrison*, no U.S. plaintiff was a party before the Supreme Court and no U.S. purchasers of securities were included in the proposed class of purchasers.  The Supreme Court, thus, left open the question of where a transaction occurs for purposes of § 10(b).  For this

Court to extend *Morrison* to U.S. citizens would strip away the protections of U.S. law from the core investors the Exchange Act was intended to protect — U.S. citizens acting in the U.S.[23]

Thus, even if Defendants' erroneous interpretation of *Morrison* is accepted and § 10(b) does not extend to purchases and sales of U.S. exchange-registered securities that occurred on a foreign exchange, Oregon is not barred from bringing § 10(b) claims based on its purchases of UBS shares on the Swiss exchange because those "purchases" occurred in the United States.

### A.    OREGON'S PURCHASES OCCURRED IN THE UNITED STATES

The majority opinion in *Morrison* did not define the term "purchase" in the second clause of the transaction test:  "Section 10(b) reaches . . . the purchase or sale of any other security in the United States." 130 S. Ct. at 2888.  Based upon the ordinary meaning of the term "purchase," as well as Supreme Court precedent that § 10(b) "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes," *SEC v. Zanford*, 535 U.S. 813 (2002), a U.S. investor such as Oregon, who, while in the United States, purchased common shares of a foreign company (such as UBS) from a foreign exchange (such as the Swiss stock exchange), satisfies *Morrison's* transactional test because this constitutes a "purchase . . . of any other security in the United States."  Because the Court also did not define the phrase "other security" and did not limit this phrase by inserting the term "domestic," the phrase "other security" applies to UBS's shares.

*Black's Law Dictionary* defines a "purchase" as "[t]he act or an instance of buying" (*Black's Law Dictionary* 1354 (9th ed. 2009), while the Exchange Act defines the term

---

[23] Indeed, as one *amicus curiae* conceded, it is well-established that §10(b) extends to the claims of American investors.  *See Brief of Infineon Technologies, AG as Amicus Curiae Supporting Respondents*, 2010 WL 723007, at *1 ("amicus recognizes the United States' interest in deterring and remedying securities fraud perpetrated against the United States capital markets and [U.S.] investors").  In writing for the majority, Justice Scalia specifically cited to the *Infineon* brief in support of his reasoning.  *See Morrison*, 130 S. Ct. at 2886.

"purchase" as "any contract to buy, purchase, or otherwise acquire." 15 U.S.C. § 78c(a)(13). In other words, a U.S. investor who places a buy order in the United States for a stock listed on a foreign exchange completes his or her "purchase" in the United States when the buy order is placed. In *Shaw v. Dreyfus*, the Second Circuit, applying the Exchange Act definition and the ordinary meaning of the word "purchase," stated that "[the] generally understood meaning of 'purchase' is to ***acquire something by one's own act or agreement for a price***." 172 F.2d 140, 142 (2d Cir. 1949) (emphasis added). Under *Shaw*, an investor becomes a purchaser when the investor voluntarily undertakes to become involved in the transaction. *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 244, 260 (S.D.N.Y. 2005) (citing *Shaw* for proposition that a purchase occurs when the buyer takes an action that involves decision-making). Likewise, in *Stella v. Graham-Paige Motors Corp.*, 232 F.2d 299 (2d Cir. 1956), the Second Circuit stated that the date when an individual became a "purchaser" is the date when he or she "***incurred an irrevocable liability to take and pay for the stock***." *Id.* at 301 (emphasis added).

Therefore, a "purchase" of securities occurs when an investor places his buy order — not when the buy order is ultimately settled on the exchange. Generally, the initiation of a buy order is in response to a general offer that a security is for sale — the general offer is the quoted price on the exchange. If an investor submits a buy order based on a quoted price, then the voluntary "act" of initiating a buy order is "one's own act or agreement" to buy a stock for a certain price. This action alone alters the designation of the investor from a mere buyer to a purchaser — and thus determines the time and location of the purchase. Accordingly, the initiation of a buy order satisfies the definition of "purchase," and the transaction is a "domestic" one under *Morrison*.

A "purchase" does not occur on the foreign exchange at the time the U.S. purchaser places his or her buy order because the intervening acts that take place on the exchange (i.e., the processing of the trade, processing by a clearing house or the act of delivering the security) do not reflect an agreement or contract; rather, the act of submitting the buy order is the agreement or contract.   For example, in *Adams v. Dick*, 226 Mass. 46, 115 N.E. 227 (1917), the Massachusetts Supreme Court, in determining whether a purchase on the NYSE represented a future contract for the sale of a security or a present sale, rejected the defendants' argument that, until the sale is cleared by the clearing house and the purchaser receives the stock certificate, only a future contract to purchase, and not a purchase has occurred.   226 Mass. at 55-56, 115 N.E. at 230-31.   Instead, the court held that a sale occurs when the order is made and "all the steps . . . taking place between the orders of the plaintiff and the conclusion of the transactions, constitute merely machinery of convenience for expediting" the actual purchase.   226 Mass. at 55, 115 N.E. at 230.

Here, Oregon's purchase of UBS stock occurred in the U.S. for purposes of the Exchange Act because Oregon made the decision to invest in UBS stock, and initiated the purchase of UBS stock, from the U.S. by means of domestic contractual transactions.   Under both the statutory definition of a "purchase" of securities set forth in § 3(a)(13) as "any contract to buy, purchase, or otherwise acquire" and the case law interpreting that definition, Oregon's purchases of UBS stock occurred in the U.S. because the investment decision was made in the United States (*see Adelphia Commc'ns*, 398 F. Supp. 2d at 260) and Oregon's act of initiating the buy orders — *i.e.*, its "own act or agreement for a price" (*Shaw*, 172 F.2d at 142), whereby it "incurred an irrevocable liability to take and pay for the stock" (*Stella*, 232 F.2d at 301) — occurred in the United States.

### B.    OREGON WAS INJURED IN THE UNITED STATES

Apart from the foregoing, the application of United States law to an action sounding in fraud where the victim is injured in the United States reflects the usual application of well-accepted "choice of law" norms.  This principle is embodied in the long-standing *lex loci delicti* rule, and strongly supports application of § 10(b) to Oregon's purchase of UBS stock.[24]

Under the *lex loci delicti* rule, as set forth in the Restatement (First) of Conflict of Laws, the local law of the "place of wrong" generally governs.  Restatement (First) of Conflict of Laws § 377 (1934).  Section 377 describes the "place of the wrong" as the "state where the last event necessary to make an actor liable for an alleged tort takes places."  Here, the "last event" was the harm to the investor.  As § 377 of the Restatement explains, "[w]hen a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made."  *Id.*  The Restatement demonstrates this principle with two examples that are particularly relevant here:

> A, in state X, makes false misrepresentations by letter to B in Y as a result of which B sends certain chattels from Y to A, in X.  A keeps the chattels.  ***The place of the wrong is in state Y where B parted with the chattels.***  *Id.* (emphasis added).

> A, in state X, owns shares in M company.  B, in state Y, fraudulently persuades A not to sell the shares.  The value of the shares fall.  ***The place of the wrong is X.***

*Id.*, comment a.  These examples demonstrate that the law of the place where the victim suffered harm applies for claims of common law fraud.  Because the law of securities fraud is grounded in

---

[24] The "common-law roots of the securities fraud action" under Section 10(b) may be found in "common-law tort actions for deceit and misrepresentation."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341, 345 (2005).  Further, the dominant principle in choice of law analysis for tort cases was *lex loci delicti* when the Exchange Act was passed.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 705 (2004).  Thus, in enacting the Exchange Act, Congress would have expected that the statute applied where its own residents were injured by the fraud.

that common law, *see Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350,

376 (1991).  This Court should find that these same principles apply here.

Defendants cite a series of recent cases to argue that Oregon's claims should be

dismissed.  For example, Defendants reference *Cornwell v. Credit Suisse Group*, No. 08 Civ.

3758, 2010 WL 3069597 (S.D.N.Y. July 27, 2010), which dismissed foreign-squared claims

involving U.S. investors who purchased a foreign company's ordinary shares on the Swiss

Exchange.  *See* DB at 15-16, 22.  Defendants also cite *Stackhouse v. Toyota Motor Co.*, 2010

WL 3377409 (S.D. Cal. Jul. 16, 2010), which denied lead plaintiff status to U.S. investors who

purchased shares of Toyota on a foreign exchange, *see* DB at 16, and interpreted *Morrison's* use

of the term "domestic transactions" as meaning "purchases and sales of securities explicitly

solicited by the issuer within the United States rather than transactions in foreign-traded

securities where the ultimate purchaser or seller has physically remained in the United States."

2010 WL 3377409, at *1.  Plaintiffs respectfully disagree with the district courts' holdings in

these cases.  Both the *Cornwell* and *Stackhouse* courts applied an overly broad interpretation of

the Supreme Court's holding in *Morrison*.  For example, in *Cornwell*, the court found that "read

as a whole, the *Morrison* opinions indicate that the Court considered that under its new test

§10(b) would not extend to foreign securities trades executed on foreign exchanges even if

purchased or sold by American investors, and even if some aspects of the transaction occurred in

the United States."  2010 WL 3069597, at *5.  Similarly, in *Stackhouse*, the court stated that

domestic transactions "means purchases and sales of securities explicitly solicited by the issuer

within the United States rather than transactions in foreign-traded securities where the ultimate

purchaser or seller has physically remained in the United States."  2010 WL 3377409, at *1.

However, *Morrison* simply held that "Section 10(b) reaches the use of a manipulative or

deceptive device or contrivance only in connection with the purchase or sale of a security listed

on an American stock exchange, and the purchase or sale of any other security in the United

States." 130 S. Ct. at 2888. Instead of applying that holding, the court in *Cornwell* improperly

blurred the distinction between the Supreme Court's majority opinion in *Morrison* and the

concurrence by Justice Stevens. The *Cornwell* court reasoned that, since the majority in

*Morrison* did not implicitly address Justice Stevens' concurrence — which interpreted the

majority's holding as barring § 10(b) claims of U.S. investors who purchased shares in a

company listed only on a foreign exchange – the majority had considered and implicitly

sanctioned that interpretation of the reach of its opinion. 2010 WL 3069597, at *5. That

reasoning, however, is not only an unwarranted expansion of the holding in *Morrison*,[25] but it

also narrows the geographical reach of the Exchange Act's protections beyond that which would

have otherwise occurred under analogous state and common law choice of law principles. For

example, courts have regularly found that in-state residents may rely on the protection of state

deceptive practice laws even if those laws do not apply "extraterritorially."[26] This narrowing,

---

[25] Prior Supreme Court decisions have rejected the position that silence by the majority implies an adoption of positions espoused in a concurrence. For example, in *Rakas v. Illinois*, 439 U.S. 128 (1978), the Court held that passengers who did not assert a property interest in the automobile searched or the evidence seized, and failed to show that they had any legitimate expectation of privacy, did not have standing to challenge a search and seizure on Fourth Amendment grounds. The Court's majority opinion, however, did not address the broader statement made by Justice Powell in his concurrence, that "passengers in automobiles have no Fourth Amendment right not to be ordered from their vehicle, once a proper stop is made." *Id.* at 155 n.4. Later, in *Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997), a majority of the Court subsequently rejected Justice Powell's interpretation of the majority in *Rakas* as non-binding *dicta*, and decided *de novo* the issue of whether passengers in vehicles are protected by the Fourth Amendment during police searches. Thus, *Rakas* and *Wilson* demonstrate that when a majority opinion of the court does not address an interpretation of the law set forth in a concurring opinion, that silence does not amount to an endorsement of the concurrence's interpretation.

[26] *Stackhouse* did not even address Justice Stevens' concurrence and the decision was only preliminary because it was rendered in connection with a lead plaintiff application. *See* 2010

which the majority in *Morrison* was unwilling to endorse, is wholly at odds with the statement of Congress's purposes in Section 2 of the Act, and with the overwhelming weight of authority interpreting the Act.  As this Court recently held in *Anwar v. Fairfield Greenwich Ltd.*, No. 09-0118 (VM), 2010 WL 3022848 (S.D.N.Y. July 29, 2010), it is a usual canon of statutory construction that statutes are interpreted to be consistent with the common law, particular where, as here, the legislature was acting to protect the public.  *Id.* at *3.

---

WL 3377409, at *1 ("[T]his is not a final determination of the issue and Plaintiffs are not foreclosed from arguing that domestic purchasers of Toyota common stock have claims under § 10(b)….").

   On reply, Defendants may point to Judge Berman's recent decision in *In re Societe Generale Securities Litigation*, No. 08 Civ. 2495, 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010), which dismissed the claims of U.S. purchasers of a French company's securities on a foreign exchange because the court concluded that the plaintiffs there were attempting to improperly resurrect the Second Circuit's conduct test.  *See id.* at *6 ("By asking the court to look to the location of the act of placing a buy order, and to the place of the wrong, Plaintiffs are asking the Court to apply the conduct test specifically rejected in *Morrison*.").  Respectfully, however, Judge Berman misconstrued the conduct test in concluding that the plaintiffs were trying to resurrect it.  By asking the court, in connection with examining the definition of "purchase" under the Exchange Act, to recognize that a U.S. citizen places a buy order within U.S. borders, neither the plaintiffs in *Societe Generale* nor Plaintiffs here are seeking application of the conduct test.  Indeed, the conduct test examined whether the U.S.-based conduct *of defendants* directly caused plaintiffs' losses.  The location of the conduct of the investor-victims of the securities fraud was not relevant to whether the conduct test was satisfied.  Thus, *Societe Generale* was wrongly decided. Similarly, Judge Koeltl's recent decision in *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, No. 08 Civ. 1958, 2010 WL 3860397 (S.D.N.Y. Oct. 4, 2010), which dismissed the claims of U.S. citizens who purchased a Swiss company's stock on the Swiss Stock Exchange, is inapposite because the court there specifically relied on *Societe Generale's* erroneous interpretation that the plaintiffs were attempting to resurrect the conduct test, *id.* at *8. Moreover, in *Swiss Reinsurance*, unlike here, the Swiss company's shares were not dually-listed on a U.S. exchange.  *See id.* at *2 ("[T]he only stock exchange on which Swiss Re common stock was listed [and traded] was the SWX Stock Exchange….)."

## CONCLUSION

Defendants' motion seeking dismissal with prejudice of all claims brought by Foreign

Plaintiffs and named plaintiff Oregon based on their purchases of UBS ordinary shares outside

the United States should be denied.

Dated: October 18, 2010

| BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP | GRANT & EISENHOFER P.A. |
|---|---|

Gregory M. Castaldo
Andrew L. Zivitz
Sharan Nirmul
Naumon A. Amjed
Jennifer L. Joost
Richard A. Russo, Jr.
280 King of Prussia Rd.
Radnor, PA  19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
*Co-Lead Counsel For Lead Plaintiffs*

ROBBINS GELLER RUDMAN & DOWD
LLP

Samuel H. Rudman
Robert M. Rothman
58 South Service Road
Suite 200
Melville, NY  11747
Tel:  (631) 367-7100
Fax:  (631) 367-1173

*Liaison Counsel*

Jay W. Eisenhofer
Geoffrey C. Jarvis
Charles T. Caliendo
Brenda F. Szydlo
Natalia D. Williams
485 Lexington Avenue, 29th Floor
New York, NY  10017
Tel:  (646) 722-8500
Fax:  (646) 722-8501

*Co-Lead Counsel For Lead Plaintiffs*

MOTLEY RICE LLC

Joseph F. Rice
William H. Narwold
Gregg S. Levin
James M. Hughes
Badge Humphries
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Tel:     (843) 216-9000
Fax:    (843) 216-9450

*Co-Lead Counsel For Lead Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned, hereby certifies that on this date, the **LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO UBS DEFENDANTS' MOTION TO DISMISS CLAIMS BASED ON PURCHASES OF UBS SHARES OUTSIDE THE UNITED STATES and the accompanying Declaration of Geoffrey C. Jarvis** were served upon the individuals registered for the Court's CM/ECF system in case No. 07-CV-11225, and was additionally sent via first class mail and email to:

Robert J. Giuffra , Jr.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004


Dated: October 18, 2010

*/s/ Geoffrey C. Jarvis*
Geoffrey C. Jarvis
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel:  (646) 722-8500
Fax:  (646) 722-8501