**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
:
:   MASTER FILE NO. 07 Civ. 11225 (RJS)
IN RE UBS AG SECURITIES LITIGATION          :
:   **ORAL ARGUMENT REQUESTED**
:
-----------------------------------------------------------------x

## THE UNDERWRITER DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

FACTUAL BACKGROUND .................................................................................4

    I.      The Rights Offering..............................................................................5

    II.    The Alleged Misstatements and Omissions in the Registration Statement ............6

    III.   Allegations Against the Underwriter Defendants...................................................9

ARGUMENT .....................................................................................................10

    I.      The Amended Complaint Fails to Allege Any Actionable Misstatements or Omissions Under Section 11 or Section 12(a)(2) .................................................10

           A.      Alaska Laborers Seeks Far More Detail from the Registration Statement and Related Documents than UBS Was Required to Provide....................................................................................................11

                 1.      The Registration Statement and Prospectus Supplement Included All Required Information. ..............................................12

                 2.      Alaska Laborers Had Full Access to the Allegedly Omitted Information Through Publicly Available Sources.........................14

                 3.      UBS Had No Obligation to Detail, Much Less Speculate as to, Allegedly Unlawful Conduct...................................................20

           B.      The Remaining Challenged Statements Are Mere Puffery. .....................22

    II.    The Registration Statement and Documents Included and Incorporated Therein Provided All Disclosures Required by Applicable SEC Rules. ...........................25

           A.      The Adequacy of the Registration Statement and the Related Documents Must Be Assessed as of May 23, 2008—and Not Any Prior Date...................................................................................................25

           B.      Under the Applicable Regulatory Framework, the Registration Statement and the Documents Included and Incorporated Therein Provided All Necessary Disclosures. .........................................................26

    III.   Alaska Laborers Lacks Standing to Bring a Section 12(a)(2) Claim. ..................30

CONCLUSION ..................................................................................................33

# TABLE OF AUTHORITIES

## Cases

*Amidax Trading Group v. S.W.I.F.T. SCRL*, 607 F. Supp. 2d 500
(S.D.N.Y. 2009) .................................................................................................30

*Anegada Master Fund, Ltd. v. PXRE Group Ltd.*, 680 F. Supp. 2d
616 (S.D.N.Y. 2010) ........................................................................................31

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009)..............................10, 31

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir.
2007) ...................................................................................................................5

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ......................................................15

*Bd. of Trustees of Ft. Lauderdale Gen. Employees' Ret. Sys. v.
Mechel OAO*, No. 09 Civ. 3617 (RJS), 2011 WL 3502016
(S.D.N.Y. Aug. 9, 2011) .....................................................................................5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..........................................10, 31

*Bluebird Partners, L.P. v. First Fid. Bank*, 896 F. Supp. 152
(S.D.N.Y. 1995) ................................................................................................30

*Ciresi v. Citicorp*, 782 F. Supp. 819 (S.D.N.Y. 1991) .......................................20

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, No.
09 Civ. 8633 (JGK), 2011 WL 4527328 (S.D.N.Y. Sept. 30,
2011) .................................................................................................................27

*DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ. 318 (RJS), 2009 WL
2242605 (S.D.N.Y. July 27, 2009) ...............................................................23, 24

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP
Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) .............................................24

*Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011) .....................................11

*GAF Corp. v. Heyman*, 724 F.2d 727 (2d Cir. 1983) ..........................................16

*Garber v. Legg Mason, Inc.*, 347 Fed. App'x 665 (2d Cir. 2009)......................15

*Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292 (VM), 2001 WL
740764 (S.D.N.Y. June 29, 2001)......................................................30, 31, 32

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ...................................................31

*Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479 (2d Cir. 2011) ..................5

*In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520 (S.D.N.Y. 2009) ..............11

*In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171
(S.D.N.Y. 2003) ................................................................................................11

*In re Axis Capital Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576
(S.D.N.Y. 2006) ................................................................................................20

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ........................................................................................2, 20

*In re Deutsche Bank AG Sec. Litig.*, No. 09 Civ. 1714 (DAB), 2011 WL 3664407 (S.D.N.Y. Aug. 19, 2011) ...................................31

*In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008) .........................20, 21

*In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419 (S.D.N.Y. 2009) ...........................31

*In re IAC/Interactivecorp Sec. Litig.*, 695 F. Supp. 2d 109 (S.D.N.Y. 2010) ..................................................................................15

*In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006).................................16

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ....................................................................................................24

*In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485 (S.D.N.Y. 2010) ..................................................................................15

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003)..............................................30, 32

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010) ....................................................................................................11

*In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366 (S.D.N.Y. 2009) ..................................................................................21

*In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204 (S.D.N.Y. 2000) ...........................12

*In re Orion Sec. Litig.*, No. 08 Civ. 1328 (RJS), 2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009) .........................................................30

*In re Pfizer Inc. Shareholder Deriv. Litig.*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010) ..................................................................................21

*In re Salomon Inc. Sec. Litig.*, No. 91 Civ. 5442 (RPP), 1994 WL 265917 (S.D.N.Y. June 16, 1994)........................................21

*In re Sterling Foster & Co. Sec. Litig.*, 222 F. Supp. 2d 216 (E.D.N.Y. 2002) ..................................................................................32

*In re Time Warner, Inc., Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) .................................12

*In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011) ..............................................................................11, 24

*In re Yukos Oil Co. Sec. Litig.*, No. 05 Civ. 5243 (WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ........................................16

*Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996)................................11

*Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011) .................................15

*Menkes v. Stolt-Nielsen S.A.*, No. 03 Civ. 409 (DJS), 2005 WL 3050970 (D. Conn. Nov. 10, 2005) ...........................................21

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*,
No. 08 CV 8781 (HB), 2010 WL 1257528 (S.D.N.Y. Mar. 31,
2010) .................................................................................................................16

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ...............................................................32

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)....................................................22

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d
100 (2d Cir. 2008)..............................................................................................32

*Welch v. TD Ameritrade Holding Corp.*, No. 07 Civ 6904 (RJS),
2009 WL 2356131 (S.D.N.Y. July 27, 2009) ...................................................23

*White v. H.R. Block, Inc.*, No. 02 Civ. 8965 (MBM), 2004 WL
1698628 (S.D.N.Y. July 28, 2004) ....................................................................16

*Wyatt v. Inner City Broadcasting Corp.*, No. 11 Civ. 4954 (PKC),
2011 WL 4484071 (S.D.N.Y. Sept. 28, 2011)..................................................30

*Yung v. Lee*, 432 F.3d 142 (2d Cir. 2005) .............................................................31

## Statutes

15 U.S.C. § 77k (2011)........................................................................................5, 11

15 U.S.C. § 77*l* (2011)...................................................................................5, 11, 31

17 C.F.R. § 229.503 (2011) ....................................................................................27

17 C.F.R. § 230.159 (2011) ....................................................................................26

17 C.F.R. § 230.430B (2011) ..................................................................................25

17 C.F.R. § 239.33 (2011) ................................................................................26, 27

17 C.F.R. § 249.220f (2011) ...................................................................................27

## Other Authorities

*Business in Brief*, Boston Globe, May 14, 2008.......................................................19

Carrick Mollenkamp *et al.*, *Two Charged in Tax Case Tied to UBS,
Billionaire*, Wall St. J., May 14, 2008 ...............................................................18

*Daily Briefing*, Atl. J-Const., May 8, 2008 ............................................................19

Glenn R. Simpson *et al.*, *International Finance*: *Probe May Lay
Open UBS—U.S. Is Investigating if Private Bank Had Ties to
Tax Scheme*, Wall St. J., May 8, 2008 ...............................................................18

Glenn R. Simpson *et al.*, *U.S. to Seek Client Names from UBS in
Tax Case*, Wall St. J., May 15, 2008...................................................................18

Haig Simonian, *UBS Tells Unit Staff to Avoid US Visits*, Fin.
Times, May 27, 2008, *available at* www.ft.com (last visited Dec.
15, 2011) .............................................................................................................17

Jeffrey Cane, *UBS' Other Problem*, Portfolio.com, May 7, 2008,
   *available at* http://www.portfolio.com (last visited Dec. 15,
   2011) ..................................................................................................................17

Julia Werdigier, *UBS to Lay Off 5,500 in U.S. and Britain*, N.Y.
   Times, May 7, 2008 ..........................................................................................19

Lynnley Browning, *Ex-Banker from UBS' Is Indicted in Tax Case*,
   N.Y. Times, May 14, 2008 ..............................................................................17

Lynnley Browning, *Federal Prosecutors Declare European
   Banker a Fugitive*, N.Y. Times, May 23, 2008 ..............................................19

Lynnley Browning, *U.S. Detains Executive, Deepening UBS
   Inquiry*, N.Y. Times, May 8, 2008 ..................................................................19

Mark DeCambre, *UBS Under Investigation by SEC and DOJ*, N.Y.
   Post, May 8, 2008 ............................................................................................19

Otis Bilodeau, *UBS Faces Tax Evasion Probe; Employee
   Detained*, Bloomberg News, May 7, 2008 ......................................................17

*Red Ink at UBS*, Bus. Week, May 19, 2008 ......................................................19

Stephen Castle, *Tax Havens Face Pressure from Europe*, N.Y.
   Times, May 15, 2008 ........................................................................................19

Defendants J.P. Morgan Securities Ltd., Morgan Stanley & Co. International plc., BNP Paribas, Goldman Sachs International, Credit Suisse, and Deutsche Bank AG, London Branch (improperly named in the Amended Consolidated Securities Class Action Complaint (the "Amended Complaint") as Deutsche Bank AG) (collectively, the "Underwriter Defendants")[1] submit this memorandum in support of their motion, pursuant to Rules 8, 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Counts III and IV of the Amended Complaint, which allege claims pursuant to Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), as against them.

## PRELIMINARY STATEMENT

Despite its length, the Amended Complaint's allegations under the Securities Act are limited.  Alaska Laborers-Employers Retirement Fund ("Alaska Laborers"), the sole named plaintiff for the Securities Act claims, alleges violations of Sections 11 and 12(a)(2) centering on a collection of purported misstatements and omissions in the registration statement (the "Registration Statement") and prospectus supplement (the "Prospectus Supplement") for UBS AG's ("UBS") 2008 rights offering.[2]  Through this offering, existing UBS shareholders and those who otherwise acquired certain rights were entitled to exercise those rights to purchase new ordinary shares of UBS.  As a matter of law, the claims against the Underwriter Defendants must be dismissed.

---

[1]     The term "Underwriter Defendants" as used in this motion does not encompass UBS Investment Bank or any other UBS entity.

[2]     Alaska Laborers is the only named plaintiff to assert any claims pursuant to the Securities Act and does so on behalf of the so-called "'33 Act Plaintiffs," a putative "Class of investors . . . [who] purchased UBS ordinary shares pursuant to and traceable to the Registration Statement and Prospectus Supplement issued in connection with the Company's 2008 Rights Offering."  Amended Complaint ¶ 1406.  Not only do the '33 Act Plaintiffs not include the Lead Plaintiff in this action, but none of the other members of this putative class is identified in the Amended Complaint.  Accordingly, this motion to dismiss addresses only the insufficiency of Alaska Laborers' allegations.

First and foremost, the substantive allegations of the Amended Complaint are insufficient as a matter of law to support a Section 11 or Section 12(a)(2) claim. Each of the purported misstatements and omissions alleged against the Underwriter Defendants rests on a single, supposed shortcoming: UBS's failure to disclose the alleged activity of its U.S. cross-border wealth management business in aiding certain U.S. clients to avoid certain U.S. taxes. Yet Alaska Laborers studiously ignores that the Registration Statement and Prospectus Supplement (and the documents incorporated therein by reference) provided by UBS to the Securities and Exchange Commission ("SEC") expressly disclosed both the fact and the nature of investigations by the Department of Justice ("DOJ") and the SEC into UBS's alleged misconduct. Moreover, for nearly a month before the rights offering at issue commenced, the national media, including the *Wall Street Journal* and *The New York Times*, published numerous stories about those investigations that detail the nature of UBS's purported involvement in its clients' efforts to evade U.S. tax liability. These media reports revealed the U.S. government's "aggressive" detention of UBS employee and Swiss national Martin Liechti, detailed the indictment of former UBS employee Bradley Birkenfeld by federal prosecutors in Florida and his alleged facilitation of an American client's evasion of U.S. taxes, and repeatedly commented on the legal threat and reputational "black eye" facing UBS as a result of these developments.

When all is said and done, Alaska Laborers claims that UBS should have provided more detailed disclosure about its U.S. cross-border business and the risks of the then-unresolved governmental investigations. Notwithstanding the fact that UBS provided ample disclosures about that business and the attendant risks associated with the investigations, "the federal securities laws do not require a company to accuse itself of wrongdoing." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004). Indeed, under settled law,

an issuer such as UBS has no duty to speculate as to the effect of pending investigations, absent a demonstration that the pendency of the investigations would have a non-speculative impact on an issuer's business.  Alaska Laborers has not alleged that UBS was in a position to disclose any non-speculative impact on its business due to the pendency of then-unresolved investigations.

In any event, UBS's generalized warnings about risk and its asserted compliance with rules and regulations, which Alaska Laborers challenges, cannot form the basis of a Section 11 or 12(a)(2) claim.  The statements in the Registration Statement referring to UBS's business practices and organization, its risk management processes, and its adherence to ethical, regulatory, and legal standards are generalized pronouncements about UBS's business or expressions of its aspirations for itself and therefore constitute non-actionable puffery.  They are not factual representations about any material matter underlying an investment decision and are not actionable as a matter of law.

Moreover, as of May 23, 2008—the effective date of the Registration Statement—the Registration Statement and the Prospectus Supplement, including the documents incorporated by reference therein, provided all of the disclosures required by applicable SEC rules regarding the risks facing UBS, its legal proceedings, and all other material changes to its business.  Alaska Laborers ignores that UBS expressly incorporated by reference in the Prospectus Supplement its May 23, 2008 6-K, which contained detailed disclosures about the government investigations into its small, Swiss-based U.S. cross-border wealth management services business.  Alaska Laborers also misreads Item 503 of Regulation S-K, which governs the "Risk Factors" section of registration statements, and impermissibly tries to broaden the scope of the required disclosures under other, unspecified SEC rules.

Finally, Alaska Laborers lacks standing to pursue a Section 12(a)(2) claim against the Underwriter Defendants.  To state a Section 12(a)(2) claim, a plaintiff must specify the person or entity responsible for selling it those securities and/or successfully soliciting its purchases.  The Amended Complaint's skeletal Section 12(a)(2) pleadings—which merely allege that all of the defendants named in the Section 12(a)(2) claim were "sellers, offerors and/or solicitors of purchasers of the UBS shares offered pursuant to the 2008 Rights Offering"— simply parrot the statutory language and do not specifically identify Alaska Laborers' seller, as is necessary to establish a plausible claim and to survive a motion to dismiss under Section 12(a)(2).  The Section 12(a)(2) claim must therefore be dismissed for lack of standing.

For all of the reasons detailed above, the claims against the Underwriter Defendants should be dismissed.

## FACTUAL BACKGROUND

In seeking to assert claims against the Underwriter Defendants, Alaska Laborers alleges a collection of misstatements in and omissions from the Registration Statement and Prospectus Supplement issued by UBS in connection with its 2008 rights offering.  Amended Complaint ¶ 1400.[3]  By Alaska Laborers' own express designation, the claims against the Underwriter Defendants neither incorporate by reference, nor otherwise rely upon, the "fraud-based allegations pled in support of [Plaintiffs'] Exchange Act claims."  *Id.*; *see also id.* ¶¶ 1452, 1463.  Instead, Alaska Laborers alleges only that the Underwriter Defendants, along with UBS

---

[3]      To the extent that the putative class Alaska Laborers purports to represent includes plaintiffs who purchased ordinary shares of UBS outside the United States, such claims must be dismissed for the reasons already articulated by this Court in its September 13, 2011 Memorandum and Order.  *See* Dkt. No. 164 at 5.  Indeed, under this Court's holding, any Section 11 or 12(a)(2) claims "asserted by U.S. investors who purchased stock on a foreign exchange" also must fail.  *Id.* at 8-9.  Moreover, the cover pages to the Prospectus Supplement issued in connection with the 2008 rights offering expressly stated that "[t]he rights and ordinary shares [were] not being registered for the purpose of sales outside the United States."  Declaration of Robert J. Giuffra, Jr. ("Giuffra Decl."), Ex. 65 (Prospectus Supplement).

and multiple current and former members of UBS's Board of Directors, "negligently issued false and material statements in and omissions from" certain offering materials issued in connection with the Rights Offering, as defined below, in violation of Sections 11 and 12(a)(2) of the Securities Act.[4]  15 U.S.C. § 77k, 15 U.S.C. § 77*l* (2011).  Accordingly, the factual allegations discussed herein are limited to those alleged against the Underwriter Defendants.[5]

## I.     The Rights Offering

Alaska Laborers' claims against the Underwriter Defendants are based on a single offering of securities:  UBS's offer, as reflected in its April 8, 2008 Form F-3 Registration Statement and its May 23, 2008 Prospectus Supplement, to "sell ordinary shares, tradable entitlements to receive ordinary shares, and tradable rights to purchase ordinary shares" (the "Rights Offering").  Amended Complaint ¶ 1401.  Pursuant to the Rights Offering, *holders* of UBS ordinary shares as of the close of business on May 26, 2008 were allotted tradable rights to acquire seven new ordinary shares of UBS (at the subscription price of CHF 21.00 per ordinary share) for every 20 rights then held.  Giuffra Decl., Ex. 65 (Prospectus Supplement) at S-11.  The rights exercise period began on May 27, 2008 and extended to June 5, June 10, or June 12, depending on the manner in which the existing ordinary shares and/or rights were held and by whom.  *Id.*  As Alaska Laborers notes, UBS announced on June 13, 2008 that it had completed

---

[4]     To the extent that Alaska Laborers contends that the Underwriter Defendants themselves issued false and material misstatements in and omissions from the relevant offering materials, the Underwriter Defendants did not "issue" any statements in connection with underwriting the 2008 rights offering and reserve their right to challenge this argument at an appropriate stage of this proceeding.  In any event, liability under Sections 11 and 12 of the Securities Act does not hinge on a determination that an underwriter "issued" a statement.

[5]     This Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 481 (2d Cir. 2011) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)); *Bd. of Trustees of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, No. 09 Civ. 3617 (RJS), 2011 WL 3502016, at *1, n. 1 (S.D.N.Y. Aug. 9, 2011).  Such documents therefore are referenced in and properly considered in connection with this motion.

the Rights Offering, through which rights holders subscribed to receive more than 755 million new ordinary shares and more than CHF 15.6 billion in proceeds were generated.  Amended Complaint ¶ 1451.

## II.     The Alleged Misstatements and Omissions in the Registration Statement

Count III of the Amended Complaint alleges violations of Section 11 of the Securities Act.  Alaska Laborers alleges that it purchased UBS ordinary shares "pursuant to and traceable to" the Registration Statement and Prospectus Supplement issued in connection with the Rights Offering, *id.* ¶ 1406, and that because the Registration Statement was "inaccurate and misleading, contained and incorporated by reference untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and negligently concealed and failed adequately to disclose material facts," the value of the shares Alaska Laborers purchased in the Rights Offering "declined substantially," causing it damages.  *Id.* ¶¶ 1453, 1459.  Alaska Laborers also alleges, for purposes of its Section 12(a)(2) claim in Count IV, that the Prospectus Supplement "contained untrue statements of material facts, omitted to state other facts necessary to make the statements therein not misleading, and omitted material facts required to be stated therein."  *Id.* ¶ 1466.

As Alaska Laborers acknowledges, the Registration Statement not only included the Prospectus Supplement, but it also incorporated by reference UBS's 2007 Annual Report, which was filed with the SEC on March 18, 2008 ("2007 Annual Report"); an April 1, 2008 press release issued by UBS on Form 6-K; and UBS's quarterly report for the first quarter of 2008, which was furnished on Form 6-K to the SEC on May 6, 2008 (the "1Q 2008 Report").  *Id.* ¶ 1402.  In addition, the Registration Statement incorporated by reference multiple other Form 6-Ks that were furnished to the SEC by UBS, including a May 23, 2008 supplement to the 1Q 2008 Report.  Declaration of Jonathan K. Youngwood in Support of the Underwriter Defendants'

Motion to Dismiss ("Youngwood Decl."), Ex. A (UBS AG, Report of Foreign Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Act of 1934 (Form 6-K) (May 23, 2008) (the "May 23 6-K")); *see also id.* at 28 (incorporating May 23 6-K into the Registration Statement).  Based on SEC rules, these documents all constituted part of the Registration Statement as of the effective date of May 23, 2008 for purposes of the Rights Offering.  *See infra* at Subsection II.A.

   Taken together, these documents also provided all materially relevant facts regarding UBS's alleged unlawful conduct, the investigations thereof, and the related risks to UBS.  In particular, among other disclosures, the 1Q 2008 Report and the May 23 6-K extensively discussed material legal proceedings in which UBS had been involved in the prior twelve months—including the very matters underlying Alaska Laborers' claims here.  The 1Q 2008 Report, for example, specifically disclosed that the DOJ and SEC were "examining UBS's conduct in relation to cross-border services provided by Swiss-based UBS client advisors to US clients during the years 2000-2007."  Giuffra Decl., Ex. 63 (1Q 2008 Report) at 39.  UBS further specified in that document that the DOJ was investigating "whether certain US clients sought, with the assistance of UBS client advisors, to evade their US tax obligations by avoiding restrictions on their securities investments imposed by the Qualified Intermediary agreement UBS entered into with the US Internal Revenue Service in 2001," and that the SEC was investigating "whether Swiss-based UBS client advisors engaged in activities in relation to their US-domiciled clients that triggered an obligation for UBS Switzerland to register with the SEC as a broker-dealer and/or investment advisor."  *Id.*

   Just over two weeks later, through the May 23 6-K, UBS reiterated the above-quoted disclosures, and further elaborated that in connection with the DOJ's investigation, "a senior UBS employee was detained by U.S. authorities as a 'material witness'" and that "a

former UBS AG client advisor was charged in an indictment unsealed on May 13, 2008 in the

Southern District of Florida with conspiring to defraud the United States and the Internal

Revenue Service in connection with providing investment and other services to a U.S. person

who is alleged to have evaded U.S. income taxes on income earned on assets maintained in,

among other places, a former UBS AG account in Switzerland."  Youngwood Decl., Ex. A (May

23 6-K) at 11.

    Ignoring these disclosures, as well as related information in the public domain,

including multiple press reports discussing the DOJ and SEC investigations of UBS's U.S. cross-

border business and the detention and indictment of current and former UBS employees, as

detailed *infra*, Alaska Laborers alleges that the Registration Statement negligently failed to

disclose two categories of material risks to UBS.  First, it alleges that the Registration Statement

failed to disclose "the significant operational and regulatory risks faced by [UBS's] cross-border

wealth management services, including exposure to substantial civil and criminal penalties in the

United States."  Amended Complaint ¶ 1436.  Second, it alleges that the Registration Statement

failed to adequately inform investors of the risk of "significant harm to [UBS's] reputation" due

to its "assisting its U.S. clients in evading tax obligations."  *Id.*  Specifically, the Amended

Complaint lists four purportedly misleading excerpts of the Registration Statement, three of

which appear in the "Risk Factors" section; several excerpts from the 2007 Annual Report

concerning UBS's fidelity to its ethical guidelines, regulatory standards, and risk management

processes; and a paragraph from UBS's quarterly report for the first quarter of 2008 that

addresses the SEC and DOJ investigations into UBS's small, Swiss-based U.S. cross-border

wealth management services business.  *Id.* ¶¶ 1437, 1439-41, 1444-45, 1447, 1449.

Alaska Laborers also alleges, on behalf of the so-called '33 Act Plaintiffs, that at the time of their purchases of UBS shares "pursuant and/or traceable to" the Registration Statement, they were "without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts," *id.* ¶ 1460, and did not know or could not have known "of the untruths and omissions contained" in the Prospectus Supplement. *Id.* ¶ 1470.

### III.   Allegations Against the Underwriter Defendants

Alaska Laborers' allegations specific to the Underwriter Defendants' conduct are minimal.  Indeed, beyond perfunctorily describing the Underwriter Defendants' roles in the Rights Offering, *id.* ¶¶ 1423-28, Alaska Laborers asserts, in a conclusory fashion, that the Underwriter Defendants: 1) "negligently failed to perform adequate due diligence in connection with their role as underwriters for the 2008 Rights Offering and were negligent in failing to ensure that the Registration Statement and Prospectus were prepared properly and accurately," *id.* ¶ 1429; and 2) that they, along with UBS, "acting through their employees, agents, and others, solicited such purchases for their personal financial gain through, *inter alia*, the preparation and dissemination of the Prospectus Supplement." *Id.* ¶ 1468.  The Amended Complaint contains no other allegations unique to the Underwriter Defendants, such as a claim that any of the Underwriter Defendants was in privity with (*i.e.*, directly sold to) or solicited Alaska Laborers in relation to the UBS shares issued in the Rights Offering.  Rather, Alaska Laborers alleges that collectively, the '33 Act Defendants—who include the Underwriter Defendants, UBS, and various current and former UBS directors and officers—were "sellers, offerors and/or solicitors of purchasers of the UBS shares offered pursuant to the 2008 Rights

Offering" that "issued, caused to be issued, and/or signed the Registration Statement." *Id.* ¶ 1464.[6]

## **ARGUMENT**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Accordingly, even assuming that all allegations in the Amended Complaint are true, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted).  While "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 129 S. Ct. at 1949, "[d]etermining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires [a court] to draw on its judicial experience and common sense." *Id.* at 1950.

## I.     The Amended Complaint Fails to Allege Any Actionable Misstatements or Omissions Under Section 11 or Section 12(a)(2).

As a matter of law, the statements made in the Registration Statement and the documents included and incorporated therein are not remotely actionable under Sections 11 and 12(a)(2) of the Securities Act.  Under Section 11, an underwriter may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make

---

[6]     The Amended Complaint also alleges that UBS and certain former officers and executives of UBS violated Section 10(b) of the Exchange Act and Rule 10b-5 (Count I), *id.* ¶¶ 1385-94, that certain current and former officers and executives of UBS violated Section 20(a) of the Exchange Act (Count II), *id.* ¶¶ 1395-99, and that certain current and former UBS directors and officers violated Section 15 of the Securities Act (Count V). *Id.* ¶¶ 1452-61.  Counts I, II, and V are not brought against the Underwriter Defendants. *See id.* ¶¶ 6 (defining "Defendants," against whom Counts I and II are alleged, as the Individual Defendants, as that term is defined in the Amended Complaint, and UBS), 1452.  Accordingly, the allegations relating to those counts are not addressed by this memorandum.

the statements therein not misleading."  15 U.S.C. § 77k(a) (2011).  Likewise, under Section

12(a)(2), a seller that "offers or sells a security . . . by means of a prospectus or oral

communication, which includes an untrue statement of a material fact or omits to state a material

fact necessary in order to make the statements . . . not misleading" may be liable to a purchaser

of such security.  15 U.S.C. § 77*l*(a)(2) (2011).  "Claims under sections 11 and 12(a)(2) are []

Securities Act siblings with roughly parallel elements."  *In re Morgan Stanley Info. Fund Sec.*

*Litig.*, 592 F.3d 347, 359 (2d Cir. 2010); *see also Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109

(2d Cir. 2011).  "A plaintiff who fails to plead a § 11 claim necessarily fails to plead a § 12(a)(2)

claim as well."  *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 525 (S.D.N.Y. 2009) (citation

and quotation omitted).

      A.    *Alaska Laborers Seeks Far More Detail from the Registration Statement and*
*Related Documents than UBS Was Required to Provide.*

      Among the fundamental tenets of Sections 11 and 12(a)(2), two are of particular

significance to the instant motion.  First, Sections 11 and 12(a)(2) both require a plaintiff to

"identify a materially misleading statement made by the defendants."  *Lasker v. N.Y. State Elec.*

*& Gas Corp.*, 85 F.3d 55, 57-58 (2d Cir. 1996); *see also In re Wachovia Equity Sec. Litig.*, 753

F. Supp. 2d 326, 367 (S.D.N.Y. 2011) ("[C]laims under Sections 11 and 12(a)(2) must plead the

materiality of the alleged misstatement or omission.").  In determining whether a registration

statement, or prospectus supplement, is materially misleading, courts within this Circuit focus on

"whether the defendants' representations, taken together and in context, would have misled a

reasonable investor."  *In re Morgan Stanley,* 592 F.3d at 360 (citations and quotations omitted).

Second, and more fundamentally, "[t]he securities laws do not require a corporation 'to disclose

a fact merely because a reasonable investor would like very much to know that fact.'"  *In re*

*Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003) (quoting *In re Time*

*Warner, Inc., Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).  An issuer need not disclose particular

facts or pieces of information unless and until they are "required by SEC regulations to be stated

therein," or are "necessary to make the disclosures in the registration statement not misleading."

*In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 2000).

   Here, the Amended Complaint ignores the fact that, as of the time of the Rights

Offering, the purported omissions regarding the condition and operation of UBS's U.S. cross-

border business and the risks posed by the governmental investigations were indisputably

available in UBS's public disclosures or through news reports in the public domain.  The

Amended Complaint also exaggerates UBS's duty to disclose the alleged omissions.  Because a

company has no obligation to disclose allegedly unlawful conduct that has not given rise to any

prosecutorial or regulatory action, much less to speculate as to the potential impact thereof, the

Registration Statement, including the Prospectus Supplement, and all of the documents

incorporated by reference therein contained the necessary and required disclosures.

Accordingly, both the Section 11 and 12(a)(2) claims against the Underwriter Defendants must

be dismissed.

    1.  The Registration Statement and Prospectus Supplement Included All
       Required Information.

   At all relevant times, investors were apprised of the alleged activity of UBS's

small, Swiss-based U.S. cross-border wealth management business in aiding certain U.S. clients

to avoid certain U.S. taxes—and the associated risks to UBS as a consequence thereof—through

UBS's own disclosures.  As a result, the information supposedly omitted from the Registration

Statement and the documents included and incorporated therein cannot support either a Section

11 or 12(a)(2) claim.

The documents filed with and furnished to the SEC by UBS prior to the Rights

Offering—including UBS's May 6, 2008 quarterly report for the first quarter of 2008, which was

furnished to the SEC on Form 6-K, and UBS's May 23, 2008 Form 6-K, which supplemented

that report—disclosed significant information about the federal government's investigations of

UBS's U.S. cross-border business and its prosecution of certain current and former UBS

employees in connection therewith.  In pertinent part, the May 23 6-K, which was incorporated

by reference into the Prospectus Supplement and which repeated and expanded the May 6

disclosure, reads:

> The DOJ and the SEC are examining UBS's conduct in relation to
> cross-border services provided by Swiss-based UBS client advisors
> to U.S. clients during the years 2000-2007.  In particular, DOJ is
> examining whether certain U.S. clients sought, with the assistance
> of UBS client advisors, to evade their U.S. tax obligations by
> avoiding restrictions on their securities investments imposed by the
> Qualified Intermediary agreement UBS entered into with the U.S.
> Internal Revenue Service in 2001.  As has been reported, in
> connection with this investigation, a senior UBS employee was
> detained by U.S. authorities as a "material witness," and remains in
> the U.S. until his status as a witness is resolved.  As has also been
> previously reported, a former UBS AG client advisor was charged
> in an indictment unsealed on May 13, 2008 in the Southern District
> of Florida with conspiring to defraud the United States and the
> Internal Revenue Service in connection with providing investment
> and other services to a U.S. person who is alleged to have evaded
> U.S. income taxes on income earned on assets maintained in,
> among other places, a former UBS AG account in Switzerland.
> The SEC is examining whether Swiss-based UBS client advisors
> engaged in activities in relation to their U.S.-domiciled clients that
> triggered an obligation for UBS Switzerland to register with the
> SEC as a broker-dealer and/or investment adviser.  UBS has been
> cooperating with these investigations.

Youngwood Decl., Ex. A (May 23 6-K) at 11; *see also* Giuffra Decl., Ex. 63 (1Q 2008 Report) at

39 (disclosing that the "DOJ is examining whether certain US clients sought, with the assistance

of UBS client advisors, to evade their US tax obligations by avoiding restrictions on their

securities investments imposed by the Qualified Intermediary agreement UBS entered into with

13

the US Internal Revenue Service" and that "[t]he SEC is examining whether Swiss-based UBS

client advisors engaged in activities in relation to their US-domiciled clients that triggered an

obligation for UBS Switzerland to register with the SEC as a broker-dealer and/or investment

advisor").  As a result, UBS's alleged omission of this information from the Registration

Statement and documents included and incorporated therein cannot support either a Section 11 or

Section 12(a)(2) claim.

> 2.    Alaska Laborers Had Full Access to the Allegedly Omitted Information
>        Through Publicly Available Sources.

The disclosure inaccuracies featured in the lengthy and unfocused Amended

Complaint can be reduced to the following allegations: that "at the time of the 2008 Rights

Offering, UBS had been, and was then currently, engaged in helping customers violate U.S. tax

laws and was thereby violating the federal securities laws and SEC regulations," *e.g.*, Amended

Complaint ¶ 1438,[7] and that it failed to disclose to investors 1) "the significant operational and

regulatory risks faced by the Company's cross-border wealth management services, including

exposure to substantial civil and criminal penalties in the United States," and 2) the risk of

"significant harm to [UBS's] reputation."  *Id.* ¶ 1436.

In order to qualify as a material misstatement or omission, there must be a

"substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made

---

[7]    *See also id.* ¶¶ 1442 (alleging inaccuracies in the Registration Statement stemming from UBS's failure to disclose that "at the time of the 2008 Rights Offering, UBS had been, and continued to be assisting its customers in violating U.S. laws and regulations"); 1446 (alleging inaccurate statements of material fact in the 2007 Annual Report due to the failure to disclose that "in violation of U.S. tax laws and SEC regulations, UBS engaged in assisting its U.S.-based clients in tax evasion"); 1448 (alleging inaccurate statements of material fact in the 2007 Annual Report due to the failure to disclose that "UBS faced substantial operational and regulatory risks related to its activities in assisting U.S. customers evade tax obligations"); 1450 (alleging inaccurate statements of material fact in the 1Q 2008 Report due to the failure to disclose that "UBS itself faced substantial criminal fines and penalties as a result of its violations of U.S. tax law and SEC regulations").

available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation and quotation omitted). Because the "total mix" of information includes "information already in the public domain and facts known or reasonably available to shareholders," courts routinely dismiss Section 11 and 12(a)(2) claims on the pleadings for lack of materiality where the allegedly omitted information was already available to the public. *Garber v. Legg Mason, Inc.*, 347 Fed. App'x 665, 668 (2d Cir. 2009) (citation omitted); *see also In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 492 (S.D.N.Y. 2010) ("The Securities Act does not require disclosure of that which is publicly known."); *In re IAC/Interactivecorp Sec. Litig.*, 695 F. Supp. 2d 109, 118 (S.D.N.Y. 2010) ("The omission of publicly available information . . . is not material because it is already part of the total mix of information.").[8]

In addition to considering documents filed with or furnished to the SEC to be publicly available information, courts in this Circuit have considered information published in media accounts, as well as publicly filed legal proceedings, to be available to the investing public. *See, e.g., Garber*, 347 Fed. App'x at 668 (holding that information expressed in three newspaper articles and SEC reports was sufficiently "in the public domain" to be immaterial);

---

[8]    The Second Circuit's recent decision in *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011) is wholly distinguishable from these cases.  In *Litwin*, the Second Circuit held that Blackstone was obligated, in keeping with the requirements of Item 303 of Regulation S-K, to disclose in its IPO materials how Blackstone's investment in a financial guaranty insurer "exposed to billions of dollars in non-prime mortgages," the downward trend in the real estate market, and a Blackstone portfolio company's loss of an exclusive contract "would materially affect [Blackstone's] investments and revenues." *Id.* at 710, 721.  In so holding, the court expressly noted that while the plaintiffs adequately pled "that Item 303 of Regulation S-K requires Blackstone to disclose the omitted information," "without that regulatory requirement Blackstone would be under no obligation to disclose even material information." *Id.* at 722-23.  In the instant case, Alaska Laborers' claims have nothing to do with Item 303, nor has Alaska Laborers sufficiently pled that the allegedly omitted information was required to be disclosed pursuant to any other regulatory provision.  *See infra*, Subsection II.B.  Rather, Alaska Laborers asserts that UBS and the Underwriter Defendants should have predicted the financial impact of as-yet unresolved governmental investigations, and/or should have accused UBS of wrongdoing before the  DOJ and SEC concluded those investigations.  *See* Amended Complaint ¶¶ 1435-1451.  As detailed herein, settled law establishes that an issuer need not accuse itself of unlawful conduct or speculate as to the impact of such conduct on its finances.  *See infra*, Subsection I.A.3.

*GAF Corp. v. Heyman*, 724 F.2d 727, 729 (2d Cir. 1983) (holding that the "total mix" of information available "included the many news stories that the [proxy contest at issue] had generated"); *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2010 WL 1257528, at *7 (S.D.N.Y. Mar. 31, 2010) (holding that "a reasonable investor would be expected to know," *inter alia*, information disclosed in "a number of trade journal[s] and other press articles"); *In re Yukos Oil Co. Sec. Litig.*, No. 05 Civ. 5243 (WHP), 2006 WL 3026024, at *21 (S.D.N.Y. Oct. 25, 2006) (holding that purported non-disclosure was immaterial in light of newspapers having been "saturated" with the allegedly omitted information); *White v. H.R. Block, Inc.*, No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *11-12 (S.D.N.Y. July 28, 2004) (holding that purported non-disclosure was "immaterial" given "public filings in public courts" and "extensive press coverage" thereof in "such nationally-recognized publications as *The New York Times*").  Moreover, if a plaintiff knows of the alleged misconduct prior to trading the relevant securities, it cannot recover under the Securities Act.  *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006).

The material misstatements and omissions alleged by Alaska Laborers were unquestionably part of the "total mix" of information available to it and investors at large.  Both through news reports and the unsealing of the indictment against UBS employee Bradley Birkenfeld ("Birkenfeld"), significant additional information about the federal investigations into UBS's U.S. cross-border business and the alleged related misconduct by UBS employees was made publicly available.  Indeed, the following four pre-Rights Offering reports were included in the Amended Complaint.  *See* Amended Complaint ¶¶ 1323, 1326, 1332.

- On May 7, 2008, Portfolio.com, the Internet site for CondeNast's business news magazine, reported that "U.S. prosecutors and regulators are investigating whether UBS advisers helped American clients evade U.S. taxes from 2000 to 2007."  Youngwood Decl., Ex. B (Jeffrey Cane, *UBS' Other Problem*,

Portfolio.com, May 7, 2008, *available at* http://www.portfolio.com (last visited Dec. 15, 2011)).  Not only did the story include a statement from UBS expressing its understanding that the individual employee detained by the federal government upon entering the country would "remain in the United States pending discussions with U.S. authorities regarding resolution of his status as a witness," but it also repeated the *Financial Times'* identification of that employee as Martin Liechti ("Liechti") and the *FT's* characterization of the detention as "'an aggressive tactic' designed to 'put pressure on UBS and its employees to reveal its business practices.'"  *Id.*

• That same day, Bloomberg News also reported that the DOJ and SEC were investigating whether UBS "helped clients evade American taxes" and "whether UBS employees in Switzerland who advised U.S. clients failed to register with the agency as required."  Youngwood Decl., Ex. C (Otis Bilodeau, *UBS Faces Tax Evasion Probe; Employee Detained*, Bloomberg News, May 7, 2008).  The article noted, citing a statement from UBS, that a "senior bank employee" was "briefly detained" as a "material witness," and like Portfolio.com, repeated the *Financial Times'* report identifying that employee as Liechti. *Id.*

• One week later, on May 14, 2008, *The New York Times* disclosed many of the details of the unsealed indictment against Birkenfeld, revealing, for example, that according to the indictment, Birkenfeld and Mario Staggl ("Staggl"), a Liechtenstein-based trust company executive, not only helped an American real estate developer evade taxes on $200 million held in bank accounts in Switzerland and Liechtenstein, but also "created fictitious trusts and bogus corporations to conceal the ownership and control of offshore assets," "advised clients to destroy bank records and helped them file false tax returns," and "made several trips to the United States to pitch tax plans that were intended to conceal American bank clients' ownership of accounts in a Swiss bank."  Youngwood Decl., Ex. D (Lynnley Browning, *Ex-Banker from UBS' Is Indicted in Tax Case*, N.Y. Times, May 14, 2008, at C3).  The *Times* report further stated that the indictment credited those plans with enabling UBS to "avoid its obligations to disclose certain income information to the I.R.S. while also evading certain American tax requirements." *Id.*

• On May 27, 2008—the day that the exercise and trading of rights pursuant to the Rights Offering commenced—the *Financial Times* reported that UBS had advised "members of its former private banking team responsible for rich US clients not to travel to America," and "made lawyers available to the more than 50 bankers involved," many of whom had already left the company.  Youngwood Decl., Ex. E (Haig Simonian, *UBS Tells Unit Staff to Avoid US Visits*, Fin. Times, May 27, 2008, *available at* www.ft.com (last visited Dec. 14, 2011)).  In analyzing the travel restrictions, the paper suggested that they signaled UBS's concern that the DOJ and SEC investigations might "widen."  *Id.*

More importantly, additional articles in the *Wall Street Journal*, *Business Week*, *The New York Times*, and other widely read publications—none of which is referred to in the Amended Complaint—collectively demonstrate that prior to the initiation of the Rights Offering, the market was saturated with ever-unfolding information about the potential legal and reputational harms associated with the DOJ and SEC investigations into UBS's U.S. cross-border services. The following stories—all of which appeared in nationally recognized and disseminated publications—were among the flood of media coverage dedicated to the investigations:

- On May 8, 2008, two days after UBS disclosed that it was the subject of investigations by the DOJ and SEC, the *Wall Street Journal* warned that the investigations, led by the U.S. Attorney's Office for the Southern District of New York, threatened to "spill[] into the open" the secrets of UBS's private bank at a time when it was already "struggling to maintain a reputation tarnished by billions of dollars in losses." Youngwood Decl., Ex. F (Glenn R. Simpson *et al.*, *International Finance*: *Probe May Lay Open UBS—U.S. Is Investigating if Private Bank Had Ties to Tax Scheme*, Wall St. J., May 8, 2008, at C2).

- On May 14, in a lengthy, front-page article on the indictments of Birkenfeld and Staggl, whose conduct it characterized as a four-year-plus scheme to "help[] clients avoid taxes by opening secret bank accounts, destroying documents, using Swiss credit cards and filing false tax returns," the *Wall Street Journal* commented that while UBS was not named in the indictment, the indictments and the continuing investigation into UBS's own conduct "threaten[ed] to taint UBS's private bank." Youngwood Decl., Ex. G (Carrick Mollenkamp *et al.*, *Two Charged in Tax Case Tied to UBS, Billionaire*, Wall St. J., May 14, 2008, at Al).

- Just one day later, on May 15, the *Wall Street Journal* reported that "U.S. prosecutors [were] expected to seek a broad subpoena for the names of wealthy American clients who may have used [UBS's] services to avoid income taxes," citing "lawyers and others involved in the case." Youngwood Decl., Ex. H (Glenn R. Simpson *et al.*, *U.S. to Seek Client Names from UBS in Tax Case*, Wall St. J., May 15, 2008, at C1). The *Journal* remarked that such a subpoena— especially given that the ongoing investigation focused on whether UBS, Birkenfeld, and Staggl "helped clients hide assets in Swiss and Liechtenstein accounts"—would "take the case to a higher level and be a black eye for the Swiss bank." *Id.*

- On May 19, *Business Week* noted that it was "raining bad news" on UBS due to, *inter alia*, its confirmation that the DOJ was "investigating whether its wealth

management unit was helping clients evade American taxes."  Youngwood Decl., Ex. I (*Red Ink at UBS*, Bus. Week, May 19, 2008, at 4).

- And on May 23, after Staggl failed to appear in court following his indictment, *The New York Times* commented that the development "cast[] another shadow" over UBS and put "further pressure on the bank's operations" at a time when it was already under "mounting scrutiny by Florida prosecutors for its Swiss-based work for clients in the United States."  Youngwood Decl., Ex. J (Lynnley Browning, *Federal Prosecutors Declare European Banker a Fugitive*, N.Y. Times, May 23, 2008, at C5).[9]

The above-cited stories were joined by other media reports on Birkenfeld's indictment, Liechti's detention, and the related potential implications for UBS.  *See, e.g.*, Youngwood Decl., Ex. M (Stephen Castle, *Tax Havens Face Pressure from Europe*, N.Y. Times, May 15, 2008, at C4) (describing indictment of Birkenfeld for "helping an American real estate investor evade taxes on $200 million held in bank accounts in Switzerland and Liechtenstein"); Ex. N (*Business in Brief*, Boston Globe, May 14, 2008, at C2) (reporting that the indictment of Birkenfeld was "the latest action in an investigation into whether UBS helped clients evade taxes"); Ex. O (*Daily Briefing*, Atl. J-Const., May 8, 2008, at 2B) (describing Liechti's detention and noting that the DOJ and SEC were "investigating UBS' work involving tax issues from 2000 to 2007" as it relates to "information provided by Swiss-based UBS advisers that may have allowed American clients to evade their tax obligations"); Ex. P (Lynnley Browning, *U.S. Detains Executive, Deepening UBS Inquiry*, N.Y. Times, May 8, 2008, at C3) (noting that the detention of a senior bank official like Liechti was "unusual" and "signals that the Justice Department [was] widening its scrutiny of questionable tax-related transactions to include foreign and offshore components").

---

[9]    *See also* Youngwood Decl., Ex. K (Julia Werdigier, *UBS to Lay Off 5,500 in U.S. and Britain*, N.Y. Times, May 7, 2008, at C6) (describing "new challenges" for UBS, including the DOJ and SEC investigations into "whether the bank had broken the terms of an agreement it reached with the [I.R.S.] in 2001"); Ex. L (Mark DeCambre, *UBS Under Investigation by SEC and DOJ*, N.Y. Post, May 8, 2008, at 35) (referring to DOJ and SEC investigations as "adding further pain to what's been a year of misadventures for the Swiss banking giant").

Each and every one of the above-recounted press reports was part of the "total mix" of information available to Alaska Laborers and other potential investors prior to the completion of the Rights Offering.  Put simply, the information purportedly omitted was in fact within the wealth of public information about UBS's alleged misconduct already at investors' disposal.

>    3.    UBS Had No Obligation to Detail, Much Less Speculate as to, Allegedly Unlawful Conduct.

Beyond ignoring the "total mix" of information available to investors due to the pervasive media coverage of UBS's allegedly unlawful conduct, Alaska Laborers demands of UBS a level of self-critical and detailed disclosure and speculation far beyond that actually required by law.  As previously indicated, "the federal securities laws do not require a company to accuse itself of wrongdoing."  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004); *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 353 (S.D.N.Y. 2008) (citing *Citigroup*, stating that "[a] corporation does not have a duty to disclose information simply . . . because it suggests that the corporation or its employees engaged in uncharged illegal conduct") (citation omitted).  Rather, while allegations or the actual existence of illegal conduct within a company "may well be material to the reasonable investor for several obvious reasons, the obligation to disclose uncharged illegal conduct will not arise from the materiality of this information alone."  *In re Axis Capital Holdings Ltd.*, *Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006) (citation and quotation omitted).

Indeed, courts within this Circuit have repeatedly recognized that the federal securities laws do not impose an affirmative duty to speculate about or disclose:

- "[U]n-charged, unadjudicated wrongdoings or mismanagement," *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), *aff'd without opinion by* 956 F.2d 1161 (2d Cir. 1992);

- Illegal conduct by an employee of the issuer, *In re Salomon Inc. Sec. Litig.*, No. 91 Civ. 5442 (RPP), 1994 WL 265917, at *9 (S.D.N.Y. June 16, 1994);

- Illegal internal policies, *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 377 (S.D.N.Y. 2009); or

- Waivers or violations of a company's internal codes of conduct and legal policies, *In re Pfizer Inc. Shareholder Deriv. Litig.*, 722 F. Supp. 2d 453, 463-65 (S.D.N.Y. 2010).

An issuer also has no obligation to "speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if [the illegal conduct] were discovered, disclosed, or terminated." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008) (citation omitted). Instead, the disclosure of an issuer's alleged unlawful conduct is mandated only where the plaintiff draws "a connection between the illegal conduct and the [allegedly misleading] statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or bottom line." *Id.* (quoting *Menkes v. Stolt-Nielsen S.A.*, No. 03 Civ. 409 (DJS), 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2005)). Alaska Laborers completely fails to do so here.

Indeed, the Amended Complaint never goes beyond envisioning general operational or financial risks as a function of UBS's alleged unlawful conduct. Alaska Laborers merely alleges, for example, that various statements about UBS's business objectives, risk management processes, and operational, regulatory, and litigation risks were false or misleading due to "[t]he fact that UBS was, for almost a decade, assisting its U.S. clients to conceal their assets in Swiss bank accounts in violation of U.S. laws" and that such conduct "exposed the Company to increased operational, regulatory and reputational risks." Amended Complaint ¶ 1443. Such allegations have been found time and again to be insufficient to require further disclosure as they are "too remote from [UBS's] alleged illegal conduct to compel disclosure of this conduct." *Menkes*, 2005 WL 3050970, at *8. Given this, the Registration Statement and all

documents included and incorporated therein more than sufficiently disclosed the reputational,

operational, and regulatory risks associated with UBS's alleged, uncharged unlawful conduct.

No further elaboration as to the investigations or the underlying conduct at issue was required.

       B.     *The Remaining Challenged Statements Are Mere Puffery.*

       Alaska Laborers' remaining allegations attack generalized statements within the

Registration Statement and the documents included and incorporated therein that describe UBS's

Global Wealth Management & Business Banking division in positive terms and/or discuss the

manner in which UBS aimed to conduct its global business.  For example, Alaska Laborers cites

the following statement about UBS's business and the organization thereof, which can only be

described as aspirational:

> UBS is a global firm, working with corporate, institutional and
> private clients.  Our strategy is to concentrate on three global core
> businesses—wealth management, asset management and
> investment banking and securities trading.  We also focus on retail
> and corporate banking in Switzerland.  We operate as one firm and
> *aim to deliver valuable advice, products and services to our clients
> while creating high quality, sustainable earnings streams.*  Our
> global core businesses are organized on a worldwide basis into
> three business groups:  Global Wealth Management & Business
> Banking, Global Asset Management and the Investment Bank.  In
> our Global Wealth Management & Business Banking business
> group, we provide services designed for high net worth and
> affluent individuals around the world.  *We provide them with
> tailored, unbiased advice and investment services—ranging from
> asset management to estate planning and from corporate finance
> to art banking.*  Our Swiss retail and corporate banking business
> provides a complete set of banking and securities services for
> domestic individual and corporate clients.

Amended Complaint ¶ 1437 (quoting Giuffra Decl., Ex. 65 (Prospectus Supplement) at S-1)

(emphasis added).  These supposedly inaccurate statements of material facts are nothing more

than non-actionable puffery.  *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)

("expressions of puffery and corporate optimism do not give rise to securities violations"); *see*

*also DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ. 318 (RJS), 2009 WL 2242605, at \*23-24

(S.D.N.Y. July 27, 2009) (holding that plaintiffs' alleged misrepresentations were "nothing more

than puffery" and were therefore an insufficient basis for plaintiffs' claim and collecting cases);

*Welch v. TD Ameritrade Holding Corp.*, No. 07 Civ. 6904 (RJS), 2009 WL 2356131, at \*35-36

(S.D.N.Y. July 27, 2009) (same).

   Alaska Laborers similarly objects to a series of quotes from the 2007 Annual

Report that by its own description concerns "the Company's compliance with ethical and legal

standards."  Amended Complaint ¶ 1444.  In paragraph 1445, Alaska Laborers faults UBS for

"claiming to limit its risk by, among other things, '*monitoring and enforcing compliance with*

*risk principles, policies, and limits, and with regulatory requirements*.'"  *Id.* ¶ 1445 (quoting

Giuffra Decl., Ex. 60 (2007 Annual Report) Section 2 at 7) (emphasis added).  Likewise, within

paragraph 1444, Alaska Laborers recites the following goal-oriented statements from the 2007

Annual Report:

- "UBS *aims to comply with all applicable provisions and to work closely and maintain good relations with regulators* in all jurisdictions where the firm conducts business."  Giuffra Decl., Ex. 60  (2007 Annual Report) Section 3 at 44 (emphasis added);

- "UBS's vision and values state that the firm is a member of the global community and should behave as a responsible corporate citizen.  *The firm and its employees should conduct themselves in a manner that is above reproach*, as preserving UBS's integrity is vital to its most valuable asset — its reputation.  The firm has a code of business conduct and ethics, which sets forth the policies and practices UBS expects all its employees to follow.  The code outlines the required standards of fairness, honesty and integrity in a general manner.  It is the basis for all UBS policies."  *Id.*, Section 1 at 84 (emphasis added);

- "As a leading financial services firm, one of UBS's main purposes is to create long-term value.  UBS believes this can be best achieved by providing clients with value-added products and services and *by promoting a corporate culture that adheres to high ethical standards*.  The firm also firmly believes that, for any business, long-term value creation is also dependent on what it does above and beyond what laws and regulations require.  It is why *UBS dedicates itself to*

*creating a working environment based on the values of equal opportunity, diversity and meritocracy*." *Id.*, Section 1 at 72 (emphasis added); and

- "[UBS] strives to maintain an appropriate balance between risk and return while establishing and controlling UBS's corporate governance processes, including compliance with relevant regulations." *Id.*, Section 1 at 147.

As the Second Circuit has made clear, broad, generalized statements of a company's aspirations or ethics are, by definition, immaterial and insufficient to support an action under the Securities Act. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (characterizing the alleged misrepresentations with respect to the company's "highly disciplined" risk management and "standard-setting reputation for integrity" as "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable" and affirming dismissal of related claims (citation omitted)); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 376 (S.D.N.Y. 2010) (holding that references to bank's "'prudent' lending practices, 'conservative' underwriting, and 'strong credit risk management'" were mere puffery); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632-33 (S.D.N.Y. 2005) ("[G]eneralizations regarding integrity, fiscal discipline and risk management [] amount to no more than puffery.").

The alleged misstatements recited above are nothing more than vague, general statements about UBS's business practices that neither "contain facts [n]or concrete promises of future performance that were specific to the relationship between [UBS and its investors]." *DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ. 318 (RJS), 2009 WL 2242605, at *24 (S.D.N.Y. July 27, 2009) (citation omitted).  Especially in light of the numerous risks repeatedly disclosed in the Registration Statement and the documents included and incorporated by reference therein, no reasonable investor would have interpreted such statements of puffery as factual claims upon which he or she could rely in making an investment decision with respect to the Rights Offering.

Accordingly, the claims that such paradigmatically aspirational statements constitute "inaccurate statements of material fact" under Sections 11 and 12(a)(2) must be dismissed.

## II.     The Registration Statement and Documents Included and Incorporated Therein Provided All Disclosures Required by Applicable SEC Rules.

### A.     *The Adequacy of the Registration Statement and the Related Documents Must Be Assessed as of May 23, 2008—and Not Any Prior Date.*

The allegations in the Amended Complaint not only fail to meet the basic threshold of materiality necessary to sustain claims under Sections 11 and 12, but the "factual" assertions regarding which documents were incorporated in the Registration Statement are demonstrably inaccurate.  The Registration Statement cannot be assessed in a vacuum.  Rather, the Registration Statement is deemed to have included the Prospectus Supplement and incorporated by reference a series of other disclosure documents filed with or furnished to the SEC by UBS, such as UBS's 2007 Annual Report on Form 20-F and the 1Q 2008 Report on Form 6-K.  But Alaska Laborers ignores that the Registration Statement also incorporated by reference UBS's May 23, 2008 supplement to its first quarter report, which was also furnished on Form 6-K.  *See* Youngwood Decl., Ex. A (May 23 6-K) at 28.

Specifically, SEC rules provide that a prospectus supplement, including the documents incorporated by reference therein, is deemed to be part of the registration statement and that, in circumstances like these, the date of first use of that prospectus supplement constitutes the applicable effective date for purposes of liability under Section 11.  *See* 17 C.F.R. § 230.430B(f)(2) (2011).  Here, the relevant effective date is May 23, 2008, which was both the issue date and the date of filing of the Prospectus Supplement, and the adequacy of disclosures set forth in the Registration Statement, including the Prospectus Supplement and the documents incorporated by reference therein, must be assessed as of that date, and not any prior date.  In addition, SEC rules provide that, for purposes of Section 12(a)(2), the adequacy of an issuer's

25

disclosures to an investor must be assessed as of the time of the investor's purchase of the

relevant securities—and not after the time of such sale.  *See* 17 C.F.R. § 230.159(a) (2011).  At

the time of the initiation of the Rights Offering, the package of UBS's disclosures consisted of

the Registration Statement proper (including the base prospectus included therein), the

Prospectus Supplement, and all the documents incorporated by reference therein, including the

2007 Annual Report and various reports on Form 6-K, including the May 23 6-K.  Collectively,

these documents offered a comprehensive picture of UBS's alleged unlawful conduct, the

investigations thereof, and the attendant risks to UBS as of the time of sale under Section

12(a)(2).

> B.    *Under the Applicable Regulatory Framework, the Registration Statement and the
> Documents Included and Incorporated Therein Provided All Necessary
> Disclosures.*

In addition to ignoring the full body of UBS's disclosures as of May 23, Alaska

Laborers fundamentally misunderstands which SEC rules and requirements applied to the

disclosures it now challenges as insufficient.  First, while Alaska Laborers broadly charges that

"applicable SEC rules and regulations governing the preparation of the Registration Statement"

required the disclosure that UBS was "assisting customers to evade tax obligations . . . in

violation of U.S. laws, the federal securities laws and SEC regulations," Amended Complaint

¶ 1443, the only rule or regulation to which it specifically points is Item 503(c) of Regulation

S-K.  *Id.*  Although the Registration Statement at issue was filed on Form F-3, Item 3 of which

requires issuers to "furnish the information required by Item 503," 17 C.F.R. § 239.33 (2011),

Alaska Laborers' expansive reading of Item 503(c) is completely unsupportable.  Item 503(c)

solely directs registrants, "where appropriate," to provide "under the caption 'Risk Factors' a

discussion of the most significant factors that make the offering speculative or risky" and warns

that the discussion, which may include items such as the registrant's "lack of an operating

history," "financial position," and "business or proposed business," "must be concise."  17

C.F.R. § 229.503(c) (2011).  Item 503 does not require and has never been interpreted to

mandate disclosure of a company's alleged, uncharged violations of federal law.  Rather, the

"scant" evaluative case law "typically analyze[s] the sufficiency of Item 503 disclosures with the

familiar materiality standard" that arises with any claims under Section 10(b) of the Exchange

Act and Sections 11 and 12 of the Securities Act.  *See City of Roseville Employees' Ret. Sys. v.*

*EnergySolutions, Inc.*, No. 09 Civ. 8633 (JGK), 2011 WL 4527328, at *23, 26 (S.D.N.Y. Sept.

30, 2011) (collecting cases).  In other words, Item 503 itself imposes no additional or different

disclosure requirements than Sections 11 and 12.  *Id.*  For the reasons reviewed above, the

Registration Statement and the documents included and incorporated therein amply satisfied

those requirements.

        Second, while Alaska Laborers does not point to any other specific disclosure

requirements to which UBS was subject, the Registration Statement and the documents included

and incorporated therein fully complied with all of them.  In addition to the requirements of Item

503 and Item 3.D of Form 20-F, which parallels the risk factor disclosure requirements of Item

503, Item 8.A.7 of Form 20-F required UBS to "[p]rovide information on any legal or arbitration

proceedings . . . which may have, or have had in the recent past, significant effects on the

company's financial position or profitability," including "governmental proceedings pending or

known to be contemplated."  17 C.F.R. § 249.220f (2011).  Item 5 of Form F-3 also required that

the Registration Statement "[d]escribe any and all material changes in the registrant's affairs that

have occurred since the end of the latest fiscal year for which certified financial statements are

included in this registration statement."  17 C.F.R. § 239.33 (2011).

As reviewed above, as of May 23, the documents included and incorporated by reference in the Registration Statement explicitly disclosed the federal investigations into UBS's U.S. cross-border services and detailed the related conduct at issue.  Such disclosures fulfilled the requirements of Item 8.A.7 of Form 20-F and Item 5 of Form F-3.  Additionally, the Registration Statement and the documents included and incorporated therein encompassed sufficiently broad risk factor disclosures to fulfill the dictates of Item 3 of Form F-3 and Item 3.D of Form 20-F.  In terms of the risks to UBS's reputation, the Risk Factors section of the Prospectus Supplement, the 2007 Annual Report, and the May 23 6-K—all of which were included or incorporated by reference in the Registration Statement—each recognized how "critical" UBS's reputation is in "maintaining [its] relationships with clients, investors, regulators and the general public," plainly flagged for investors the potential for reputational damage as a result of employee misconduct, and warned that if such reputational harm did occur, it could "result in client attrition in different parts of [UBS's] business and could negatively impact [UBS's] financial performance."  Giuffra Decl., Ex. 65 (Prospectus Supplement) at S-23; Giuffra Decl., Ex. 60 (2007 Annual Report) Section 1 at 23; Youngwood Decl., Ex. A (May 23 6-K) at 8.

Further, the Registration Statement and the documents included and incorporated therein contain multiple discussions of the "operational and regulatory risks" that Alaska Laborers complains were insufficiently disclosed.  Among those discussions, UBS disclosed that:

- "In the ordinary course of [its] business, [UBS is] subject to regulatory oversight and liability risk.  [UBS is] also involved in a variety of other claims, disputes, legal proceedings and government investigations in jurisdictions where [it is] active, including the United States and Switzerland.  These types of proceedings expose [UBS] to substantial monetary damages and legal defense costs, injunctive relief, criminal and civil penalties and the potential for regulatory restrictions on

28

[UBS's] business.  The outcome of these matters cannot be predicted and they could adversely affect [UBS's] future business."  Giuffra Decl., Ex. 65 (Prospectus Supplement) at S-22; *see also* Giuffra Decl., Ex. 60 (2007 Annual Report) Section 1 at 23; Youngwood Decl., Ex. A (May 23 6-K) at 8;

- "UBS Group operates in a legal and regulatory environment that exposes it to potentially significant litigation risks.  As a result, UBS is involved in various disputes and legal proceedings, including litigation, arbitration, and regulatory and criminal investigations.  Such cases are subject to many uncertainties, and their outcome is often difficult to predict, particularly in the earlier stages of a case."  Giuffra Decl., Ex. 60 (2007 Annual Report) Section 4 at 65; Giuffra Decl., Ex. 63 (1Q 2008 Report) at 39;

- "Our operational risk management and control systems and processes are designed to ensure that the risks associated with our activities, including those arising from process error, failed execution, unauthorized trading, fraud, systems failure and failure of security and physical protection, are appropriately controlled.  If these internal controls fail or prove ineffective in identifying and remedying such risks, [UBS] could suffer operational failures that might result in losses."  Giuffra Decl., Ex. 65 (Prospectus Supplement) at S-22; *see also* Giuffra Decl., Ex. 60 (2007 Annual Report) Section 1 at 22-23; Youngwood Decl., Ex. A (May 23 6-K) at 8; and

- "Operational losses can be caused by external factors, deliberate, accidental or natural, or failures of internal processes, people or systems.  They can, unfortunately, never be entirely eliminated.  Especially in today's environment of complex global processes, low regulatory tolerance for error and growing propensity for litigation, operational risk runs alongside market and credit risk as one of UBS's principal risk classes."  Giuffra Decl., Ex. 63 (1Q 2008 Report) at 10.

Each of these disclosures was not only accurate, but complied with the requirements imposed upon UBS in connection with Forms F-3 and 20-F.  Only by mischaracterizing the applicable legal and regulatory framework and misrepresenting the totality of the disclosures encompassed within the Registration Statement can Alaska Laborers allege that these disclosures were insufficient and/or misleading.  This Court should not credit such a distortion of both the law and facts.

**III.      Alaska Laborers Lacks Standing to Bring a Section 12(a)(2) Claim.**

Finally, beyond failing to state a claim under either Section 11 or 12(a)(2), Alaska Laborers has an even more basic problem with its Section 12(a)(2) claim.  To bring a claim under Section 12(a)(2), a plaintiff must allege that it purchased shares directly from a specific defendant or that it purchased as a result of a particular defendant's solicitation.  *E.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig*., 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003); *Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292 (VM), 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001).  As this Court has noted, Section 12(a)(2) "imposes liability on only the buyer's immediate seller," defined as one who either "passed title of the securities to the plaintiff" or "successfully solicited the purchase motivated at least in part by his own financial interest."  *In re Orion Sec. Litig.*, No. 08 Civ. 1328 (RJS), 2009 WL 2601952, at *2 (S.D.N.Y. Aug. 20, 2009) (citations and quotations omitted).

The question of a plaintiff's standing is a "jurisdictional [one] determining the power of the court to entertain the suit."  *Wyatt v. Inner City Broadcasting Corp.*, No. 11 Civ. 4954 (PKC), 2011 WL 4484071, at *5 (S.D.N.Y. Sept. 28, 2011) (citations and quotations omitted); *see also Amidax Trading Group v. S.W.I.F.T. SCRL*, 607 F. Supp. 2d 500, 508 (S.D.N.Y. 2009) (granting motion to dismiss under Rule 12(b)(1) where plaintiff failed to "adequately allege an injury in fact"); *Bluebird Partners, L.P. v. First Fid. Bank*, 896 F. Supp. 152, 156-57 (S.D.N.Y. 1995) (dismissing plaintiff's claims pursuant to Rule 12(b)(1) where plaintiff lacked standing to prosecute its claim under the relevant federal securities law).

Alaska Laborers cannot satisfy this elementary jurisdictional requirement.  Nowhere in the Amended Complaint does Alaska Laborers specifically allege that it "directly *purchased* . . . securities from the Underwriter Defendants or that the Underwriter Defendants *successfully* solicited such sales."  *Orion*, 2009 WL 2601952, at *2 (citations omitted).  Instead,

it merely alleges that the Underwriter Defendants, along with all of the other '33 Act Defendants, "were sellers, offerors and/or solicitors of purchasers of the UBS shares offered pursuant to the 2008 Rights Offering," Amended Complaint ¶ 1464, and that UBS and the Underwriter Defendants, "acting through their employees, agents and others, solicited such purchases for their personal financial gain through . . . the preparation and dissemination of the Prospectus Supplement." *Id.* ¶ 1468.

Such conclusory pleadings fall far short of the type of allegations necessary to adequately plead a violation of Section 12(a)(2). First, under the Supreme Court's holdings in *Iqbal* and *Twombly*, pleadings that, like Alaska Laborers' allegations here, solely "offer[] 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Moreover, any effort by Plaintiffs to resuscitate their Section 12(a)(2) claim on the basis of their putative class of "'33 Act Plaintiffs" must fail as well: "[I]t is well established that 'if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.'"[10] *Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292 (VM), 2001 WL

---

[10]     To the extent that this Court is inclined to evaluate the Section 12(a)(2) claim as a putative class claim, rather than as one made solely by Alaska Laborers, the claim fails for another reason as well. In order to state a claim under Section 12(a)(2), the plaintiff must have purchased its shares directly through the offering that is the subject of the relevant registration statement. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 571-72 (1995); *Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005); *Anegada Master Fund, Ltd. v. PXRE Group Ltd.*, 680 F. Supp. 2d 616, 620-22 (S.D.N.Y. 2010); *see also* 15 U.S.C. § 77*l*(a)(2) (2011) ("Any person who . . . offers or sells a security" by means of a prospectus which includes an untrue statement of a material fact or omits to state a material fact "shall be liable . . . to the person purchasing such security from him."). A plaintiff therefore has standing to assert a Section 12(a)(2) claim only if it claims to have purchased the securities at issue directly in the offering at issue and "not the so-called 'aftermarket.'" *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 445 (S.D.N.Y. 2009) (quoting *Gustafson*). Accordingly, allegations "that securities were purchased 'pursuant or traceable to' the Registration Statement and Prospectuses are insufficient to establish standing for purposes of Section 12(a)(2)." *In re Deutsche Bank AG Sec. Litig.*, No. 09 Civ. 1714 (DAB), 2011 WL 3664407, at *10 (S.D.N.Y. Aug. 19, 2011); *compare*

740764, at *2 (S.D.N.Y. June 29, 2001) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974)). In *Griffin*, the court dismissed the Section 12(a)(2) claim against one underwriter defendant because the sole named plaintiff alleged neither that he purchased his shares from that underwriter, nor that he purchased his securities specifically as a result of that underwriter's solicitation, thereby precluding the plaintiff from establishing an "actual controversy" with that defendant. *Id.* at *2.

Here, the sole named plaintiff among the purported class of '33 Act Plaintiffs— Alaska Laborers—similarly has not alleged that it purchased its shares from any of the Underwriter Defendants, or that any of them specifically and successfully solicited its purchases. Given that a named plaintiff's failure to "allege and show that [it] personally [has] been injured" is fatal to the maintenance of claims by "other, unidentified members of the class to which they belong and which they purport to represent," Alaska Laborers' failure to specify which person or entity passed title to it or directly and actively solicited its purchase further mandates the dismissal of the Section 12(a)(2) claim against the Underwriter Defendants. *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 n.5 (2d Cir. 2008) (citation omitted); *see also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003) (holding that where a named representative who purports to act on behalf of a class cannot individually state a claim against the defendants, the class claim must be dismissed).

---

*with* Amended Complaint ¶¶ 1463, 1470.  Indeed, courts in this Circuit have made clear that "plaintiffs should specify at the pleading stage whether they made [their alleged] purchases in the offering or in the secondary market." *In re Sterling Foster & Co. Sec. Litig.*, 222 F. Supp. 2d 216, 246 (E.D.N.Y. 2002).

## <u>CONCLUSION</u>

For the foregoing reasons, the Underwriter Defendants respectfully submit that Counts III and IV of the Amended Complaint should be dismissed as against them in their entirety with prejudice.

Dated: December 15, 2011
      New York, New York

                                 Respectfully submitted,

                                 SIMPSON THACHER & BARTLETT LLP

                                 By   <u>/s/ Jonathan K. Youngwood</u>
                                     Barry R. Ostrager, Esq.
                                     (bostrager@stblaw.com)
                                     Jonathan K. Youngwood, Esq.
                                     (jyoungwood@stblaw.com)
                                     Lisa H. Rubin, Esq.
                                     (lrubin@stblaw.com)

                                 425 Lexington Avenue
                                 New York, New York 10017-3954
                                 Telephone:  (212) 455-2000
                                 Facsimile:  (212) 455-2502

                                 *Attorneys for Defendants J.P. Morgan Securities Ltd., Morgan Stanley & Co. International plc., BNP Paribas, Goldman Sachs International, Credit Suisse, and Deutsche Bank AG, London Branch*

33