**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE UBS AG SECURITIES LITIGATION

No. 07 CV 11225 (RJS)

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO DISMISS THE AMENDED CONSOLIDATED SECURITIES**
**CLASS ACTION COMPLAINT PURSUANT TO RULES 9(b), 12(b)(2), AND 12(b)(6)**

Robert J. Giuffra, Jr.
Suhana S. Han
Matthew A. Schwartz
Justin J. DeCamp
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*

December 15, 2011

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ........................................................................... 1

**THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS CHALLENGING UBS'S DISCLOSURES ABOUT ITS POSITIONS IN MORTGAGE-RELATED SECURITIES** ............................................................................................... 10

    **BACKGROUND** ...................................................................................10

        A.    UBS's Specific Warnings About Business Risks and Market Downturns...................................................................................10

        B.    RMBS and CDOs..................................................................................11

        C.    UBS's Disclosure of Business Strategy in the RMBS and CDO Markets ...............................................................................13

        D.    Lower-Rated Subprime Securities Decline in Value in Early 2007 ..........15

        E.    UBS's Early Disclosure of Subprime-Related Losses...............................18

        F.    The Onset of the Financial Crisis and the Unexpected Decline in Value of AAA-Rated Mortgage-Related Securities .................................18

            1.    UBS's Disclosure of Second Quarter 2007 Results......................18

            2.    The Impact of the Credit Crisis on Higher-Rated Securities .........19

            3.    UBS's Disclosures of RMBS and CDO Writedowns...................20

                a.    Third Quarter 2007 Disclosures........................................ 20

                b.    Fourth Quarter 2007 Disclosures ...................................... 21

                c.    First Quarter 2008 Disclosures ......................................... 22

    **LEGAL STANDARD** ...........................................................................22

    **ARGUMENT** ......................................................................................23

    I.    PLAINTIFFS FAIL TO ALLEGE A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER IN MAKING DISCLOSURES ABOUT UBS'S POSITIONS IN MORTGAGE-RELATED SECURITIES...............................................................23

        A.    As a Matter of Law, Plaintiffs Have Not Pleaded a Strong Inference of Scienter Here. ...............................................................24

            1.    Plaintiffs Fail to Allege a Cognizable Motive for the Alleged Fraud. ..................................................................25

*Page*

          a.    UBS's Compensation Structure Did Not Create an Incentive for the Individual Defendants to Commit the Alleged Fraud............................................................ 26

          b.    UBS Repurchased Its Own Shares at Allegedly Inflated Prices and Sold Those Shares When the Price Was Low................................................................ 27

      2.    Plaintiffs' Theory of Scienter Is Implausible and Makes No Economic Sense. ..........................................................28

          a.    Plaintiffs' Allegation That UBS Purposely Poured Billions of Dollars into Overvalued Mortgage-Related Securities Defies Economic Sense...................... 29

          b.    Plaintiffs Never Explain How UBS Planned to Conceal Its Build-up of Allegedly Overvalued Mortgage-Related Securities........................................... 30

          c.    UBS's Numerous Early Profit Warnings Undercut Any Inference That Defendants Acted with Scienter. ...... 31

  B.    The Competing Inference That the Losses Were Due to a Marketwide Downturn Is Much More Likely............................................32

      1.    The Indisputable Market Downturn Negates an Inference of Scienter. ................................................................33

      2.    Plaintiffs' Allegations That UBS Should Have Taken Writedowns Earlier Do Not Establish a Strong Inference of Scienter. ................................................................36

  C.    None of Plaintiffs' Allegations Concerning Risk Exposures, Valuations, or Accounting Methods Overcomes the Implausibility of Their "Fraud" Claims............................................................37

      1.    UBS's Risk Control Procedures....................................................38

      2.    The Value of UBS's Mortgage-Related Positions .........................39

          a.    The Allegations of Confidential Witness 9...................... 39

          b.    The Closing of DRCM...................................... 41

      3.    International Financial Reporting Standards ("IFRS").................42

*Page*

II.     PLAINTIFFS ALSO DO NOT ALLEGE LOSS CAUSATION IN
        CONNECTION WITH UBS'S DISCLOSURES OF ITS POSITIONS IN
        MORTGAGE-RELATED SECURITIES....................................................44

III.    PLAINTIFFS DO NOT ALLEGE THAT UBS MADE ACTIONABLE
        MISSTATEMENTS ABOUT ITS POSITIONS IN MORTGAGE-
        RELATED SECURITIES....................................................................47

        A.      As a Matter of Law, UBS Made No Material Misstatement. ...................47

                1.      The Market Knew that UBS Had Significant Exposure to
                        Mortgage-Related Securities, and UBS Was Not Required
                        To Disclose Its Holdings in Particular Types of Such
                        Securities..........................................................................47

                2.      There Is No Support for the Allegation That UBS's Portfolio
                        Was "Illiquid and Concentrated."............................................49

                3.      Plaintiffs Do Not Adequately Plead a Misstatement
                        Concerning UBS's Valuation of Its Mortgage-Related
                        Securities..........................................................................50

        B.      As Encouraged by the Reform Act, UBS's Challenged Disclosures
                Were Accompanied by Extensive and Specific Cautionary
                Language...........................................................................53

AS A MATTER OF LAW, PLAINTIFFS' ALLEGATIONS CONCERNING UBS'S
DISCLOSURES ABOUT ITS ARS HOLDINGS DO NOT STATE A CLAIM...................55

        BACKGROUND .....................................................................................55

        ARGUMENT ..........................................................................................57

        I.      PLAINTIFFS FAIL TO ALLEGE FACTS CREATING A STRONG
                INFERENCE OF SCIENTER WITH REGARD TO UBS'S
                DISCLOSURES ABOUT ARS. ..........................................................57

        II.     PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION REGARDING
                UBS'S ARS DISCLOSURES...............................................................59

PLAINTIFFS DO NOT STATE A FRAUD CLAIM IN CONNECTION WITH
UBS'S DISCLOSURES ABOUT ITS SMALL SWISS-BASED U.S. CROSS-
BORDER BUSINESS .......................................................................................60

        BACKGROUND .....................................................................................60

        ARGUMENT ..........................................................................................63

        I.      PLAINTIFFS DO NOT ALLEGE ANY ACTIONABLE
                MISSTATEMENT OVER UBS'S DISCLOSURES ABOUT THE
                INVOLVEMENT OF ITS "VERY SMALL," SWISS-BASED CROSS-
                BURDER BUSINESS IN TAX AVOIDANCE BY U.S. CUSTOMERS.............63

*Page*

A.  Most of the Challenged Statements Are Not Actionable..........................64

B.  UBS's Statements Concerning NNM, the Success of the U.S. Wealth Management Division, and the "Gaps" in Its Systems Were Not Materially Misleading As a Matter of Law.........................................66

C.  As a Matter of Law, UBS Had No Duty to Disclose the Uncharged Conduct of Its "Very Small," Swiss-Based U.S. Cross-Border Business. ................................................................................................68

D.  UBS Timely Disclosed the DOJ Investigation of Its Small Swiss-Based U.S. Cross-Border Business. ...........................................................70

**THE COURT SHOULD DISMISS PLAINTIFFS' SECURITIES ACT CLAIMS** ............. 71

**THE COURT SHOULD DISMISS THE CLAIMS AGAINST THE TWELVE INDIVIDUAL DEFENDANTS**............................................................................ 73

**ARGUMENT** ............................................................................................75

I.   THE AMENDED COMPLAINT FAILS TO PLEAD SPECIFIC CLAIMS AGAINST EACH OF THE INDIVIDUAL DEFENDANTS. ..............................75

II.  BEYOND ITS IMPERMISSIBLE "SHOTGUN" PLEADING, THE AMENDED COMPLAINT DOES NOT STATE A CLAIM AS TO THE INDIVIDUAL DEFENDANTS........................................................................76

A.  Hutchins and Stehli.........................................................................76

B.  Costas..............................................................................................77

C.  Stuerzinger .....................................................................................79

D.  Martin and Singh.............................................................................80

E.  Jenkins, Ospel, Rohner, Standish, Suter, and Wuffli................................81

**CONCLUSION** ............................................................................. 82

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*60223 Trust* v. *Goldman, Sachs & Co.*,
   540 F. Supp. 2d 449 (S.D.N.Y. 2007).......................................................................................46

*Acito* v. *Imcera Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ...................................................................................25, 36, 70

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)..................................................................................1, 23, 58

*Basic, Inc.* v. *Levinson*,
   485 U.S. 224 (1988)...........................................................................................................47

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007)....................................................................................................22, 54

*Bd. of Trustees of Ft. Lauderdale Gen. Employees' Retirement Sys.* v. *Mechel OAO*,
   09 civ. 3617, 2011 WL 3502016 (S.D.N.Y. Aug. 9, 2011) .....................................25

*Bond Opportunity Fund* v. *Unilab Corp.*,
   99 civ. 11074, 2003 WL 21058251 (S.D.N.Y. May 9, 2003)................................74

*Brecher* v. *Citigroup, Inc.*,
   09 civ. 7359, 2011 WL 2209145 (S.D.N.Y. June 7, 2011)....................................34

*Caiafa* v. *Sea Containers Ltd.*,
   525 F. Supp. 2d 398 (S.D.N.Y. 2007).......................................................................40

*Chill* v. *Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996).................................................................................23, 23

*Ciresi* v. *Citicorp*,
   782 F. Supp. 819 (S.D.N.Y. 1991) .........................................................................34, 69

*Davidoff* v. *Farina*,
   04 civ. 7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)...........................30, 43

*DeBlasio* v. *Merrill Lynch & Co.*,
   07 civ. 318, 2009 WL 4242605 (S.D.N.Y. July 27, 2009) ............................. *passim*

*DeMaria* v. *Andersen*,
   318 F.3d 170 (2d Cir. 2003)......................................................................................47

*Denny* v. *Barber*,
   576 F.2d 465 (2d Cir. 1978).................................................................................33, 70

*Page(s)*

*DiLeo* v. *Ernst & Young,*
901 F.2d 624 (7th Cir. 1990) ...................................................................36

*Druskin* v. *Answerthink, Inc.,*
299 F. Supp. 2d 1307 (S.D. Fla. 2004) ...................................................40

*Dura Pharms., Inc.* v. *Broudo,*
544 U.S. 336 (2005)..........................................................................7, 44

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.,*
553 F.3d 187 (2d Cir. 2009).......................................................... *passim*

*Edison Fund* v. *Cogent Inv. Strategies Fund, LTD,*
551 F. Supp. 2d 210 (S.D.N.Y. 2008).......................................................75

*Fadem* v. *Ford Motor Co.,*
352 F. Supp. 2d 501 (S.D.N.Y. 2005) .....................................................30

*Fait* v. *Regions Fin. Corp.,*
655 F.3d 105 (2d Cir. 2011) ............................................................52, 53

*Fulton County Employees' Ret. Sys.* v. *MGIC Inv. Corp.,*
08 civ. 458, 2010 WL 601364 (E.D. Wis. Feb. 18, 2010) ........................49

*Ganino* v. *Citizens Utils. Co.,*
228 F.3d 154 (2d Cir. 2000)....................................................................45

*Garber* v. *Legg Mason, Inc.,*
537 F. Supp. 2d 597 (S.D.N.Y. 2008)......................................................67

*GE Investors Retirement Plan* v. *Gen. Elec. Co.,*
No. 10-4284-cv, 2011 WL 5607137 (2d Cir. Nov. 18, 2011) ..................60

*Glassman* v. *Computervision Corp.,*
90 F.3d 617 (1st Cir. 1996)....................................................................67

*GSC Partners CDO Fund* v. *Wash.,*
368 F.3d 228 (3d Cir. 2004)....................................................................29

*Halperin* v. *eBanker USA.com, Inc.,*
295 F.3d 352 (2d Cir. 2002)............................................................53, 66

*Higginbotham* v. *Baxter Intern., Inc.,*
495 F.3d 753 (7th Cir. 2007) ............................................................59, 70

*In re 2007 Novastar Fin., Inc. Sec. Litig.,*
No. 07-0139-CV-W-ODS, 2008 WL 2354367 (W.D. Mo. June 4, 2008) ...................6, 35, 43

Page(s)

*In re Aegon N.V. Sec. Litig.*,
03 civ. 0603, 2004 WL 1415973 (S.D.N.Y. June 23, 2004)......................................34

*In re Allied Capital Corp. Sec. Litig.*,
02 civ. 3812, 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003)......................................37

*In re AstraZeneca Sec. Litig.*,
559 F. Supp. 2d 453 (S.D.N.Y. 2008)......................................79

*In re AXIS Capital Holdings Ltd. Sec. Litig.,*
456 F. Supp. 2d 576 (S.D.N.Y. 2006)......................................68, 69

*In re Barclays Bank PLC Sec. Litig.,*
09 civ. 1989, 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011)......................................53

*In re Canandaigua Sec. Litig.*,
944 F. Supp. 1202 (S.D.N.Y. 1996)......................................48

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004)......................................69

*In re Cross Media Mktg. Corp. Sec. Litig.*,
314 F. Supp. 2d 256 (S.D.N.Y. 2004)......................................74

*In re Downey Sec. Litig.*,
No. CV 08-3261, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)......................................35, 37

*In re Duke Energy Corp. Sec. Litig.*,
282 F. Supp. 2d 158 (S.D.N.Y. 2003)......................................67

*In re Fannie Mae 2008 Sec. Litig.*,
08 civ. 7831, 2010 WL 3825713 (S.D.N.Y. Sept. 30, 2010)......................................36

*In re FBR Inc. Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008)......................................68-69, 70

*In re Homebanc Corp. Sec. Litig.*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010)......................................43

*In re Huntington Bancshares Sec. Litig.*,
674 F. Supp. 2d 951 (S.D. Ohio 2009)......................................35, 42

*In re JP Morgan Chase Sec. Litig.,*
02 civ. 1282, 2007 WL 950132 (S.D.N.Y. 2007)......................................42-43

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003)......................................1

*Page(s)*

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008)...................................................................46

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    02 civ. 9690, 2008 WL 2324111 (S.D.N.Y. June 4, 2008).....................................44

*In re Metro. Sec. Litig.*,
    532 F. Supp. 2d 1260 (E.D. Wash. 2007) ........................................................ 75-76

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    643 F. Supp. 2d 366 (S.D.N.Y. 2009).................................................................69

*In re N.Y. Cmty. Bancorp Inc., Sec. Litig.*
    448 F. Supp. 2d 466 (E.D.N.Y. 2006) ................................................................48

*In re Orion Sec. Litig.*,
    08 civ. 1328, 2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009)...................................73

*In re PXRE Grp. Ltd. Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009)........................................................ *passim*

*In re Radian Sec. Litig.*,
    612 F. Supp. 2d 594 (E.D. Pa. 2009) .................................................................35

*In re Rhodia SA Sec. Litig.*,
    531 F. Supp. 2d 527 (S.D.N.Y. 2007)............................................................45, 79

*In re Salomon Analyst Level 3 Litig.*,
    373 F. Supp. 2d 248 (S.D.N.Y. 2005)............................................................40, 52

*In re Security Capital Assurance Ltd. Sec. Litig.*,
    729 F. Supp. 2d 569 (S.D.N.Y. 2010)......................................................28, 34, 46

*In re Sina Corp. Sec. Litig.*,
    05 civ. 2154, 2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006).................................45

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)........................................................ *passim*

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 431 (S.D.N.Y. 2003).................................................................31

*Janus Capital Grp., Inc.* v. *First Deriv. Traders*,
    131 S. Ct. 2296 (2011) .......................................................................... *passim*

*Kadel* v. *Flood*,
    427 F. App'x 778 (11th Cir. 2011) .....................................................................34

*Page(s)*

*Kalnit* v. *Eichler,*
    85 F. Supp. 2d 232 (S.D.N.Y. 1999)........................................................................25

*Kalnit* v. *Eichler,*
    264 F.3d 131 (2d Cir. 2001)..................................................................................23

*Kinsey* v. *Cendant Corp.,*
    04 civ. 0582, 2004 WL 2591946 (S.D.N.Y. Nov. 16, 2004) ................................24

*Kuriakose* v. *Fed. Home Loan Mortg. Corp.,*
    08 civ. 7821, 2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011) ...................... 31, 44-45

*Lattanzio* v. *Deloitte & Touche LLP,*
    476 F.3d 147 (2d Cir. 2007)..................................................................................44

*Lentell* v. *Merrill Lynch & Co. Inc.,*
    396 F.3d 161 (2d Cir. 2005)..............................................................................22, 44

*Lipsky* v. *Commonwealth United Corp.,*
    551 F.2d 887 (2d Cir. 1976)..................................................................................55

*Litwin* v. *Blackstone Grp., L.P.,*
    634 F.3d 706 (2d Cir. 2011)..................................................................................67

*Local No. 38 Int'l Broth. of Elec. Workers Pension Fund.* v. *Am. Express Co.,*
    724 F. Supp. 2d 447 (S.D.N.Y. 2010)...................................................................34

*Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.,*
    437 F.3d 588 (7th Cir. 2006) ...............................................................................74

*McNamara* v. *Pre-Paid Legal Servs., Inc.,*
    189 F. App'x 702 (10th Cir. 2006) .......................................................................28

*Menkes* v. *Stolt-Nielsen S.A.,*
    03 civ. 409, 2005 WL 3050970 (D. Conn. Nov. 10, 2005) ...................................70

*Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit,*
    547 U.S. 71 (2006)............................................................................................ 22-23

*Moorhead* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    949 F.2d 243 (8th Cir. 1991) ................................................................................54

*Nolte* v. *Capital One Fin. Corp.,*
    390 F.3d 311 (4th Cir. 2004) ................................................................................48

*Novak* v. *Kasaks,*
    216 F.3d 300 (2d Cir. 2000)..............................................................................42, 43

*Page(s)*

*Patel* v. *Parnes,*
    253 F.R.D. 531 (C.D. Cal. 2008) ............................................................................. 35

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadain Imperial Bank of*
    *Commerce,*
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) ................................................................. 34-35

*Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.,*
    507 F.3d 117 (2d Cir. 2007) ................................................................................. 54

*Rombach* v. *Chang,*
    355 F.3d 164 (2d Cir. 2004) ................................................................. 26, 31, 72

*Rothman* v. *Gregor,*
    220 F.3d 81 (2d Cir. 2000) ................................................................................. 24

*Santa Fe Indus., Inc.* v. *Green,*
    430 U.S. 462 (1977) ............................................................................................ 33

*Schwartz* v. *Celestial Seasonings, Inc.,*
    124 F.3d 1246 (10th Cir. 1997) ........................................................................ 74

*SEC* v. *Kelly,*
    08 civ. 4612, 2011 WL 4431161 (S.D.N.Y. Sept. 22, 2011) .............................. 77

*Seinfeld* v. *Gray,*
    404 F.3d 645 (2d Cir. 2005) ................................................................................. 78

*Shields* v. *Citytrust Bancorp, Inc.,*
    25 F.3d 1124 (2d Cir. 1994) ........................................................... 25, 30-31, 33

*Southland Secs. Corp.* v. *INSpire Ins. Solutions Inc.,*
    365 F.3d 353 (5th Cir. 2004) ............................................................................. 74

*Stavros* v. *Exelon Corp.,*
    266 F. Supp. 2d 833 (N.D. Ill. 2003) ................................................................. 36

*Steinberg* v. *Ericsson LM Tel. Co.,*
    07 CV. 9615, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ........................... C-2

*Stratte-McClure* v. *Stanley,*
    09 civ. 2017, 2011 WL 1362100 (S.D.N.Y. Apr. 4, 2011) .............................. 44

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.,*
    531 F.3d 190 (2d Cir. 2008) ............................................................... 3, 23, 33

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ................................................................................. *passim*

*Page(s)*

*Wagner* v. *First Horizon Pharm. Corp.*,
    464 F.3d 1273 (11th Cir. 2006) ...................................................................75

*Welch* v. *TD Ameritrade Holding Corp.*,
    07 civ. 6904, 2009 WL 2356131 (S.D.N.Y. July 27, 2009) ...........................65, C-2

*Winer Family Trust* v. *Queen*,
    503 F.3d 319 (3d Cir. 2007)............................................................................74

*Woodward* v. *Raymond James Fin., Inc.*,
    732 F. Supp. 2d 425 (S.D.N.Y. 2010)..............................................................35

*Wright* v. *Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998)......................................................................73, 77

**STATUTES, RULES, AND REGULATIONS**

Rule 9, Fed. R. Civ. P. ..................................................................................... *passim*

Rule 12, Fed. R. Civ. P. ................................................................................... *passim*

Securities Act of 1933
    Section 11, 15 U.S.C. § 77(k) ...................................................................1, 72
    Section 12, 15 U.S.C. § 77(l).....................................................................1, 72
    Section 15, 15 U.S.C. § 77(0) ...................................................................1, 73

Securities Act Release
    No. 33-7386, 62 Fed. Reg. 6044 (Feb. 10, 1997) ..................................48

Securities & Exchange Commission
    Rule 10b-5, 17 C.F.R. § 240.10b-5 ............................................................ *passim*

Securities Exchange Act of 1934
    Section 10(b), 15 U.S.C. § 78j .................................................................. *passim*
    Section 20(a), 15 U.S.C. § 78t(a).................................................................1, 81

**OTHER AUTHORITIES**

Andrew Davidson et al.,
    SECURITIZATION: STRUCTURING & INVESTMENT ANALYSIS (2003)..........................15

*Bank of America, Accused of Misleading Customers, Agrees to Buy Back Securities*,
    N.Y. TIMES, Oct. 9, 2008 ...............................................................................56

Ben Logan, *The ABX Index: A Pricing Conundrum*,
    CREDIT, May 1, 2008 ......................................................................................51

*Page(s)*

Ben S. Bernanke, Testimony before the Joint Economic Committee, U.S. Congress (Mar. 28, 2007) ...............................................................................................................17

Bond Mkt Ass'n, RESEARCH QUARTERLY, Feb. 17, 2006 ............................................15

Christine Harper, *UBS's Costas, Fraser Say "Legacy" Positions Caused Fund Losses*, BLOOMBERG NEWS, May 3, 2007 ...............................................................................77

FASB Staff Position No. FAS 157-4, *Determining Fair Value When the Volume and Level of Activity for the Asset or Liability Have Significantly Decreased and Identifying Transactions That Are Not Orderly* ......................................................37

Congressional Oversight Panel, Aug. Oversight Report: The Continued Risk of Troubled Assets, Submitted under Section 125(b)(1) of Title 1 of the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343 ................................................... A-3

David L. Scott, WALL STREET WORDS: AN A TO Z GUIDE TO INVESTMENT TERMS FOR TODAY'S INVESTOR (2003)............................................................................13

Frank J. Fabozzi, *Handbook of Fixed Income Secs.* (7th ed. 2005)........................ 21-22

Gabi Thesing, *German Consumer Confidence Rises on Oil-Price Drop*, BLOOMBERG.COM, Oct. 28, 2008 ...............................................................................3

Gregory Zuckerman, *Trader Made Billions on Subprime—John Paulson Bet big on Drop in Housing Values; Greenspan Gets a New Gig, Soros Does Lunch,* WALL ST. J., Jan. 15, 2008 ...............................................................................6

IASB, *Fair Value Measurement Exposure Draft* ......................................................37

Int'l Monetary Fund, *Global Financial Stability Report* (Apr. 2007) ..................... 17-18

John C. Dugan, Comptroller of the Currency, *Remarks Before the Global Association of Risk Professionals,* Feb. 27, 2008...................................................................... A-1

Kate Kelly, *How Goldman Won Big on Mortgage Meltdown—A Team's Bearish Bets Netted Firm Billions; A Nudge From the CFO,* WALL ST. J., Dec. 14, 2007..............................................................................6

Kevin M. LaCroix, *Subprime & Credit Crisis-Related Securities Class Action Lawsuits*, THE D&O DIARY (Aug. 31, 2009) ...............................................................................5

Meg Fletcher, *Subprime Fallout Could Cost Billions,* BUS. INS., April 1, 2008 ...............................................................................3

News Release, *SEC Office of the Chief Accountant and FASB Staff Clarifications on Fair Value Accounting* (Sept. 30, 2008) ...............................................................19

*Page(s)*

Rep. Henry Waxman, Remarks at Hearing of the House Oversight and Gov't Reform Comm., Credit Rating Agencies & the Financial Crisis (Oct. 22, 2008) ............................ A-2

Ruth Simon & James R. Hagerty, *More Borrowers with Risky Loans Are Falling Behind—Subprime Mortgages Surged as Housing Market Soared; Now Delinquencies Mount*, WALL ST. J., Dec. 5, 2006 ................................................................... 15

SEC Chairman Christopher Cox, Keynote Address to the Investment Company Institute (Apr. 30, 2008) ............................................................................................................ A1-A-2

SEC, OFFICE OF THE CHIEF ACCOUNTANT, REPORT & RECOMMENDATIONS PURSUANT TO SECTION 133 OF THE EMERGENCY ECONOMIC STABILIZATION ACT OF 2008: STUDY ON MARK-TO-MARKET ACCOUNTING (2008) ............................................................................ 37

SIFMA, *Global CDO Issuance Data*, 2004-2009 ......................................................... 15

SIFMA, RESEARCH QUARTERLY, Feb. 2007 .................................................................. 15

SIFMA, *U.S. Mortgage-Related Securities Issuance*, 1996-2009 ................................. 15

STANDARD & POOR'S, RATINGSDIRECT, UNDERSTANDING STANDARD & POOR'S RATING DEFINITIONS (2009) ........................................................................................................ 13

Standard & Poor's Request for Comment Teleconference: U.S. RMBS Rating Methodology & Assumptions for Prime Jumbo, Alt-A and Subprime Loans ..................... A-2

Tom Barkley et al., *IMF Sees U.S. Maladies Infecting World Economy*, WALL ST. J., Apr. 10, 2008 ..................................................................................................... 1

Yalman Onaran, *Subprime Bank Losses Reach $312 Billion with RBS, Nomura*, BLOOMBERG.COM, Apr. 28, 2008 ................................................................................................ 3

Yalman Onaran, *Banks' Subprime Losses Top $500 Billion on Writedowns*, BLOOMBERG.COM, Aug. 12, 2008 ............................................................................................... 3

Pursuant to Rules 9(b), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure, UBS AG ("UBS"), UBS Securities LLC, and twenty-two present and former UBS executives and board members (together, "Defendants") hereby move to dismiss with prejudice Plaintiffs' claims, in the Amended Consolidated Securities Class Action Complaint ("Amended Complaint" or "AC"):  in Counts I and II under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act");  and (ii) in Counts III, IV, and V under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act").[1]

## PRELIMINARY STATEMENT[2]

From 2006 through 2008, in response to what the International Monetary Fund and Federal Reserve Chairman Ben Bernanke have called the worst financial crisis since the Great Depression,[3] the share price of nearly every major financial institution dramatically declined.  Ignoring the financial crisis, Plaintiffs implausibly seek to attribute to fraud the decline in UBS's share price, which was in the middle of its peer group. Specifically, Plaintiffs allege

---

[1]  Plaintiffs' Exchange Act claims are against UBS, and Peter Wuffli, Marcel Ospel, Marcel Rohner, Clive Standish, Marco Suter, Walter Stuerzinger, Huw Jenkins, Ramesh Singh, David Martin, James Stehli, John Costas, and Michael Hutchins (the "Individual Defendants"). Plaintiffs' claims under the Securities Act are against UBS, UBS Securities LLC, Ernesto Bertarelli, Stephan Haeringer, Gabrielle Kaufman-Kohler, Sergio Marchionne, Rolf Meyer, Marcel Ospel, Helmut Panke, Marcel Rohner, Peter Spuhler, Marco Suter, Peter Voser, Lawrence Weinbach, and Joerg Wolle, and various underwriter banks.

[2]  In deciding Defendants' motion to dismiss the Amended Complaint, this Court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Speeches by government officials and newspaper articles reflecting what the public knew or believed at the time also are appropriate sources on a motion to dismiss.  *See, e.g., In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 383-88 (S.D.N.Y. 2003) (Pollack, J.) .

[3]  (*See* Ex. 1 (Tom Barkley et al., *IMF Sees U.S. Maladies Infecting World Economy*, Wall St. J., Apr. 10, 2008, at A9).)

UBS-specific "frauds" in connection with its disclosures regarding (i) UBS's positions in and writedowns of mortgage-related securities, and (ii) UBS's positions in and writedowns of auction rate securities ("ARS").  Seizing on UBS's February 19, 2009 settlements with the Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") involving certain activities of UBS's small, Swiss-based U.S. cross-border business involving U.S. taxpayers, Plaintiffs also try to manufacture a securities claim against Defendants, even though UBS never made any disclosures about that business and promptly disclosed the existence of the DOJ's and SEC's investigations.  As a matter of law, Plaintiffs' allegations, while spanning hundreds of pages, do not satisfy the heightened pleading requirements for securities fraud specified in Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("Reform Act").

　　　　*Mortgage-Related Securities.*  As to UBS's disclosures of its positions and losses in securities backed by U.S. residential mortgages, Plaintiffs have alleged, at most, that UBS— like virtually every other major financial institution—in retrospect, made the mistaken business judgment to invest in what were then AAA-rated securities.  In fact, UBS publicly disclosed its strategy of acquiring large positions in these mortgage-related securities, and then promptly disclosed its losses on these securities when, as Plaintiffs acknowledge, the broader mortgage-related securities market "severely dislocated in the summer of 2007."  (AC ¶ 314.)

　　　　At bottom, Plaintiffs' case rests on the same theories that this Court rejected in dismissing a similar shareholder class action against Wachovia, namely the "flawed assumption about the determinate outcome of the financial crisis" and the invalid presupposition that "the duration of the financial crisis was both inevitable and foreseeable to Defendants."  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 349 (S.D.N.Y. 2011).  Indeed, it is telling that eleven other courts have granted Rule 12(b)(6) motions to dismiss shareholder "stock drop" class

actions based on declines in the value of a defendant's positions in mortgage-related securities. (*See infra* at 34 to 35.)  As a matter of law, Plaintiffs' theory that UBS was not clairvoyant in predicting the scope of the financial crisis cannot satisfy their burden to allege a "strong inference of scienter."  *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

The facts of the financial crisis are well-known.  By mid-2008, leading financial institutions—none of which had announced any significant losses from mortgage-related securities before UBS did so—had disclosed massive losses and suffered substantial declines in their stock prices:

| Financial Institution | Losses and Writedowns (as of July 3, 2008)[4] | Stock Price % Change (Feb. 13, 2006 to July 3, 2008)[5] |
|---|---|---|
| Bear Stearns | $3.2 billion | -93% |
| Washington Mutual | $14.8 billion | -86% |
| Wachovia | $22.5 billion | -73% |
| Lehman Brothers | $8.2 billion | -66% |

---

[4]  (Ex. 2 (Yalman Onaran, *Banks' Subprime Losses Top $500 Billion on Writedowns*, BLOOMBERG.COM, Aug. 12, 2008); *see also* Ex. 3 (Yalman Onaran, *Subprime Bank Losses Reach $312 Billion with RBS, Nomura*, BLOOMBERG.COM, Apr. 28, 2008); Ex. 4 (Meg Fletcher, *Subprime Fallout Could Cost Billions*, BUS. INS., Apr. 1, 2008 ("[at least] 130 companies . . . reported $257 billion in subprime-related write-downs by early February [2008]")).)  The losses continued after the period during which the Amended Complaint alleges that UBS committed fraud concerning its mortgage-related positions, reaching over $670 billion by October 2008. (Ex. 5 (Gabi Thesing, *German Consumer Confidence Rises on Oil-Price Drop*, BLOOMBERG.COM, Oct. 28, 2008).)

[5]  February 13, 2006 is the date of the Amended Complaint's first alleged misstatement concerning UBS's mortgage-related positions (AC ¶¶ 736-46); July 3, 2008 is the date of the last alleged corrective disclosure concerning these positions (AC ¶ 1352).  The rest of the putative class period of August 13, 2003 to February 23, 2009 concerns alleged misstatements about UBS's small Swiss-based U.S. cross-border business.

| Financial Institution | Losses and Writedowns (as of July 3, 2008)[4] | Stock Price % Change (Feb. 13, 2006 to July 3, 2008)[5] |
|---|---|---|
| Citigroup | $55.1 billion | -59% |
| Merrill Lynch | $51.8 billion | -56% |
| **UBS** | **$44.2 billion** | **-55%** |
| Royal Bank of Scotland | $14.9 billion | -44% |
| Bank of America | $21.2 billion | -42% |
| Barclays | $9.1 billion | -42% |
| Morgan Stanley | $14.4 billion | -26% |
| Credit Suisse | $10.5 billion | -19% |
| Wells Fargo | $10 billion | -16% |
| Deutsche Bank | $10.8 billion | -8% |
| HSBC | $27.4 billion | -5% |
| JP Morgan Chase | $14.3 billion | -4% |

(Ex. 6 (Compilation of Stock Prices for Financial Institutions, Feb. 13, 2006 to July 3, 2008 ("Stock Price Compilation")).)

As 2008 went on, this severe market dislocation changed the face of the financial services industry.  Lehman Brothers and Washington Mutual declared bankruptcy; Bear Stearns, Merrill Lynch, and Wachovia were sold for far less than their market values just a year earlier; two of the three largest bank failures in U.S. history occurred; Fannie Mae and Freddie Mac were placed into government conservatorship; the Federal Reserve provided a $150 billion rescue package to AIG; and Congress enacted a more than $700 billion "bailout" of the industry.

Like its peers, UBS suffered in this global financial collapse, taking writedowns on previously secure, *AAA-rated* residential mortgage-backed securities ("RMBS"), "super

senior" tranches of collateralized debt obligations ("CDOs"), and other highly rated instruments. Over this period, UBS repeatedly announced specific profit warnings and writedowns on its mortgage-related positions.  In total, in the eight months after the onset of the worst financial dislocation in almost 80 years, UBS issued at least ten written disclosures and held numerous investor conference calls disclosing its losses—all in line with disclosures from peer institutions.

Predictably, shareholder class actions follow stock drops.  Since the onset of the financial crisis, the plaintiffs' bar has filed dozens of securities fraud actions against financial institutions, including this action against UBS, seeking to capitalize on the "severe dislocation" in the mortgage-related securities markets that began "in the summer of 2007." (*See* Ex. 7 (listing fraud actions brought in U.S. courts against financial institutions alleging improper valuations of mortgage-related securities).)[6]  Obviously, these suits do not allege a coordinated global conspiracy among financial institutions to defraud their shareholders.  Rather, they implausibly allege that officers and directors at each of these financial institutions independently conspired within their own institutions—unbeknownst to the marketplace or regulators—to increase and then to hide their exposures to toxic mortgage-related securities.

Plaintiffs here seek to obscure their inherently irrational theory of a UBS-specific "fraud" by filing a massive 548-page, 1477-paragraph Amended Complaint.  But the allegations do *not* satisfy the rigorous requirements for pleading securities fraud specified in Rule 9(b) and the Reform Act.  As one court emphasized, in granting a Rule 12(b)(6) motion to dismiss securities fraud claims based on alleged misstatements concerning the value of the issuer's positions in mortgage-related securities:   "One might be tempted to think that a complaint

---

[6]  (*See also* Ex. 8 (Kevin M. LaCroix, *Subprime & Credit Crisis-Related Securities Class Action Lawsuits*, THE D&O DIARY (Aug. 31, 2009).)

spanning more than 100 pages and consisting of more than 200 paragraphs could not fail to be specific. The temptation is dangerous and must be resisted." *In re 2007 Novastar Fin., Inc., Sec. Litig.*, No. 07-0139-CV-W-ODS, 2008 WL 2354367, at *2 (W.D. Mo. June 4, 2008), *aff'd*, 579 F.3d 878 (8th Cir. 2009).

*First*, Plaintiffs' theory of scienter rests on their contradictory allegations that (i) UBS's most senior executives knew *by no later than June 22, 2005* (AC ¶ 360)—over two years *before* the markets "severely dislocated in the summer of 2007" (AC ¶ 314)—that UBS's mortgage-related positions were materially overvalued, and yet (ii) irrationally chose to accumulate *additional hundreds of billions of dollars* of overvalued securities without protecting against a downturn in the market. (AC ¶¶ 46, 307.) Plaintiffs never explain why Defendants pursued this suicidal business strategy (which caused them to suffer large losses in their own UBS holdings and ultimately cost them their jobs) or did not use their supposed knowledge to UBS's and their own advantage by shorting such securities—as did some hedge funds and other financial institutions.[7] And, Plaintiffs do not explain how the alleged masterminds of this fraud, supposedly involving dozens of individuals and hundreds of billions of dollars, expected to make money when the markets inevitably "severely dislocated." (*See infra* at 28 to 31.) Indeed, Plaintiffs do not allege that any of the Individual Defendants sold their personal UBS holdings or otherwise capitalized on UBS's allegedly inflated share price.[8]

---

[7] (*See, e.g.*, Ex. 9 (Gregory Zuckerman, *Trader Made Billions on Subprime*, WALL ST. J., Jan. 15, 2008, at A1; Ex. 10 (Kate Kelly, *How Goldman Won Big on Mortgage Meltdown*, WALL ST. J., Dec. 14, 2007, at A1).)

[8] In support of their implausible theory of "fraud," Plaintiffs cite an investigation conducted by the Swiss Federal Banking Commission ("SFBC") of "UBS's losses in the U.S. residential mortgage market, and which individuals within UBS were responsible for the losses." (AC ¶ 79.) But the SFBC, in fact, concluded that UBS executives and personnel in UBS's Investment Bank ("IB") did *not* engage in fraud in accumulating and valuing U.S. mortgage-related

*(footnote continued . . .)*

*Second*, because the entire financial industry suffered from this market-wide dislocation, Plaintiffs cannot plead loss causation, as required by the Supreme Court in *Dura Pharms., Inc.* v. *Broudo,* 544 U.S. 336, 341-42 (2005).  Plaintiffs have not pleaded that an "ascertainable" amount of UBS's share price decline was caused by the revelation of their claimed company-specific fraud at UBS, as opposed to UBS's market-driven losses on mortgage-related securities and the broader downturn suffered by financial institutions and public companies generally during 2007 through early 2009.

*Third*, Plaintiffs do not adequately allege that any of UBS's disclosures concerning the amount, valuation, and riskiness of its positions in mortgage-related securities was materially false or misleading.  UBS disclosed to the market substantial information about its mortgage-related portfolios, including its method for valuing those securities.  At bottom, Plaintiffs simply take issue with UBS's business judgment to invest in AAA-rated securities, and claim that, in hindsight, UBS should have used different methods to value those securities.

**Auction Rate Securities.**  On their second theory of a UBS-specific "fraud," Plaintiffs spend just 13 pages—less than 3% of their 548-page Amended Complaint—alleging that, as with its holdings in mortgage-related securities, UBS executives secretly and irrationally accumulated concentrated and illiquid positions in auction rate securities ("ARS"), misrepresented *to UBS's customers* (as opposed to its *shareholders*) that ARS were as liquid as cash, and did not disclose to UBS shareholders that those securities were overvalued.  But Plaintiffs ignore (i) that other financial institutions similarly acquired large positions in the ARS

---

(*...continued footnote*)

securities.  (Ex. 11 (SFBC, *Subprime Crisis: SFBC Investigation Into the Causes of the Write-downs of UBS AG*, at 5 (Sept. 30, 2008) ("SFBC Report").)

market, (ii) their own admission that the ARS market "crashed" in February 2008 as the financial crisis grew (AC ¶ 87), and (iii) that UBS was among the first of its peers to disclose its ARS exposure and to write them down. As with their claims challenging UBS's disclosures about mortgage-related securities, Plaintiffs cannot turn a marketwide failure of the ARS market into a UBS-specific "fraud" against UBS shareholders. As a matter of law, they do not sufficiently allege that any UBS executives acted with scienter in making these alleged misstatements about ARS to UBS shareholders.

*UBS's U.S. Cross-Border Business.* For their third theory of "fraud," Plaintiffs latch onto UBS's settlements with the DOJ and SEC concerning conduct within UBS's small, Swiss-based U.S. cross-border business (which employed just 45 to 60 customer advisors out of more than 80,000 total UBS employees). Plaintiffs allege that UBS made materially misleading disclosures by (1) stating that UBS, a global firm, was "conservative" and acted with the "highest ethical standards," (2) inflating the amount of "net new money" ("NNM") that UBS generated each year by including NNM from the U.S. cross-border business, (3) misrepresenting that UBS had fixed certain "gaps" in its tax compliance systems, and (4) failing to disclose the DOJ's investigation of that conduct a few weeks earlier than UBS did.

In trying to convert the acts of a small number of UBS employees relating to certain U.S. individuals depriving the U.S. government of tax revenues into a broader claim of fraud against *UBS shareholders*, Plaintiffs ignore that (i) UBS never made any disclosures about its U.S. cross-border business until disclosing the existence of the DOJ's investigation; (ii) UBS's challenged statements concerning the ethics and integrity of its many global businesses were inactionable, aspirational statements under the securities laws; (iii) the amount of NNM generated by the business sector that included UBS's Swiss-based U.S. cross-border

business constituted just 0.3% of the overall NNM of UBS's global wealth management group; and (iv) as their own pleadings confirm, UBS disclosed that it had addressed "gaps" in its tax compliance systems unrelated to the U.S. cross-border business.

The Court also should dismiss the claim under the Securities Act that UBS's Registration Statement for its May 2008 Rights Offering was materially misleading, because the Registration Statement did not adequately disclose the investigation of UBS's Swiss-based U.S. cross-border business.  The Registration Statement and Prospectus Supplement did, in fact, disclose the investigations, and the market was well aware (through UBS's risk disclosures and numerous press reports) of the potential impact of the investigations on UBS's business.

### *Independent Grounds to Dismiss the Claims Against the Individual Defendants.*

Beyond the substantive failures of their claims, there are several additional grounds to dismiss all or some of Plaintiffs' claims against the Individual Defendants.  *First*, the Amended Complaint impermissibly employs a "shotgun" approach in making its allegations against the Individual Defendants, making it impossible to tell which claims are brought against which Defendants.  As a result, the Amended Complaint never links the Individual Defendants to one or more of the alleged frauds and seeks to hold Individual Defendants responsible for conduct occurring after they left UBS.  *Second*, the Amended Complaint does not sufficiently allege that any of the Individual Defendants acted with scienter or made materially false or misleading statements.

**THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS CHALLENGING UBS'S
DISCLOSURES ABOUT ITS POSITIONS IN MORTGAGE-RELATED SECURITIES**

**BACKGROUND**

**A.     UBS's Specific Warnings About Business Risks and Market Downturns**

In its public filings, UBS consistently warned investors that "[r]isk taking is a
major part of the business of a financial services firm," and that certain risks—including the very
risks that materialized during 2007 and 2008—could substantially impact its results.  (Ex. 12
(UBS AG, 2006 Annual Report (Form 20-F), at 15 (Mar. 21, 2007)).)  For example, UBS's 2006
Annual Report expressly warned about "risk factors" that could "impact our ability to carry out
our business strategies and can directly affect our earnings," including "[a]n economic downturn
. . . or a severe financial crisis."  (*Id.* at 14.)  UBS also warned that in a "severe financial crisis,"
like the one that began in the summer of 2007: (1) "reduced market liquidity may limit trading . .
. opportunities or impede our ability to manage risks, impacting . . . trading income"; (2) "the
assets we hold for our own account as investments or trading positions may fall in value"; and
(3) "impairments and defaults on credit exposures and on trading and investment positions may
increase."  (*Id.* at 14-15.)

UBS's 2006 Annual Report also presciently warned that:  "Our risk management
and control processes may not always protect us from loss," and "market fluctuations can
adversely affect our earnings. . . .  We could . . . suffer losses if:

- "we do not fully identify the risks in our portfolio, in particular risk concentrations
  and correlated risks";

- "our assessment of the risks we have identified, or our response to negative trends,
  proves to be inadequate or incorrect";

- "markets move in ways that are unexpected in terms of their speed, direction, severity
  or correlation and our ability to manage risks in the resultant environment is
  restricted"; and

> ▪ "third parties to whom we have credit exposure . . . are severely affected by unexpected events and we suffer defaults and impairments beyond the level implied by our risk assessment . . . ."

(*Id.* at 15.)

### B.   RMBS and CDOs

Plaintiffs' claims focus on securities backed by U.S. residential mortgages. These securities are characterized as "prime," "Alt-A," or "subprime," based on the creditworthiness of the borrower and other factors, such as loan-to-value ratio and loan documentation. (AC ¶¶ 161-62.) Underwriters like UBS created RMBS through the purchase and securitization of pools of residential mortgages with similar characteristics. (AC ¶ 163; Ex. 13 (UBS AG, Shareholder Report on UBS's Write-Downs ("Shareholder Report" or "SR"), at 45-46 (Apr. 18, 2008)).)[9] During the securitization process, underwriters and rating agencies "determine the right combination of mortgages to include as collateral for a given RMBS" and assign credit ratings to each class of RMBS. (AC ¶ 166.) Prior to the onset of the financial crisis, the highest class of RMBS generally was rated AAA, with subordinate classes bearing lower ratings (AA, A, BBB, etc.). (AC ¶¶ 166, 168.)

CDOs are more complex securities that can be backed by pools of assets or cash flows from different types of assets, including RMBS. (AC ¶ 170.) CDOs collateralized by higher-rated (*e.g.*, AA, A) classes of RMBS were known as "high grade" CDOs, while CDOs

---

[9] UBS submitted to the SFBC a confidential supervisory report, and provided to its shareholders a summary of that report. UBS also responded in writing to questions from shareholders concerning the effects of the deterioration of mortgage-related securities on UBS. (Ex. 14 (Answers to the Questions Submitted by Ethos, Swiss Foundation for Sustainable Development, and Pictet Funds SA to the Board of Directors and the External Auditors of UBS AG (Feb. 14, 2008) ("Ethos Answers")).) Because the Amended Complaint relies heavily on both the Shareholder Report and the Ethos Answers, the Court may consider the substance of these documents on this motion. (*See supra* at n.2.)

collateralized by lower-rated (*e.g.*, BBB) classes of RMBS were known as "mezzanine" CDOs. (AC ¶ 173.)  CDO underwriters worked with a third-party collateral manager to select the assets to collateralize the CDO, and with one or more rating agencies to devise a ratings-based structure for the CDO.  (AC ¶¶ 173, 181.)  As a result, a CDO's structure offered investors different degrees of risk, and correspondingly different levels of income, based on which "tranche," *i.e.*, level of risk, they invested in, as shown in the chart below.



(AC ¶ 175.)  Thus, CDOs backed by RMBS generally had senior AAA tranches (AC ¶¶ 175, 177), which were the least risky and lowest yielding tranches of CDOs (AC ¶ 178).  These "super senior" tranches, as the last tranches to suffer losses as a result of defaults on the underlying mortgage payments, were believed to be unlikely to suffer losses even with high default rates; consequently, ratings agencies rated them as AAA securities, even though the underlying collateral consisted of lower-rated securities.  (AC ¶¶ 173, 175-79.)

From 2005-2007, UBS accumulated RMBS and CDOs consisting almost exclusively of AAA-rated securities. (Ex. 11 (SFBC Report, at 6-7).) Significantly, AAA is the highest possible credit rating, "indicat[ing] an unusually strong capacity to pay interest and repay principal." David L. Scott, WALL STREET WORDS: AN A TO Z GUIDE TO INVESTMENT TERMS FOR TODAY'S INVESTOR 1 (2003) (definition of "AAA"). According to Standard & Poor's (one of three nationally recognized ratings agencies), "[a]n issuer or obligation rated 'AAA' should be able to withstand an extreme level of stress and still meet its financial obligations. A historical example of such a scenario is the Great Depression in the U.S." (Ex. 15 (Standard & Poor's, *RatingsDirect*: *Understanding Standard & Poor's Rating Definitions*, at 14 (June 3, 2009)).)[10] UBS believed that it could profit from holding these conservative, low-yielding instruments, because of UBS's low cost of borrowing funds. (AC ¶ 254.)

### C.     UBS's Disclosure of Business Strategy in the RMBS and CDO Markets

UBS underwrote and traded RMBS and CDOs as part of its *publicly announced* strategy to grow the fixed income business of the UBS Investment Bank ("IB"). (AC ¶¶ 234, 239-41; Ex. 16 (UBS AG, Product Day 2005: Mortgage and Asset-Backed Securities (May 12, 2005)).) As part of this plan, UBS disclosed in 2006 that it was "seeking to expand [its] fixed income business further by pursuing opportunities in . . . asset-backed securities." (Ex. 17 (UBS AG, 2005 Annual Report (Form 20-F), Handbook 2005/2006, at 46 (Mar. 21, 2006)).) In 2005, UBS launched a hedge fund, Dillon Read Capital Management LLC ("DRCM"), which managed (i) the IB's proprietary positions in a controlled finance company ("CFC") and (ii) client money in a separate outside investor fund ("OIF"). (AC ¶¶ 242, 250.)

---

[10]  *See also* Appendix A (collecting statements from public officials concerning the perceived low risk of AAA-rated securities).

In pursuing these disclosed growth strategies, several businesses within the IB and DRCM accumulated large positions in RMBS and CDOs.  (Ex. 13 (SR, at 7, 12-16).)  As these businesses grew, UBS publicly disclosed its accumulation of large mortgage-related positions. Indeed, the Amended Complaint relies on and even quotes UBS's disclosures in the first, second, and third quarters of *2006*, stating that:

> For 1Q 2006, UBS reported that the amount of its debt instruments, which included RMBS and super senior CDO tranches, grew by ***CHF 5 billion*** from the previous quarter's level, 'mainly due to higher positions in commercial paper and asset-backed securities.'  In 2Q 2006, [UBS AG's] debt instruments rose by a whopping ***CHF 69 billion***, again, 'mainly due to higher positions in . . . asset backed securities. . . . [In] 3Q 2006 . . . UBS reported that debt instruments had risen another ***CHF 50 billion***, 'mainly due to higher positions in [asset backed securities].'

(AC ¶ 307 (quoting Ex. 18 (UBS AG, 1Q 2006 (Form 6-K), at 50 (May 4, 2006)); Ex. 19 (UBS AG, 2Q 2006 (Form 6-K), at 52 (Aug. 15, 2006)); Ex. 20 (UBS AG, 3Q 2006 (Form 6-K), at 52 (Oct. 31, 2006))).)  Tellingly, the Amended Complaint concludes that "[t]he effect on UBS's balance sheet of its . . . investment in subprime-backed CDOs was ***immediately apparent***."  (AC ¶ 307 (emphasis added).)

In opposing Defendants' initial motion to dismiss, Plaintiffs tried to backtrack by arguing that this allegation "cannot be read in isolation, and the averments contained therein, when read in conjunction with the other allegations in the [First Consolidated] Complaint and the Company's public filings, do not support the proposition that UBS's huge position in subprime and Alt-A mortgage-backed securities was 'immediately apparent' to the public at large from UBS's growing asset base."  (Pls. 12(b)(6) Opp. at 29-30.)  Despite Plaintiffs' effort to explain their inconsistent pleadings, UBS plainly disclosed that it was taking on hundreds of billions of dollars in asset-backed securities, and the market knew that these asset-backed securities included large positions in securities backed by subprime and Alt-A residential loans, because

subprime and Alt-A backed securities constituted at least 40% of the asset-backed securities market during 2005 and 2006.[11] Thus, the market understood that UBS's disclosed accumulation of CHF 124 billion in asset-backed securities, together with UBS's disclosures that it would seek to expand its "non-agency and subprime business," meant that UBS was accumulating substantial amounts of subprime and Alt-A securities in the first three quarters of 2006 alone.

### D.   Lower-Rated Subprime Securities Decline in Value in Early 2007

During 2006, as the U.S. housing market began slowing (AC ¶ 1068-70), securitization of RMBS and CDOs continued to expand, and market participants and regulators believed that these AAA-rated securities would not suffer losses even as delinquency and default rates in the housing market rose.[12] While the Amended Complaint cites examples of negative

---

[11] The estimate that mortgage-related securities backed by subprime and Alt-A loans constituted 40% of all ABS during that time period is very conservative in that it only includes "HEL" or home-equity loan securities (*see* Ex. 21 (Bond Mkt. Ass'n, RESEARCH QUARTERLY, Feb. 17, 2006, at 7 (noting that HEL issuance in 2005 was $453.6 billion of a total ABS issuance of $1.1 trillion)); Ex. 22 (SIFMA, RESEARCH QUARTERLY, Feb. 2007, at 8 (noting that HEL accounted for nearly 40% of the ABS market in 2006))), which are mainly backed by subprime or other loans to lower-credit-quality borrowers (*see* Ex. 23 (Andrew Davidson et al., SECURITIZATION: STRUCTURING & INVESTMENT ANALYSIS 325 (2003) ("Only a very small portion of the entire HEL ABS market consists of prime second mortgages"))). This estimate thus excludes subprime and Alt-A mortgages that were securitized in "non-agency" mortgage-backed securities ("MBS"), which, along with HEL securities, were referenced in CDOs. If this estimate included (i) the close to $1 trillion of non-agency RMBS that was issued in each of 2005 and 2006, and (ii) the approximately $250 billion and $500 billion of CDOs that were issued in 2005 and 2006, respectively (Ex. 24 (SIFMA, *U.S. Mortgage-Related Securities Issuance*, 1996-2009); Ex. 25 (SIFMA, *Global CDO Issuance Data*, 2004-2009)), the total amount of securitized products referencing subprime and Alt-A mortgages would have substantially exceeded 40% of all ABS.

[12] (*See, e.g.*, Ex. 26 (Ruth Simon & James R. Hagerty, *More Borrowers with Risky Loans Are Falling Behind—Subprime Mortgages Surged as Housing Market Soared; Now, Delinquencies Mount*, WALL ST. J., Dec. 5, 2006, at A1, cited in AC ¶ 1057(d) ("Because of the way mortgage-backed securities are structured, investors who buy investment-grade [*i.e.*, rated BBB- or higher] securities aren't likely to be hurt if losses are close to expectations. . . . [I]f the losses on the underlying mortgages substantially exceed expectations, some investors who buy the riskiest slices of subprime securities are likely to rack up losses.")).)

sentiment in UBS's CDO market research (*e.g.*, AC ¶ 859), market participants and analysts, including UBS's own internal research group, consistently believed that a normal downturn in the real estate market (even if accompanied by significant defaults on subprime loans) likely would not harm highly rated assets that were specifically designed to withstand such defaults. (*See*, *e.g.*, Ex. 27 (CDO INSIGHT, Apr. 12, 2007, at 3 ("[T]he only risk that senior AAA tranche holders . . . face is the potential downgrade of their bonds within investment grade rating categories.  Actual loss is a remote possibility for those tranches.")).)

As Plaintiffs recognize, "the [subprime] market moved in mid to late February 2007." (AC ¶ 978 (internal quotation marks omitted).)  This movement affected the price of *lower-rated* subprime securities[13]—not the price of the higher-rated securities held by the UBS IB—and caused DRCM to take markdowns on such securities.  (Ex. 13 (SR, at 12); Ex. 14 (Ethos Answers, at 7, 9).)  In other words, while the UBS IB was exposed to subprime risk, the Amended Complaint ignores that the IB was not exposed to risks similar to those faced by DRCM, because the vast majority of the IB's mortgage-related positions were in AAA-rated assets.

When notified of these markdowns in lower-rated securities held by DRCM, UBS Chief Risk Officer Walter Stuerzinger ordered a review by UBS Group Internal Audit ("GIA") (AC ¶ 382), which concluded that "the write-downs resulted from a combination of extraordinary market developments" and a trading strategy for these lower-rated subprime securities that did not perform as expected.  (Ex. 14 (Ethos Answers, at 15).)  "[GIA's] review also highlighted that

---

[13]  The lower-rated tranches of the ABX indices also reflected this market movement.  (AC ¶¶ 212, 216, 356.)  In early 2007, the decline in lower-rated tranches of the ABX did not lead any financial institution to mark down AAA-rated subprime assets—whether RMBS or CDO tranches—including super seniors from mezzanine CDOs.

(i) improvements were required in analyzing, measuring and reporting risks inherent in sub-prime related activities; and (ii) valuation uncertainties in both IB and DRCM portfolios were not sufficiently transparent and inherent risks not adequately analyzed." (*Id.*) As a result of this report, UBS management "requested an in-depth analysis of the trading positions of the IB . . . to ascertain whether the IB was exposed to risks similar to those of DRCM," but the "results of this . . . analysis [became] available only after the Subprime mortgage crisis had unfolded [in the summer of 2007]." (Ex. 11 (SFBC Report, at 11).)

In addition to GIA's review, UBS's Business Unit Control ("BUC") reported its assessment of the principal valuation issues for UBS's mortgage-related securities to UBS's Audit Committee in April 2007, stating that although "[t]he diminished market liquidity and transparency" in the first quarter had led to "a substantial reduction in the coverage of independent price testing of Subprime securities," UBS's AAA-rated super senior securities were a "net flat risk or low risk for valuation purposes." (Ex. 13 (SR, at 22-23).) Moreover, on April 25, 2007, Ernst & Young ("E&Y"), UBS's independent outside auditor advised the UBS Audit Committee that "nothing had come to [its] attention to indicate that fair values [of UBS's portfolios] at 31 March 2007 were inappropriate." (*Id.* at 24.)

In March 2007, Federal Reserve Chairman Ben Bernanke advised Congress that "the impact on the broader economy and financial markets of the problems in the subprime market seems likely to be contained." (Ex. 28 (Ben S. Bernanke, Testimony before the Joint Economic Committee, U.S. Congress (Mar. 28. 2007), at 2).) In April 2007, after several financial institutions announced writedowns on whole real estate loans (*i.e.*, non-securitized mortgages) (AC ¶¶ 1101, 1103-06), the IMF reported that "even under scenarios of nationwide house price declines that are historically unprecedented, most investors with exposure to

subprime mortgages through securitized structures *will not face losses*."  (Ex. 29 (Int'l Monetary

Fund, *Global Financial Stability Report*, at 7 (Apr. 2007) (emphasis added)).)

       **E.**      **UBS's Early Disclosure of Subprime-Related Losses**

          On May 3, 2007, UBS reported its first quarter 2007 results, including "negative

trading revenues from the [UBS IB's] proprietary capital managed by DRCM of approximately

CHF 150 million in the context of difficult market conditions in US mortgage securities."

(Ex. 30 (UBS AG, 1Q 2007 (Form 6-K), at 1 (May 3, 2007)).)  UBS specifically stressed that

"[t]he US sub-prime mortgage market suffered a major dislocation in February resulting in

significant markdowns and reduced liquidity, with limited contagion to other markets."  (*Id.* at

5.)  UBS also announced the closure of DRCM and redemption of its OIFs, acknowledging that

DRCM "turned out not to be successful."  (Ex. 31 (UBS AG, 1Q 2007 Earnings Conference Call

(Afternoon Call), at 2 (May 3, 2007)).)

       **F.**      **The Onset of the Financial Crisis and the Unexpected Decline in Value of AAA-Rated Mortgage-Related Securities**

         **1.**      **UBS's Disclosure of Second Quarter 2007 Results**

          During the second quarter of 2007, markets for residential mortgage-related

securities, including lower-rated securities, recovered somewhat from the first quarter, leading

many government regulators and market observers to believe that the worst was over.  (*See supra*

at 17-18.)  Nevertheless, in its August 14, 2007 disclosure of second quarter results, UBS

discussed prevailing market conditions, and issued a profit warning for the IB for the second half

of 2007:

> By April, markets had temporarily recovered from the disruption that followed the
> US sub-prime market dislocation in February and March.  Volatilities were down,
> although still above the levels seen early in first quarter. . . .  Continuing bad news
> about collateral values on US sub-prime mortgages triggered sharper declines in
> credit markets in the second half of June . . . .

(Ex. 32 (UBS AG, 2Q 2007 (Form 6-K), at 5 (Aug. 14, 2007)).)  UBS also announced that, as a result of these market conditions, it had sustained losses: "Continued difficulties in the US mortgage securities market led to lower revenues in our rates business and further losses in some of DRCM's former portfolios.  The DRCM business itself contributed net negative revenues of approximately CHF 230 million in second quarter 2007."  (*Id.* at 2.)

UBS specifically warned that these uncertain market conditions threatened the IB's future profits:

> ***This quarter's downturn in credit and equity markets was a timely reminder of the nature of financial risk, and has continued into third quarter.***  Our asset and wealth management businesses show sustained strength, and investment banking deal pipelines remain promising.  However, ***markets are currently very volatile, and forecasting is even more difficult than usual.***  If the current turbulent conditions prevail throughout the quarter, we will probably see ***a very weak trading result in the Investment Bank***, offset by predictable earnings from wealth and asset management.  This makes it likely that ***profits in the second half of 2007 will be lower than in the second half of last year.***

(*Id.* (emphasis added).)   In so doing, UBS was among the first of its peers to make such a forward-looking profit warning.

## 2.  The Impact of the Credit Crisis on Higher-Rated Securities

As the "markets severely dislocated in the summer of 2007" (AC ¶ 314), even previously secure AAA mortgage-related securities began to decline in value and became illiquid, and the securitization market effectively closed down.  Numerous regulators, financial institutions, and commentators observed that these circumstances made it extraordinarily difficult to determine the value of such securities.  (*See*, *e.g.*, Ex. 33 (News Release, *SEC Office of the Chief Accountant and FASB Staff Clarifications on Fair Value Accounting* (Sept. 30, 2008) ("The current environment has made questions surrounding the determination of fair value particularly challenging for preparers, auditors, and users of financial information.").))

### 3.     UBS's Disclosures of RMBS and CDO Writedowns

#### a.     Third Quarter 2007 Disclosures

On October 1, 2007, the *first day* after the end of its third quarter, UBS *pre-announced* estimated third quarter results, disclosing "significant write downs on positions in Super Senior AAA-rated tranches of CDOs" and a likely overall pre-tax loss of between CHF 600 million and CHF 800 million for the quarter.  (Ex. 34 (UBS, Media Release (Form 6-K), at 1-3 (Oct. 1, 2007)).)  UBS also disclosed that its remaining subprime RMBS, the overwhelming majority of which were rated AAA, were valued at $19 billion, and its exposure to subprime RMBS and CDOs as a result of warehousing and retention of CDO tranches was valued at $4 billion.  (*Id.* at 3.)

On October 30, 2007, UBS reported third quarter results in line with its pre-announcement, including writedowns on subprime RMBS and CDO positions of $4.4 billion.  (Ex. 35 (UBS AG, 3Q 2007 (Form 6-K), at 7 (Oct. 30, 2007)).)  UBS also provided extensive disclosures of its mortgage-related exposure, including details concerning the size and nature of its subprime positions and the valuation models used to value these positions, which UBS stated were "calibrated to transactions in similar instruments." (*Id.*)  UBS also warned that the value of its remaining positions "depend[ed] on developments in the underlying mortgage pools," and that UBS "remain[ed] exposed to further deterioration in the US housing and mortgage markets as well as rating downgrades for mortgage-related securities." (*Id.* at 2.)

b.      **Fourth Quarter 2007 Disclosures**

As financial market conditions worsened considerably in the fourth quarter, UBS and nearly all of its peers announced further significant mortgage-related writedowns.[14]  On December 10, 2007, UBS disclosed further deterioration in the market for subprime securities had resulted in a further writedown of $10 billion as of the end of November, primarily on super senior and CDO holdings.  (Ex. 39 (UBS AG, Media Release (Form 6-K), at 1 (Dec. 10, 2007)).)  UBS explained that it now anticipated a loss for the fourth quarter and, possibly, the year, and had taken steps to strengthen its capital base.  (*Id.*)  The next day, UBS provided additional detail on its exposures and valuation methodology.   (Ex. 40 (UBS AG, UBS Investor Event Presentation (Dec. 11, 2007)).)

On January 30, 2008, UBS disclosed further fourth quarter writedowns of $2 billion on subprime-related positions and $2 billion on other residential mortgage-related positions.  (Ex. 41 (UBS AG, Media Release (Form 6-K), at 1 (Jan. 30, 2008)).)

On February 14, 2008, UBS disclosed fourth quarter losses of $13.7 billion on subprime and Alt-A positions, including RMBS, super senior CDO tranches, and reference-linked notes ("RLNs"), as well as on credit protection purchased from monoline insurers.  UBS also discussed its Alt-A RMBS positions, which had suffered from spread widening[15] late in the

_____

[14]  For example, for the fourth quarter of 2007, Citigroup reported $18.1 billion in writedowns ($14.3 billion of which was attributable to super senior CDO tranches), Merrill Lynch reported $11.5 billion in net losses within its Fixed Income business ($9.9 billion of which was attributable to writedowns of CDOs), and Morgan Stanley reported $9.4 billion in writedowns ($7.8 billion of which was attributable to subprime, principally super senior CDO tranches). (Ex. 36 (Citigroup Inc., 2007 Annual Report (Form 10-K), at 48 (Feb. 22, 2008)); Ex. 37 (Merrill Lynch & Co., Inc., 4Q 2007 Earnings Release (Form 8-K), at 5 (Jan. 17, 2008); Ex. 38 (Morgan Stanley, 2007 Annual Report (Form 10-K), at 51 (Jan. 28, 2008)).)

[15]  A "spread" on a bond refers to the difference between that bond's yield and the yield on a comparable benchmark security, often a U.S. Treasury security.  (Ex. 42 (Frank J. Fabozzi,

(*footnote continued . . .*)

quarter.  (Ex. 43 (UBS AG, 4Q 2007 Earnings Conference Call, at 5, 7-8 (Feb. 14, 2008)).)  UBS

further warned that "[***UBS] expect[s] 2008 to be another difficult year***."  (Ex. 44 (UBS AG, 4Q

2007 (Form 6-K), at 4 (Feb. 14, 2008) (emphasis added)).)

### c.     First Quarter 2008 Disclosures

On April 1, 2008, UBS *pre-announced* that, as a result of even further market

deterioration, it had taken an additional $19 billion writedown on U.S. real estate and related

structured credit positions, and provided a detailed explanation of the writedowns and exposures

in a conference call.  (Ex. 45 (UBS AG, Media Release (Form 6-K), at 1-2 (Apr. 1, 2008)).)

### LEGAL STANDARD

Under Rule 12(b)(6), this Court must dismiss a complaint if it fails to plead

"enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.*

v. *Twombly*, 550 U.S. 544, 570 (2007).   To state a claim for relief under Section 10(b),

"[P]laintiffs must allege that [Defendants] '(1) made misstatements or omissions of material fact;

(2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which

plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.'"

*Lentell* v. *Merrill Lynch & Co. Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation omitted).

The Reform Act—enacted "to deter strike suits wherein opportunistic private

plaintiffs file securities fraud claims of dubious merit in order to exact large settlement

recoveries," *Lentell*, 396 F.3d at 171—"insists that securities fraud complaints 'specify' each

misleading statement; that they set forth the facts 'on which [a] belief' that a statement is

---

(*...continued footnote*)

*Handbook of Fixed Income Secs.* 329 (7th ed. 2005)).)   When that difference increases, or
"widens," it reflects the market's view that the bond's risk of default has increased.  (*See id.* at
135-36, 329, 782.)

misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,'" *Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U.S. 71, 81-82 (2006) (internal quotation marks omitted).

## ARGUMENT

I.   **PLAINTIFFS FAIL TO ALLEGE A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER IN MAKING DISCLOSURES ABOUT UBS'S POSITIONS IN MORTGAGE-RELATED SECURITIES.**

The heart of any securities fraud case is scienter—"a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). In determining if Plaintiffs have met their burden of pleading "an inference of scienter *at least as likely as* any plausible opposing inference," the Court:

> must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.

*Id.* at 314, 328.

Plaintiffs may establish a strong inference of scienter only by pleading particularized facts that "(1) show[] that the defendants had both motive and opportunity to commit the fraud or (2) constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Where "[a] plaintiff has failed to demonstrate that defendants had a motive to defraud . . . he must produce a *stronger* inference of recklessness." *Kalnit* v. *Eichler*, 264 F.3d 131, 143 (2d Cir. 2001) (emphasis added); *see also Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) (stressing the "significant burden on the plaintiff in stating a fraud claim based on recklessness"). And, regardless of how Plaintiffs try to plead scienter, at the end of its evaluation, the Court must be convinced that the inference of scienter is "at least as compelling" as any competing inferences. *Dynex*, 531 F.3d at 197.

Scienter must be based on direct knowledge or reckless conduct that "is highly unreasonable and . . . represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill*, 101 F.3d at 269 (internal quotation marks omitted). "*[P]oor business judgment is not actionable* under section 10(b) and Rule 10b-5." *Rothman* v. *Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (emphasis added) (citation omitted). Moreover, Plaintiffs must show that "the individual corporate officer making the statement" acted with scienter, and "[i]t is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false." *Kinsey* v. *Cendant Corp.*, 04 civ. 0582, 2004 WL 2591946, at *13 (S.D.N.Y. Nov. 16, 2004) (Sweet, J.) (citation omitted).

### A. As a Matter of Law, Plaintiffs Have Not Pleaded a Strong Inference of Scienter Here.

Notwithstanding its massive girth, the Amended Complaint is a classic "fraud by hindsight" pleading, whereby Plaintiffs second-guess a series of business judgments by UBS executives trying to navigate the worst financial crisis in 80 years. While acknowledging that the mortgage-related securities market "severely dislocated in the summer of 2007," Plaintiffs ignore that this severe dislocation forced virtually all financial institutions, investors of all types, and regulators around the world to re-evaluate once-universally-held assumptions about the safety and value of *AAA-rated* mortgage-related securities. Following that unanticipated market dislocation, UBS—like its peers—lost substantial value in assets uniformly believed, including by regulators, to be low risk investments. Then, in response to deteriorating market conditions, UBS accurately and timely disclosed these losses to investors in a series of disclosures.

###### 1.   Plaintiffs Fail to Allege a Cognizable Motive for the Alleged Fraud.

Tellingly, Plaintiffs do not allege that any of the UBS executives who made the alleged misstatements (1) engaged in insider trading in UBS securities, or (2) were compensated based on the performance of mortgage-related securities or the results of UBS business units acquiring those securities.  *See Kalnit* v. *Eichler*, 85 F. Supp. 2d 232, 243 (S.D.N.Y. 1999) (Scheindlin, J.) ("There is no allegation of any insider trading by any of the defendants, nor is there any allegation of pecuniary gain. . . . [Second Circuit precedent] does not permit mere conclusory allegations of motive to satisfy the requirements of Rule 9(b) and the Reform Act."), *aff'd*, 264 F.3d 131 (2d Cir. 2001); *Bd. of Trustees of Ft. Lauderdale Gen. Employees' Retirement Sys.* v. *Mechel OAO*, 09 civ. 3617, 2011 WL 3502016, at *11 (S.D.N.Y. Aug. 9, 2011) (Sullivan, J.) (plaintiffs' failure to allege that "any of the Individual Defendants . . . sold their shares during the Class Period" weighs against finding a motive to commit fraud).

At best, Plaintiffs allege that the UBS executives who made the alleged misstatements planned to grow the IB, and that limiting the IB's acquisition of mortgage-related securities might "potentially impact [] their growth plans."  (AC ¶ 1020.)  But the Second Circuit has consistently held that such generalized allegations are insufficient to establish motive, because they do not "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994); *see also Acito* v. *Imcera Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (executives' desire to achieve "an inflated stock price [to] increase their compensation" does not constitute a cognizable motive to commit fraud); *Mechel*, 2011 WL 3502016, at *10 ("[A company's] need to attract in investors in order to pay down debt accruing from prior acquisitions is insufficient to demonstrate scienter because it is common to most for-profit companies.").

### a.     UBS's Compensation Structure Did Not Create an Incentive for the Individual Defendants to Commit the Alleged Fraud.

During the putative class period, UBS's senior executives typically received at least half of their incentive compensation in restricted UBS shares.  (Ex. 46 (UBS AG 2007 Annual Report, ch. 3 (Compensation Report), at 26 (Mar. 18, 2008)).)  These shares normally vested in equal portions over a five-year period, and UBS's most senior executives (Messrs. Ospel, Wuffli, Rohner, Standish, Suter, and Stuerzinger) could not sell these shares until the end of this five-year period.  (*Id.*)

As a result, these UBS senior executives had every incentive to protect the *long-term* health of the institution, and not to embark on a massive short-term "fraud" that would not only cause them great personal loss, but could not be hidden for the lengthy period needed for them to profit on their restricted shares.  *See Rombach* v. *Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (finding "no personal interest sufficient to establish motive" where defendants, all major shareholders, "shared the pain when the company failed"); *see also Wachovia*, 753 F. Supp. 2d at 349 (noting that "a net increase in company holdings . . . during the class period signals only confidence in the future of the company") (quotation omitted).

Plaintiffs allege, based on confidential witnesses and newspaper articles, that certain UBS employees were compensated based on their total amount of CDO origination (and not the proper valuation of those CDOs).  (AC ¶¶ 329-30, 1047.)  This compensation structure, however, was limited to UBS's "U.S.-based" "CDO traders" (AC ¶¶ 329, 1244), and therefore does not provide evidence of the claimed scienter of the Individual Defendants responsible for the challenged disclosures—none of whom was a U.S.-based CDO trader.  Moreover, Plaintiffs' allegation that Mr. Hutchins was part of this CDO-trader group of U.S. employees (AC ¶¶ 329-30) is contradicted by their recognition that Mr. Hutchins in June 2005 moved from the IB to

-26-

DRCM (AC ¶¶ 41-42, 129).  Plaintiffs do not allege that DRCM tied its compensation to any CDO origination program.

Moreover, the departures of several of the Individual Defendants and other UBS employees do not raise a strong inference of scienter, because Plaintiffs fail to make any specific allegation that these departures were due to knowledge of any alleged fraud.  *See In re PXRE Grp. Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 544-45 (S.D.N.Y. 2009) (Sullivan, J.) ("Without additional factual allegations linking [the executive's] resignation . . . to the alleged fraud, the Court finds these allegations insufficient to raise a strong inference of scienter.") (citing cases).

### b.    UBS Repurchased Its Own Shares at Allegedly Inflated Prices and Sold Those Shares When the Price Was Low.

During 2006 and 2007, UBS repurchased more than $4.1 billion of its own shares at an average price of over $59.17 per share.  (Ex. 19 (UBS 2Q 2006 6-K, at 54); Ex. 20 (UBS 3Q 2006 6-K, at 53); Ex. 47 (UBS AG, 4Q 2006 (Form 6-K), at 56 (Feb. 13, 2007)); Ex. 30 (UBS 1Q 2007 6-K, at 17); Ex. 32 (UBS 2Q 2007 6-K, at 16); Ex. 35 (UBS 3Q 2007 6-K, at 16); Ex. 44 (UBS 4Q 2007 6-K, at 57-58).)  In fact, in the third quarter of 2007, right before Plaintiffs allege that UBS began making the heart of its "corrective" disclosures, UBS purchased more than 17 million shares at over $57 per share (for a total of $1 billion).  (Ex. 35 (UBS 3Q 2007 6-K, at 53).)  In the fourth quarter of 2007, *after* UBS's share price decline, UBS then suspended this buyback program.  (Ex. 44 (UBS 4Q 2007 6-K, at 60).)[16]  On May 19, 2008, UBS issued a share dividend of 98.7 million shares, and on May 23, 2008, UBS conducted a rights offering

---

[16]  UBS also purchased 3.215 million shares for $330 million during the first quarter of 2006 (which is within the putative class period) for a (stock-split adjusted) price of $51.32 per share. (Ex. 18 (UBS 1Q 2006 6-K, at 51).)

that enabled shareholders to purchase 7 UBS shares at $20.59 per share for every 20 shares they held.  (Ex. 48 (UBS AG, 2Q 2008 (Form 6-K), at 58-59 (Aug. 12, 2008)).)

Thus, contrary to Plaintiffs' theory of scienter, UBS bought its own shares in 2006 and 2007, while the price was high, and sold those shares in 2008, when the price was low. Such a strategy would have been economically irrational if UBS executives actually believed that UBS's holdings in soon-to-be-written-off mortgage-related securities had inflated its share price.  *See*, *e.g.*, *McNamara* v. *Pre-Paid Legal Servs., Inc.*, 189 F. App'x 702, 717-18 (10th Cir. 2006) (affirming dismissal of a securities fraud claim because, while the "Consolidated Complaint raises some serious 'red flags'. . . it is lacking in allegations demonstrating [defendants'] alleged fraud was economically logical in light of [its] repurchase of its own stock at allegedly inflated prices").[17]

### 2. Plaintiffs' Theory of Scienter Is Implausible and Makes No Economic Sense.

Plaintiffs' theory of scienter rests on the allegations that UBS (1) misrepresented the strength of its risk control mechanisms (*e.g.*, AC ¶ 45), (2) hid the accumulation of mortgage-related securities (*e.g.*, AC ¶ 46), (3) misrepresented the value of those securities (*e.g.*, AC ¶ 60), and (4) failed to disclose timely their devaluation when the market dislocated (*e.g.*, AC ¶ 348). But Plaintiffs' theory of scienter is implausible and not sufficiently "cogent" or "compelling," as required by *Tellabs*, 551 U.S. at 314, to overcome the obvious alternative inference that UBS— like the Federal Reserve, IMF, SEC, ratings agencies, and virtually every other financial

---

[17]  Absent well-pleaded allegations that UBS or the Individual Defendants benefitted in some concrete way from this seemingly irrational decision, UBS's repurchase of its own shares weighs heavily against any inference of scienter.  *See In re Security Capital Assurance Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 594 (S.D.N.Y. 2010) (Batts, J.)  ("That Defendants increased their holdings during the Class Period, and did not sell their stock prior to a price drop suggest[s] the absence of any nefarious motives.").

institution in the world—failed to predict the severity and impact of the rapid and unexpected "sever[e] disloca[tion]" of the markets in the summer of 2007 (AC ¶ 314).

<blockquote>

**a.      Plaintiffs' Allegation That UBS Purposely Poured Billions of Dollars into Overvalued Mortgage-Related Securities Defies Economic Sense.**

</blockquote>

In their fraud-by-hindsight Amended Complaint, Plaintiffs allege that UBS executives responsible for the alleged misstatements knew no later than June 22, *2005* that up to $50 billion of UBS's mortgage-related securities portfolio was overvalued.  (AC ¶¶ 963-64.)  But then Plaintiffs assert that these same executives irrationally:

- allowed the IB and DRCM to accumulate *additional* hundreds of billions of dollars in overvalued mortgage-related securities (AC ¶¶ 46, 307);

- allowed the IB to hedge those securities for only 2-4% of their value (AC ¶ 324); and

- did not take massive short positions on mortgage-related securities (*see supra* at 6).

Plaintiffs provide no reason for this behavior, and its irrationality refutes any inference of fraudulent intent.  If Defendants knew what Plaintiffs allege they did, Defendants could have used that knowledge to enrich UBS and themselves, or at least to avoid massive losses.  Indeed, some financial institutions made billions of dollars by taking short positions in mortgage-related securities before the market downturn and purchasing default protection on those securities when it was relatively cheap.  (*See supra* at 6.)  As this Court explained in *PXRE*, "the seeming futility of Defendants' alleged scheme is relevant to the [scienter] analysis."  600 F. Supp. 2d at 533; *see also GSC Partners CDO Fund* v. *Wash.*, 368 F.3d 228, 244 (3d Cir. 2004) (dismissing a securities claim for failure to plead scienter because "[t]here is simply nothing to suggest that [the defendant] was on a suicide mission in this acquisition").

The Second Circuit's decision in *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ("*JP Morgan*"), is directly on

point.  There, shareholders alleged that JP Morgan Chase ("JPMC") fraudulently concealed that it made loans to Enron that would not be repaid.  In affirming dismissal for failure to plead scienter, the Second Circuit emphasized that the complaint "fail[ed] to allege facts explaining why, if [JPMC] was aware of Enron's problems, [JPMC] would have continued to lend Enron billions of dollars."  *Id.* at 203; *see also Fadem* v. *Ford Motor Co.*, 352 F. Supp. 2d 501, 525 (S.D.N.Y. 2005) (Haight, J.)  (granting motion to dismiss where "[t]his [alleged conduct] is a recipe for economic disaster, which in fact came to pass, and is inconsistent with hopes for or expectations of increased bonuses"), *aff'd*, 157 F. App'x 398 (2d Cir. 2005); *Davidoff* v. *Farina*, 04 civ. 7617, 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005) (Buchwald, J.) (granting motion to dismiss where "it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail").

> **b.**     **Plaintiffs Never Explain How UBS Planned to Conceal Its Build-up of Allegedly Overvalued Mortgage-Related Securities.**

Similarly, Plaintiffs never contend that Defendants thought they could possibly conceal UBS's accumulation of such massive amounts of allegedly overvalued securities—the magnitude of which was generally known to the public, because UBS had publicly disclosed such information. (*See supra* at 13 to 15.)  Indeed, Plaintiffs' allegations are inconsistent in this regard—on the one hand, they claim that UBS executives knowingly pushed UBS down a path of inevitable disaster, but, on the other hand, somehow thought such disaster could be concealed. The implausibility of concealing such a massive "fraud" weighs heavily against any inference of scienter.  *See*, *e.g.*, *Shields*, 25 F.3d at 1130 (inference of scienter was weak, because without

allegations showing the Defendants' motive to commit a short-term fraud, "[i]t is hard to see what benefits accrue from a short respite from an inevitable day of reckoning").[18]

### c. UBS's Numerous Early Profit Warnings Undercut Any Inference That Defendants Acted with Scienter.

UBS issued ten disclosures and held several investor conference calls, including early warnings of a decline in future profits on August 14, 2007 and pre-announcements of quarterly earnings on October 1, 2007, December 10-11, 2007, January 30, 2008, and April 1, 2008, identifying the significant risks posed to UBS's balance sheet by the volatility in the markets for mortgage-related securities. (*See supra* at 18-22.) As this Court explained in *In re PXRE*, the "inference of scienter is further belied by . . . Defendants' willingness to issue a steady stream of press releases, replete with cautionary language, informing the public of PXRE's updated initial loss estimates as more information became available . . . ." 600 F. Supp. 2d at 533-34; *see also Rombach*, 355 F.3d at 176 ("[T]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file [their] financial statements."); *Kuriakose* v. *Fed. Home Loan Mortg. Corp.*, 08 civ. 7821, 2011 WL 1158028, at *12-13 (S.D.N.Y. Mar. 30, 2011) (Keenan, J.) (dismissing complaint for failure to plead scienter where "Freddie Mac gave the public sufficient information to question Freddie Mac's accounting decisions in light of differing assumptions"); *cf. Wachovia*,

---

[18] Plaintiffs' reliance on the initiation of investigations by the SEC, DOJ, and SFBC (AC ¶¶ 1022-32) is wholly misplaced. *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 447 (S.D.N.Y. 2003) (Cote, J.) ("[T]he service of a sweeping SEC subpoena . . . does not reveal, by itself, any particular [disclosure] irregularity."). This point is borne out by the fact that the SFBC has found that UBS did *not* engage in fraud here. (*See supra* at n.8.)

753 F. Supp. 2d at 356 ("[T]he mere fact of that disclosure [relating to a method of verifying borrower income] undermines any credible theory of scienter.").[19]

**B.    The Competing Inference That the Losses Were Due to a Marketwide Downturn Is Much More Likely.**

Ultimately, the more "compelling" and "cogent" inference to be drawn from the allegations of the Amended Complaint, *Tellabs*, 551 U.S. at 314, is that UBS and the Individual Defendants—like regulators and other major financial institutions and their executives—were surprised and unprepared "when the markets severely dislocated in the summer of 2007" (AC ¶ 314). At most, Plaintiffs' prolix allegations give rise to an inference that, in retrospect, UBS executives did not act as effectively as they could have to limit its exposures during a period of unprecedented market turmoil—not to an inference that they acted with scienter in making disclosures about UBS's positions in mortgage-related securities.

In analogous circumstances, this Court dismissed plaintiffs' securities fraud claims, alleging that Wachovia made misleading statements concerning its financial health in the wake of the subprime "mortgage crisis," for failure to plead the required strong inference of fraud. As this Court explained:

> The more compelling inference, at least based on the facts as they are alleged in the complaints, is that Defendants simply did not anticipate the full extent of the mortgage crisis and the resulting implications for the [loan portfolio that caused most of Wachovia's losses].

753 F. Supp. 2d at 368. The Court should do the same here.

---

[19] Further undercutting any inference of scienter is Plaintiffs' allegation that UBS made *ten separate* partial corrective disclosures concerning its exposure to mortgage-related securities. (AC ¶¶ 1279, 1284, 1291, 1294, 1296, 1300, 1304, 1310, 1315, 1330.)

Similarly, in *In re PXRE*, this Court dismissed a securities fraud claim alleging that a reinsurance corporation made misleading statements concerning its financial health in the wake of hurricanes that devastated the Gulf Coast in 2005, because:

> [T]he more compelling inference. . . is that Defendants, in an unprecedented and uncertain situation, simply lacked the software and internal mechanisms to calculate accurately the full extent of losses incurred by the three hurricanes . . . . Defendants issued the challenged statements in good faith, but based upon ultimately erroneous loss estimations.

600 F. Supp. 2d at 548.

Here, as in *Wachovia* and *In re PXRE*, Plaintiffs cannot state a plausible theory of fraud in the face of a financial "hurricane"—*i.e.*, the marketwide collapse in value of mortgage-related securities. *See also Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 479 (1977) (securities laws do not regulate "corporate mismanagement"); *Shields*, 25 F.3d at 1129 ("The pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing indicates that management was promoting a fraud.").

## 1.     The Indisputable Market Downturn Negates an Inference of Scienter.

Numerous Second Circuit decisions have held that marketwide downturns undermine or negate the inference of fraud.  As Judge Friendly held three decades ago in *Denny* v. *Barber*, the securities laws do not countenance such "fraud by hindsight."  576 F.2d 465, 470 (2d Cir. 1978); *see also Shields*, 25 F.3d at 1129 (rejecting claims that bank executives knew the company's loan portfolio was "precarious" and understated reserves before the commercial real estate market collapsed during the late 1980s); *Dynex*, 531 F.3d at 197 ("In sum, [Plaintiff] fails to allege the existence of information that would demonstrate that the statements made to investors were misleading, e.g., information showing that the primary cause of the bonds' poor performance was *not* the general weakness in the mobile homes market."); *In re Aegon N.V. Sec. Litig.*, 03 civ. 0603, 2004 WL 1415973, at *18 (S.D.N.Y. June 23, 2004) (Sweet, J.) (rejecting

claim that defendant fraudulently understated its default reserve in the middle of a sharp market

decline).  As Judge Owen emphasized in dismissing a securities fraud claim in the wake of a

marketwide downturn:

> As sometimes happens when an industry encounters financial problems, this is not
> the only case of its kind pending against a major bank, and it also is not the only
> case of its kind that Citicorp/Citibank is now defending.  A number of these
> complaints have been dismissed for a reason common to them all: the claims in
> essence try to penalize banking institutions for failing to show greater
> clairvoyance.

*Ciresi* v. *Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992).

Indeed, in the current crisis, at least eleven district courts—in addition to this

Court—already have held that fraud claims relating to losses in mortgage-related securities are

"more likely attributable to the financial turmoil occurring in 2007, than to fraud or

recklessness." *Brecher* v. *Citigroup, Inc.*, 09 civ. 7359, 2011 WL 2209145, at *14 (S.D.N.Y.

June 7, 2011) (Stein, J.); *Kadel* v. *Flood*, 427 F. App'x 778, 780 (11th Cir. 2011) (affirming a

Rule 12(b)(6) dismissal because "the stronger inference is that [the defendants] simply failed to

predict the eventual collapse of the housing and subprime mortgage market, and, as a result, were

ill-prepared to respond when those markets crashed"); *Security Capital*, 729 F. Supp. 2d at 596

(a "fundamental misunderstanding and underestimate of the true risks presented by investment in

the housing market, particularly with regard to opaque CDOs" was the more compelling

inference under *Tellabs*); *Local No. 38 Int'l Broth. of Elec. Workers Pension Fund* v. *Am.

Express Co.*, 724 F. Supp. 2d 447, 463-64 (S.D.N.Y. 2010) (Pauley, J.) ("The more compelling

inference is that Defendants' aggressive growth strategy was sideswiped by the collapse of the

credit markets. . . . That a business plan turned out to be ill-timed and, in hindsight, ill-advised

does not transmogrify it into a securities fraud."); *Plumbers & Steamfitters Local 773 Pension

Fund* v. *Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010)

(Pauley, J.) ("unprecedented paralysis of the credit market and a global recession" make honest error "as plausible an explanation for the losses as an inference of fraud"); *In re 2007 Novastar*, 2008 WL 2354367, at *4 (dismissing claims because the allegations of fraud were "more consistent with a company and executives confronting a deterioration in the business and finding itself unable to prevent it than they are with a company and executives recklessly deceiving the investing community"); *Woodward* v. *Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010) (Patterson, J.) (finding "no basis for inferring . . . scienter; it is much more likely that Defendants underestimated the magnitude of the coming economic crisis and believed that they were taking adequate risk management and cautionary measures to account for any future downturn."); *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 614 (E.D. Pa. 2009) (dismissing under Rule 12(b)(6) because of "more compelling" inferences of nonculpable conduct in securities suit challenging timing of subprime-related impairment charge); *In re Huntington Bancshares Sec. Litig.*, 674 F. Supp. 2d 951, 965 (S.D. Ohio 2009) (dismissing plaintiffs' claims that defendants fraudulently misrepresented their exposure to subprime mortgages, since plaintiffs merely alleged that defendants "should have known the continuing erosion of the real estate market"); *Patel* v. *Parnes*, 253 F.R.D. 531, 560 (C.D. Cal. 2008) (dismissing securities fraud claims based on decline in mortgage market, where "[i]n effect, by arguing that defendants' predictions and forecasts were not low enough, plaintiffs improperly attempt to allege 'fraud by hindsight.'"); *In re Downey Sec. Litig.*, No. CV 08-3261, 2009 WL 2767670, at *1 (C.D. Cal. Aug. 21, 2009) (dismissing securities claims attempting to attribute company's losses in subprime positions to "misrepresentations" rather than the "current economic climate").  Plaintiffs cannot overcome this powerful authority.

### 2.   Plaintiffs' Allegations That UBS Should Have Taken Writedowns Earlier Do Not Establish a Strong Inference of Scienter.

The Amended Complaint's speculative allegations that UBS (alone among its peers) should have taken more significant writedowns on its mortgage-related securities sometime in 2006 or early 2007, rather than the third and fourth quarters of 2007 and the first quarter of 2008 (AC ¶¶ 800-01, 818, 841, 844-45), are insufficient to plead fraud. *See Stavros* v. *Exelon Corp.*, 266 F. Supp. 2d 833, 851-52 (N.D. Ill. 2003) (allegation that asset writedown should have occurred in first or second quarter, rather than third quarter, provided no basis from which to infer scienter).

Courts recognize that the securities laws do not exist to second-guess highly judgmental decisions such as the setting of reserves or, as in this case, the valuation of complex securities. As the Second Circuit has stated, "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito*, 47 F.3d at 53; *see also In re Fannie Mae 2008 Sec. Litig.*, 08 civ. 7831, 2010 WL 3825713, at *18 (S.D.N.Y. Sept. 30, 2010) (Crotty, J.) ("The fact that a financial item is accounted for differently, or in a later period, does not support the inference that a previously filed financial statement was fraudulent."). And as Judge Easterbrook explained:

> For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner. If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence.

*DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Moreover, as confirmed by accounting standards boards and government regulators, including the SEC, once the market for AAA-rated mortgage-related securities became illiquid during the summer of 2007, those securities became extremely difficult to value.

As Judge Lynch held back in 2003, "given the difficulty of valuing illiquid securities, and the multitude of factors that may appropriately be taken into account, alleging disagreement with some of [defendant's] valuations does not equate to alleging fraud." *In re Allied Capital Corp. Sec. Litig.*, 02 civ. 3812, 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003).   Indeed, in the wake of the financial crisis, the U.S. and International accounting standards boards (FASB and IASB) and regulators such as the SEC have acknowledged the difficulty that financial firms such as UBS had in valuing mortgage-related securities once the markets became illiquid, and FASB and IASB have since issued revised standards on how to value such securities.[20]

C.   **None of Plaintiffs' Allegations Concerning Risk Exposures, Valuations, or Accounting Methods Overcomes the Implausibility of Their "Fraud" Claims.**

None of Plaintiffs' mishmash of allegations concerning UBS's risk controls and exposures, its valuations, or its accounting methods overcomes the overwhelming inference against scienter here.   As a whole, Plaintiffs' allegations tell a familiar marketwide story: financial institutions (and regulators) underestimated the risks associated with AAA-rated investments in mortgage-related securities and, in retrospect, those institutions invested more in those securities than they should have.   When the market suffered its "severe dislocation," these assets lost more value than anticipated and became very difficult to value.   Except for their conclusory (and implausible) allegations that UBS deliberately miscalculated the risk and mis-

---

[20]   The accounting standards boards have acknowledged that the valuation standards during the financial crisis did not provide sufficient guidance for determining fair value in those illiquid markets.  (Ex. 49 (SEC Office of the Chief Accountant, *Report & Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008:  Study on Mark-To-Market Accounting*) at 203; Ex. 50 (FASB Staff Position No. FAS 157-4, *Determining Fair Value When the Volume and Level of Activity for the Asset or Liability Have Significantly Decreased and Identifying Transactions That Are Not Orderly*); Ex. 51 (IASB, *Fair Value Measurement Exposure Draft*, May 2009).)

valued these AAA-rated securities, Plaintiffs provide no specificity regarding UBS's alleged fraudulent conduct.

### 1. UBS's Risk Control Procedures

Beyond conclusorily alleging that UBS's employees manipulated Value at Risk ("VaR") measures (AC ¶¶ 317-32), Plaintiffs do not explain how UBS actually manipulated VaR. The only specific allegations that Plaintiffs make regarding VaR are that (i) UBS employees executed hedges on AAA-rated mortgage-related positions that UBS held (AC ¶ 330)—positions that had never before lost significant value—and (ii) because UBS's risk models assumed these positions "would never lose more than 2-4% of their value" (*id.*), UBS's VaR showed that a 2-4% hedge resulted in the positions being fully hedged (AC ¶ 331).

Thus, Plaintiffs' specific allegations regarding UBS's supposed manipulation of risk controls assert only that UBS's hedges on AAA-rated mortgage-related positions proved insufficient in the wake of the "severe market dislocation" in the summer of 2007. The fact that, in retrospect, UBS's VaR measurements (like similar risk management tools at other financial institutions) did not anticipate unprecedented market movements, however, is not sufficient to plead fraud.[21]

Similarly, Plaintiffs' reliance on reports by UBS's Group Internal Audit to UBS's Group Executive Board ("GEB") Risk Subcommittee (the "GIA Report") and by UBS's Business Unit Control to UBS's Audit Committee ("BUC Report") (AC ¶¶ 970-73) do not raise any inference of fraud. All these reports reflect—as Plaintiffs' allegations make clear—is that

---

[21] Nor do Plaintiffs' efforts to make their allegations more compelling by referencing information of "confidential witnesses" (AC ¶¶ 328-29) salvage their deficient pleadings. Plaintiffs' confidential witnesses claim only that UBS's compensation structure motivated traders to take on more risk for short-term gain (*id.*), and they offer no evidence that UBS senior executives acted with scienter in making disclosures about mortgage-related securities.

"'because of diminished market liquidity and transparency' in the subprime market . . . there had been a substantial reduction in the ability to source external prices to verify trader marks . . . ." (AC ¶ 972), or, put another way, that a lack of data due to market deterioration had made valuations more difficult (*id.*).  These unsurprising observations certainly do not state a case of fraud or give rise to an inference of fraudulent intent.

Moreover, the possibility that UBS's positions in AAA-rated mortgage-related securities might be difficult to value was no secret to the market, as UBS had previously disclosed to its shareholders that UBS used "internally developed models," and that "[s]ome of the inputs to these models may not be market-observable and are therefore estimated based on assumptions."  (Ex. 12 (UBS 2006 20-F, at 89)); *see also supra* at 37 (discussing changes in valuation guidelines by accounting boards in the wake of the financial crisis).

Indeed, in its first quarter 2007 report, UBS specifically warned investors about such diminished liquidity:  "[t]he US sub-prime mortgage market suffered a major dislocation in February resulting in significant markdowns and reduced liquidity, with limited contagion to other markets."  (Ex. 30 (UBS 1Q 2007 6-K, at 5).)  Plaintiffs also ignore other findings of the BUC Report that negate any inference of scienter, including that UBS's AAA-rated super senior securities were a "net flat risk or low risk for valuation purposes," (Ex. 13 (SR, at 23)), and that "UBS was not aware of the extent and the nature" of its mortgage-related risk exposure until "the [Subprime mortgage] crisis unfolded."  (Ex. 11 (SFBC Report, at 4).)

### 2.    The Value of UBS's Mortgage-Related Positions

#### a.    The Allegations of Confidential Witness 9

Plaintiffs' allegation about the supposed claims of confidential witness 9 ("CW 9") represents another example of their attempt to rest their securities fraud claims on differences of opinion over the valuation of complex financial instruments during an

unprecedented financial crisis.  Plaintiffs allege that beginning in *2004* (including in a June 22, *2005* letter from CW 9 to Peter Wuffli) (AC ¶ 645), CW 9 supposedly communicated his views to UBS executives that UBS's internal models did not properly value certain positions in mortgage-related securities.  Yet, according to Plaintiffs, "[o]ver the course of *2006* and *2007*," UBS "amassed a $100 billion position" in these allegedly overvalued securities.  (AC ¶ 7 (emphasis added).)  CW 9's views as to how to value these complex instruments in 2004 and 2005—almost two years *before* the period in which Plaintiffs allege that UBS accumulated these instruments and the subsequent market crisis—do not raise an inference of scienter.

As a matter of law, scienter cannot rest on statements of an unidentified former employee that merely reflect "that [the employee] and Defendants had different business judgments."  *Druskin* v. *Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1334 (S.D. Fla. 2004); *see also In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) (Lynch, J.) ("[T]he fact that other individuals within SSB may have had views different from [research analyst] Grubman's does not provide any basis for an inference that Grubman did not believe his own professed opinions on [the company's] value, or that the other valuation models, rather than Grubman's, constituted SSB's true institutional opinion (if such a concept is even meaningful).").[22]

---

[22]  The allegations that IB employee Eric Rothman—who is not a defendant in this action—"subjectively" managed his pricing marks on UBS CDOs (AC ¶¶ 734-37) are taken directly from uncorroborated allegations in another complaint.  As such, the Court should disregard them.  *See Caiafa* v. *Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007) (Berman, J.) ("[A]llegations about [defendant] contained in pleadings from an unrelated lawsuit . . . are inadmissible.").  Furthermore, even if UBS's AAA-rated mortgage-related positions were overvalued, Plaintiffs have no basis to allege that UBS executives who made the alleged misstatements knew or should have known about such overvaluation based on UBS's "downgrading bonds during the summer of 2007."  (AC ¶ 969.)  UBS reported those downgrades

(*footnote continued . . .*)

### b.    The Closing of DRCM

Plaintiffs allege (i) that UBS closed DRCM to conceal from the market that DRCM had written down its holdings of mortgage-related securities, (ii) that these securities were similar to mortgage-related securities held in larger amounts by the IB, and (iii) that UBS overpaid DRCM's outside investors to keep those investors from disclosing the reason for closing DRCM.  (AC ¶ 994.)  But these allegations are entirely speculative, and Plaintiffs allege no particularized facts to support them.

*First*, Plaintiffs provide no support for their bald assertion that DRCM and the IB were "engaged in substantially the same trading strategies . . . and, thus, held virtually identical types of assets, including CDOs and RMBS backed by subprime and Alt-A mortgages."  (AC ¶ 974.)  In fact, DRCM wrote off lower-rated mortgage-related securities (which Plaintiffs acknowledge declined in value in February 2007), while the IB held AAA-rated mortgage-related securities (which Plaintiffs acknowledge did not "severely dislocate" until the summer of 2007).  (*See supra* at 16.)  Accordingly, UBS's decision not to write down the IB's AAA-rated securities in early 2007 (when DRCM wrote down its lower-rated securities) does not support a strong inference of scienter.

*Second*, Plaintiffs conclusorily claim that UBS overpaid OIF investors in DRCM a return on their investment to prevent them from disclosing that DRCM had suffered losses on mortgage-related securities.  Plaintiffs' only allegation to support this claim is that the OIF investors did not earn a profit, because they "sustained losses on positions in home equity-linked instruments in Q1 2007 just like those suffered by the DRCM proprietary fund."  (AC ¶ 1006.)

---

(*...continued footnote*)

in its third quarter results, released in October 2007 (AC ¶ 869), and even pre-warned about such problems when reporting its second quarter results on August 14, 2007 (AC ¶ 476).

But such losses by OIF investors on home *equity-linked* instruments do not support the claim that they suffered an overall loss in the entire OIF portfolio of investments, much less that the IB suffered a loss in AAA-rated mortgage-related securities in Q1 2007.

*Third*, far from hiding DRCM's losses in mortgage-related securities, UBS, in announcing DRCM's closing, specifically reported that DRCM had suffered losses of "approximately CHF 150 million in the context of difficult market conditions in US mortgage securities."  (Ex. 30 (UBS 1Q 2007 6-K, at 1).)

### 3.    International Financial Reporting Standards ("IFRS")

During the putative class period, E&Y audited and certified UBS's financial statements and internal controls.  (Ex. 12 (UBS 2006 20-F, at 78-81).)  Plaintiffs do not allege that E&Y required UBS to restate any of these financial statements, but nevertheless claim that UBS violated International Financial Reporting Standards ("IFRS") by overstating the value of mortgage-related securities and omitting UBS's significant exposure to such securities.  As a matter of law, such violations of accounting standards (even if true) are insufficient to infer scienter: "[o]nly where such allegations are coupled with evidence of 'corresponding fraudulent intent,' might they be sufficient."  *Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (citation omitted).  *See also In re Huntington Bancshares Secs. Litig.*, 674 F. Supp. 2d at 973 ("The generalized allegations of GAAP violations and any temporal proximity suggestive of scienter lack specific facts to establish a strong inference of scienter.").  Plaintiffs have made no such allegations here.

The fact that UBS's financial statements concerning mortgage-related securities were audited and have not been restated actually bars any inference of scienter based on alleged violations of applicable accounting standards.  *See In re JP Morgan Chase Sec. Litig.*, 02 civ. 1282, 2007 WL 950132, at *13 (S.D.N.Y. 2007) (Stein, J.) (fact that auditor had not required

restatement shows that "reasonable accountants could differ as to whether [a particular accounting rule] applied to the [] transactions—an inference that defeats plaintiffs' claim of recklessness"), *aff'd*, 553 F.3d at 187.[23]  Moreover, Plaintiffs' failure to allege any cogent motive bars any inference of scienter based on alleged accounting violations.  *See Davidoff*, 2005 WL 2030501, at *17 ("[F]ailure to allege motive is fatal because allegations of GAAP violations or accounting irregularities alone are insufficient to state a securities fraud claim without evidence of 'corresponding fraudulent intent.'") (quoting *Novak*, 216 F.3d at 309).

*      *      *

By raising dozens upon dozens of vague, unparticularized, unsubstantiated, incomplete, and inaccurate allegations that might relate to scienter, Plaintiffs try to satisfy their substantial burden under the Reform Act.  In the end though, Plaintiffs' attempt to turn UBS's publicly announced strategy to acquire mortgage-related securities into a massive "fraud" is not plausible as a matter of law.  Under the reasoning of *Tellabs*, the only plausible inference is that UBS—like every market regulator and other major financial institution—did not foresee the worst financial crisis since the Great Depression and, when the crisis unexpectedly occurred, did not (in retrospect) react as quickly as Plaintiffs believe they should have.

---

[23] *See also In re Homebanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1358-59 (N.D. Ga. 2010) (dismissing a securities fraud claim based on losses in a company's subprime loan portfolio and noting that a company's auditors "would likely have demanded [a financial restatement] had they shared Plaintiff's view that [there was fraud]"); *In re 2007 Novastar*, 2008 WL 2354367, at *3 (finding it "noteworthy that nobody—the SEC, Novastar's auditors, or anyone else—has suggested Novastar should or must restate its financial reports," suggesting that "reasonable accountants could differ" and defeating an inference of recklessness).

## II.     PLAINTIFFS ALSO DO NOT ALLEGE LOSS CAUSATION IN CONNECTION WITH UBS'S DISCLOSURES OF ITS POSITIONS IN MORTGAGE-RELATED SECURITIES.

In the face of the global market collapse, Plaintiffs "must distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price," *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 02 civ. 9690, 2008 WL 2324111, at *7 (S.D.N.Y. June 4, 2008) (Keenan, J.) (quoting *Dura Pharms.*, 544 U.S. at 343), and must raise a plausible inference that there exist "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [Defendants' alleged] misstatements," *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007). As the Second Circuit has explained:

> [Whether] the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss. *However*, when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately [pleaded] facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.

*Lentell*, 396 F.3d at 174 (emphasis added) (citations and internal quotation marks omitted).

Accordingly, courts routinely dismiss securities claims where, as here, a marketwide downturn, such as the collapse of the housing market, significantly diminishes the inference that the alleged loss was caused by a fraud. *See Stratte-McClure* v. *Stanley*, 09 civ. 2017, 2011 WL 1362100, at *1, *13-14 (S.D.N.Y. Apr. 4, 2011) (Batts, J.) (dismissing securities fraud claims based on Morgan Stanley's alleged "risky positions in the subprime mortgage market," because the plaintiffs' allegations of loss causation lacked "particularized facts linking the alleged misstatements the Company had made about the value of its [allegedly inflated securities] to the events that caused the stock slide"); *Kuriakose*, 2011 WL 1158028, at *13-14 (dismissing complaint on loss causation grounds where the "marketwide phenomenon" of the

housing price collapse and concomitant impact on Freddie Mac's stock price "decreased [the] probability that Plaintiffs' losses were caused by fraud"); *In re Rhodia SA Sec. Litig.*, 531 F. Supp. 2d 527, 548 (S.D.N.Y. 2007) (Batts, J.) (dismissing complaint where allegation "strongly suggests that market forces other than the alleged misconduct at least contributed to, if not entirely caused, the fall in Rhodia's stock prices during the Putative Class Period").

       As shown in the table *supra* at 3 to 4, in response to the "severe[] disloc[ation]" in the market for AAA-rated mortgage-related securities in the summer of 2007, UBS's share price declined hand-in-hand with the declines suffered by the shares of other leading financial institutions.[24]  Plaintiffs make no effort to extrapolate the "rough proportion" of this decline attributable to their three UBS-specific frauds, as opposed to the marketwide and industry factors.  Instead, Plaintiffs impermissibly speculate that the *entire* decline in UBS's share price between the first alleged corrective disclosure on August 14, 2007 and the last alleged corrective disclosure on February 23, 2009 are "directly attributable to the market absorbing information correcting the Defendants' fraudulent misrepresentations and omissions . . . ."  (AC ¶ 1276.)[25] Plaintiffs thus refuse to acknowledge the unquestionable impact of the severe financial crisis affecting UBS and other peer institutions.

---

[24]  In considering loss causation, this Court "is entitled 'to take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment.'"  *In re Sina Corp. Sec. Litig.*, 05 civ. 2154, 2006 WL 2742048, at *13 n.16 (S.D.N.Y. Sept. 26, 2006) (Buchwald, J.) (dismissing securities fraud claims for failure to properly plead misstatement, scienter, or damages) (quoting *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000)).

[25]  Indeed, the Amended Complaint goes so far as to allege that the amount of the decline in UBS's share price during the putative class period due to the alleged frauds was greater than UBS's share price before the first alleged corrective disclosure.  (AC ¶¶ 1278-1378.)  This is a mathematical impossibility.

Plaintiffs also never explain how loss causation can be pleaded here, when UBS's share price dropped significantly on multiple days when UBS allegedly made no corrective disclosure.  (Ex. 6 (Stock Price Compilation) (*e.g.*, October 19, 2007 (-3%), November 5, 2007 (-3.4%), November 7, 2007 (-4.3%), November 15, 2007 (-3%), November 21, 2007 (-3.5%), January 4, 2008 (-3.9%), January 17, 2008 (-4.5%), January 25, 2008 (-4.7%), February 4, 2008 (-4.6%), February 5, 2008 (-4.8%), February 21, 2008 (-3.2%), February 29, 2008 (-4.3%)).)  Moreover, UBS's share price hit an all-time high on April 26, 2007, and then declined by 16.4% by August 13, 2007, the day *before* the first alleged corrective disclosure.  (*Id.*)

The Court can—and should—take judicial notice of such unexplained price reactions in holding that Plaintiffs have not sufficiently pled loss causation.  *See In re Merrill Lynch*, 568 F. Supp. 2d at 364-65 (concluding that loss causation could not be established where "[t]he Complaint fails to account, for example, for the cratering of the Internet market that occurred during the ten-month period when the reports were issued" (alteration and internal quotation marks omitted)); *Security Capital*, 729 F. Supp. 2d at 599 (dismissing complaint based on loss causation where "Plaintiffs' Complaint fails even to demonstrate a correlation between 'revealed' facts and a decline in SCA's stock price"); *60223 Trust* v. *Goldman, Sachs & Co.*, 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007) (Griesa, J.) (holding loss causation not adequately pleaded where "gradual loss of value" over class period "occurred during the time when the alleged false and misleading comments of an optimistic nature were being issued").

Accordingly, as a matter of law, Plaintiffs have not pled loss causation, because they have not "distinguish[ed] the alleged fraud from the 'tangle of [other] factors' that affect a stock's price."  *In re Merrill Lynch*, 568 F. Supp. 2d at 363.

### III.   PLAINTIFFS DO NOT ALLEGE THAT UBS MADE ACTIONABLE MISSTATEMENTS ABOUT ITS POSITIONS IN MORTGAGE-RELATED SECURITIES.

Section 10(b) requires Plaintiffs to allege a material misstatement in a public disclosure. *See* 15 U.S.C. § 78(j).  To show materiality, there must be a "substantial likelihood" that a reasonable investor would deem the alleged misstatement significant in light of the "total mix" of information available at such time about the investment. *Basic, Inc.* v. *Levinson*, 485 U.S. 224, 231-32 (1988) (quotation omitted).  The challenged disclosure must be read as a whole, focusing not "on whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the [securities]." *DeMaria* v. *Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (alteration and internal quotation marks omitted).

### A.   As a Matter of Law, UBS Made No Material Misstatement.

#### 1.   The Market Knew that UBS Had Significant Exposure to Mortgage-Related Securities, and UBS Was Not Required To Disclose Its Holdings in Particular Types of Such Securities.

Plaintiffs simultaneously—and inconsistently—allege that (i) UBS "*secretly amass[ed] more than $100 billion in U.S. asset backed securities*" including subprime-backed CDOs, ***and*** (ii) the "effect on UBS's balance sheet of its frenzied investment in subprime-backed CDOs was *immediately apparent*."  (AC ¶¶ 46, 307 (emphasis added).)  Accepting their allegation that the size of UBS's mortgage-related positions was "immediately apparent," Plaintiffs cannot plead that there was anything *secret* about UBS's large exposure to mortgage-related securities, or the previously disclosed risks posed to UBS by a massive market downturn in such securities.  (*See supra* at 13 to 15.)

Moreover, UBS was not required to "disaggregate" particular assets, line items of revenue or costs, or other financial details simply because those items became problematic based

on subsequent events. *See*, *e.g.*, *Nolte* v. *Capital One Fin. Corp.*, 390 F.3d 311, 316-17 (4th Cir. 2004) (in affirming dismissal, holding that as long as the bank met its regulatory obligations of disclosing its capital and loan loss reserves, no more specificity regarding the size of its "subprime" portfolio was required); *In re N.Y. Cmty. Bancorp Inc.*, *Sec. Litig.,* 448 F. Supp. 2d 466, 479 (E.D.N.Y. 2006) (additional disclosure not required where "it is apparent from the quarterly reports disclosed to the public that the company was heavily involved in investing in mortgage backed securities").

Nor can Plaintiffs point to any other large financial institution that, before the third quarter of 2007, reported details of its mortgage-related securities exposures.  Indeed, UBS specifically told investors that it did not provide such details about its trading positions.  (AC ¶ 862 (quoting Mr. Rohner during an August 14, 2007 conference call as stating: "I think you'll understand that in these market environments and conditions, we are not particularly keen to disclose our trading positions.").)  If UBS's competitors or its counterparties had access to specific information regarding the classes of assets UBS was seeking to buy, sell or hedge, such disclosures would have adversely affected UBS's ability to negotiate favorable pricing terms. *See* SEC Disclosure of Accounting Policies, Securities Act Release No. 33-7386, 62 Fed. Reg. 6044, 6055 (Feb. 10, 1997) (SEC regulations are specifically designed so that market risk disclosures do not require disclosure of proprietary information regarding specific investments). Thus, courts "have been sensitive about forcing a company to damage its own interests as well as those of its shareholders by revealing competitive information." *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1211 (S.D.N.Y. 1996) (Pollack, J.).

In any event, starting in October 2007, UBS *did* disclose its holdings in particular types of mortgage-related positions:

- **October 1, 2007**:  disclosing that UBS's remaining "relevant positions in *direct sub prime RMBS* have a current net value of USD 19 billion"; and that UBS had "taken significant write downs on positions in *Super Senior AAA-rated tranches of CDOs*." (AC ¶ 870 (emphasis added); *see also id.* ¶¶ 881-82.)

- **October 30, 2007**:  disclosing that (1) UBS had a $20.2 billion net notional value in subprime "*super senior* positions"; and (2) "Of the [$] 20.2 billion, [$] 3.2 billion are actually *high grade ABS super senior positions*.   A further [$] 2.7 billion has a substantial first loss protection of 12%.   About [$] 13.2 billion are *mezzanine ABS CDOs*."  (AC ¶ 894 (emphasis added).)

- **December 11, 2007**:  disclosing that at the end of November 2007 (1) UBS's "largest bucket [of subprime exposure] is our *direct RMBS exposures* . . . [at] US $16 billion . . . ."; (2) "[t]he next largest bucket is our *super senior exposure* [at] approximately [$] 13 billion"; and (3) "[the] third bucket is our *CDO warehouse exposure*."  (AC ¶ 909 (emphasis added).)

Plaintiffs do not allege that any of these statements was false.  Rather, Plaintiffs allege that these statements were misleading, because UBS did not reveal the full scope of its specific positions in the mortgage-related markets all at once.   But UBS: (1) specifically announced its policy not to disclose its disaggregated trading positions; (2)  did not purport to disclose the particular types or quality of its mortgage-related positions all at once; (3) did not deny having positions in mortgage-related holdings; and (4) specifically identified the particular types of holdings when it subsequently disclosed such information.   As such, there was nothing false or misleading about those disclosures. *See Fulton County Employees' Ret. Sys.* v. *MGIC Inv. Corp.*, 08 civ. 458, 2010 WL 601364, at *12 (E.D. Wis. Feb. 18, 2010) (dismissing subprime-based fraud claims for failure to plead an actionable misstatement where the defendant "unequivocally identified the loans he was talking about").

### 2.     There Is No Support for the Allegation That UBS's Portfolio Was "Illiquid and Concentrated."

Likewise, Plaintiffs do not support their conclusory allegation that UBS falsely told investors that it did not assume "illiquid and concentrated positions."  (AC ¶¶ 737, 748, 780, 784, 1201.)  Plaintiffs make no specific allegation that any material amount of UBS's mortgage-

related portfolio was "illiquid" prior to (i) the market's "sever[e] discloc[ation] in the summer of 2007" (AC ¶ 314) and (ii) UBS's August 14, 2007 express warning of "reduced liquidity in sub-prime related securities" (Ex. 32 (UBS 2Q 2007 6-K, at 5)).  Plaintiffs' only specific allegation as to illiquidity concerns lower-rated securities held by DRCM in early 2007.  (*E.g.*, AC ¶ 30.)[26]

### 3.    Plaintiffs Do Not Adequately Plead a Misstatement Concerning UBS's Valuation of Its Mortgage-Related Securities.

While the Amended Complaint is riddled with conclusory assertions that UBS's mortgage-related securities were overvalued, Plaintiffs rely on blatant mischaracterizations of writedowns at DRCM and Merrill Lynch and their alleged relationship to the value of the AAA-rated securities held by the UBS IB.  Without citing any source, Plaintiffs baldly allege that the UBS IB-held mortgage-related securities were "virtually identical to" or the "same" as those held by DRCM, and that the IB should have written down the value of these assets at the same time as DRCM.  (AC ¶¶ 38, 367, 375, 386, 974, 984, 991.)

Not only do these allegations lack any support, but they are refuted by the SFBC Report and documents referenced in the Amended Complaint making clear that DRCM wrote down mortgage-related securities rated BB+ and below in early 2007, while the IB held higher-rated AAA positions that did not decline in value until the second half of 2007:

- "Although the business strategies of the IB and DRCM showed many similarities, there were nonetheless key differences between them.  For instance, the IB hardly invested in Net Interest Margin Securities (NIMS), which, compared to the Super Senior CDOs, carried more risk."  (Ex. 11 (SFBC Report, at 8).)

- "DRCM's losses in first quarter 2007 arose largely on lower rated tranches of residential MBS, whereas the IB generally had short positions in these rating bands,

---

[26]  The Amended Complaint's lone allegation concerning the liquidity of the IB's portfolio is a conclusory statement from a confidential witness that UBS's "super senior tranches" were, at an unspecified time, "'harder to move' than the mezzanine or equity tranches, meaning that UBS was unable to sell them to third-party investors."  (AC ¶ 304.)

on which it had recorded gains in the quarter. . . . [and] positions in the more senior parts of the capital structure of CDOs, which were highly rated . . . ."  (Ex. 14 (Ethos Answers, at 9).)

▪ "DRCM took write-downs on the ABS Relative Value strategy's home equity book in Q1 2007 . . . substantially in the lower credit quality ABS and NIMs (i.e. rated BB+ and below) . . . ."  (Ex. 13 (SR, at 12).)

Furthermore, Plaintiffs' heavy reliance on the ABX Index[27] actually supports UBS's valuation of its AAA-rated securities.  These ABX trading prices, if relied upon, show that mortgage-related securities with AAA and AA ratings traded almost at or near their par value (100) during the first quarter of 2007, while only lower-rated securities traded below par.  (AC ¶ 209.)  And, these trading prices are consistent with the indisputable fact that no major financial institution announced significant writedowns of highly rated AAA-rated subprime assets, including super-senior tranches of mezzanine CDOs, before the third quarter of 2007, after the onset of the financial crisis.

Plaintiffs' efforts to claim otherwise backfire.  The Amended Complaint alleges that because Merrill Lynch purportedly marked down mezzanine CDOs by $12.4 billion as of October 24, 2007, UBS should have marked down similar positions more severely in the third quarter of 2007.  (AC ¶¶ 888, 896, 901, 1109.)  But this allegation distorts publicly disclosed facts:  Merrill's *total* third quarter writedown on all of its subprime-related exposures—not just mezzanine CDOs—actually was $7.9 billion.[28]  Plaintiffs also fail to allege that UBS and Merrill

---

[27] The ABX is a set of four indices, each of which tracks the price of credit default protection on a basket of 20 subprime RMBS of similar vintage, and is divided into five rated tranches, from AAA to BBB-.  (*See* Ex. 52 (Ben Logan, *The ABX Index: A Pricing Conundrum*, CREDIT, May 1, 2008).)

[28] (*See* Ex. 53 (Merrill Lynch & Co., Inc., 3Q 2007 Quarterly Report (Form 10-Q), at 29 (Nov. 7, 2007).)  Plaintiffs appear to have come up with a $12.4 billion writedown by adding Merrill's October 5 writedown estimate of $4.5 billion and its October 24 upward revision of that estimate to $7.9 billion.  A review of Merrill's disclosures shows that those amounts were not additive.

*(footnote continued . . .)*

had CDOs that were similar in (i) structure and subordination levels, (ii) rights of holders of the

various tranches, particularly the super senior tranche, and (iii) collateral vintage and quality

(apart from simply being "mezzanine"), such that they should have been valued the same.  Nor

do Plaintiffs allege any facts concerning the hedge protection that UBS or Merrill had on their

mezzanine CDO positions.  At most, Plaintiffs suggest that Merrill used a more pessimistic

model than did UBS.

Moreover, because "financial valuation models depend so heavily on the

discretionary choice of the modeler—including choice of method . . . choice of assumptions . . .

and choice of 'comparables' . . . the resulting models and their predictions can only fairly be

characterized as subjective opinions."  *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d at

251-52.  "Like other opinions, some valuation models may be more or less reliable than other

models, have more or less predictive power, or hew more or less closely to the conventional

wisdom on a subject, but they are nonetheless opinions and not objective facts."  *Id.* at 252; *see*

*also Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (determining the "fair value of

the assets . . . are not matters of objective fact," because "Plaintiff [could] not point to any

objective standard such as market price that he claims [the company] should have but failed to

use in determining the value of [an acquired company's] assets"); *cf. Wachovia*, 753 F. Supp. at

364 (plaintiffs failed to plead scienter as to Wachovia's alleged "overstate[ment of] the value of

its CDO holdings" where "there [was] no allegation that ABX/TABX numbers determined the

value of particular securities").

---

(*...continued footnote*)

(*Compare* Ex. 54 (Merrill Lynch & Co., Inc., Press Release (Form 8-K), at 2 (Oct. 5, 2007)),
*with* Ex. 55 (Merrill Lynch & Co., Inc., Press Release (Form 8-K), at 1 (Oct. 24, 2007)).)

Because UBS's statements on the value of its mortgage-related positions are opinions, Plaintiff must "plausibly allege that the defendants did not believe the statements regarding [those positions] at the time they made them." *Fait*, 655 F.3d at 112; *see also In re Barclays Bank PLC Sec. Litig.*, 09 civ. 1989, 2011 WL 31548, at *8 (S.D.N.Y. Jan. 5, 2011) (Crotty, J.) (stating that defendant's "valuations and write downs were subjective" and dismissing plaintiff's complaint "in the absence of ample allegations that [defendant] did not truly believe its own valuation"). There is no well-pleaded allegation that any UBS executives who made the alleged misstatements believed they were misrepresenting the value of UBS's mortgage-related portfolio.

**B.    As Encouraged by the Reform Act, UBS's Challenged Disclosures Were Accompanied by Extensive and Specific Cautionary Language.**

Even if Plaintiffs could identify statements within UBS's extensive disclosures that were misleading when taken out of context, UBS's extensive and specific cautions about the credit market, coupled with general market knowledge of the financial crisis and UBS's stated exposure to mortgage-related securities, "not only besp[oke] caution, they shout[ed] it from the rooftops," and, as such, rendered these disclosures not materially misleading as a matter of law. *Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352, 360 (2d Cir. 2002).

As shown *supra* at 10 to 11 and 18 to 19, prior to the market dislocation in the summer of 2007, UBS repeatedly warned investors that it faced substantial market and credit risks, and UBS provided specific warnings about the risks associated with its holdings of mortgage-related securities in its reports for the third and fourth quarters of 2007 (*see supra* at 19 to 22; *see also* Appendix B). Moreover, UBS specifically disclosed that the values of its trading positions could change in the face of market illiquidity. (Ex. 12 (UBS 2006 20-F, at 70 ("A

variety of factors are incorporated into our models, including actual or estimated market prices and rates, such as time value and volatility, and market depth and liquidity.")).)

Plaintiffs cannot "base [their] federal securities fraud claim on any misrepresentation or omission . . . which was addressed by the repeated, specific warnings of significant risk factors and the disclosures of underlying factual assumptions also contained therein." *Moorhead* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 949 F.2d 243, 245-46 (8th Cir. 1991). Because Plaintiffs have not alleged facts "actively and plausibly suggest[ing]" that they were deceived by UBS's disclosures about its positions and losses in mortgage-related securities, *Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 557), this Court should dismiss all claims relating to mortgage-backed securities for failure to state a claim.

*    *    *

Notwithstanding their massive pleading, Plaintiffs simply cannot establish scienter, loss causation, or misstatement concerning UBS's disclosures of its positions and losses in mortgage-related securities. Because failure to establish just one of these independent elements of a securities claim is fatal, this Court should dismiss Plaintiffs' claims as a matter of law.

## AS A MATTER OF LAW, PLAINTIFFS' ALLEGATIONS CONCERNING UBS'S DISCLOSURES ABOUT ITS ARS HOLDINGS DO NOT STATE A CLAIM

### BACKGROUND[29]

Auction Rate Securities ("ARS") are long-term bonds or preferred stock issued by municipalities, student loan companies, closed-end funds, and other entities that pay interest or dividends at levels that periodically reset via Dutch auctions, generally sponsored by the investment banks that underwrote the securities.  (AC ¶ 397.)  During the putative class period, UBS offered ARS as an investment option to its wealth management clients, underwrote ARS on behalf of issuers, and sponsored the Dutch auctions at which the interest rates on these securities were determined and reset.  (AC ¶¶ 396-408.)

As part of their sponsorship of ARS auctions, UBS and other banks frequently submitted bids to ensure the auctions functioned smoothly, and the banks took ARS into their own inventory.  In its publicly available ARS offering materials, UBS disclosed this practice.  For example, a brochure posted on UBS's website in October 2007 stated:  "[T]he Firm might decide to submit a bid to prevent a failed auction . . . . The Firm bids in a large percentage of auctions and believes that a significant number of auctions would fail if it did not do so."  (Ex. 56 (UBS AG, *Putting Liquidity to Work: A Guide to Cash Alternatives*, at 6 (2006)).)

As the financial crisis worsened late in the fourth quarter of 2007 and throughout the first quarter of 2008, the impact spread from mortgage-related securities to other credit-related instruments, including ARS.  Demand for ARS dropped, and UBS and other investment

---

[29]  In seeking to expand the size of this action, Plaintiffs impermissibly parrot allegations from government filings, private lawsuits and newspaper articles, even though Plaintiffs' duty to investigate the factual basis for their claims is nondelegable.  *See*, *e.g.*, *Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 893-94 (2d Cir. 1976) (striking references to allegations in an SEC complaint that did not result in an adjudication on the merits).

banks were forced to increase their support for the auctions to prevent auction failures, thereby substantially increasing their ARS inventories.  (*See* Ex. 57 (Complaint filed by N.Y. Attorney General against UBS Securities LLC and UBS Financial Services Inc., July 24, 2008, ¶¶ 53-54).)

Ultimately, by February 2008, most banks had stopped supporting these ARS auctions, leading to numerous auction failures (AC ¶¶ 87, 402) and, as Plaintiffs acknowledge, a "crash" in the liquidity and value of ARS (AC ¶ 87).  UBS was among the last of the major banks to stop placing support bids.

Following the failure of the ARS market in February 2008, regulators began industry-wide investigations and filed complaints against various firms alleging that the firms favored their own financial well-being (and, thus, the well-being of their *shareholders*) over that of the clients to whom they sold ARS.  (*E.g.*, Ex. 58 (*Bank of America, Accused of Misleading Customers, Agrees to Buy Back Securities*, N.Y. TIMES, Oct. 9, 2008, at A30).)  On October 31, 2008, UBS settled with the SEC without admitting or denying the allegations of the SEC complaint, which claimed that UBS had defrauded its ARS *customers*; this SEC complaint said nothing about any fraud on UBS's *shareholders*.  (Ex. 59 (Consent of Defendants UBS Securities LLC and UBS Financial Services Inc., dated Oct. 31, 2008) ¶ 2.)  Lawsuits also were filed against UBS and other firms on behalf of ARS *purchasers*.  (*E.g.*, AC ¶ 408.)  These lawsuits similarly alleged that UBS and other firms had favored the interests of Plaintiffs and other UBS *shareholders* over those of ARS *purchasers.*  (*See, e.g.*, AC ¶¶ 408, 1147.)

In its 2007 Annual Report (filed on March 18, 2008), UBS disclosed that, as a result of its auction support, it had accumulated ARS exposure of $5.9 billion as of December 31, 2007.  (Ex. 60 (UBS 2007 Annual Report (Form 20-F), ch. 2, at 14).)  Plaintiffs cannot identify *any* instance where one of UBS's peer firms disclosed its own ARS exposures in an

earlier reporting period than UBS.  Instead, ignoring UBS's March 18, 2008 disclosure, Plaintiffs

erroneously allege that UBS first disclosed its ARS exposure in *May 2008*.  (AC ¶ 959(j).)  On

March 28, 2008, which was after the ARS market became illiquid, UBS, almost alone among its

peers, announced markdowns in the value of its clients' ARS holdings.  (AC ¶ 406.)

## ARGUMENT

I.   **PLAINTIFFS FAIL TO ALLEGE FACTS CREATING A STRONG INFERENCE OF SCIENTER WITH REGARD TO UBS'S DISCLOSURES ABOUT ARS.**

        Notwithstanding their admission that "the market for ARS crashed" in February

2008 (AC ¶ 87), Plaintiffs try to turn yet another industry-wide market failure into a UBS-

specific fraud claim, claiming that Defendants somehow concealed UBS's support for auctions

and resulting accumulation of ARS inventory from UBS shareholders, and that UBS

shareholders suffered when UBS wrote down its ARS positions after the market "crashed."

Whatever the merits of the regulatory investigations into UBS's representations to ARS

*purchasers*, those investigations plainly did not concern UBS's disclosures to its *shareholders*.[30]

        Amid a stream of allegations demonstrating that UBS prudently sought to limit its

exposure to ARS (AC ¶ 1146)—and, thus, to protect the interests of its *shareholders*—Plaintiffs

conclusorily assert that UBS (i) knowingly violated its representations that it would avoid

concentrations of illiquid assets by accumulating ARS, and (ii) concealed these concentrations

out of fear of being forced to announce writedowns on ARS.  (AC ¶¶ 404, 1142.)  As a matter of

---

[30]  Plaintiffs also allege, in conclusory terms (*see* AC ¶¶ 1146, 1173, 1175, 1181, 1189), that UBS overvalued its ARS holdings.  Beyond lacking any well-pleaded factual basis, this allegation fails for the same reasons as Plaintiffs' allegations concerning UBS's valuation of mortgage-related securities, namely that the entire market valued these securities at close to par prior to the February 2008 "crash" in the ARS market.  Similarly, Plaintiffs cannot point to any of UBS's peer firms that wrote down the value of their ARS holdings prior to UBS's doing so, thereby negating any allegation that UBS had overvalued these securities.

law, these allegations do not "constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness," *ATSI*, 493 F.3d at 99, by any UBS senior executive responsible for the challenged ARS disclosures.

      *First*, as with their claims concerning UBS's positions and losses in mortgage-related securities, Plaintiffs fail to allege any cognizable motive—such as insider trading or compensation based on revenues—for UBS and its senior executives to defraud UBS shareholders concerning UBS's positions in ARS.  Moreover, UBS had an incentive *not* to commit the alleged fraud, because UBS's March 18, 2008 disclosure of its exposure to ARS came just before UBS sold its common shares through its May 2008 Rights Offering.  (*See supra* at 27 to 28.)

      *Second*, Plaintiffs have not made any specific allegation showing that UBS or the senior executives responsible for the alleged UBS misstatements concerning ARS knew or were reckless in not knowing about the alleged accumulation and overvaluation of UBS's positions in ARS.  For example, Plaintiffs allege that at an August 8, 2007 GEB meeting "*municipal securities were discussed at length,*" and "[a]s a result of the meeting, the GEB asked 'to be presented with a true P&L of the [municipal securities] business in the end of the year 2007.'" (AC ¶ 1146.a (alteration in original) (emphasis added).)  But there is no allegation that this reference to "*municipal* securities" in the GEB minutes, months before any issues arising in the ARS market, relates to ARS—as opposed to UBS's *municipal* securities business generally. And, Plaintiffs offer no reasonable basis to infer that this reference evidences any misconduct.

      Likewise, as Plaintiffs acknowledge, the December 19, 2007 GEB meeting discussion concerning ARS "produced many questions and a sense of urgency," and consequently UBS's Chief Risk Officer, Joe Scoby, sought answers to those questions.  (AC

¶ 1146.l.)   But the mere fact that a meeting was held does not establish that UBS senior executives then knew of the impending collapse in the ARS market.  *See Higginbotham* v. *Baxter Intern., Inc.*, 495 F.3d 753, 760-61 (7th Cir. 2007) ("Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention . . . .  Taking the time necessary to get things right is both proper and lawful.").[31]

In sum, Plaintiffs' ARS allegations amount to a claim that UBS acted improperly in protecting the interests of Plaintiffs and other UBS *shareholders* at the expense of its customers by limiting its ARS inventory.  As the Second Circuit recently explained, "[e]ven if [an issuer] was actively engaged in duping other institutions for the purposes of gaining at the expense of those institutions, it would not constitute a motive for [that issuer] to defraud its own investors." *JP Morgan*, 553 F.3d at 203.  Thus, the Second Circuit emphasized, "[e]arning profits for the shareholders is the essence of the duty of loyalty, and therefore it would be an unusual case where accomplishment of this objective constitutes the requisite motive to defraud the shareholders." *Id.* at 200.

## II.   PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION REGARDING UBS'S ARS DISCLOSURES.

As with their claims about UBS's mortgage-related disclosures, Plaintiffs fail to allege that UBS's disclosure of its exposure to ARS caused a loss in the price of UBS shares. Notwithstanding Plaintiffs' erroneous claim that "[a]ll massive position[s] in ARS [were] concealed until May 7, 2007 [sic]" (AC ¶ 959(j))—presumably Plaintiffs meant "May 7,

---

[31]  Plaintiffs' citations to emails attached to the "Massachusetts complaint" fail to demonstrate any intent to defraud UBS shareholders.  (AC ¶ 1146.)  For example, the December 11, 2007 email from Scoby ordering Fixed Income personnel to adhere to ARS limits shows that UBS sought to limit its ARS exposure.  It is telling that the emails Plaintiffs cite in support of their scienter theory are used in the "Massachusetts complaint" to show that UBS protected its own interests (and by definition the interests of its shareholders) at the expense of ARS customers.

2008"— UBS disclosed on March 18, 2008 its ARS exposure of $5.9 billion as of December 31, 2007.  (Ex. 60 (UBS 2007 20-F, ch.2, at 14).)   That same day, UBS's share price closed at $25.75, *up* approximately 17% from its prior end-of-day closing price of $22.01.  (Ex. 6 (Stock Price Compilation).)   Accordingly, Plaintiffs have no basis for alleging that UBS's share price was artificially inflated because of any concealment of UBS's ARS exposure.  *See GE Investors Retirement Plan* v. *Gen. Elec. Co.*, No. 10-4284-cv, 2011 WL 5607137, at *3 (2d Cir. Nov. 18, 2011) (affirming a dismissal on loss causation grounds where the company's stock price increased on the day of the alleged corrective disclosure, because "no loss occurred upon the revelation of this [allegedly concealed] information").

*      *      *

Plaintiffs cannot establish scienter or loss causation in relation to UBS's positions and losses in ARS.  Because Plaintiffs' failure to establish even one of these independent elements is fatal, this Court should dismiss their claims relating to ARS as a matter of law.

### PLAINTIFFS DO NOT STATE A FRAUD CLAIM IN CONNECTION WITH UBS'S DISCLOSURES ABOUT ITS SMALL SWISS-BASED U.S. CROSS-BORDER BUSINESS

### BACKGROUND

During the putative class period, UBS had three core businesses—Global Wealth Management & Business Banking, Global Asset Management, and the Investment Bank ("IB").  (Ex. 61 (UBS AG, 2007 Annual Report, ch. 1, at 4).)   UBS's Global Wealth Management business included Wealth Management US, which "offer[ed] sophisticated products and services specifically designed to address the needs of emerging affluent, affluent, high net worth and ultra-high net worth domestic US clients."  (*Id.* at 86.)  "During the Class Period, UBS's Wealth Management U.S. division comprised the operations of PaineWebber, the large U.S.-based wealth manager and brokerage that UBS acquired in November 2000."  (AC ¶ 422.)  For 2007,

Wealth Management US had operating income of CHF 6.659 billion and net new money

("NNM") of CHF 26.6 billion, with total assets under management of CHF 840 billion as of

December 31, 2007.  (Ex. 61 (UBS 2007 Annual Report, ch. 1, at 87).)   As of January 2008,

Wealth Management US had "more than 8,200 financial advisors in over 480 branch and satellite

office locations in the US and Puerto Rico."  (*Id.* at 104.)

        In addition, UBS's Global Wealth Management business included Wealth

Management International & Switzerland, which, in 2007, provided similar services to affluent

individuals almost wholly residing outside the United States.  (*Id.* at 86.)  For 2007, Wealth

Management International & Switzerland had operating income of CHF 12.866 billion and NNM

of CHF 125.1 billion, with total assets under management of CHF 1.294 trillion as of December

31, 2007.  (*Id.* at 87.)

        UBS's Swiss-based U.S. cross-border private banking business—the business

involved in the tax-related allegations here—was part of Wealth Management International &

Switzerland and was a "very small part" of UBS's Global Wealth Management business.

(Ex. 62 (Deferred Prosecution Agreement, filed February 18, 2009, Exhibit C Statement of Facts

("DPA Facts") ¶¶ 5, 8).)  "This  U.S. cross-border business was serviced primarily from service

desks located in Zurich, Geneva, and Lugano, which employed about 45 to 60 Swiss-based

private bankers or client advisors who specialized in servicing U.S clients," and generated

approximately $120-$140 million in annual revenues (a measure greater than operating income)

for UBS from 2001 to 2007.  (*Id.* ¶¶ 6, 8.)  By contrast, UBS had overall operating income in

2007 of nearly $30 billion (CHF 31.98 billion).   (Ex. 60 (UBS 2007 20-F, ch.1, at 36).)

Accordingly, in 2007, UBS's small Swiss-based U.S. cross-border business contributed less than

0.4% of UBS's overall operating income, and only approximately 0.3% of the NNM of UBS's

Global Wealth Management business.  (Ex. 62 (DPA Facts ¶ 8).)

On May 6, 2008, in its first quarter report for 2008, UBS specifically disclosed

that:

> The Department of Justice ("DOJ") and the SEC are examining UBS's conduct in relation to cross-border services provided by Swiss-based UBS client advisors to US clients during the years 2000-2007. In particular, DOJ is examining whether certain US clients sought, with the assistance of UBS client advisors, to evade their US tax obligations by avoiding restrictions on their securities investments imposed by the Qualified Intermediary agreement UBS entered into with the US Internal Revenue Service in 2001. The SEC is examining whether Swiss-based UBS client advisors engaged in activities in relation to their US-domiciled clients that triggered an obligation for UBS Switzerland to register with the SEC as a broker-dealer and/or investment advisor. UBS is cooperating with these investigations.

(Ex. 63 (UBS AG, 1Q 2008 (Form 6-K), at 39 (May 6, 2008)).)  UBS had never previously made

any disclosures to investors about this "very small," Swiss-based business.

UBS also disclosed that the risks of the investigation (and other similar

investigations) to UBS were uncertain:

> UBS Group operates in a legal and regulatory environment that exposes it to potentially significant litigation risks.  As a result, UBS is involved in various disputes and legal proceedings, including litigation, arbitration, and regulatory and criminal investigations.  Such cases are subject to many uncertainties, and their outcome is often difficult to predict, particularly in the earlier stages of a case.

(*Id.*)

On May 23, 2008, UBS expanded on its May 6 disclosure about the DOJ

investigation into its "very small" U.S. cross-border business:

> The DOJ and the SEC are examining UBS's conduct in relation to cross-border services provided by Swiss-based UBS client advisors to U.S. clients during the years 2000-2007.  In particular, DOJ is examining whether certain U.S. clients sought, with the assistance of UBS client advisors, to evade their U.S. tax obligations by avoiding restrictions on their securities investments imposed by the Qualified Intermediary agreement UBS entered into with the U.S. Internal

Revenue Service in 2001.  As has been reported, in connection with this investigation, a senior UBS employee was detained by U.S. authorities as a "material witness", and he remains in the U.S. until his status as a witness is resolved.  As has also been previously reported, a former UBS AG client advisor was charged in an indictment unsealed on May 13, 2008 in the Southern District of Florida with conspiring to defraud the United States and the Internal Revenue Service in connection with providing investment and other services to a U.S. person who is alleged to have evaded U.S. income taxes on income earned on assets maintained in, among other places, a former UBS AG account in Switzerland.  The SEC is examining whether Swiss-based UBS client advisors engaged in activities in relation to their U.S.-domiciled clients that triggered an obligation for UBS Switzerland to register with the SEC as a broker-dealer and/or investment adviser.  UBS has been cooperating with these investigations.

(Ex. 64 (UBS Media Release (Form 6-K), at 11 (May 23, 2008).)

On February 19, 2009, UBS entered into the DPA, which specifically found that UBS's compliance systems were "inadequate," and that UBS internal investigations failed to adequately uncover the Swiss-based U.S. cross-border business's misconduct.  (Ex. 62 (DPA Facts ¶¶ 14-15).)  The DOJ, however, did not accuse any of UBS's executive officers of fraud, and said nothing about UBS's disclosures to its shareholders concerning its Swiss-based U.S. cross-border business.

## ARGUMENT

I. **PLAINTIFFS DO NOT ALLEGE ANY ACTIONABLE MISSTATEMENT OVER UBS'S DISCLOSURES ABOUT THE INVOLVEMENT OF ITS "VERY SMALL," SWISS-BASED CROSS-BORDER BUSINESS IN TAX AVOIDANCE BY U.S. CUSTOMERS.**

Plaintiffs here are attempting to turn the conduct of a small group of UBS employees, located in Switzerland, that harmed *the U.S. Treasury*, into a fraud by UBS on *its shareholders*.  To do so, Plaintiffs allege that UBS made several broad, generalized aspirational statements about its overall Wealth Management business or its Wealth Management U.S. business that were materially false or misleading, because those disclosures did not reveal the activity of UBS's separate, Swiss-based U.S. cross-border business.  But none of these

challenged statements directly concerned this Swiss-based U.S. cross-border business, and as a matter of law, those statements cannot be the basis of a securities fraud claim.

### A.    Most of the Challenged Statements Are Not Actionable.

The vast majority of Plaintiffs' alleged misstatements are general aspirational statements about the manner in which UBS endeavored to conduct its global business of more than 80,000 employees or its risk controls in multiple business lines in 50 countries around the world.  (Ex. 60 (UBS 2007 20-F, ch. 1, at 58-59, 61).)  This Court has already held that nearly identical statements are "puffery" that cannot be the basis of a securities fraud claim.  *See* Appendix C (comparing alleged misstatements about UBS's integrity and risk controls to statements dismissed as non-actionable "puffery" by courts in this Circuit).

In *DeBlasio* v. *Merrill Lynch & Co.*, 07 civ. 318, 2009 WL 2242605 (S.D.N.Y. July 27, 2009) (Sullivan, J.), plaintiffs alleged common law fraud against financial institutions for purportedly engaging in "deceptive and misleading" practices relating to a series of "cash sweep programs" that were offered as part of plaintiffs' brokerage accounts.  *Id.* at *11.  This Court dismissed the following alleged misstatements as mere "puffery":

- "[T]he client is [our] first priority";

- "[O]btaining your financial goals is number one on your financial advisor's list";

- "[We] expect the highest degree of ethics, honesty and fairness in all our dealings"; and

- "[Y]ou will be informed of any significant conflict of interest and we will always act in your best interest."

*Id.* at *20-21.

This Court further held that "an investment bank's assertion of 'high standards of integrity and credit risk management' were statements that 'no investor would take . . . seriously

in assessing a potential investment for the simple fact that almost every investment bank makes these statements.'"  *Id.* at *23 (quoting *JP Morgan*, 553 F.3d at 206); *see also Welch* v. *TD Ameritrade Holding Corp.*, 07 civ. 6904, 2009 WL 2356131, at *6 (S.D.N.Y. July 27, 2009) (Sullivan, J.) (dismissing the following statements as immaterial puffery: "outstanding personal service," "great" cash sweep options, and "impartial guidance"); *Wachovia*, 753 F. Supp. 2d at 376 (dismissing the following statements as puffery:  "very sound" asset quality and financial condition; "prudent" lending practices; "conservative" underwriting; and "strong" credit risk management).

   As  detailed  in  Appendix  C  hereto,  the  vast  majority  of  the  challenged  UBS statements are generalized aspirational statements about UBS's business ethics and risks that are substantively  equivalent  to  the  statements  dismissed  as  non-actionable  puffery  in  *DeBlasio*, *Welch*, *JPMorgan*, and other cases in this Circuit.  (The remainder of the challenged statements, as described below, are also immaterial as a matter of law.)

   Moreover, Plaintiffs have simply cherry-picked these aspirational statements from UBS's disclosures, while studiously ignoring that UBS *actually disclosed* that it faced "the risk of loss resulting from inadequate or failed internal processes, people and systems," including failing to comply with tax withholding or reporting requirement on behalf of clients.  (Ex. 12 (UBS 2006 20-F, Handbook 2006/2007, at 60).)  Specifically, UBS warned that operational risk could arise in many ways, including:

- "by not complying with rules, regulations, laws, accounting standards, local or international best practice, or our own internal standards, which can result in regulatory fines or penalties, restriction or suspension of business, or mandatory corrective action";

- "[by] fail[ing] to fulfill the obligations, responsibilities or duties imposed by law or assumed under a contract, which can lead to claims against us";

- ▪ "by taking technically incorrect positions on tax matters, or *failing to comply with tax withholding or reporting requirements on behalf of clients* . . . or as a result of our involvement in tax-sensitive products or transactions."

(*Id.* (emphasis added).)  UBS further disclosed that the "[f]ailure to identify, manage or control any of these risks" could result in "financial loss" and in "loss of reputation," which could not be quantified.  (*Id.*)

Thus, in view of these warnings, Plaintiffs simply cannot allege any actionable misstatement concerning UBS's conduct of its "very small," Swiss-based U.S. cross-border business.  *See Halperin*, 295 F.3d at 360.

**B.  UBS's Statements Concerning NNM, the Success of the U.S. Wealth Management Division, and the "Gaps" in Its Systems Were Not Materially Misleading As a Matter of Law.**

Plaintiffs also allege that UBS's disclosures concerning its NNM and the overall success of its U.S. Wealth Management business[32] were misleading, because those disclosures did not reveal the activity of UBS's Swiss-based U.S. cross-border business.  As a matter of law, these statements cannot support a claim of fraud.

*First*, Plaintiffs do not allege that UBS made any disclosures to investors on any subject specifically about its "very small" Swiss-based U.S. cross-border business prior to disclosing the government investigations of that business.

*Second*, Plaintiffs cannot maintain that UBS materially inflated its overall NNM figures by including NNM improperly gained through its Swiss-based U.S. cross-border business, because that business contributed just 0.3% of the overall NNM of UBS's Wealth Management business in 2007 (Ex. 62 (DPA Facts ¶ 8)), and an even smaller percentage of

---

[32]  (*E.g.*, AC ¶¶ 531, 535, 542, 562, 564, 584, 626, 628, 637.)

UBS's overall NNM.  As the Second Circuit explained in dismissing claims that JP Morgan

misled the market concerning the categorization of $2 billion:

> Although $2 billion in prepay transactions may sound staggering, the number
> must be placed in context—reclassifying $2 billion out of one category of trading
> assets (derivative receivables) totaling $76 billion into another category (loan
> assets) totaling $212 billion does not alter JPMC's total assets of $715 billion. . . .
> As the district court said about this same information, "*[c]hanging the accounting
> treatment of approximately 0.3% of JPM Chase's total assets from trades to loans
> would not have been material to investors.*"

*JP Morgan*, 553 F.3d at 204 (emphasis added); *see also Garber* v. *Legg Mason, Inc.*, 537 F.

Supp. 2d 597, 613-14 (S.D.N.Y. 2008) (Chin, J.) (omission of 0.4% in company's annual

revenue was immaterial, because "[t]his share is simply too small to be material as a matter of

law when considered in the broader context of the company's revenues and expenses"); *In re*

*Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) (Rakoff, J.) (inflation

of company's revenue by 0.3% immaterial as a matter of law); *Glassman* v. *Computervision*

*Corp.*, 90 F.3d 617, 633 n.26 (1st Cir. 1996) (omission of 3% to 9% of actual revenue immaterial

as a matter of law).[33]

      *Third*, even if this Court were to hold that the alleged misstatements concerning

the success of UBS's U.S. Wealth Management business were not non-actionable "puffery,"

those statements were not materially misleading, because, as shown above, the "very small,"

Swiss-based U.S. cross-border business was separate and distinct from UBS's *U.S.*-based Wealth

Management business.  Plaintiffs have not alleged that UBS's large U.S. Wealth Management

business (with more than 480 branch offices in the United States) would have been unsuccessful

if the Swiss-based U.S. cross-border business had not made money.

---

[33]  Nor do Plaintiffs allege that the NNM figures were somehow "qualitatively" material or
would otherwise have an "adverse effect on [UBS's] future revenues."  *Litwin* v. *Blackstone*
*Grp., L.P.*, 634 F.3d 706, 720 (2d Cir. 2011).

*Fourth*, Plaintiffs allege that UBS misled the market in disclosing (beginning on August 10, 2004) that it had found and fixed certain "gaps" in its reporting systems that resulted in insufficient withholding of U.S. taxes from client funds.  (*E.g.*, AC ¶¶ 572, 574, 578, 586.) But, as the Amended Complaint makes clear, these statements concerned "gaps" in withholding systems at UBS *Investment Bank* operations *in the United States* during 2004, and had nothing to do with any aspect of UBS's Wealth Management business, much less the "very small," Swiss-based U.S. cross-border business within that global business.  (*E.g.*, AC ¶ 572 ("The provision for US withholding tax costs relates to gaps in our systems and processes which led to incomplete client tax documentation in some of our *US operations*." (emphasis added)); ¶ 574 ("we have uncovered certain systems and process weaknesses in our *US operations, of the investment bank*, that led to incomplete client tax documentation . . ." (emphasis added)).)

**C.     As a Matter of Law, UBS Had No Duty to Disclose the Uncharged Conduct of Its "Very Small," Swiss-Based U.S. Cross-Border Business.**

"While the fact that a corporation's employees engaged in illegal conduct may well be material to the reasonable investor for several obvious reasons, the obligation to disclose uncharged illegal conduct will not arise from the materiality of this information alone."  *In re AXIS Holdings Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006) (Holwell, J.) (internal quotation marks omitted).  Thus, "courts in this Circuit have required a connection between the [uncharged] illegal conduct and the allegedly misleading statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or bottom line."  *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008) (Holwell, J.) (dismissing complaint and rejecting plaintiffs' argument that press releases were "sufficiently connected to the undisclosed activity," because success of company's "ongoing operations and its financial condition might be harmed if the insider trading scheme came to light and the

company or its executives were sanctioned") (internal quotation marks omitted). "This connection is required because companies are not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the illegal conduct were discovered, disclosed or terminated." *Id*. (internal quotation marks omitted). (*See also* cases cited in Br. of Underwriter Defendants In Support of Mot. to Dismiss the AC ("Underwriters' Brief"), at 20 to 22.)

Here, Plaintiffs have alleged no specific "connection" between the challenged aspirational statements that UBS sought to comply with the law in the conduct of all of its global businesses, employing more than 80,000 employees, and the "uncharged illegal conduct" of UBS's Swiss-based U.S. cross-border business of 45 to 60 client advisors, *In re AXIS Holdings*, 456 F. Supp. 2d at 589, particularly given the "very small," *see* Ex. 62 (DPA Facts ¶ 8), size of that business line in relation to UBS's global business of 80,000 employees, *In re FBR,* 544 F. Supp. 2d at 357-63 (rejecting Section 10(b) claims premised on a duty to disclose alleged illegal activity where that activity "did not involve a significant percentage of [the company's] revenue"). *See also In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 377 (S.D.N.Y. 2009) (Jones, J.) ("Defendants had no duty to disclose that [the company] issued purportedly misleading research reports," because "firms have no duty to accuse themselves of unproven, allegedly illegal policies"); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (Swain, J.) ("failure to disclose that . . . revenues were derived from 'unsustainable and illegitimate sources'" did not violate Section 10(b), because "the federal securities laws do not require a company to accuse itself of wrongdoing") (citations omitted); *Ciresi*, 782 F. Supp. at 823 ("[T]he law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement.").

Because Plaintiffs have failed to identify any specific UBS disclosure concerning the uncharged conduct of its Swiss-based U.S. cross-border business, the alleged misstatements are simply "too remote from [UBS's] alleged illegal conduct to compel disclosure of this conduct." *Menkes* v. *Stolt-Nielsen S.A.*, 03 civ. 409, 2005 WL 3050970, at *8 (D. Conn. Nov. 10, 2005). Plaintiffs simply cannot "transform[] . . . Rule 10b-5 from a prohibition on investor deception into a mandate that corporations insure their investors against losses from regulatory investigations." *In re FBR Inc.*, 544 F. Supp. 2d at 363.

**D.     UBS Timely Disclosed the DOJ Investigation of Its Small Swiss-Based U.S. Cross-Border Business.**

Nor can Plaintiffs allege an actionable misstatement by claiming that UBS should have disclosed the uncharged, unadjudicated DOJ investigation of its Swiss-based U.S. cross-border business in its Annual Report for 2007 (issued on March 18, 2008), rather than in its first quarter report issued a month and a half later on May 6, 2008. (AC ¶ 926.) Moreover, Plaintiffs do not allege any particularized facts suggesting that the timing of UBS's disclosure was the result of improper conduct. (AC ¶ 926.) "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud," *Acito*, 47 F.3d at 53 (citing *Denny*, 576 F.2d at 470), and corporate managers "are entitled to investigate for a reasonable time, until they have a full story to reveal." *Higginbotham*, 495 F.3d at 761.

Furthermore, Plaintiffs cannot manufacture a securities fraud on the ground that UBS's May 6, 2008 disclosure of the DOJ investigation and May 23, 2008 disclosure that a former UBS U.S. cross-border employee had been indicted for conspiring to defraud the IRS (AC ¶¶ 939-40) did not sufficiently announce that "UBS itself faced substantial criminal fines and penalties as a result of its knowing violations of U.S. law" (AC ¶ 941). It is not plausible that disclosure of a DOJ investigation into alleged aiding of tax avoidance would not place

investors on notice that UBS faced such potential consequences. In fact, numerous press reports during this period made the marketplace well aware of a range of potential outcomes of the DOJ investigation of UBS's U.S. cross-border business. (*See* Underwriters' Brief at 16 to 20.)[34]

\* \* \*

Because they fail to adequately plead any material misstatements, Plaintiffs' allegations cannot turn the actions of a "very small," Swiss-based division of UBS, which was purportedly trying to benefit UBS shareholders by *gaining* customers by helping those customers avoid U.S. taxes, into a securities fraud on *UBS shareholders*. Accordingly, the Court should dismiss all claims concerning the U.S. cross-border business.

## THE COURT SHOULD DISMISS PLAINTIFFS' SECURITIES ACT CLAIMS

After disclosing substantial losses in 2007 and 2008 because of the global financial crisis, UBS announced a rights offering (the "Rights Offering") to raise additional capital. In the Rights Offering, UBS shareholders received tradable rights to purchase seven additional UBS shares for CHF 21.00 per share for every 20 UBS shares that they held. (Ex. 65 (UBS AG Prospectus Supplement (filed under SEC Rule 424(b)(2)), at S-11 (May 23, 2008)).)[35] The holders of these rights could exercise them between May 27 and June 12, 2008. (*Id.*)

On May 23, 2008, UBS filed with the SEC (under an effective shelf registration statement) a Prospectus Supplement specifying the UBS ordinary shares to be offered and sold in the United States as part of its worldwide Rights Offering. Plaintiff Alaska Laborers, which

---

[34] As with the ARS claims, Plaintiffs' claims that UBS intended to help certain U.S. *customers* defraud the IRS cannot establish a strong inference that UBS had the requisite intent to defraud UBS *shareholders*. (*See supra* at 59.) Moreover, because the alleged corrective disclosures took place during the middle of a financial industry meltdown, Plaintiffs cannot adequately plead loss causation.

[35] On May 21, 2008, UBS shares traded for CHF 30.64 on the Swiss Exchange, so the rights offering price represented a discount of approximately CHF 9.64. (*Id.*)

claims to have purchased shares in the Rights Offering, brings claims under Sections 11, 12(a)(2), and 15 of the Securities Act against UBS, its CEO, CFO, members of its Board of Directors as signatories of the Registration Statement,[36] and UBS Securities LLC and other investment banks (as underwriters) ("Rights Offering Defendants"), alleging (i) that the Registration Statement and Prospectus contained material misstatements concerning UBS's exposure as a result of the U.S. cross-border business's conduct (AC ¶¶ 1435-50), and (ii) that the value of UBS shares purchased in the Rights Offering declined when the full extent of UBS's exposure was revealed (AC ¶¶ 1459).

Alaska Laborers' Securities Act allegations against all Rights Offering Defendants should be dismissed. *First*, for the reasons stated in the Underwriters' Brief, the Registration Statement and Prospectus were not false or misleading in any respect. Moreover, when exercising its rights, Alaska Laborers was fully aware of the DOJ investigation into the U.S. cross-border business and of UBS's potential exposure.[37] Accordingly, Alaska Laborers fails to plead a Section 11 violation.

*Second*, the Court should dismiss all of Plaintiffs' claims under Section 12(a)(2) against UBS Securities LLC for lack of standing, because Alaska Laborers fails to allege

---

[36] *See supra* at n.1 for a list of these individuals.

[37] Because the Amended Complaint also alleges fraud against Defendants UBS, Rohner, Suter, and Ospel in relation to UBS's small U.S. cross-border business (AC ¶ 1116), Alaska Laborers must plead a strong inference that these Individual Defendants acted with scienter in regard to alleged misstatements underlying its Securities Act claims. *See Rombach*, 355 F.3d at 170 ("The district court concluded that the same heightened pleading standard applies to securities claims brought under Section 11 and Section 12(a)(2) when premised on averments of fraud. We agree."). Notwithstanding the bald allegation that Mr. Ospel was "intimately aware of the illegal conduct taking place within UBS's cross-border business" (AC ¶ 1116), Plaintiffs do not provide a shred of factual specificity as to his having any part in or knowledge of this conduct (AC ¶¶ 1116-41). Likewise, Plaintiffs never allege any facts (and never even claim to do so) showing Mr. Suter had any knowledge of the U.S. cross-border business's conduct.

adequately that it purchased its Rights Offering shares from UBS Securities LLC or that UBS Securities LLC solicited those sales.  *See In re Orion Sec. Litig.*, 08 civ. 1328, 2009 WL 2601952, at *2 (S.D.N.Y. Aug. 20, 2009) (Sullivan, J.) (dismissing Section 12(a)(2) claims for lack of standing, because "Plaintiff has not alleged that Plaintiff either directly *purchased* Orion securities from the Underwriter Defendants or that the Underwriter Defendants *successfully* solicited such sales").

For these reasons, Alaska Laborers fails to state a claim under the Securities Act.[38]

## THE COURT SHOULD DISMISS THE
## CLAIMS AGAINST THE TWELVE INDIVIDUAL DEFENDANTS

To support a Section 10(b) claim against any of the Individual Defendants, Plaintiffs specifically must allege that that defendant "'made' the material misstatement[]s." *Janus Capital Grp., Inc.* v. *First Deriv. Traders*, 131 S. Ct. 2296, 2301 (2011) (quoting 17 C.F.R. § 240.10b-5(b)); *see also Wright* v. *Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (to state a claim, a plaintiff must allege that the defendant "actually ma[de] a false or misleading statement").  As this Court recently explained in *DeBlasio*, "where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud," and "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"  *DeBlasio*, 2009 WL 2242605, at *10 (quotation marks omitted).  Plaintiffs "may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled

---

[38]  As Plaintiffs have not stated a claim for a primary violation of the Securities Act, their derivative "control person" claims under Section 15 must be dismissed.  *See JP Morgan*, 553 F.3d at 206-07 (dismissing Section 15 claim for want of a primary violation).

to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged." *Id*. at *13 (quotation marks omitted).

Although Plaintiffs invoke the so-called "Group Pleading Doctrine" (AC ¶¶ 150-55) to try to establish liability on the part of the individual defendants, the Reform Act "has eliminated" such form of pleading. *Bond Opportunity Fund* v. *Unilab Corp.*, 99 civ. 11074, 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) (Martin, J.); *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 262 (S.D.N.Y. 2004) (Patterson, J.) (Reform Act's "use of the singular 'defendant' counsels against group pleading"). Indeed, all three Circuit Courts that have directly addressed this issue have so held. *See Winer Family Trust* v. *Queen*, 503 F.3d 319, 335-37 (3d Cir. 2007) (because the Reform Act "requires plaintiffs to specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions," the group pleading doctrine "is no longer viable"); *Southland Secs. Corp.* v. *INSpire Ins. Solutions Inc.*, 365 F.3d 353, 363-65 (5th Cir. 2004) (same); *Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 437 F.3d 588, 602-03 (7th Cir. 2006) (same), *vacated on other grounds*, 551 U.S. 308 (2007); *but cf. Schwartz* v. *Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir. 1997) (applying the Group Pleading Doctrine without analysis or citation of the Reform Act).

Moreover, the Group Pleading Doctrine cannot be squared with the Supreme Court's recent *Janus* decision. The Group Pleading Doctrine purported to permit a presumption that certain corporate statements were the collective work of individuals with direct involvement in the everyday business of the company. But the Supreme Court held in *Janus* that, to state a Section 10(b) fraud claim against a defendant for an alleged misstatement, the defendant must have "made" the statement by having "ultimate authority over the content of the statement and whether and how to communicate it," *Janus*, 131 S. Ct. at 2303. The Supreme Court made clear

that even "significant involve[ment]" in preparing a statement was insufficient for liability. *Id.* at

2305.  In light of this holding, the Group Pleading Doctrine's presumption based on generalized

involvement in the business of the company cannot stand.

> In addition, Plaintiffs "must 'state with particularity facts giving rise to a strong
>
> inference' that *each defendant* acted with scienter."  *Edison Fund* v. *Cogent Inv. Strategies Fund,*
>
> *LTD*, 551 F. Supp. 2d 210, 228 (S.D.N.Y. 2008) (Koeltl, J.) (citation omitted) (emphasis added).

## ARGUMENT

## I.   THE AMENDED COMPLAINT FAILS TO PLEAD SPECIFIC CLAIMS AGAINST EACH OF THE INDIVIDUAL DEFENDANTS.

> Under the applicable pleading requirements, a securities fraud complaint may not

simply incorporate hundreds of pages of allegations into its claim section without specifying

which allegations pertain to which statements, time periods, or individuals.  *See*, *e.g.*, *Wagner* v.

*First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006) ("Shotgun pleadings are

those that incorporate every antecedent allegation by reference into each subsequent claim for

relief or affirmative defense.  Shotgun pleadings wreak havoc on the judicial system.")

(alterations omitted) (citations omitted).  It should not be "difficult and laborious to determine

which portions of the [disclosure] are allegedly false and which false statements are attributed to

any particular defendant."  *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1279 (E.D. Wash.

2007).

> Here, Plaintiffs spend 1,384 paragraphs making various allegations of fraud, and

then devote only ten rote paragraphs to the actual claims of Section 10(b) violations "against all

Defendants."  (AC ¶ 1385.)  Nowhere do Plaintiffs differentiate their claims against each of the

twelve Individual Defendants, making it impossible to determine "which false statements are

attributed to any particular defendant." *In re Metro.*, 532 F. Supp. 2d at 1279.   That alone

requires dismissal of the Amended Complaint.[39]

## II.     BEYOND ITS IMPERMISSIBLE "SHOTGUN" PLEADING, THE AMENDED COMPLAINT DOES NOT STATE A CLAIM AS TO THE INDIVIDUAL DEFENDANTS.

### A.     Hutchins and Stehli

Under *Janus*, the claims against Michael Hutchins and James Stehli must be

dismissed, because Plaintiffs do not allege that they made any misstatements.  *Janus*, 131 S. Ct.

at 2301 ("To be liable, [the defendant] must have 'made' the material misstatements . . . .").

Plaintiffs allege that Michael Hutchins was the head of UBS's Fixed Income division until 2005,

and the President and Co-Chief Investment Officer of DRCM until his resignation on May 3,

2007 (AC ¶ 129), and that James Stehli was the head of UBS's Global CDO Group until his

departure, which the Amended Complaint alleges to have occurred on October 11, 2007 (AC

¶ 127).   According to the Amended Complaint, Mr. Hutchins knew that UBS's mortgage-related

securities portfolio was overvalued because, in the first quarter of 2007, Mr. Hutchins attempted

to sell certain low-rated DRCM mortgage-related securities, and was only able to sell them for

below their marked value in UBS's portfolio.   (AC ¶ 30.)   With respect to Mr. Stehli, Plaintiffs

generally allege that he caused UBS to retain large amounts of super senior CDO tranches on

UBS's books, in violation of UBS's policy against concentrated positions in illiquid securities

(AC ¶ 305), and that he failed to stop the growth of UBS's CDO origination (AC ¶ 313).

Plaintiffs do *not* allege that Messrs. Hutchins or Stehli made *any* actionable

misstatement whatsoever to investors, or that any of the challenged misstatements are somehow

---

[39]   As shown in Appendix E, many of the Individual Defendants (i) have no ties whatsoever to the ARS or U.S. cross-border allegations, and (ii) were not at UBS or in the relevant position at UBS for large portions of the putative class period.

attributable to them.  As a matter of law, on this basis alone, the claims against Messrs. Hutchins

and Stehli must be dismissed.  *See Janus*, 131 S. Ct. at 2301; *SEC* v. *Kelly*, 08 civ. 4612, 2011

WL 4431161, at *2 (S.D.N.Y. Sept. 22, 2011) (McMahon, J.) ("The SEC concedes that *Janus*

foreclosed its ability to assert a misstatement claim under subsection (b) of Rule 10b-5 against

[the individual defendants who did not make the alleged misstatement]."); *Wright*, 152 F.3d at

175 ("[T]he misrepresentation must be attributed to that specific actor at the time of public

dissemination, that is, in advance of the investment decision."); *see also In re Downey*, 2009 WL

2767670, at *4 n.1 ("[O]nly those defendants who actually make a false or misleading statement

will be liable under section 10(b) or Rule 10b-5.").  In any event, Plaintiffs do not allege any

scienter or loss causation as to Messrs. Hutchins or Stehli.  (*See supra* at 23 to 46.)

### B.    Costas

Plaintiffs allege that John Costas was the Chairman and Chief Executive Officer

of the UBS IB from the beginning of the relevant time period until June 2005 and Chairman and

Chief Executive Officer of DRCM from June 2005 until June 30, 2007.  (AC ¶ 128.)  Plaintiffs

generally allege that, under Mr. Costas's leadership, DRCM accumulated "high concentrations"

of "risky" mortgage-related securities.  Plaintiffs attribute only three statements to Mr. Costas:

- A quote in a May 3, 2007 *Bloomberg News* article that: "*We* can't comment on specific trade management processes especially on UBS's proprietary capital.  *We* don't get that granular, I apologize. I think the important thing going forward is UBS is in complete control from a risk management standpoint, a control standpoint, of [the DRCM legacy] assets.  And is managing those with the same care and attention they do elsewhere in the investment bank."  (Ex. 66 (Christine Harper, *UBS's Costas, Fraser Say "Legacy" Positions Caused Fund Losses*, BLOOMBERG NEWS, May 3, 2007)) (emphasis added);[40]

---

[40]  The Amended Complaint also contains a second quotation from Mr. Costas recorded in the article, but does not allege why it was false or misleading.  (AC ¶¶ 831-32.)

- A quote from the same article that "[t]he portfolio that was the proprietary trading business [at DRCM] we had run for a very long time at UBS, in fact since 1999. And there were positions, just to expand upon John's comments, there were positions in that book that had been established in 2001, 2002, and so there was idiosyncratic risk that was in the book" (*id.*); and

- A quote in a July 2005 interview with *EuroMoney* magazine stating that "[t]he private bank is a real asset for us. And yes, we do have to be protective of it.   Super-protective.   Even with the conservative risk-management philosophy, we are careful. It would be reckless to squander that for one quarter's earnings for a deal."   (AC ¶ 619).

As a matter of law, none of these statements by Mr. Costas was materially misleading.  As to the first statement, Plaintiffs do not allege that after DRCM closed in May 2007 (i) the IB did not have "control from a risk management standpoint" over these DRCM legacy positions, or that (ii) the IB did not treat those positions in the same manner that the IB treated other IB positions.  Thus, on its face, Mr. Costas's statement was not false or misleading. *See Seinfeld* v. *Gray*, 404 F.3d 645, 650-51 (2d Cir. 2005) (upholding dismissal of claims under SEC Rule 14a-9 where the proxy statement was neither false nor misleading).  Moreover, this type of statement is of the kind this Court has held to be puffery.  (*See supra* at 63 to 68.)  As to the second statement, Plaintiffs do not allege that (i) the DRCM proprietary portfolio had not been run by the IB since 1999, or (ii) that some of the positions had not been established in 2001 and 2002.

As to the first two statements, Plaintiffs also fail to allege scienter on Mr. Costas's part.  Plaintiffs do not allege any motive for him to lie about the IB's risk controls over assets no longer under his control, and there is no allegation that Mr. Costas, who left the IB in 2005, months before the first alleged misstatements concerning mortgage-related securities (AC ¶¶ 257, 271), had any reason to believe that the IB did not have sufficient risk controls over its positions.  Indeed, Plaintiffs acknowledge that Mr. Costas was "involved in the day-to-day management of DRCM's portfolios" (AC ¶ 1163), and makes no allegation about his knowledge

of the IB's risk procedures during the alleged fraud concerning mortgage-related securities.  Nor do Plaintiffs allege loss causation with respect to these statements.  As a matter of law, statements such as the third Costas statement about UBS's "conservative" risk management and desire to protect the private bank—both of which Plaintiffs interpret as referring to UBS's Wealth Management division—are the types of statements this Court has held to be inactionable puffery.  (*See supra* at 63 to 66.)  Moreover, Plaintiffs never link Mr. Costas in any way to the "very small," U.S. cross-border business.

### C.      Stuerzinger

Plaintiffs allege that Walter Stuerzinger was the Group Chief Risk Officer and member of the Group Executive Board until October 1, 2007.  (AC ¶ 123.)  Mr. Stuerzinger is a Swiss national working in Switzerland (Ex. 60 (UBS 2007 20-F, ch. 3, at 17)), and Plaintiffs never allege any facts that justify this Court's personal jurisdiction over him.  Plaintiffs do not allege that Mr. Stuerzinger (i) lived in, worked in, or traveled extensively to the United States, (ii) made material misstatement in or directed to the United States, (iii) traveled to the United States in connection with the alleged fraud, or (iv) signed any of the allegedly false or misleading SEC submissions identified in the Amended Complaint.  *See In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 466-67 (S.D.N.Y. 2008) (Griesa, J.) (dismissing claims against executives for lack of personal jurisdiction where those executives did not direct statements to the United States); *In re Rhodia*, 531 F. Supp. 2d at 542 (dismissing claims for lack of personal jurisdiction because "[l]ead Plaintiffs have not set forth any specific allegation that [individual corporate executives] issued any statements, effectuated any transactions, or authorized any acquisitions that constitute the misconduct alleged in the Complaint").  Accordingly, this Court should dismiss the claims against Mr. Stuerzinger under Rule 12(b)(2) for lack of personal jurisdiction.

Moreover, none of Mr. Stuerzinger's statements during the June 4, 2007 presentation in Switzerland was false or misleading:

- "The slides that accompanied Defendant Stuerzinger's presentation titled 'Risk & Capital Management at UBS' stated that, as of [June 4, 2007], UBS had a 'strong risk management and risk control culture' and 'highly integrated risk management and control process' which 'focus[ed] on managing and controlling concentration and liquidity risk.'"

- "Stuerzinger stated during his presentation that UBS was 'executing on [its] grow[th] agenda, without jeopardizing [its] risk principles.' Stuerzinger further stated that UBS's 'risk culture has not changed.'"

- "Defendant Stuerzinger further stated that UBS was 'clearly' invested in 'highly liquid assets' and that UBS had 'moved out of . . . certain illiquid assets.'"

- "With respect to concentrations, Defendant Stuerzinger stated: 'We rigorously want to avoid risk concentrations of all kinds.  We are basically obsessed with risk diversification.'"

(AC ¶¶ 833-34.)  The first two statements above are non-actionable puffery.  Further, each statement was made *prior* to the severe market dislocation during the third quarter of 2007.  Plaintiffs do not allege any motive for him to make false statements, or any facts suggesting that he thought there were serious concerns about UBS's overall risk controls at the time he made those statements.  Nor do Plaintiffs allege loss causation with respect to his statements.

## D.     Martin and Singh

Plaintiffs allege that David Martin was the Global Head of the UBS IB's Rates business, a segment of IB's Fixed Income unit until October 11, 2007 (AC ¶ 126), and that Ramesh Singh was the IB's Global Head of Securitized Products until the end of the putative class period (AC ¶ 125).  The only alleged misstatements by Messrs. Martin and Singh concern the March 28, 2007 "Fixed Income Investor Day" conference, where they allegedly stated that UBS had "superior risk management" policies and did not plan to "[p]rovide excess liquidity to drive high margin business," to "chase league tables" or to "grow business lines that rapidly

expand the balance sheet."  (AC ¶¶ 378-80, 790-93.)  As discussed above, these statements are classic puffery and, therefore, cannot be grounds for a securities fraud claim.  Nor do Plaintiffs adequately allege scienter or loss causation against Messrs. Singh or Martin.

       **E.**        **Jenkins, Ospel, Rohner, Standish, Suter, and Wuffli**

With respect to Huw Jenkins, Marcel Ospel, Marcel Rohner, Clive Standish, Marco Suter, and Peter Wuffli—all senior UBS executive officers—Plaintiffs fail to allege that (1) any of their statements were materially false or misleading (*see supra* at 47 to 54); (2) they had any motive to commit fraud or were reckless in their actions (*see supra* at 23 to 43); or (3) their statements caused any decline in UBS's share price (*see supra* at 44 to 46).

Moreover, these Individual Defendants cannot be held responsible for all the challenged statements:  According to Plaintiffs, Mr. Jenkins left UBS AG on October 1, 2007 (AC ¶ 68); Mr. Ospel stepped down as Group Chairman on April 23, 2008 (AC ¶ 70); Mr. Rohner did not become Group CEO until July 5, 2007 (AC ¶ 66); Mr. Standish left his position as Group CFO on October 1, 2007 (AC ¶ 68); Mr. Suter did not become Group CFO until October 1, 2007 (AC ¶ 122); and Mr. Wuffli left UBS on July 5, 2007 (AC ¶ 66).  At a minimum, this Court should dismiss the Section 10(b) claims against these Defendants to the extent that they rely on any part of the alleged frauds that occurred before they assumed the relevant positions, or after they left UBS or stepped down from such positions.[41]

---

[41]  As Plaintiffs have failed to state a Section 10(b) claim as to the Individual Defendants, the "control person" claims in Count II under Section 20(a) should be dismissed.  15 U.S.C. § 78t(a).

-81-

## CONCLUSION

For the foregoing reasons, this Court should dismiss the remaining claims in the Amended Complaint and deny leave to amend.  Plaintiffs have had several years and two separate opportunities to draft proper allegations that support their claims, and their failure to do so should not force Defendants into a fourth round of filings on Plaintiffs' meritless claims.  As this Court stated when granting Plaintiffs leave to amend the First Consolidated Complaint, "my hope is and my presumption at this point is that this is going to be the last amended complaint . . . ." (Ex. 67 (4/23/09 Hr'g Tr. at 10:14-16).)  The time has come to close this case.

Respectfully,

Robert J. Giuffra, Jr.
Suhana S. Han
Matthew A. Schwartz
Justin J. DeCamp
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*

December 15, 2011

## APPENDIX A

### Statements By Government Officials and Ratings Agencies Concerning the Security And Conservative Nature of AAA-Rated Mortgage-Related Securities

| Date | Statement | Source |
|------|-----------|--------|
| Feb. 27, 2008 | "Of course, in order for a conservative investor to get comfortable with the credit quality of the senior tranche, there must be a blessing from a credit rating agency in the form of a triple A rating.  When the credit rating agency provided that designation to the senior tranche of a mortgage-backed security, it was a judgment that the junior tranches were large enough to absorb so much of the losses of the underlying mortgages that the probability of default for the senior tranche was generally as low as it would be for triple A-rated corporate security.  Thus, *the triple A rating sent a very powerful signal to the investor and regulatory community that the senior tranche was truly low risk.*" | Ex. 68 (John C. Dugan, Comptroller of the Currency, Remarks Before the Global Association of Risk Professionals, at 3 (emphasis added); *see also id.* at 8 (referring to super-senior CDO tranches as "supposedly super safe investment[s]") |
| Feb. 27, 2008 | "First, because of their triple A rating, virtually any investor could buy super-senior ABS CDO securities either directly, or indirectly by purchasing commercial paper from triple A-rated conduits that owned such securities.  *Among these investors were ones that were very risk-averse, including some regulated firms that have legal restrictions that prevent or limit their investing in riskier instruments.*  I am talking, for example, about banks, thrifts, credit unions, insurance companies, money market funds, pension funds, and state and local governments, all of which have investment restrictions that make direct reference to credit ratings.  As a result, as we now know, a number of such firms purchased super-senior CDO securities, either directly or through conduits." | *Id.* at 5-6 (emphasis added) |
| Feb. 27, 2008 | "Although . . . investors should never rely exclusively on credit ratings in making investment decisions, the plain fact is that *triple A credit ratings are a powerful green light for conservative investors all over the world.*  These include banks, insurance companies, and other firms whose regulatory regimes are laced with restrictions that reference high credit ratings as a simple way to limit risk." | *Id.* at 9 (emphasis added) |
| Apr. 30, 2008 | "But even bond fund investors with a low tolerance for risk, who may have intended to stick with funds that bought only very safe, AAA-rated investments, too often discovered that in | Ex. 69 (SEC Chairman Christopher Cox, Keynote Address to the |

| Date | Statement | Source |
|------|-----------|--------|
|  | practice it was not that simple. When bond-rating agencies such as Standard & Poor's and Moody's downgraded many formerly high-rated securities, it affected even some bond funds that might otherwise have been considered safe." | Investment Company Institute (Apr. 30, 2008)) |
| Sept. 30, 2008 | "Super Senior CDOs had a AAA-rating and, in the event of a default, were rated higher than other AAA-tranches of the same issue. *As they were considered virtually risk-free*, they bore a very low interest rate." | Ex. 11 (SFBC Report at 5, Textbox 2) (emphasis added) |
| Oct. 22, 2008 | "*A triple-A rating has been regarded as the gold standard for safety and security . . . for nearly a century. . . .* For investors, a triple-A rating became the stamp of approval that said this investment is safe." | Ex. 70 (Rep. Henry Waxman, Remarks at Hearing of the House Oversight and Gov't Reform Comm., Credit Rating Agencies & the Financial Crisis (Oct. 22, 2008)) (emphasis added) |
| June 9, 2009 | "*We believe that 'AAA' rated securities should be able to withstand extreme economic conditions and still pay timely interest and principal in full.*" | Standard & Poor's Request for Comment Teleconference: U.S. RMBS Rating Methodology & Assumptions for Prime Jumbo, Alt-A and Subprime Loans, at 4, available at http://mcgraw-hill.mediasite.com /mcgrawhill/Viewer/?pei d=36afe55642ab4d7 9a57bf4a76726fb00 (emphasis added) |

| Date | Statement | Source |
|------|-----------|--------|
| Aug. 11, 2009 | "Super-senior tranches sit above the senior tranche and hence receive their payments before anyone else. . . . *they were presumed – incorrectly as it turned out – to be substantially risk-free.*" | Ex. 71 (Congressional Oversight Panel, Aug. Oversight Report: The Continued Risk of Troubled Assets, Submitted under Section 125(b)(1) of Title 1 of the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343) (emphasis added) |

**APPENDIX B**

*Public Disclosures by UBS Concerning*
*The Risks of UBS's Positions in Mortgage-Related Securities*

| Date | UBS Statement |
|---|---|
| October 1, 2007 | "Following a write down of positions in fixed income . . . mainly related to deteriorating conditions in the US sub prime residential mortgage market, UBS is likely to record an overall Group pre-tax loss of between CHF 600 million and CHF 800 million for third quarter . . . ." (Ex. 34 (UBS Oct. 1, 2007 6-K, at 1).) |
| October 30, 2007 | "[The] FICC business remains exposed to further deterioration in the US housing and mortgage markets as well as rating downgrades for mortgage-related securities, which could lead to further writedowns on our positions. . . ." (Ex. 35 (UBS 3Q 2007 6-K, at 2).) |
| December 10, 2007 | "In response to continued deterioration in the US sub-prime mortgage securities market, . . . UBS has revised the assumptions and inputs used to value US sub-prime mortgage related positions," resulting in "further writedowns of around USD 10 billion, primarily on CDO and 'super senior' holdings." (Ex. 39 (UBS Dec. 10, 2007 6-K, at 1).) The next day, UBS held a conference call with investors and analysts in which UBS provided extensive disclosure of its subprime positions. (Ex. 72 (UBS AG, 1Q 2007 Business Update Call (Dec. 11, 2007); Ex. 40 (UBS Investor Event Presentation, at 19-21.) |
| January 30, 2008 | UBS issued an additional profit warning for the fourth quarter and full year of 2007, and explained that UBS now expected to record a loss for the year and $4 billion in additional losses on subprime and other mortgage-related positions. (Ex. 41 (UBS Jan. 30, 2008 6-K, at 1).) |
| April 1, 2008 | UBS pre-announced a loss for the first quarter of 2008 and writedowns and losses of "approximately USD 19 billion on US real estate and related structured credit positions" as a result of continued market deterioration. (Ex. 45 (UBS Apr. 1, 2008 6-K, at 1).) |
| May 6, 2008 | "The year started with tough business conditions for the financial industry as a whole. We expect this difficult environment to remain and be characterized by a continuing unfavorable global economic climate, . . . The impact will affect all of our businesses . . . ." (Ex. 63 (UBS 1Q 2008 6-K, at 2).) |

APPENDIX C

| Statements Dismissed by *JPMorgan*, *DeBlasio*, *Welch*, and other SDNY cases as Inactionable Puffery | Alleged Misstatements in This Action Concerning the U.S. Cross-Border Business |
|---|---|
| "[We] expect the highest degree of ethics, honesty and fairness in all our dealings"<br><br>*DeBlasio*, 2009 WL 2242605, at *21<br><br>"'set the standard for integrity'"<br><br>*JP Morgan*, 553 F.3d at 206 | UBS performed "above and beyond what laws and regulations require" (AC ¶¶ 773, 922, 1444);<br><br>UBS "maintain[ed] . . . compliance with relevant regulations" *(id.* ¶¶ 773, 922, 1444);<br><br>UBS "monitor[ed] and enforc[ed] compliance . . . with regulatory requirements" *(id.* ¶¶ 922, 929, 1445, 1447);<br><br>UBS itself avoided transactions that were "sensitive for tax, legal, regulatory or accounting reasons" *(id.* ¶¶ 557, 660, 681);<br><br>UBS "aim[ed] to maintain the highest ethical standards" *(id.* ¶¶ 557, 559, 660, 672, 676, 681);<br><br>UBS employees "should conduct themselves in a manner that is above reproach" *(id.* ¶¶ 558, 676, 773, 788, 922, 1444);<br><br>UBS makes "responsible behavior an important part of its culture, identity and business practices" *(id.* ¶ 559, 672, 676)<br><br>*See also* ¶¶ 601, 788 |
| "had 'risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process,'"<br><br>*JP Morgan*, 553 F.3d at 205 | UBS's "our overriding goal is to secure an appropriate balance between risk and return" and "has no intention of changing [its] risk culture and will retain [its] overriding commitment to high-quality earnings . . . ." *(id.* ¶¶ 538-40)<br><br>UBS has "comprehensive *risk reporting* to stakeholders, and to management at all levels against the approved risk control framework and, where applicable, limits" *(id.* ¶ 554) |

| Statements Dismissed by *JPMorgan*, *DeBlasio*, *Welch*, and other SDNY cases as Inactionable Puffery | Alleged Misstatements in This Action Concerning the U.S. Cross-Border Business |
|---|---|
| | (emphasis in original)<br><br>UBS's "systems and processes are designed to ensure that the risks associated with our activities, including those arising from process error, failed execution, fraud, systems failure, and failure of security and physical protection, are appropriately controlled" (*id.* ¶ 591)<br><br>*See also* ¶¶ 555, 557, 596, 599, 603, 619, 624, 669, 687-89, 695, 748, 759-62, 857, 893, 919, 927, 929, 937, 947, 952, 956 |
| "would 'continue to reposition and strengthen [its] franchises with a focus on financial discipline,'"<br><br>*JP Morgan*, 553 F.3d at 206 | UBS "further improved [its] service for ultra high net worth individuals in 2003" (*id.* ¶ 541) |
| the company would "continue to do well and gain market share and outperform the competition"<br><br>*Steinberg* v. *Ericsson LM Tel. Co.*, 07 civ. 9615, 2008 WL 5170640, at *9 (S.D.N.Y. Dec. 10, 2008) (Patterson, J.) | UBS "outperformed its peers in the U.S. private client market" (*id.* ¶¶ 531, 532, 535)<br><br>UBS "remain confident that the wealth management market holds significant long-term potential and that our asset-gathering performance and strong market position provide a good foundation for future growth." (*id.* ¶ 536)<br><br>*See also* ¶¶ 610, 615, 655, 714 |
| "outstanding personal service"<br><br>*Welch*, 2009 WL 2356131, at *6 | UBS's "experts work with financial advisors to create investment strategies designed to achieve the client's long-term objectives" (*id.* ¶ 570)<br><br>*See also* ¶¶ 588, 594 |
| "impartial guidance"<br><br>*Welch*, 2009 WL 2356131, at *6 | "The trust clients place in [UBS's] advice is demonstrated by the rapid expansion of our franchises across the world." (*id.* ¶ 544) |

**APPENDIX D**

| Financial Institution | Stock Price % Change (August 13, 2003 to February 23, 2009)[42] |
|---|---|
| Lehman Brothers | -99.58% |
| Royal Bank of Scotland | -94.80% |
| Washington Mutual | -99.49% |
| Citigroup | -94.07% |
| Bank of America | -87.33% |
| Bear Stearns | -85.9% |
| Wachovia | -84.07% |
| Barclays | -77.6% |
| Merrill Lynch | -75.15% |
| UBS | -63.55% |
| Deutsche Bank | -58.56% |
| Morgan Stanley | -47.82% |
| Wells Fargo | -46.13% |
| HSBC | -30.44% |
| JP Morgan Chase | -29.27% |
| Credit Suisse | -22.91% |

(Ex. 6 (Stock Price Compilation).)

---

[42] February 13, 2006 is the date of the first alleged misstatement in this action concerning UBS's mortgage-related positions (AC ¶¶ 736-46); July 3, 2008 is the date of the last alleged corrective disclosure concerning these positions (AC ¶ 1352).

**APPENDIX E**

| Defendant | Allegations in Complaint Relating to | | Not Alleged to Have Been in a Relevant Position at UBS |
|---|---|---|---|
| | **Auction Rate Securities** | **U.S. Cross Border** | |
| Ospel | Yes | Yes | After April 23, 2008 |
| Rohner | Yes | Yes | Before July 6, 2007 |
| Suter | Yes | Yes | Before October 1, 2007 and after August 12, 2008 |
| Wuffli | No | No | After July 6, 2007 |
| Standish | No | No | Before April 1, 2004 and After October 1, 2007 |
| Stuerzinger | No | No | After October 1, 2007 |
| Jenkins | No | No | Before July 2005 and After October 1, 2007 |
| Singh | No | No | After November 24, 2008 |
| Martin | No | No | After October 11, 2007 |
| Stehli | No | No | After October 11, 2007 |
| Costas | No | No | After June 30, 2007 |
| Hutchins | No | No | After May 3, 2007 |

E-1