# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

Master File No. 07 Civ. 11225 (RJS)

IN RE UBS AG SECURITIES LITIGATION

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9 28 2012

OPINION AND ORDER
September 28, 2012

RICHARD J. SULLIVAN, District Judge:

Plaintiffs bring this putative class action against UBS AG ("UBS" or the "Company") and a series of Individual Defendant executives, alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) & t(a), and the United States Securities and Exchange Commission's ("SEC") corresponding rule, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").[1] Plaintiff Alaska Laborers-Employers Retirement Fund ("Alaska Laborers") also brings this action on behalf of all persons or entities that purchased ordinary shares of UBS in connection with the Company's June 13, 2008 Rights Offering (the "2008 Rights Offering"), alleging violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l, & 77o, against UBS, a series of Individual Defendant executives, and seven underwriters (the "Underwriter Defendants") for the offering.[2]

Before the Court are two motions to dismiss – one from UBS and the Individual Defendants (collectively, the "UBS Defendants"), seeking to dismiss the claims under the Exchange Act, and one from the seven Underwriter Defendants who underwrote the 2008 Rights Offering, seeking to dismiss the claims under the Securities Act. For the reasons that follow, the Court grants both motions.

---

[1] The Individual Defendants with respect to the claims under the Exchange Act are: (1) Peter Wuffli; (2) Marcel Ospel; (3) Marcel Rohner; (4) Clive Standish; (5) Marco Suter; (6) Walter Stuerzinger; (7) Huw Jenkins; (8) Ramesh Singh; (9) David Martin; (10) James Stehli; (11) John Costas; and (12) Michael Hutchins.

[2] The Individual Defendants with respect to the claims under the Securities Act are: (1) Marcel Rohner; (2) Marco Suter; (3) Marcel Ospel; (4) Stephan Haeringer; (5) Ernesto Bertarelli; (6) Gabrielle Kaufmann-Kohler; (7) Sergio Marchionne; (8) Rolf A. Meyer; (9) Helmut Panke; (10) Peter Spuhler; (11) Peter R. Voser; (12) Lawrence A. Weinbach; and (13) Joerge Wolle. The seven underwriters for the 2008 Rights Offering are: (1) UBS Securities LLC, misnamed in the Amended Consolidated Securities Class Action Complaint (the "Amended Complaint") as UBS Investment Bank; (2) J.P. Morgan Securities Ltd.; (3) Morgan Stanley & Co. International plc; (4) BNP Paribas; (5) Goldman Sachs International; (6) Credit Suisse Group; and (7) Deutsche Bank AG, London Branch, misnamed as Deutsche Bank AG in the Amended Complaint.

## I. BACKGROUND

### A. Facts[3]

Plaintiffs – the City of Pontiac Policemen's and Firemen's Retirement System ("Pontiac" or "Lead Plaintiff") and Teamsters Union Local 500 Severance Fund, the Council of the Borough of South Tyneside acting in its capacity as the Administering Authority of the Tyne and Wear Pension Fund, Oregon Public Employees Board, and Alaska Laborers – bring this suit individually and on behalf of all other persons and entities who purchased or acquired registered securities issued by UBS from August 13, 2003 to February 23, 2009 (the putative "Class Period").[4]   Their

Amended Complaint spans a grand total of 548 pages and includes 1,477 paragraphs. Because detailing each of the facts contained therein would prove unwieldy and would likely obfuscate the crux of the allegations at issue, the following recitation of facts provides only a brief overview of the litigation.   However, in Part III, the Court will delve into the details of the pleadings as necessary to resolve particular legal challenges raised by the UBS Defendants and the Underwriter Defendants, respectively.

#### 1. The Three Alleged Frauds

Plaintiffs allege that, during the putative Class Period, UBS and the Individual Defendants violated the Exchange Act by issuing fraudulent statements with respect to: (1) UBS's mortgage-related securities portfolio (the alleged "mortgage-related securities fraud"); (2) UBS's Auction Rate Securities ("ARS") portfolio (the alleged "ARS fraud"); and (3) UBS's purported compliance with United States tax and securities laws by UBS's Swiss-based cross-border private banking business for American clients (the alleged "tax fraud"). (Am. Compl. ¶¶ 1385–1477.)   Plaintiffs' allegations regarding each of these alleged frauds are summarized in turn.

##### a. Mortgage-Related Securities

During the Class Period, UBS originated, underwrote, and invested in residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs").   (Am. Compl. ¶ 163; Decl. of Robert J. Giuffra, dated Dec. 15, 2011, Doc. No. 174 ("Giuffra Decl."), Ex. 11 (Swiss Federal Banking Commission ("SFBC") Report, dated Sept. 30, 2008) at 6–7.)   Most of the allegations in the Amended Complaint involve UBS's decisions regarding these RMBS and CDOs

---

[3] The following facts are taken from the Amended Complaint and the documents referenced therein and attached as exhibits to various declarations submitted in connection with the motions to dismiss.   In consideration of the UBS Defendants' motion to dismiss, the Court also considers the UBS Defendants' Memorandum of Law in Support of their Motion to Dismiss ("Defs.' Mem. in Supp."), Lead Plaintiff's Memorandum of Law in Opposition to the UBS Defendants' Motion ("Opp'n to Defs."), and the UBS Defendants' Reply Memorandum of Law in Support of their Motion to Dismiss ("Defs.' Reply"). In consideration of the Underwriter Defendants' motion to dismiss, the Court considers the Underwriter Defendants' Memorandum of Law in Support of their Motion to Dismiss ("UDs' Mem. in Supp."), Lead Plaintiff's Memorandum of Law in Opposition to Underwriter Defendants' Motion ("Opp'n to UDs"), and the Underwriter Defendants' Reply Memorandum of Law in Further Support of their Motion ("UDs' Reply").   The Court also considers the declarations, and exhibits attached thereto, submitted in connection with the motions to dismiss.

[4] The Court refers to "Plaintiffs" when referring to the parties making allegations in the Amended Complaint under the Exchange Act, "Alaska Laborers" when referring to the party making allegations under the Securities Act, and "Lead Plaintiff" when referring to the party making arguments on behalf of Plaintiffs and the putative class in opposition to the instant motions.

following the filing of its 2005 Annual Report, in which UBS announced that it was "seeking to expand [its] fixed income business . . . by pursuing opportunities in . . . asset-backed securities." (*Id.* Ex. 17 (UBS 2005 Annual Report) at 46.) According to the Amended Complaint, UBS acquired at least $100 billion in subprime and Alt-A mortgage-related assets despite repeatedly representing to the market, from the fourth quarter of 2005 onward, that it sought to avoid "undue concentrations" of risks. (Am. Compl. ¶¶ 43–45.)

Plaintiffs allege that in June 2005, UBS formed the internal hedge fund Dillon Read Capital Management LLC ("DRCM"), ostensibly to manage: (1) the proprietary positions of UBS's Investment Bank (the "IB") in a controlled financial company; and (2) client money in a separate outside investor fund ("OIF"). (Am. Compl. ¶¶ 242–44, 250.)[5] However, shortly thereafter, DRCM allegedly "embarked on a secret campaign to acquire CDOs and RMBS backed by subprime and Alt-A mortgage collateral." (*Id.* ¶ 26; *see id.* ¶¶ 41, 292–93.) Throughout 2006, as Plaintiffs acknowledge, UBS did disclose similar growth in the debt instruments of its IB, mainly due to the IB's increased positions in asset-backed securities. (Am. Compl. ¶ 307.)

According to Plaintiffs, the subprime market declined in mid-to-late February 2007 (*id.* ¶ 978 (internal quotation marks omitted)), affecting the price of lower-rated securities and causing DRCM to take markdowns on those securities (*id.*; Giuffra Decl. Ex. 13 (UBS Shareholder Report on UBS's Write-Downs, issued Apr. 18, 2008 ("UBS Shareholder Report")) at 12 & Ex. 14 (Answers to Questions Submitted by Ethos, Swiss Foundation for Sustainable Development ("Ethos Answers")) at 7, 9). In late February through early March 2007, following the decline of these lower-rated securities, DRCM, by way of Individual Defendant Hutchins, allegedly tested the stated values of DRCM's subprime assets. (Am. Compl. ¶¶ 30, 365.) The test revealed that a randomly selected portfolio of subprime assets, which was carried on DRCM's books at $100 million, was selling for fifty cents on the dollar. (*Id.*) Based on these results, DRCM eventually wrote down those assets; however, according to Plaintiffs, UBS concealed these writedowns by not specifically disaggregating for investors the assets that DRCM managed on behalf of UBS. (*Id.* ¶¶ 30–31.) Plaintiffs also allege that, in neither disclosing DRCM's internal test nor writing down its positions on its entire mortgage-backed asset portfolio, UBS committed securities fraud. (*Id.* ¶ 31.)

In April 2007, UBS's Business Unit Control reported to UBS's Audit Committee that, although "[t]he diminished market liquidity and transparency" in the first quarter had led to "a substantial reduction in the coverage of independent price testing of Subprime securities," UBS's AAA-rated super senior securities were a "net flat risk or low risk for valuation purposes." (Giuffra Decl. Ex. 13 (UBS Shareholder Report) at 22–23.) Moreover, on April 25, 2007, UBS's independent outside auditor Ernst & Young advised UBS's Audit Committee that "nothing had come to [its] attention to indicate that fair values [of UBS's portfolios] at 31 March 2007 were inappropriate." (*Id.* at 24.)

---

[5] Plaintiffs inconsistently allege throughout their Amended Complaint that UBS formed DRCM in both June 2005 and June 2006. (*E.g.*, ¶¶ 26 (June 2006), 242 (June 2005).) Because the Amended Complaint refers to the earlier date much more frequently than the later date, the Court presumes for purposes of deciding the instant motions that UBS formed DRCM in June 2005.

On May 3, 2007, after DRCM had written down some – but not all – of its mortgage-backed security assets, UBS closed DRCM, ousted Individual Defendant Costas, and fired Individual Defendant Hutchins. (Am. Compl. ¶¶ 387, 392, 1035–36.) According to Plaintiffs, as a result of DRCM's closing, UBS's IB took on "$20 billion in subprime and Alt-A mortgage-backed holdings" that, "unbeknownst to investors, were materially overvalued." (*Id.* ¶ 37.) UBS announced the closing of DRCM and the redemption of its OIFs in its 1Q 2007 Form 6-K, filed on May 3, 2007. In that filing, UBS reported that its first quarter results included "negative trading revenues from the [UBS IB's] proprietary capital managed by DRCM of approximately . . . 150 billion [Swiss francs ('CHF')] in the context of difficult market conditions in US mortgage securities" (*id.* Ex. 30 at 1) and indicated that "[t]he US sub-prime mortgage market suffered a major dislocation in February resulting in significant markdowns and reduced liquidity" (*id.* at 5).

The market continued to decline throughout the remainder of 2007, ultimately suffering a "severe[] disclocat[ion] in the summer of 2007," which directly affected UBS's AAA-rated mortgage-related securities. (Am. Compl. ¶ 314.) As a result, in UBS's 2Q 2007 Form 6-K, filed on August 14, 2007, the company acknowledged that "[c]ontinuing bad news about collateral values on US sub-prime mortgages triggered sharper declines in credit markets in the second half of June [2007]." (Giuffra Decl. Ex. 32 at 5.) UBS also announced that it had sustained losses in its mortgage securities market – specifically, in "some of DRCM's former portfolios" – and warned that uncertain market conditions threatened the IB's future profits. (*Id.* at 1–2.)

According to Plaintiffs, in "acquir[ing] high concentrations of highly illiquid subprime and Alt-A mortgage-backed assets in contravention of UBS's risk management policy and public statements" and in manipulating risk measures and "materially overvalu[ing]" its mortgage-related securities portfolio, UBS "concealed the truth from investors [about its mortgage-related securities portfolio] until October 30, 2007," when UBS began the first of what would eventually total $48.6 billion in asset writedowns during the Class Period. (Am. Compl. ¶ 60; *see id.* ¶¶ 5–6, 61, 317, 319–20, 483, 489, 492, 498, 1109.)

### b. ARS

In addition to allegedly concealing its exposure to mortgage-related securities, UBS allegedly concealed its exposure to ARS.[6] Throughout the Class Period, UBS held and offered ARS as an investment option to its wealth management clients, underwrote ARS on behalf of issuers, and sponsored the Dutch auctions at which the securities' interest rates were reset and determined. (*See* Am. Compl. ¶¶ 396–408.) According to the Amended Complaint, as early as August 2007, UBS executives became aware that "the demand for ARS was plummeting and [that] UBS had less capital available to support future auctions." (*Id.* ¶ 403.) As a result, UBS allegedly began a "secret[]" campaign to unload its ARS. (*Id.* ¶ 405.)

By February 2008, the ARS market crashed due to a lack of liquidity. (*Id.* ¶¶ 87, 402.) Because investors were unable to sell their securities, UBS was left with an

---

[6] ARS are "long-term bonds with interest rates that are reset and determined regularly through Dutch auctions overseen by the brokerage firms that originally sold them to investors." (Am. Compl. ¶ 397.)

allegedly materially overvalued ARS portfolio. (*Id.* ¶ 402.)

In its 2007 Annual Report, filed on March 18, 2008, UBS disclosed that it had acquired at least $5.9 billion in ARS as of December 31, 2007. (*Id.* ¶ 86, 400; Giuffra Decl. Ex. 60, ch. 2 at 14.) Moreover, on March 28, 2008, UBS announced that it "would begin marking down the value of the ARS held by its clients and that starting in April 2008, ARS would no longer be called 'cash equivalents' on customer statements." (Am. Compl. ¶ 406.) On May 6, 2008, UBS announced writedowns of $974 million on its ARS portfolio. (*Id.* ¶ 407.)

### c. Cross-Border Private Banking Business

The third fraud alleged in the Amended Complaint involves UBS's Swiss-based cross-border private banking business. During the Class Period, UBS had three core businesses: (1) Global Wealth Management & Business Banking; (2) Global Asset Management; and (3) the IB. (Defs.' Mem. in Supp. at 60 (citing Giuffra Decl. Ex. 61, ch. 1 at 4).) Within the first of these categories was UBS's "Wealth Management U.S.," which comprised the operations of PaineWebber (Am. Compl. ¶ 422) and "Wealth Management International & Switzerland," which catered to mostly affluent individuals overseas (Giuffra Decl. Ex. 61 (UBS 2007 Annual Report, filed with the Swiss Exchange on Mar. 25, 2008), ch. 1 at 86). Within this latter business unit was UBS's Swiss-based cross-border private banking business, which was a "very small part" of UBS's larger Global Wealth Management business, generating approximately 0.4% of UBS's overall operating income in 2007 and approximately 0.3% of the net new money of the Global Wealth Management business in 2007. (*See id.* Ex. 60 (UBS 2007 Annual

Report, filed with the SEC on Mar. 18, 2008), ch. 1 at 36; *id.* Ex. 62 at Ex. C ¶ 8.)

Plaintiffs allege that this cross-border private banking business contributed to a tax fraud scheme, whereby UBS Swiss bankers traveled in and out of the United States to illegally advise American clients on the purchase of investments. (Am. Compl. ¶¶ 96, 428–31, 1118, 1254–60.) Plaintiffs also allege that UBS violated United States laws by breaching the terms of a 2001 Qualified Intermediary Agreement with the IRS, whereby UBS was to disclose the identity of and/or withhold income taxes for American clients who traded in United States securities or had United States-sourced income. (Am. Compl. ¶¶ 96–98; 442–45.)

In April 2008, the United States government indicted Bradley Birkenfeld, a senior UBS banker, in connection with the alleged tax fraud scheme. (*Id.* ¶ 99, 415.) In 2008, following Birkenfield's indictment, UBS made two disclosures regarding its cross-border private banking business – the first in its May 6, 2008 quarterly report for the first quarter of 2008 ("1Q 2008 Report") and the second in its May 23, 2008 Form 6-K ("May 23 6-K"). Combined, these disclosures revealed, *inter alia*, that the United States Department of Justice ("DOJ") and the SEC were investigating UBS's conduct in relation to the cross-border services provided to American clients between 2001 and 2007. (*See* Am. Compl. ¶ 413; Giuffra Decl. Ex. 63 (1Q 2008 Report) at 39; Decl. of Jonathan K. Youngwood, dated Dec. 15, 2011, Doc. No. 171 ("Youngwood Decl."), Ex. A (May 23 6-K) at 11.)[7]

---

[7] Each of those disclosures is discussed in greater detail below. *See* Part B.2.a.

Following additional prosecutions in connection with the alleged tax fraud scheme, UBS entered into a Deferred Prosecution Agreement ("DPA") with the DOJ and the IRS to avoid prosecution for conspiracy to defraud the United States government, paying fines and penalties in the amount of $780,000,000. (*Id.* ¶¶ 100, 412, 527–28.) The DPA revealed, *inter alia*, that UBS had (1) authorized UBS bankers to refer American clients to outside lawyers and accountants to create sham offshore structures in tax haven countries (Decl. of Geoffrey C. Jarvis, dated Feb. 13, 2012, Doc. No. 177 ("Jarvis Decl."), Ex. G at Ex. C ¶ 11); (2) dispatched about forty-five to sixty UBS bankers to the United States an average of two to three times per year to meet with three to five clients per day (for approximately 3,800 total visits with clients), despite the bankers' lack of necessary SEC broker-dealer and investment-adviser licenses (*id.* ¶ 6); (3) provided training to UBS bankers on avoiding detection by American authorities while traveling to the United States (*id.*); and (4) issued a form letter to American clients reminding them that since at least 1939, UBS had been successful in concealing account holder identities from American authorities and that the Company still had the capability of doing so (*id.* ¶ 7).

### 2. 2008 Rights Offering

As part of its claims against the Defendants named in the Securities Act causes of action, Alaska Laborers alleges that the UBS Defendants made material misstatements and omissions in connection with UBS's 2008 Rights Offering to "sell ordinary shares, tradable entitlements to receive ordinary shares, and tradable right to purchase ordinary shares."[8] (Am. Compl. ¶ 1401.) The Registration Statement for this offering, filed April 8, 2008, included a Prospectus Supplemental, filed with the SEC on May 23, 2008, which incorporated by reference (1) UBS's 2007 Annual Report, filed with the SEC on March 18, 2008, (2) an April 1, 2008 press release issued by UBS on Form 6-K, (3) the 1Q 2008 Report, and (4) the May 23 6-K. (*Id.* ¶ 1402; *see* UDs' Mem. in Supp. at 6–7; Opp'n to UDs at 1 n.1.)

Pursuant to the terms of the offering, as of the close of business on May 26, 2008, holders of UBS ordinary shares were allotted tradable rights to acquire seven new ordinary shares of UBS (at the subscription price of CHF 21.00 per ordinary share) for every twenty shares then held. (Giuffra Decl. Ex. 65 (Prospectus Supplemental) at S-11.) On June 13, 2008, UBS announced that it had completed the 2008 Rights Offering, thereby raising more than CHF 15.6 billion. (Am. Compl. ¶ 1451.)

According to Alaska Laborers, the Registration Statement for the offering, and the documents incorporated therein, "contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and [were] not prepared in accordance with the rules and regulations governing its preparation." (*Id.* ¶ 1435.) Specifically, these documents allegedly "failed to disclose that UBS had assisted its U.S. clients in violating U.S. tax laws[,] thereby concealing material risks to the company." (*Id.* ¶ 1436.) These allegations are discussed in greater detail below.

---

[8] Alaska Laborers is the sole named Plaintiff for the causes of action arising under the Securities Act. (Am. Compl. ¶ 1406.)

B.  Procedural History

This action was commenced on December 13, 2007, when William L. Wesner filed a putative class action complaint against UBS and several individual defendants. (Doc. No. 1.)  On March 6, 2008, Wesner's action was consolidated with *Garber v. UBS AG, et al.*, No. 08 Civ. 969 (RJS), into the above-captioned action (Doc. No. 19), and on July 11, 2008, Plaintiffs filed a Consolidated Securities Class Action Complaint (Doc. No. 35).   On April 7, 2009, the Court ordered that two additional actions – (1) *Police & Fire Retirement System of the City of Detroit, et al. v. UBS AG, et al.*, No. 09 Civ. 2191 (RJS); and (2) *New Orleans Employees' Retirement System v. UBS AG, et al.*, No. 09 Civ. 893 (RJS) – be consolidated with this action, pursuant to Rule 42(a) of the Federal Rules of Civil Procedure. (Doc. No. 97.)

On May 8, 2009, Plaintiffs filed their Amended Consolidated Securities Class Action Complaint (the "Amended Complaint"), which included new allegations and new claims under Sections 11, 12(a)(2), and 15 of the Securities Act relating to alleged misstatements concerning UBS's compliance with United States tax and securities laws in its cross-border business. (Doc. No. 102.)

On September 30, 2009, the UBS Defendants moved to dismiss Foreign Lead Plaintiffs'[9] claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure (Doc. No. 116) and to dismiss the Amended Complaint pursuant to Rules 9(b), 12(b)(2), and 12(b)(6). (Doc. No. 127.)  That same day, the Underwriter Defendants filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). (Doc. No. 119.)  On March 19, 2010, the Court denied the motions without prejudice and with leave to renew following the Supreme Court's anticipated decision in *Morrison v. National Australia Bank Ltd.*, --- U.S. ---, 130 S. Ct. 2869 (2010). (Doc. No. 147.)  On June 24, 2010, the Supreme Court issued its decision in *Morrison*.

On July 13, 2010, following the Supreme Court's decision in *Morrison*, the Court ordered the parties to brief the UBS Defendants' previously made motion to dismiss based on the *Morrison* decision only. (Doc. No. 149.)  The UBS Defendants filed that motion on August 31, 2010, seeking to dismiss "all claims based on purchases of UBS shares outside the United States." (Doc. No. 151.)  The motion was fully briefed as of November 10, 2010.  On September 13, 2011, the Court issued a Memorandum and Order granting the UBS "Defendants' motion to dismiss the claims brought by those Plaintiffs who purchased shares of UBS stock on foreign exchanges." *In re UBS Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2011 WL 4059356, at *1 (S.D.N.Y. Sept. 13, 2011).  Accordingly, the Court terminated the Foreign Lead Plaintiffs. Because Lead Plaintiff Pontiac was unaffected by this ruling, on October 17, 2011, the Court ordered Pontiac to continue as the sole remaining Lead Plaintiff. (Doc. No. 165.)[10]

On December 15, 2011, the UBS Defendants filed one of the two instant motions, arguing that the Amended

---

[9]  The Foreign Lead Plaintiffs consisted of: (1) Arbejdsmarkedets Tillægspension, a Danish pension fund; (2) Union Asset Management Holding AG, a German investment company; and (3) International Fund Management, S.A., a Luxembourg financial institution.

[10]  Lead Plaintiff Pontiac remains the only Lead Plaintiff in this action.

Complaint should be dismissed pursuant to Rules 9(b), 12(b)(2), and 12(b)(6). (Doc. No. 172). The Underwriter Defendants filed the second of the instant motions on the same date, arguing that the claims under the Securities Act should be dismissed pursuant to Rules 8, 12(b)(1), and 12(b)(6). The motions were both fully briefed as of March 14, 2012, and on April 25, 2012, the Court heard oral argument on both motions.

## II. LEGAL STANDARDS

### A. Rule 12(b)(6)

In order to survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [its] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). A plaintiff must also allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that only offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

### B. Securities Fraud

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns*, 493 F.3d at 99. The heightened pleading requirements are set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b).

Although the rules of federal pleading usually require only "a short and plain statement" of a plaintiff's claim for relief, Fed. R. Civ. P. 8, averments of fraud must be "state[d] with particularity," Fed. R. Civ. P. 9(b). *See ATSI Commc'ns*, 493 F.3d at 99. In order to satisfy Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal citation omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

Although the PSLRA additionally requires that a plaintiff plead with particularity the requisite mental state under the law, it otherwise imposes the same standard as Rule 9(b). *See Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000); *Lewy v. Skypeople Fruit Juice, Inc.*, No. 11 Civ. 2700 (PKC), 2012 WL 3957916, at *7 (S.D.N.Y. Sept. 10, 2012) ("The PSLRA mandated a uniform national pleading standard for private securities fraud actions that mimics the standard the Second Circuit had derived from Rule 9(b), except insofar as the PSLRA requires particularity in the pleading of the requisite mental state."). "Courts must dismiss pleadings that fail to

adhere to the requirements of the PSLRA." *Lewy*, 2012 WL 3957916, at *7.[11]

### C.  Rule 12(b)(1)

On a motion to dismiss pursuant to Rule 12(b)(1), "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In deciding a motion to dismiss pursuant to Rule 12(b)(1), the Court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff."  *Morrison v. Nat'l Austr. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted). However, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *Id.* (internal quotation marks omitted).  Rather, the Court may resolve "disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *see Kamen v.*

*Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).[12]

### III.  DISCUSSION

### A.  Section 10(b) Claims

Plaintiffs brings securities fraud claims pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), the accompanying SEC provision.  Rule 10b–5 provides, in relevant part, that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  *Id.*  To state a claim for securities fraud under Section 10(b) and Rule 10b–5, Plaintiffs must adequately plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

In their motion to dismiss, the UBS Defendants argue that Plaintiffs have failed to plead: (1) materiality, scienter, and loss causation as to the alleged mortgage-related securities fraud; (2) scienter and loss causation as to the alleged ARS fraud; and (3) materiality as to the alleged tax fraud. Before addressing whether Plaintiffs have sufficiently pleaded those challenged elements, the Court must address a more

---

[11] Because "fraud is not an element or a requisite to a claim under Section 11 [or 12,] . . . a plaintiff need allege no more than negligence to proceed." *Rombach*, 355 F.3d at 171; *see* Part III.B.  Thus, whereas a heightened pleading standard applies to claims brought pursuant to Section 10(b) of the Exchange Act, it does not apply to Section 11 or 12 claims where, as here, a plaintiff has disclaimed all allegations of fraud.  *See Lewy*, 2012 WL 3957916, at *7–9; (Am. Compl. ¶ 1400).

[12] The Court applies this standard in determining only whether Plaintiffs have standing to pursue a claim under Section 12(a)(2) of the Securities Act.  *See* Part III.B.1.

general defect in their pleading – their reliance on the "group pleading doctrine."

### 1. General Pleading Defect as to the Individual Defendants

To plead a claim against individual defendants under Section 10(b), a plaintiff must allege that the particular defendant "'made' the material misstatements." *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). Specifically, "'[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" *DeBlasio v. Merrill Lynch & Co., Inc.*, No. Civ. 318 (RJS), 2009 WL 2242605, at *10 (S.D.N.Y. July 27, 2009) (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)); *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). A plaintiff "may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be [apprised] of the circumstances surrounding the fraudulent conduct with which he individually stands charged." *DeBlasio*, 2009 WL 2242605, at *13 (internal quotation marks omitted); *see also Filler v. Hanvit Bank*, Nos. 01 Civ. 9510, 02 Civ. 8251 (MGC), 2003 WL 22110773, at *3 (S.D.N.Y. Sept. 12, 2003) (holding that the plaintiffs had failed to meet the requirements of Rule 9(b) because they failed to "make allegations with respect to each defendant, but instead refer[red] only generally to the defendants as 'the Banks' or 'the Korean Banks'"). Rather, a complaint "must state with particularity facts giving rise to a strong inference that *each defendant* acted with scienter." *Edison Fund v. Cogent Inv. Strategies Fund, LTD*, 551 F. Supp. 2d 210, 228 (S.D.N.Y. 2008) (citation and

internal quotation marks omitted) (emphasis added).

In an attempt to survive the UBS Defendants' motion to dismiss, Plaintiffs invoke the so-called "group pleading doctrine," which allows a plaintiff to "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent," *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 529–30 (S.D.N.Y. 2010) (internal quotation marks omitted), by allowing a court to "presume that certain group-published documents [such as SEC filings and press releases] . . . are attributable to corporate insiders involved in the everyday affairs of the company." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 266 (S.D.N.Y. 2008) (citation omitted); (*see, e.g.*, Am. Compl. ¶ 150 ("By virtue of the Individual Defendants' 'positions within the Company, they had access to undisclosed adverse information about UBS, its business, operations, operational trends, finances, and present and future business prospects."), ¶ 151 ("It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes . . . ."), ¶¶ 152–55.)

The UBS Defendants argue that, to the extent Plaintiffs invoke this doctrine, their claims must be rejected because the doctrine does not survive the PSLRA and has been abrogated by the Supreme Court's recent *Janus* decision. (Defs.' Mem. in Supp. at 73–75; Defs.' Reply at 28–30.) The Second Circuit has never squarely addressed whether the doctrine survived the PSLRA, although, prior to *Janus*, a majority of district courts in this district held that it did. *See, e.g.*, *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d at 530 (applying the Group Pleading Doctrine in finding that plaintiffs sufficiently stated a claim against

individual defendants); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 642 (S.D.N.Y. 2007) ("[T]his Court joins the majority of district courts in this district and others in holding that the group pleading doctrine is 'alive and well.'"); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 399 (S.D.N.Y. 2005) ("The majority rule in this district is that the group pleading doctrine has survived the PSLRA."). *But see, e.g.*, *Bond Opportunity Fund v. Unilab Corp.*, 99 Civ. 11074 (JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003). Significantly, the majority view in this district is wholly at odds with the view of each circuit court to have squarely addressed the issue prior to *Janus*. *See Wilner Family Trust v. Queen*, 503 F.3d 319, 336–37 (3d Cir. 2007) ("[T]he group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA."); *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 363–65 (5th Cir. 2004) (rejecting the group pleading doctrine as inconsistent with the PSLRA); *Makor Issues & Rights Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602–03 (7th Cir. 2006) (same), *rev'd on other grounds*, 551 U.S. 308 (2007). *But cf. Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1265 (10th Cir. 1997) (applying the group pleading doctrine without analyzing whether it survives the PSLRA).

In any event, as courts have since acknowledged, the Supreme Court's decision in "*Janus* calls into question the viability of the group pleading doctrine for federal securities law claims." *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 263 (S.D.N.Y. 2011). In *Janus*, the Supreme Court held that because "none of the statements in the prospectuses were attributed, explicitly or implicitly, to [a defendant]," there was no basis for concluding that it made any actionable misrepresentations or omissions. *Janus*, 131

S. Ct. at 2304–05 & n.11. Indeed, the Court explained that defendants must have "made" the allegedly problematic statement by having "authority over the content of the statement and whether and how to communicate it." *Id.* at 2303. Therefore, even "significant invole[ment]" in preparing a statement was deemed insufficient for liability. *Id.* at 2305.

In its opposition brief, Lead Plaintiff attempts to read into *Janus* a distinction that does not appear in the opinion – namely, that although the opinion applies to a third-party advisor, it does not apply to "corporate insider[s] responsible for the day-to-day affairs" of a company. (Opp'n to Defs. at 23.) However, while it is true that *Janus* might "not alter the well-established rule that 'a corporation can act only through its employees and agents," *In re Merck & Co. Sec., Derivative & "ERISA" Litig.*, MDL No. 1658 (SRC), 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011) (citation omitted), it is nonetheless also true that a theory of liability premised on treating corporate insiders as a group cannot survive a plain reading of the *Janus* decision, *see Ho v. Duoyuan Global Water, Inc.*, No. 10 Civ. 7233 (GBD), 2012 WL 3647043, at *16 n.13 (S.D.N.Y. Aug. 24, 2012) (noting that holding one individual defendant liable under Section 10(b) for failing to correct another's "alleged false statements based on a failure to correct, or omission, would be in tension with [*Janus*]" because *Janus* holds that only the person who "makes" the misstatement is ultimately liable and "implies that each party is only liable for their own omissions as well"); *Optimal U.S. Litig.*, 837 F. Supp. 2d at 262–263 (highlighting several rationales indicating that *Janus* bars the group pleading doctrine in federal securities actions while preserving the doctrine in common law fraud actions); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395,

417 (S.D.N.Y. 2011) (holding, under *Janus*, that individual defendants "cannot be held liable for any alleged misstatements" in a registration statement that they did not sign and that lacked any indication that the individual defendants had any "authority over its contents, aside from consenting to being listed" therein); *SEC v. Kelly*, 817 F. Supp. 2d 340, 342 (S.D.N.Y. 2011) (noting that "the SEC concedes that *Janus* forecloses a misstatement claim against [certain individual defendants] under subsection (b) of Rule 10b–5, because neither defendant 'made' a misleading statement under the new *Janus* standard"). *But see City of Pontiac Gen. Ret. Sys. v. Lockheed Martin Corp.*, No. 11 Civ. 5026 (JSR), 2012 WL 2866425, at *13–14 (S.D.N.Y. July 13, 2012) (noting that the group pleading doctrine survives *Janus*). Although *Janus* might not necessarily "imply that there can be only one 'maker' of a statement in the case of express or implicit attribution," *City of Roseville*, 814 F. Supp. 2d at 417 n.9; *City of Pontiac*, 2012 WL 2866425, at *14, the individual defendants still must have actually "made" the statements under the new *Janus* standard to be held liable under Section 10(b). Therefore, the Court rejects Plaintiffs' theory of liability as to the Individual Defendants.[13]

Moreover, although the Amended Complaint contains a number of allegations regarding Defendants Hutchins's and Stehli's respective roles in the alleged mortgage-related securities fraud, it does not allege that either executive made any actionable misstatement. Lead Plaintiff also concedes through silence that Defendant Stuerzinger did not make an actionable material misstatement. (Opp'n to Defs. at 59–60); *see Gortat v. Capala Bros., Inc.*, No. 07 Civ. 3629 (ILG), 2010 WL 1423018, at *11 (E.D.N.Y. Apr. 9, 2010) (considering an argument not addressed in an opposition brief waived); *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392–393 & n.116 (S.D.N.Y. 2002) (same). As stated above, where an Individual Defendant has not "made" the allegedly material misstatement, he cannot be liable under the Exchange Act. *See Janus*, 131 S. Ct. at 2301 ("To be liable, [the defendant] must have 'made' the material misstatement . . . ."). Accordingly, the Court dismisses the claims against Defendants Hutchins, Stehli, and Stuerzinger.

## 2. Scienter

The Court next considers whether Plaintiffs have sufficiently pleaded the elements necessary to maintain their Section 10(b) claims under the Exchange Act, beginning with scienter as to the alleged mortgage-related securities and ARS frauds. *See Orlan v. Spongetech Delivery Sys., Inc., Sec. Litig.*, Nos. 10 Civ. 4093, 10 Civ. 4104 (DLI) (JMA), 2012 WL 1067975, at *11 (E.D.N.Y. Mar. 29, 2012) ("Whether or not the group pleading doctrine survived *Janus*, that doctrine is irrelevant to the pleading of scienter.").

A plaintiff alleging fraud under Section 10(b) must sufficiently plead scienter, stating "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), defined as a "state embracing

---

[13] For the same reasons, the Court rejects Lead Plaintiff's contention that a non-speaking defendant can be liable under Section 10(b) if his conduct goes to the "very heart of the fraudulent scheme in question." (Opp'n to Defs. at 25 (citing *Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 169–70 (S.D.N.Y. 2008), *recons. denied sub nom. Sampson v. Robinson*, 07 Civ. 6890 (PAC), 2008 WL 4779079 (S.D.N.Y. Oct. 31, 2008)). Such a theory of liability cannot survive the Supreme Court's holding in *Janus*.

intent to deceive, manipulate, or defraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). To survive a motion to dismiss, a plaintiff must plead "an inference of scienter *at least as likely as* any plausible opposing inference." *Id.* at 328. In determining whether a plaintiff has sufficiently pleaded scienter, the Court must consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* at 314 (explaining that "[a]n inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct"); *ATSI Commc'ns*, 493 F.3d at 99 (explaining that an inference of scienter must be strong, such that "a reasonable person [would] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged" (internal quotation marks omitted)).

In this Circuit, a plaintiff may establish a "strong inference" of scienter by pleading particularized facts that either: "(1) show[] that the defendants had both motive and opportunity to commit the fraud, or (2) constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. Where "[a] plaintiff has failed to demonstrate that defendants had a motive to defraud . . . he must produce a *stronger* inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

### a. Motive and Opportunity

As an initial matter, it is undisputed that the UBS Defendants had an "opportunity" to commit fraud with respect to both the alleged mortgage-related securities and ARS frauds. *Cf. Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (noting that it is "indisputable that key directors and officers have [the] ability to manipulate their

company's stock price" (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813 (2d Cir. 1996)); *see also, e.g., Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired."). Therefore, the only issue before the Court as to "motive and opportunity" is whether Plaintiffs have adequately pleaded a "motive" to defraud.[14]

"[T]his Circuit has been generous to plaintiffs by allowing 'fairly tenuous inferences' of motive to satisfy pleading requirements." *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 243 (S.D.N.Y. 1999) (citing *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)), *aff'd*, 264 F.3d 131 (2d Cir. 2001). However, Second Circuit precedent "does not permit mere conclusory allegations of motive to satisfy the requirements of Rule 9(b) and the [PSLRA]." *Id.* As such, "a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions

---

[14] Lead Plaintiff does not assert that any of the UBS Defendants had a motive to commit fraud with respect to UBS's investments in ARS, arguing only that allegations of motive are not "required" to survive a motion to dismiss. (Opp'n to Defs. at 66 n.64; *see id.* 36.) The Court agrees. Indeed, as noted above, a plaintiff may still sufficiently plead scienter by alleging particularized facts that "constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. Thus, while the Court addresses below whether Plaintiffs have sufficiently satisfied this standard with respect to both the mortgage-related securities and ARS frauds, *see* Part III.A.2.b, it proceeds to address here whether the UBS Defendants had a motive and opportunity to defraud with respect to only the alleged mortgage-related securities fraud.

they hold." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994); *see also S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("[I]t is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." (internal citation omitted)); *cf. also Bd. of Trustees of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 868 (S.D.N.Y. 2011) (explaining that plaintiffs' failure to allege that "any of the [i]ndividual [d]efendants . . . sold their shares during the [c]lass [p]eriod" weighs against finding a motive to commit fraud); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 349 (S.D.N.Y. 2011) ("[I]nsider trading is considered a classic example of a 'concrete and personal' benefit that suffices to plead motive to commit securities fraud.").

Here, Plaintiffs allege that the Individual Defendants responsible for the alleged misstatements had a motive to commit securities fraud because they knew, no later than June 22, 2005, that up to $50 billion of UBS's mortgage-related securities portfolio was overvalued but nonetheless (1) allowed the IB and DRCM to accumulate additional billions of dollars in overvalued mortgage-related securities; (2) allowed the IB to hedge those securities for only 2–4% of their value; and (3) did not take massive short positions on their mortgage-related securities portfolio. (Am. Compl. ¶¶ 4, 307, 324, 963–64.) However, the mere fact that UBS made substantial investments in mortgage-related securities, as alleged in the Amended Complaint, undercuts Plaintiffs' ability to plead a "strong inference" of scienter. *See ECA, Local 134 IBEW Joint*

*Pension Trust of Chi. v. JP Morgan Chase* ("*JP Morgan*"), 553 F.3d 187, 203 (2d Cir. 2009) (affirming dismissal for failure to plead scienter and noting that the complaint "fail[ed] to allege facts explaining why, if [JPMC] was aware of Enron's problems, [JPMC] would have continued to lend Enron billions of dollars."); *Wachovia*, 753 F. Supp. 2d at 349 ("[A] net increase in company holdings . . . during the class period 'signals only confidence in the nature of th[e] company.'" (quoting *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009))). Indeed, the argument that the Individual Defendants had a motive to invest in overvalued mortgage-related securities defies not only economic reason but also common sense.

Moreover, during 2006 and 2007, while the alleged mortgage-related securities fraud was still ongoing, UBS repurchased more than $4.1 billion of its own shares at an average price of over $59.17 per share, only to later sell those shares in the 2008 Rights Offering at $20.59 per share. (*See* Giuffra Decl. Exs. 19 (UBS 2Q 2006 Report), 20 (UBS 3Q 2006 Report), 47 (UBS 4Q 2006 Report), 32 (UBS 1Q 2007 Report), 35 (UBS 3Q 2007 Report), 44 (UBS 4Q 2007 Report), 48 (UBS 2Q 2008 Report).) Again, such a strategy of repurchasing stock at a knowingly inflated price would be economically irrational. *See Davidoff v. Farina*, No. 04 Civ. 7617 (NRB), 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005) (granting motion to dismiss where "it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail").

Accordingly, the Court finds that Plaintiffs have failed to plead a strong inference of scienter by showing that the UBS Defendants had motive and

opportunity to commit either the mortgage-related securities or ARS frauds.

### b. Conscious Misbehavior or Recklessness

Because Plaintiffs have failed to plead particularized facts demonstrating that the UBS Defendants had "both motive and opportunity to commit" fraud with respect to the mortgage-related securities fraud, and have failed altogether to allege a motive with respect to the ARS fraud, they must demonstrate conscious misbehavior or recklessness as to both frauds in order to survive dismissal. *ATSI Commc'ns*, 493 F.3d at 99. Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *Novak*, 216 F.3d at 308 (internal citations omitted). Plaintiffs allege no facts to support an inference that the UBS Defendants engaged in such behavior. Accordingly, the sole relevant question with respect to scienter is whether Plaintiffs have adequately pleaded recklessness.

In *Novak*, the Second Circuit "defined reckless conduct as, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (internal quotation marks and citations omitted; ellipsis in original). "Recklessness in the scienter context cannot be merely enhanced negligence." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005). In other words, "an allegation that a defendant merely 'ought to have known' is not sufficient to allege recklessness." *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) (internal quotation

marks omitted); *see also In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007) (noting that "the strength of the recklessness allegations must be greater than that of allegations of garden-variety fraud").

Rather, recklessness is adequately alleged when a plaintiff "specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308 (noting that a strong inference of scienter may also arise under the "conscious misbehavior or recklessness" prong "where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud"). "[S]cienter may [also] be found where there are specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice that the public statements were false." *In re Refco, Inc. Sec. Litig*, 503 F. Supp. 2d at 649 (internal quotation marks omitted). Nevertheless, if a plaintiff fails to allege adequate motive, as Plaintiffs have in this case, the strength of the circumstantial allegations demonstrating recklessness must be correspondingly greater. *See Kalnit*, 264 F.3d at 142; *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987).

Although the Court must ultimately determine whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard," *Tellabs*, 551 U.S. at 323, "for the sake of clarity and ease of analysis, the Court will first examine [Plaintiffs'] allegations by category before undertaking the required holistic assessment," *Wachovia*, 753 F. Supp. 2d at 353.

i.  Alleged Mortgage-Related
Securities Fraud

(A)  Avoidance of "Undue Concentrations"
of Risk

Plaintiffs allege that the UBS Defendants made repeated false statements throughout the putative Class Period regarding UBS's avoidance of "undue concentrations" of risk. (*See, e.g.*, Am. Compl. ¶¶ 649, 660, 681, 741, 748, 760, 834, 848.) For example, in its fourth quarter 2006 Form 6-K, filed on February 13, 2007, UBS represented that "[t]he diversification of risks and avoidance of undue concentrations remain key pillars of our risk control process." (*Id.* ¶ 741.) Likewise, in its June 4, 2007 Risk Management Presentation, Defendant Stuerzinger stated, "We rigorously want to avoid risk concentrations of all kinds. We are basically obsessed with risk diversification." (*Id.* ¶ 834.)

The parties address this category of alleged misstatements only briefly and in the context of the materiality or falsity of the statements rather than in the context of whether the UBS Defendants had the required scienter. Lead Plaintiff argues that the UBS Defendants' statements regarding the "concentration" of risks "were misleading because a $100 billion portfolio is, *per se*, a 'concentrated position.'" (Opp'n to Defs. at 28; Apr. 25, 2012 Oral Arg. Proceedings ("Tr.") 46:7–12.) As an initial matter, the Court finds that the alleged misstatements are non-actionable puffery. As the Second Circuit explained in *JP Morgan*, statements that are "too general to cause a reasonable investor to rely on them" are not actionable. 553 F.3d at 206; *see also Wachovia*, 753 F. Supp. 2d at 354 (holding that statements regarding "conservative" underwriting standards and "careful

management of inherent credit risk" were non-actionable puffery).

Even assuming *arguendo* that statements regarding the avoidance of undue risk concentration were materially misleading, Plaintiffs have failed to prove that the UBS Defendants acted with the required scienter in making them. At year-end 2007, UBS had a balance sheet of more than $2 trillion in assets. (Giuffra Decl. Ex. 60 (UBS 2007 Annual Report) at 46.) Although UBS disclosed an eventual $100 billion portfolio in asset-backed securities, these positions constituted approximately 5% of its overall portfolio and, without more, cannot be said to be "undue" at the time the alleged misstatements were made given the significant diversification on UBS's balance sheet. (*See id.*)

Lead Plaintiff nonetheless argues that an inference of scienter can be inferred because the UBS Defendants made statements about avoiding concentrations in asset types and being "as transparent as possible" while knowing that UBS possessed *additional* mortgage-related positions and exposure totaling in the tens of billions of dollars. (Tr. 40:6–23, 41:20–22; *see, e.g.*, Am. Compl. ¶¶ 862, 872, 880, 882.) In support of its position that the UBS Defendants were reckless in not *completely* disclosing UBS's mortgage-related securities portfolio when UBS made its first writedowns in October 2007, Lead Plaintiff points to the fact that UBS's Group Executive Board (the "GEB") received monthly and quarterly reports detailing the growth in UBS's overall balance sheet and the fact that CEO Rohner represented that he knew UBS's various asset positions. (Am. Compl. ¶¶ 862, 1157(c).) However, as detailed in the Amended Complaint and the documents incorporated therein, by October 1, 2007, the market already had an understanding that UBS had a large mortgage-related securities

portfolio. For example, UBS disclosed in its 2005 Annual Report that it was "seeking to expand [its] fixed income business further by pursuing opportunities in . . . asset-backed securities" (Giuffra Decl. Ex. 17 at 46), and in the first three quarters of 2006 alone, UBS reported increases in asset-backed securities of CHF 5 billion, CHF 69 billion, and CHF 50 billion, respectively (Am. Compl. ¶ 307 (quoting Giuffra Decl. Exs. 18 (UBS 1Q 2006 Report), 19 (UBS 2Q 2006 Report), 20 (UBS 3Q 2006 Report))).[15]   Indeed, the Amended Complaint states that "[t]he effect on UBS's balance sheet of its frenzied investment in subprime-backed CDOs was *immediately apparent*." (*Id.* ¶ 307 (emphasis added).) Such details weaken the inference that the UBS Defendants intended to conceal the full scope of UBS's exposure from the market.

### (B) Purported Red Flags Regarding UBS's Improper Valuations

Plaintiffs also point to a number of "red flags" to demonstrate that the UBS Defendants were on notice that UBS was marking its AAA-rated mortgage-related securities too high and making false representations to the market regarding its balance sheet. According to Plaintiffs, the UBS Defendants were reckless in ignoring these red flags.

First, Plaintiffs point to a June 22, 2005 letter from Confidential Witness 9 ("CW 9") to Individual Defendant Wuffli and other members of the UBS Board of Directors that warned that the Company's risk valuation methodologies were overvaluing mortgage-related securities because the methodologies were designed for simple bond transactions rather than for complex mortgage-related securities transactions. (Am. Compl. ¶¶ 360, 645, 675, 960–65.) However, as the UBS Defendants rightly note, the Amended Complaint concedes that UBS's AAA-rated securities continued to trade at or near par value for almost two years *after* CW 9's letter, undercutting the inference that the UBS Defendants were reckless in not acting upon the information in the letter. (Defs.' Reply at 14 (citing Am. Compl. ¶ 209).) Although pre-class data is relevant to establishing scienter, *see In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), the lapse in time between the supposed red flag and the absence of any corresponding decline in market value undercuts an inference of scienter.

Furthermore, Plaintiffs fail to demonstrate that CW 9's letter highlighted a serious flaw in UBS's valuation model, rather than simply reflecting a different business judgment. *Cf. In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) ("[T]he fact that other individuals within [the company's division] may have had views different from [research analyst] Grubman's does not provide any basis for an inference that *Grubman* did not believe his own professed opinions on [the company's] value, or that the other valuation models, rather than Grubman's, constituted [the division's] true institutional opinion (if such a concept is even meaningful)."). This case is thus distinguishable from *In re Bear Stearns Cos. Securities, Derivative, & ERISA Litigation*, where the court held that plaintiffs had sufficiently pleaded scienter because, *inter alia*, Bear Stearns had been expressly warned "by the SEC . . . that its mortgage valuation and VaR modeling" was

---

[15] Neither in its opposition brief nor at oral argument did Lead Plaintiff contest the UBS Defendants' statement that "the market knew that . . . asset-backed securities included large positions in securities backed by subprime and Alt-A residential loans[] because subprime and Alt-A backed securities constituted at least 40% of the asset-backed securities market during 2005 and 2006." (Defs.' Mem. in Supp. at 14–15; *see* Opp'n to Defs. at 78–79 & App. A.)

*flawed*, not by an internal employee offering a different business opinion. 763 F. Supp. 2d 423, 479, 501 (S.D.N.Y. 2011) (emphasis added).

Second, Lead Plaintiff points to early reports during 2005 and 2006 in which UBS analysts warned of downward trends in the United States mortgage market. (Opp'n to Defs. at 39–40.) However, Lead Plaintiff's argument is, once again, unavailing. As Judge Stein concluded in *Brecher v. Citigroup, Inc.*, "reports about a downturn in the subprime mortgage industry do not, by themselves, permit the inference that [defendants] knew or should have known that any of the statements [or omissions] cited in the complaint were misleading" because "general facts about the financial world are insufficiently particularized to establish that defendants acted with scienter." 797 F. Supp. 2d 354, 371 (S.D.N.Y. 2011) (internal citation and quotation marks omitted), *vacated on other grounds*, No. 09 Civ. 7359 (SHS), 2011 WL 5525353 (S.D.N.Y. Nov. 14, 2011). Although it is true that UBS analysts warned of the mortgage market's general decline, Plaintiffs do not allege with particularity that AAA-rated mortgage-backed securities were also at risk. (Am. Compl. ¶ 165 ("[T]he AAA-rated RMBS-holder would only experience losses if both the equity and mezzanine tranches were exhausted as a result of credit events, such as defaults, in the underlying mortgage collateral.").) In fact, whereas the market for lower-rated mortgage-related securities "'moved' in mid to late February 2007" (*id.* ¶ 978), markets for AAA-rated mortgage-related securities did not "severely dislocate[]" until the "summer of 2007" (*id.* ¶ 314). Consequently, those reports do not support a strong inference of scienter in connection with statements made years earlier.

Third, Lead Plaintiff points to a February 2007 internal test of UBS's valuation methodologies as proof that UBS's RMBS and CDO positions were overvalued. (Opp'n to Defs. at 40–41.) According to Lead Plaintiff, because the UBS Defendants did not disclose the existence or results of the test – or a resulting audit – until April 21, 2008, the UBS Defendants were reckless. (*See id.*) However, again, Lead Plaintiff fails to tie the test and DRCM's resulting spring 2007 writedowns of its *low-grade* mortgage related securities to the alleged failure to make sufficient disclosures with regard to UBS's *high-grade* AAA-rated securities. (*See* Giuffra Decl. Ex. 13 (Shareholder Report on UBS's Write-Downs, dated Apr. 18, 2008) at 12 (explaining that DRCM's writedowns "occurred substantially in the lower credit quality ABS and [net interest margin certificates] (i.e. rated BB+ and below), and on 2006 vintages with 2nd lien bonds"); *id.* Ex. 14 (Ethos Answers) at 9 ("DRCM's losses in first quarter 2007 arose largely on lower[-]rated tranches of residential MBS, whereas the IB generally had short positions in these ratings bands, on which it had recorded gains in the quarter.").)

Moreover, upon learning of the DRCM writedowns, far from trying to conceal any alleged losses, UBS actually began reviewing the valuation and risk management practices connected to its higher-rated securities. (*See id.* Ex. 11 (SFBC Report) & Ex. 14 (Ethos Answers) (noting that the results of UBS's subsequent analysis into the IB's assets did not become available until *after* the subprime mortgage crisis unfolded in the summer of 2007).)[16]

---

[16] Lead Plaintiff argues that, despite making statements regarding the "limits" applied to its individual portfolios and various internal warnings, UBS continued to invest in mortgage-related

Thus, like the other purported red flags, the internal tests do not support a strong inference of scienter.[17]

---

securities throughout 2006 and into the early part of 2007. (Opp'n to Defs. at 41–43; *see, e.g.*, Am. Compl. ¶¶ 660, 684–85.) However, as noted above, the market for AAA-rated securities was liquid throughout that period and did not "severely dislocate[]" until the summer of 2007. (*See* Am. Compl. ¶ 314.) Even assuming that the IB's continued involvement in even AAA-rated securities constituted poor business judgment at the time, "[D]efendants' lack of clairvoyance [about the market's ultimate bottoming out] simply does not constitute securities fraud." *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995).

[17] Plaintiffs also allege that the UBS Defendants applied subjective marks to its CDO positions during the putative Class Period, despite representations that it used "observable market prices" and "genuine mark to markets" wherever possible. (*See, e.g.*, Am. Compl. ¶¶ 757, 769, 817.) In support of this argument, Plaintiffs point to allegations that IB employee and UBS executive Eric Rothman, who is not a defendant, "subjectively" managed his pricing marks on UBS CDOs. (*Id.* ¶¶ 966–68, 1164(q).) However, because such allegations are taken directly from uncorroborated allegations embedded in a complaint in another action, the Court will not consider them. *See Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007) ("[A]llegations about [defendant] contained in pleadings from an unrelated lawsuit . . . are inadmissible."). Although Lead Plaintiff argued, correctly, at oral argument that the Court can consider certain post-class data to establish scienter (Tr. 34:24–35:8 (directing the Court's attention to *Scholastic*, 252 F.3d 63)), its argument is irrelevant because the Court still need not consider parroted allegations for which counsel has not conducted independent investigation, *see* Fed. R. Civ. P. 11; *Geinko v. Padda*, No. 00 C 5070 (DHC), 2002 WL 276236, at *5–6 (N.D. Ill. Feb. 27, 2002).

In any event, even if the Court did consider the allegations, its analysis would not change because, as noted above, Plaintiffs do not indicate how "downgrading bonds during the summer of 2007" (Am. Compl. ¶ 969) indicates that the UBS Defendants knew or should have known about overvaluation in UBS's *AAA-rated* mortgage-related positions. Indeed, UBS disclosed problems with

---

### (C)  The Closing of DRCM

The Amended Complaint contains allegations that: (1) the UBS Defendants closed DRCM to "conceal their material misstatements to the market regarding UBS's risk management and controls and its inflated valuations of its U.S. residential mortgage-backed securities" (Am. Compl. ¶ 994); (2) the securities held by DRCM were "substantially the same" or "virtually identical" to mortgage-backed securities held by the investment bank (*id.* ¶¶ 38, 42, 974, 984, 991, 997, 1019); and (3) UBS overpaid DRCM's outside investors to keep them from disclosing the reason for closing DRCM (*id.* ¶ 994). However, Plaintiffs do not provide substantial facts to support these conclusory allegations. For instance, following DRCM's closing, UBS did disclose that DRCM suffered losses of "approximately CHF 150 million in the context of difficult market conditions in US mortgage securities." (Giuffra Decl. Ex. 30 (UBS 1Q 2007 Report) at 1.) Moreover, as the UBS Defendants note, DRCM wrote off lower-rated mortgage-related securities after they declined in value in February 2007 while the IB held AAA-rated mortgage-related securities, which did not severely decline in value until the summer of 2007. (*See* Defs.' Mem. in Supp. at 41.) Therefore, neither the types of assets nor the trading strategies employed by DRCM and the IB, respectively, can be said to be "substantially the same" or "virtually identical," as Plaintiffs allege. (*See* Am. Compl. ¶¶ 38, 42, 974, 984, 991, 997, 1019.)

Also, Plaintiffs' only allegation in the Amended Complaint to support its claim that UBS overpaid DRCM's outside investors is that those outside investors

---

those bonds when reporting its second quarter results on August 14, 2007. (*Id.* ¶ 476.)

"sustained losses on positions in home equity-linked instruments in Q1 2007 just like those suffered by the DRCM proprietary fund." (Am. Compl. ¶ 1006.) As the UBS Defendants correctly explain, such losses on positions in only home equity-linked instruments do not support a claim that the outside investors suffered an *overall* loss in the entire portfolio of their investments. (Defs.' Mem. in Supp. at 42; Tr. 13:20–14:12.) Thus, Plaintiffs fail to plead that the payments were a result of fraud rather than a proper accounting based upon the total value of the portfolio at the end of the relevant period. Accordingly, Plaintiffs' allegations regarding the closing of DRCM do not support an inference of scienter.[18]

### (D)   Resignations and Terminations

Lead Plaintiff asserts that the forced resignations and terminations of key UBS personnel over the course of eleven months – from May 2007 to April 2008 – further support an inference of scienter. (Opp'n to Defs. at 43–44; Tr. 36:17–21.) However, as this Court made clear in *In re PXRE Group Ltd., Securities Litigation*, absent "additional factual allegations linking [the executives'] resignation . . . to the alleged fraud," such allegations are "insufficient to raise a strong inference of scienter." 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009) (collecting cases); *see also Wachovia*, 753 F. Supp. 2d at 366 ("resignations of [i]ndividual [d]efendants – without factual allegations linking the resignations to the alleged fraud" – are not "sufficient to raise the inferences required to establish fraud"); *In re DRDGOLD Ltd. Sec.*

*Litig.*, 472 F. Supp. 2d 562, 575 (S.D.N.Y. 2007) ("Plaintiffs also assert that at the end of the [c]lass [p]eriod, [the Senior Independent Non-Executive Director] resigned after being in the position just three weeks. However, the [complaint] does not state any facts to indicate that his departure was a result of any knowledge of alleged fraudulent activities at DRD." (internal quotation marks and citation omitted)). Here, Plaintiffs have failed to provide such "additional factual allegations," and thus the cited resignations and terminations do not support a strong inference of scienter.

### (E)   Alleged Violations of International Financial Reporting Standards

Lead Plaintiff asserts that UBS violated International Financial Reporting Standards ("IFRS") on a number of occasions and that such violations support an inference that the UBS Defendants acted with scienter. (Opp'n to Defs. at 45–46; *see* Am. Compl. ¶¶ 1165–1222.) As the Second Circuit explained in *Novak*, however, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of 'corresponding fraudulent intent,' might they be sufficient." 216 F.3d at 309 (citations omitted); *cf. Davidoff*, 2005 WL 2030501, at *17 ("[F]ailure to allege motive is fatal because allegations of GAAP violations or accounting irregularities alone are insufficient to state a securities fraud claim without evidence of 'corresponding fraudulent intent.'" (quoting *Novak*, 216 F.3d at 309)). Furthermore, the fact that UBS's outside independent auditor, Ernst & Young, did not require a restatement of UBS's financials significantly undercuts Plaintiffs' allegations of recklessness as to compliance with IFRS. *See In re JP Morgan Chase Sec. Litig.*, 02 Civ. 1282 (SHS), 2007 WL 950132, at *13 (S.D.N.Y.

---

[18] In any event, in its opposition brief, Lead Plaintiff did not directly address any of the UBS Defendants' arguments regarding DRCM's closing; therefore, it has conceded the point by silence. *See Gortat*, 2010 WL 1423018, at *11 (E.D.N.Y. Apr. 9, 2010); *First Capital Asset Mgmt.*, 218 F. Supp. 2d at 392–393 & n.116.

2007) (noting that the fact that the auditor had not required a restatement demonstrates that "reasonable accountants could differ as to whether [a particular accounting rule] applied to the . . . transactions – an inference that defeats plaintiffs' claims of recklessness"), *aff'd*, 553 F.3d 187 (2d Cir. 2009).

### (F) The Magnitude and Timing of UBS's Writedowns

Lead Plaintiff argues that the magnitude of the alleged fraud – in sum, a $48 billion writedown – should give rise to an inference of scienter when combined with Plaintiffs' other allegations. (Opp'n to Defs. at 45–46.) As even Lead Plaintiff acknowledges, however, "the magnitude of the alleged fraud *alone* is not enough" to establish such an inference. *Wachovia*, 753 F. Supp. 2d at 366 (emphasis added); *see also PXRE*, 600 F. Supp. 2d at 545 ("While certainly a relevant factor, it is well established that the size of the fraud alone does not create an inference of scienter." (internal quotation marks omitted)); (Opp'n to Defs. at 45). Because Plaintiffs' other allegations fail to otherwise support a strong inference of scienter, the magnitude of the alleged fraud is a non-starter.

Lead Plaintiff nonetheless argues that UBS should have taken *more significant* writedowns on its mortgage-related securities portfolio in 2006 or early 2007, rather than at the end of 2007 and the first quarter of 2008, because of certain facts available to it earlier. (Opp'n to Defs. at 46–47; *see, e.g.*, Am. Compl. ¶¶ 800–01, 818, 841, 844–45.) However, "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito*, 47 F.3d at 53; *see also In re Fannie Mae 2008 Sec. Litig.*, 08 Civ. 7831 (PAC), 2010 WL 3825713, at *18 (S.D.N.Y. Sept.

30, 2010) ("The fact that a financial item is accounted for differently, or in a later period, does not support the inference that a previously filed financial statement was fraudulent."). Only when "identical factors" that ultimately forced the company to make writedowns were "operative and evident to defendants" at the time of earlier incomplete public statements or reports can timing support an inference of scienter. *See CLAL Fin. Batucha Inv. Mgmt., Ltd. v. Perrigo Co.*, No. 09 Civ. 2255 (TPG), 2010 WL 4177103, at *7 (S.D.N.Y. Oct. 7, 2010). Although Plaintiffs do point to certain facts available to various UBS personnel at an earlier date (Am. Compl. ¶¶ 58, 353–58, 365–71, 374–75, 382–86, 389–90), they have failed to demonstrate that these facts constitute "identical factors" that ultimately forced UBS's to writedown its *AAA-rated* securities, as separate from its lower-rated, mortgage-backed securities portfolio.

The fact that UBS made multiple profit warnings and subsequent disclosures before it was required to do so further weakens Lead Plaintiff's arguments with respect to scienter. *See Rombach*, 355 F.3d at 176 ("[T]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements."); *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 530 (S.D.N.Y. 2012) (noting that even if Merrill Lynch had "made some disclosures relating to the type of conduct alleged," those partial disclosures would still suffice to negate an inference of scienter based on "the substantially higher bar set for recklessness allegations"); *PXRE*, 600 F. Supp. 2d at 533–34 ("Plaintiff's inference of scienter is further belied by . . . [d]efendants' willingness to issue a steady stream of press releases, replete with cautionary language, informing the public of PXRE's updated initial loss estimates as more information became available."). UBS

issued an August 14, 2007 early warning of a decline in future profit and made a series of pre-announcements of quarterly earnings on October 1, 2007, December 10–11, 2007, January 30, 2008 and April 1, 2008, which identified significant risks posed to UBS's balance sheet by volatility in the markets for mortgage-related securities. (Giuffra Decl. Exs. 32, 34, 39, 40, 41, 45; *see* Defs.' Mem. in Supp. at 31–32.) Although such disclosures do not necessarily *negate* an inference of scienter, they certainly cut against it. The timing of the writedowns is thus not sufficient to support a strong inference of scienter.

### ii. Alleged ARS Fraud

Plaintiffs allege that the UBS Defendants concealed from shareholders the fact that UBS had accumulated billions of dollars of ARS, that the ARS market was illiquid, and that the Company's ARS portfolio was materially overvalued starting in August 2007. (Am. Compl. ¶¶ 84–90; 396–408.) As a result, Plaintiffs allege that shareholders suffered when the market for ARS "crashed" in February 2008 and UBS wrote down its ARS positions. In support of their motion, the UBS Defendants argue that Plaintiffs nonetheless fail to state a claim for securities fraud because, among other things, Plaintiffs have failed to allege a cognizable motive for the fraud or that UBS's executives knew about the alleged accumulation and overvaluation of UBS's positions in ARS prior to the crash of the ARS markets. (Defs.' Mem. in Supp. at 58–59.)

Lead Plaintiff argues in opposition that a series of emails beginning in August 2007 demonstrates that UBS executives knew for months *prior* to the crash that the market for ARS was rapidly deteriorating and illiquid. (Opp'n to Defs. at 64–66; *see, e.g.*, Am. Compl. ¶¶ 402–03, 1146.) However, as the

UBS Defendants rightly note, none of the emails cited in the Amended Complaint appear to have involved any of the UBS Defendants, and thus "cannot support an inference that any *Defendant* knew that UBS's ARS portfolio was allegedly overvalued." (Defs.' Reply at 21; Am. Compl. ¶ 1146); *see also Kinsey v. Cendant Corp.*, No. 04 Civ. 0582 (RWS), 2004 WL 2591946, at *13 (S.D.N.Y. Nov. 16, 2004) ("It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false. A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement." (internal quotation marks omitted)).

Lead Plaintiff also argues that the UBS Defendants ignore, *inter alia*, that (1) "UBS had generated false demand for ARS by bidding in the auctions for many months before the ARS writedown," (2) UBS purchased high concentrations of illiquid ARS in violation of its own stated policies, (3) the head of UBS's Municipal Securities Group, David Shulman, sold personally held ARS, and (4) investigations pertaining to whether UBS defrauded its customers who purchased ARS were ongoing and known to the UBS Defendants as early as May 2008. (Opp'n to Defs. at 64, 66–67; *see* Am. Compl. ¶¶ 396, 398–400, 404, 407–08.) According to Lead Plaintiff, taken together, these facts – some of which are conclusory – compel a strong inference of scienter. (*See* Opp'n to Defs. at 65–67.)

However, the Court finds that an alternative inference is at least as plausible: that Plaintiffs' allegations regarding UBS's activities at the end of 2007 and early 2008

indicate not that the UBS Defendants sought to defraud its investors but that UBS actually sought to *limit* exposure to ARS and protect its shareholders from a troubled and increasingly illiquid market. (*See, e.g.*, Am. Compl. ¶ 1146.) For instance, Plaintiffs allege that the GEB met on December 19, 2007 to discuss UBS's ARS exposure, "produc[ing] 'many questions and a sense of urgency,'" (*Id.* ¶ 1146.*l.*) But alleging that there were questions and a sense of urgency within UBS does not establish that the UBS Defendants *knew* of the impending February 2008 "crash" in the ARS market (*see id.* ¶ 402), nor does it demonstrate that they were reckless is not making immediate disclosures or writedowns regarding UBS's ARS exposure, *see Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 760–61 (7th Cir. 2007) ("Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention. . . . Taking the time necessary to get things right is both proper and lawful."). Indeed, throughout the entirety of their Amended Complaint, Plaintiffs never allege that any peer institution of UBS disclosed its ARS exposure or wrote down the value of its ARS holdings earlier than UBS, which made its first disclosure about its exposure on March 18, 2008 and made its first writedown on March 28, 2008. (*See* Giuffra Ex 60, ch. 2 at 14; Am.  Compl. ¶ 406.)

Moreover, although Plaintiffs allege in a single repeated sentence that Shulman "himself dumped all of his entire personal holdings in ARS on December 12, 2007" (Am. Compl. ¶¶ 404, 1145), Shulman is not a Defendant and, thus, his activities are not probative of the UBS Defendants' scienter. (Opp'n to Defs. at n.67 (citing only *In re Oxford Health Plans*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999), in support of its argument that Shulman's alleged sale of ARS is probative of scienter, even though in *Oxford*, *individual defendants* allegedly engaged in

insider trading, not an unnamed employee)); *see also Bd. of Trustees of Ft. Lauderdale Gen. Emps.' Ret. Sys.*, 811 F. Supp. 2d at 868 (S.D.N.Y. 2011) (explaining that plaintiffs' failure to allege that "any of the [i]ndividual [d]efendants . . . sold their shares during the [c]lass [p]eriod" weighs against finding a motive to commit fraud).

Lastly, even if Plaintiffs could prove that the UBS Defendants' actions establish that UBS had intent to defraud its ARS customers, Plaintiffs cannot prove that UBS had intent to defraud its own investors. *See JP Morgan*, 553 F.3d at 203 ("Even if [an issuer] was actively engaged in duping other institutions for the purposes of gaining at the expense of those institutions, it would not constitute a motive for [that issuer] to defraud its own investors."). The investigations cited by Plaintiff related to whether UBS defrauded its ARS customers by representing that ARS were "cash equivalents." (*See, e.g.*, Am. Compl. ¶¶ 401, 406–08.) However, just as in *JP Morgan*, "[i]t seems implausible [here] to have both an intent to earn excessive fees for the corporation and also an intent to defraud Plaintiffs by losing vast sums of money." *JP Morgan*, 553 F.3d at 203.[19] Therefore, the Court finds that Plaintiffs have failed to plead a strong inference of scienter as to UBS's ARS program.

---

[19] Although the UBS Defendants addressed this argument in their opening brief (Defs.' Mem. in Supp. at 57–59; *see id.* at 56), Lead Plaintiff did not respond to it in its opposition brief (Opp'n to Defs. at 63–67). Therefore, it appears that Lead Plaintiff has conceded the point by silence. *See Gortat*, 2010 WL 1423018, at *11 (considering an argument not addressed in an opposition brief waived); *First Capital Asset Mgmt.*, 218 F. Supp. 2d at 392–393 & n.116 (same).

### c. *Tellabs* Analysis

Upon careful consideration, the Court finds that a reasonable person would not deem Plaintiffs' purported inference of scienter to be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Indeed, after examining the entirety of Plaintiffs' scienter allegations, the Court finds that Plaintiffs have "failed to plead facts giving rise to a strong inference that [the UBS] Defendants acted with the intent 'to deceive, manipulate, or defraud.'" *Wachovia*, 753 F. Supp. 2d at 366–67 (quoting *Tellabs*, 551 U.S. at 313 (internal quotation marks omitted)).

The more compelling inference, at least based on the facts as they are alleged in the Amended Complaint, is that the UBS Defendants simply did not anticipate that there would be a market-wide downturn impacting its various businesses and, ultimately, UBS's shareholders. The Court therefore finds that any alleged failure to disclose was "more likely attributable to the financial turmoil occurring in 2007 than to fraud or recklessness." *Brecher*, 2011 WL 2209145, at *14; *see also Wachovia*, 753 F. Supp. 2d at 368 ("The more compelling inference, *at least based on the facts as they are alleged in the complaints*, is that [d]efendants simply did not anticipate the full extent of the mortgage crisis and the resulting implications for the [loan portfolio that caused most of Wachovia's losses]."); *In re Sec. Capital Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 596 (S.D.N.Y. 2010) ("[F]undamental misunderstanding and underestimate of the true risks presented by investment in the housing market, particularly with regard to opaque CDOs," was the more compelling inference under *Tellabs*); *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 301

(S.D.N.Y. 2010) (explaining that "unprecedented paralysis of the credit market and a global recession" make honest error "as plausible an explanation for the losses as an inference of fraud"); *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010) (finding "no basis for inferring . . . scienter; it is much more likely that [d]efendants (like many other financial institutions) underestimated the magnitude of the coming economic crisis and believed that they were taking adequate risk management and cautionary measures to account for any future downturn"). Although UBS made a series of bad bets with disastrous consequences for the company and its shareholders, those consequences alone are insufficient to establish scienter and support a claim for securities fraud.

\* \* \*

Because the issue of scienter as to the mortgage-related securities and ARS frauds proves fatal to Plaintiffs' Section 10(b) claims against both UBS and each of the named Individual Defendants, the Court need not reach the UBS Defendants' arguments regarding materiality for the mortgage-related securities fraud and loss causation for the mortgage-related securities and ARS frauds.[20]   However, because the UBS Defendants do not challenge that Plaintiffs have pleaded scienter as to the

---

[20]  Although the Court need not address loss causation, it notes that the Individual Defendants plainly cannot be held liable for "alleged losses resulting from statements made after they left UBS or before they had assumed the rules in which they are alleged to have committed fraud." (Defs.' Reply at 28; *see* Defs.' Mem. in Supp. at 81.)  Thus, in the alternative, the Court dismisses all claims against the Individual Defendants to the extent that they rely on any part of the alleged frauds that occurred before they assumed those roles or after they left UBS.  (*See* Defs.' Reply App. A.)

alleged tax fraud, the Court proceeds to examine materiality as to that scheme alone.

### 3. Materiality of Statements Relating to the Alleged Tax Fraud

#### a. Non-Actionable Puffery and the Duty to Disclose

In the Amended Complaint, Plaintiffs allege that UBS made several general, but materially false or misleading, statements about its overall and U.S.-based Wealth Management businesses that did not reveal the full scope of the misconduct in connection with UBS's Swiss-based cross-border business. The UBS Defendants dispute the materiality of these statements, as well as whether the UBS Defendants had a more general duty to disclose conduct related to the alleged tax fraud. Their arguments are substantially similar to those made by the Underwriter Defendants' in their briefing. In fact, the UBS Defendants explicitly incorporate the arguments made therein. (Defs.' Reply at 23 n.17.) Therefore, the Court addresses both sets of Defendants' arguments together and, for the reasons stated in Part III.B.2.c, finds that each of the statements in Appendix C to the UBS Defendants' opening brief is no more than non-actionable puffery and that, alternatively, UBS had no further duty to disclose the uncharged conduct related to the alleged tax fraud.

#### b. Statements Concerning Net New Money and the Overall Success of UBS's United States Wealth Management Business

Plaintiffs allege that UBS inflated the amount of net new money[21] it generated each year by including net new money from its cross-border business. (*See, e.g.*, Am. Compl. ¶¶ 91, 531, 533, 542–43, 548, 562–63, 564–65, 580–85, 598, 600, 626–67.) The UBS Defendants argue that such allegations, even if true, could not have been material because UBS's Swiss-based cross-border business contributed just 0.3% of the overall net new money of UBS's Global Wealth Management business in 2007. (Mem. in Supp. at 66 & n.32 (citing Am. Compl. ¶¶ 531, 535, 542, 562, 564, 584, 626, 628, 637); *see* Giuffra Decl. Ex. 62 (DPA) at Ex. C (Statement of Facts) ¶ 8.) As an initial matter, Lead Plaintiff explicitly abandons any allegations that UBS made material misstatements concerning its Wealth Management Business's net new money. (Opp'n to Defs. at 67 n.70 ("Lead Plaintiff has alleged only that UBS's [net new money] figures declined dramatically following revelation of the U.S. tax fraud," not that "UBS materially inflated its overall net new money figures." (internal quotation marks omitted)).)

Nonetheless, assuming *arguendo* that Lead Plaintiff did *not* make such a concession, Plaintiffs' claim about UBS's net new money figures would still fail. Significantly, the Second Circuit and district courts within this Circuit have repeatedly held that accounting categorizations of such small magnitude, when compared against a company's much larger total assets, are not "material." *JP Morgan*, 553 F.3d at 204 ("[C]hanging the accounting treatment of approximately 0.3% of [the company's] total assets from trades to loans would not have been material to investors" (internal quotation marks omitted)); *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (holding that an

---

[21] Net new money represents the net amount of assets under management from new or existing clients less the amount of client assets withdrawn. According to Plaintiffs, net new money was "UBS's princip[al] metric for assessing the health of the Private Bank." (Am. Compl. ¶ 470.)

omission regarding 0.4% in the company's annual revenue was immaterial because "[t]his share is simply too small to be material as a matter of law when considered in the broad context of the company's revenues and expenses"); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) (collecting cases and concluding that a 0.3% inflation in the defendant's revenues over the relevant period was "an immaterial percentage as a matter of law").

Plaintiffs also assert in their Amended Complaint that UBS misled the market in disclosing that it had found and fixed certain "gaps" in the reporting system that resulted in insufficient withholding of United States taxes from client funds. (*See, e.g.*, Am. Compl. ¶¶ 572, 574, 578, 586.) However, as the UBS Defendants rightly note, UBS's statements about these gaps upon which Plaintiffs rely concerned operations in the *United States* during 2004 and "had nothing to do with any aspect of UBS's Wealth Management business, much less the 'very small,' Swiss-based cross-border business within that global business." (*See* Defs.' Mem. in Supp. at 68.) Therefore, the Court finds that such statements are not "material."[22]

* * *

Because Plaintiffs have failed to plead scienter with regard to the alleged mortgage-related securities and ARS frauds, and materiality with regard to the alleged tax fraud, the Court grants the UBS Defendants'

motion to dismiss the Section 10(b) claims against the UBS Defendants.[23]

B. Sections 11 and 12(a)(2) Claims

Alaska Laborers brings claims against the Underwriter Defendants under both Sections 11 and 12(a)(2) of the Securities Act. In moving to dismiss, the Underwriter Defendants assert that Plaintiffs fail to allege sufficient actionable misstatements or omissions in the Registration Statement and documents included and incorporated therein to state a claim under either section.

In contrast to the "catchall function" of Section 10(b) and Rule 10b-5,[24] Sections 11 and 12(a)(2) of the Securities Act create liability only for material misrepresentations or omissions in connection with a registered securities offering. Section 11 applies to registration statements, while Section 12(a)(2) covers prospectuses and oral communications. *See* 15 U.S.C. §§ 77k(a), 77*l*(a)(2).

Under Section 11, an underwriter may be liable if "any part of the registration

---

[22] Once again, Lead Plaintiff concedes as much by not addressing the UBS Defendants' argument as to these alleged "gaps" at all in its opposition brief. *See Gortat*, 2010 WL 1423018, at *11 (considering an argument not addressed in an opposition brief waived); *First Capital Asset Mgmt.*, 218 F. Supp. 2d at 392–393 & n.116 (same).

[23] Since the Court finds that Plaintiffs have failed to adequately plead scienter as to the alleged mortgage-related securities and ARS frauds and materiality as to the alleged tax fraud, it need not address whether Plaintiffs have sufficiently pleaded loss causation as to any of those alleged frauds. Moreover, because the Court grants the UBS Defendants' motion to dismiss pursuant to Rules 12(b)(6) and 9(b), it need not address the UBS Defendants' argument regarding personal jurisdiction over Defendant Stuerzinger pursuant to Rule 12(b)(2). In addition, since Plaintiffs have not stated a Section 10(b) claim as to the Individual Defendants, the Court also dismisses Plaintiffs' "control person" claims under Sections 20(a). *See* 15 U.S.C. § 78t(a).

[24] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 202–04 (1976) (describing Section 10(b) as a "catchall" section to deal with "manipulative (or cunning) devices" (internal quotation marks omitted)).

statement, when such became effective, contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).   "In the event of such a misdeed, the [Securities Act] provides for a cause of action by the purchaser of the registered security against the security's issuer, its underwriter, and certain other statutorily enumerated parties."   *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C.  § 77k(a)).   To state a claim under Section 11, the plaintiff must allege that:

> (1) [it] purchased a registered security either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

*Id.* at 358–59 (quoting 15 U.S.C.  § 77k(a)).

"Section 12(a)(2) provides a similar cause of action where the securities at issue were sold using prospectuses or oral communications containing material misstatements or omissions."   *Wachovia*, 753 F. Supp. 2d at 367.   To plead a claim under Section 12(a)(2), the plaintiff must allege that: "(1) the defendant is a 'statutory seller'; (2) the sale was effected 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication" contained a material misstatement or

omission.[25]   *In re Morgan* Stanley, 592 F.3d at 359 (quoting 15 U.S.C. § 77*l*(a)(2)).

Because Sections 11 and 12(a)(2) are "Securities Act siblings with roughly parallel elements," *id.* at 359, courts analyze the two together, *see Wachovia*, 753 F. Supp. 2d at 368 ("'Claims under Sections 11 and 12 are usually evaluated in tandem because if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a).'" (quoting *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008))).   Together, Sections 11 and 12(a)(2) create "three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; and (3) a material omission of information that is necessary to prevent existing disclosures from being misleading."   *Id.* (citing *Litwin v. Blackstone Grp., L.P.* 634 F.3d 706, 715–16 (2d Cir. 2011)).

Although Securities Act plaintiffs must plead the materiality of the alleged misstatement or omission under Sections 11 and 12(a)(2), they need not allege scienter, reliance, or causation.   *In re Morgan Stanley*, 592 F.3d at 359; *Rombach*, 355 F.3d at 169 n.4.   "Issuers are subject to 'virtually absolute' liability under section 11, while the remaining potential defendants

---

[25] "An individual is a 'statutory seller' – and therefore a potential Section 12(a)(2) defendant – if he: (1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'"   *In re Morgan Stanley*, 592 F.3d at 359 (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)); *accord In re Orion Sec. Litig.*, No. 08 Civ. 1328 (RJS), 2009 WL 2601952, at *2 (S.D.N.Y. Aug. 20, 2009); *see infra* Part III.B.2.

under sections 11 and 12(a)(2) may be held liable for mere negligence." *In re Morgan Stanley*, 592 F.3d at 359 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). "Thus, by contrast to Section 10(b), liability under Sections 11 and 12(a)(2) is both more narrowly defined and more readily triggered." *Wachovia*, 753 F. Supp. 2d at 368.

Defendants seek dismissal of Alaska Laborers's Securities Act claims for failing to allege materiality. In addition, Defendants assert that Alaska Laborers does not have standing to bring a Section 12(a)(2) claim. Because standing is a threshold requirement, the Court turns to it first and then proceeds to discuss materiality under both Sections 11 and 12.

### 1. Section 12(a)(2) Standing

The UBS Defendants and the Underwriter Defendants move to dismiss Alaska Laborers' Section 12(a)(2) claim, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, on the grounds that the Amended Complaint fails to allege that Alaska Laborers purchased shares directly from a specific Underwriter Defendant or that Alaska Laborers purchased securities as a result of a particular Underwriter Defendants' solicitation. (Defs.' Mem. in Supp. at 72–73; UDs' Mem. in Supp. at 30–32.) Without such allegations, the Underwriter Defendants argue, Alaska Laborers has failed to plead facts sufficient to demonstrate its standing under Section 12(a)(2).

As the Second Circuit has made clear, "[w]hereas the reach of section 11 is expressly limited to specific offering participants, the list of potential defendants in a section 12(a)(2) case is governed by a judicial interpretation of section 12 known

as the 'statutory seller requirement.'" *In re Morgan Stanley*, 592 F.3d at 359; *see supra* n.25. According to the Supreme Court, Section 12(a) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Pinter*, 486 U.S. at 644 n.21. Moreover, liability pursuant to Section 12(a)(2), unlike Section 11, may attach only when plaintiffs "purchased their shares directly in the initial public offering, and not in the so-called 'aftermarket.'" *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 445 (S.D.N.Y. 2009) (citing *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 578 (1995) (holding that Section 12(a)(2) does not apply to a private contract for a secondary-market sale of securities)); *see also Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005) (holding that a Section 12(a)(2) action "cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary").

Here, Alaska Laborers is the sole named Plaintiff for the Securities Act claims. Moreover, even if the Court were to evaluate the Section 12(a)(2) claim as a putative class claim, Alaska Laborers must still demonstrate "statutory seller" standing. "Although a class, when certified, may be divided into subclasses to support claims against different defendants, it is well established that 'if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.'" *Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292 (VM), 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974)); *see also In re Orion Sec. Litig.*, 2009 WL 2601952, at *2 (dismissing a Section 12(a)(2) claim against underwriter defendants where the plaintiff had not

alleged that it "either directly *purchased* . . . securities from the [u]nderwriter [d]efendants or that the [u]nderwriter [d]efendants *successfully* solicited such sales" (emphasis in original)); *Griffin*, 2001 WL 740764, at *2 (dismissing Section 12(a)(2) claim against an underwriter where the pleading "describe[d] solicitation activities by [the underwriter] as they affected other putative plaintiffs, but . . . d[id] not allege that [the underwriter] was directly involved in the actual solicitation of [the named plaintiff's] purchase").

Alaska Laborers purports to bring claims "on behalf of all purchasers of UBS shares in connection with, and traceable to, the 2008 Rights Offering," alleging that "UBS and the Underwriter Defendants, acting through their employees, agents[,] and others, solicited . . . purchases for their personal gain through . . . the preparation and dissemination of the Prospectus Supplemental." (*See* Am. Compl. ¶¶ 1463, 1468.) Yet as the Underwriter Defendants rightly note, Alaska Laborers "has not alleged that it purchased its shares from any of the Underwriter Defendants[] or that any of them specifically and successfully solicited its purchases." (UDs' Mem. in Supp. at 32; *see* Defs.' Mem. in Supp. at 72–73.)

In opposition, Lead Plaintiff points to two cases for the proposition that "courts within the Second Circuit do not require that the putative class representative identify the specific underwriter from which it purchased shares." (Opp'n to UDs at 29–30.) In the first, *In re WorldCom, Inc. Securities Litigation*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003), the Court denied the underwriter defendants' motion to dismiss the putative class's Section 12(a)(2) claim for lack of standing because plaintiffs pleaded, among other things, that they:

purchased WorldCom debt securities in the two [o]fferings, that the [u]nderwriter [d]efendants participated in the solicitation and sale of the notes in the [o]fferings pursuant to the [r]egistration [s]tatements, that the solicitations were motivated at least in part by the desire of the [u]nderwriter [d]efendants to serve their own financial interest and the interest of WorldCom, and that the [u]nderwriter [d]efendants actively solicited the sale of the notes issued in the [o]fferings by participating in "road show" meetings.

*Id.* at 423. The court went on to state that:

While the [c]omplaint does not identify from which defendant either named plaintiff purchased its notes, it does contain sufficient allegations, when judged against the requirements of Rule 8, to give the [u]nderwriter [d]efendants fair notice of the basis for the claims against them, to wit, that they solicited the named plaintiffs in the sale of the notes or sold notes to them.

*Id.* (citation omitted). In the second case that Lead Plaintiff cites, *Wachovia*, 753 F. Supp. 2d at 373–74, the Court also denied the underwriter defendants' motion to dismiss the putative class's Section 12(a)(2) claim for lack of standing. The Court held that the plaintiffs sufficiently pleaded that the underwriter defendants were "sellers" within the meaning of the Securities Act because they "[(1)] transferred title to [p]laintiffs and other members of the [c]lass who purchased in the [o]fferings; . . . [(2)] solicited the purchase of the [b]ond [c]lass [s]ecurities by [p]laintiffs and other members of the Class"; and "[(3)] liste[d] the [u]nderwriter [d]efendants who sold in

each offering" and included "certifications indicat[ing] the securities purchased by each [plaintiff]." *Id.* at 374 (internal quotation marks omitted). The Court cautioned, however, that although the allegations were sufficient to withstand a Section 12(a)(2) motion to dismiss, mere allegations that the plaintiffs had "purchased 'pursuant or traceable to' the offering documents would be insufficient." *Id.* at 373.

Here, the Amended Complaint does not contain the degree of detail present in the pleadings in either *WorldCom* or *Wachovia*. Indeed, whereas the complaint in *WorldCom* contained allegations regarding the underwriter defendants' specific solicitation at "road show" meetings, the Amended Complaint here is devoid of any mention of the manner in which the underwriters solicited the sale of securities or whether any of its solicitations were actually successful. Similarly, whereas the complaint in *Wachovia* contained allegations regarding the transfer of title to plaintiffs and detail regarding the underwriters' participation in each offering at issue, the Amended Complaint here alleges only that Alaska Laborers purchased "in connection with, and traceable to, the 2008 Rights Offering." (Am. Compl. ¶ 1463.)

In opposition, Lead Plaintiff directs the Court's attention to an exhibit attached to its opposition brief, which purportedly indicates that Alaska Laborers purchased the securities at issue "directly" in the 2008 Rights Offering. (Opp'n to UDs. at 30; Jarvis Decl. Ex. P at Ex. H.) The exhibit indicates that shares were "purchased pursuant to [the] rights offering" (*id.* Ex. P); however, even the exhibit does not make clear whether Alaska Laborers purchased the shares directly or in a secondary market "traceable" to the 2008 Rights Offering.

Therefore, because the allegations in the complaint fail to demonstrate "statutory seller" standing, the Court dismisses Alaska Laborers' Section 12(a)(2) claim.[26]

### 2. Materiality

The definition of materiality under Sections 11 and 12(a)(2) is the same as under Section 10(b) of the Exchange Act: "[w]hether the defendants' representations, taken together and in context, would have misled a reasonable investor." *In re Morgan Stanley*, 592 F.3d at 360 (internal quotation marks omitted). "To be material[,] the information need not be such that a reasonable investor would necessarily change his investment decision based on the information, as long as a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." *Fuwei Films*, 634 F. Supp. 2d at 439 (internal quotation marks omitted); *accord Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). "At the pleading stage, a plaintiff satisfies the materiality requirement . . . by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161–62 (2d Cir. 2000) (citing *Basic*, 485 U.S. at 231). However, "[c]ourts do not grant motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on grounds of immateriality, unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Fuwei Films*, 634 F. Supp. 2d at 439 (internal quotation marks omitted).

---

[26] Even if Alaska Laborers were able to plead statutory seller sending under Section 12(a)(2), it would still fail to state a claim. *See infra* Part III.B.2.

a.  Alleged Misstatements and Omissions

The Underwriter Defendants argue that Alaska Laborers fails to allege actionable misstatements or omissions because the Registration Statement for the 2008 Rights Offering, and the documents incorporated by reference therein, included all information either required by SEC regulations or necessary to make the disclosures in the documents not misleading.  (UDs' Mem. in Supp. at 12–14.)   In the Amended Complaint, Alaska Laborers alleges that the Registration Statement for the 2008 Rights Offering contained a number material misstatements or omissions, including that it:

> (a) stated that UBS clients in the Private Bank are provided with "tailored, unbiased advice and investment services ranging from asset management to estate planning and from corporate finance to art banking" (¶ 1437); (b) stated that the Private Bank's "pre-tax profit was CHF 9,251 million for 2007 and CHF 2,152 million in first quarter 2008" (¶ 1438); (c) touted UBS's supposed strengths in controlling operational risks (¶ 1439); (d) stated that the Company [was] subject to government investigations the outcome of which UBS claimed could not be predicted (¶ 1440); and (e) asserted that "maintaining [the Company's] reputation and addressing adverse reputational developments [were supposedly] key factors in [UBS's] risk management efforts[" (¶ 1441.)]

(Opp'n to UDs at 14–15.)

By contrast, the Underwriter Defendants point to two additional documents incorporated by reference therein – (1) the 1Q 2008 Report and (2) the May 23 6-K – to argue that the Registration Statement did *not* contain any material misstatements and omissions when read as a whole.  (UDs' Mem. in Supp. at 13.)

The 1Q 2008 Report disclosed, *inter alia*, that (1) "DOJ is examining whether certain US clients sought, with the assistance of UBS client advisors, to evade their US tax obligations by avoiding restrictions on their securities investments imposed by the Qualified Intermediary agreement UBS entered into with the US Internal Revenue Service," and (2) "[t]he SEC is examining whether Swiss-based UBS client advisors engaged in activities in relation to their US-domiciled clients that triggered an obligation for UBS Switzerland to register with the SEC as a broker-dealer and/or investment advisor."  (Giuffra Decl. Ex. 63 (UBS 1Q 2008 Report) at 39.)  Lead Plaintiff argues, however, that while the 1Q 2008 Report revealed that the DOJ and SEC were conducting such investigations, it "failed to disclose the magnitude of the problem."   (Opp'n to UDs at 15–16.)  Specifically, Lead Plaintiff asserts that the 1Q 2008 Report failed to disclose that:

> (a) it was not just "certain" UBS clients, but rather . . . *tens of thousands* of clients that UBS assisted in evading U.S. income taxes; (b) an entire network of UBS advisors traveled to the U.S. over the course of at least six years to instruct U.S clients on how to evade taxes . . . in violation of applicable law; and (c) the tax scheme was so extensive that it exposed UBS to hundreds of millions of dollars in criminal fines and penalties . . . .

(*Id.* at 16 (emphasis in original).)

Similarly, the May 23 6-K, which supplemented the 1Q 2008 Report and was also incorporated into the Registration Statement, disclosed, *inter alia*, that:

The DOJ and SEC are examining UBS's conduct in relation to cross-border services provided by Swiss-based UBS client advisors to U.S. clients during the years 2000–2007. In particular, DOJ is examining whether certain U.S. clients sought, with the assistance of UBS client advisors, to evade their U.S. tax obligations by avoiding restrictions on their securities investments imposed by the Qualified Intermediary agreement UBS entered into with the U.S. Internal Revenue Service in 2001. As has been reported, in connection with this investigation, a senior UBS employee was detained by U.S. authorities as a "material witness[,"] and remains in the U.S. until his status as a witness is resolved. As has also been previously reported, a former UBS . . . client advisor was charged in an indictment unsealed on May 13, 2008 in the Southern District of Florida with conspiring to defraud the United States and the Internal Revenue Service in connection with providing investment and other services to a U.S. person who is alleged to have evaded U.S. income taxes on income earned on assets maintained in, among other places, a former UBS . . . account in Switzerland. The SEC is examining whether Swiss-based UBS client advisors engaged in activities in relation to their U.S.-domiciled clients that triggered an obligation for UBS Switzerland to register with the SEC as a broker-dealer and/or investment adviser.

UBS has been cooperating with these investigations.

(Youngwood Decl. Ex. A (May 23 6-K) at 11.) Lead Plaintiff argues that the May 23 6-K was materially misleading for the "same reasons cited with respect to the [1Q 2008 Report] – the innocuous description in the [May 23 6-K] downplayed the scope of UBS's illicit conduct," particularly in light of the facts "that have now been admitted by UBS in the DPA." (Opp'n to UDs at 16–18.)

### b. Duty to Disclose

As an initial matter, "it is well established that there is no liability in the absence of a duty to disclose, even if the information would have been material." *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009) (citing *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor. For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information.")). As the court explained in *Morgan Stanley Technology Fund*, "[t]here are two accepted methods of determining whether a duty exists to disclose information[:] [f]irst a duty to disclose information may be imposed by statute or by regulation . . .[, and s]econd, a duty to disclose may arise when additional information is needed to make another statement, whether required or voluntarily made, not misleading." 643 F. Supp. 2d at 375 (internal citation omitted).

### i. Duty to Disclose by Statute or Regulation

As to the first method, Lead Plaintiff contends in a single footnote in its opposition brief that UBS had an absolute duty to disclose the omitted information

under "applicable SEC regulations." (Opp'n to UDs at 26–27 n.15.)  The only regulatory provision Lead Plaintiff cites, however, is Item 503(c) of Regulation S-K, which requires a "discussion of the *most significant factors* that make the offering speculative or risky."  17 C.F.R. § 229.503(c) (emphasis added).  In support of its argument, Lead Plaintiff points to *In re WorldCom, Inc. Securities Litigation*, in which the court found that the defendants were required to disclose, pursuant to Item 503(c), factors such as WorldCom's "ability to sustain its debt load, its reliance on borrowed money to fund its operations, its problems placing its commercial paper, its lack of positive cash-flow, and its underperforming stock."  346 F. Supp. 2d 628, 690–92 (S.D.N.Y. 2004).  According to Lead Plaintiff, the fact that UBS engaged in a "tax evasion scheme" for more than six years is "far more significant than the disclosures at issue in *WorldCom* and, thus, the facts underlying the scheme were required to be disclosed." (Opp'n to UDs at 26–27 n.15.)  However, *WorldCom* is easily distinguished, since in *WorldCom*, there was a "question of fact as to whether [the company] adequately disclosed even to a careful reader the alleged precarious state of [the company's] profit margins in a major component of its business . . . and the impact of that problem on its business as a whole."  346 F. Supp. 2d at 691.  Here, by contrast, UBS *did* disclose that there were active investigations, such that a reader of the May 23 6-K and 1Q 2008 Report would be warned about the potential impact of uncharged illegal conduct on UBS's bottom line.

Moreover, the fact that there was uncharged illegal conduct involving a minor business unit cannot be described as among the "most significant factors" making the 2008 Rights Offering speculative or risky. (*See* UDs' Reply 10–11 (citing Giuffra Decl. Ex. 62 (DPA) at Ex. C (Statement of Facts)

¶ 8 (characterizing the cross-border business as "very small" and noting that it contributed 0.3% of UBS's Wealth Management business's overall net new money in 2007)).)  Even assuming *arguendo* that the uncharged illegal conduct constituted one of the "most significant factors that ma[de] the offering speculative or risky," 17 C.F.R. § 229.503(c), UBS *did* disclose its involvement in multiple legal proceedings and government investigations and indicated that its involvement could expose UBS "to substantial monetary damages and legal defense costs," as well as "injunctive relief, criminal and civil penalties[,] and the potential for regulatory restrictions." (*See* Giuffra Decl. Ex. 60 (UBS 2007 Annual Report) at 22–23 & 65, Ex. 63 at 10, Ex. 65 at S-22.)  Therefore, assuming that UBS had a duty to disclose the uncharged illegal conduct, pursuant to Item 503(c), it adequately met its obligation.

ii. Duties Triggered by Prior Disclosure

Lead Plaintiff also argues that UBS had a duty to disclose "because the omitted information rendered [UBS's] affirmative statements materially misleading."  (Opp'n to UDs at 25.)  According to Lead Plaintiff, once UBS made partial disclosures about the DOJ and SEC investigations, "a duty existed to make a complete disclosure, including disclosing the conduct underlying the investigation, and that UBS itself faced substantial criminal fines and penalties as a result of this conduct." (*Id.* at 27.)  Once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366 (internal quotation marks omitted).  However, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."  *In re Time Warner Inc. Sec. Litig.*, 9

F.3d 259, 267 (2d Cir. 1993); *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 353 (S.D.N.Y. 2008) ("A corporation does not have a duty to disclose information simply because it is material . . . or because it suggests that the corporation or its employees engaged in uncharged illegal conduct." (citation omitted)). Indeed, absent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose "uncharged, unadjudicated wrongdoings or mismanagement," *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), *aff'd without opinion*, 956 F.2d 1161 (2d Cir. 1992), illegal internal policies, *Morgan Stanley Tech. Fund*, 643 F. Supp. 2d at 377, or violations of a company's internal codes of conduct and legal policies, *In re Pfizer Inc. Shareholder Derivative Litig.*, 722 F. Supp. 2d 453, 463–65 (S.D.N.Y. 2010). Courts in this Circuit have therefore "required a connection between the illegal conduct and the [allegedly misleading] statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or bottom line." *FBR*, 544 F. Supp. 2d at 357 (internal quotation marks omitted).

Lead Plaintiff all but acknowledges as much. (*See* Opp'n to UDs at 25 (noting that a defendant "may not be required to disclose all known information" and that "the securities laws may not impose an automatic duty to disclose uncharged criminal conduct").) Nevertheless, Lead Plaintiff argues that UBS was required to disclose additional facts necessary to make other statements not misleading, including statements: "(1) positively describing UBS's business, including its Private Bank; (2) regarding operational, regulatory[,] and reputational risks; and (3) concerning UBS's compliance with legal and ethical standards" (*id.* at 26). However, as explained above and below, UBS did not make positive assurances or guarantees that would necessitate additional disclosures. Rather, in its Registration Statement and in the documents included and incorporated therein, UBS disclosed reputational, operational, and regulatory risks associated with UBS's alleged, uncharged unlawful conduct and made other aspirational statements that constitute non-actionable puffery.[27] Thus, UBS had no further duty to disclose.

Even if the Court were to conclude that UBS had a duty to further disclose as a result of its prior disclosures, Alaska Laborers has still failed to demonstrate that Defendants' alleged misstatements and

---

[27] In opposition to the UBS Defendants' motion to dismiss the claims under Section 10(b), Lead Plaintiff argues that the UBS Defendants had a duty to disclose the DOJ investigation on October 30, 2007, prior to its 1Q 2008 Report on May 6, 2008. (Opp'n to Defs. at 71–72.) In support of its argument, Lead Plaintiff relies principally on one case – *In re Independent Energy Holdings PLC Securities Litigation*, 154 F. Supp. 2d 741 (S.D.N.Y. 2001). However, that case is readily distinguishable from the case at bar. In *Independent Energy Holdings*, the business under investigation accounted for 40% of the company's customer base, 154 F. Supp. 2d at 760, whereas here, the cross border business was "very small" in relation to UBS's global business (Giuffra Ex. 62 (DPA) at Ex. C (Statement of Facts) ¶ 8). *See FBR*, 544 F. Supp. 2d at 357–63 (rejecting Section 10(b) claims based on the duty to disclose alleged activity where the activity "did not involve a significant percentage of [the company's] revenue"). Moreover, to the extent that Lead Plaintiff argues that the disclosures in the 1Q 2008 Report should have been made prior to May 6, 2008, "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito*, 47 F.3d at 53 (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)); *see also Higginbotham.*, 495 F.3d at 761 (noting that corporate managers "are entitled to investigate for a reasonable time, until they have a full story to reveal"). Here, Lead Plaintiff does not adequately explain why UBS was required to make these disclosures earlier.

omissions were material. In evaluating whether the alleged misstatements and omissions were "material" and would be viewed by the reasonable investor as "significantly altering the 'total mix' of information available," *Fuwei Films*, 634 F. Supp. 2d at 439, the Court must first examine whether the existence of "information already in the public domain" obviated any duty to otherwise disclose. *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (explaining that "[t]he total mix of information may include 'information already in the public domain and facts known or reasonably available to shareholders'" (quoting *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993))). The law in this Circuit is clear that a party "can be relieved of a duty to disclose when certain developments affecting a corporation become 'matters of general public knowledge.'" *Fuwei Films*, 634 F. Supp. 2d at 437 (internal quotation marks omitted); *see also Garber*, 347 F. App'x at 668 (holding that information expressed in three newspaper articles and SEC reports was sufficiently "in the public domain" to be immaterial).

Here, the Underwriter Defendants point to a collection of news articles and reports – four of which were included in the Amended Complaint (*see* Am. Compl. ¶¶ 1323, 1326, 1332) – to demonstrate that the alleged misstatements and omissions were on "matters of general public knowledge" as of the 2008 Rights Offering and, thus, not material. *See Fuwei Films*, 634 F. Supp. 2d at 437. For instance, on May 7, 2008, CondeNast's business news magazine, Portfolio.com, reported that "U.S. prosecutors and regulators are investigating whether UBS advisers helped American clients evade U.S. taxes from 2000 to 2007" and identified employee Martin Liechti as an employee who had been detained to "put

pressure on UBS and its employees to reveal its business practices." (Youngwood Decl. Ex. B (internal quotation marks omitted); Am. Compl. ¶ 1323; *see also* Youngwood Decl. Ex. C (Bloomberg News article reporting that the DOJ and SEC were investigating whether UBS "helped clients evade American taxes").) The Underwriter Defendants also refer to a May 14, 2008 article in *The New York Times* disclosing many of the details relating to the unsealing of the indictment against UBS employee Bradley Birkenfeld and his activities in allegedly enabling UBS to "avoid its obligations to disclose certain income information to the I.R.S. . . . while also evading certain American tax requirements." (Youngwood Decl. Ex. D; Am. Compl. ¶ 1326.) Furthermore, on May 27, 2008, the day that the "exercise and trading of rights pursuant to the Rights Offering commenced," the *Financial Times* reported that UBS had advised "members of its former private banking team responsible for rich US clients not to travel to America" and "made lawyers available to the more than 50 bankers involved," many of whom had already left the company. (Youngwood Decl. Ex. E; Am. Compl. ¶ 1332.) In addition to the these articles and reports mentioned in the Amended Complaint, the Underwriter Defendants also point to a series of articles in national publications such as the *Wall Street Journal*, *Business Week*, and *The New York Times* discussing the potential legal and reputational harms associated with the DOJ and SEC investigations into UBS's Swiss-based cross-border services business. (Youngwood Decl. Exs. F–J.)[28]

---

[28] Although Lead Plaintiff asserts that the Court should disregard these additional documents because they exist "outside of the four corners of the allegations supporting the Securities Act claims" (Opp'n to UDs at 14 n.9), the Court may take judicial notice of the publication of such articles without

Lead Plaintiff does not dispute that the articles were part of the "total mix" of information available to investors prior to the 2008 Rights Offering; rather, it argues that the articles "essentially parrot the incomplete disclosures made by UBS on May 6 and 23, 2008" and fail to "reveal the full extent of the at-least-six-year tax scheme, involving as many as 52,000 UBS clients and upwards of 50 UBS bankers." (Opp'n to UDs at 18; *see* Tr. 73:5–15.) However, although it might be true that the articles did not reveal the "full extent" of the alleged tax scheme, there is no requirement that they reveal everything for the Underwriter Defendants to be relieved of any duty to disclose that they might have. Indeed, because the articles collectively revealed the existence of the DOJ and SEC investigations into UBS's alleged involvement in a tax evasion scheme and the risk that the danger to UBS would grow considerably, there was not "a *substantial* likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having *significantly* altered the "total mix" of information made available." *Basic*, 485 U.S. at 231–32 (emphasis added).[29]

Indeed, the only cases Lead Plaintiff cites regarding the "total mix" of information are, as the Underwriter Defendants rightly note, factually inapposite. (UDs' Reply 5 n.5.) For instance, in *Fuwei*, this Court held that seven newspaper articles did not constitute "matters of general public knowledge" attributable to investors because only three of the articles were published before the offering in question and even those were published in Chinese-language newspapers lacking a wide distribution. *Fuwei Films*, 634 F. Supp. 2d at 438 (internal quotation marks omitted). Likewise, in *Kronfeld v. Trans World Airlines, Inc.*, allegedly public documents did not absolve the issuer from a failure to make corrective disclosures where the events that were allegedly actionable, but omitted, *post-dated* the public documents in question. 832 F.2d 726, 736 (2d Cir. 1987). Lastly, in *RMED International, Inc. v. Sloan's Supermarkets, Inc.*, the Court found that newspaper articles cited by the defendants did not alter the materiality of the alleged misstatements and omissions because the articles appeared in only one publication not widely circulated among the investing public and disclosed the investigation of only a defendant's operating company, as opposed to that of the defendant itself. 185 F. Supp. 2d 389, 402 (S.D.N.Y. 2002).

Here, the articles and reports that the Underwriter Defendants cite appeared in widely circulated publications such as the *Wall Street Journal* and *The New York*

---

transforming the Underwriter Defendants' motion into a motion for summary judgment. *See In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243 (WHP), 2006 WL 3026024, at *21 & n.10, *22 (S.D.N.Y. Oct. 25, 2006) (taking judicial notice of "[newspaper] articles on a motion to dismiss without transforming it into a motion for summary judgment" and dismissing remaining claims against defendants on the basis of such information); *In re Merrill Lynch Tyco Research Sec. Litig.*, No. 03 Civ. 4080 (MP), 2004 WL 305809, at *4 n.3 (S.D.N.Y. Feb. 18, 2004) ("The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment."); *cf. Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

[29] At oral argument, counsel for the Lead Plaintiff argued that because UBS disclosed that the SEC and

DOJ were investigating conduct allegedly occurring in 2000 to 2007, UBS gave the materially false impression that the conduct in question was not ongoing throughout 2008. (Tr. 65:8–66:11.) However, nowhere in the May 23 6-K did UBS either deny the alleged misconduct or indicate that the misconduct was indeed *isolated* to particular years or personnel.

*Times* and addressed the risk not only to UBS's business units but also to UBS's financial health and reputation as a whole. In light of these existing disclosures in the public domain, the Court finds that the alleged misstatements and omissions related to the tax fraud were not "material" and would not be viewed by the reasonable investor as "significantly altering the 'total mix' of information available." *See Fuwei Films*, 634 F. Supp. 2d at 439 (internal quotation marks omitted).

### c. Non-Actionable Puffery

The Underwriter Defendants also seek to dismiss allegations regarding a series of generalized statements within the Registration Statement and documents included and incorporated therein that discussed UBS's general corporate outlook and business goals. For example, Plaintiffs refer to statements in which UBS represented that it "aim[ed] to deliver valuable advice, products[,] and services to our clients while creating high quality, sustainable earnings streams," and that it provided investors with "tailored, unbiased advice and investment services." (Am. Compl. ¶ 1437 (quoting Giuffra Decl. Ex. 65 (Prospectus Supplemental) at S-1).) Plaintiffs also cite to a series of quotations from the UBS's 2007 Annual Report concerning "the Company's adherence to ethical and legal standards." (*Id.* ¶ 922.) Among these quotations are the following:

- "UBS *aims to comply with all applicable provisions* and to work closely and maintain good relations with regulators in all jurisdictions where the firm conducts business." (Giuffra Decl. Ex. 60 (UBS 2007 Annual Report) § 3 at 44 (emphasis added).)

- "UBS's vision and values state that the firm is a member of the global community and should behave as a responsible corporate citizen. The firm and its employees should *conduct themselves in a manner that is above reproach*, as preserving UBS's integrity is vital to its most valuable asset – its reputation. The firm has a code of business and ethics, which sets forth the policies and practices UBS expects its employees to follow. The code outlines the required standards of fairness, honesty[,] and integrity in a general manner. It is the basis for all UBS policies." (*Id.*, § 1 at 84 (emphasis added).)

- "As a leading financial services firm, one of UBS's main purposes is to create long-term value. UBS believes this can be best achieved by providing clients with value-added products and services and by promoting a corporate culture that adheres to *high ethical standards*. The firm also firmly believes that, for any business, long-term value creation is also dependent on *what it does above and beyond what laws and regulations require*. It is why UBS dedicates itself to creating a working environment based on the values of equal opportunity, diversity and meritocracy." (*Id.* § 1 at 72 (emphasis added).)

- "[UBS] strives to maintain an appropriate balance between risk and return while establishing and controlling UBS's corporate governance processes, including

*compliance with relevant regulations.*" (*Id.* § 1 at 147 (emphasis added).)

(*See* Am. Compl. ¶ 922; *see also id.* ¶ 773 (quoting similar statements in UBS's 2006 Annual Report); *id.* ¶ 676 (quoting similar statements in UBS's 2005 Annual Report).) For the reasons that follow, the Court agrees with the Underwriter Defendants that these statements, and others like them, are non-actionable under either Section 11 or 12(a)(2).

"It is well accepted that 'expressions of puffery and corporate optimism do not give rise to securities violations.'" *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) (quoting *Rombach*, 355 F.3d at 174 (citation omitted)). "The Second Circuit recognizes that '[u]p to a point, companies must be permitted to operate with a hopeful outlook,' and that as a result, executives 'are not required to take a gloomy, fearful[,] or defeatist view of the future.'" *Id.* (quoting *Rombach*, 355 F.3d at 174 (internal quotations and citations omitted)). Thus, statements that are "too general to cause a reasonable investor to rely upon them," including "mere[] generalizations regarding . . . business practices" are no more than non-actionable "puffery." *JP Morgan*, 553 F.3d at 205–06 (holding that alleged statements regarding the company's "highly disciplined" risk management and "standard-setting reputation for integrity" are "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable" (internal quotation marks omitted)); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005) ("[G]eneralizations regarding integrity, fiscal discipline[,] and risk management [] amount to no more than puffery."). However, "optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted . . . or that the opinions imply certainty." *Lapin*, 506 F. Supp. 2d at 239; *see also Novak*, 216 F.3d at 315 ("While statements containing simple economic projections, expressions of optimism, and other puffery are insufficient, defendants may be liable for misrepresentations of existing facts." (internal citation omitted)); *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("Statements regarding projections of future performance may be actionable . . . if they are worded as guarantees or are supported by specific statements of fact, . . . or if the speaker does not genuinely or reasonably believe them [at the time they were made]." (citations omitted)).

Lead Plaintiff argues in opposition that the UBS Defendants' representations regarding UBS's commitment to compliance with legal and ethical standards are actionable because UBS put its compliance at issue. (Opp'n to UDs at 23–24; *see* Opp'n to Defs. at 69.) In support of its argument, Lead Plaintiff relies on two cases that predate *JP Morgan*, 553 F.3d at 205–06, in which the Second Circuit refined the puffery standard: (1) *Lapin*, 506 F. Supp. 2d at 239–40; and (2) *Ballan v. Wilfred American Educational Corp.*, 720 F. Supp. 241, 245–46 (E.D.N.Y. 1989). The statements at issue here are readily distinguishable from the statements in both of those pre-*JP Morgan* cases.

In *Lapin*, the defendant "attempted to distinguish itself from other institutions based on its 'truly independent investment research[,]' while it allegedly knew the contrary was true." 506 F. Supp. 2d at 240. It is in this context – in which the defendant made affirmative representations regarding "one of its core competencies" and supposed competitive advantages – that the court

found that a reasonable investor would have relied on the defendant's statements regarding complying fully with the law. *Id.* 239–41 (internal quotation marks omitted). As the court in *Lapin* explained, "if [a company] puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success." *Lapin*, 506 F. Supp. 2d at 240 (internal quotation marks omitted). However, where a party does *not* put the topic of the cause of its financial success at issue, there is generally no duty to "speculate about the risk of future investigation or litigation." *Id.* (internal quotation marks omitted).

Here, there is no indication that UBS asserted that its financial success was attributable to its adherence to laws or to a particular advantage it had over its peer institutions. Rather, its statements can be described, at most, as puffery. *See DeBlasio*, 2009 WL 2242605, at *23 (dismissing alleged misstatements as mere "puffery" and explaining that an investment bank's assertion of "'high standards of integrity and credit-risk management'" are misstatements that "'[n]o investor would take . . . seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements'" (quoting *JP Morgan*, 553 F.3d at 206)). Although UBS did represent that its "employees should conduct themselves in a manner that is above reproach" to preserve UBS's integrity and reputation (Giuffra Decl. Ex. 60 (UBS 2007 Annual Report) ch. 1 at 84), such a statement, like the others UBS made, cannot be said to be attributing the cause of UBS's financial success to its simple compliance with the law.

*Ballan* too is readily distinguishable. There, the defendants told investors that the "[c]ompany's policy . . . has always been to comply with all applicable laws and regulations. To further ensure that federal and state funding is used in a responsible way, *we added additional elaborate compliance and control steps which we believe are the best procedures in the industry*." 720 F. Supp. at 245–26 (internal quotation marks omitted; emphasis added). Once again, the defendants' statements in *Ballan* were qualitative assurances and affirmative guarantees regarding the company's compliance with applicable laws and controls that, like the statements in *Lapin*, were ways to indicate a competitive advantage over its peer firms. Here, by contrast, UBS made no such assurances or guarantees regarding the success of its divisions or affirmative statements regarding specific steps it had taken to achieve particular results. *See FBR*, 544 F. Supp. 2d at 359–60 (distinguishing *Ballan* on the basis that the *FBR* defendants were "not alleged to have provided any qualitative assurances that [their] compliance program was 'properly' managed or employed the 'best' procedures in the industry" and noting that the *FBR* defendants were "alleged to have made no guarantees or to have bolstered their predictions of continued prosperity with specific statements that were false or misleading"). In any event, the court in *Ballan* did not and, in fact, *could not* apply the Second Circuit's refined puffery standard, as set forth in *JP Morgan*, because the refined standard would not exist for nearly twenty years. *See JP Morgan*, 553 F.3d at 205–06.

Lead Plaintiff also argues that UBS's representations in connection with the 2008 Rights Offering are actionable because "UBS knew that it was violating U.S. tax law, the federal securities laws[,] and SEC regulations, and UBS's supposed ethical practices, as admitted in the DPA." (Opp'n to UDs at 24.) However, as noted above, whereas statements of existing fact are not puffery, simple economic projections and

expressions of optimism are. Here, each of the alleged misstatements quoted above is clearly in the latter category. (*See, e.g.*, Am. Complaint ¶¶ 676, 773, 922, 1437, 1444–45) (including phrases such as "UBS aims to," "UBS's vision and values state," "[t]he firm and its employees should," "UBS believes," and "UBS strives").)[30]   As such, the statements are non-actionable puffery and do not constitute material misstatements within the context of either the Exchange Act or the Securities Act.[31]

* * *

Because Alaska Laborers has failed to demonstrate that there are any actionable misstatements in connection with the alleged tax fraud scheme, it has failed to state a claim against any of the Defendants named in the Securities Act causes of action. Accordingly, the Court dismisses Alaska Laborers' claims under the Securities Act.[32]

IV. CONCLUSION

For the reasons discussed above, the Court finds that Plaintiffs have failed to plead scienter under the Exchange Act as to the mortgage-related securities and ARS frauds and materiality as to the alleged tax fraud.   The Court also finds that Alaska Laborers has not demonstrated statutory standing under Section 12(a)(2) of the Securities Act and has failed to sufficiently allege materiality in connection with the 2008 Rights Offering.   Accordingly, the Court grants both the UBS Defendants' and the Underwriter Defendants' motions to dismiss the Amended Complaint with prejudice.   The Clerk of the Court is respectfully directed to terminate the motions located at Doc. Nos. 169 and 172 and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

---

[30] Lead Plaintiff cites to *Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010), for the proposition that alleged misstatements cannot constitute puffery when the statements were false when made. (Opp'n to Defs. at 69.) However, the defendants in *Freudenberg* had stated that the company was "ideally positioned to capitalize on . . . growth trends." *Freudenberg*, 712 F. Supp. at 191 (internal quotation marks omitted) (citing cases in support in which defendants made positive assurances that, for instance, they "'would continue to experience rapidly rising sales and profits on its core products and new product offerings'" and were "'positioned . . . for dramatic revenue'").   By contrast, here, none of the statements reflect affirmative statements or guarantees as to UBS's performance.

[31] As noted above, the UBS Defendants also argue that a series of generalized statements about the manner in which UBS endeavored to run its overall Wealth Management and Wealth Management U.S. businesses are non-actionable puffery. (*See* Defs.' Mem. in Supp. at 64–65; *id.* App. C (listing the statements at issue).) The Court agrees and finds that each of these statements is non-actionable puffery under Section 10(b) for the same reasons that it finds the statements identified by the Underwriter Defendants to be non-actionable puffery under Sections 11 and 12(a)(2). Accordingly, the Court finds non-actionable, *inter alia*, statements by Defendant Costas (Am. Compl. ¶ 830), Defendant Stuerzinger (*id.* ¶¶ 833–84); and Defendants Martin and Singh (*id.* ¶¶ 378–80, 790–93.)

[32] Because Alaska Laborers has not stated a claim for a primary violation of the Securities Act, the Court also dismisses its derivative "control person" claims under Sections 15. *See JP Morgan*, 553 F.3d at 206–07 (dismissing plaintiff's Section 15 claim for want of a primary violation); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person . . . .").

40

Dated: September 28, 2012
      New York, New York

* * *

Plaintiffs are represented by Gregory M. Castaldo, Andrew L. Zivitz, Sharan Nirmul, Naumon A. Amjed, Jennifer L. Joost, and Richard A. Russo, Jr. of Topaz Kessler Meltzer & Check, LLP, 280 King of Prussia Rd., Radnor, PA 19087; Jay W. Eisenhofer, Geoffrey C. Jarvis, Brenda F. Szydlo, and Charles T. Caliendo, of Grant & Eisenhofer P.A., 485 Lexington Avenue, 29th Floor, New York, NY 10017; Joseph F. Rice, William H. Narwold, Gregg S. Levin, James M. Hughes, and Badge Humphries of Motley Rice LLC, 28 Bridgeside Blvd., Mt. Pleasant, SC 29464; and Samuel H. Rudman and Robert M. Rothman of Robbins Geller Rudman & Dowd LLP, 58 South Service Road, Suite 200, Melville, NY 11747.

The UBS Defendants are represented by Robert J. Giuffra, Jr., Suhana S. Han, and Matthew A. Schwartz of Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004.

The Underwriter Defendants are represented by Barry Robert Ostrager and Jonathan K. Youngwood of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017.